FILED: SEPTEMBER 12, 2008

08CV5214

JUDGE ZAGEL

MAGISTRATE JUDGE COLE

MHN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

_____
:
**STANDARD IRON WORKS,**                      :
**on behalf of itself and all others**        :          **CIVIL ACTION NO.**
**similarly situated,**                        :
         **Plaintiff,**           :
:
     **v.**                            :
:
**ARCELORMITTAL;**                             :
**ARCELORMITTAL USA, INC.;**                   :
**UNITED STATES STEEL CORPORATION;**           :          **CLASS ACTION COMPLAINT**
**NUCOR CORPORATION;**                         :
**GERDAU AMERISTEEL CORPORATION;**             :          **JURY TRIAL DEMANDED**
**STEEL DYNAMICS, INC.;**                      :
**AK STEEL HOLDING CORPORATION;**              :
**SSAB SWEDISH STEEL CORPORATION;**            :
**COMMERCIAL METALS, INC.,**                   :
:
        **Defendants.**          :
_____:

## COMPLAINT

Plaintiff Standard Iron Works, individually and on behalf of a Class of all those similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a trial by jury.

## NATURE OF THE ACTION

1.      This suit is brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf of a plaintiff class, defined more fully below in Paragraph 20, consisting of all persons and entities who purchased steel products directly from Defendants between January 1, 2005 and the present (the "Class Period").

2.     The gravamen of this action is that Defendants conspired to fix, raise, maintain and stabilize the price at which steel products were sold in the United States during the Class Period.  The mechanics of Defendants' conspiracy included a scheme designed to, and which had the effect of, artificially restricting the supply of steel products in the United States, thereby allowing Defendants to charge supra-competitive prices to the plaintiff class.

3.     Throughout the Class Period, and as detailed below, Defendants met with each other to discuss the need to impose industry production "discipline" and to "adjust their production rates so the price of steel doesn't drop."  These and other calls to arms and pledges by and between Defendants were followed with action:  massive, coordinated and unprecedented market downtime, *i.e.*, idling and/or reducing production of steel products.  By acting in concert pursuant to their conspiracy, Defendants removed substantial amounts of steel products from the market, which caused prices artificially to rise.

4.     The impact on the plaintiff class has been and continues to be substantial.  As a result of "being squeezed by the steel mills' market domination and shortening of supply," direct purchasers of steel paid substantially more for steel products during the conspiracy period than they would have paid in a competitive market.

## JURISDICTION AND VENUE

5.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.     Venue is appropriate in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## PARTIES

8.     Plaintiff Standard Iron Works is a Pennsylvania corporation with its principal place of business in Scranton, Pennsylvania.  During the Class Period, Standard Iron Works purchased steel products directly from one or more of the Defendants.

9.     Defendant ArcelorMittal ("Mittal" or "Mittal Steel") is a Luxembourg corporation with its principal place of business at 19 Avenue de la Liberte, L-2930, Luxembourg, Grand Duchy of Luxembourg.  Defendant ArcelorMittal, formerly known as Mittal Steel Company N.V. and/or as Ispat International N.V., has extensive operations in the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, ArcelorMittal and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

10.     Defendant ArcelorMittal USA, Inc. ("Mittal" or "Mittal Steel") is the principal United States operating subsidiary of ArcelorMittal.  ArcelorMittal USA, Inc. is a wholly-owned subsidiary of ArcelorMittal with its principal place of business at 1 South Dearborn, Chicago, IL 60603.  ArcelorMittal USA is the successor of the following relevant entities:  International Steel Group, Inc.; Mittal Steel USA ISG, Inc.; Ispat Inland; and Mittal Steel USA, Inc.  During the

3

Class Period, ArcelorMittal USA and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

11.     Defendant United States Steel Corporation ("U.S. Steel") is a Delaware corporation with its principal place of business at 600 Grant Street, Pittsburgh, Pennsylvania 15219.  During the Class Period, U.S. Steel and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

12.     Defendant Nucor Corporation ("Nucor") is a Delaware corporation with its principal place of business at 1915 Rexford Road, Charlotte, North Carolina 28211.  During the Class Period, Nucor and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates (including Nucor-Yamato Steel Company, an affiliate owned and controlled by Nucor) sold steel products directly to purchasers in the United States.

13.     Defendant Gerdau Ameristeel Corporation ("Gerdau Ameristeel") is a Canadian corporation with its principal place of business at 4221 West Boy Scout Boulevard, Suite 600, Tampa, Florida 33607.  During the Class Period, Gerdau Ameristeel and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

14.     Defendant Steel Dynamics, Inc. ("Steel Dynamics") is an Indiana corporation with its principal place of business at 6714 Pointe Inverness Way, Suite 200, Fort Wayne, Indiana 46804.  During the Class Period, Steel Dynamics and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

15.     Defendant AK Steel Holding Corporation ("AK Steel") is a Delaware corporation with its principal place of business at 9227 Centre Point Drive, West Chester, Ohio 45069.

4

During the Class Period, AK Steel and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

16. Defendant SSAB Swedish Steel Corporation ("SSAB") is a Swedish corporation headquartered in Stockholm, Sweden, with its principal North American place of business at 650 Warrenville Road, Suite 500, Lisle, Illinois 60532. SSAB is the successor of IPSCO, Inc. ("IPSCO"). During the Class Period, SSAB and IPSCO and/or their predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

17. Defendant Commercial Metals Company ("Commercial Metals") is a Delaware corporation with its principal place of business at 6565 MacArthur Boulevard, Irving, Texas 75039. During the Class Period, Commercial Metals and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products directly to purchasers in the United States.

## CO-CONSPIRATORS

18. Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

19. In this Complaint, whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on behalf of itself and as a class action under the

provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

all members of the following Class:

> All persons (excluding Defendants, their present and former
> parents, subsidiaries, affiliates and Co-Conspirators and
> government entities) who purchased steel products directly from
> any of the Defendants or their subsidiaries or affiliates for delivery
> in the United States or for pickup at any United States facility at
> any time from at least as early as January 2005 until the Present.

21.     For purposes of this Complaint, steel products include all products derived from

raw steel and sold by Defendants, including, but not limited to, steel sheet and coil products;

galvanized sheet and other galvanized and/or coated steel products; tin mill products; steel slabs

and plates; steel beams, blooms, rails, and other structural shapes; steel billets, bars, and rods;

steel pipe and other tubular products; and all other products derived from raw steel and sold by

Defendants.

22.     Due to the nature of the trade and commerce involved, Plaintiff believes that there

are thousands of Class members as above described, the exact number and their identities being

known to Defendants and their Co-Conspirators.

23.     The Class is so numerous and geographically dispersed that joinder of all

members is impracticable.

24.     There are questions of law and fact common to the Class, including:

    a.  Whether Defendants and their Co-Conspirators engaged in a combination and

        conspiracy among themselves to fix, raise, maintain or stabilize prices of steel

        products sold in the United States;

b. The identity of the participants of the conspiracy;

c. The duration of the conspiracy alleged herein and the acts performed by Defendants and their Co-Conspirators in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

e. Whether the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

f. The effect of Defendants' conspiracy on the prices of steel products sold in the United States during the Class Period; and

g. The appropriate class-wide measure of damages.

25. Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a direct purchaser of steel products and its interests are aligned with, and not antagonistic to, those of the other members of the Class.

26. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

27. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

28.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

30.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

31.     During the time period covered by this Complaint, Defendants manufactured, sold and/or distributed steel products throughout the United States.

32.     During the Class Period, Defendants and their Co-Conspirators manufactured, sold and shipped substantial quantities of steel products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced steel products.

33.     The conspiracy in which the Defendants and their Co-Conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## BACKGROUND FACTS

34.     Steel is one of the largest commodity markets in the United States, comprising approximately 105 million tons of annual domestic raw steel production and at least $80 billion in annual domestic sales by United States producers.

35.     The core product in the steel industry is "raw steel," a commodity good that is the primary input for a variety of steel products manufactured and sold by the Defendants, including, *inter alia*, flat steel sheets and coils; galvanized steel products; tin mill products; steel plates; steel beams, rails and other structural shapes; steel bars and rods; steel wire and wire rod; steel pipes and other tubular products; and a variety of other products derived from raw steel.

36.     These and other steel products are used by, *inter alia*, direct purchasers in the auto manufacturing industry; the equipment, shipbuilding, railcar and appliance manufacturing industries; the container manufacturing industry; the construction industry; the oil and gas industry; and the steel fabrication industry.

37.     The price of steel products sold in the United States is impacted directly by the production, supply, and price of raw steel.

38.     In the United States, raw steel is manufactured primarily by two methods of production:  (1) the basic oxygen furnace and (2) the electric arc furnace.

39.     Basic oxygen furnaces are operated by so-called "integrated" steel producers.  In broad terms, integrated steel production entails combining iron ore, limestone, and coke (a fuel derived from coal) in a large "blast furnace," which produces molten iron.  Iron produced in this manner is then transferred to a basic oxygen furnace, where it is combined with other elements and purified with oxygen to create usable raw steel.

40.     Defendant ArcelorMittal is the largest integrated steel producer in the United States, controlling approximately 20-25% of total domestic raw steel capacity during the conspiracy period.

41.     Defendant U.S. Steel is the second largest integrated steel producer in the United States, controlling approximately 16% of total domestic raw steel capacity.

42.     The alternative method of raw steel production, the electric arc furnace, functions principally by recycling scrap. Electric arc production—also known as "minimill" production—entails melting steel scrap and other inputs in an electric arc furnace and reconstituting the materials into usable raw steel.

43.     Defendant Nucor is the largest electric arc ("minimill") producer in the United States, controlling approximately 21% of total domestic raw steel capacity.

44.     Other major United States steel producers include Defendants Gerdau Ameristeel, AK Steel, Steel Dynamics, IPSCO, and Commercial Metals, which control approximately 10%, 5%, 4%, 2.5%, and 2% of total domestic raw steel capacity, respectively.

45.     Collectively, Defendants control approximately 80-85% of domestic raw steel capacity.

46.     Steel production was sufficiently concentrated in the relevant United States market such that collusion among Defendants was feasible throughout the conspiracy period.

47.     Steel production is capital intensive and is characterized by costly and lengthy new entry, including new mill construction and startup costs that typically exceed $1 billion. In addition, steel production is subject to federal environmental laws and regulations, and is insulated from foreign competition by, *inter alia*, significant transportation costs (including

ocean freight rates) and trade barriers (including import duties). Accordingly, there are high barriers to entry in the relevant United States market.

48.     Indeed, U.S. Steel admitted during the conspiracy period that the United States represents a distinct geographic market for steel products due to "freight" and other import costs.

## VIOLATIONS ALLEGED

49.     Beginning at least as early as 2005 until the present, the exact dates being unknown to Plaintiff, Defendants and their Co-Conspirators engaged in a continuing contract, combination or conspiracy with respect to the production and sale of steel products in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

50.     The combination and conspiracy consisted of an agreement among the Defendants and their Co-Conspirators, the substantial terms of which were to restrict output and to fix, raise, stabilize and maintain at artificially high levels the prices they charged for steel products in the United States.

51.     The conspiracy began following a dramatic period of restructuring in the domestic steel industry. Between 2000 and 2004, a series of bankruptcies, mergers, and acquisitions consolidated what previously had been a fragmented market. Defendants Mittal Steel, U.S. Steel and Nucor emerged from this period as the dominant domestic producers, together controlling over 55% of domestic raw steel capacity.

52.     The industry's rapid consolidation coincided with strong demand, prices, and earnings through mid-2004, before pricing began to decline in the latter part of the year.

53.     In early-2005, market leader Mittal Steel USA—the largest domestic producer and a predecessor of Defendant ArcelorMittal USA—recognized the need for improved industry "discipline" to improve prices and profits in the United States market.

54.     In particular, senior Mittal Steel executives believed that the industry should limit its total output in an effort to reduce supply and inflate the price of steel.

55.     On February 11, 2005, Lakshmi Mittal, chairman of Mittal Steel, explained his company's strategy:  "Mr. Mittal said the growing consolidation in the sector, led by his group, had led to a greater focus on profitability, making companies more likely to cut output than prices in any downturn."

56.     Mittal Steel knew that it could not control the price of steel in the United States unilaterally, and knew that price and supply stabilization required coordinated action from other major producers.  To that end, senior Mittal executives conspired with other Defendants to limit the industry's total production and output.

57.     On March 1, 2005, Mittal Steel USA executive Louis Schorsch addressed a steel industry meeting in Chicago and criticized the industry's traditional business model, which "ensured that most producers would cut price before reducing volume."  According to Mr. Schorsch, 2004-2005 was a "watershed" period marking "the resolution of many of these structural issues" because "consolidation has improved the industry structure and should ultimately lead to better conduct and therefore better performance."  Mr. Schorsch continued: "Ultimately, if we are going to see improved conduct and thus improved performance, it will only be because the consolidation we have undergone encourages a change in behavior to match

the industry structure. This means an emphasis on value instead of just cost, a focus on profits rather than tons, and an ability to manage strategically rather than just for the short term."

58. Mr. Schorsch concluded by calling on the industry to "respond to market fluctuations" with "adjustments in operating rates." In response to falling prices, Mr. Schorsch asked other producers to avoid "an inevitable 'race to the bottom,'" and to instead cut production at "marginal facilities."

59. On May 9, 2005, Malay Mukherjee, COO of Mittal Steel, U.S. Steel CEO John Surma, Nucor CEO Dan DiMicco, and Gerdau Ameristeel CEO Phillip Casey met at the Association for Iron and Steel Technology ("AIST") in Charlotte, North Carolina.

60. At that meeting, Mr. Mukherjee explained that "what is needed from the industry is a disciplined approach to bringing on supply and managing capacity." According to Mr. Mukherjee, such production discipline would lead to "more stable price levels and a financially healthier industry overall."

61. One week later, on May 16-17, 2005, steel executives convened in Washington, DC, for an annual meeting of the American Iron and Steel Institute ("AISI"), a trade association whose members include Defendants ArcelorMittal, U.S. Steel, Nucor, AK Steel and Steel Dynamics and whose past Chairmen include Mittal Steel USA CEO Louis Schorsch, U.S. Steel CEO John Surma, Nucor CEO Dan DiMicco, and the former CEO of IPSCO, David Sutherland.

62. Immediately after this series of executive-level contacts and discussions concerning the need to limit industry output, Mittal Steel and U.S. Steel curtailed several domestic blast furnaces in May 2005 for the express purpose of reducing the market supply of steel.

63.     Approximately one month later, on June 20-22, 2005, executives from the major producers convened again in New York for a trade conference known as Steel Success Strategies. According to the CEO of ArcelorMittal, Steel Success Strategies brings together "the most influential stakeholders in the steel industry today . . . . this event [is] a must-attend for anyone involved in the industry."

64.     Attendees at the June 2005 Steel Success Strategies conference included, *inter alia*, Lakshmi Mittal, Chairman and CEO of Mittal Steel; Louis Schorsch, CEO of Mittal Steel USA; Daniel R. DiMicco, Vice Chairman, President and CEO of Nucor; Phillip E. Casey, Chairman and CEO of Gerdau Ameristeel; Keith Busse, President and CEO of Steel Dynamics, Inc.; James L. Wainscott, President and CEO of AK Steel; David Sutherland, President and CEO of IPSCO; and executives and/or senior managers from Defendants U.S. Steel and Commercial Metals.

65.     During the June 2005 Steel Success Strategies conference, "industry leaders discussed at length the changes the industry has gone through in the past 12-18 months—especially the impact of consolidation and its ability to bring newfound discipline to what traditionally has been an unruly market."  Industry executives including Mittal Steel USA CEO Louis Schorsch "made the point that steel's resurgence in demand and profitability during the past 18 months can be sustained—but only if capacity and production are brought under control now."

66.     At the same 2005 Steel Success Strategies conference, Phillip Casey, chairman and CEO of Gerdau Ameristeel Corp., "urged that it's time for the industry to take advantage of the lessons learned from the recent wave of consolidation."  Mr. Casey elaborated:

14

> We have demonstrated the advantages of market discipline, accelerated supply responsiveness, improved asset utilization, an improved network ability to exchange operating knowledge and best operating practices, and an improved capital structure. I think all these will improve the stability of our industry. We can take advantage of the education we have received and learn from it, and will find that fewer players and tighter metallics will be beneficial for the overall industry.

67. At the same 2005 Steel Success Strategies conference, Mittal Steel USA CEO Louis Schorsch cautioned the industry against "growing supply."

68. In addition, Mittal Steel CEO Lakshmi Mittal explained at the conference that: "Today's softening of the market is not due to a sudden drop in demand but due to an inventory overhang situation created in the market." According to Mr. Mittal, "[t]his situation can be better dealt with through consolidation of the industry. Consolidation will lead to *companies adjusting production levels* to ensure that the inventory corrects itself and the state of equilibrium is re-established. Thus if we as an industry can understand this phenomena we will be able to build more sustainability in our operations." (Emphasis added.)

69. In addition to the meetings recounted above, CEOs including Lakshmi Mittal from ArcelorMittal, John Surma from U.S. Steel, and Dan DiMicco from Nucor typically met quarterly during 2004-2005 and beyond as members of the executive committee of the International Iron and Steel Institute ("IISI"), a trade group comprised of President and CEO-level executives from the world's largest steel producers.

70. Defendants discussed capacity and output at these IISI functions, including an executive meeting in 2005 at which Nucor CEO Dan DiMicco cautioned the industry against oversupplying the market.

15

71.     In mid-2005, immediately after this series of high-level discussions and agreements regarding supply, the major domestic steel producers took unprecedented and cooperative action.  For example, Mittal Steel USA—the largest United States producer and predecessor of Defendants ArcelorMittal and ArcelorMittal USA—substantially curtailed production at several of its United States mills in the second quarter of 2005.

72.     As of June 29, 2005—one week after the trade meeting at which Lakshmi Mittal explicitly called on the industry to "adjust[] operating levels"—Mittal Steel USA had closed five of its twelve United States blast furnaces, was operating other mills at reduced rates, and had announced that it would extend its North American production curtailments into the third quarter of 2005.  According to Mittal, its objective in taking downtime was to remove supply from the marketplace.

73.     In July 2005, Mittal Steel USA operated its United States mills at only 55% of available capacity.

74.     According to Lakshmi Mittal, Mittal Steel was the "[f]irst steel company to announce production cutbacks, of one million tons, for third-quarter 2005, maintaining reduced production levels from the second quarter."

75.     The second largest domestic integrated producer, U.S. Steel, cut production simultaneously by reducing its United States operating rate from approximately 90% in the first quarter of 2005 to approximately 75% in the second quarter of 2005.

76.     U.S. Steel closed at least two of its twelve United States blast furnaces in the second quarter of 2005 for the express purpose of reducing the market supply of steel.  In addition, U.S. Steel decreased production at several other facilities.

16

77.     U.S. Steel extended its curtailment through the third quarter of 2005, when it operated its United States mills at only 72% of capacity.  U.S. Steel again stated that it had cut production to limit supply.

78.     In response to the mid-2005 curtailments from Mittal and U.S. Steel, industry experts remarked that "the degree to which integrated producers cut back is really unprecedented."

79.     Nucor, the largest United States minimill producer, followed suit, announcing downtime on June 28, 2005, contemporaneous with downtime announcements from its major competitors and only one week after the Steel Success Strategies trade meeting.  Ultimately, Nucor operated its United States mills at only 79% of capacity in the second quarter of 2005 and only 81% of capacity in the third quarter of 2005.  By comparison, Nucor operated its mills at approximately 96% of capacity in 2004.

80.     Nucor explained that, along with other steel producers, it cut production in mid-2005 "to generate a reasonable profit per ton of steel sold."

81.     Steel Dynamics, Inc., another large minimill producer, participated in the industry's mid-2005 downtime.

82.     In July 2005, Steel Dynamics CEO Keith Busse explained that industry supply discipline had stabilized the price of steel:  "You had supply-side cutbacks with what we did and the blast furnaces that took some production out . . . . Those kinds of things have led to a stronger market."  According to the trade press, "Busse said that discipline by the mills earlier this year helped stabilize prices . . . He said his mill and others could have moved tons at lower numbers,

but chose to reduce production to bring supply and demand more into balance." According to Mr. Busse, producers imposed "a discipline . . . that didn't exist 10 years ago."

83.     Beginning in May 2005, Gerdau Ameristeel locked out workers for six months at a mill in Beaumont, Texas, and also curtailed at least one of its mills for two weeks in July and August 2005.

84.     Gerdau Ameristeel CEO Phillip Casey explained that prices stabilized in mid-2005 due to "better discipline in the market from the producers in terms of adjusting the supply." According to Mr. Casey, the industry's "consolidated producer base react[ed] with more discipline than you would have seen at any time in the past."

85.     On or about June 28, 2005, Defendant Commercial Metals joined its major competitors in announcing market-related downtime at three United States mills.

86.     Summarizing the remarkable mid-2005 period of industry-wide downtime, the trade press reported on July 20, 2005, that "U.S. steel producers appear to be sticking to their pledges to reduce production" in an effort to restrict supply.

87.     An experienced market analyst surveyed the industry's mid-2005 downtime and reported having "never seen such a rapid drop in output . . . clearly this is unprecedented in our 30-year history analyzing this sector."

88.     Similarly, the trade press reported that, "In 2005, many U.S. mills, led to some degree by U.S. Steel, Mittal and Nucor, scaled back production when springtime service center inventory levels were high. The production cutbacks . . . had the effect of stabilizing pricing. In years past, mills often cut prices to move tons when service center inventories reached similar

levels. The mills trumpeted the success of 2005 as evidence of their newfound business strategy and market discipline."

89.     The mid-2005 industry-wide curtailments were against Defendants' individual competitive interest in that, at all relevant times, the prevailing market price of steel was substantially higher than Defendants' marginal cost of production. In other words, at all relevant times, Defendants could have produced and sold steel products at a significant operating profit rather than taking costly market downtime at their mills.

90.     Mill shutdowns are costly because production and revenue are lost while the mill's fixed costs—including facility, labor, maintenance and other overhead costs—remain. In a competitive marketplace, Defendants would have operated their mills at a profit, and competed with each other for market share, rather than incurring these significant downtime costs.

91.     Defendants' coordinated mid-2005 mill shutdowns did not represent a competitive unilateral business strategy because no domestic steel producer enjoyed sufficient market power to control the price of steel unilaterally. To the contrary, as a Mittal Steel executive explained, the participation of other producers was necessary and played an "important" role in reducing supply and stabilizing the market.

92.     In addition, at all relevant times, annual domestic demand for steel far exceeded the United States production capacity of Defendants and other domestic producers. In other words, Defendants' industry-wide shutdowns cannot be explained by lack of demand.

93.     Indeed, at all relevant times during the conspiracy period, there was a structural *shortage* of steel in the United States market. According to data published by the AISI trade association, annual domestic demand for steel significantly exceeded domestic production during

19

every year of the conspiracy period. Defendants' cooperative downtime exacerbated this supply shortage, squeezing the market and inflating the prevailing market price of steel.

94.     As alleged in more detail at Paragraphs 107-14, *infra*, domestic manufacturers and other steel purchasers experienced shortages and volume restrictions resulting from the industry's mid-2005 downtime.

95.     Defendants' strikingly coordinated mid-2005 downtime—implemented on the heels of public and private meetings concerning the need for industry-wide supply "discipline," at a time when no producer could control the price of steel unilaterally, when domestic demand for steel exceeded domestic supply, and when, absent collusion, production and competition would have been more profitable than costly mill shutdowns—is evidence of an agreement among Defendants to drive up prices by artificially reducing the market supply of steel.

96.     By working together to limit production on an industry-wide basis, Defendants were able to restrict the domestic supply of steel and artificially inflate its price.

97.     Defendants' coordinated output restraints had their intended impact on the market price of steel.

98.     After the industry's mid-2005 downtime, the benchmark price of hot rolled steel sheet increased by approximately 25%, *i.e.*, from approximately $440 in July 2005 to approximately $560 in September 2005.

99.     Mittal Steel explained that the industry's mid-2005 production curtailments "led to price stabilisation in August" 2005 and that "Prices are stabilizing . . . . That is why producers are announcing price increases."

100.     In August 2005, the trade press reported on price increases imposed by U.S. Steel, Nucor, Steel Dynamics and others.  According to these reports, "Steel producers cut back production during the first half of the year to bring steel supplies more in line with demand, leading to recent price stabilization[.]"

101.     Similarly, Mittal Steel reported in November 2005 that "cuts in production have enabled a significant price recovery over recent months."

102.     Confirming the direct price impact of the industry's mid-2005 production curtailment, Nucor Executive Vice President Joe Rutkowski explained that "companies decided to curtail production to prop prices up."

103.     As summarized in Mittal's 2005 annual report, "We saw major players in both North America and Europe reducing production to address the challenges presented by the market.  These actions contributed to reducing the inventory overhang, resulting in a price recovery in the latter part of 2005, a trend that has continued into this year."

104.     Similarly, Mittal Steel explained that the industry-wide "cuts in production prove the industry's new focus is shareholder value."

105.     Lakshmi Mittal praised both Mittal's leadership and the industry's collective supply discipline:  "When the market were soft in 2005 Q2 and Q3 [sic], Mittal Steel and Arcelor has been clearly the leader who has cut production and that really shows the resilience of the steel industry, that shows that the industry is becoming much more sustainable than before." According to Mr. Mittal, "we have seen that the industry stood on its feet through the challenges and the industry has recovered . . . . The companies want to produce results to the shareholders, and I think that they will be ready to cut production, if required[.]"

106.    In November 2005, Mr. Mittal praised "the behavior of the steel companies and they seem to be behaving very well with following the production side and trying to maintain the supply demand balance . . . . we have seen the inventory buildup last year and since then the producers have been very cautious and careful in oversupply to the market and we believe that that inventory buildup will not take place in the Americas."

107.    The industry's production "discipline" came at the expense of the domestic manufacturing sector and other direct purchasers of steel, which suffered from supply shortages caused by the Defendants' coordinated downtime.  Contrary to Defendants' assertions in the trade press that "oversupply" somehow justified their downtime—a market condition that, in any event, would not justify forming a cartel—the domestic market in fact was undersupplied during the conspiracy period.

108.    As Steel Dynamics CEO Keith Busse has explained, the United States market is fundamentally "steel short" and "we have to remember we are still undersupplied, not oversupplied over here."

109.    Defendants' coordinated downtime exacerbated that supply shortage.  As a Toyota representative testified in 2006 proceedings before the United States International Trade Commission ("ITC"), "for the first time in my 19 plus years working for Toyota, when we approached [steel] suppliers [in 2005] and told them that . . . we were able to increase some of our volumes . . . we were met with no, we can't support that."  According to the Toyota representative, the steel industry's production restrictions caused a situation in which "two of our suppliers, citing capacity constraints, effectively imposed a maximum volume commitment that is lower than the volume we sought."

22

110.     Similarly, a Chrysler representative testified in October 2006 that, "we at the Chrysler group have had consistent and increasing shortages recently of products for, actually for committed tons.  I get calls every Saturday, that famous Friday night call or Saturday morning call, the plant's running and we don't have our steel here.  It happens throughout the week more frequently than we would like to have to deal with . . . . it started in earnest about a year ago and it's gotten progressively worse."

111.     After the steel industry's initial round of coordinated downtime in mid-2005, a purchasing manager for General Motors reported that the resulting supply "shortages became sufficiently critical around the third quarter of '05 that we had to assemble a crisis center."

112.     Likewise, a brief submitted to the ITC by the Motor and Equipment Manufacturers Association and the Precision Metalforming Association stated that "23 out of 31 purchasers reported problems with supply, including being placed on allocation or controlled order entry, and that such supply shortages have continued into 2006[.]"  The steel purchasers' brief emphasized that "supply problems are ongoing"; that "U.S. steel producers are still unable to supply all of U.S. steel consumers' requirements"; and that "there is a fundamental deficit in the domestic industry's ability to supply U.S. demand."

113.     Other steel customers reported major supply disruptions and being placed on supply "allocation" during the conspiracy period.

114.     These supply shortages were caused and/or exacerbated by the domestic industry's unprecedented and collusive downtime in mid-2005 and other subsequent periods.

115.     After the industry's mid-2005 downtime, prices remained high and the market remained extremely profitable for producers through mid-2006.

116. On February 23, 2006, Mittal Steel CEO Lakshmi Mittal explained that: "The industry has changed immensely . . . there is a new discipline in the industry which means when demand is soft, as happened in the second quarter of 2005, companies cut production to better manage supply/demand."

117. Mr. Mittal congratulated the industry for its discipline in early-2006, stating:

> I first spoke publicly about the need for consolidation in the steel industry in 1998 . . . . The industry had long been associated with cyclicality, volatility and an inability to adjust supply to global demand. The result was some of the lowest valuations of any sector of the stock market. Fast forward eight years and thankfully the dynamics are changing. The benefits of a more global, consolidated market are understood and supported. Considerable consolidation has taken place, most notably in Europe, the U.S. and Japan. A number of multinational companies have been created. The industry is less volume-focused and has built enough scale and scope to be able to curtail production in times of overcapacity or weak demand. We have had a number of consecutive years of impressive profitability.

118. Industry analysts were equally impressed, and praised "the significant supply discipline for an industry that never had any discipline."

119. On May 7-9, 2006, executives including Louis Schorsch, CEO of Mittal Steel USA; John Surma, CEO of U.S. Steel; and Dan DiMicco, CEO of Nucor gathered in Boca Raton, Florida, for the annual meeting of the AISI trade organization, of which Mr. Schorsch served as Chairman.

120. The following month, Lakshmi Mittal, CEO of Mittal, explained that "definitely industry has been watchful and inventory levels are in control, and we believe that industry will remain watchful, and they will be proactive whenever they see that the market is softening[.]"

121.    In August 2006, Mr. Mittal explained that "going forward the industry is getting geared to adjust their production and volume to maintain the prices. They should not be oversupplying the market. Industry has become very conscious and careful on their inventory levels and industry has shown in the last one and a half years that whenever there has been higher inventory levels, the industry has announced production cuts. And so is the policy of ArcelorMittal . . . . and we will continue with this policy because both the company and the industry believes in maintaining the price to return adequate returns to the shareholder."

122.    Mr. Mittal's repeated statements to this effect—praising *industry-wide* supply discipline and predicting future *industry* downtime—are evidence of an understanding and agreement among Defendants.

123.    The pattern would repeat itself in late-2006: When steel prices began to decline, the major United States producers intervened with remarkably coordinated downtime.

124.    Indeed, soon after Mr. Mittal's August 2006 prediction that "the industry is getting geared to adjust their production and volume to maintain the prices," a purchasing manager for General Motors, one of the largest domestic purchasers of steel, stated that a "major, integrated steel producer" had threatened to cut production rather than accept lower prices.

125.    From October 1-3, 2006, senior executives from the world's major steel producers convened in Buenos Aires, Argentina, for the annual conference of the International Iron and Steel Institute ("IISI"). Executive committee members of the IISI included CEO Lakshmi Mittal of ArcelorMittal, CEO John Surma from U.S. Steel and CEO Dan DiMicco from Nucor.

126.    According to accounts from the October 2006 IISI meeting in Buenos Aires, despite the expectation of strong demand in the near-term, the major steel producers explicitly urged production restraint and holding the line on capacity.

127.    On or about October 6, 2006, immediately after that meeting, ArcelorMittal announced the indefinite shutdown of two United States blast furnaces for the purpose of limiting supply.

128.    Contemporaneously, on or about October 4, 2006, U.S. Steel closed a blast furnace in Illinois.

129.    On or about October 9, 2006, U.S. Steel closed another blast furnace at its Gary, Indiana, facility.

130.    Ultimately, U.S. Steel operated its United States mills at only 67% of capacity in the fourth quarter of 2006.

131.    Nucor operated its United States mills at approximately 92% of capacity in the first three quarters of 2006 before cutting production to approximately 81% of capacity in the fourth quarter of 2006.

132.    In discussing the industry's fourth quarter 2006 downtime, Nucor explained that, "Similar to past experience, the more disciplined and profit driven flat-rolled industry is appropriately focused on pacing supply to match consumer demand."

133.    Accordingly, Nucor joined its competitors in taking downtime and publicly discussed its "production discipline during the fourth quarter."  Nucor curtailed steel sheet production by at least 15% in the fourth quarter of 2006, which according to Nucor "provided a more stable pricing environment."

26

134.    Like mid-2005, Steel Dynamics participated by taking mill downtime in the fourth quarter of 2006.  Steel Dynamics reported that "in the fourth quarter, Steel Dynamics, as well as other domestic producers, cut back significantly on production."

135.    Gerdau Ameristeel also cut production at several of its United States mills in the fourth quarter of 2006 for the purpose of reducing supply.

136.    With respect to steel bar and other "long" products, Gerdau Ameristeel cut output by at least 10% in the fourth quarter of 2006 relative to the third quarter of 2006.

137.    With respect to steel sheet and other "flat" products, Gerdau Ameristeel cut production by "considerably more than 10%" in the fourth quarter of 2006 relative to the third quarter of 2006.

138.    Gerdau Ameristeel estimated that it operated its United States mills at only 60% of capacity in the fourth quarter of 2006.

139.    AK Steel participated in the industry's late-2006 downtime, operating "somewhere on average about 8% below our total capacity."  Like its competitors, AK Steel explained that it cut production because "I don't think that really we are interested in getting supply and demand out of balance."

140.    Commercial Metals participated in the late-2006 downtime.  According to Commercial Metals, it operated at only 75-80% of capacity in the fourth quarter of 2006 and did so for the purpose of reducing supply in the marketplace.  Commercial Metals also explained that U.S. mills were "disciplined with their outages" in late-2006.

141.     Defendant IPSCO participated in the late-2006 downtime.  On October 16, 2006, IPSCO announced mill curtailments, "falling in line with other companies that are taking similar action."

142.     An industry analyst concluded that "Supply discipline on the part of the mills is being imposed much more quickly than it was last year . . . The announcement by Mittal to indefinitely idle two blast furnaces represents the final piece of a supply discipline scenario unfolding over the past several weeks, an almost immediate response to higher-than-normal service center inventories . . . The breadth of this discipline is exceptionally encouraging[.]"

143.     On October 18, 2006, a steel industry analyst reported that "U.S. mills have reacted quickly . . . cutting production and moving up maintenance outages to take steel out of the system."

144.     Another industry analyst noted that Mittal had been successful in "encouraging [its United States] peer group to take some downtime in Q4 to clear up the inventory."

145.     Like mid-2005, the industry's late-2006 and early-2007 downtime was against each participating Defendant's competitive self-interest, absent a conspiracy.  At all relevant times during the conspiracy period:  (1) annual domestic demand for steel exceeded available domestic supply and (2) the prevailing market price for steel was substantially higher than Defendants' marginal cost of production.  Accordingly, in a competitive marketplace, Defendants would have operated their mills at a profit, and competed for market share, rather than curtailing production and taking costly market downtime.

146.     United States manufacturers and other direct purchasers suffered steel supply shortages following the industry's late-2006 and early-2007 downtime.  For example, in August

2007, a group of domestic auto parts manufacturers appeared before the ITC to testify on behalf "of the many American hot-rolled steel purchasers that are being squeezed by the steel mills' market domination and shortening of supply . . . all to the benefit of foreign auto parts makers."

147.     Market pricing stabilized after the late-2006 and early-2007 industry downtime. For example, the benchmark price of hot-rolled steel sheet rallied from approximately $510/ton in January 2007 to approximately $580/ton in March 2007.

148.     Nucor CEO Dan DiMicco remarked in early-2007 that the industry had displayed "more profit driven discipline than ever before in my 30 plus years in the industry."

149.     On or about February 21, 2007, ArcelorMittal CEO Lakshmi Mittal stated that when "[w]e had softness in the U.S. market, the industry was able to restrict production to keep prices stable."

150.     In May 2007, ArcelorMittal reported that "most important are the prices and we see that the prices in North America have rebounded nicely in response to our industry's earlier production cut and are currently stable."

151.     At a trade meeting in mid-2007, Mr. Mittal called on fellow producers to "take a moment to enjoy" the industry's turnaround, explaining:  "We have successfully made considerable progress in consolidation.  We have successfully demonstrated the benefits that a more consolidated industry creates.  We have successfully demonstrated our ability to better manage supply and demand."

152.     On May 9, 2007, a group of seven leading steel executives met in Pittsburgh, Pennsylvania, to discuss their industry's "new operating model and the benefits of consolidation."  Participants included Leonard Chuderewicz, Executive Vice President of Mittal

Steel USA; Larry T. Brockway, Vice President and Treasurer of U.S. Steel; Giffin F. Daughtridge, Vice President at Nucor; Mark D. Millet, Executive Vice President of Steel Dynamics; and Joseph D. Russo, Senior Vice President at IPSCO. This group discussed the industry's successful downtime in the fourth quarter of 2006—including Mittal's "decision to shut down three blast furnaces" and U.S. Steel's decision to operate "at 67 percent capacity"— and praised supply restriction as "a new industry operating model" and one of the "main reasons for optimism about the steel industry's future."

153. At another trade meeting in New York in June 2007, ArcelorMittal executive Louis Schorsch addressed competing executives (including the CEOs of Nucor, U.S. Steel and Steel Dynamics) and praised the industry's "disciplined" supply strategy. In yet another explicit call for industry collusion, Mr. Schorsch stated that, "the steel mills have to work to remain sustainable, and they need to adjust their production rates so the price of steel doesn't drop." Other steel leaders attending this meeting agreed that "they all need to work together to keep the prices high."

154. At the same meeting, Nucor CEO Dan DiMicco addressed competing executives and explained that "when steel makers are tempted by the market and therefore fluctuate their prices, the growth in the industry will quickly decline."

155. At the same meeting in June 2007, Steel Dynamics CEO Keith Busse commented that the industry had "entered a new age" characterized by "market discipline."

156. In the wake of these calls to cut production and maintain industry "discipline," Defendants including ArcelorMittal, U.S. Steel, Nucor, Steel Dynamics, AK Steel and Commercial Metals collectively scaled back production, yet again, in mid-2007.

157.    Once again, these industry-wide curtailments were against Defendants' individual competitive interest and artificially inflated the market price of steel.  As an executive from Steel Dynamics explained in October 2007, the industry's "market discipline" in mid-2007—*i.e.*, "mills reducing production"—facilitated another round of price increases later that year.

158.    In addition, an October 2007 statement from Steel Dynamics CEO Keith Busse reflects that producers were coordinating not only on output, but also on price.  Mr. Busse complained that "[t]here are some folks out there who are speaking with a forked tongue . . . They raised the prices and then backed off.  That hurt us in some areas, but we didn't do it.  We held the line."

159.    Defendants' conspiracy remains ongoing through the present.  As steel prices continued their ascent and reached record highs in 2008, Defendants continued to limit production artificially and cooperatively.  Commenting on another round of supply restriction imposed by Defendants in mid-2008, experienced steel market analysts reported that "increased supply discipline" over the summer months allowed Defendants to announce price increases effective in August and September 2008.

160.    A *Business Week* profile of Lakshmi Mittal aptly summarized the state of the market and the cooperative production discipline imposed by Mittal and other major producers: "In the long run Lakshmi's vision is an industry dominated by a handful of powerful companies, strong enough to cut output rather than prices in a downturn."

161.    The conspiracy outlined above was exceptionally profitable for Defendants.

162.    Nucor, for example, reported record operating earnings of approximately $2.1 billion in 2005, followed by $2.2 billion in 2006 and $1.9 billion in 2007.  Nucor's stock value

more than tripled from approximately $25/share at the beginning of 2005 to a high of $83/share in 2008.

163.     U.S. Steel enjoyed its "second highest earnings on record" in 2005, with reported operating income of approximately $1.4 billion, followed by $1.78 billion in 2006, and $1.2 billion in 2007.  U.S. Steel's stock value nearly quadrupled from approximately $50/share at the beginning of 2005 to a high of $196/share in 2008.

164.     Other Defendants enjoyed equally impressive returns, commensurate with their respective market shares.

165.     As Lakshmi Mittal summarized at an industry trade meeting in June 2008, "We have succeeded in transforming ourselves into a profitable and sustainable industry."

166.     The ongoing activities described above have been engaged in by Defendants and their Co-Conspirators for the purpose of effectuating the unlawful arrangements to restrict output and to fix, maintain, raise or stabilize prices of steel products.

167.     Defendants' unlawful cooperation with respect to the production and supply of raw steel allowed Defendants to impose substantial (and often strikingly parallel) price increases and raw material surcharges during the conspiracy period.

168.     In addition, implementation and monitoring of the conspiracy was facilitated by Defendants' public and private dissemination of output, supply and pricing information.

169.     For example, certain Defendants published production and/or capacity utilization information in their quarterly and annual reports, and in press releases.

170.     Similarly, the AISI trade association facilitated implementation and monitoring of the conspiracy by compiling, *inter alia*, detailed output and/or capacity utilization information

32

and by maintaining a members-only website that published, *inter alia*, detailed output and/or capacity utilization information.

171. World Steel Dynamics, a steel consulting firm, likewise published supply, demand, cost and output data that facilitated implementation and monitoring of the conspiracy.

172. In addition, the Metals Service Center Institute ("MSCI") published steel inventory data that facilitated implementation and monitoring of the conspiracy.

173. During the Class Period, Defendants increased the prices for steel products and earned unusual and supracompetitive profits as a result of their anticompetitive conduct.

## ANTITRUST IMPACT AND DAMAGES

174. The unlawful conspiracy has had at least the following effects:

(a) Prices charged by Defendants and their Co-Conspirators to Plaintiff and the members of the Class for steel products were artificially fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

(b) Plaintiff and the other members of the Class had to pay more for steel products than they would have paid in a competitive marketplace, unfettered by Defendants' and their Co-Conspirators' collusive and unlawful activities;

(c) Competition in the sale of steel products was restrained, suppressed and eliminated in the United States; and

(d) As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and

33

financially damaged in their respective businesses and property, in amounts that are presently undetermined.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

D.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That Plaintiff and members of the Class have such other, further or different relief, including appropriate injunctive relief, as the case may require and the Court may deem just and proper under the circumstances.

Dated: September 12, 2008

Respectfully Submitted,

*/s/ Douglas A. Millen*
Michael J. Freed
Steven A. Kanner
William H. London
Douglas A. Millen
**FREED KANNER LONDON**
 **& MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.:      (224) 632-4500
Fax:      (224) 632-4521
Email:  mfreed@fklmlaw.com;
skanner@fklmlaw.com;
wlondon@fklmlaw.com;
dmillen@fklmlaw.com

| | |
|---|---|
| Michael K. Kellogg<br>Mark C. Hansen<br>Aaron M. Panner<br>Julius N. Richardson<br>**KELLOGG, HUBER, HANSEN, TODD,**<br>**EVANS & FIGEL, P.L.L.C.**<br>Sumner Square<br>1615 M Street, NW, Suite 400<br>Washington, DC 20036<br>Tel.: (202) 326-7900<br>Fax: (202) 326-7999 | Allen D. Black<br>Roberta D. Liebenberg<br>Donald L. Perelman<br>Jeffrey S. Istvan<br>Matthew Duncan<br>Adam J. Pessin<br>**FINE, KAPLAN AND BLACK, R.P.C**<br>1835 Market Street, 28th Floor<br>Philadelphia, PA 19103<br>Tel.: (215) 567-6565<br>Fax: (215) 568-5872 |
| Paul J. LaBelle, Esquire<br>116 North Washington Avenue<br>Suite 2-H<br>Scranton, PA 18503<br>Tel.: (570) 504-0880<br>Fax.: (570) 963-8973 | Simon B. Paris<br>Patrick Howard<br>**SALTZ MONGELUZZI BARRETT &**<br>**BENDESKY, P.C.**<br>One Liberty Place, 52nd Floor<br>1650 Market St.<br>Philadelphia, PA 19103<br>Tel.: (215) 496-8282<br>Fax: (215) 496-0999 |

| | |
|---|---|
| Stephen N. Zack<br>**BOIES, SCHILLER & FLEXNER, LLP**<br>100 SE Second Street<br>Suite 2800<br>Miami, FL 33131<br>Tel.: (305) 539-8400<br>Fax.: (305) 539-1307 | Marc M. Seltzer<br>**SUSMAN GODFREY LLP**<br>Suite 950<br>1901 Avenue of the Stars<br>Los Angeles, CA 90067-6029<br>Tel: (310) 789-3100<br>Fax: (310) 789-3150 |
| Howard J. Sedran<br>**LEVIN, FISHBEIN, SEDRAN &**<br>**BERMAN**<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Tel.: (215) 592-1500<br>Fax: (215) 592-4663 | Joseph Goldberg<br>**FREEDMAN, BOYD, HOLLANDER,**<br>**GOLDBERG & IVES, P.A.**<br>20 First Plaza, Suite 700<br>Albuquerque, NM 87102<br>Tel.: 505-842-9960<br>Fax: 505-842-0761 |
| Michael D. Hausfeld<br>Richard A. Koffman<br>Christopher J. Cormier<br>**COHEN, MILSTEIN, HAUSFELD &**<br>**TOLL, P.L.L.C.**<br>1100 New York Avenue, N.W.<br>Suite 500, West Tower<br>Washington, DC 20005<br>Tel: (202) 408-4600<br>Fax: (202) 408-4699 | H. Laddie Montague, Jr.<br>Ruthanne Gordon<br>Martin I. Twersky<br>**BERGER & MONTAGUE, P.C.**<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Tel.: (215) 875-3010<br>Fax: (215) 875-4671 |
| Jeffrey Gittleman<br>**BARRACK, RODOS & BACINE**<br>Two Commerce Square<br>2001 Market Street, Suite 3300<br>Philadelphia, PA 19103<br>Tel: (215) 963-0600<br>Fax: (215) 963-0838 | Robert N. Kaplan<br>Linda P. Nussbaum<br>**KAPLAN FOX & KILSHEIMER, LLP**<br>850 Third Avenue, 22nd Floor<br>New York, NY 10022<br>Tel: (212) 687-1980<br>Fax: (212) 687-7714 |

| | |
|---|---|
| Steven A. Asher<br>Mindee J. Reuben<br>**WEINSTEIN KITCHENOFF & ASHER LLC**<br>1845 Walnut Street, Suite 1100<br>Philadelphia, PA 19103<br>Tel: (215) 545-7200<br>Fax: (215) 545-6535 | Eugene A. Spector<br>Jeffrey J. Corrigan<br>**SPECTOR, ROSEMAN & KODROFF, P.C.**<br>1818 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>Tel: (215) 496-0300<br>Fax: (215) 496-6611 |
| Ira Richards<br>**TRUJILLO RODRIGUEZ & RICHARDS, LLP**<br>1717 Arch Street, Suite 3838<br>Philadelphia, PA 19103<br>Tel: (215) 731-9004<br>Fax: (215) 731-9044 | Daniel Gustafson<br>Jason S. Kilene<br>**GUSTAFSON GLUEK PLLC**<br>650 Northstar East<br>608 Second Ave. South<br>Minneapolis, MN 55402<br>Tel: (612) 333-8844<br>Fax: (612) 339-6622 |
| Anthony Shapiro<br>**HAGENS BERMAN SOBOL SHAPIRO**<br>1301 Fifth Avenue, Suite 2900<br>Seattle, WA, 98101<br>Tel: (206) 623-7292 | Vincent Esades<br>**HEINS MILLS & OLSON, P.L.C.**<br>310 Clifton Avenue<br>Minneapolis, MN 55403<br>Tel: (612) 338-4605 |
| Howard Langer<br>**LANGER, GROGAN & DIVER, P.C.**<br>1717 Arch Street, Suite 4130<br>Philadelphia, PA 19103<br>Tel.: (215) 320-5660 | Michael J. Boni<br>**BONI & ZACK LLC**<br>15 St. Asaphs Rd.<br>Bala Cynwyd, PA 19004<br>Tel: (610) 822-0200 |
| Garrett Blanchfield<br>**REINHARDT, WENDORF & BLANCHFIELD**<br>E-1250 First National Bank Bldg.<br>332 Minnesota St.<br>St. Paul, MN 55101<br>Tel.: (651) 287-2100 | Anthony J. Bolognese<br>**BOLOGNESE & ASSOCIATES, LLC**<br>Two Penn Center<br>1500 JFK Blvd., Suite 320<br>Philadelphia, PA 19102<br>Tel: (215) 814-6750<br>Fax: (215) 814-6764 |

| | |
|---|---|
| Natalie Finkelman Bennett<br>**SHEPHERD, FINKELMAN, MILLER &**<br>**SHAH, LLC**<br>35 E. State Street<br>Media, PA 19063<br>Tel: (610) 891-9880 | Warren Rubin<br>**LAW OFFICES OF BERNARD M. GROSS**<br>Suite 450, John Wanamaker Building<br>100 Penn Square East<br>Philadelphia, PA 19107<br>Tel: (215) 561-3600 |
| Dennis Stewart<br>**HULETT HARPER STEWART, LLP**<br>550 West C Street<br>Suite 1600<br>San Diego, CA 92101<br>Tel.: (619) 338-1133 | Joseph C. Kohn<br>Douglas A. Abrahams<br>**KOHN, SWIFT & GRAF, P.C.**<br>One South Broad Street<br>Suite 2100<br>Philadelphia, PA 19107<br>Tel: (215) 238-1700 |
| R. Anthony Rupp III<br>**RUPP, BAASE, PFALZGRAF,**<br>**CUNNINGHAM & COPPOLA LLC**<br>1600 Liberty Building<br>Buffalo, New York 14202-3502<br>Tel.: (716) 854-3400 | Tom Muzilla<br>**THE MUZILLA LAW FIRM, L.L.C.**<br>Tower at Erieview, Suite 1100<br>1301 East 9th Street<br>Cleveland, OH 44114<br>Tel.: (216) 458-5880 |
| Stewart L. Cohen<br>**COHEN, PLACITELLA & ROTH, P.C.**<br>2001 Market Street, Suite 2900<br>Philadelphia, PA 19103<br>Tel.: (215) 567-3500<br>Fax: (215) 567-6019 | Christopher G. Hayes<br>**LAW OFFICES OF CHRISTOPHER G.**<br>**HAYES**<br>115 East Chestnut Street<br>West Chester, PA 19380<br>Tel: (610) 431-9505 |
| Tim J. Moore<br>**MORRIS, LAING, EVANS, BROCK &**<br>**KENNEDY, CHTD.**<br>Old Town Square<br>300 North Mead – Suite 200<br>Wichita, KS 67202<br>Tel.: (316) 262-2671 | Marc H. Edelson<br>**EDELSON & ASSOCIATES, LLC**<br>45 West Court Street<br>Doylestown, PA 18901<br>Tel.: (215) 230-8043 |

*Attorneys for Plaintiff Standard Iron Works and the Proposed Class*