# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** | Honorable James B. Zagel |
| *Standard Iron Works v. ArcelorMittal, et al.,* **Case No. 08-cv-5214** | |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-5371** | |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* **Case No. 08-cv-5633** | |
| *MPM Display, Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-5700** | |
| *REM Systems, Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-5942** | |
| *Alco Industries, Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-6197** | |

# PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 5

I.    The Steel Industry Was Conducive To Collusion ........................................................ 5

II.   Defendants' Agreement................................................................................................. 9

     A.  Coordinated Production Cuts in 2005 .................................................................. 9

     B.  Coordinated Production Cuts in 2006 ................................................................ 16

     C.  Coordinated Production Cuts in 2007 ................................................................ 20

     D.  The Conspiracy's Success.................................................................................. 24

ARGUMENT ...................................................................................................................... 25

I.    Plaintiffs' Well-Pleaded Allegations Go Well Beyond Those At Issue In
      *Twombly*, And Warrant Discovery ............................................................................. 25

II.   Defendants Urge The Court To Impose An Improper Standard Of Review.............. 27

III.  Plaintiffs Adequately Allege That Defendants Violated Section 1 Of The
      Sherman Act By Agreeing To Coordinated Cuts In The Production
      Of Raw Steel ............................................................................................................... 31

     A.  The Structure of the Steel Industry Makes Collusion Both Feasible
          And Worthwhile.................................................................................................. 32

          1.  Supply Concentration and Demand Diffusion............................................. 32

          2.  High Barriers to Entry................................................................................. 33

          3.  Commodity Product .................................................................................... 34

          4.  High Fixed Costs......................................................................................... 36

B. The Steel Marketplace Behaved in an Uncompetitive Manner ........................... 37

    1. Actions Contrary to Independent Competitive Interest ................................ 37

    2. Production Cuts Not Explained by Demand Conditions ............................. 39

    3. Unprecedented Behavior .............................................................................. 40

    4. Extraordinary Profits ................................................................................... 42

C. Defendants' Statements, Contacts and Facilitating Practices
Provide Strong Support for the Inference that Defendants Conspired .............. 42

    1. Defendants' Calls to Action Are Highly Suggestive of Conspiracy ............ 43

    2. Defendants' Other Statements Support a Plausible Inference
Of Conspiracy .............................................................................................. 47

    3. Coordinated Actions Taken After Meetings Support an
Inference of Conspiracy ............................................................................... 49

    4. Defendants Shared Production Information That Facilitated Collusion ...... 51

IV. The Defendant-Specific Motions Should Be Denied ................................................. 52

A. Gerdau ................................................................................................................. 52

B. AK Steel .............................................................................................................. 55

C. CMC .................................................................................................................... 58

D. SSAB ................................................................................................................... 61

CONCLUSION .............................................................................................................. 64

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page**

*Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*
  525 F.3d 8 (D.C. Cir. 2008)................................................................27

*Babyage.com, Inc. v. Toys R Us, Inc.,* 558 F. Supp. 2d 575 (E.D. Pa. 2008)...................38

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................ passim

*Brown v. Pro Football, Inc.,* 518 U.S. 231 (1996) ..........................................................29

*Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690 (1962).............29

*Empagran S.A. v. Hoffman-LaRoche, Ltd.,* 388 F.3d 337 (D.C. Cir. 2004).....................33

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) ...........25

*Hackman v. Dickerson Realtors, Inc.,* 557 F. Supp. 2d 938 (N.D. Ill. 2008).............27, 30

*Hackman v. Dickerson Realtors, Inc.,* 520  F. Supp. 2d 954 (N.D. Ill. 2007)..................27

*In re Flat Glass Antitrust Litig.,* 385 F.3d 350 (3d Cir. 2004).................................. passim

*In re Graphics Processing Unit Antitrust Litig.,*
  540 F. Supp. 2d 1085 (N.D. Cal. 2007) ........................................................41

*In re Graphics Processing Unit Antitrust Litig.,*
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................41

*In re High Fructose Corn Syrup Antitrust Litig.,*
  295 F.3d 651 (7th Cir. 2002) ............................................................... passim

*In re Linerboard Antitrust Litig.,*
  504 F. Supp. 2d 38 (E.D. Pa. 2007)........................................................ passim

*In re Linerboard Antitrust Litig.,* 305 F.3d 145 (3d Cir. 2002).........................................35

*In re OSB Antitrust Litig.,*
  2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ........................................... passim

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
566 F. Supp. 2d 363 (M.D. Pa. 2008) ............................................................26, 27, 29, 49

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
2008 WL 4831214 (D.D.C. Nov. 7, 2008) .............................................................27, 51

*In re Southeastern Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)................................................................29, 55

*In re SRAM Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008)............................32, 52

*In re Sugar Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978)....................................................35

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2008 WL 3916309 (N.D. Cal. Aug. 25, 2008) ........................................................ passim

*In re Travel Agent Comm'n Antitrust Litig.*,
2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) .............................................................50

*In re Urethane [Polyether Polyols] Antitrust Litig.*,
251 F.R.D. 629 (D. Kan 2008)......................................................................................35

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.* 190 F.3d 775 (7th Cir. 1999)..............42, 54

*Limestone Dev. Corp. v. Village of Lemont,* 520 F.3d 797 (7th Cir. 2008) ........................27

*Milk Producers Ass'n, Inc. v. United States,* 362 U.S. 458 (1960)...................................51

*Poller v. Columbia Broadcasting Sys. Inc.*, 368 U.S. 464 (1962) ....................................46

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008)................................................27, 28

*United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979) ........................................................43

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)........................................29

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* (2d ed. 2003)....................................................30, 45

Richard A. Posner, *Antitrust Law* (2d ed. 2001)................................................................46

Direct Purchaser Plaintiffs Standard Iron Works; Wilmington Steel Processing Co., Inc.; Capow, Inc.; MPM Display, Inc.; REM Systems, Inc.; and Alco Industries, Inc. (together "Plaintiffs") respectfully submit this memorandum in opposition to the Motion to Dismiss filed on January 2, 2009 by Defendants ArcelorMittal and ArcelorMittal USA, Inc. (together "ArcelorMittal" or "Mittal Steel"); United States Steel Corp. ("U.S. Steel"); Nucor Corp.; Gerdau Ameristeel Corp. ("Gerdau"); Steel Dynamics, Inc.; AK Steel Holding Corp. ("AK Steel"); SSAB Swedish Steel Corp. ("SSAB" or its predecessor, "IPSCO"); and Commercial Metals Company ("CMC").  For the reasons set forth below, Defendants' motion should be denied.

## INTRODUCTION[1]

In 2005, the U.S. steel industry was at a crossroads.  Several years of restructuring had consolidated and strengthened the industry and introduced a new market leader, ArcelorMittal. But the record high steel prices of 2004 were beginning to recede.  Would steel producers stay true to their history and compete, or would they take a different path?

ArcelorMittal made it known that it preferred a new approach.  Its CEO, Lakshmi Mittal, proclaimed in February 2005 that the key to continuing the industry's record profits was to "cut output [rather] than prices."  But ArcelorMittal could not do that alone.  As its CFO explained, competitors would have to play an "important" role.  Other defendants agreed, having told the International Trade Commission that "attempts by any single U.S. producer to maintain prices by cutting production are unlikely to be successful."

Accordingly, ArcelorMittal executives began a campaign to deliver Mr. Mittal's message to competitors.  At a March 2005 trade conference, the CEO of Mittal Steel USA urged the

---

[1] Citations for all quotes in this introduction are included in the body of plaintiffs' brief, *infra*.

industry to "make adjustments in operating rates" to halt "an inevitable race to the bottom." At a May 2005 conference, Mittal Steel's COO encouraged competing executives to take "a disciplined approach to bringing on supply and managing capacity." At another meeting a week later, Steel Dynamics' CEO voiced optimism that the industry could control production and "no longer has to deal with the desperate acts of dying men," *i.e.*, price competition.

In June, the message was the same as steel executives met again. Again Mr. Mittal communicated his vision, calling for the industry to reduce "price volatility" through "companies adjusting production levels." Another Mittal Steel executive cautioned against "growing supply." Other CEOs participated in discussions about the industry's "newfound discipline" and the need for "capacity and production to be brought under control now."

By July 2005, every single defendant, representing 85% of the market, cut output. The cuts were massive and unprecedented. ArcelorMittal reduced production to 55% of capacity. U.S. Steel operated at 75% of capacity (down from 90% the previous quarter). Nucor operated at 80% of capacity (down from 96% in 2004) to help "prop prices up." And despite profitable market pricing, the opportunity to build market share, and the longstanding industry strategy of maximizing utilization and output, all of the other defendants cut production too.

Defendants' coordinated action had its desired effects: a supply shortage and higher prices. AK Steel reported that prices "skyrocketed" after the 2005 industry cutbacks. The price of steel sheet increased by 25%, and similarly "extraordinary" results were reported in the long sector. Mr. Mittal was pleased with his competitors for "behaving very well with following the production side and trying to maintain the supply demand balance," and he boasted that the "new discipline in the industry" would continue. Steel Dynamics CEO congratulated competitors for each giving their "pint of blood"—sacrificing individual sales for the good of the group.

2006 saw more meetings among defendants' executives, more statements from Mr. Mittal urging inventory "control" and "maintaining the price," and even a knowing prediction (after more high-level meetings) that despite "strong" demand, "going forward the industry is getting geared to adjust their production and volume to maintain the prices." Mr. Mittal's prediction, of course, came true. In October 2006, immediately after another conference attended by Mr. Mittal and other steel CEOs in Buenos Aires, defendants embarked on another round of massive production cuts. Led by ArcelorMittal and U.S. Steel (which cut production to 67% of capacity), every defendant cut production in tandem. Again prices soared.

By 2007, even defendants' largest customers were complaining of supply shortages. Major automakers briefed the ITC on "the steel mills' market domination and shortening of supply," noting that defendants' behavior was affecting their "ability . . . to obtain the steel required for their operations." Undeterred, steel executives met several times in the spring of 2007, culminating in a mid-June conference in New York at which an ArcelorMittal senior executive again called on his competitors "to adjust their production rates so the price of steel doesn't drop." Nucor's CEO echoed the warning that "whenever the steel makers are tempted by the market and therefore fluctuate their prices, the growth in the industry will quickly decline." Within weeks, defendants curtailed production in tandem, and again prices rose.

Defendants have enjoyed huge profits from their conspiracy. Nucor reported record earnings in 2005, even higher earnings in 2006, and its stock price more than tripled. U.S. Steel reported its "second highest earnings on record" in 2005, even higher earnings in 2006, and its stock price nearly quadrupled. Mr. Mittal himself took home $1.89 billion in 2007 alone.

Defendants cannot seriously dispute these facts, many of which are based on their own statements. The complaint makes clear, moreover, that the market was characterized by

3

economic factors that courts, antitrust experts and economists agree make an industry conducive to collusion:  high concentration on the supply side (85% controlled by defendants) and diffusion on the demand side, high barriers to entry (huge costs to build mills, and high transportation costs and tariffs on imports), a commodity good (raw steel, which is the primary input for all downstream steel products), high fixed costs, and a natural shortage of capacity in the domestic market that made a supply cartel particularly likely to succeed in inflating price.

Defendants argue, in spite of all of this, that plaintiffs' conspiracy allegations are "implausible" and lack the "factual heft" described in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  According to defendants, it is implausible to believe that the unprecedented downtime, supply shortages, high prices and record profits had anything to do with their frequent meetings and calls to industry action.  They say it is implausible to believe that their strikingly parallel conduct, coming on the heels of meetings at which senior executives urged that very conduct, resulted from agreement.  They say that their decisions to cut production—all eight defendants, multiple times—when maintaining it would have been in their individual competitive interest, were the remarkable result of individual deliberation.  And they say that their industry's turnaround from fierce competition to striking coordination was the inevitable result of industry consolidation.  (But they do not explain why, if production cuts were inevitable, they devoted such effort to encouraging and assuring each other they would happen.)

These may be defendants' arguments at trial.  But they are unavailing on a motion to dismiss.  *Twombly* did not alter the time-honored rules that the Court must read the complaint as a whole, "accept as true all well-pleaded facts alleged, and draw all possible inferences in [plaintiffs'] favor."  And *Twombly* made clear that allegations of parallel conduct, "placed in a context that raises a suggestion of a preceding agreement," are sufficient for a case to proceed to

discovery. Here there is more than enough direct communication, conduct, suggestive context, and "factual heft" in the complaint. Discovery surely will reveal more, but for now plaintiffs' allegations easily cross the line "between the factually neutral and the factually suggestive."

## STATEMENT OF FACTS

### I.     The Steel Industry Was Conducive To Collusion

Raw steel is a commodity good that is the primary input for a variety of steel products manufactured and sold by defendants in the United States. Compl. ¶ 35.[2] All defendants manufacture raw steel, which they convert into steel products for sale to direct purchasers in a variety of industries. *Id.* ¶ 36. The prices of defendants' steel products are impacted directly by the production, supply, and price of raw steel. *Id.* ¶ 37.

Defendant ArcelorMittal is the largest integrated steel producer in the United States, controlling approximately 20-25% of total domestic raw steel capacity during the conspiracy period. *Id.* ¶ 40. Defendant U.S. Steel is the second largest integrated steel producer in the United States, controlling approximately 16% of total domestic raw steel capacity. *Id.* ¶ 41. Defendant Nucor is the largest minimill producer in the United States, controlling approximately 21% of total domestic raw steel capacity. *Id.* ¶ 43. Defendants Gerdau, AK Steel, Steel Dynamics, IPSCO, and CMC control approximately 10%, 5%, 4%, 2.5%, and 2% of total domestic raw steel capacity, respectively. *Id.* ¶ 44. In total, defendants control approximately 85% of steel production in the United States.

---

[2] For ease of reference, citations are made to the complaint in the *Standard Iron* action, which is the first filed case of these related actions. The same facts are alleged by each plaintiff in its complaint.

With respect to "flat" and "long" product groups—a distinction drawn by defendants—the market is similarly concentrated.*[3]   ArcelorMittal, U.S. Steel and Nucor are the leading flat-rolled producers in the United States, controlling over 70% of this segment.*  AK Steel, Steel Dynamics and IPSCO are likewise major flat producers, controlling much of the remaining domestic market.*  Production of long products—such as bars, structural steel and rails—is dominated by Nucor, Gerdau, CMC, and Steel Dynamics, which together control approximately 80% of this market segment.*  ArcelorMittal is another significant long producer.*

While the market is concentrated in the hands of relatively few producers, no single U.S. producer has the power to control supply and price unilaterally. *Id.* ¶ 56.  As Nucor and Steel Dynamics have explained in proceedings before the International Trade Commission ("ITC"): "attempts by any single U.S. producer to maintain prices by cutting production are unlikely to be successful." *In re Certain Carbon Steel Products*, Prehearing Brief of Nucor and Steel Dynamics, 10/6/06, at 54.*  Similarly, ArcelorMittal's CFO, Aditya Mittal, acknowledged during the conspiracy period that only *collective* industry action could impact the market.  When asked by an industry analyst whether ArcelorMittal was large enough to render competing steel producers "irrelevant" to ArcelorMittal's efforts to control supply, Mr. Mittal responded unequivocally: "I think we are very clear that they are not irrelevant . . . they play an important role." *Id.* ¶ 91; Def. Ex. 91.

In fact, unilateral attempts to manipulate the supply of steel posed substantial risks. Idling or slowing steel production is costly because revenue and market share are lost to

---

[3] At the November 21, 2008 status conference, the Court directed that, rather than filing an amended complaint, plaintiffs should simply incorporate additional and/or responsive allegations into this opposition. Hearing Transcript, at 19-20. For ease of reference, all new allegations included herein will be identified with an asterisk (*), and will be accompanied with a citation where appropriate.

competitors while fixed costs—including facility, labor, maintenance and overhead—remain. *Id.* ¶ 90, 95. Defendants themselves have emphasized this point before the ITC, explaining that the industry's cost structure encourages competitive producers to maximize utilization and output. *See, e.g., In re Certain Carbon Steel Products*, Prehearing Brief of U.S. Steel, 10/6/06, at 8-9 (steel production "entails high fixed costs," which create "an incentive to maximize and sustain the utilization of available capacity"); Prehearing Brief of Nucor and Steel Dynamics, 10/6/06, at 54 (unilateral production cuts lead to "reduced volumes" and "a significant negative effect on industry profitability").*

A steel producer's incentive to maximize production is particularly strong in a market—like the domestic steel market during the conspiracy period—where prevailing prices are substantially higher than the industry's marginal cost of production. *Id.* ¶ 89. Cutting output in that situation entails substantial lost operating profit for every lost ton of production, which is something competitive producers are unlikely to accept. *Id.*

Competitive steel producers are equally unlikely to curtail production in a market—like the U.S. market during the conspiracy period—where demand exceeds supply. According to estimates from Goldman Sachs, for example, annual U.S. demand for steel was approximately 125-130 million tons between 2005 and 2007,* while domestic raw steel production totaled approximately 105 million tons per year. *Id.* ¶¶ 34, 92-93. In other words, annual U.S. demand far outstripped domestic supply. Compl. ¶ 92. This capacity shortfall rendered the U.S. market naturally "tight"—and thus ripe for supply manipulation. *See also id.* ¶ 108 (Steel Dynamics' CEO: the United States is fundamentally "steel short" and "we have to remember we are still undersupplied, not oversupplied over here"); Remarks by President of American Iron and Steel

Institute, MSCI conference, 2/17/05 ("North American steel capacity will be insufficient to meet steel demand for the foreseeable future.").*

The U.S. market is further characterized by significant barriers to entry. Creation of new domestic capacity is lengthy and difficult due to high capital requirements, regulatory barriers, and start-up costs, while import competition is limited by transportation costs (including ocean freight rates), trade duties, currency exchange rates and other trade restraints. *Id.* ¶¶ 47-48. These barriers prevent new entrants, including foreign producers, from effectively constraining the collective market power of defendants. *Id.*

Tariffs and trade duties, in particular, are an important barrier. Trade duties impose substantial costs on imported steel, including major product categories such as flat-rolled steel, coated steel sheet, cut-to-length plate, rebar, and others.* Defendants are fully aware of these trade restraints, having devoted substantial legal and lobbying effort to erecting them.* Indeed, defendants have appeared before the ITC repeatedly in recent years to argue that existing import barriers are essential to the domestic industry's pricing power and profitability.* *See, e.g., In re Hot Rolled Steel Products*, Prehearing Brief of AK Steel, 7/23/07, at 15 (explaining that imposition of trade duties in the years since 2000 "has been a significant factor in the ability of the domestic hot-rolled steel industry to maintain prices"). Trade barriers, then, effectively insulate domestic producers from import competition, allowing defendants to raise prices in the U.S. market. Compl. ¶ 47; *see also* Gerdau Analyst Call, 2/13/08 ("The weaker dollar, high transportation rates and existing trade orders should continue to discourage imports.").*

Transportation barriers are significant as well. As Gerdau's CEO has explained, "steel doesn't travel all that well, especially with ocean freight rates up." Gerdau Analyst Call, 2/8/06.* Accordingly, "[y]our primary market in steel making tends to be your domestic

market." *Id.*; *see also* Compl. ¶ 47-48 (U.S. Steel statement that United States represents a distinct geographic market due to freight and other import costs).

For all of these reasons—concentrated production, high barriers to entry, limited import competition, a commodity product, and a structural shortage of domestic supply—market conditions were ripe for the conspiracy alleged.

## II.    Defendants' Agreement

On at least three occasions during the class period—mid-2005, late-2006, and mid-2007—each defendant implemented coordinated production cuts for the express purpose of raising the price of steel products. *Id.* ¶¶ 73-85; 127-141; 156.[4] Absent a collusive agreement, these production cuts were against the individual competitive interests of each participating defendant. *Id.* ¶¶ 95, 145, 157.

### A.    Coordinated Production Cuts in 2005

Between 2000 and 2003, the domestic steel industry underwent a dramatic period of restructuring, marked by a series of bankruptcies, mergers, and acquisitions. *Id.* ¶ 51. Defendants ArcelorMittal (through its predecessor, Mittal Steel), U.S. Steel and Nucor emerged from this era of consolidation as the dominant producers, controlling more than half of raw steel capacity in the United States. *Id.*

On the heels of the industry's rapid consolidation, the business cycle turned for the better, resulting in strong earnings for defendants in 2004. *Id.* ¶ 52. By early-2005, however, the market was retreating from these record highs, prompting Mittal Steel—the largest domestic producer—to conclude that only improved industry "discipline" could stabilize pricing. *Id.* ¶ 53.

---

[4] Since filing the complaint, plaintiffs have learned that every defendant participated in every major round of downtime.*  The complaint alleged that most, but not all, participated in each round.

As Lakshmi Mittal proclaimed publicly in February 2005, the secret to the industry's continued success was for producers to "cut output [rather] than prices in any downturn." *Id.* ¶ 55.

The logic of this strategy was simple: rather than competing on the basis of price, the industry should instead exercise "discipline" in the production of raw steel. By restricting industry output, producers could squeeze the market and inflate their margins. As Mittal Steel's COO, Malay Mukherjee, explained in 2005, the goal was to "squeeze the cycle a little bit and cut your production . . . Control supply." "Recasting Global Steel," *Business World*, 8/4/05.*

In early-2005, Mittal Steel was in a position to encourage this strategy in the U.S. market, having recently announced the acquisition of International Steel Group ("ISG"), which placed Lakshmi Mittal in control of the largest domestic steel company.* Consistent with Mr. Mittal's vision of a more "disciplined" industry, Mittal Steel executives appeared at a series of 2005 trade meetings and delivered their message directly to competing executives.

On March 1, 2005, Mittal Steel executive Lou Schorsch presented a speech at a trade meeting in Chicago. Addressing a group that included U.S. Steel* and the CEO of Gerdau,* Mr. Schorsch criticized the industry's traditional business model in which "producers would cut price before reducing volume." *Id.* ¶ 57. Instead, Mr. Schorsch urged the industry to make "adjustments in operating rates" to halt "an inevitable race to the bottom," *i.e.*, declining prices. *Id.* ¶ 58. This call to action was repeated on May 9, 2005, by Mr. Mukherjee, Mittal Steel's COO, who explained at a meeting of the Association for Iron and Steel Technology ("AIST") that "what is needed from the industry is a disciplined approach to bringing on supply and managing capacity." *Id.* ¶¶ 59-60. Mr. Mukherjee was joined at this event by the CEOs from U.S. Steel (John Surma), Nucor (Dan DiMicco), Steel Dynamics* (Keith Busse), Gerdau (Philip Casey), and CMC* (Clyde Selig). *Id.* ¶ 59.

One week later, Mr. Schorsch (Mittal Steel), Mr. Surma (U.S. Steel), Mr. DiMicco

(Nucor), Mr. Busse (Steel Dynamics), and Mr. Casey (Gerdau) were joined by David Sutherland,

the CEO of IPSCO, and Gretchen Haggerty, the CFO of U.S. Steel, at the annual meetings of the

American Iron and Steel Institute ("AISI") and the Steel Manufacturers Association ("SMA"),

two prominent trade associations that met jointly at the Ritz Carlton in Washington, D.C.  *Id.*

¶ 61.*[5]  Mr. Busse voiced optimism that the industry could eliminate price volatility by

controlling production; the consolidation of capacity meant, in Mr. Busse's words, that "[t]he

industry no longer has to deal with the desperate acts of dying men."  "Steel Strong—For Now,

Experts Say," *Northwest Indiana Times*, 5/19/05.*  This marked (at a minimum) the third time in

three months that executives met and spoke about the need to control the supply of steel.

Immediately after this series of executive-level communications concerning the need to

restrict industry output, ArcelorMittal and U.S. Steel curtailed several domestic blast furnaces in

May 2005 for the express purpose of reducing the market supply of steel.  *Id.* ¶ 62.  Tellingly,

U.S. Steel did so despite its CEO's projection only a few weeks earlier that steel inventories were

balanced and that, "Looking forward, key economic data suggests that North American demand

for [U.S. Steel products] will remain favorable."  Analyst Call, 4/26/05.*

Approximately one month later, on June 20-22, 2005, executives from each defendant

convened in New York City for a trade conference known as Steel Success Strategies.  *Id.* ¶ 63.

According to the CEO of ArcelorMittal, Steel Success Strategies brings together "the most

influential stakeholders in the steel industry today . . . . this event [is] a must-attend for anyone

involved in the industry."  *Id.*  Attendees included, among others, the following CEOs:  Lakshmi

---

[5] Plaintiffs have learned that these specific executives attended the meeting.*  Though plaintiffs
have yet to document their attendance, executives from AK Steel and CMC were active members and/or
officers of AISI and SMA, respectively.*

Mittal, Mr. Schorsch (Mittal Steel), Mr. DiMicco (Nucor), Mr. Casey (Gerdau), Mr. Busse (Steel

Dynamics), Mr. Sutherland (IPSCO) and James L. Wainscott (AK Steel). *Id.* ¶ 64. Executives

and/or senior managers from U.S. Steel and CMC attended as well. *Id.*

Mr. Mittal's industry-wide production strategy was a central topic at the June event.

Addressing the entire conference, Mr. Mittal revisited his plan for keeping prices high:

restriction of supply. *Id.* ¶ 68; Def. Ex. 68. Mr. Mittal spoke in terms of collective action,

referring not to the behavior of his own company but to that of the entire industry: "The major

trend that will help address cyclicality is not management of the underlying demand, but

*management of the industry's supply chain*." *Id.* (emphasis added). Mr. Mittal continued,

"Consolidation will lead to *companies adjusting production levels* to ensure that the inventory

corrects itself and the state of equilibrium is reestablished. Thus if *we as an industry* can

understand this phenomena we will be able to build more sustainability in our operations." *Id.*

(emphasis added).

Mr. Mittal was not the only CEO at this conference talking about squeezing the supply of

steel. *Id.* ¶ 65. Mr. Busse, Mr. Sutherland and Mr. Wainscott participated in a panel discussion

addressing "Steel in the Americas: What New Behavior Patterns?" during which they "discussed

at length the changes the industry has gone through in the past 12-18 months—especially the

impact of consolidation and its ability to bring newfound discipline to what traditionally has been

an unruly market." *Id.* ¶ 65; Def. Ex. 65. Mr. Casey and Mr. Schorsch were panelists in a

discussion of "Tighter Metallics," during which they "made the point that steel's resurgence in

demand and profitability during the past 18 months can be sustained—but only if capacity and

production are brought under control now." *Id.* Mr. Schorsch cautioned producers against

"growing supply," while Mr. Casey urged the industry to "take advantage" of consolidation,

touted the "advantages of market discipline," and explained that "fewer players and tighter metallics will be beneficial for the overall industry." *Id.* ¶¶ 66-67.

In sum, the series of face-to-face trade meeting communications among CEOs in 2005— many of which occurred contemporaneously with trade association board and committee meetings and social contacts among those same executives—were explicit: they all confirmed that the industry needed collectively to control the supply of steel to keep prices high.

By July 2005, every defendant had accepted Mr. Mittal's invitation to limit the output of steel. *Id.* ¶¶ 71-77, 79, 81, 83, 85. The production cuts were massive and unprecedented. *Id.* ¶ 78. Mittal Steel idled five of its twelve blast furnaces and slowed production at others, operating at a mere 55% of available capacity during July. *Id.* ¶¶ 72-73. U.S. Steel simultaneously idled at least two of its twelve mills and operated at 75% or less of available capacity in the second and third quarters of 2005, as compared to 90% during the first quarter of 2005. *Id.* ¶¶ 75-77. Nucor joined the downtime, announcing production cuts on June 28, 2005, overlapping with its major competitors. *Id.* ¶ 79. Nucor operated at only 79% of capacity in the second quarter and 81% of capacity in the third quarter of 2005, compared to approximately 96% utilization in 2004. *Id.* Steel Dynamics, Gerdau, CMC, AK Steel and IPSCO also curtailed production in mid-2005. *Id.* ¶¶ 81, 83, 85.[6] The industry's "discipline," moreover, related to both "flat" and "long" product groups. Compl. ¶¶ 71-85 (alleging mid-2005 downtime from leading "flat" and "long" producers); *see also* Gerdau Analyst Call, 8/3/05 (praising "better discipline" from long producers "in terms of adjusting the supply").*

---

[6] Since filing the complaint, plaintiffs have learned that, after attending the trade meetings, AK Steel and IPSCO participated in the 2005 production cuts. AK Steel, for example, rearranged its maintenance schedule to impose outages at two mills in July 2005.* IPSCO likewise "brought forward" maintenance plans to impose downtime at two mills in the third quarter of 2005. Analyst Call, 7/27/05.*

Defendants imposed these unprecedented curtailments notwithstanding market pricing substantially higher than their marginal cost of production. Compl. ¶ 89. In other words, defendants could have produced and sold steel at a significant operating profit rather than taking costly market downtime. *Id.*

The following chart summarizes the relevant 2005 meetings and production cuts:

| SUMMARY OF 2005 MEETINGS AND PRODUCTION CUTS[7] | | | | |
|---|---|---|---|---|
| | AIST Meeting May 9, 2005 Charlotte, NC | AISI/SMA Meeting May 16-17, 2005 Washington, DC | Steel Success Strategies June 20-22, 2005 New York, NY | Production Cuts May – July, 2005 |
| ArcelorMittal | ✓ | ✓ | ✓ | ✓ |
| U.S. Steel | ✓ | ✓ | ✓ | ✓ |
| Nucor | ✓ | ✓ | ✓ | ✓ |
| AK Steel | | | ✓ | ✓ |
| Steel Dynamics | ✓ | ✓ | ✓ | ✓ |
| Gerdau | ✓ | ✓ | ✓ | ✓ |
| IPSCO | | ✓ | ✓ | ✓ |
| CMC | ✓ | | ✓ | ✓ |

Defendants have admitted that the reason for their production cuts was to remove supply to keep prices high, exactly as devised by Mr. Mittal and as contemplated in their trade meeting discussions in the preceding months. *Id.* ¶¶ 72, 76, 80, 82, 84, 96, 99, 101, 103. The trade press reported on July 20, 2005, that "U.S. steel producers appear to be sticking to their pledges to

---

[7] That plaintiffs have not yet confirmed attendance by all defendants at each trade meeting listed does not mean that those defendants were not there. Nor does this table purport to capture all of the relevant trade meetings or inter-defendant contacts. For example, Mr. Surma, Mr. Mittal, Mr. DiMicco and Jorge Gerdau Johanpeter (President of Grupo Gerdau, parent of Gerdau) typically met quarterly as members of the Executive Committee of the International Iron and Steel Institute. *See* Compl. ¶¶ 69-70. Defendants are known to have discussed industry output at these meetings. *Id.* Defendant executives also convened regularly at board and committee meetings for the AISI trade association, events typically held 3-4 times per year.* In addition, defendants' executives routinely gathered at resort locations for meetings sponsored by the MSCI trade association, including a meeting held in Hawaii just prior to the industry's initial round of cutbacks; this conference took place from May 1-4, 2005, and was attended by Mr. Surma (CEO U.S. Steel), Mr. Busse (CEO Steel Dynamics), Mr. Sutherland (CEO IPSCO), Michael Rippey (Mittal Steel executive), and representatives from Nucor and Gerdau.*

reduce production." *Id.* ¶ 86.  Mr. Busse of Steel Dynamics "said his mill and others could have moved tons at lower numbers, but chose to reduce production to bring supply and demand more into balance." *Id.* ¶ 82.  Nucor's CFO expressed a similar sentiment, suggesting that Nucor could have sold more steel, but instead cut production to "generate a reasonable profit per ton of steel." *Id.* ¶ 80.  Nucor Executive Vice President Joe Rutkowski confirmed that "companies decided to curtail production to prop prices up." *Id.* ¶ 102.[8]

Steel industry consultant Michelle Applebaum explained that when steel prices declined in early-2005, "the industry in effect acted in concert to cut output and stiffen prices."  "Blazing Success:  How Prospects for the Steel Industry are Being Reignited," *Financial Times*, 3/3/06.*[9]

Although numerous customers were unhappy with the resulting shortage of steel, *see* Compl. ¶¶ 107-114, defendants' coordinated production cuts had their intended impact on the market. *Id.* ¶ 97.  After the 2005 curtailment, the price of hot rolled steel sheet (a benchmark flat-rolled product) increased by approximately 25%, from approximately $440 in July 2005 to approximately $560 in September 2005. *Id.* ¶ 98.  AK Steel noted that prices "skyrocketed" after the 2005 cutbacks.  Analyst Call, 7/24/07.*  ArcelorMittal repeatedly touted the success of the industry's strategy, emphasizing the price inflation caused by the production cuts. *Id.* ¶¶ 99, 101, 103.  Similarly, CMC reported "extraordinary" results in the long sector in the final quarter of 2005, which it attributed to strong pricing in the U.S. market.  Analyst Call, 12/21/2005; *see also*

---

[8] Mr. Rutkowski also attended the June 2005 Steel Success Strategies conference.*

[9] Notably, Ms. Applebaum met personally (and privately) with several defendant executives in the weeks immediately preceding the mid-2005 cutbacks.*  According to her calendar, Ms. Applebaum had private meetings with the following executives during the May 17-18, 2005, AISI conference:  Mr. Schorsch (Mittal Steel), Mr. DiMicco (Nucor), Ms. Haggerty (U.S. Steel CFO), Mr. Busse (Steel Dynamics), Mr. Casey (Gerdau), and Mr. Sutherland (IPSCO).*  Ms. Applebaum also had private meetings on June 21-22, 2005 with Mr. Casey, Mr. Busse, and Stanley Rabin, CEO of CMC.*

Gerdau Analyst Call, 8/3/05 (praising "better discipline" from long producers "in terms of adjusting the supply" in mid-2005).*

Steel Dynamics CEO Keith Busse summarized the industry's unprecedented collective action: "I've been around the industry for 20 years.  And I haven't seen this kind of discipline.  And it's to be applauded . . . historically there wasn't any discipline . . . . I think everybody is, to some degree, giving that pint of blood.  And there has been a better discipline.  It's affected all of us.  And that's a real positive."  Analyst Call, 7/19/05.*

In November 2005, Mr. Mittal applauded "the behavior of the steel companies . . . [for] behaving very well with following the production side and trying to maintain the supply demand balance[.]"  *Id.* ¶ 106.  He expressed optimism that the industry would continue its efforts to keep prices high, explaining that "producers have been very cautious and careful in oversupply to the market and we believe that that inventory buildup will not take place in the Americas."  *Id.*  Industry analysts praised "the significant supply discipline for an industry that never had any discipline."  *Id.* ¶ 118.  On February 23, 2006, Mr. Mittal explained that: "The industry has changed immensely . . . there is a new discipline in the industry which means when demand is soft, as happened in the second quarter of 2005, companies cut production to better manage supply/demand."  *Id.* ¶ 116.

## B.    Coordinated Production Cuts in 2006

After the mid-2005 cutbacks, supply remained tight, prices remained high, and the market remained extremely profitable for producers through 2006.  *Id.* ¶ 115.  Defendants nonetheless continued to meet and discuss the need for ongoing "discipline."

On May 1-3, 2006, executives from Mittal Steel, U.S. Steel, Nucor, AK Steel and Steel Dynamics met in Cleveland for the annual AIST trade conference, where they discussed the industry's newfound production restraint and its success in 2005.*[10]

On May 7-9, 2006, the AISI, SMA and the Metal Service Center Institute ("MSCI") jointly held their annual meetings in Boca Raton, Florida.  *Id.* ¶ 119.  Executives in attendance included Mr. Schorsch (CEO Mittal Steel USA), Mr. Surma (CEO U.S. Steel), Mr. DiMicco (CEO Nucor), Mr. Busse (CEO Steel Dynamics)* and Mr. Sutherland (CEO IPSCO)*, as well as executives or managers from Gerdau* and CMC*.  *Id.*  On June 19-21, 2006, executives from each defendant also attended the annual Steel Success Strategies conference in New York, including Lakshmi Mittal, Mr. DiMicco, Mr. Busse, Mr. Wainscott (AK Steel CEO), Mario Longhi (Gerdau CEO) and Mr. Johanpeter (Grupo Gerdau).*

Days after the industry gathering in New York, Mr. Mittal voiced his expectation that defendants, acting together, would be able to maintain high prices.  He explained, "definitely industry has been watchful and inventory levels are in control, and we believe that industry will remain watchful, and they will be proactive whenever they see that the market is softening[.]"  *Id.* ¶ 120.  At the same time, Mr. Mittal noted that "for 2006 . . . the environment is very positive.  The demand is strong."  Analyst Call, 6/26/06.*  Despite this bullish outlook, a little over a month later Mr. Mittal announced that he was expecting a *future* round of *industry-wide* production cuts.  Compl. ¶ 122.  Again referencing collective action, he announced that "going forward *the industry* is getting geared to adjust their production and volume to maintain the prices."  *Id.* ¶ 121 (emphasis added).  He further explained that the industry was being careful

---

[10] Attendees included John Goodish (COO, U.S. Steel); John Kaloski (Senior VP, Operations, AK Steel); Malay Mukherjee (COO, ArcelorMittal); John Rutkowski (Executive VP, Nucor); Mark Millet (VP and General Manager, Steel Dynamics); and H. Avery Hilton (Executive VP, CMC).*

about not "oversupplying the market" and reiterated his commitment to this strategy:  "And so is

the policy of ArcelorMittal . . . we will continue with this policy because both the company and

the industry believes in maintaining the price to return adequate returns to the shareholder." *Id.*

Mr. Mittal's intention to communicate this message to competitors is further reflected in

an article published by *The Economist* in 2006, which reported that:  "Mr. Mittal also hopes that

a new, larger group may be able to set a lead for the rest of the industry—*sending signals about*

*when to moderate production*, and so smooth the peaks and troughs in demand that have

bedeviled the steel business." "The Age of Giants," 2/2/2006 (emphasis added).*

From October 1-3, 2006, senior executives from the world's major steel companies—

including Mr. Mittal, Mr. Surma, Mr. DiMicco and Mr. Johanpeter*—convened in Buenos

Aires, Argentina for the annual conference of the International Iron and Steel Institute ("IISI").

*Id.* ¶ 125.  Despite expectations of strong demand in the near-term, executives at the IISI

conference explicitly urged production restraint and holding the line on capacity.  *Id.* ¶ 126.

Immediately after the Buenos Aires meeting, defendants embarked on another massive

round of production cuts.  U.S. Steel and ArcelorMittal began idling mills within days of the

meeting.  *Id.* ¶¶ 127-29.  As predicted by Mr. Mittal back in August, all other defendants

followed suit, just as they had done in 2005.  *Id.* ¶¶ 131, 135, 139, 140, 141.  The production cuts

were swift and deep.  U.S. Steel, for example, operated its United States mills at only 67% of

capacity in the fourth quarter of 2006.  *Id.* ¶ 130.  Gerdau estimated that it operated its domestic

mills at only 60% of capacity in the fourth quarter of 2006, restricting output in both flat and

long products.  *Id.* ¶¶ 135-138.  An industry analyst noted that "[s]upply discipline on the part of

the mills is being imposed much more quickly than it was last year."  *Id.* ¶ 142.  Another

industry analyst congratulated Mittal Steel on successfully "encouraging [its United States] peer group to take some downtime in Q4 to clear up the inventory." *Id.* ¶ 144.

The following chart summarizes the 2006 meetings and production cuts:

| SUMMARY OF 2006 MEETINGS AND PRODUCTION CUTS[11] | | | | | |
|---|---|---|---|---|---|
| | AIST Meeting May 1-3, 2006 Cleveland, OH | AISI/SMA/MSCI Meeting May 7-9, 2006 Boca Raton, FL | Steel Success Strategies June 19-21, 2006 New York, NY | IISI Meeting Oct. 1-3, 2006 Buenos Aires | Production Cuts Oct. – Dec. 2006 |
| ArcelorMittal | ✓ | ✓ | ✓ | ✓ | ✓ |
| U.S. Steel | ✓ | ✓ | ✓ | ✓ | ✓ |
| Nucor | ✓ | ✓ | ✓ | ✓ | ✓ |
| AK Steel | ✓ | | ✓ | | ✓ |
| Steel Dynamics | ✓ | ✓ | ✓ | | ✓ |
| Gerdau | | ✓ | ✓ | ✓ | ✓ |
| IPSCO | | ✓ | ✓ | | ✓ |
| CMC | ✓ | ✓ | ✓ | | ✓ |

As in 2005, each defendant cut production to manipulate the supply—and ultimately the price—of steel. *Id.* ¶¶ 127, 131, 135, 139, 140, 141. Because the prevailing market price remained well above defendants' marginal cost of production, any defendant could have sold more steel at a considerable profit, but all opted instead to limit their output. *Id.* ¶ 145.

The supply squeeze was again a success. The benchmark price of hot-rolled steel rallied from approximately $510/ton in January 2007 to approximately $580/ton in March 2007. *Id.* ¶ 147. Long prices rose as well. *See, e.g.,* CMC Analyst Call, 3/20/07 (long "prices are moving up"; "we anticipate record profits"; and CMC had announced price increases of $15/ton in February 2007, $30/ton in March 2007, and $55/ton in April 2007).*

---

[11] This chart does not purport to identify all relevant trade meetings or inter-defendant contacts. For example, a few weeks before the industry's 2006 production cuts, executives and/or managers representing every defendant attended an "economic summit" sponsored by the MSCI trade organization, which was held in Chicago on September 11-12, 2006.*

Industry executives recognized that their actions were unprecedented and brought remarkable success. Mr. DiMicco from Nucor remarked in early-2007 that the industry had displayed "more profit driven discipline than ever before in my 30 plus years in the industry." *Id.* ¶ 148. Mr. Mittal reported that the "industry was able to restrict production to keep prices stable." *Id.* ¶ 149. Mr. Busse from Steel Dynamics explained that "the industry . . . .realized supply side constraints in late '06 and early '07. So I think the outages were very, very real, supply was diminished," resulting in "pricing momentum going the other direction." Analyst Call, 1/24/2007.* In May 2007, ArcelorMittal explicitly credited the pricing "rebound" to "our industry's earlier production cut[.]" *Id.* ¶ 150.

### C.      Coordinated Production Cuts in 2007

After defendants' late-2006 round of curtailment, complaints from steel consumers intensified. For example, a group of domestic manufacturers appeared before the ITC in August 2007 and testified that they were "being squeezed by the steel mills' market domination and shortening of supply[.]" *Id.* ¶ 146. A group of major U.S. automakers filed briefs in the same matter explaining that the "power of the steel industry to control supply has affected the ability of U.S. Auto Producers and Suppliers to obtain the steel required for their operations." *In re Hot Rolled Carbon Steel*, U.S. Automobile Producers and Suppliers Prehearing Brief, 7/23/07, at 25.* According to these major steel purchasers, "domestic producers have refused to supply hot-rolled steel or even caused shortages for their customers." *Id.* at 26.* Ford Motor Company filed a separate brief in the same proceeding, emphasizing that: "The steel industry's concerted strategy to maintain high prices has reduced the volume of steel available in the market[.]" Final Comments of the Ford Motor Company, 10/4/07, at 6.*

The conspiracy was working.  And it continued to work in 2007, during which defendants continued to meet and discuss the industry's newfound production strategy.

On May 6-8, 2007, the CEOs of ArcelorMittal USA (Mr. Schorsch), U.S. Steel (Mr. Surma), Nucor (Mr. DiMicco), AK Steel (Mr. Wainscott), Steel Dynamics (Mr. Busse) and IPSCO (Mr. Sutherland) convened for the annual meetings of the AISI and MSCI, which were held jointly at the Ritz Carlton in Las Vegas.*  On May 7-10, 2007, other executives from ArcelorMittal, U.S. Steel, Nucor, Steel Dynamics, IPSCO and CMC met in Indianapolis at the AIST annual meeting. *Id.* ¶ 152.  During the AIST conference, a panel that included "leading steel executives" from ArcelorMittal USA, U.S. Steel, Nucor, Steel Dynamics and IPSCO discussed, among other things, "a new industry operating model" and the ability of consolidated steel producers to cut production to support prices. *Id.* ¶ 152.[12]

On June 18-20, 2007, representatives from every defendant—including at least six CEOs—again convened at the annual Steel Success Strategies conference in New York City. *Id.* ¶ 153.[13]  During a panel discussion with the CEOs of Nucor and Steel Dynamics, Mr. Schorsch of ArcelorMittal USA praised the industry's "disciplined" supply strategy, and urged the steel mills "to adjust their production rates so the price of steel doesn't drop." *Id.*  Other industry leaders agreed that "they all need to work together to keep the prices high regardless of the flexibility in the marketplace." *Id.*  Mr. DiMicco urged producers against competing on the basis of price, warning that "whenever the steel makers are tempted by the market and therefore fluctuate their prices, the growth in the industry will quickly decline." *Id.* ¶ 154.  Mr. Busse

---

[12] The complaint alleged that this meeting took place in Pittsburgh.  While the press release quoted in the complaint was issued from Pittsburgh, the meeting itself took place in Indianapolis.*

[13] Attendees included Mr. Mittal (ArcelorMittal), Mr. Schorsch (ArcelorMittal USA), Mr. Surma (U.S. Steel), Mr. DiMicco (Nucor), Mr. Busse (Steel Dynamics) and Mr. Wainscott* (AK Steel).

added that the steel industry had entered a "new age," characterized foremost by industry "discipline." *Id.* ¶ 155.

Within weeks of these high-level discussions about the hazards of oversupply and the consequences of competing on price, all defendants curtailed production. *Id.* ¶ 156.[14]  Once again, defendants' 2007 production cuts were against their individual competitive interests, as prevailing market prices were substantially higher than defendants' marginal cost. *Id.* ¶ 157.

| 2007 MEETINGS AND PRODUCTION CUTS[15] | | | | |
|---|---|---|---|---|
| | AISI/MSCI/CEO Conference May 6-8, 2007 Las Vegas, NV | AIST Meeting May 7-10, 2007 Indianapolis, IN | Steel Success Strategies June 19-21, 2007 New York, NY | Production Cuts May – July, 2007 |
| ArcelorMittal | ✓ | ✓ | ✓ | ✓ |
| U.S. Steel | ✓ | ✓ | ✓ | ✓ |
| Nucor | ✓ | ✓ | ✓ | ✓ |
| AK Steel | ✓ | | ✓ | ✓ |
| Steel Dynamics | ✓ | ✓ | ✓ | ✓ |
| Gerdau | | | ✓ | ✓ |
| IPSCO | ✓ | ✓ | ✓ | ✓ |
| CMC | | ✓ | ✓ | ✓ |

The magnitude and impact of the industry's mid-2007 production cut was confirmed in

---

[14] Although not alleged in the complaint, plaintiffs recently have learned that IPSCO and Gerdau joined the other defendants in the mid-2007 curtailment.*  In particular, IPSCO brought forward scheduled downtime and idled a mill for (at least) twelve days, restricting output along with the other defendants.*  Gerdau curtailed production as well.*  *See* page 24, *infra*.

[15] Again, this chart does not purport to identify all relevant trade meetings or inter-defendant contacts.  For example, on February 16, 2007, a Goldman Sachs analyst addressed the SMA trade association, which was holding its annual board of directors meeting in Phoenix.*  SMA board members included, among others, six defendants' CEOs: Mr. Selig (CMC); Mr. Longhi (Gerdau); Mr. Sutherland (IPSCO); Mr. Schorsch (ArcelorMittal USA), Mr. DiMicco (Nucor), and Mr. Busse (Steel Dynamics).*  At this meeting, the analyst applauded the industry's production cuts in the fourth quarter of 2006 in a presentation titled, "Outlook for 2007: A successful test of market discipline," which projected that the industry's "supply reductions" would "cause a sharp recovery" in steel prices in 2007, particularly considering "broad-based underlying demand strength."*  Similarly, steel analyst Mark Parr delivered a presentation at the SMA's annual meeting in Washington, D.C., encouraging the industry to "maintain focus on SUPPLY DISCIPLINE[.]"  Mark Parr Presentation, 5/15/2007 (emphasis in original).*

proceedings before the ITC.  On July 31, 2007, a group of senior executives from ArcelorMittal, U.S. Steel, Steel Dynamics, Nucor, and AK Steel testified together on a panel at an ITC proceeding involving hot-rolled steel.*  During his testimony, the COO of U.S. Steel acknowledged that, "In 2007, I believe we all have furnaces off or have reduced production." *In re Hot Rolled Steel Products*, Hearing Transcript, 7/31/07, at 239.*  With respect to long products, testimony from Gerdau, Nucor and CMC (the three largest "long" producers) in a separate ITC matter confirmed production cutbacks in both late-2006 and mid-2007. *In re Steel Concrete Reinforcing Bar*, Revised Hearing Transcript, 5/10/07, at 58, 73, 75.*  *See also* CMC Press Release, 10/30/2007 (noting "lower production" in mid-2007)*; Gerdau Analyst Call, 11/6/07 (discussing mid-summer "curtailment" taken to reduce supply).*

Indeed, defendants' pattern of cutbacks prompted the Ford Motor Company to file a brief with the ITC objecting to steel industry supply constraints.  Ford noted that ArcelorMittal and U.S. Steel had idled at least four domestic blast furnaces in mid-2007 "to maintain high market prices," and explained that the industry's "concerted" production cuts "only confirm[] that . . . the supply of hot-rolled steel is, and will continue to be, significantly constrained."  Final Comments of Ford Motor Company, 10/4/07, at 3, 6-8.*

Once again, the curtailment had its intended effect on the market price of steel.  Steel Dynamics noted, for example, that mid-2007 production cuts had facilitated yet another round of price increases later that year.  Compl. ¶ 157.  Similarly, ArcelorMittal delivered an investor presentation documenting extraordinary industry margins in the U.S. market over that period.  Analyst Presentation, 5/14/08.*  ArcelorMittal attributed this strong pricing environment to "supply constrained by declining imports, low level of inventory and production." *Id.*\*

23

### D.    The Conspiracy's Success

The conspiracy was exceptionally profitable for defendants.  *Id.* ¶ 161.  Nucor, for

example, reported record operating earnings of approximately $2.1 billion in 2005, $2.2 billion

in 2006, and $1.9 billion in 2007.  *Id.* ¶ 162.  Nucor's stock more than tripled from

approximately $25/share in early 2005 to a high of $83/share in 2008.  *Id.*  U.S. Steel enjoyed its

"second highest earnings on record" in 2005, with operating income of $1.4 billion, followed by

$1.78 billion in 2006 and $1.2 billion in 2007.  *Id.* ¶ 163.  U.S. Steel's stock value nearly

quadrupled from approximately $50/share in early 2005 to a high of $196/share in 2008.  *Id.*

The other defendants enjoyed similarly impressive returns.  *Id.* ¶ 164.

Defendants' executives benefited as well.  Mr. Mittal, for example, personally received

cash payments of approximately $1.89 billion in 2007 from dividends and stock share buybacks

from ArcelorMittal.*  U.S. Steel's CEO, Mr. Surma, earned approximately $8.94 million in

2007, more than 80% of which was bonuses and stock options.*  Mr. DiMicco, CEO of Nucor,

earned $6.7 million in 2007, of which $755,000 was salary while the bulk of the remainder was

bonuses and stock.*  By contrast, in "lean" years prior to the conspiracy, Mr. DiMicco's total

compensation was less than $1 million.*

## ARGUMENT

I.    **Plaintiffs' Well-Pleaded Allegations Go Well Beyond Those At Issue In** *Twombly***, And Warrant Discovery.**

Defendants' motion to dismiss should be denied because plaintiffs' allegations support a plausible inference that defendants' success at restricting the production of raw steel was the result of an unlawful agreement.

Defendants do not argue that the complaint fails to state a claim under Section 1 of the Sherman Act because of any *legal* insufficiency.  The alleged agreement among the defendants to curtail production is, like a naked agreement to fix prices, unlawful *per se*.  *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) ("An agreement on output also equates to a price-fixing agreement . . . . [R]aising price, reducing output, and dividing markets have the same anticompetitive effects.").

Defendants instead argue that the complaint is *factually* insufficient because, according to defendants, it fails to supply "either direct or inferential allegations" sufficient to justify a "reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim." *Twombly*, 127 S. Ct. at 1967, 1969 (citations and internal quotation marks omitted; alteration in original).  Defendants are wrong.  To be sure, *Twombly* establishes that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 1966.  But the Court likewise recognized that allegations of parallel conduct state a claim when they are "placed in a context that raises a suggestion" of a preceding agreement. *Id.*[16]

---

[16] The defendants in *Twombly* were incumbent local telephone companies, which historically had done business as regulated monopolists in exclusive service territories.  The basic allegation against the defendants was that they had, in parallel, resisted the efforts of new entrants (called "CLECs") to compete and had declined to compete in each others' territories as CLECs.  As to the first, the Court recognized that "resisting competition is routine market conduct" and that "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." 127 S. Ct. at 1971 (internal quotation marks omitted).

Here, when plaintiffs' allegations are "viewed in light of common economic experience," they "plausibly suggest[] agreement." *Twombly*, 127 S. Ct. at 1959-60. As a matter of substantive antitrust law, the complaint alleges a plausible conspiracy based on well-pleaded facts supporting the conclusion, first, that "the structure of the market [is] such as to make [cartelization] feasible" and "worth attempting"; second, that "the market behaved in a noncompetitive manner"; and, third, that defendants conspired to restrict supply. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002) (establishing framework for evaluating conspiracy allegations).

While the *Twombly* complaint "proceed[ed] *exclusively* via allegations of parallel conduct," 127 S. Ct. at 1971 n.11 (emphasis added), plaintiffs here have alleged much more: that the market structure was ripe for collusion; that defendants' coordinated supply cuts represented an abrupt departure from firms' prior behavior; that such behavior, at a time of pricing well above cost, was contrary to the independent competitive interest of each defendant; that immediately prior to the production cuts, defendants' executives gathered at trade meetings and made statements directly to competing executives calling for industry-wide production restraint; that those same executives held contemporaneous private trade association meetings; that other statements made by defendants suggest collective action and agreement; and that defendants enjoyed supracompetitive profits as a result of their coordinated action.

---

As to the second, "a natural explanation for the noncompetition . . . is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing. In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf." *Id.* at 1972. "[A]ntitrust conspiracy was not suggested by the facts adduced under either theory of the complaint." *Id.* at 1973. *See also In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 369-71 (M.D. Pa. 2008) (explaining economic implausibility of *Twombly* theory).

These well-pleaded allegations, as explained in more detail below, are more than enough to raise a plausible inference of conspiracy and afford defendants fair notice under Rule 8. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2008 WL 3916309, at *3-*4 (N.D. Cal. Aug. 25, 2008) (denying motion to dismiss on strikingly similar facts); *Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 371; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2008 WL 4831214 (D.D.C. Nov. 7, 2008); *In re OSB Antitrust Litig.*, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38 (E.D. Pa. 2007) (denying summary judgment on similar facts); *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 945 n.4 (N.D. Ill. 2008).[17]

## II.   Defendants Urge The Court To Impose An Improper Standard Of Review.

In evaluating the complaint, the Court "accept[s] as true all well-pleaded facts alleged, and draw[s] all possible inferences in [plaintiffs'] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); see also *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) (*Twombly* "must not be over-read"); *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) ("*Twombly* leaves the long-standing fundamentals of notice pleading intact.").

The Court "must be careful," moreover, to avoid "traps that the defendants have cleverly laid in their brief." *Compare Fructose*, 295 F.3d at 655. One such trap is to disregard well-pleaded factual allegations on the ground that they are "conclusory." *See* Def. Mem. at 2, 26-28. For example, defendants dispute that production restraint was against their individual economic

---

[17] Defendants cite *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954 (N.D. Ill. 2007) as having "dismiss[ed an] antitrust conspiracy claim," Def. Mem. at 11, without acknowledging that the court *denied* a motion to dismiss the amended complaint in that litigation, finding that the amended allegations satisfied *Twombly. See* 557 F. Supp. 2d 938, 943-45 (N.D. Ill. 2008).

interest in the absence of agreement, claiming that the allegation is "wholly conclusory." Def. Mem. at 2. But the complaint's allegations are *not* bare conclusions; rather, they are based on specific facts alleged concerning the marginal and fixed costs of production, the nature of demand, prevailing prices at the time of the shutdowns, and the inability of any defendant to control prices unilaterally. *See* Compl. ¶¶ 89-92. Defendants argue that these allegations are untrue, but that is not a basis for a motion to dismiss. To the contrary, the Court must assume that all factual allegations in the complaint are true: "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 127 S. Ct. at 1965 (internal quotation marks omitted).

Second, the Court should not accept defendants' invitation to draw disputed inferences in their favor. *See Tamayo*, 526 F.3d at 1083. For example, defendants argue that plaintiffs have taken "statement[s] out of context" and presented them "unfairly." Def. Mem. at 19. But, as discussed in more detail below, the statements at issue were fairly and accurately quoted and, considered in context with the actions that followed, support the inference that plaintiffs seek to draw: namely, that defendants agreed to cut production and that the resulting "industry discipline" was successful in raising prices above the competitive level. Defendants argue that different, more innocent inferences can be drawn from these statements. But that is what trials are for. It is not plaintiffs' burden to allege facts that cannot be squared with the *possibility* of unilateral action—if that were true, hardly any claim could proceed absent a direct admission. *See Fructose*, 295 F.3d at 663 (finding plausible inference of agreement from evidence even though "there are alternative interpretations of every bit of it").

Third, defendants would have the court "parse and dismember the complaints," but this is "contrary to the Supreme Court's admonition that '[t]he character and effect of a [Sherman Act]

conspiracy are not to be judged by dismembering it and viewing its separate parts.'" *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) (quoting *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)); *Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 373 ("Nothing in *Twombly* . . . contemplates this 'dismemberment' approach to assessing the sufficiency of a complaint."); *cf. Fructose*, 295 F.3d at 655 (summary judgment inappropriate even if "no single item of evidence . . . points unequivocally to conspiracy").

For example, defendants argue that the statements of their executives quoted in the complaint are not enough, standing alone, to constitute "a mutual commitment to do anything," Def. Mem. at 16, and then would have the Court ignore those statements for purposes of evaluating the complaint's remaining allegations.  But the Court need not conclude that the statements and ensuing conduct *constituted* an agreement—an issue that can await full factual development—to conclude that, together with economic and other evidence, they are plausibly *suggestive* of an agreement.

As the Court noted at the parties' November status hearing, it is possible to infer agreement from statements followed by action.  11/21/08 Hearing Transcript, at 11 ("the theory has always been that you could infer the existence of the agreement from what could be reasonably deemed to be signals plus conduct that occurred afterwards"); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 179 (1940) (agreement can include "informal gentlemen's agreement or understanding"); *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) (jury is permitted "to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable, or accompanied by other conduct that in context suggests that each competitor failed

to make an independent decision") (citations omitted); *Twombly*, 127 S. Ct. at 1964 (conspiracy

can be "tacit or express"); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004)

(conspiracy established if "defendants got together and exchanged assurances of common action

or otherwise adopted a common plan even though no meetings, conversations or exchanged

documents are shown"); *TFT-LCD*, 2008 WL 3916309, at *3-*4 (plausible agreement on

strikingly similar facts, because "a conspiracy . . . can be inferred from an invitation followed by

responsive assurances and conduct") (citation omitted); *Hackman*, 557 F. Supp. 2d at 945 n.4

("The anticompetitive agreement need not . . . be explicit, and parallel business behavior may be

circumstantial evidence of a tacit agreement that violates the Sherman Act."); *cf.* 11/21/08

Transcript at 12 (defendants concede that public statements can constitute an agreement).

   An inference of agreement is particularly plausible here.  The statements at issue—

many of them trade meeting statements made directly to competing executives encouraging

*industry* production restraint—were followed closely by action:  unprecedented industry-wide

production cuts, exactly as encouraged by Mr. Mittal and others.  Moreover, the statements

reflect defendants' own understanding that (contrary to their arguments concerning the

complexity of the product market and competition from imports) such a conspiracy was feasible

and likely to succeed.  The statements also reflect the state of mind and intent of certain key

executives—namely an intent to communicate with competitors regarding the need for

production cuts. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 1419c (2d ed. 2003) at 126-27

(solicitation to collude "might be circumstantial evidence of an ongoing conspiracy" that bears

on "the solicitor's conspiratorial state of mind").  Finally, given the proximity of defendants'

trade meeting statements to private trade association meetings involving the same high-level

executives—including regular board, committee and social gatherings related to the AISI, SMA

and IISI trade associations*—there is reason to infer that private communications reinforced the industry strategy. For all of these reasons, the allegations in the complaint strongly suggest a plausible conspiracy and illustrate the importance of allowing discovery to proceed. *See OSB*, 2007 WL 2253419, at *5 ("*Twombly* does not . . . require plaintiffs to prove their allegations before taking discovery."); page 43-49, *infra* (further analysis of defendants' statements).

### III.   Plaintiffs Adequately Allege That Defendants Violated Section 1 Of The Sherman Act By Agreeing To Coordinated Cuts In The Production Of Raw Steel.

The complaint states a claim under Section 1 of the Sherman Act by pleading facts to support the inference that three unprecedented cuts in production—joined by all defendants and which made no economic sense absent concerted action—were the result of an unlawful agreement. The complaint's allegations, taken as true, (1) establish that the market was ripe for collusion; (2) show that the market behaved in a non-competitive manner; and (3) support the inference that coordinated downtime was the result of actual agreement, not mere conscious parallelism. *See Fructose*, 295 F.3d at 654.

The plausibility of the conspiracy is perhaps best illustrated by the fact that it worked exactly as planned. Defendants cannot seriously dispute that, on the heels of trade meetings at which industry executives encouraged production restraint, defendants imposed massive, historically unprecedented and coordinated production cuts, after which they attributed higher market prices and profits to the industry's newfound "discipline." *See, e.g.,* Compl. ¶¶ 101, 102, 133, 149 (ArcelorMittal: "industry was able to restrict production to keep prices stable"). These allegations make clear that the alleged conspiracy was both straightforward in theory—not "farfetched" and "wholly speculative" as defendants contend—and, by defendants' own account, remarkably effective in fact.

A.    **The Structure of the Steel Industry Makes Collusion Both Feasible and Worthwhile.**

The complaint's well-pleaded facts support the allegation that the structure of the steel industry is one in which collusion is feasible and in which it would be "[]rational to run the legal and business risks" of agreeing to restrict supply. *Fructose*, 295 F.3d at 656; *see also Flat Glass*, 385 F.3d at 358 ("[P]laintiffs' theory of conspiracy—an agreement among oligopolists to fix prices at a supracompetitve level—makes perfect economic sense."); *In re SRAM Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) (market characteristics "conducive" to collusion).

1.    Supply Concentration and Demand Diffusion

The production of raw steel was concentrated among the eight defendants, which accounted for between 80 and 85 percent of domestic production. *See* Compl. ¶¶ 40-46; *compare Fructose*, 295 F.3d at 656.  Moreover, the four largest producers accounted for approximately 70 percent of U.S. capacity.  Such concentration "is favorable" to cartelization, because it eliminates the need for "elaborate communications" and makes cheating easy to detect. *Id.*  By contrast, the buyer side of the market is unconcentrated, putting buyers at the mercy of the cartel.  *Id.*

Defendants argue that because "imports and non-defendant domestic manufacturers accounted for a significant percentage of virtually all steel products sold" during the conspiracy period, the conspiracy is implausible.  Def. Mem. at 35.  This claim is contrary to specific allegations in the complaint, *see* Compl. ¶ 40-48, and is belied by defendants' own contemporaneous statements, which repeatedly emphasized that "consolidation" had the "ability to bring newfound discipline"—*i.e.*, coordination of production cuts—"to what traditionally has been an unruly market."  Compl. ¶ 65; *see also, e.g.*, ¶ 57 ("consolidation has improved industry structure"); ¶ 68 ("Consolidation will lead to companies adjusting production levels . . . .").

Indeed, defendants make this very point in their briefs:  that one of the principal benefits

of industry restructuring was that it facilitated coordinated supply reductions in response to

market conditions.  *See, e.g.*, Def. Mem. at 29 n.32 ("consolidation in the steel industry has had

beneficial effects by enabling producers to better calibrate production").  In other words, the

market was both concentrated and ripe for coordinated action.  *Fructose*, 295 F.3d at 656.

> ## 2.   High Barriers to Entry

Barriers to entry into the domestic market were high, and the market was sufficiently

insulated from import competition to ensure that foreign producers would not undercut cartelized

prices.  Compl. ¶¶ 47-48.  *See Empagran S.A. v. Hoffman-LaRoche, Ltd.*, 388 F.3d 337, 340

(D.C. Cir. 2004) (allegation of "significant barrier to entry" supported conspiracy claim).

New domestic entry is costly and lengthy due to capital requirements and legal barriers.

Compl. ¶ 47.  Building a new steel mill typically requires many years for design, regulatory

approval and construction, and the total costs typically exceed $1 billion.  *Id.*  Barriers to import

competition—including tariffs and transportation costs—are likewise significant.  *Id.*  As

Gerdau's CEO has explained, "existing trade orders" operate "to discourage imports."  Analyst

Call, 2/13/08*; *see* page 8, *supra* (discussing import barriers).  Moreover, "steel doesn't travel all

that well, especially with ocean freight rates up.  Your primary market in steel making tends to

be your domestic market."  Gerdau Analyst Call, 2/8/06.*

In terms of import duties, steel is among the nation's most restricted commodity

products.  During the conspiracy period, there were over 100 trade-restricting measures on U.S.

steel imports from approximately 30 countries, affecting a broad array of finished steel

products.*  To be sure, imported steel arrives in the United States despite these barriers.  *See*

Def. Mem. at 10 (citing import data).  The reason is that the structural capacity shortage in the

domestic market *forces* U.S. consumers to purchase imported steel for the balance of their needs,

notwithstanding the additional costs of freight, shipping delays, and tariffs. *See* page 7-8, *supra*

(discussing domestic capacity shortage). This import dynamic neither diminishes the domestic

industry's power to inflate prices by restricting supply, nor renders the conspiracy implausible.

Ultimately, the central point regarding imports is that shipping costs, attendant lead time delays,

and trade barriers effectively insulate the domestic industry from foreign competition. Compl.

¶¶ 47-48; *see also In re Hot Rolled Steel Products*, Prehearing Brief of AK Steel, 7/23/07, at 15

(imposition of trade duties in the years since 2000 "has been a significant factor in the ability of

the domestic hot-rolled steel industry to maintain prices").*

        Indeed, if imports were a close substitute for domestic steel, defendants would have had

nothing to gain from production discipline within the domestic market; yet they repeatedly called

for and imposed such discipline. *See* Compl. ¶ 86 ("*U.S.* steel producers appear to be sticking to

their pledges to reduce production") (emphasis added); ¶ 149 (noting that when we "had softness

in the U.S. market, the industry was able to restrict production to keep prices stable").

        3.    <u>Commodity Product</u>

        The core product at issue—raw steel—is a commodity good, which facilitates agreement

to and monitoring of production restraint. Compl. ¶ 35; *see, e.g., Fructose*, 295 F.3d at 656-57;

*Linerboard*, 504 F. Supp. 2d at 54. Defendants argue that because they are vertically

integrated—producing a variety of "long" and "flat" products out of raw steel—the alleged

conspiracy is implausible. Def. Mem. at 33-34. But defendants control both the flat and long

segments of the market, *see* page 6, *supra*, and the complaint alleges that *all* defendants acted in

concert in *all three* periods of industry downtime. Compl. ¶¶ 35-37, 71-86 (mid-2005

curtailment by flat and long producers), 127-144 (same in late-2006), 156 (same in mid-2007);

*see also* ¶ 84 (Gerdau praising long producers for excellent "discipline . . . in terms of adjusting

the supply" in mid-2005); page 23, *supra* (discussing long cutbacks in 2006 and 2007).

Plaintiffs have alleged, in other words, that by agreeing to reduce production of raw steel

on an industry-wide basis, defendants inflated the price of steel generally.  *See* Compl. ¶ 37.

This theory of conspiracy and impact is neither novel nor implausible:  precisely because

downstream product differentiation may make price fixing more difficult, it is not uncommon for

cartels to focus at an upstream level of commodity production.  OPEC is only the most famous

example.  *See also Flat Glass*, 385 F.3d at 353-54 (conspiracy among producers of upstream

commodity input); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002) (certifying

class where cartel restricted supply of primary input and inflated price of downstream goods); *In*

*re Urethane [Polyether Polyols] Antitrust Litig.*, 251 F.R.D. 629, 630 (D. Kan. 2008) (certifying

class where primary input cartel impacted price of downstream goods); *TFT-LCD*, 2008 WL

3916309, at *1 (denying motion to dismiss in similar market); *cf. In re Sugar Antitrust Litig.*, 579

F.2d 13, 18 (3d Cir. 1978) ("to deny recovery in this instance . . . would allow the price-fixer of a

basic commodity to escape the reach of a treble-damage penalty simply by incorporating the

tainted element into another product").

Moreover, defendants' own statements refer to supply discipline in the production of

steel generally.  For example, when defendants' executives discussed the need for production

restraint at trade meetings, they did not limit their remarks to any particular steel product.  *See,*

*e.g., id.* ¶¶ 55, 57, 65-68.  U.S. Steel and other defendants reported their raw steel production in

press releases, quarterly and annual reports, and to the AISI trade association, which generated

members-only reports concerning raw steel utilization and output.  Id. ¶ 170.  And U.S. Steel's

CEO has explained that the company's "raw steel production as a percent of capability" is "not a

bad estimate of how active we are or how less active we will be." Analyst Call, 10/31/2006.* In short, "raw steel" is the standard industry benchmark for measuring output.

Likewise, while defendants argue that differences among integrated and minimill producers lead to different cost structures, *see* Def. Mem. at 35, plaintiffs have alleged that defendants agreed to restrict production by both types of producers to support price. Industry groups include producers using both basic production methods, *see*, *e.g.*, Compl. ¶¶ 59, 64, and U.S. Steel (an integrated producer) explained in its 2007 annual report that its principal domestic competitors include both integrated and minimill producers.* Defendants, moreover, explicitly recognized that coordinated action by both types of producers was successful in stabilizing prices. *See id.* ¶ 82 (CEO of Steel Dynamics, a major minimill producer: "You had supply-side cutbacks with what we did and the blast furnaces that took some production out . . . . Those kinds of things have led to a stronger market.").

4.   High Fixed Costs

Steel production is characterized by high fixed costs, including facility, labor, maintenance and overhead expenses. Compl. ¶ 90. In a competitive market, this cost structure would encourage defendants to produce steel so long as the prevailing market price remains above the marginal cost of production, because maximizing output contributes to cost recovery, bolsters market share, and rewards the most efficient producers. *See* Compl. ¶¶ 89-90; *compare Fructose*, 295 F.3d at 657; *Linerboard*, 504 F. Supp. 2d at 52-53. Over time, this dynamic is what drives prices to the competitive level. Defendants, however, had a strong motive to short-circuit this process—to establish and maintain supracompetitive prices—by coordinating their reductions in output.

Defendants cannot challenge these factual allegations on a motion to dismiss, particularly as they have made the same points when it suited their interests. As U.S. Steel explained in an October 2006 brief filed with the ITC, the steel industry's "high fixed costs" encourage competitive producers to "maximize and sustain the utilization of available capacity," *i.e.*, to maximize production. *In re Certain Carbon Steel Products*, Prehearing Brief of U.S. Steel, 10/6/06, at 8-9.* This observation is *not* limited to integrated producers: Nucor and Steel Dynamics, which are exclusively minimill producers, have likewise argued that "[t]he steel industry is characterized by high fixed costs and relatively inelastic demand, particularly in the short term," which gives producers "a strong incentive to maintain or increase capacity utilization." *In re Certain Carbon Steel Products*, Prehearing Brief of Nucor and Steel Dynamics, 10/6/06, at 6.* As discussed below, however, the industry collectively resisted those competitive imperatives for the greater rewards of price stabilization.

**B.    The Steel Marketplace Behaved in an Uncompetitive Manner.**

The episodes of coordinated industry downtime—in May-July 2005, October-December 2006, and May-July 2007—strongly support the plausibility of the alleged conspiracy.

1.    Actions Contrary to Independent Competitive Interest

Absent concerted action, the production cuts would have been contrary to the defendants' individual self-interest. Compl. ¶¶ 89-95, 145, 157. Even in periods of falling prices, the "market price of steel was substantially higher than defendants' marginal cost of production" meaning that defendants could continue to make sales at an operating profit. Compl. ¶ 89.[18]

---

[18] Defendants argue that this allegation is "vague and conclusory," but that is simply defendants' way of asking the Court to disregard well-pleaded allegations in the complaint. To elaborate further, ArcelorMittal delivered a presentation in 2008 showing that, throughout 2005-2007, defendants maintained the price of hot-rolled steel sheet (a benchmark industry product) well above not only the "industry cash cost" of production but also well above ArcelorMittal's long-run earnings targets. Analyst

By contrast, "[m]ill shutdowns are costly because production and revenue are lost while the mill's fixed costs—including facility, labor, maintenance, and overhead costs—remain." *Id.* ¶ 90.  Furthermore, no *individual* producer had sufficient power to raise prices by cutting output unilaterally.  *Id.* ¶ 91; *see also In re Certain Carbon Steel Products*, Prehearing Brief of Nucor and Steel Dynamics, 10/6/06, at 54 ("attempts by any single U.S. producer to maintain prices by cutting production are unlikely to be successful").

In these circumstances, if the defendants had behaved independently, they would have "operated their mills at a profit, and competed with each other for market share."  Compl. ¶ 90. The industry's pattern of contrary behavior—which made economic sense only if defendants coordinated their actions—supports an inference that they agreed to do so.  *See, e.g., Flat Glass*, 385 F.3d at 361; *Linerboard*, 504 F. Supp. 2d at 54; *Babyage.com, Inc. v. Toys R Us, Inc.*, 558 F. Supp. 2d 575, 583 (E.D. Pa. 2008) ("plaintiffs have alleged [action] against each manufacturer's independent self interest.  This tends to suggest . . . the absence of unilateral action.").

Defendants' statements reinforce the anti-competitive nature of their conduct.  In 2005, for example, Steel Dynamics CEO Keith Busse noted that "his mill and others could have moved tons at lower numbers, but chose to reduce production" instead, imposing "a discipline . . . that didn't exist ten years ago."  Compl. ¶ 82.  Mr. Busse explained that this strategy entailed both collective industry action and shared sacrifice: "everybody is, to some degree, giving that pint of blood.  And there has been a better discipline.  It's affected all of us.  And that's a real positive." Analyst Call, 7/19/05.*  Defendants, in other words, knowingly incurred the substantial costs of lost production (in a profitable market) in exchange for the greater rewards of supply

---

Presentation, 5/14/08.* ArcelorMittal attributed this "strong pricing environment in the U.S." to "supply constrained by declining imports, low level of inventory and production," resulting from reduced industry production of "crude steel." *Id.*\*

manipulation.  This behavior made sense only if defendants *knew* that others would do the same.

Absent coordination and agreement—*i.e.*, mutual assurance that each producer would give its

"pint of blood"—no competitive producer would sacrifice profitable production and sales.  That

defendants did so—all eight defendants, multiple times—plausibly suggests agreement.

> ### 2.    Production Cuts Not Explained By Demand Conditions

Defendants nevertheless argue that their behavior can be explained by "substantial

imports and a drop in demand during the relevant downtime periods."  Def. Mem. at 28.  As an

initial matter, the complaint squarely alleges that the production cuts cannot be explained by any

lack of demand, because annual domestic demand far exceeded domestic production throughout

the conspiracy period.  Compl. ¶¶ 92-93; *id.* ¶ 108 (U.S. market is fundamentally "steel short"

and "we have to remember we are still undersupplied, not oversupplied over here.").

The level of demand, moreover, is reflected in the prevailing market price, which, as

noted, was substantially higher than defendants' cost throughout the conspiracy period.  *Id.* ¶ 89.

Furthermore, while defendants cite statements suggesting that demand was weak, *see* Def. Mem.

at 28 n.29, there are many contrary statements by defendants and others.[19]

---

[19] For example:

- The president of the AISI, a leading industry trade association, explained in February 2005 that "North American steel capacity will be insufficient to meet steel demand for the foreseeable future."  Remarks delivered at MSCI event, February 17-18, 2005.*

- On April 26, 2005, just before the first round of coordinated downtime, U.S. Steel reported that, "Looking forward, key economic data suggests that North American demand for [U.S. Steel products] will remain favorable."  Analyst Call.*

- In the midst of the industry's mid-2005 production cuts, Nucor's Executive Vice President initially attributed the cutbacks to "a challenging market in the second quarter" but acknowledged that "end use demand remains strong" for Nucor's flat products, that service center inventories were "under historical levels," that steel sheet "order entry levels have increased significantly over the past four weeks," and that Nucor's sheet mills were already "85% booked through the end of August."  Analyst Call, 7/21/05.*

The complaint also details statements from major customers explaining that the industry's production cuts caused acute shortages in the marketplace, a result that cannot be squared with a lack of demand. Compl. ¶¶ 94, 109-114, 146. Defendants would have the Court dismiss these statements as "self-serving," but that would involve drawing (unwarranted) inferences in favor of *defendants* not plaintiffs. *See* page 28, *supra*.

### 3. Unprecedented Behavior

Even assuming *arguendo* that the production cuts came in periods of *relatively* soft demand, the industry cutbacks nevertheless reflected an unprecedented coordinated strategy. As alleged in the complaint, in prior periods of relatively soft demand, producers maintained production and reduced prices. *See* Compl. ¶ 88. They did so because in an "unruly"—read "competitive"—market, doing so was in their individual interest. *Id.* ¶ 65. Recognizing this incentive to compete on the basis of price and efficiency, defendants, at the prodding of Mr.

---

Similarly, Nucor's CEO acknowledged that Nucor imposed "production restraint" during mid-2005, while simultaneously noting that "we've seen almost a 200% up tick in orders" for sheet products over that same period. *Id.*\*

- With respect to "long" products, CMC reported on June 21, 2005 that "markets for our products are strong" and that "margins are pushing all time highs." Analyst Call.\* CMC announced market downtime only one week later—immediately after the Steel Success Strategies conference. *See* Compl. ¶¶ 63-68 (conference), 85 (downtime).

- Similarly, in the midst of the industry's massive late-2006 production cuts, Nucor stated that "demand remains good" for sheet; the "plate market has remained robust"; and long product "demand, mill inventories and backlogs remain at good levels." Analyst Call, 10/19/06\*; *see also* Gerdau Analyst Call, 11/7/06 ("hot-rolled sheet demand, prices and spreads remain strong" while long product "end-use demand as far as we can see remains very solid").\* Indeed, Nucor's CEO noted as early as *July* 2006 that the domestic market was strong and that "a lot of steel companies" *already* were sold out through the end of 2006. (Dan DiMicco interview with TheStreet.com, 7/2/06.)\*

- So, too, in advance of the 2007 downtime, when Gerdau reported "solid underlying demand" across "all product lines," including "continued sound demand for our long products and continued firming and rebounding of demand for our hot rolled sheet products." Analyst Call, 5/3/07.\*

Mittal and others, instead elected to short-circuit competition by imposing unprecedented

production cuts to maintain high prices, which of course is classic cartel behavior. Allegations

such as these—showing "that there was a marked change in defendants' behavior in the market

around the time the conspiracy allegedly started"—are sufficient to "make an antitrust

conspiracy plausible." *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085,

1096 (N.D. Cal. 2007);[20] *see Twombly*, 127 S. Ct. at 1965 n.4 ("historically unprecedented

changes . . . made at the very same time by multiple competitors" can suggest a plausible

conspiracy); *TFT-LCD*, 2008 WL 3916309, at *3.

Defendants themselves recognized that this industry behavior represented an abrupt

departure from past competitive practice. *See* Compl. ¶ 116 (Lakshmi Mittal: "The industry has

changed immensely . . . there is a new discipline in the industry"); *id.* ¶ 78 ("the degree to which

integrated producers cut back is really unprecedented"); *id.* ¶ 87 (analyst noting that the mid-

2005 "rapid drop in output . . . is unprecedented in our 30-year history analyzing this sector"); *id.*

¶ 84 (Gerdau CEO:  industry "react[ed] with more discipline that you would have seen at any

time in the past").

Defendants nevertheless argue that this behavior reflected the benefits of a less

competitive industry structure, which facilitated oligopolistic coordination in the absence of

agreement. *See* Def. Mem. at 29. But the facts alleged—that *every one of the eight defendants*

took downtime in the same narrow periods, despite what defendants argue is a diversity of

downstream products and cost structures, despite the individual benefit to firms of maintaining

production, despite the industry's long history of maintaining production in the face of "soft"

---

[20] Defendants rely on *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007)—which had dismissed the original complaint in the litigation—without acknowledging that the motion to dismiss the amended complaint was denied for reasons that are equally applicable here.

demand, and in the context of repeated executive-level efforts to encourage industry production restraint—suggest a plausible alternative: namely, that defendants could *not* have coordinated their actions absent the communications, assurances, and agreement alleged in the complaint.

    4.    <u>Extraordinary Profits</u>

Defendants' "new discipline" successfully impacted the market, resulting in supracompetitive prices and earnings. *See* Compl. ¶¶ 161-167, 173.[21] Several defendants reported record or near-record profits; their stock prices soared; and their executives received extraordinary bonuses and compensation. *Id.*; *see also* page 24, *supra.* Such unusual industry profits serve as another indicator of collusion. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778-79 (7th Cir. 1999) (unusual profits support inference of conspiracy). Defendants ignore these allegations.

### C.    Defendants' Statements, Contacts and Facilitating Practices Provide Strong Support for the Inference that Defendants Conspired.

The allegations that defendants coordinated their production cuts—contrary to their independent self-interest and in a departure from historical practice—are sufficient to defeat defendants' motion to dismiss, particularly when considered in the context of defendants' contemporaneous meetings and communications. These additional allegations—including trade meeting statements, private high-level contacts immediately preceding the alleged production cuts, and additional facilitating practices including elaborate sharing of production data— strongly support the conclusion that plaintiffs' allegations are plausible.

---

[21] *See also* AK Steel Analyst Call, 7/24/07 (prices "skyrocketed" after 2005 cutbacks)*; Compl. ¶¶ 88, 100, 101 (ArcelorMittal: "cuts in production have enabled a significant price recovery"), 102 (Nucor: "companies decided to curtail production to prop prices up"), 133, 149 (ArcelorMittal: "industry was able to restrict production to keep prices stable").

1.      Defendants' Calls to Action Are Highly Suggestive of Conspiracy.

As noted above, defendants' own statements support plaintiffs' allegations that (1) the structure of the steel industry made collusion both feasible and attractive; (2) only concerted industry action would succeed in stabilizing prices; (3) concerted industry action would not happen on its own, absent coordination among defendants; (4) the industry production cuts in 2005, 2006, and 2007 were a sharp departure from prior behavior; and (5) defendants' concerted action was successful in inflating prices and profits.

More fundamentally, the statements support a plausible inference that defendants conspired.  As an initial matter, the fact that industry leaders found it necessary repeatedly to encourage and reinforce the message of production restraint suggests that such industry "discipline" would not have occurred unilaterally.  Second, the calls to action were followed immediately by the very production cuts sought, suggesting that defendants received the message and agreed to participate.

In *TFT-LCD*, the court cited allegations of "public statements by defendants," including "a keynote address . . . which plaintiffs characterize as an effort to get other manufacturers in the industry to limit production," "statements by an executive [of one of the defendants] . . . that the company would raise prices and restrict production," and "statements . . . boasting that [one of the defendants] had succeeded in convincing its competitors to cut capacity" in concluding that the complaint satisfied *Twombly*.  2008 WL 3916309, at \*3-\*4.  The court concluded that these allegations supported a plausible inference of agreement and noted that "a conspiracy . . . can be inferred from an invitation followed by responsive assurances and conduct."  *Id.* at \*3 (citing *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979)); *see also* page 29-30, *supra* (collecting authority).

The same types of communications are alleged here.  For example, in March 2005, a Mittal Steel executive expressly called on other producers to reduce output, asking competitors "to avoid 'an inevitable "race to the bottom"'" and to instead cut production at 'marginal facilities.'"  Compl. ¶ 58.  In June 2005, a Mittal Steel executive "made the point that steel's resurgence in demand and profitability during the past 18 months can be sustained—but only if capacity and production are brought under control now."  *Id.* ¶ 65.  Also in June 2005, Lakshmi Mittal encouraged the industry to focus on supply restraint by "adjusting production levels."  *Id.* ¶ 68.  In October 2006, "the major steel producers explicitly urged production restraint and holding the line on capacity."  *Id.* ¶ 126.  And in June 2007, an ArcelorMittal executive addressed every defendant at a trade meeting to explain that "steel mills . . . need to adjust their production rates so the price of steel doesn't drop."  *Id.* ¶ 153.  Other defendants responded to these statements with action:  competitors restricting output in tandem.  *See, e.g., id.* ¶¶ 73, 75, 76 77, 79, 81, 83, 85, 127-134, 135-141, 156.

On these facts, *OSB* and *Linerboard* also are instructive.  As here, *OSB* and *Linerboard* stemmed from allegations that a major producer—a ringleader—encouraged its competitors to restrict industry output, which they did.  In both *OSB* and *Linerboard*, the ringleader's motive and intention to communicate with other defendants—combined with a market structure ripe for collusion, inter-firm contacts, opportunities to conspire and historically unprecedented production cuts—raised a plausible, indeed strongly suggestive, inference of agreement.  *OSB*, 2007 WL 2253419, at *3 (denying motion to dismiss because allegations "strongly suggest" agreement); *Linerboard*, 504 F. Supp. 2d at 59 (denying summary judgment under more rigorous standard based on similar evidence).  Plaintiffs have alleged these things and more, including explicit trade meeting communications that go well beyond the allegations in *OSB*.

Defendants argue that "a decision to announce an output reduction virtually always has a valid non-collusive purpose" apart from any "signaling" that may be accomplished. Def. Mem. at 18. Read in context, however, the trade meeting statements at issue reflect an unmistakable intent to communicate with competitors. *See, e.g.*, Compl. ¶ 68 ("if *we as an industry* can understand this phenomena *we* will be able to build more sustainability in our operations") (emphasis added); *id.* ¶ 153-54 ("the steel mills . . . need to adjust their production rates so the price of steel doesn't drop"); *id.* ¶ 144 (industry analyst: Mittal was able to encourage competitors "to take some downtime in Q4 [2006] to clear up the inventory"). As noted by commentators, such solicitations to collude "might be circumstantial evidence of an ongoing conspiracy," bearing on "the solicitor's conspiratorial state of mind." Areeda & Hovenkamp, *Antitrust Law* ¶ 1419c at 126-27.

Defendants are wrong, moreover, to conflate their public statements announcing or signaling downtime (*e.g.*, press releases and SEC filings) with their trade meeting statements made directly to competing executives. *See* Def. Mem. at 17-18 (suggesting that statements in complaint merely represented efforts to convey downtime information to "customers, employees, communities and suppliers"). There is a fundamental distinction between announcing downtime to employees, or even announcing price or downtime information to the market generally in a press release, and appearing at a trade meeting to encourage competing executives explicitly to cut production. The latter behavior—direct, in-person communication to competitors—is nothing like the "signaling" cases cited in defendants' papers. Def. Mem. at 16. It is a traditional form of conspiracy. *See, e.g., TFT-LCD*, 2008 WL 3916309, at *3-*4; *Flat Glass*, 385 F.3d at 361 (evidence of conspiracy can include proof showing that "defendants got together

and exchanged assurances of common action or otherwise adopted a common plan even though

no meetings, conversations or exchanged documents are shown") (citation omitted).

The ruling sought by defendants—that their statements and subsequent conduct cannot

constitute an agreement—would be not only premature, but also unprecedented. At bottom,

defendants contend that because their statements were made at "public" and semi-public trade

meetings, they should be immune from antitrust scrutiny, no matter the intent and content of the

remarks or the unusual, coordinated, and anticompetitive industry behavior that followed. That,

of course, is not the law. *TFT-LCD*, 2008 WL 3916309, at *3-*4; *cf.* Richard A. Posner,

*Antitrust Law* (2d ed. 2001), at 170 (trade association exchanges do not "immunize [defendants]

from legal sanction [where] the conditions of the market suggest that the exchange promotes

collusive rather than competitive pricing. The fact that the exchange is 'laundered' through a

trade association should be no defense, especially since an empirical study of price-fixing cases

found that trade associations have figured as defendants in a surprising number of cases."); *see*

*also Poller v. Columbia Broadcasting Sys. Inc.*, 368 U.S. 464, 473 (1962) ("summary procedures

should be used sparingly in complex antitrust litigation where motive and intent play leading

roles" and where "the proof is largely in the hands of the alleged conspirators").

In any event, whether the trade meeting speeches and other statements, in the context of

contemporaneous private meetings and concerted conduct, might suffice to *constitute* an

agreement is not the issue at this stage. Defendants' statements and conduct are, at a minimum,

strongly supportive of the plausible inference that defendants reached a meeting of the minds on

industry-wide production cuts. *See, e.g., OSB*, 2007 WL 2253419, at *3 (denying motion to

dismiss where defendant had "communicated to its competitors its intention to take mill

downtime" and defendants took "production downtime" in response); *TFT-LCD*, 2008 WL 3916309, at *3-*4.

> ### 2. Defendants' Other Statements Support a Plausible Inference of Conspiracy.

Additional statements support an inference that defendants conspired. For example, defendants repeatedly referenced industry "discipline"—a common euphemism for collusion—in connection with their production cuts.[22] While defendants argue that "discipline" is not always a "code word for conspiracy," Def. Mem. at 22, it is plausible that such statements *could* refer to an existing understanding among co-conspirators. Such a judgment can be made only in factual context. *See Flat Glass*, 385 F.3d at 365 (denying summary judgment and citing documents discussing industry "discipline" as suggesting conspiracy); *Fructose*, 295 F.3d at 662 (same).

Other statements suggest an agreement as well. In August 2006, Lakshmi Mittal stated that "*going forward the industry* is getting geared to adjust their production and volume to maintain the prices," noting that the "[i]ndustry has become very conscious and careful on their inventory levels." Compl. ¶ 121 (emphasis added); *see also id.* ¶ 105 ("I think that [competitors] will be ready to cut production, if required."); ¶ 120 ("we believe that industry will remain watchful"). Such prior awareness of competitors' intentions, and reference to collective industry action, supports an inference of prior agreement. *See Flat Glass*, 385 F.3d at 364-65 (advance awareness); *Fructose*, 295 F.3d at 662-63 (citing statements implying collective action).

Defendants argue that plaintiffs have taken their statements out of context and that, read as a whole, the statements are all "consistent with lawful independent conduct." Def. Mem. at

---

[22] *See, e.g.,* Compl. ¶¶ 65 and 66 (Gerdau praising industry "discipline"), 82 (Steel Dynamics), 84 (Gerdau), 88, 116 (ArcelorMittal), 132-33 (Nucor), 140 (CMC), 148 (Nucor), 153 (ArcelorMittal), 157 (Steel Dynamics).

19; *compare Fructose*, 295 F.3d at 663 (finding conspiracy evidence plausible notwithstanding defendants' innocent explanations).  In fact, plaintiffs have been fair and accurate with the quoted materials, which, read in context, tell an unmistakable story:  that defendants repeatedly got together and exchanged assurances that the industry should cut production to bolster price, which all defendants did immediately after those meetings, and with great success.[23]

---

[23] To respond to defendants' specific complaints:

- Complaint ¶ 80 quotes a Nucor executive stating that Nucor cut production in 2005 for the purpose of generating "a reasonable profit per ton of steel sold."  *See* Def. Mem. at 19-20.  Plaintiffs' allegation is simply that Nucor joined its competitors in taking market-related downtime in mid-2005, which it did.  Defendants nevertheless complain that plaintiffs omitted separate statements about different product groups appearing on different pages of the transcript.  Def. Mem. at 20.  While defendants may seek to explain away their statements to a jury by citing unrelated statements from an unrelated discussion, plaintiffs can fairly seek to draw a different inference from statements accurately quoted.  (Moreover, the increased "bar" production noted by defendants related to a Nucor acquisition and does not undermine the allegation that Nucor restricted output.  *See* Def. App.A, Ex. 80 at 15.)

- Complaint ¶ 152 accurately quotes a 2007 trade association press release documenting a panel discussion during which defendants' executives discussed the industry's "new operating model"—including the ability to cut supply, as ArcelorMittal and U.S. Steel had done in late-2006.  Defendants state that the meeting was not secret, Def. Mem. at 20, but plaintiffs did not claim that it was.

- Complaint ¶ 118 quotes an industry analyst who remarked on "the significant supply discipline for an industry that never had any discipline."  The substance of the allegation is simply that the industry's coordinated cutbacks were unprecedented.  Defendants contend that other statements from that analyst should have been included in the complaint, but they do not challenge the accuracy of the quote, nor do they dispute that the industry's coordinated behavior was unprecedented.

- According to defendants, certain statements by Lakshmi Mittal were taken out of context because they omitted Mr. Mittal's contemporaneous discussion of industry "consolidation."  Def. Mem. at 21.  Far from avoiding a discussion of consolidation, plaintiffs have alleged that consolidation *facilitated* the conspiracy.  Compl. ¶ 51.  But plaintiffs reasonably, and fairly, focused on the sections of Mr. Mittal's statements in which he urged industry production restraint.  Nothing was taken out of context.  *See also* Compl. ¶ 68 (including full quote from Mr. Mittal referenced in Paragraph 72, including "consolidation" statement).

- None of the other examples of purported unfair quotation, *see* Def. Mem. n.22, supports defendants either.  Defendants do not identify inaccurate quotations, but rather seek to draw different inferences from the statements at issue, which is inappropriate at this stage.

In any event, the question at this stage is not whether defendants can explain away their statements, but whether the statements (all quoted accurately), together with all the other allegations, plausibly support the inferences that plaintiffs seek to draw.  Read in context, the statements in the complaint—accompanying a dramatic change in industry conduct—clearly support a plausible inference of conspiracy.

> 3.   Coordinated Actions Taken After Meetings Support an Inference of Conspiracy.

The inference that defendants conspired gains additional support from the allegation that coordinated production cuts closely followed meetings among co-conspirators.  For example, executives of several defendants met in May 2005; immediately thereafter two of the defendants idled their steel mills.  Compl. ¶¶ 57-62.  After additional meetings involving additional defendants, several more defendants cut production.  *Id.* ¶¶ 61-85.  Immediately after a meeting on October 1-3, 2006, in Argentina, attended by (at least) ArcelorMittal, U.S. Steel, Nucor, and Gerdau*, all defendants cut production.  *Id.* ¶¶ 125-141.  Mid-2007 downtime followed meetings in May and June involving executives from every defendant.  *See* page 20-23, *supra*. Allegations comparable to these have helped defeat motions to dismiss after *Twombly*, *see, e.g.*, *Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 372, and comparable facts have helped to establish an issue of fact for trial even at a later stage of litigation, *see Flat Glass*, 385 F.3d at 368-69; *Linerboard*, 504 F. Supp. 2d at 53, 59-60.

Defendants seek to minimize these contacts by arguing that attendance at trade association meetings "is a neutral fact."  Def. Mem. at 31.  But plaintiffs are not seeking inferences from mere membership in a trade association and attendance at meetings.  Rather, the complaint relies on what actually was said at the meetings, the opportunities they presented for

additional private communications, and what defendants did immediately afterwards. Taken together, these allegations plausibly suggest that defendants conspired.

Defendants also cite liberally to the *Travel Agents* case, contending that "opportunities to conspire" are irrelevant to the plausibility analysis. Def. Mem. at 14 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007)). But that case is nothing like this one. *Travel Agents* is a classic example of a case that lacked "factual heft." The complaint alleged parallel conduct (among some but not all defendants), an "opportunity to conspire" (frequent contacts among the defendants' executives), a conclusory allegation of "action against interest," and "common knowledge," *i.e.*, that airlines knew about each others' reduction of travel-agent commissions. But the complaint apparently contained no allegations that the defendants actually discussed travel-agent commissions. In other words, the complaint apparently contained no allegations of conspiratorial communications. Plaintiffs' complaint here, in contrast, is replete with allegations of direct communications among defendants— statements made during trade events immediately prior to historically unprecedented output reductions—encouraging that very behavior. It is this context that renders defendants' additional trade meetings and contacts suggestive. *See Flat Glass*, 385 F.3d at 368-69.

Finally, defendants argue that the timing of their trade meetings is not suspicious because "defendants participated in numerous industry, trade association, and trade show meetings." Def. Mem. at 33. Aside from their reliance on a case mooted by that court's denial of a subsequent motion to dismiss an amended complaint, *see* note 20, *supra* , defendants cite no authority for the proposition that allegations of opportunity to conspire can be disregarded because such opportunities were too numerous. The fact that defendants were in regular contact only makes the allegation of agreement more plausible, not less.

4.    Defendants Shared Production Information That Facilitated Collusion.

Defendants engaged in elaborate sharing of information concerning output through their trade association, including through a members-only website. *See* Compl. ¶¶ 168-70.  Such information sharing has been found to support an inference of conspiracy. *See OSB*, 2007 WL 2253419, at *3 (sharing of pricing information through industry publication); *Rail Freight Fuel Surcharge*, 2008 WL 4831214, at *2 (trade association cost index facilitated conspiracy); *see generally Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 472 (1960) ("even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act").  While defendants argue that such allegations are "insufficient to permit an inference of agreement" standing alone, Def. Mem. at 32, under the circumstances alleged here, the sharing of detailed production information facilitated implementation and monitoring of the output agreement, reinforcing the plausibility of the alleged conspiracy.

*****

Considered as a whole, the allegations in the complaint show that the domestic market was ripe for collusion, that it behaved in a non-competitive manner, and that the industry's unprecedented coordinated action plausibly stemmed from an agreement among defendants. *See Fructose*, 295 F.3d at 656.  This case is a far cry from *Twombly*, where the plaintiffs "proceed[ed] exclusively via allegations of parallel conduct." 127 S. Ct. at 1971 n.11. Accordingly, defendants' motion should be denied.

IV.   **The Defendant-Specific Motions Should Be Denied.**

Four defendants have filed separate briefs in support of their individual motions.  Each of

these four defendants—Gerdau, AK Steel, CMC and SSAB—participated in all three rounds of

unprecedented industry downtime, even though it was against their competitive interest to do so.

Each of these defendants attended trade meetings preceding the downtime during which the need

for industry production restraint was discussed.  For substantially the reasons outlined above, the

individual motions should be denied.

In evaluating these arguments, it is well established that the Court should not review

defendant-specific allegations in isolation, but rather should consider them within the context of

the complaint as a whole.  *See, e.g.*, *OSB*, 2007 WL 2253419, at *5 (explaining that post-

*Twombly* "conspiracy allegations need not be detailed defendant by defendant.  Rather, an

antitrust complaint should be viewed as a whole, and the plaintiff must allege that each

individual defendant joined the conspiracy and played some role in it.") (citations omitted);

*SRAM*, 580 F. Supp. 2d at 904 ("Although plaintiffs will need to provide evidence of each

defendant's participation in any conspiracy, they now only need to make allegations that

plausibly suggest that each defendant participated in the alleged conspiracy.").

A.   **Gerdau**

Gerdau does not contest that the complaint properly alleges that it cut production in

coordination with its competitors; that the output restraints were historically unprecedented and

occurred despite prevailing prices well above cost; that its executives attended key trade

meetings preceding these actions; that its senior officers made the statements quoted in the

complaint, *see* ¶¶ 66, 84; or that Gerdau earned exceptional profits as a result.

Gerdau nevertheless suggests that the complaint should be dismissed because plaintiffs are required to *prove* a documented industry agreement at this stage in the case. Gerdau Mem., at 2 ("they do not reference a document or communication that expressly acknowledges such an agreement"). That, of course, is not the law. *Twombly*, 127 S. Ct. at 1965.

Gerdau devotes the bulk of its brief to repeating arguments advanced in defendants' omnibus papers—namely, that imports restrain domestic pricing power and that the industry-wide production cuts represented unilateral oligopolistic responses to demand conditions. As explained above, these arguments are at odds with the well-pleaded allegations in the complaint.

The inability of imports to restrain the domestic industry's market power has been addressed previously and will not be repeated here. *See* page 33-34 *supra*. Moreover, Gerdau's import argument is fundamentally inconsistent with its theory of oligopoly. If imports meaningfully restrained the pricing power of domestic mills—as Gerdau and other defendants contend—it would have been irrational for domestic producers to cut production in parallel in an effort to stabilize or inflate price. Yet that is what defendants did.[24]

Gerdau is equally wrong that demand conditions explain its production cuts. At most, this argument raises disputed questions of fact. *See* page 39-40, *supra*.

---

[24] Gerdau adds a footnote to its import theory, citing import data for the proposition that domestic demand was relatively weak in mid-2005 and late-2006. *See* Gerdau Mem. n.7. According to Gerdau, the decline in imports during these months shows that domestic demand was soft and that it therefore was sensible for domestic mills to limit their production. But Gerdau misapprehends the relevance of these statistics. As alleged in the complaint, the volume of imports in any given month (or quarter) is influenced by a variety of factors other than domestic demand—including tariffs and ocean freight rates. Import volumes are further influenced by currency exchange rates and steel prices in other parts of the world.* It also takes time (often months) for imports to arrive in the United States following an order; this temporal lag renders monthly import statistics an even less reliable indicator of domestic demand.* In short, the import data cited by Gerdau has little if any bearing on the plausibility of the conspiracy.

Indeed, Gerdau's contemporaneous statements about demand—reporting solid demand and pricing just before and during its major production cuts—suggest that lack of demand was a pretextual excuse for the industry's efforts to squeeze the market.[25] *Compare JTC Petroleum*, 190 F.3d at 779 (pretextual explanations suggest conspiracy).

Late-2006 illustrates the trend. Despite solid demand for its products and pricing well above marginal cost, Gerdau joined its competitors in imposing massive downtime, *see* Compl. ¶¶ 135-138, explaining that industry "production cutbacks planned in the December quarter" should make "the next six months . . . a very interesting time in the North American steel sector." Analyst Call, 11/7/06.* Which of course it was: after the coordinated shutdowns, Gerdau (along with other defendants) announced successive price increases effective in February, March and April 2007 and reported a sharp increase in first quarter 2007 earnings. Analyst Call, 5/3/07.*

In sum, Gerdau senior executives attended the relevant trade meetings, and at those meetings encouraged the industry to "take advantage" of "market discipline" to improve "the stability of our industry." Compl. ¶ 66. After these gatherings, Gerdau—the fourth largest domestic producer—participated in every period of industry-wide curtailment (contrary to its independent competitive interest and its own announcements of strong pricing and demand), after which Gerdau praised the industry's newfound "discipline . . . in terms of adjusting the

---

[25] *See, e.g.*, Analyst Call, 5/3/05 (reporting that overall "market conditions continue to be fairly strong" and that, with respect to long products such as bar, "we'll be shipping basically everything we can make over the next four or five months")*; Analyst Call 8/3/05 (demand for long products "remained seasonally strong" and "is expected to remain firm")*; Analyst Call, 8/2/06 (reporting on "solid demand for our products and continued market strength across our product ranges," and noting that imports were "not much of a competitive factor" in the domestic market)*; Analyst Call, 11/7/06 (reporting "strong" demand and pricing for its flat and long products, and noting that "end-use demand" for long products "as far as we can see remains very solid")*; Analyst Call, 5/3/07 (reporting "solid underlying demand" across "all product lines," including "sound demand for our long products and continued firming and rebounding of demand for our hot rolled sheet products")*; Analyst Call 8/8/07 ("underlying demand for our product portfolio remains firm").*

supply." *Id.* ¶ 84.  These allegations, viewed in the overall context of the complaint, are more than sufficient to state a claim against Gerdau.

### B.    AK Steel

AK Steel incorrectly argues that only three allegations in the complaint bear on the plausibility of its participation in the conspiracy.  AK Steel Mem., at 1.  To the contrary, the complaint includes dozens of paragraphs relating to, *inter alia*, the structure of the market, the prevailing price, margin and demand conditions when downtime was imposed, the intention of certain ringleaders to communicate with competitors, the unprecedented nature of the industry behavior, and the corresponding impact on prices and profits.  Whether or not these allegations specifically mentioned AK Steel by name (or other defendants such as CMC and SSAB, both of which make the same argument), they provide important context for considering each defendant's behavior.  *Southeastern Milk*, 555 F. Supp. 2d at 943-44.

More substantively, AK Steel rests its motion on the absence of alleged downtime in 2005 and 2008, and the purported absence of facts showing actual production cuts by AK Steel in late-2006 and mid-2007.  In fact, plaintiffs' well-pleaded allegations (including those added here by permission of the Court) implicate AK Steel in each of the major coordinated production cuts in 2005, 2006 and 2007, and place AK Steel at the trade meetings preceding these cuts, during which AK Steel and other defendants discussed the need for production restraint.

In June 2005, AK Steel CEO James Wainscott, along with officers and senior executives from every other defendant, attended the Steel Success Strategies conference at which Lakshmi Mittal and others advocated for industry-wide production restraint.  *See* ¶¶ 63-68; Def. Ex. 65. Mr. Wainscott participated in a roundtable discussion at that conference, during which industry executives (including the CEOs of Steel Dynamics and IPSCO) discussed new behavior in the

steel industry and "the ability to bring newfound discipline to what traditionally has been an unruly market." Compl. ¶ 65; Def. Ex. 65. After these meetings, AK Steel joined its competitors in scheduling downtime at two of its domestic mills in mid-2005.*[26]

AK Steel also restricted output in late-2006. Compl. ¶ 139. In support of this allegation, the complaint quoted Mr. Wainscott, who stated on an analyst call that the company restricted output by approximately 8% because AK Steel was not "interested in getting supply and demand out of balance." *Id.* AK Steel's response is that Mr. Wainscott's quote, considered in context, does not suggest that the company actually cut production. AK Steel Mem., at 5-6. At most, this is a disputed question of fact, particularly considering additional statements in which Mr. Wainscott confirmed that he meant what he said. For example, Mr. Wainscott explained on another analyst call that AK Steel's plan was to limit output by approximately 100,000 tons in both the third and fourth quarters of 2006 in an effort to support market pricing; in particular, AK Steel would impose fourth quarter 2006 maintenance outages to avoid "put[ting] additional tons into the market" and not "chase spot prices down." Analyst Call, 10/24/06; *see also id.* (discussing "industry wide steel production cuts" and "our own production cutbacks").* As in 2005, these cutbacks were against AK Steel's individual competitive interest.

AK Steel's commitment to industry "discipline" was confirmed in 2007. At a time when AK Steel was celebrating the "best performance in the company's history" in the second quarter of 2007, and was emphasizing "solid" demand for its products, *see* July 24, 2007, Analyst Call,* AK Steel nevertheless joined its major competitors in cutting production in mid-2007. Compl.

---

[26] Publicly, AK Steel attributed its mid-2005 shutdowns to maintenance, but in fact AK Steel adjusted its maintenance schedule so that its downtime would overlap with that of its competitors.*

56

¶ 156.  AK Steel did so after its executives attended a series of 2007 trade meetings, including the June 2007 conference at which ArcelorMittal executives encouraged producers "to adjust their production rates so the price of steel doesn't drop."  *Id.* ¶ 153; *see* page 21, *supra* (alleging AK Steel attended this meeting).  Mr. Wainscott later confirmed that AK Steel participated in the industry's mid-2007 round of "market discipline," before "crank[ing] things back up" later in the year.  Analyst Call, 7/24/07 ("in terms of the market discipline, again, we're ready to crank things back up").*

AK Steel also argues that, as a *purchaser* of steel slabs, it would have been economically irrational for it to participate in a conspiracy to inflate market prices by curtailing production. AK Steel Mem., at 7.  The argument is misplaced.  First, as plaintiffs have alleged and as AK Steel's contemporaneous statements confirm, AK Steel did indeed restrict output along with its competitors.  Second, there is nothing unusual about a market in which cartel members purchase a certain volume of product from their co-conspirators; indeed, sometimes these inter-defendant transactions can *facilitate*, rather than undermine, a conspiracy.  *Fructose*, 295 F.3d at 659 (inter-defendant purchases suggest a conspiracy when purchasing company could have produced more product of its own).  Third, AK Steel's steel slab purchases represent a small fraction of its total output.  Taking the fourth quarter of 2006 as an example, AK Steel purchased 150,000 tons of steel slab while selling approximately 1.5 million tons.  Analyst Call, 1/23/07.*  Accordingly, there is no basis for AK Steel's suggestion that higher steel prices would have been against the company's overall interests.  In fact, AK Steel's financial reports are quite clear that high steel prices were beneficial to the firm's bottom line.*

Nor was AK Steel a minor player in the market, as its papers suggest.  AK Steel is a significant domestic producer, reporting sales revenue of approximately $5.6 billion in 2005, $6.1 billion in 2006, and $7 billion in 2007.*

The complaint's well-pleaded allegations show that AK Steel attended the relevant trade meetings; curtailed output with its competitors in 2005, 2006 and 2007 despite profitable market pricing; and acknowledged its participation in the industry's unprecedented "market discipline." The complaint states a claim against AK Steel.

### C.   CMC

Commercial Metals contends that plaintiffs "barely allege any facts about CMC at all"; that CMC is not alleged to have participated in many of the trade meetings referenced in the complaint; that its downtime was taken unilaterally; and that its ostensibly unique market position (it produces only long products and apparently purchases some steel for its downstream operations) renders its participation implausible.  CMC Mem., at 2.  CMC's argument mirrors that of AK Steel.  It fails for the same reasons.

At the outset, CMC incorrectly suggests that it is a bit player in the industry, unfairly swept up in litigation.  In fact, CMC is a top three domestic producer of "long" products, with domestic sales of more than $5 billion during the conspiracy period.*  Nucor, Gerdau, CMC and Steel Dynamics collectively control approximately 80% of the long segment of the domestic market.*  Along with these and other defendants, CMC attended the relevant trade meetings, curtailed production in 2005, 2006 and 2007, and made statements suggesting its participation in the conspiracy.

CMC is implicated from the start.  In May 2005, CMC's CEO, Clyde Selig, attended a conference at which Mittal Steel's chief operating officer urged "disciplined" industry

production.  Compl. ¶¶ 59-60; *see* page 14, *supra* (summarizing CMC attendance at 2005 trade meetings).*  A few weeks later, each defendant (including CMC) attended the Steel Success Strategies conference, at which Lakshmi Mittal and other industry executives urged production restraint.  Compl. ¶ 64.  CMC joined its competitors in announcing production cuts a few days after this event.  *Id.* ¶ 85.

Tellingly, CMC announced these 2005 cutbacks despite reporting on June 21, 2005, that "end-use markets for our products are strong" and that "metal margins are pushing all time highs."  Analyst Call.*  Responding to an analyst's question about its rationale for taking downtime when "the markets are strong," CMC stated that supply restraint was simply "something all the steel producers are looking at right now."  *Id.*  Indeed they were.  After the industry's mid-2005 curtailment, CMC reported that prices rose, that "our domestic mills rode the demand curve to new heights," and that CMC's quarterly earnings provided a "fitting finish" to a "spectacular year."  Analyst Call, 10/25/05*; *compare* Compl. ¶ 84 (Gerdau CEO praising long producers for excellent "discipline . . . in terms of adjusting the supply" in mid-2005).

In 2006, CMC again cut production with the other defendants, despite robust demand and pricing for its products.  On October 24, 2006, CMC reported that "it's been a sensational year"; that "gross margins reached all time highs at our domestic mills"; and that CMC's prospects were "excellent for the projected future, certainly the future for our long product lines."  Analyst Call.*  Moreover, according to CMC, "our end use markets are vibrant and should maintain" and "demand will certainly remain very strong."  *Id.*  CMC further explained on December 21, 2006 that "the fundamentals, the underlying market, the non-residential construction demand remains very solid in all sectors"—and that "gross margins are especially strong at the steel mills."  Analyst Call.*  Notwithstanding these assessments, CMC joined its major competitors, including

major long producers Nucor and Gerdau, in restricting production in late-2006.  Compl. ¶ 140.
CMC did so because the "industry has changed fundamentally.  Now we as an industry are
stronger, we are more disciplined and rational in approaching the markets."  Analyst Call,
10/24/06.*  CMC further acknowledged that its late-2006 downtime was "not just all
maintenance" but rather stemmed from "producer discipline."  Analyst Call, 12/21/06.*

In April 2007, CMC reported "unprecedented demand for rebar and other steel long
products, in particular in the markets of North America."  CMC Quarterly Report, 4/6/07.*
Nevertheless, after attending a series of trade meetings in May and June during which industry
supply discipline was again a prominent topic, CMC, along with leading long producers Nucor
and Gerdau, cut production in mid-2007 in an effort to further squeeze the market price.  Compl.
¶ 156; *see* page 23, *supra* (discussing mid-2007 downtime).  These efforts enabled CMC to
report its "second best quarter ever" in October 2007.  Analyst Call, 10/30/2007.*

Despite CMC's participation in all three rounds of coordinated industry downtime—
which CMC acknowledged led to higher prices and record profitability—CMC argues that its
purported purchases of steel "severely undercut" the allegation that it participated in the
conspiracy.  CMC Mem., at 7.  As explained above, this argument is unavailing.  *See* page 57,
*supra*.  In fact, CMC was perfectly clear in its financial reports that high domestic steel prices
and producer "discipline" were beneficial to its overall business.*

In sum, CMC attended key trade meetings; participated in every round of downtime
(despite robust demand and pricing for its products); attributed its cutbacks to industry
discipline; praised its competitors' "more disciplined" approach to the markets; and earned
exceptional profits as a result.  CMC's motion should be denied.[27]

---

[27] As to CMC's argument concerning the *in terrorem* effect of this litigation, *Twombly* itself

### D.   SSAB

SSAB argues that plaintiffs have failed even to allege that its predecessor, IPSCO, participated in parallel production restraint.  SSAB is mistaken.  IPSCO participated in every major period of industry-wide curtailment.*

Throughout the conspiracy period, SSAB and IPSCO were important producers in the domestic market, particularly with respect to steel plate.  Before its 2007 acquisition by SSAB, IPSCO's total sales were approximately $3 billion in 2005 and $3.8 billion in 2006, while its operating income in those years was approximately $909 million and $996 million, respectively.*  Approximately 75% of these sales were to United States customers.*  In addition, IPSCO was the largest domestic producer of steel plate.*  IPSCO, ArcelorMittal and Nucor together controlled approximately 75% of the domestic plate sector.*

In 2005, senior IPSCO executives—including CEO David Sutherland[28]—attended several of the key trade meetings at which Lakshmi Mittal and others encouraged production restraint.  *See* page 14, *supra*.  Since the filing of the complaint, plaintiffs have learned that, after these events, IPSCO scheduled downtime along with its competitors in mid-2005.*

IPSCO did so despite contemporaneous statements emphasizing strong markets and tight supply for its products.  On April 26, 2005, for example, IPSCO reported that domestic "demand for plate remains strong"; that its customers remained on supply "allocation"; and that, looking forward, IPSCO expected to "sell out all of the steel that we have available."  Analyst Call.*  Likewise, on June 2, 2005, Mr. Sutherland commented on "robust" demand, an assessment

---

provides the answer.  As the Court explained, where an antitrust complaint raises a plausible inference of conspiracy—as this one does—that is the end of the inquiry, and no more is required to allow discovery to proceed.  127 S. Ct. at 1965-66.  To the extent CMC objects to the joint and several liability provisions of the antitrust laws, CMC Mem. at 7, that is an argument more appropriately addressed to Congress.

shared by the company's executive vice president, John Tulloch, who emphasized "thriving purchases of plate" by the company's major customers. "Bottom Line: Purchasing is Thriving in Most Markets," *Purchasing Magazine*, 6/2/2005.

IPSCO nevertheless elected to join the rest of the industry by moving forward its maintenance schedules to impose downtime at two domestic mills in mid-2005.*

The pattern repeated itself in 2006. On November 1, 2006, IPSCO delivered a presentation to industry analysts reporting on strong and growing demand, favorable supply conditions, and strong prices and margins for its products, particularly plate. Analyst Day Presentation, 11/1/06. Nevertheless, IPSCO joined the late-2006 industry cutbacks, stating that it "elected to reduce output volumes" in the fourth quarter. Press Release, 2/5/07*; *see also* Compl. ¶ 141 (alleging IPSCO downtime). Ultimately, IPSCO cut production by 10-15% in late-2006, despite strong demand and prevailing market prices that would have returned substantial operating margins (approximately 22% according to financial reports) on every ton of steel IPSCO produced and sold.*

Plaintiffs also have learned that, after attending the 2007 trade meetings recounted above, *see* page 21-22, *supra*, IPSCO participated in the mid-2007 curtailment by moving forward a twelve day maintenance outage at one of its mills, thereby overlapping with shutdowns imposed by every other defendant.*

IPSCO's production cutbacks were inconsistent, moreover, with the company's "steel short" operating strategy, which SSAB mentioned in its brief. Mem., at n.5. The principal advantage of this strategy, according to IPSCO, was that it allowed the company to *always* maximize production at its mills, and to adjust to market conditions simply by adjusting its

---

[28] Mr. Sutherland is now retired from SSAB, and serves on the board of directors at U.S. Steel.*

purchases of open-market steel.  Analyst Day Presentation, 11/1/06, at 52 (explaining that steel short strategy is designed to "ensure that [IPSCO's mills] will be running continuously 24/7 at the bottom of the steel cycle").*  In 2006, however, IPSCO did just the opposite.  At a time when prices and demand were strong, IPSCO elected to join its competitors in substantially cutting its production of "liquid steel" by 10-15%, contrary to the very premise of its "steel short" operating model.  Analyst Call, 2/5/07.*  That behavior made no economic sense, and was contrary to IPSCO's independent competitive interest, absent IPSCO's participation in the conspiracy.

IPSCO's response is to cite *yearly* data showing that it increased "overall production" in 2005 and 2006.  *See* SSAB Mem., at 5 and n.6.  But those statistics are beside the point.  The question is not whether IPSCO produced more or less over the course of a year, but whether IPSCO joined its competitors in cutting production during *particular key periods* (first in mid-2005, then late-2006 and mid-2007) when the industry was especially interested in restricting supply and inflating price.  *See Linerboard,* 504 F. Supp. 2d at 62 (yearly production "does not bear on whether or not the company conspired to take downtime" during particular key periods).  IPSCO has admitted that it cut production during the key conspiracy periods.*

In short, plaintiffs have alleged that IPSCO was an important player in the industry, that its executives attended the trade meetings at issue, that it participated in the industry's parallel and unprecedented output restraints in 2005, 2006 and 2007 (despite strong demand and pricing), and that IPSCO, like the other defendants, earned exceptional profits as a result.  Accordingly, the complaint states a claim against SSAB.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully submit that defendants' motion should be denied.

Dated: January 30, 2009

By: */s/ Allen D. Black*

| | |
|---|---|
| Michael K. Kellogg | Allen D. Black |
| Mark C. Hansen | Roberta D. Liebenberg |
| Steven F. Benz | Donald L. Perelman |
| Aaron M. Panner | Jeffrey S. Istvan |
| Julius N. Richardson | Matthew Duncan |
| **KELLOGG, HUBER, HANSEN,** | Adam J. Pessin |
| **TODD, EVANS & FIGEL, P.L.L.C.** | **FINE, KAPLAN AND BLACK,** |
| Sumner Square | **R.P.C.** |
| 1615 M Street, NW, Suite 400 | 1835 Market Street, 28th Floor |
| Washington, DC 20036 | Philadelphia, PA 19103 |
| Tel.: (202) 326-7900 | Tel.: (215) 567-6565 |
| Fax: (202) 326-7999 | Fax:  (215) 568-5872 |

*Interim Co-Lead Counsel For Plaintiffs And The Proposed Class*

**Additional Counsel for Plaintiffs and the Proposed Class**

| | |
|---|---|
| Michael J. Freed<br>Steven A. Kanner<br>William H. London<br>Douglas A. Millen<br>**FREED KANNER LONDON &<br>MILLEN LLC**<br>2201 Waukegan Road, Suite 130<br>Bannockburn, IL 60015<br>Tel: (224) 632-4500<br>Fax: (224) 632-4521 | Simon B. Paris<br>Patrick Howard<br>**SALTZ MONGELUZZI BARRETT &<br>BENDESKY, P.C.**<br>One Liberty Place, 52nd Floor<br>1650 Market St.<br>Philadelphia, PA 19103<br>Tel: (215) 496-8282<br>Fax: (215) 496-0999 |
| Stephen N. Zack<br>**BOIES, SCHILLER & FLEXNER, LLP**<br>100 SE Second Street<br>Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307 | Marc M. Seltzer<br>**SUSMAN GODFREY LLP**<br>1901 Avenue of the Stars, Suite 950<br>Los Angeles, CA 90067-6029<br>Tel: (310) 789-3100<br>Fax: (310) 789-3150 |
| Howard J. Sedran<br>**LEVIN, FISHBEIN, SEDRAN &<br>BERMAN**<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Tel: (215) 592-1500<br>Fax: (215) 592-4663 | Joseph Goldberg<br>**FREEDMAN, BOYD, HOLLANDER,<br>GOLDBERG & IVES, P.A.**<br>20 First Plaza, Suite 700<br>Albuquerque, NM 87102<br>Tel: (505) 842-9960<br>Fax: (505) 842-0761 |
| Richard A. Koffman<br>Patrick Tillou<br>Christopher J. Cormier<br>**COHEN, MILSTEIN, SELLERS &<br>TOLL, P.L.L.C.**<br>1100 New York Avenue, N.W.<br>Suite 500, West Tower<br>Washington, DC 20005<br>Tel: (202) 408-4600<br>Fax: (202) 408-4699 | H. Laddie Montague, Jr.<br>Ruthanne Gordon<br>Martin I. Twersky<br>**BERGER & MONTAGUE, P.C.**<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Tel: (215) 875-3010<br>Fax: (215) 875-4671 |

| | |
|---|---|
| Paul J. LaBelle, Esquire<br>116 North Washington Avenue<br>Suite 2-H<br>Scranton, PA 18503<br>Tel:  (570) 504-0880<br>Fax.: (570) 963-8973 | Gerald J. Rodos<br>Jeffrey B. Gittleman<br>**BARRACK, RODOS & BACINE**<br>Two Commerce Square<br>2001 Market Street, Suite 3300<br>Philadelphia, PA  19103<br>Tel:  (215) 963-0600<br>Fax: (215) 963-0838 |
| Robert N. Kaplan<br>Linda P. Nussbaum<br>**KAPLAN FOX & KILSHEIMER, LLP**<br>850 Third Avenue, 22nd Floor<br>New York, NY 10022<br>Tel:  (212) 687-1980<br>Fax: (212) 687-7714 | Steven A. Asher<br>Robert S. Kitchenoff<br>Mindee J. Reuben<br>**WEINSTEIN KITCHENOFF & ASHER LLC**<br>1845 Walnut Street, Suite 1100<br>Philadelphia, PA 19103<br>Tel:  (215) 545-7200<br>Fax: (215) 545-6535 |
| Eugene A. Spector<br>Jeffrey J. Corrigan<br>**SPECTOR, ROSEMAN & KODROFF, P.C.**<br>1818 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>Tel:  (215) 496-0300<br>Fax: (215) 496-6611 | Ira Richards<br>**TRUJILLO RODRIGUEZ & RICHARDS, LLP**<br>1717 Arch Street, Suite 3838<br>Philadelphia, PA  19103<br>Tel:  (215) 731-9004<br>Fax: (215) 731-9044 |
| Daniel Gustafson<br>Jason S. Kilene<br>**GUSTAFSON GLUEK PLLC**<br>650 Northstar East<br>608 Second Ave. South<br>Minneapolis, MN  55402<br>Tel:  (612) 333-8844<br>Fax:  (612) 339-6622 | Anthony Shapiro<br>**HAGENS BERMAN SOBOL SHAPIRO**<br>1301 Fifth Avenue, Suite 2900<br>Seattle, WA, 98101<br>Tel:  (206) 623-7292<br>Fax: (206) 623-0594 |

| | |
|---|---|
| Vincent Esades<br>**HEINS MILLS & OLSON, P.L.C.**<br>310 Clifton Avenue<br>Minneapolis, MN 55403<br>Tel: (612) 338-4605<br>Fax: (612) 338-4692 | Howard Langer<br>**LANGER, GROGAN & DIVER, P.C.**<br>1717 Arch Street, Suite 4130<br>Philadelphia, PA 19103<br>Tel: (215) 320-5660<br>Fax: (215) 320-5703 |
| Michael J. Boni<br>**BONI & ZACK LLC**<br>15 St. Asaphs Rd.<br>Bala Cynwyd, PA 19004<br>Tel: (610) 822-0200<br>Fax: (610) 822-0206 | Garrett Blanchfield<br>**REINHARDT, WENDORF &**<br>**BLANCHFIELD**<br>E-1250 First National Bank Bldg.<br>332 Minnesota St.<br>St. Paul, MN 55101<br>Tel: (651) 287-2100<br>Fax: (651) 287-2103 |
| Anthony J. Bolognese<br>**BOLOGNESE & ASSOCIATES, LLC**<br>Two Penn Center<br>1500 JFK Blvd., Suite 320<br>Philadelphia, PA 19102<br>Tel: (215) 814-6750<br>Fax: (215) 814-6764 | Natalie Finkelman Bennett<br>**SHEPHERD, FINKELMAN, MILLER**<br>**& SHAH, LLC**<br>35 E. State Street<br>Media, PA 19063<br>Tel: (610) 891-9880<br>Fax: (610) 891-9883 |
| Warren Rubin<br>**LAW OFFICES OF BERNARD M.**<br>**GROSS**<br>Suite 450, John Wanamaker Building<br>100 Penn Square East<br>Philadelphia, PA 19107<br>Tel: (215) 561-3600<br>Fax: (215) 561-3000 | Dennis Stewart<br>**HULETT HARPER STEWART, LLP**<br>550 West C Street<br>Suite 1600<br>San Diego, CA 92101<br>Tel: (619) 338-1133<br>Fax: (619) 338-1139 |
| Joseph C. Kohn<br>Douglas A. Abrahams<br>**KOHN, SWIFT & GRAF, P.C.**<br>One South Broad Street<br>Suite 2100<br>Philadelphia, PA 19107<br>Tel: (215) 238-1700<br>Fax: (215) 238-1968 | R. Anthony Rupp III<br>**RUPP, BAASE, PFALZGRAF,**<br>**CUNNINGHAM & COPPOLA LLC**<br>1600 Liberty Building<br>Buffalo, New York 14202-3502<br>Tel: (716) 854-3400<br>Fax: (716) 332-0336 |

| | |
|---|---|
| Tom Muzilla<br>**THE MUZILLA LAW FIRM, L.L.C.**<br>Tower at Erieview, Suite 1100<br>1301 East 9th Street<br>Cleveland, OH  44114<br>Tel:  (216) 458-5880<br>Fax: (216) 928-0016 | Stewart L. Cohen<br>**COHEN, PLACITELLA & ROTH, P.C.**<br>2001 Market Street, Suite 2900<br>Philadelphia, PA 19103<br>Tel:  (215) 567-3500<br>Fax: (215) 567-6019 |
| Christopher G. Hayes<br>**LAW OFFICES OF CHRISTOPHER G. HAYES**<br>115 East Chestnut Street<br>West Chester, PA  19380<br>Tel:  (610) 431-9505<br>Fax:  (610) 431-1269 | Tim J. Moore<br>**MORRIS, LAING, EVANS, BROCK & KENNEDY, CHTD.**<br>Old Town Square<br>300 North Mead – Suite 200<br>Wichita, KS 67202<br>Tel: (316) 262-2671<br>Fax: (316) 262-6226 |
| Marc H. Edelson<br>**EDELSON & ASSOCIATES, LLC**<br>45 West Court Street<br>Doylestown, PA 18901<br>Tel:  (215) 230-8043<br>Fax: (215) 230-8735 | Ronald J. Aronoff<br>**BERNSTEIN LEIBHARD & LIFSHITZ LLP**<br>10 East 40th Street, 22nd Floor<br>New York, NY 10016<br>Tel: (212) 779-1414<br>Fax: (212) 779-3218 |
| Bryan L. Clobes<br>**CAFFERTY FAUCHER, LLP**<br>1717 Arch Street, Suite 3610<br>Philadelphia, PA 19103<br>Tel:  (215) 864-2800<br>Fax: (215) 864-2810 | Christopher B. Sanchez<br>Nyran Rose Pearson<br>**CAFFERTY FAUCHER, LLP**<br>30 North LaSalle Street, Suite 3200<br>Chicago, IL 60602<br>Tel:  (312) 782-4880<br>Fax: (312) 782-4485 |
| David T. Shulick<br>**LAW OFFICE OF DAVID T. SHULICK**<br>1635 Market Street, 19th Floor<br>Philadelphia, PA 19103<br>Tel:   (215) 988-5495<br>Fax:  (215) 988-5478 | Shaheen Rushd<br>Jason S. Cowart<br>**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**<br>100 Park Avenue, 26th Floor<br>New York, NY 10017<br>Tel:  (212) 661-1100<br>Fax:  (212) 661-8665 |

| | |
|---|---|
| Christopher Coleman<br>**LIEFF CABRASER HEIMANN &**<br>**BERNSTEIN, LLP**<br>One Nashville Place<br>150 4th Avenue North, Suite 1650<br>Nashville, TN 37219<br>Tel:   (615) 313-9000<br>Fax:   (615) 313-0065 | Joseph R. Saveri<br>Eric B. Fastiff<br>**LIEFF CABRASER HEIMANN &**<br>**BERNSTEIN, LLP**<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111<br>Tel:  (415) 956-1000<br>Fax: (415) 956-1008 |
| Tobias Millrood<br>**POGUST BRASLOW & MILLROOD**<br>8 Tower Bridge, Suite 1520<br>161 Washington Street<br>Conshohocken, PA 19428<br>Tel:   (610) 941-4204<br>Fax:   (610) 941-4245 | Nicholas E. Chimicles<br>Steven A. Schwartz<br>**CHIMICLES & TIKELLIS LLP**<br>One Haverford Centre<br>361 West Lancaster Avenue<br>Haverford, PA 19041<br>Tel:   (610) 642-8500<br>Fax:   (610) 649-3633 |
| Michael P. Lynn<br>Richard A. Smith<br>**LYNN TILLOTSON PINKER & COX**<br>750 N. St. Paul Street, Suite 1400<br>Dallas, TX 75201<br>Tel:   (214) 981-3800<br>Fax:   (214) 981-3839 | Jeffrey W. Herrmann<br>**COHN LIFLAND PEARLMAN**<br>**HERRMANN & KNOPF, LLP**<br>Park 80 Plaza, West-One<br>Saddle Brook, NJ 07663<br>Tel:  (201) 845-9600<br>Fax: (201) 845-9423 |
| Michael E. Criden<br>Kevin B. Love<br>**CRIDEN & LOVE, P.A.**<br>7301 S.W. 57th Court, Suite 515<br>South Miami, FL 33143<br>Tel:   (305) 357-9010<br>Fax:   (305) 357-9050 | Dianne M. Nast<br>**RODANAST, P.C.**<br>801 Estelle Drive<br>Lancaster, PA 17601<br>Tel:   (717) 892-3000<br>Fax:   (717) 892-1200 |
| Robert S. Schachter<br>**ZWERLING, SCHACHTER &**<br>**ZWERLING, LLP**<br>41 Madison Avenue<br>New York, NY 10010<br>Tel:   (212) 223-3900<br>Fax:   (212) 371-5969 | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2009, I caused a true and correct copy of the foregoing **Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss** to be filed and served electronically via the Court's CM/ECF system upon all registered users.  A true and correct copy is also being served via first-class mail, postage prepaid, upon the following who are not registered ECF users:

David I. Gelfand, Esq.
Mark Leddy, Esq.
Cleary, Gottlieb, Steen &  Hamilton
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006

Joseph A. Tate, Esq.
Stephen D. Brown, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Dianne M. Nast, Esq.
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601

Joseph R. Saveri, Esq.
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 30th Floor
Embarcedero Center West
San Francisco, CA 94111

Marc H. Edelson, Esq.
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901


     /s/   Matthew Duncan          .
Matthew Duncan