# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STANDARD IRON WORKS, on behalf of
itself and all others similarly situated,

     Plaintiffs,

      v.

ARCELORMITTAL; ARCELORMITTAL
USA, INC.; UNITED STATES STEEL
CORPORATION; NUCOR
CORPORATION; GERDAU
AMERISTEEL CORPORATION; STEEL
DYNAMICS, INC.; AK STEEL HOLDING
CORPORATION; SSAB SWEDISH
STEEL CORPORATION; COMMERCIAL
METALS, INC.,

     Defendants.

No. 08 C 5214
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff Standard Iron Works, a direct purchaser of steel, has alleged, on behalf of itself

and all others who purchased steel products directly from Defendants between January 1, 2005

and the present, a multi-year antitrust conspiracy amongst Defendant domestic steel producers to

reduce the production of steel products in the United States in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1.[1]  Specifically, Plaintiffs collectively allege that on at least three

occasions during the class period – mid-2005, late-2006, and mid-2007 – each Defendant

---

[1] Plaintiffs purport to bring their class allegations pursuant to Fed R. Civ. P. 23(a), (b)(2), and (b)(3).  Six other direct purchaser actions have been filed and those related actions have been consolidated here.  The representative Plaintiffs named in those actions (and corresponding case numbers) are:  Wilmington Steel Processing Co., Inc. (08-5371); Supreme Auto Transport (08-5468); Capow, Inc. d/b/a Eastern States Steel (08-5633); MPM Display, Inc. (08-5700); REM Systems, Inc. (08-5942); and Alco Industries, Inc. (08-6197).

implemented coordinated production cuts for the express purpose of raising the price of steel products.  Absent a collusive agreement, Plaintiffs allege these production cuts were against the individual competitive interests of each participating Defendant.  Defendants filed a joint motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## I.  Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted).  To survive, factual allegations must be enough to raise a right to relief above the speculative level.  *Id*.  A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Id.* at 570.

The proper standard for pleading an antitrust conspiracy through allegations of parallel conduct was enunciated in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007).  *Twombly*, which applied Rule 12's general standards to a § 1 claim, held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that recovery is very remote and unlikely.'"  *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  However, an

allegation of parallel conduct and a bare assertion of conspiracy will not suffice. *Id.* at 556-57. Even "conscious parallelism," a common reaction of firms in a concentrated market that each recognize their shared economic interests and their interdependence with regard to price and output decisions, is not in itself unlawful. *Id.* at 553-54 (citations and quotations omitted). Allegations of parallel conduct must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. *Id.* at 557. "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* To state a claim, the factual allegations must cross the line between factually neutral and factually suggestive. *Id.* at n.5. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, No. 07-1015, 2009 WL 1361536, at *12 (U.S. May 18, 2009). It is under this plausibility standard that Defendants contend that Plaintiffs' antitrust post-*Twombly* complaint must be dismissed.

## II. Factual Allegations

For purposes of this motion, I accept the following well-pleaded facts from Plaintiffs' complaint as true:[2]

---

[2] *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). In addition, Defendants attached to their joint motion a collection of the underlying sources for various statements quoted in the complaint. For purposes of ruling on this joint motion to dismiss, I consider these materials in their entirety because they are quoted in the complaint and are central to Plaintiffs' claim. *See Twombly*, 550 U.S. at 569 n.13.

### A. United States Steel Market

Raw steel, an alloy of iron and carbon, is a commodity good that is the primary input for a variety of steel products manufactured and sold by Defendants in the United States. All Defendants manufacture raw steel, which they convert into steel products such as flat sheets, coils, plates, beams, rails, bars, rods, wire, wire rods, or pipes for sale to direct purchasers in a variety of industries. The price of Defendants' steel products is impacted directly by the production, supply, and price of raw steel.

Raw steel is made primarily by two different methods: (1) the basic oxygen furnace ("BOF"), and (2) the electrical arc furnace ("EAF"). The BOF method is used by "integrated" steel producers that combine iron ore, limestone, and coke (baked coal) in a large blast furnace, which produces molten iron. Iron produced in this manner is then transferred to a basic oxygen furnace, where it is combined with other elements and purified with oxygen to create usable raw steel. Defendants ArcelorMittal[3], U.S. Steel, and AK Steel are integrated steel companies. ArcelorMittal is the largest integrated steel producer in the United States, controlling approximately 20-25% of total domestic raw steel capacity during the alleged conspiracy period. U.S. Steel is the second largest integrated steel producer in the United States, controlling approximately 16% of total domestic raw steel capacity. AK Steel controls approximately 5% of the total domestic raw steel capacity.

---

[3] Steel producers Arcelor and Mittal Steel merged in November 2007. The merged corporation, "ArcelorMittal," is a named Defendant here, though the facts as alleged refer to either "Arcelor" or "Mittal" at various intervals to describe conduct by one or the other producer prior to the merger.

The EAF method primarily uses recycled scrap to make raw steel. EAF "minimills" melt steel scrap and other inputs in an electric arc furnace and reconstitute these materials into usable raw steel. Defendants Nucor, Gerdau, Steel Dynamics, Commercial Metals, and SSAB operate minimills exclusively. ArcelorMittal and AK Steel, which are primarily integrated producers, also have some EAF facilities. Nucor is the largest EAF producer in the United States and controls approximately 21% of total domestic raw steel capacity. Gerdau, Steel Dynamics, IPSCO[4], and Commercial Metals control approximately 10%, 4%, 2.5%, and 2%, respectively, of the total domestic raw steel capacity. In total, Defendants control approximately 80-85% of steel production in the United States.

Raw steel is solidified, rolled, and sometimes further processed. The finished products range from "flat products" such as hot rolled coil, cold rolled sheet, corrosion-resistant sheet, and tin mill products, to "long products" such as beams and other heavy structural sections, concrete reinforcing bar, merchant and special quality bar, wire rod, and rails. With respect to these "flat" and "long" product groups, the market for domestic production is similarly concentrated. ArcelorMittal, U.S. Steel, and Nucor are the leading flat-rolled producers in the United States, controlling over 70% of this segment of the market. AK Steel, Steel Dynamics, and IPSCO are likewise major flat producers, controlling much of the remaining domestic market. Nucor, Gerdau, Commercial Metals, and Steel Dynamics are the leading domestic producers of long products, together controlling approximately 80% of this segment of the market. ArcelorMittal is also a significant producer of long products.

---

[4] Although not explicitly stated in the pleadings, I understand steel producer "IPSCO" is the predecessor to named Defendant SSAB Swedish Steel Corporation.

While the steel market is concentrated in the hands of relatively few producers, no single U.S. producer has the power to control supply and price unilaterally. As Nucor and Steel Dynamics explained to the International Trade Commission ("ITC") in 2006, "attempts by any single U.S. producer to maintain prices by cutting production are unlikely to be successful."[5] Similarly, during ArcelorMittal's half-year 2006 earnings conference call, Joseph Kinsch, Arcelor's chairman of the board of directors, acknowledged that other competing steel producers are not irrelevant in Arcelor's calculations for controlling inventory levels: "I think we are very clear that they are not irrelevant . . . they play an important role."

Plaintiffs also maintain that unilateral attempts to manipulate the supply of steel poses substantial risks. Idling or slowing steel production is costly because revenue and market share are lost to competitors while fixed costs - facility, labor, maintenance, and overhead - remain the same. Further, Plaintiffs allege that the prevailing market price of steel was, at all relevant times,

---

[5] Defendants argue in their reply brief that this 2006 statement was based upon a 2000 ITC decision that described the state of the steel industry before the wave of bankruptcies and mergers between 2000 and 2004 (*see* discussion *infra* Part II.B.) and also upon a 2000 study by the U.S. Department of Commerce. The Department of Commerce study found that the industry is characterized by high fixed costs which, in part, put "pressure on companies to keep mills running even when market signals may be indicating the need for production cutbacks, the temporary idling of facilities or even the elimination of capacity." In support of these findings, Defendants cite to a March 2005 address at the Steel Business Briefing Conference by Arcelor executive Louis Schorsch, in which Schorsch commented that "the industry's cost structure has improved, particularly in North America, as fixed costs have been reduced as a proportion of total costs. This reduces the urgency of maintaining volume in a downturn, thus reducing the pressure to 'race for the bottom.'"

While true that the 2000 study reported on the contemporaneous nature of the steel industry, I accept as true for purposes of this motion the basic premise that the production of steel involves "high fixed costs" due to the uncontroverted evidence regarding its capital-intensive nature. Defendants may argue how new aspects of the industry serve to explain their alleged anticompetitive behavior, but I will not at this stage discredit Plaintiffs' reliance on facts about maximizing output that are based upon the assumption of high fixed costs.

substantially higher than Defendants' marginal cost of production. In this atmosphere, a steel producer's incentive to maximize production is particularly strong because cutting output would mean substantially less operating profits.

In addition, at all relevant times, annual domestic demand for steel is alleged to have far exceeded the production capacity of Defendants and other domestic producers. Estimates from Goldman Sachs reveal that the annual domestic demand for steel was approximately 125-130 million tons between 2005 and 2007, while domestic raw steel production totaled approximately 105 million tons per year. This capacity shortfall rendered the U.S. market naturally "tight" and thus ripe for supply manipulation. According to Plaintiffs, Defendants' cooperative downtime exacerbated this supply shortage, thus squeezing the market and inflating the prevailing market price for steel.[6]

_____

[6] With regard to supply and demand, Plaintiffs allege that the industry's production "discipline" came at the expense of the domestic manufacturing sector and other direct purchasers of steel, which suffered from supply shortages caused by Defendants' coordinated downtime. Contrary to Defendants' assertions in the trade press that "oversupply" justified their downtime, Plaintiffs allege that the domestic market was in fact under-supplied during the conspiracy period.
Some of Plaintiffs' allegations in support of their contention that annual domestic demand far exceeded domestic production throughout the conspiracy period include:

- The president of the AISI, a leading industry trade association, explained in February 2005 that "North American steel capacity will be insufficient to meet steel demand for the foreseeable future."
- On April 26, 2005, just before the first round of alleged coordinated downtime, U.S. Steel reported that, "Looking forward, key economic data suggests that North American demand for [U.S. Steel products] will remain favorable."
- With respect to "long" products, Commercial Metals reported on June 21, 2005 that "markets for our products are strong" and that "margins are pushing all time highs." One week later, immediately after the June 20-22, 2005 Steel Success Strategies Conference, Commercial Metals announced market downtime.
- In July 2005, during the mid-2005 production cuts, Nucor's Executive Vice President ("EVP") John Ferriola explained that "[d]espite a challenging market in the second

quarter we remain optimistic concerning the balance of 2005. End use demand remains strong . . . our service center customers are telling us that their inventories are under historical levels. . . . Nonresidential construction is showing strength and should add to the demand in the third quarter." For steel sheet Ferriola said "order entry levels have increased significantly over the past four weeks" and Nucor's sheet mills were already "85% booked through the end of August." Nucor's CEO Dan DiMicco reported that "demand for sheet continues to improve, and we've seen almost a 200% uptick in orders over the last seven weeks."

- On July 25, 2005, IPSCO reported that it "believes that end user demand for steel mill products will remain strong in increase throughout the year."

- During the late-2006 production cuts, Nucor stated that "demand remains good" for sheet; the "plate market has remained robust"; and long product "demand, mill inventories and backlogs remain at good levels." As early as July 2006, Nucor's CEO noted that the domestic market was strong and that "a lot of steel companies" already were sold out through the end of 2006.

- In May 2007, before the 2007 downtime, Gerdau reported "solid underlying demand" across "all product lines," including "continued sound demand for our long products and continued firming and rebounding of demand for our hot rolled sheet products."

- In November 2007, Lakshmi Mittal reported during ArcelorMittal's earnings conference call that "the level of imports has reduced dramatically" and "real demand has not fundamentally deteriorated despite price volatility."

In addition, Plaintiffs present October 2006 statements by a Toyota representative who testified in proceedings before the ITC that, "for the first time in my 19 plus years working for Toyota, when we approached suppliers and told them . . . that we are able to increase some of our volumes, instead of smiles and high-fives, we were met with no, we can't support that." According to the same representative, in the spring of 2006, Toyota was "surprised when two of our suppliers, citing capacity constraints, effectively imposed a maximum volume commitment that [was] lower than the volume we sought." Similarly, a Chrysler representative testified at the October 2006 hearing that, "we at the Chrysler group have had consistent and increasing shortages recently of products for, actually for committed tons. I get calls every Saturday, that famous Friday night call or Saturday morning call, the plant's running and we don't have our steel here. It happens throughout the week more frequently than we would like to have to deal with. . . . it started in earnest about a year ago and it's gotten progressively worse." A purchasing manager for General Motors also testified about domestic steel shortages, observing that shortages "became sufficiently critical around the third quarter of '05 that we had to assemble a crisis center." Finally, a brief submitted to the ITC by the Motor Equipment Manufacturers Association and the Precision Metalforming Association states that "23 out of 31 purchasers reported problems with supply, including being placed on allocation or controlled order entry, and that such supply shortages have continued into 2006 for some purchasers." That brief stated in summary, "the record in this case clearly demonstrates that supply problems are ongoing. U.S. steel producers are still unable to supply all of U.S. steel consumers' requirements," thus

Plaintiffs further allege that the U.S. market for steel is characterized by significant barriers to entry, including high capital requirements and regulatory barriers, while import competition is limited by transportation costs (including ocean freight rates), trade duties, and currency exchange rates. Restraints on imports impose substantial costs on imported steel, which effectively insulate domestic producers from import competition and allow them to raise prices in the U.S. market.

In sum, Plaintiffs allege that the steel market was characterized by economic factors that courts, antitrust experts, and economists agree make an industry conducive to collusion: high concentration on the supply side (80-85% controlled by Defendants) and diffusion on the demand side, high barriers to entry (huge costs to build mills, high transportation costs, and tariffs on imports), a commodity good (raw steel, which is the primary input for all downstream steel products), high fixed costs, and a natural capacity shortage in the domestic market that made a

_____

evidencing "a fundamental deficit in the domestic industry's ability to supply U.S. demand."

Defendants counter these statements by citing to the corresponding ITC determination which was issued in January 2007. According to the ITC, "[w]hile automotive customers described the phenomenon as a type of shortage or allocation, we do not view that as an entirely accurate description. Rather, it appears as if automotive customers generally could obtain the necessary steel, but they had to pay more as they were competing against higher spot market prices." The ITC also observed "that this was a new phenomenon."

Defendants also cite to an October 2006 report from a steel industry analyst describing "[a] current oversupply of steel in the United States" which "has pushed the country's steel industry into something of a 'mini-crisis.'" Managing Director Christopher Plummer of Metal Strategies, Inc., a corporation that provides management consulting to the steel industry, attributed the so-called 'mini-crisis' to "major inventory buildups of steel at the service center level" due to "excess production and exports from China." Plummer predicted the crisis to end in three to six months. "[S]teel producers . . . clearly are taking the lead by cutting back production or moving up maintenance outages. They have addressed the supply situation very quickly. . . [m]oving more quickly than they did the last time."

supply cartel particularly likely to succeed in inflating price. It is against this backdrop that Plaintiffs allege the specifics of their Section 1 antitrust claim.

### B. Antitrust Allegations

Plaintiffs allege that Defendants' conspiracy began following a dramatic period of restructuring in the domestic steel industry. Historically, many financially strapped domestic steel producers overproduced in periods of weak demand in a desperate effort to cover the high fixed costs of production. Between 2000 and 2004, a series of bankruptcies (more than 40), mergers, and acquisitions consolidated what previously had been a fragmented market. The change was due in part to both a sharp rise in the cost of raw materials and a significant increase in imports. Following the restructuring, Defendants ArcelorMittal, U.S. Steel, and Nucor emerged as dominant producers, controlling over 55% of domestic raw steel capacity.

The industry's rapid consolidation coincided with strong demand, prices, and earnings through mid-2004. By early-2005, however, the market was retreating from these record highs and Defendant ArcelorMittal recognized the need for improved industry "discipline" to increase prices and profits. In February 2005, ArcelorMittal chairman Lakshmi Mittal "said the growing consolidation in the sector, led by his group, had led to a greater focus on profitability, making companies more likely to cut output than prices in any downturn." According to Plaintiffs, ArcelorMittal executives recognized they could not unilaterally control the price of steel and conspired with other Defendants to limit the industry's total production and output. Consistent with Lakshmi Mittal's vision of a more "disciplined" industry, Mittal executives appeared at a series of 2005 trade meetings and are alleged to have delivered their message directly to competing executives.

The logic of Mittal executives' strategy was simple - rather than compete on the basis of price, the industry should instead exercise "discipline" in the production of raw steel. By restricting industry output, producers could squeeze the market and inflate their margins. Mittal's COO, Malay Mukherjee, explained in 2005, the goal was to "squeeze the cycle a little bit and cut your production . . . Control supply." Having recently announced the acquisition of International Steel Group, Mittal was the largest domestic steel company and in a powerful position to encourage its strategy in the U.S. market.

On March 1, 2005, Mittal executive Louis Schorsch addressed a steel industry meeting in Chicago and criticized the industry's traditional business model, which "ensured that most producers would cut price before reducing volume." Schorsch referred to 2004 as "a watershed year" that "mark[ed] the resolution of many of these structural issues." Looking to the future, he remarked, "if we are going to see improved conduct and thus improved performance, it will only be because the consolidation we have undergone encourages a change in behavior to match the industry structure. This means an emphasis on value instead of just cost, a focus on profits rather than on tons, and an ability to manage strategically rather than just for the short term." Schorsch urged the industry to make "adjustments in operating rates" to halt "an inevitable race to the bottom." A representative of U.S. Steel and the CEO of Gerdau were in attendance at the meeting.

Mittal COO Mukherjee, repeated similar remarks on May 9, 2005, when he explained at a meeting of the Association for Iron and Steel Technology that:

> "what is needed from the industry is a disciplined approach to bringing on supply and managing capacity. A better collective understanding of the microeconomics of our industry, meaning the cost structure and other aspects of the supply side, the likely scenarios for demand growth and what these imply for fair, long

run prices will help ensure that we achieve a better match of supply with demand, more stable price levels and a financially healthier industry overall."

Mukherjee was joined at this event by the CEOs from U.S. Steel, Nucor, Steel Dynamics, Gerdau, and Commercial Metals.

One week later, Schorsch was joined by CEOs from U.S. Steel, Nucor, Steel Dynamics, Gerdau, and IPSCO, and the CFO of U.S. Steel, at the annual meetings of the American Iron and Steel Institute and the Steel Manufacturers Association, two prominent trade associations that met jointly at the Ritz Carlton in Washington, D.C. Keith Busse, chairman and CEO of Steel Dynamics, voiced optimism that the industry could eliminate price volatility by controlling production; the consolidation of capacity meant that "[t]he industry no longer has to deal with the desperate acts of dying men." This marked the third time in three months that executives met and spoke about the need to control the supply of steel.

Immediately following this series of executive-level communications concerning the need to restrict industry output, Mittal and U.S. Steel curtailed several domestic blast furnaces in May 2005 for the express purpose of reducing the market supply of steel. U.S. Steel did so despite its CEO's projection only a few weeks earlier that steel inventories were balanced and that, "[l]ooking forward, key economic data suggest that North American demand for [U.S. Steel products] will remain favorable."

Approximately one month later, from June 20-22, 2005, executives from each Defendant convened in New York City for the Steel Success Strategies trade conference. According to Lakshmi Mittal, the conference brings together "the most influential stakeholders in the steel industry today . . . this event [is] a must-attend for anyone involved in the industry." In attendance were CEOs from Mittal, Nucor, Gerdau, Steel Dynamics, IPSCO, and AK Steel.

12

Executives or senior managers from U.S. Steel and Commercial Metals were also there, as was Nucor's Executive Vice President. During the conference "industry leaders discussed at length the changes the industry has gone through in the past 12 - 18 months – especially the impact of consolidation and its ability to bring newfound discipline to what traditionally has been an unruly market." Executives participating in a panel called "Global Steel: Fewer Players and Tight Metallics: What's the Consequence," "made the point that steel's resurgence in demand and profitability during the past 18 months can be sustained-but only if capability and production are brought under control now." Phillip Casey, chairman and CEO of Gerdau, "urged that it's time for the industry to take advantage of the lessons learned from the recent wave of consolidation." He elaborated:

> We have demonstrated the advantages of market discipline, accelerated supply responsiveness, improved asset utilization, an improved network ability to exchange operating knowledge and best operating practices, and an improved capital structure. I think all these will improve the stability of our industry. We can take advantage of the education we have received and learn from it, and will find that fewer players and tighter metallics will be beneficial for the overall industry.

During the same panel discussion, Schorsch added, "[w]e also need to increase competitiveness of our value chain in terms of growing demand for our product - not in terms of growing supply."

In addition, Lakshmi Mittal addressed the entire conference and spread the message about restricting supply. He attributed the "softening of the market" not to a "sudden drop in demand" but rather "to an inventory overhang situation created in the market." He proposed dealing with the situation by advocating "management of the industry's supply chain." Mr. Mittal endorsed consolidation and spoke in terms of collective action, which, he stated, "will lead to companies adjusting production levels to ensure that the inventory corrects itself and the state of equilibrium

13

is reestablished. Thus if we as an industry can understand this phenomena we will be able to build more sustainability in our operations." He praised countries like Ukraine, Russia and China for having already taken steps in this direction by cutting production.

To summarize thus far, Plaintiffs allege that this series of face-to-face trade meeting communications among CEOs in 2005 – occurring contemporaneously with trade association and board and committee meetings and social contacts among the same executives – were explicit: they all confirmed that the industry needed to take collective action to control the supply of steel.

By July 2005, all Defendants are alleged to have implemented massive and unprecedented production cuts. One week after Lakshmi Mittal spoke at the trade meeting about "adjusting production levels," Mittal idled five of its twelve blast furnaces and slowed production at others, operating at 55% of available capacity during July. Mittal's 2005 Annual Report boasted that Mittal was the "[f]irst steel company to announce production cutbacks, of one million tons, for third-quarter 2005, maintaining reduced production levels from the second-quarter." Lakshmi Mittal praised his company as "clearly the leader who has cut production." U.S. Steel simultaneously idled at least two of its twelve mills and operated at 75% or less of available capacity in the second and third quarters of 2005, as compared to 90% during the first quarter of 2005. Nucor, the largest U.S. minimill producer, announced production cuts on June 28, 2005 and operated at 79% of capacity in the second quarter and 81% of capacity in the third quarter of 2005, as compared to about 96% utilization in 2004. Steel Dynamics, Gerdau, Commercial Metals, AK Steel and IPSCO also curtailed production in mid-2005. Beginning in May 2005, Gerdau locked out workers for six months at a mill in Beaumont, Texas and also curtailed at least one of its mills for two weeks in July and August 2005. Overall, the cutbacks related to both "flat" and "long" product groups. In response to the mid-2005 curtailments, industry

experts remarked that "the degree to which integrated producers cut back is really unprecedented."

Defendants are alleged to have imposed these unprecedented curtailments notwithstanding market pricing substantially higher than their marginal cost of production. In July 2005, Steel Dynamics CEO Keith Busse referred to a "discipline [in the industry] that didn't exist 10 years ago," and discussed the evolution of market stabilization by saying, "[y]ou had supply-side cutbacks with what we did and the blast furnace outages that took some production out. Imports are down – I think even the buyers would admit that. Those kinds of things have led to a stronger market." According to a trade press, "Busse said that discipline by the mills earlier this year helped stabilize prices following the lengthy slide. He said his mill and others could have moved tons at lower numbers, but chose to reduce production to bring supply and demand more into balance." The trade press also reported:

> In 2005, many U.S. mills, led to some degree by U.S. Steel, Mittal and Nucor, scaled back production when springtime service center inventory levels were high. The production cutbacks – some of them brought on by maintenance outages and/or capital projects, such as U.S. Steel's rebuild of its largest blast furnace – had the effect of stabilizing pricing. In years past, mills often cut prices to move tons when service center inventories reached similar levels.
>
> The mills trumped the success of 2005 as evidence of their newfound business strategy and market discipline.

Gerdau CEO Phillip Casey explained that prices stabilized in mid-2005 as a result of "better discipline in the market from the producers in terms of adjusting the supply to meet the current market demand." Commenting on the deterioration of market conditions for flat rolled products, Casey remarked, "we believe that we saw signs of the consolidated producer base react with more discipline than you would have in any time in the past." Casey also discussed the rod

business, attributing weakness in that market to "rod imports, which continue to be a disruptive factor for the domestic market." Nucor's Executive Vice President, Joe Rutkowski, explained that following the industry's consolidation, "when an oversupply of inventory in 2005 threatened to sharply drive down prices again, companies decided to curtail production to prop prices up."

Defendants have candidly admitted that the reason for their production cuts was to decrease supply to keep prices high, just as Lakshmi Mittal had intended and then discussed at trade meetings in the preceding months. It is difficult to see how they could plausibly deny that this was so. On July 20, 2005, the trade press reported that "U.S. steel producers appear to be sticking to their pledges to reduce production in the face of oversupply." An experienced market analyst surveyed the industry's mid-2005 downtime and reported having "never seen such a rapid drop in output corresponding to a rapid drop in demand and pricing . . . clearly this is unprecedented in our 30-year history analyzing this sector." Steel industry consultant Michelle Applebaum explained that in the spring of 2005, when global demand showed signs of weakness, "the industry in effect acted in concert to cut output and stiffen prices." Applebaum met personally and privately with several defendant executives in the weeks immediately preceding the mid-2005 cutbacks. According to her calendar, she had private meetings with Louis Schorsch (CEO, Mittal Steel USA), Dan DiMicco (CEO, Nucor), Gretchen Haggerty (CFO, U.S. Steel), Keith Busse (CEO, Steel Dynamics), Phillip Casey (CEO, Gerdau), and David Sutherland (CEO, IPSCO) between May 17-18, 2005 at the American Iron and Steel Institute ("AISI") conference. Applebaum also had private meetings with Casey, Busse, and Stanley Rabin (CEO, Commercial Metals) between June 21-22, 2005.

Defendants' coordinated production cuts had their intended impact on the market. After the 2005 curtailment, the price of hot rolled steel sheet (a benchmark flat-rolled product)

increased by approximately 25%, from about $440 in July 2005 to about $560 in September 2005.  AK Steel noted that prices "skyrocketed" after the 2005 cutbacks.  Commercial Metals similarly reported "extraordinary" results in the long sector in the final quarter of 2005, which it attributed to strong pricing in the U.S. Market.  In August 2005, the trade press reported on price increases imposed by U.S. Steel, Nucor, and Steel Dynamics.

After the production cuts, Aditya Mittal, President and CFO of Mittal, explained that "[p]rices are stabilizing . . . . That is why producers are announcing price increases."  According to trade press reports, "Steel producers cut back production during the first half of the year to bring steel supplies more in line with demand, leading to recent price stabilization."  Mittal's November 2005 investor presentation concluded "cuts in production have enable [sic] a significant price recovery over recent months."  The "Market prospect trend" portion of that same investor presentation also listed "[r]eal demand still growing" as a bullet point under the column labeled "Americas."  Mittal's 2005 annual report summarized that it "saw major players in both North America and Europe reducing production to address the challenges presented by the market.  These actions contributed to reducing the inventory overhang, resulting in a price recovery in the latter part of 2005."

Steel Dynamics CEO Keith Busse summarized the industry's unprecedented collective action:

> I've been around the industry for 20 years.  And I haven't seen this kind of discipline.  And it's to be applauded.  You know, there still exists the knee-jerk reaction to events that cause people to go places that we all wish we didn't have to go.  But historically there wasn't any discipline.  It was, as I said earlier, the desperate acts of dying men . . . everybody is, to some degree, giving that pint of blood.  And there has been a better discipline.  It's affected us all.  And that's real positive.

In November 2005, Lakshmi Mittal praised "the behavior of companies," saying "they seem to be behaving very well, with following the production starts and trying to maintain supply/demand balance." He expressed optimism that the industry would continue its efforts to keep prices high, explaining that "producers have been very cautious and careful in oversupply to the market, and we believe that that inventory [buildup] will not take place in the Americas." Industry analysts praised "the significant supply discipline for an industry that never had any discipline." In a February 23, 2006 interview with Financial Times, Lakshmi Mittal looked back on the past few good years and commented, "[t]he industry has changed immensely. . . . On top of this [consolidation] there is a new discipline in the industry which means when demand is soft, as happened in the second quarter of 2005, companies cut production to better manage supply/demand."

After the mid-2005 cutbacks, supply remained tight, prices remained high, and the market remained extremely profitable for producers through 2006. Defendants are alleged to have nonetheless continued to meet and discuss the need for ongoing "discipline."

In February 2006, an article published in *The Economist* about the consolidation of the steel industry in general and on Mittals' hostile takeover bid for Arcelor in particular noted: "Mr. Mittal also hopes that a new, larger group may be able to set a lead for the rest of the industry – sending signals about when to moderate production, and so smooth the peaks and troughs in demand that have bedeviled the steel business." *The Age of Giants*, The Economist, Feb. 4, 2006, at 79.

Between May 1-3, 2006, executives from Mittal (Malay Mukherjee, COO), U.S. Steel (John Goodish, COO), Nucor (John Rutkowski, EVP), AK Steel (John Kaloski, Senior VP Operations), Steel Dynamics (Mark Millet, VP and General Manager), and Commercial Metals

(H. Avery Hilton, EVP) met in Cleveland for the annual Association for Iron & Steel Technology ("AIST") trade conference, where they discussed the industry's newfound production restraint and its success in 2005.

On May 7-9, 2006, the AISI, Steel Manufacturers Association ("SMA"), and the Metal Service Center Institute ("MSCI") jointly held their annual meetings in Boca Raton, Florida. Executives in attendance included Schorsch (CEO, Mittal), Surma (CEO, U.S. Steel), DiMicco (CEO, Nucor), Busse (CEO, Steel Dynamics), and Sutherland (CEO, IPSCO), as well as executives or managers from Gerdau and Commercial Metals. On June 19-21, 2006, executives from each Defendant also attended the annual Steel Success Strategies conference in New York, including Lakshmi Mittal, DiMicco, Busse, Wainscott (CEO, AK Steel), Mario Longhi (CEO, Gerdau), and Johanpeter (Gerdau executive).

Days after the industry gathering in New York, Lakshmi Mittal voiced his expectation that Defendants, acting together, would be able to maintain high prices. In a June 26, 2006 conference call entitled "Proposed creation of Arcelor-Mittal," Lakshmi explained "the environment is very positive. The demand is strong. All the companies are running basically full-out and definitely the industry has been watchful. Inventory levels are in control. And we believe that the industry will remain watchful and they will be proactive whenever they see that the market is softening." Despite this bullish outlook, a little over a month later (on August 2, 2006), during the ArcelorMittal Half Year 2006 Earnings Conference Call, Joseph Kinsch (Chairman of the Board of Directors, Arcelor), joined by Lakshmi Mittal and other executives, announced that he was expecting a future round of industry-wide production cuts: "going forward the industry is getting geared to assist production and volume to maintain the prices." Kinsch predicted "there should not be oversupply in the market" and reiterated ArcelorMittals'

"policy" of "announc[ing] production cuts." Stressing ArcelorMittal's commitment, Kinsch explained, "we will continue with this policy because both the Company and industry believes in maintaining the price to return adequate returns for the shareholder."

Between October 1-3, 2006, several of Defendants' senior executives – Lakshmi Mittal, Surma, DiMicco, Johanpeter – again convened in Buenos Aires, Argentina for the annual conference of the International Iron and Steel Institute ("IISI"). Despite expectations of strong demand in the near-term, executives at the conference explicitly urged production restraint and holding the line on capacity.

Immediately after the Buenos Aires meeting, Defendants embarked on another massive round of production cuts. ArcelorMittal and U.S. Steel began idling mills within days of the meeting.[7] All other Defendants followed suit, just as they had done in 2005. Ultimately, U.S. Steel operated its United States mills at only 67% of capacity in the fourth quarter of 2006. Nucor operated its United States mills at approximately 92% of capacity in the first three quarters of 2006 before cutting production to approximately 81% of capacity in the fourth quarter of 2006. Nucor's EVP said "[t]he fourth quarter is usually a heavy maintenance time for us. We typically take a week at each of our facilities."[8] Gerdau's CFO, Tom Landa, estimated that

---

[7] On or about October 4, 2006, U.S. Steel closed a blast furnace in Illinois. On or about October 6, 2006, ArcelorMittal announced the indefinite shutdown of two United States blast furnaces for the purpose of limiting supply. On or about October 9, U.S. Steel closed another blast furnace in Indiana.

[8] Ferriola, Nucor's EVP, explained that the fourth quarter is "typically a quarter where you have a seasonal slowdown to begin with. No one accepts anything between Christmas and New Year anymore and you lose about five days at Thanksgiving every year, so right off the bat you're looking at about two weeks of shipping time right there. . . . The other thing is the weather. In the October/November timeframe, you're not in the heat of summer and you're not yet in the freezing cold of the dead of winter. That makes it more advantageous to take the outages now."

Gerdau operated its domestic mills at 60% of capacity in the fourth quarter of 2006, restricting output in both flat and long products.[9] Steel Dynamics implemented mill downtime in the fourth quarter of 2006, "cut[ing] back significantly on production."[10] AK Steel operated "somewhere on average about 8% below [] total capacity" in the fourth quarter of 2006. According to Bill Larson, Commercial Metals CFO, his company operated at 75-80% of capacity in the fourth quarter, due to both the performance of maintenance and for the purpose of reducing supply in the marketplace. Defendant IPSCO also scaled back production in October 2006, "falling in line with other companies that are taking similar action." Nevertheless, IPSCO said "it expect[ed] its fourth-quarter shipments to remain on par with those in the third quarter."

One industry analyst noted:

> Supply discipline on the part of the mills is being imposed much more quickly than it [was] last year. . . . The announcement by Mittal to indefinitely idle two blast furnaces represents the final piece of a supply discipline scenario unfolding (for the fourth

---

[9] Landa also estimated 85% - 86% "is a pretty good quarter."

[10] Steel Dynamics' 2006 Annual Report highlights the fact that these significant cutbacks in production were in response to slowing order rates. This explanation is repeated throughout the record before me by many, if not all, Defendants. Defendants argue that Plaintiffs cite the fact of production cuts out of context. At this stage, however, Plaintiffs are entitled to assume that Defendants' proffered explanation is not true in part or in whole. In many instances, Plaintiffs have not so much taken quoted language out of context as they have set forth the largely uncontested facts relating to the timing and the extent of the production cuts made by each Defendant producer. The explanation for those cuts – indeed, the crux of this case – cannot be proven by a statement in an annual report, much the same as some alternate explanation is not proven by various other statements made by steel executives or industry analysts, or by the fact that those executives attended certain meetings on certain dates. The question now is one of facial plausibility, which I take up in the discussion section, *infra* Part III. That plausibility determination will be made "on the ASSUMPTION THAT ALL THE allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citation omitted). For the most part, Plaintiffs have alleged a fair and plausible reading of the cited sources. Plaintiffs may be incorrect, but whether they are seriously incorrect is a matter for summary judgment or trial.

> quarter of 2006) over the past several weeks, an almost immediate
> response to higher-than-normal service center inventories. . . . The
> breadth of this discipline is exceptionally encouraging.

Another industry analyst recognized ArcelorMittal's "reasonable amount of success" in "encouraging [its] peer group" in the United States to take "downtime in Q4, to clear up the inventory cycle." Again, Plaintiffs allege that the market price for steel remained well above Defendants' marginal cost of production; any single defendant could have sold more steel at a considerable profit, but all opted instead to limit output. Indeed, Nucor announced in its Q4 2006 Earnings Conference Call that Nucor's "production discipline during the fourth quarter adversely affected [its] results for that quarter."[11]

The squeeze on supply was again a success. The benchmark price of hot-rolled steel rose from approximately $510/ton in January 2007 to approximately $580/ton in March 2007. Long prices rose as well, with Commercial Metals "anticipat[ing] record profits."[12] In early 2007, DiMicco from Nucor remarked that the industry displayed "more profit-driven discipline than ever before in my 38 plus years in the industry." Lakshmi Mittal told a Luxembourg press conference that his company would continue to benefit from its role as market leader and from further synergies and praised the U.S. industry for its ability "to restrict production to keep prices stable." Busse from Steel Dynamics explained that "the industry . . . realized supply side constraints in late '06 and early '07. So I think the outages were very, very real, supply was diminished," resulting in "pricing momentum going the other direction." In its May 2007

---

[11] John Ferriola, Nucor's EVP, explained that the production discipline also "provided a more stable pricing environment during the period we were negotiating our 2007 contracts. . . . This approach is consistent with Nucor's long-standing focus on long-term profitability."

[12] Commercial Metals announced price increases from $15/ton in February 2007, to $30/ton in March 2007, and $55/ton in April 2007.

earnings conference call, ArcelorMittal, discussing "market evolution" reported "we see that the prices in North America have rebounded nicely in response to our industry's earlier production cut and they are currently stable."  In mid-2007, at the Steel Success Strategies conference, Lakshmi Mittal called on his audience – "the most influential stakeholders in the steel industry today" – to "all take a moment to enjoy.  We have successfully made considerable progress in consolidation.  We have successfully demonstrated the benefits that a more consolidated industry creates.  We have successfully demonstrated our ability to better manage supply and demand."

After Defendants' late-2006 round of production cuts, complaints from steel consumers increased.  A group of domestic manufacturers appeared before the ITC in August 2007 and testified that they were "being squeezed by the steel mills' market domination and shortening of supply."  A group of major U.S. automakers filed briefs in the same matter explaining that the "power of the steel industry to control supply has affected the ability of U.S. Auto Producers to obtain the steel required for their operations."  According to these major purchasers, "domestic producers have refused to supply hot-rolled steel or even caused shortages for their customers." Ford Motor Company filed a separate brief in the same proceeding, stating "[t]he steel industry's concerted strategy to maintain high prices has reduced the volume of steel available in the market."

The conspiracy is alleged to have continued in 2007, during which time Defendants continued to meet and discuss the industry's newfound production strategy.  On February 16, 2007, a Goldman Sachs analyst addressed the SMA, which was holding its annual board of directors meeting in Phoenix.  SMA board members included, among others, six Defendants' CEOs (Selig, Commercial Metals; Longhi, Gerdau; Sutherland, IPSCO; Schorsch, ArcelorMittal; DiMicco, Nucor; and Busse, Steel Dynamics).  At this meeting, the analyst applauded the

industry's production cuts in the fourth quarter of 2006 in a presentation titled, "Outlook for 2007: A successful test of market discipline." The presentation projected that the industry's "supply reductions" would "cause a sharp recovery" in steel prices in 2007, particularly considering "broad-based underlying demand strength." Similarly, steel analyst Mark Parr delivered a presentation at the SMA's annual meeting in Washington, D.C. on May 15, 2007, encouraging the industry to "maintain focus on SUPPLY DISCIPLINE."

Between May 6-8, 2007, CEOs of ArcelorMittal (Schorsch), U.S. Steel (Surma), Nucor (DiMicco), AK Steel (Wainscott), Steel Dynamics (Busse), and IPSCO (Sutherland) convened for the annual meetings of the AISI and MSCI, which were jointly held at the Ritz Carlton in Las Vegas. Between May 7-10, 2007, other executives from ArcelorMittal, U.S. Steel, Nucor, Steel Dynamics, IPSCO, and Commercial Metals met in Indianapolis for the AIST annual conference. During the conference, a panel that included "leading steel executives" from ArcelorMittal, U.S. Steel, Nucor, Steel Dynamics, and IPSCO discussed the "new industry operating model" and the ability of consolidated steel producers to cut production to support prices.

Between June 18-20, 2007, representatives from every Defendant, including at least six CEOs (Lakshmi Mittal, Schorsch, Surma, DiMicco, Busse, Wainscott), again convened at the annual Steel Success Strategies conference in New York City. There, Schorsch said the steel mills have to work to remain sustainable and urged them "to adjust their production rates so the price of steel doesn't drop." Other industry leaders agreed "and said they all need to work together to keep the prices high regardless of the flexibility in the marketplace." DiMicco warned that "whenever the steel makers are tempted by the market and therefore fluctuate their prices, the growth of the industry will quickly decline." Busse added that "the North American industry has entered a new age marked by the aforementioned discipline."

Within weeks of these discussions about the hazards of oversupply and the consequences of competing on price, all Defendants curtailed production. On July 31, 2007 a group of senior executives from ArcelorMittal, U.S. Steel, Steel Dynamics, Nucor, and AK Steel testified on a panel at an ITC proceeding involving hot-rolled steel. U.S. Steel's COO acknowledged that, "in 2007, I believe we all have furnaces off or have reduced production." With respect to long products, testimony from Gerdau, Nucor, and Commercial Metals (the three largest "long" producers) confirmed in a separate ITC matter that there were cutbacks in both late-2006 and mid-2007. In October 2007, Ford Motor Company filed a brief with the ITC objecting to steel industry supply constraints. Ford noted that ArcelorMittal and U.S. Steel had idled at least four domestic blast furnaces in mid-2007 "to maintain high market prices," and explained that the industry's "concerted" production cuts "only confirm[] that . . . the supply of hot-rolled steel is, and will continue to be, significantly restrained." Again, Plaintiffs allege these production cuts were against each Defendant's individual competitive interests, as prevailing market prices were substantially higher than Defendants' marginal cost.[13]

Overall, the alleged conspiracy was exceptionally profitable for Defendants. Nucor reported record operating earnings of approximately $2.1 billion in 2005, $2.2 billion in 2006, and $1.9 billion in 2007. Nucor's stock more than tripled from about $25 per share in early 2005 to a high of $83 per share in 2008. U.S. steel enjoyed its "second highest earnings on record" in 2005, with operating income of $1.4 billion, followed by $1.78 billion in 2006, and $1.2 billion

---

[13] Plaintiffs also allege that an October 2007 statement by Steel Dynamics CEO Busse indicates that producers were coordinating not only on output, but also on price: "I clearly would tell you there are folks out there that speak with a forked tongue. They raised the price and then backed off. There's just no doubt about it and – but we're not one of them, frankly, and it may have hurt us in the order entry a little bit. We've pretty much held the line on our price."

in 2007.  U.S. Steel's stock value nearly quadrupled from approximately $50 per share in early

2005 to a high of $196 per share in 2008.  The other Defendants enjoyed similarly impressive

returns.  Lakshmi Mittal personally received cash payments of approximately $1.89 billion in

2007 from dividends and stock share buybacks.  U.S. Steel's CEO, Surma, earned approximately

$8.94 million in 2007, over 80% of which was from bonuses and stock options.  DiMicco, CEO

of Nucor, earned $6.7 million in 2007, of which $755,000 was salary and the remainder of which

was largely bonuses and stock.  By contrast, in "lean" years prior to the alleged conspiracy,

DiMicco's total compensation was less than $1 million.

## III.  Discussion

"A successful claim under Section 1 of the Sherman Act requires proof of three elements:

(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint on trade in the

relevant market; and (3) an accompanying injury."  *Denny's Marina, Inc. v. Renfro Prods., Inc.*,

8 F.3d 1217, 1220 (7th Cir. 1993) (citations omitted).  A jurisdictional prerequisite to such a

claim is that the defendants' activities affect interstate commerce, and a plaintiff may

conclusorily allege such an effect.  *Hackman v. Dickerson Realtors*, *Inc.*, 520 F. Supp. 2d 954,

964 (N.D. Ill. 2007) (citing *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778-80 (7th

Cir. 1994)).

To constitute a violation of the Sherman Act, the actors involved must have "understood

from something that was said or done that they were, in fact, committed to [cut production]."

*U.S. v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963).  Individual production curtailment

decisions, even when each producer rests its own decision upon its belief that competitors will do

the same, do not constitute an unlawful agreement.  *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,

851 F.2d 478, 484 (1st Cir. 1988).  The crucial question is whether each Defendant's conduct

stemmed from an independent decision or from an agreement, though such an agreement need not be express, and it may be inferred from all the circumstances. *U.S. v. Gen. Motors Corp.*, No. 38219 , 1974 WL 926, at *19 (E.D. Mich. Sept. 26, 1974) (citations and quotations omitted). An agreement requires that "each defendant had previously assured the other" that it would participate in the conspiracy. *Id.*; *see also Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (to prevail on an antitrust claim a plaintiff must present direct or circumstantial evidence that reasonably tends to prove that defendants "had a conscious commitment to a common scheme").

Plaintiffs have alleged no specific evidence of a conspiracy, but rather evidence of a course of conduct that clearly helped all Defendants (although it could be found to be against the interests of some). Plaintiffs argue that Defendants' joint motion should be denied because the allegations support a plausible inference that Defendants' success at restricting the production of raw steel was the result of an unlawful agreement. In addition to averments of parallel conduct, Plaintiffs point to seven separate facts that suggest a conspiracy: (1) market structure was ripe for collusion; (2) coordinated supply cuts represented an abrupt departure from each firm's prior behavior; (3) such behavior, at a time when pricing was well above cost and when domestic demand for steel far exceeded domestic supply, was contrary to the independent competitive interest of each defendant; (4) timing of production cuts and gatherings of Defendants' executives at trade meetings where they made statements directly to competing executives calling for industry-wide production restraint; (5) those same executives held private trade association meetings; (6) specific statements by Defendants' executives that suggest collective action and agreement; and (7) Defendants have enjoyed supracompetitive profits as a result of their coordinated action.

Defendants do not dispute that the conduct complained of is actionable if it was undertaken by agreement among them. Instead, Defendants argue that Plaintiffs' complaint is factually insufficient because it fails to supply either direct or inferential allegations sufficient to justify a reasonably founded hope that the discovery process will reveal evidence to support a Section 1 claim. I note at the outset that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Defendants' arguments in support of their motion are essentially four: (1) the public commentary cited by Plaintiffs does not support an inference of conspiracy; (2) production decisions within the conspiracy period aligned with the individual economic interest of each defendant; (3) attendance at trade association meetings and public conferences are neutral facts; and (4) the conspiracy alleged defies practical plausibility. Plaintiffs' allegations must also be evaluated as a whole and in the context of the dramatic consolidation of the domestic steel industry just prior to the alleged conspiracy period. *In re Pressure Sensitive Lablestock Antitrust Litig.*, 566 F. Supp. 2d 363, 371 (M.D. Pa. 2008) (pleading must be considered in its entirety, including industry context).

### A.  Public Commentary

Defendants maintain that it is not surprising that executives of steel companies, like many stock analysts and reporters, discussed the profound changes that occurred throughout and following the restructuring of the steel industry. According to Defendants, Plaintiffs' allegations simply describe a restructured industry making legitimate public observations about that transformation and acting consistently with the dictates of its new structure in the face of high inventories, strong import competition, and weakening demand. Defendants argue that it is

equally if not more plausible that the term "discipline" and other statements alleged by Plaintiffs describe unilateral decisions by producers in a concentrated market. According to Defendants, none of the alleged statements contains the type of language of agreement that would accompany a Section 1 violation, nor do they otherwise provide a sufficient basis on which to infer that Defendants conspired to reduce the output of their steel products.

Moreover, Defendants contend, a decision to announce an output reduction virtually always has a valid-non-collusive purpose: customers, employees, communities, and suppliers affected by plant closings have a vested interest in knowing of the closing ahead of time. In addition, industry analysts routinely inquire about planned production adjustments and Defendants argue they were merely adhering to the common practice of making such information available.

Public statements about output reduction, in the form of press releases or SEC filings, are fundamentally distinct from statements made at trade meetings directly to competing executives, and Defendants proffered non-collusive purpose for the former does not, in all instances, account for the latter. While there may be valid non-collusive purposes to each of the statements alleged, the direct, in-person communications at trade meetings between executives at least supply a plus factor in support of the plausible inference that Defendants reached a meeting of the minds on industry-wide production cuts. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (the most important evidence of conspiracy will generally be non-economic evidence, such as "proof that the defendants got together and exchanged mutual assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown") (quotation and citation omitted).

The types of statements alleged include Defendants' repeated reference to collective industry action and specifically to industry "discipline" in connection with production cuts. For example, in March 2005, a Mittal executive called on other producers to reduce output, asking competitors to avoid "an inevitable race to the bottom" and to instead cut production at "marginal facilities." In June 2005, executives from Mittal and Gerdau "made the point that steel's resurgence in demand and profitability during the past 18 months can be sustained – but only if capacity and production are brought under control now." Also in June 2005, Lakshmi Mittal explained that the "industry overhang situation" would be best dealt with by consolidation, whereby companies could focus on "adjusting production levels." At a Buenos Aires meeting in October 2006, "the major steel producers explicitly urged production restraint and holding the line on capacity." And in June 2007, an ArcelorMittal executive addressed every Defendant at a trade meeting to explain that "steel mills . . . need to adjust their production rates so the price of steel doesn't drop." In addition, Defendants Gerdau, Steel Dynamics, ArcelorMittal, Nucor, and Commercial Metals are specifically alleged to have made statements referring to industry "discipline" in connection with their production cuts.

In another case, a handwritten internal document of one defendant referred under the heading "competitors" to "entry of new entrants (barriers) and will they play by the rules (discipline)." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). The Court of Appeals reasoned that the existence of a price-fixing conspiracy was not the only interpretation of the document, but it was certainly a plausible one. *Id.*

While more innocent inferences can be drawn from the statements that Plaintiffs contend infer an agreement to cut production, it is not Plaintiffs' burden to allege facts that cannot be squared with the possibility of unilateral action. *Fructose*, 295 F.3d at 663 (finding plausible

inference of agreement from evidence even though "there are alternative interpretations of every bit of it").  In addition, Plaintiffs allege more than specific statements by various executives.  Plaintiffs allege that those statements were on many occasions followed by the adoption of the proposed behavior.  The timing of the statements with the alleged concerted action provides some of the requisite "factual heft" in support of Plaintiffs' allegation of parallel conduct.  *See Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 944 (N.D. Ill. 2008) (two concrete settings in which alleged conspiracy was discussed plus one overt act that could be reasonably understood as indicating defendant's agreement therewith was sufficient to state a claim against that defendant).  "Courts have held that a conspiracy to fix prices can be inferred from an invitation followed by responsive assurances and conduct."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2008 WL 3916309, at *3 (N.D. Cal. Aug. 25, 2008) (denying motion to dismiss) (citing *United States v. Foley*, 598 F.2d 1323, 1131-32 (4th Cir. 1979); *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965)).  The statements here – many of them trade meeting statements made directly to competing executives and encouraging industry production restraint – were followed closely by unprecedented industry-wide production cuts, exactly as encouraged and represented by Defendant executives.[14]  The statements bear on the

---

[14] For example, executives from Mittal, U.S. Steel, Nucor, Steel Dynamics, Gerdau, Commercial Metals, and IPSCO met in May 2005; immediately thereafter Mittal and U.S. Steel idled some of their steel mills.  As more specifically detailed in the factual allegations section, *supra* Part II.B, after additional meetings involving additional Defendants, several more Defendants cut production.  Immediately after a meeting on October 1-3, 2006, in Argentina, attended by at least ArcelorMittal, U.S. Steel, Nucor, and Gerdau, all Defendants cut production.  Mid-2007 downtime followed meetings in May and June involving executives from every Defendant.  That Defendants participated in numerous industry, trade association, and trade show meetings does not make the timing of those meetings with the production cuts any less suspicious; if anything the fact that Defendants' executives were in regular contact makes the allegation of agreement more, not less, plausible.

state of mind and intent of certain key executives – especially those at Mittal, which emerged from the era of consolidation as the largest domestic producer and was the first to boast about leading the industry in production curtailment. Together, the statements by Defendant executives at least provide circumstantial evidence of the alleged ongoing conspiracy.

### B. Behavior Against Self Interest

Plaintiffs allege that the coordinated supply cuts were contrary to the independent competitive interest of each Defendant because they came at a time when pricing was well above cost and when domestic demand for steel far exceeded domestic supply. *See supra* note 6 (listing specific allegations with regard to supply and demand during the alleged conspiracy period). Defendants argue that in a market characterized by conscious parallelism, "[o]ne must not characterize a firm's sacrifice of short-run interest in favor of long-run interest as contrary to its self interest. Such a sacrifice by itself tells us nothing about possible conspiracy, because a firm often makes this choice even about non-interdependent matters." Defs. Joint Reply Br. at 23 (quoting VI Philip E. Areeda & Herbert Hovenkamp Antitrust Law ¶ 1415e, at 100 (2d ed. 2003)). Defendants dispute that production restraint was against their individual economic interest in the absence of agreement and claim that Plaintiffs' allegations in this respect are "wholly conclusory." Defendants argue that their behavior can be explained by substantial imports and a drop in demand during the relevant downtime periods.

The allegations in the complaint are not bare conclusions, however, but are instead based on specific facts concerning the marginal and fixed costs of production, the nature of demand, the prevailing prices at the time of the cutbacks, and the inability of any single Defendant to control prices unilaterally. In these circumstances, Plaintiffs allege that, had Defendants behaved independently, they would have operated their mills at a profit while competing with each other

for market share. Giving up a part of that share, and the concomitant profit, at least plausibly infers that Defendants agreed to do so. *See, e.g., Flat Glass*, 385 F.3d at 360-61 (evidence that defendant acted contrary to its self-interest was plus factor in favor of conspiracy); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53-54 (E.D. Pa. 2007) (same); *Babyage.com, Inc. v. Toys R Us, Inc.*, 558 F. Supp. 2d 575, 583 (E.D. Pa. 2008) (defendant's actions against self-interest constitute "widely recognized plus factor[]" suggestive of concerted action). While Defendants may point to competing sources to contradict Plaintiffs' allegations (i.e., with regard to the forces of supply and demand, *see supra* note 6), for purposes of ruling on this motion, I have assumed the well-plead factual allegations in the complaint to be true.[15] It is certainly plausible that absent coordination and agreement by each producer to give its "pint of blood," no Defendant would have sacrificed profitable production. But all eight Defendants made that sacrifice, and did so on multiple occasions. This, I find plausibly suggests agreement.

## C. *Attendance at trade meetings and conferences are neutral facts*

Plaintiffs allege that executives from Defendant companies met frequently during the period when the wisdom of the coordinated production cuts was first discussed and later implemented. Plaintiffs also point out that these executives had the opportunity to conspire at private meetings through various industry associations, trade meetings, and conferences. Proof of Defendants' opportunity to conspire does not alone suggest that there was an agreement to

---

[15] For example, Plaintiffs allege that U.S. Steel explained in an October 2006 brief filed with the ITC that the steel industry's "high fixed costs" encourage competitive producers to "maximize and sustain the utilization of available capacity." *In re Certain Carbon Steel Products*, Prehearing Br. of U.S. Steel, 10/6/06, at 8-9. Likewise, Nucor and Steel Dynamics, exclusive minimill producers, have argued that "[t]he steel industry is characterized by high fixed costs and relatively inelastic demand, particularly in the short term" which gives producers "a strong incentive to maintain or increase capacity utilization." *In re Certain Carbon Steel Products*, Prehearing Br. of Nucor and Steel Dynamics, 10/6/06, at 6.

curtail production.  *See In re Travel Agent Comm'n Antitrust Litig.*, No. 03-30000, 2007 WL

3171675, at *9 (N.D. Ohio Oct. 29, 2007).  But Plaintiffs' allegations go further than pointing to

opportunity alone.  Plaintiffs have alleged the specific content of statements made in public by

Defendants' executives which endorsed an industry strategy to reduce the output of steel.

Plaintiffs have also alleged concerted and unprecedented production curtailments that occurred

on the heels of those statements at specific intervals in 2005, 2006, and 2007.  Given the

proximity of Defendants' trade meeting statements to private trade association meetings

involving the same high-level executives, there is reason to infer that the opportunity for private

communications reinforced the industry strategy to squeeze supply.

Furthermore, Defendants cannot rely on the public or semi-public nature of trade

meetings to immunize their statements from antitrust scrutiny.  Richard A. Posner, *Antitrust Law*

(2d ed. 2001), at 170 ("that the exchange is 'laundered' through a trade association should be no

defense, especially since an empirical study of price-fixing cases found that trade associations

have figured as defendants in a surprising number of cases.").

### D.  *Practical Plausibility*

Defendants argue that Plaintiffs' conspiracy theory must be rejected because it defies

practical plausibility.  First of all, the two production methods, BOF and EAF, have significantly

different cost structures and vary widely in the time and cost involved in shutting down and

restarting capacity in response to shifts in demand.  A blast furnace, which must run 24 hours a

day, takes weeks to shut down and weeks to ramp back up to normal production, while an EAF

can be shut down and restarted on a minute-by-minute basis.  The different methods also lead to

the production of different finished products:  BOF manufacturers focus primarily on flat

products, whereas EAF producers tend to focus on long products.  These finished products are

bought and sold commercially and used in an array of applications in many industries, each having a unique set of customers and supply/demand characteristics. Indeed in one of the speeches on which Plaintiffs rely, Mittal's COO Malay Mukherjee said, "[p]eople are so used to talking about 'the' steel industry and 'the' price of steel when we all know that there are multiple steel products made for multiple applications and markets. Each has a difference cost structure."[16]

Second, Defendants emphasize that they compete with many non-defendant domestic companies and with imports. Domestic producers other than Defendants operate 15% to 20% of domestic steel capacity. Defendants argue that the alleged conspiracy does not account for the ability of those producers to fill any resulting supply shortfall and thereby frustrate the purpose of the alleged co-conspirators. Likewise, imports of steel products accounted for a significant percentage of aggregate U.S. consumption during the relevant period, representing, respectively, 24%, 29%, and 20% during 2005, 2006, and 2007.[17] Nucor's EVP reported that the fourth quarter of 2006 "was impacted by record levels of imports" and a "resulting high service center

---

[16] For instance, Nucor's DiMicco insists that his company's "short-term performance is not tied to any one market" because of its product line diversity. For example, the composition of Nucor sales in 2006 was 38% sheet, 15% beams, 11% plate, and 7% down-stream steel products.

[17] For certain steel products, the impact of imports during the relevant period was even greater. *See* Certain Circular Welded Carbon Quality Steel Line Pipe from China and Korea, USITC Pub. No. 4003, Inv. Nos. 701-TA-455 and 731-TA-1149-1150 (Preliminary), at 14, 17 (May 2008) (finding that from 2005 to 2007 steel line pipe imports increased from about 20% to over 50% and attributing "decline in [domestic line pipe] profitability to the presence of low-priced subject imports and their price-suppressing effects"); Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Indonesia, Mexico, Trinidad and Tobago, and Ukraine, USITC Pub. No. 4014, Inv. Nos. 701-TA-417 and 731-TA-953, 954, 957-59, 961, and 962 (Review), at I-37 (Table I-16) (wire rod imports were about 50%, 43%, 46%, and 30% in 2004, 2005, 2006, and 2007, respectively).

inventories."[18]  Thus, the hypothesis that an agreement to reduce production of these disparate

steel products could be reached among a partial set of competitors is, Defendants argue,

farfetched and wholly speculative.

With respect to the first argument – that the conspiracy is not practical since Defendants

produce a wide array of products – the complaint alleges that Defendants control both the flat and

long segments of the steel market and that all Defendants acted in concert in all three periods of

industry downtime.  Thus, by agreeing to reduce production of raw steel on an industry-wide

basis, Plaintiffs allege that Defendants inflated the price of steel generally.  Although

downstream product differentiation may make price fixing more difficult, it is not uncommon for

a conspiracy to focus on the upstream level of commodity production.  *Flat Glass*, 385 at 353-54

(conspiracy alleged among producers of flat glass, an upstream commodity product); *In re*

*Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002) (certifying class where cartel

restricted supply of linerboard, the primary import of downstream goods).  The core product at

issue in this case – raw steel – is a commodity good.  In addition, the statements made by

Defendants' executives refer to supply discipline in the production of steel generally; remarks

discussing the need for production restraint at trade meetings are not limited to any particular

steel product.  Furthermore, Plaintiffs allege that "raw steel" is the standard industry benchmark

for measuring output.  Defendants' impracticality argument based on each individual producer's

arguably unique product is unavailing because collectively Defendants, employing both

production methods, produce a vast majority of downstream domestic steel products.

---

[18] The same was not true in July 2005, however, when Nucor reported that "[c]urrent
levels of steel imports are down, and import license requests have decreased."

Likewise, the presence of imported steel does not diminish the domestic industry's power to inflate prices by restricting supply, nor does it render the alleged conspiracy implausible. Even with imports, Defendants supplied over 70% of domestic consumption of steel during the relevant conspiracy period, and nothing indicates that imported steel filled the void created by the production curtailments as the alleged conspiracy progressed. Instead, the percentage of imports supplying domestic demand decreased. In November 2007, during ArcelorMittal's Earnings Conference Call, Lakshmi Mittal reported that "imports are continuing to decline due to market unattractiveness and the low price difference between the U.S. and China which is currently less than $30 per ton. . . . [I]n September there has been a 17% decline in import volume." Indeed, if imports presented such a "major source of competition" and meaningfully restrained the pricing power of domestic mills, as Defendants argue they did, then Defendants would have had nothing to gain from parallel production discipline within the domestic market. However, Defendants repeatedly espoused such discipline and in doing so realized supracompetitive profits, a point which Defendants do not dispute.

The same is true for the 15% - 20% of non-defendant domestic producer's steel. As compared to the market segment controlled by Defendants, these non-defendant producers lack the capacity to thwart Defendants' ability to significantly affect the supply side of the domestic market through the implementation of the alleged coordinated action.

### E. Context

In *Twombly*, the history and context of the telecommunications industry provided an explanation for the noncompetitive behavior alleged in the complaint. 550 U.S. at 567. It was natural that the defendants, incumbent local telephone companies, failed to enter into each

other's territories after Congress passed the Telecommunications Act of 1996 because they had been behaving that way (*i.e.*, operating in a "monopolistic tradition") for decades. *Id.* at 567-69.

Defendants argue that the context of the dramatic change in the steel industry in the early years of this century similarly provides an explanation for the noncompetitive behavior alleged here. Here, new industry conditions, Defendants argue, caused them to independently change their behavior (*i.e.*, cut back on capacity), because such output cuts were clearly and obviously in each Defendant's own self-interest. In the new, more concentrated market, Defendants could cease chasing legacy health care costs and pension obligations. Producers that survived the restructuring, now larger and more efficient, were able to reduce fixed costs, thereby reducing the urgency of maintaining volume in a downturn and making room for more forward-looking, longer-term capital investment and production decisions. In short, the dramatic change resulted in each steel company's improved ability to reach to softness in demand with production cutbacks.[19] However, Defendants' reaction to the new market conditions in the steel industry is markedly different than the reaction of the defendants in *Twombly*. In *Twombly*, despite new conditions, the defendants fell back onto a pattern of behavior to which they were accustomed, and the Court gave a certain amount of credit to the industrial culture in which the defendants were operating. The industrial culture here, characterized by fierce competition and a longstanding strategy of maximizing utilization and output, does not similarly explain the

---

[19] The ITC has attributed the "industry's higher profitability from 2004 through the first half of 2006 . . . in large part to the restructuring by many U.S. producers that permitted them to terminate pension and healthcare liabilities and secure less costly labor contracts." Certain Carbon Steel Products, USTIC Pub. No. 3899, Inv. Nos. AA1921-197 (Second Review); 701-TA-319, 320, 325-27, 348, and 350 (Second Review); and 731-TA-573, 574, 576, 578, 582-587, 612, and 614-18 (Second Review), at 135-36 (Jan. 2007). The same determination report found that "[t]he industry's reduction in fixed costs allows producers to better match their production levels to their demand so as to avoid over-production." *Id.* at 136.

massive, unprecedented, and coordinated output cuts by Defendant steel manufacturers.  If the drastic output cuts were so clearly and obviously in each Defendant's own self-interest, if the cuts were as "natural and predictable" as Defendants claim, then why didn't each manufacturer implement them sooner?  And why were the curtailments imposed in coordination with one another?  The parallel and drastically novel conduct in the context presented here at least suggests some sort of preceding agreement among the actors involved.  Similar allegations showing "that there was a marked change in defendants' behavior in the market around the time the conspiracy started" have been held sufficient to "make an antitrust conspiracy plausible." *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007).  Indeed, in *Twombly*, the Supreme Court noted in dicta that "the parties . . . agree that 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy."  550 U.S. 544, 557 n.4.  Plaintiffs here have alleged with specificity distinct differences in Defendants' behavior before and during the alleged conspiracy.  It is possible that the industry turnaround from fierce competition to striking coordination was the inevitable result of industry consolidation, but the context, as a whole, provides enough to support the plausible conclusion that the cause of the turnaround was something other than consolidation.  Indeed, Plaintiffs' complaint relies heavily on the new industry landscape as support for Defendants' ability to implement and succeed with their agreement to cut production.  Plaintiffs do not dispute that one of the principal benefits of industry restructuring was that it facilitated coordinated supply reductions in response to market conditions.  In fact, Plaintiffs emphasize this fact in making their point that the market was both concentrated and ripe for coordinated action.

## IV. Defendant-Specific Motions

Four Defendants – Gerdau, AK Steel, Commercial Metals, and SSAB – filed separate briefs in support of their individual motions to dismiss. While the complaint need not contain detailed "defendant by defendant" allegations, it "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *TFT-LCD*, 2008 WL 3916309, at *4 (quotation and citation omitted); *Hinds County v. Wachovia Bank*, No. 08-2516, 2009 WL 1204345, at *8 (S.D.N.Y. Apr. 9, 2009) (Plaintiffs must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy) (quotation and citation omitted). This the complaint adequately does.

### A. Gerdau

Gerdau does not contest that the complaint properly alleges that it cut production in coordination with other Defendants, nor that the output restraints were historically unprecedented and occurred despite prevailing prices well above cost. Gerdau also does not contest that its executives attended key trade meetings preceding these actions, nor that its senior officers made the statements quoted in the complaint. Gerdau also admits that it earned exceptional profits during the alleged conspiracy period. These allegations, viewed in the overall context of the complaint, are more than sufficient to state a claim against Gerdau. Gerdau's argument with regard to the effect of imports on the domestic market was addressed in the joint motion and need not be repeated here. Gerdau's specific contention that demand conditions explain its own production cuts is a question of fact that will be addressed at a later date.

### B. AK Steel

The allegations that AK Steel attended the relevant trade meetings, curtailed output with its competitors in 2005, 2006, and 2007 despite profitable market pricing, and acknowledged its participation in the industry's unprecedented "market discipline," viewed in the context of the complaint as a whole, are also sufficient to state a claim against AK Steel. AK Steel's argument that because it is also a *purchaser* of steel slabs it would have been economically irrational for it to participate in a conspiracy to raise market prices is unavailing. There is nothing unusual about a market in which cartel members purchase a certain volume of product from their co-conspirators. Also, AK Steel's slab purchases represent only a small fraction of its total output. In the fourth quarter of 2006, for example, AK Steel purchased 150,000 tons of steel slab while selling approximately 1.5 million tons. Indeed, AK Steel's financial reports clearly indicate that the high steel prices served as a benefit to its bottom line.

### C. Commercial Metals

Commercial Metals incorrectly suggests that it is a bit player in the industry and has been unfairly swept up in this litigation. As alleged by Plaintiffs, Commercial Metals is a top three domestic producer of "long" products, with domestic sales of more than $5 billion during the alleged conspiracy period. Together, Nucor, Gerdau, Steel Dynamics, and Commercial Metals control approximately 80% of the long segment of the domestic market. Plaintiffs acknowledge that no single Defendant could control prices unilaterally; indeed Plaintiffs rely on this fact in support of their argument that the steel industry was particularly ripe for concerted action. Along with the other Defendants, Commercial Metals is alleged to have attended the relevant trade meetings, curtailed production in 2005, 2006, and 2007, and made statements suggesting its participation in the conspiracy. These allegations, in the context of the complaint as a whole, are

sufficient to state a claim. Commercial Metals' argument about its purported purchases of steel is, as explained *supra* Part IV.B., unavailing. Commercial Metals' financial reports indicate that high domestic steel prices and producer discipline were beneficial to its overall business.

### D. SSAB

Contrary to the arguments in SSAB's individual motion, Plaintiffs have alleged that its predecessor, IPSCO, participated in every alleged period of industry-wide curtailment. In 2005, senior IPSCO executives attended several of the key trade meetings at which Lakshmi Mittal and others encouraged production restraint. After these events and despite contemporaneous statements emphasizing strong markets and tight supply for producers, IPSCO is alleged to have scheduled downtime in mid-2005. Again, despite predictions of strong and growing demand and favorable supply conditions, IPSCO is alleged to have joined the late-2006 industry cutbacks, stating that it "elected to reduce output volumes" in the fourth quarter. Also, after attending certain alleged 2007 trade meetings, IPSCO participated in the mid-2007 curtailment by moving forward a twelve-day maintenance outage at one of its mills, thereby overlapping with shutdowns imposed by every other Defendant. SSAB's attempt to cite IPSCO's yearly data with regard to overall production in 2005 and 2006 does not defeat Plaintiffs' allegations that IPSCO joined its competitors in cutting production during the particular alleged conspiracy periods when the industry is alleged to have been especially interested in restricting supply and inflating price. In the context of the complaint as a whole, the specific allegations included against IPSCO are sufficient to state a claim.

## V. Conclusion

Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings)

42

support a plausible inference of conspiracy – is contrary to the Supreme Court's admonition that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts." *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962). While individual Defendants may be able to suggest business justifications for some of the mill shutdowns (e.g., scheduled maintenance, specific supply/demand projection for a particular product), "the fact that multiple instances of parallel conduct are alleged makes it far less likely that a business justification exists for all of the acts taken in total." *In re Southeastern Milk*, 555 F. Supp. 2d 934, 944 (E.D. Tenn. 2008). Whether the production curtailments were simple, benign unilateral business decisions made by the individual Defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which I cannot decide on the pleadings and which require discovery prior to resolution. The complaint alleges parallel conduct in addition to a number of other facts plausibly suggesting an agreement to curtail production. For all of these reasons, I find that Plaintiffs have plead sufficient facts to comply with Federal Rule of Civil Procedure 8(a)(2) and *Twombly*. The complaint adequately states facts which address the questions of who, what, when, and where to give the Defendants an idea of where to begin their response. Therefore, Defendants' joint motion to dismiss is denied. The complaint survives dismissal and the case should proceed to class issues and then to the merits of the claims, on neither of which matters I express any view.

## VI. Discovery

It is my intention to proceed with phases of discovery, and I am willing to entertain suggestions from all parties (preferably jointly) on how to achieve the goals of discovery in an economically feasible manner. I recognize the potential for staggering discovery costs in a case such as this. Some of those costs will be borne by Plaintiffs, who are not indigent, and, for

unnecessary discovery, I am willing to impose costs on the party at fault for requesting it.  This is not to say that I am allowing discovery to proceed cautiously because Plaintiffs' claim is shy of a plausible entitlement to relief - it is not.  *Iqbal*, at *16 ("a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process") (quoting *Twombly*, 550 U.S. at 559).  *Twombly's* concern that allowing big, complex cases to proceed based on "threadbare" claims may force defendants to settle even largely groundless claims because of their "in terrorem" effect does not militate in favor of dismissal here.  *See Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) (citing *Twombly*, 550 U.S. at 557-58).  But because – as far as I can tell and based upon the briefing up until this point – this will be a sizable, complex case, I am inclined to proceed with discovery in phases and, as is my custom in many other cases, invite the litigants to make a proposal (or two) in that regard.

ENTER:

James B. Zagel
United States District Judge

DATE:  June 12, 2009