# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| ———————————————— | Honorable James B. Zagel |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** |  |
| ***Standard Iron Works v. ArcelorMittal, et al.,*** **Case No. 08-cv-5214** |  |
| ***Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,*** **Case No. 08-cv-5371** |  |
| ***Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,*** **Case No. 08-cv-5633** |  |
| ***MPM Display, Inc. v. ArcelorMittal, et al.,*** **Case No. 08-cv-5700** |  |
| ***REM Systems, Inc. v. ArcelorMittal, et al.,*** **Case No. 08-cv-5942** |  |
| ***Alco Industries, Inc. v. ArcelorMittal, et al.,*** **Case No. 08-cv-6197** |  |

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' PROPOSED CASE MANAGEMENT ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT .......................................................................................................................... 7

I.   The initial discovery sought by plaintiffs is directly relevant to class certification ................ 7

     A.   Senior management discovery ................................................................................ 8

          (1)   Relevance ..................................................................................................... 8

          (2)   Burden ......................................................................................................... 10

     B.   High level planning and strategy documents reports ...................................... 11

     C.   Economic data ...................................................................................................... 12

     D.   Certain categories of easily produced discovery, including ITC,
          Department of Commerce, and government investigation records;
          organizational discovery; and corporate policy documents ........................... 14

II.  Plaintiffs' plan is reasonable, efficient and will meaningfully advance the case ................. 16

     A.   The scope of plaintiffs' proposed phase one discovery is reasonable ........................... 16

     B.   Plaintiffs' initial discovery plan will advance the case ................................................... 17

     C.   Plaintiffs' proposal will resolve class certification at an early practicable time
          with minimal pre-certification deposition practice ....................................................... 18

III. Defendants' proposal will not develop an appropriate record for class certification ........... 19

IV.  Any effort to distinguish between "conspiracy" and "impact" evidence
     would be inefficient and unworkable in practice ............................................................... 20

V.   Other case management issues ......................................................................................... 22

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .................................................... 5, 8

*Clark v. Experian Information Solutions, Inc.*, No. 03C7882,
2006 WL 626820 (N.D. Ill. Jan. 6, 2006) ................................................. 15

*Coopers & Lybrand v. Livesay,* 437 U.S. 463 (1978).................................................. 10

*General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 146 (1982) .................................... 7

*In re Bulk [Extruded] Graphite Products Antitrust Litig.*, No. Civ-02-6030 (WHW),
2006 WL 891362 (D.N.J. April 4, 2006)................................................ 3, 9

*In re Carbon Black Antitrust Litig.,* No. 03-10191-DPW, 2005 WL 102966
(D. Mass. Jan. 18, 2005) ............................................................ 3

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486-PJH,
2006 WL 1530166 (N.D. Cal. June 5, 2006) ............................................ 3

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82
(D. Conn. 2009) ................................................. 3, 7, 9, 11, 19

*In re Foundry Resins Antitrust Litig.,* 242 F.R.D. 393 (S.D. Ohio 2007) .................................... 3

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008).................................. 7, 19

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ........................................ 7, 11, 13

*In re Linerboard Antitrust Litig.,* 203 F.R.D. 197 (E.D. Pa. 2001),
*aff'd*, 305 F.3d 145 (3d Cir. 2002) ...................................................... 3, 8

*In re Microcrystalline Cellulose Antitrust Litig.*, 221 F.R.D. 428 (E.D. Pa. 2004)...................... 17

*In re OSB Antitrust Litig.,* No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007)................. 3, 7

*In re Plastics Additives Antitrust Litig.*, No. 03-2038, 2004 WL 2743591
(E.D. Pa. Nov. 29, 2004)............................................... 3. 10, 17, 21

*In re Polyester Staple Antitrust Litig.*, No. MDL 3:03cv1516, 2007 WL 2111380
(W.D.N.C. July 19, 2007).......................................................... 3, 7, 8, 15

*In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) ............. 13

*In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 03-MDL-1556,
　　2007 WL 4150666 (M.D. Pa. 2007) ...................................................................... 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.,* MDL No. 1869,
　　2009 WL 1904333 (D.D.C. July 2, 2009)....................................................... passim

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008) ............... 16

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008),
　　*cert. denied*, 129 S.Ct. 1673 (2009) ............................................................... 5, 8, 13

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C0701819CS,
　　2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ................................................... 3

*In re Sulfuric Acid Antitrust Litig.*, No. 03C4576, 2007 WL 898600
　　(N.D. Ill. Mar. 21, 2007) .................................................................................... 3

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ............................................. 3, 8, 9

*McDonough v. Toys R Us*, No. 06-0242, 2009 WL 2055168 (E.D. Pa. July 15, 2009) ............. 3, 7

*Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008) ........................... 14

*Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672 (7th Cir. 2001)......................................... 7, 19

**Rules**

Fed. R. Civ. P. 23.......................................................................................................... passim

Fed. R. Civ. 26(b)(1) ................................................................................................. 13, 17

**Other Authorities**

7AA Wright & Miller, Federal Practice and Procedure: Civil 3d § 1781 ................................... 8

Manual for Complex Litigation (Fourth*)* § 11.22 (2004*)*. .................................................... 22, 23

Manual for Complex Litigation (Fourth*)* § 11.422 (2004*)*. .................................................. 1, 17

Manual for Complex Litigation (Fourth*)* § 21.14 (2004*)*. .......................................................... 22

Newburg on Class Actions § 9.44 (4th ed. 2009) ................................................................ 18

## INTRODUCTION

Consistent with the Court's stated preference for phased discovery, plaintiffs propose that "initial discovery should focus on matters—witnesses, documents, information—that appear pivotal." MANUAL FOR COMPLEX LITIGATION (Fourth) § 11.422, at 54-55 (2004).

Plaintiffs' proposed case management order provides for targeted initial discovery on core evidence and "issues that will actually be presented at trial," while imposing meaningful limits on the scope and burden of initial production. Fed. R. Civ. P. 23(c)(1) Advisory Committee Note, 2003 Amendments. Rather than unfettered, company-wide merits discovery, plaintiffs propose initial discovery of (i) a targeted number of high-level individuals, (ii) high-level planning and strategy documents, (iii) relevant market data, and (iv) other easily-produced and relevant materials, such as ITC, merger review, and government investigation records.

Plaintiffs do not support phasing discovery based on an artificial and unworkable distinction between "class" and "merits" discovery, or "conspiracy" and "impact" discovery, as defendants propose. Prior attempts to phase discovery along such lines have produced unwarranted contention, expense, and delay, actually increasing the parties' discovery burdens.

Defendants, moreover, seek radical limits on the scope of initial discovery—limits that should not be adopted under *any* reasonable discovery plan. The substance of their position is that phase one discovery should be confined to narrow categories of self-selected information, principally raw economic data, that defendants deem "sufficient" for the Court to evaluate the class certification element of common antitrust "impact." Defendants contend that the Court should exclude from initial discovery core categories of evidence relevant to the scope, nature, and common impact of the conspiracy, notwithstanding defendants' intention to litigate those issues vigorously at class certification. For example, defendants object to *any* discovery of

emails or other communications—including highly relevant "impact" documents—from the key executives alleged to have conspired to inflate the price of steel. By excluding such evidence from phase one discovery, defendants would have the Court decide class certification considering only technical economic data favorable to their position, without the benefit of the most important information in the case: what defendants' executives said and did, and their own views about the impact of production cuts on the market.

Defendants' position is untenable. Limiting initial discovery as defendants propose would deprive plaintiffs, and the Court, of evidence centrally relevant to both class certification and the case going forward. Defendants' plan would inhibit the Court's ability to understand the extent of common issues and identify the parameters of the eventual trial, and would engender inefficiency, delay, and unnecessary disputes about the line between "class" and "merits" evidence. At bottom, defendants' proposal is an effort to draft their own discovery requests, gain an extraordinary strategic advantage at class certification, and delay *any* discovery of the central evidence in the case.

For precisely these reasons, courts have rejected similar proposals. In the ongoing *Rail Freight* litigation, for example, the defendants also attempted to preclude pre-certification discovery into "conspiracy" issues. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:2007-mc-00489, Docket # 291, at 6 (D.D.C. July 2, 2009) (copy attached as Exhibit A). Rejecting that proposal as arbitrary and inconsistent with the Federal Rules, Magistrate Judge Facciola, a respected authority on discovery management in complex litigation, held that discovery relating to the scope, nature and impact of an antitrust conspiracy is central to class certification, and that any attempt to bifurcate "conspiracy" and "impact" discovery would be inefficient and unworkable in practice. *Id.* at 11-16. The court refused to endorse defendants'

effort to shield initial discovery of highly relevant evidence, explaining that "the whole purpose of discovery is to find not only those documents that defendants wish for plaintiffs to see but *all* documents that pertain to the certification issue[.]" *Id.* at 11 (emphasis added); *see also In re Plastics Additives Antitrust Litig.*, 2004 WL 2743591 (E.D. Pa. Nov. 29, 2004).[1]

The better approach in complex antitrust litigation is targeted initial discovery limited to core issues and individuals, aimed not at trolling broadly through defendants' corporate records but instead building a proper record for class certification and advancing the case on the merits in a reasonable way.

## **BACKGROUND**

Plaintiffs propose targeted initial discovery on the elements of (1) conspiracy, (2) antitrust impact or injury (*i.e.*, higher prices in the relevant market), and (3) damages. *See, e.g., Sulfuric Acid*, 2007 WL 898600, at *2-6 (plaintiffs' burden at class certification is to show that these elements can be established using predominantly common proof at trial).

---

[1] Antitrust class certification routinely follows discovery targeting the core issues and evidence in the case. Defendants' proposal to bifurcate "conspiracy" and "impact" discovery is the exception in recent antitrust litigation, not the rule. *See, e.g., Rail Freight, supra*; *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009) (certifying class following initial merits discovery); *McDonough v. Toys R Us, Inc.*, 2009 WL 2055168 (E.D. Pa. July 15, 2009) (same); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) (same); *In re Polyester Staple Antitrust Litigation*, 2007 WL 2111380 (W.D.N.C. July 19, 2007) (same); *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600 (N.D. Ill. March 21, 2007) (same); *In re OSB Antitrust Litig.*, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) (same); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007) (same); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166 (N.D. Cal. June 5, 2006) (same); *In re Bulk [Extruded] Graphite Products Antitrust Litig.*, 2006 WL 891362 (D.N.J. April 4, 2006) (same); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966 (D. Mass. Jan. 18, 2005) (same); *Plastics Additives,* 2004 WL 2743591 (same); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) (same), *aff'd* 305 F.3d 145 (3d Cir. 2002); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) (same).

Plaintiffs' plan will develop the record necessary for class certification, and substantially advance the case on the merits, while imposing reasonable and meaningful bounds on the scope of initial discovery. Each defendant is a massive steelmaking organization with thousands of employees—in most cases tens of thousands and hundreds of thousands in the case of ArcelorMittal. Plaintiffs are not seeking broad initial discovery from these companies, and are not seeking initial production of voluminous middle-management files from defendants' various offices and plant locations, notwithstanding that those files likely include relevant information about steel production, industry coordination, and its impact on pricing.

In substance, plaintiffs' initial discovery plan targets the following categories of evidence, all of which is both centrally relevant to the Court's certification analysis under Rule 23 and critical to the case going forward:

- **Discovery from defendants' senior officers and senior managers.** This evidence is directly relevant to the elements of conspiracy *and* antitrust impact, the latter of which defendants intend to challenge vigorously at class certification. Such evidence also bears heavily on the Court's "predominance" inquiry under Rule 23(b)(3). *See* page 8, *infra*.

- **High level planning and strategy documents**. Market, strategy or operational reports received or prepared by senior management likely include information on production, pricing, competitive conditions, and the impact of production cuts, all of which will be core evidence at class certification and trial. *See* page 11, *infra*.

- **Economic data on products, pricing, production and utilization, demand, cost, profit, imports, exports, and sales transactions**. This information is relevant to expert analysis at class certification and trial on the issues of common antitrust impact and damages. *See* page 12, *infra*.

- **Other relevant evidence that is easily produced, including ITC, Department of Commerce, merger review and government investigation records, as well as corporate policies and organizational documents.** Defendants' "government investigation" records—already prepared, received or filed in connection with other proceedings—are easily produced and directly relevant to production, pricing, import trends, competitive conditions and therefore to class certification. "Organizational" and corporate "policy" discovery is both minimally burdensome and standard practice at the outset of complex litigation. *See* page 14, *infra*.

Defendants reject plaintiffs' proposal out of hand, taking the position that *no* "conspiracy" related discovery is appropriate prior to class certification. Defendants do not agree that *any* discovery is warranted from their senior management (aside from a narrow, self-selected category of "business planning" reports)—notwithstanding their intention to litigate vigorously the element of "impact" at class certification and notwithstanding the high likelihood that these executives discussed production cuts *and their impact on the market* in emails, trade meeting discussions and other communications.

Defendants instead have offered to produce, on a "sufficient to show" basis, limited categories of discovery including (1) production data, (2) backlog and inventory data, (3) transactional data, (4) purchase contracts and customer negotiation records, (5) documents related to production processes and end uses for "raw steel," (6) certain business planning reports limited to those that, in defendants' view, relate to the class certification element of common "impact," (7) organizational charts, (8) document retention and antitrust compliance policies, and (9) a "list" of ITC and Department of Commerce proceedings (but not the underlying documents from those proceedings).

In support of their plan, defendants have said they will concede, for purposes of class certification, that the alleged antitrust "conspiracy" is amenable to common proof at trial. Defendants' "concession" on this point simply acknowledges settled law. *See, e.g, In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)), *cert. denied*, 129 S.Ct. 1673 (2009). Yet according to defendants, their "concession" obviates the need for any pre-certification discovery into *any* issue that defendants deem related to the alleged conspiracy.

5

Defendants have not agreed, however, to forego class certification challenge to the fundamental plausibility of the conspiracy, to refrain from other class certification arguments related to the scope and nature of the conspiracy, to produce directly-relevant "impact" documents from their senior management, or to produce the ITC/merger review/government investigation materials requested by plaintiffs. Nor have they conceded the "predominance" of common conspiracy or other "senior management" evidence for purposes of Rule 23(b)(3).

As an example of the extreme nature of defendants' position, under their proposal defendants would not be required to produce an email or trade meeting record in which a senior executive communicated with a competing executive and explicitly discussed cutting production to raise market prices. Nor would they produce a high-level email stating that industry production cuts had, in fact, restricted supply and raised prices. Nor would they produce a merger review or ITC filing explaining in detail the pricing trends, production trends, and general competitive conditions in the steel industry. All of these documents would be directly relevant to the issues of conspiracy *and* common impact at class certification, and their early production, moreover, would substantially advance the litigation on the merits.

## ARGUMENT

### I.    The initial discovery sought by plaintiffs is directly relevant to class certification.

It is well settled that class certification requires rigorous analysis of the common proof available on the elements of a Section 1 antitrust claim:  (1) conspiracy, (2) impact, and (3) damages.  *OSB*, 2007 WL 2253418, at *4 (certifying class in factually similar litigation); *Linerboard*, 305 F.3d. at 149-55 (same); *see generally General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982) ("rigorous" certification inquiry); *Polyester Staple*, 2007 WL 2111380 (same).

The Court's task under Rule 23 is not to resolve these elements on the merits, but rather to scrutinize the core evidence in the case (not simply the parties' expert reports), understand the market, and ultimately determine whether common proof will predominate at trial.  *Id.*; *see also Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672 (7th Cir. 2001).

Defendants, no doubt, will argue at class certification that the "rigor" of the antitrust certification inquiry has grown even more pronounced under recent decisions such as *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008); *Polyester Staple*, 2007 WL 2111380; *EPDM*, 256 F.R.D. 82; and *McDonough*, 2009 WL 2055168.  Defendants, however, cannot legitimately make that argument at class certification *and* seek to bar initial discovery of the core evidence in the case, as they propose.  If defendants' position is that antitrust class certification requires rigorous scrutiny of the evidence that will be available at trial, then it is essential for the Court to allow pre-certification discovery on central issues, including the scope, nature and impact of the conspiracy.  *See Rail Freight*, at 11-14; *see also* note 1, *supra* (collecting cases allowing initial "merits" discovery).  Simply put, defendants cannot refuse to produce the key evidence and then criticize plaintiffs for not having it.

### A.    Senior management discovery

### (1)    Relevance

First and foremost, plaintiffs seek initial discovery from defendants' senior management, including email, trade meeting records, and other communications in which top management discussed production cuts, the reason for production cuts, and/or the potential or actual impact of production cuts on the market.  This type of common evidence—from individuals central to the allegations in the complaint—should be the principal focus of initial discovery.

These materials will inform the Court's class certification inquiry on the elements of conspiracy *and* common impact, as well as the Court's predominance inquiry under Rule 23(b)(3).  *See, e.g., Rail Freight*, at 13 ("To satisfy this 'predominance' requirement, plaintiffs must secure evidence concerning" the "scope" and "operation" of the conspiracy—"evidence defendants classify as 'merits based[.]'"); *Scrap Metal*, 527 F.3d at 535 ("predominance is a test readily met" in antitrust conspiracy cases "because proof of the *conspiracy* is a common question that is thought to predominate") (citing *Amchem*, 521 U.S. at 623 and 7AA Wright & Miller § 1781) (emphasis in original)); *Vitamins*, 209 F.R.D. at 262-264 ("defendants' conduct" is the focus of predominance inquiry); *Polyester Staple*, 2007 WL 2111380, at *27 (same); *Linerboard*, 203 F.R.D. at 220 ("plaintiffs' allegations regarding impact, like their allegations regarding conspiracy, will focus the inquiry on defendants' actions").

For example, evidence showing that defendants' executives agreed to cut raw steel production in an effort to raise prices would be a smoking gun for both class certification and the ultimate merits of the case.  *See, e.g.*, Complaint ¶ 60 (ArcelorMittal executive stating to competing executives that production discipline would lead to "more stable price levels and a financially healthier industry overall").  While defendants would classify this as "conspiracy"

8

evidence and exclude it from initial discovery, such evidence would provide direct, common and predominating proof on the elements of conspiracy (the communication) *and* impact (defendants' expectation regarding across-the-board price effect), directly from the mouths of defendants' senior management. Similarly, high-level emails stating that "industry discipline" was having its intended effect on prices (or profits) would go directly to the issues of impact and damages. Such evidence is relevant at class certification and necessary to counter the *post hoc* opinions of defendants' experts, who will assert on the basis of narrow economic data that the alleged conspiracy was implausible and, even assuming its existence, ineffective.

Plaintiffs' proposed "senior management" discovery also goes to the "fundamental plausibility" of the conspiracy, which will be a central issue at class certification and trial. *See, e.g., Bulk Graphite*, 2006 WL 891362, at *11("defendants resisting class certification routinely argue that the complexity of their particular industry makes it impossible for common proofs to predominate on the issue of antitrust impact [. . . ] but the argument is usually rejected.") (internal quotation marks and citation omitted); *Vitamins*, 209 F.R.D. at 262-268 (same); *EPDM*, 256 F.R.D. at 93-95 (defense expert challenging plausibility of conspiracy at class certification).

Defendants advanced this plausibility argument repeatedly in their motion to dismiss briefing, and doubtless will repeat it at class certification. *See* Mem. in Support of Def. Joint Motion to Dismiss, Docket # 111, at 2-3 and 33-35 (alleged raw steel conspiracy "defies any notion of practical plausibility" because it "ignores and fails to account for economic and market realities"). Initial discovery from defendants' executives will show their contemporaneous views on the economic plausibility of the alleged conspiracy, which may well differ from the *ex post* theories of their experts.

Pre-certification conspiracy discovery is likewise necessary to tailor an appropriate class definition—including the products covered by the conspiracy and the duration of the class period. For example, defendants argued in their *Twombly* briefing that a conspiracy impacting both "long" and "flat" steel purchasers would be implausible. *Id.* Initial discovery is therefore warranted to inquire whether both types of purchasers can use common evidence to show injury from the conspiracy, and therefore should be included in the same class. So, too, with the class period. Before the Court certifies a class, initial conspiracy discovery is appropriate to determine beginning and ending dates for the class period.

Further, defendants' proposal to avoid top management discovery by stipulating to the commonality of conspiracy evidence ignores the fact that evidence relating to the scope and nature of the conspiracy will be inextricable from evidence relating to its impact. Many courts have recognized that an antitrust conspiracy's scope and operation is closely intertwined with its impact, and that preliminary conspiracy discovery is essential in evaluating the propriety of certification. *See Rail Freight*, at 13-14 ("Defendants' adoption of the fuel surcharge program, how it was imposed, and the Defendants' purposes in doing so . . . bear[] directly on the issue of common impact"); *Plastics Additives*, 2004 WL 2743591, at *3 (rejecting conspiracy/impact bifurcation because distinction is "blurry, if not spurious" in complex antitrust litigation); *see generally Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12 (1978) (certification inquiry "is intimately involved with the merits of the claims").

### (2)    Burden

In response to the Court's concerns about the burden of initial discovery, plaintiffs have advised defendants that initial senior management discovery would be limited to approximately 10-20 high-level positions per defendant— a reasonable number considering that defendants'

organizations consist of thousands, in most cases tens of thousands, of employees. For example, twenty "senior managers" represent less than one tenth of one percent of ArcelorMittal's U.S. employees. In addition, plaintiffs would expect defendants to search their "central files," and the files of relevant administrative assistants, to produce documents associated with these key senior managers but no longer in their actual custody.

With respect to pre-certification depositions, plaintiffs' proposed case management order provides for 90 depositions over the life of the case—an average of ten for each defendant (if the ArcelorMittal entities are treated separately). Plaintiffs anticipate taking a small fraction of these depositions prior to class certification. If and when the class is certified, the vast majority of depositions will proceed in phase two as the parties ready the case for trial.

Plaintiffs' approach is entirely reasonable. Rather than unlimited, company-wide discovery—requiring search and production from scores of potentially-relevant mid-level employees—the parties instead will focus first on those individuals and issues that matter most. Plaintiffs' plan will minimize initial production of voluminous discovery, while developing the record necessary for class certification and readying the parties for phase two.

### B. High level planning and strategy documents

High-level planning and strategy documents, by their nature, provide a detailed overview of market structure, competitive conditions, products, production, capacity utilization, pricing, profits, supply, or demand—all of which are potentially relevant to the certification analysis. *See, e.g., EPDM*, 256 F.R.D. at 91-95; *Linerboard*, 305 F.3d at 153-55 (crediting expert's market structure analysis). Such reports are particularly significant in a case, like this one, where the conspiracy allegedly was hatched at the highest levels of the industry.

While defendants have agreed to produce reports created "by or for" senior executives that, in defendants' view, are relevant to the question of common "impact," their initial production should not be so limited. *All* high-level planning and strategy reports are potentially relevant to a host of certification issues, and defendants should not be permitted to exclude unilaterally those they deem irrelevant (or harmful to their case). Moreover, defendants' attempt to define a subset of reports relating only to "impact" will likely spawn a series of secondary disputes among the parties. Nor should high-level reports *received* by senior managers (but not necessarily created "by or for" them) be excluded, as defendants propose.

The burden of production, moreover, is relatively modest. Defendants know full well which reports their top management received or prepared in running their operations. Initial discovery is a matter of collecting these documents (most likely from readily-accessible headquarters files) and producing them.

### C. Economic data

Plaintiffs propose initial discovery of sales contracts, commodity product documents, and economic data related to products, pricing, capacity, utilization, production, outages, supply, demand, cost, margins, imports, exports and transactions. Although defendants agree to produce some of this material, two key areas of difference remain: (i) defendants do not agree to produce information related to capacity, utilization, demand, cost, margins/profits, imports, or exports; and (ii) defendants insist on producing data on a "documents sufficient to show" basis.

Plaintiffs anticipate that their class certification, and later liability and damages, expert(s) will consider (1) capacity and utilization data in evaluating the common impact of production cuts on the market; (2) import/export information in evaluating the impact, if any, of international trade on the domestic market (an issue defendants were at pains to emphasize in

their *Twombly* papers); and (3) demand, cost, profit, and margin data in evaluating the impact of production cuts, as opposed to other factors, on the market price of steel. These requests are standard fare for purposes of antitrust class certification and should be included in initial discovery. Such information commonly is evaluated by expert economists in addressing the issue of common impact and in proposing a common methodology (typically a multiple regression analysis) for calculating damages. *See, e.g., Linerboard*, 305 F.3d at 153-55 (affirming certification and approving proposed damages methodology in factually similar litigation); *see generally Scrap Metal*, 527 F.3d at 533-35 (explaining approach typically used to establish class-wide antitrust damages at trial); *In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) (expert damages methodology employing, *inter alia*, pricing, margin, supply and demand data as variables).

More fundamentally, it is not for defendants to decide unilaterally—before any discovery requests have been served—which categories of "economic data" are potentially relevant to the litigation. That is not the stuff of an initial case management order, but rather something that should be addressed by the parties in the context of specific discovery requests.

Similarly, defendants should not be permitted to limit their production unilaterally on a "sufficient to show" basis. To the extent it makes sense for the parties to produce information on that basis, plaintiffs are willing to discuss it in the context of specific document requests. But defendants' insistence on this limitation for broad categories of data is simply a license to produce only that information most favorable to them. The Federal Rules, of course, mandate a very different approach. *See* Fed. R. Civ. P. 26(b)(1); *Rail Freight*, at 11 ("the whole purpose of discovery is to find not only those documents that defendants wish for plaintiffs to see but all documents that pertain to the certification issue").

**D.    Certain categories of easily produced discovery, including ITC, Department of Commerce, and government investigation records; organizational discovery; and corporate policy documents.**

Plaintiffs' final category of initial discovery targets highly relevant information easily produced by defendants. For example, defendants appear routinely before the Department of Commerce ("DOC") and International Trade Commission ("ITC") in connection with steel trade proceedings. As the Court well knows, see *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008), the materials defendants prepare and receive in connection with these matters—and submit under seal to the DOC and ITC—are directly relevant to the claims at issue. These records include, *inter alia*, detailed information regarding production, price and competitive conditions in the domestic steel industry. *See also* Mem. Op. and Order Denying Mot. to Dismiss, Docket # 170, at 25 (citing defendants' statements in ITC proceedings). Defendants, moreover, emphasized repeatedly in their motion to dismiss papers that import/export issues supposedly undercut the plausibility of the alleged conspiracy. Docket # 111, at 35. Plaintiffs investigation to date also shows that defendants routinely argue to the ITC that their products are commodity goods for purposes of competing against imported commodity steel. Surely these issues will be relevant at class certification.

Accordingly, defendants should produce their high-level import/export documents in initial discovery, including all materials submitted, received or prepared in connection with relevant ITC and DOC proceedings. It is highly likely that such materials are segregated and readily accessible in defendants' trade-related files (and/or the files of counsel), and therefore can be produced at minimal burden. Inexplicably, however, defendants refuse to produce anything more than a "list" identifying trade proceedings in which they were involved.

14

So, too, with any materials related to government antitrust investigations. Merger filings, for example, include detailed analysis of market structure and competitive conditions in the industry, which plainly are relevant to class certification and the merits. *See, e.g., In re Pressure Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666, at \*17 (M.D. Pa. Nov. 19, 2007) (citing merger filings at class certification). Again, these materials are easily produced, and likely reside in dedicated files maintained by counsel. Discovery is a matter of turning them over.

In addition, plaintiffs seek initial discovery of any materials related to other government antitrust investigations—including any Department of Justice or FBI investigation into the conduct at issue in this case. If the DOJ has issued subpoenas, or obtained documents, or accepted any cooperating defendant under its corporate leniency ("amnesty") program, plaintiffs are entitled to discover that information. *See, e.g., Clark v. Experian Information Solutions, Inc.*, 2006 WL 626820 (N.D. Ill. Jan. 6, 2006). Indeed, if any defendant has received a government subpoena related to the conduct at issue, and is preparing document productions in response, those same documents can be made available to plaintiffs at trivial burden.

Finally, plaintiffs seek initial discovery of corporate policy documents including antitrust compliance policies, pricing policies, and supply restriction policies. By way of explanation, plaintiffs intend to request pricing policy documents relevant to the question of antitrust impact. For example, if defendants' issued a corporate pricing directive stating that price increases should be implemented throughout the market, that would be common evidence of antitrust impact. *See, e.g., Polyester Staple*, 2007 WL 2111380, at \*23 (broadly applicable pricing policies furnish common proof of impact at class certification). Similarly, plaintiffs intend to request documents relevant to any policy regarding customer supply restraints, also known as volume "allocation," which is relevant to the issue of market shortages and antitrust impact.

II.     **Plaintiffs' plan is reasonable, efficient and will meaningfully advance the case.**

    A.     **The scope of plaintiffs' proposed phase one discovery is reasonable.**

Initial discovery of the information outlined above will advance the litigation significantly, at reasonable burden to defendants. *Cf.* Mem. Op. and Order Denying Mot. to Dismiss, Docket # 170, at 44 ("This is not to say that I am allowing discovery to proceed cautiously because Plaintiffs' claim is shy of a plausible entitlement to relief—it is not."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 32 n.3 (D.D.C. 2008) ("as sensitive as courts must be to the cost to litigants of discovery, where plaintiffs have made out a plausible antitrust claim, as they have here, they are entitled to discovery in order to determine to what relief, if any, they are entitled");

Plaintiffs expect that much of the information targeted for phase one discovery (such as senior management files, high-level market reports, and documents related to ITC or other government proceedings) is segregated by defendants in the ordinary course of business and will be readily accessible in defendants' headquarters files, thereby minimizing the burden of searching and producing electronic information from satellite offices and plant locations.

Defendants object that plaintiffs' plan is in effect full-blown discovery—that nothing meaningful will be left to the second phase. But that mischaracterizes plaintiffs' proposal. As detailed above, plaintiffs are willing to forego the company-wide discovery program that would otherwise commence, affording considerable pre-certification cost savings to all parties. Without phased discovery, plaintiffs would seek *company-wide* discovery from an array of middle managers in a variety of mill and satellite office locations seeking to identify, *inter alia*, any communications discussing reasons for production cuts, any inter-defendant communications, and any documents discussing the market impact of production cuts. These

would be standard document requests in complex antitrust litigation, entirely appropriate under Rule 26(b)(1). *See, e.g., Plastics Additives*, 2004 WL 2743591, at \*14 ("It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining the scope of discovery."); *In re Microcrystalline Cellulose Antitrust Litig.*, 221 F.R.D. 428, 429-30 (E.D. Pa. 2004) ("[A] broad scope of discovery is particularly appropriate in antitrust litigation because, for example, relevant business documents pertaining to an antitrust conspiracy may not exist and covert behavior may have to be proven through less direct means.").

Plaintiffs, however, are willing at this stage to forego such broad discovery and focus instead on high-level management. This represents a substantial concession by plaintiffs on the scope of phase one production, and meaningful cost savings for the parties.

**B.     Plaintiffs' initial discovery plan will advance the case.**

A principal efficiency benefit under plaintiffs' plan is that, by focusing on core evidence at the outset, the parties will not only build an appropriate record for class certification but also advance the case on the merits. If and when the class is certified, discovery will be underway and the parties will have a much better understanding about which issues warrant further factual development. This will allow the parties to tailor their second phase requests accordingly, and proceed promptly through phase two discovery, summary judgment, and trial. *See* MANUAL FOR COMPLEX LITIGATION (Fourth) § 11.422, at 55 (initial discovery on core issues "may render other discovery unnecessary or provide leads for further necessary discovery").

Defendants' plan, in contrast, would do little if anything to advance the case on the merits. Defendants' approach—in which a year or more of pre-certification discovery would accomplish nothing on the central issues, forcing the parties to start discovery from scratch following class certification—is neither efficient nor sensible.

The recent *OSB* litigation is instructive on this point. *OSB* was a factually similar supply-restriction matter in which the court—consistent with the vast weight of authority, see note 1, *supra*—did not attempt to bifurcate "conspiracy" and "impact" discovery. *OSB* proceeded efficiently from complaint through discovery, class certification, summary judgment briefing, and final resolution (on the eve of trial), all in well under three years. *See* No. 2:2006-cv-00826 (E.D. Pa.) (Diamond, J.). That is a compelling model for the present litigation.

The *Labelstock* antitrust litigation, in contrast, was a recent matter in which the court bifurcated "class" and "merits" discovery. *See* No. 3:2003-md-01556 (M.D. Pa.) (order granting bifurcation entered April 15, 2004). The original *Labelstock* complaints were filed in 2003, after which the parties engaged in years of protracted discovery. In May 2009—after nearly *six years* of litigation—the plaintiffs moved for approval of settlements with the remaining defendants. *Cf. Rail Freight*, at 15 ("Defendants' proposal would not increase the efficiency of case proceedings, but would delay the proceedings and ultimately, the resolution of the case.") (citing NEWBERG ON CLASS ACTIONS § 9.44 (4th ed. 2009)).

> **C.** **Plaintiffs' proposal will resolve class certification at an early practicable time with minimal pre-certification deposition practice.**

As to the timing of class certification, plaintiffs' proposed case management order keys the briefing schedule to defendants' production of documents. If defendants produce documents promptly—completing initial discovery production by the end of 2009—class certification expert reports and briefing will be finished by October 2010.

Plaintiffs, at all events, will review documents quickly, schedule a limited number of phase one depositions, prepare their expert reports, and file their moving class certification papers approximately five months after completion of defendants' phase one production. As noted, plaintiffs have every interest in moving this case quickly.

### III.   Defendants' proposal will not develop an appropriate record for class certification.

As noted above, defendants plan would do nothing to advance the case on the merits, instead delaying core issue discovery for more than a year.  Worse yet, defendants' plan attempts to set a clever trap for class certification.  First, they would have the Court limit initial discovery to an incomplete subset of technical data, turning class certification into a battle of the experts. Then, defendants will cite recent authority like *Hydrogen Peroxide*, insisting that the Court must rigorously scrutinize the "merits" of the case and not certify a class based solely on the say-so of plaintiffs' experts.  *See* 552 F.3d at 317; *see also Szabo*, 249 F.3d 672.

Defendants will cite the absence of evidence concerning the scope and impact of the conspiracy—the very evidence they now seek to exclude from discovery—and will insist that the class cannot be certified without marshaling that type of evidence.  Defendants will contend that the class product definition is overbroad, and will say that the class period is unfounded, without having produced any discovery relevant to the scope and duration of the conspiracy.  Defendants will argue at length about the economic implausibility of the conspiracy, despite having refused to produce the core evidence bearing on that issue, including contrary statements from their own executives.  *See, e.g,* Complaint ¶¶ 149-50 (ArcelorMittal CEO stating that "industry was able to restrict production to keep prices stable"); *see also EPDM*, 256 F.R.D. at 93-95 (defense class certification expert attacking plausibility of conspiracy in connection with "impact" analysis).

In short, the discovery trap proposed by defendants would unnecessarily (and unfairly) deprive plaintiffs and the Court of the central evidence relevant to class certification.

Moreover, as noted above, defendants' proposal fails even to provide for adequate discovery of technical economic data.  *See* page 12-13, *supra*.  Defendants would not only turn class certification into a battle of the experts, they would hamstring plaintiffs' expert(s).

**IV.    Any effort to distinguish between "conspiracy" and "impact" evidence would be inefficient and unworkable in practice.**

Defendants' discovery plan would also engender substantial inefficiency and delay. First, even defendants recognize that antitrust "impact" will be a hotly contested issue at class certification. As such, any senior management document discussing the actual or potential impact of production cuts is plainly central to class certification and, under *any* reasonable plan, should be produced in the first phase of discovery.

Considering that defendants *must* search their senior management files for emails and other evidence relevant to the "impact" of production cuts, it makes no sense to avoid producing "conspiracy" evidence identified during that search. Plainly such evidence is relevant to the case, and (for reasons explained above) to the certification calculus. Yet defendants would withhold production of these (harmful) conspiracy records during phase one, notwithstanding the minimal burden of producing evidence already identified and reviewed. Then defendants would require plaintiffs to serve another round of "merits" discovery requests after class certification, accompanied by another round of objections and protracted meet and confer negotiation, all in an effort to obtain discovery of senior management evidence that easily could have been produced in phase one. That approach is neither efficient nor sensible.

Moreover, as Magistrate Judge Facciola explained, it is not possible to effectively distinguish between antitrust "conspiracy" evidence and "impact" evidence in searching for responsive electronic documents. Rejecting "defendants' assertions about the ease with which they can find responsive documents" relevant *only* to "impact," the court explained:

> Things become infinitely more complicated, however, when we are
> confronted with the possibility that there will exist, within a given
> type of document—such as e-mails, memoranda, or meeting
> minutes—items that are relevant to class certification, items that

> are relevant to the merits, and items that aren't relevant to the case at all.
>
> . . . . Moreover, the creation of means to search large databases is a work in progress and no one has suggested how the search of defendants' data could be refined so that a search engine of some sort could yield ESI that pertained to impact but not ESI pertaining to anything else. While defendants blithely suggest that the lawyers in this case are skilled at searching and can therefore find what they need, they do not propose exactly how the lawyers will use this claimed expertise and create a search engine so refined and exquisite that it will yield information bearing on the certification question but not the merits.

*Rail Freight*, at 12-13.

So, too, here. When defendants undertake to search their electronic records for senior-management documents relating to the "impact" of production cuts on the steel market—as they plainly must do under any reasonable plan for initial discovery—it will be technically infeasible to develop ESI search protocols that meaningfully distinguish between that type of evidence and evidence of the alleged conspiracy. There is no practical difference between the two, especially considering that the most important documents in the case are likely to bear on the scope and nature of the conspiracy, its fundamental plausibility, *and* its impact on the market. *Plastics Additives*, 2004 WL 2743591, at *3 (distinction between conspiracy and impact evidence is "blurry if not spurious").

In addition, defendants' plan would trigger "various needless disputes . . . concerning the classification of each document as 'merits' or 'certification' discovery," requiring ongoing intervention by the Court. *Rail Freight*, at 15. For this reason, as well, defendants' "proposal would not increase the efficiency of case proceedings, but would delay the proceedings and ultimately, the resolution of the case." *Id.* (citation omitted).

21

The better approach is initial discovery limited to core issues and individuals, focused on developing an appropriate record for certification, and advancing the case on the merits, while limiting the burden of initial company-wide discovery. *See, e.g.*, MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.14, at 256 ("Courts have recognized that information about the nature of the claims on the merits and the proof that they require is important to deciding certification. Arbitrary insistence on the merits/class discovery distinction sometimes thwarts the informed judicial assessment that current class certification practice emphasizes."); Fed. R. Civ. P. 23(c)(1) Advisory Committee Note, 2003 Amendments ("it is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis").

## V.      Other Case Management Issues

In addition to the scope of initial discovery, the parties disagree on several collateral case management issues, including the desirability of monthly joint progress reports and status conferences with the Court. Plaintiffs' view, informed by experience, is that monthly progress reports are an important case management device—forcing the parties to move the case, take reasonable positions on discovery issues, and keep the Court apprised of new developments. *See* MANUAL FOR COMPLEX LITIGATION (Fourth) § 11.22, at 40-41. Furthermore, plaintiffs believe monthly reports can be used by the Court to monitor initial discovery and ensure that it proceeds within appropriate bounds. The reports need not be lengthy or require excessive time to prepare. Accordingly, plaintiffs propose that the Court order a joint monthly status report, which should

include a concise summary of recent litigation and discovery activities, a summary of outstanding motions or disputes, and a concise discovery plan for the following month.[2]

In addition, plaintiffs have included in their draft case management order a provision for monthly status conferences with the Court (either in person or by telephone, at the Court's direction). Again, in the experience of plaintiffs' counsel, such conferences are effective in keeping the case on track. The status conferences need not take long, and need not occur at all if the parties have no new information to report. *See, e.g.*, MANUAL FOR COMPLEX LITIGATION (Fourth) § 11.22, at 40 ("Conferences following the initial conference help the judge to monitor the progress of the case and to address problems as they arise.").

Finally, the parties disagree regarding:

- the schedule for phase one fact depositions,

- the schedule for expert reports in connection with class certification, and

- the scope of initial third party discovery.

Defendants would (i) limit the initial window for depositions to a two month period after their substantial completion of phase one document production; (ii) require full submission of expert reports *before* the parties file any class certification briefs; and (iii) limit initial third party discovery to the narrow categories of information that defendants believe is relevant to class certification.

Plaintiffs believe depositions should be permitted through the phase one discovery period. This will allow sufficient time for the parties to complete document review and take

---

[2] Among other cases, monthly status reports worked favorably in *OSB*, a complex matter in which the court played an active role in monitoring the progress of discovery and directing the litigation promptly to resolution. *See* No. 2:2006-cv-00826 (E.D. Pa.).

necessary depositions, including any depositions necessary to address new issues raised in the class certification briefs.

Consistent with the usual practice in similar cases, plaintiffs also propose that class certification expert reports should be filed contemporaneously with the parties' briefs, affording each side's expert(s) an opportunity to address economic arguments raised for the first time in the parties' papers. For example, if defendants' class certification opposition brief were to challenge the economic analysis of plaintiffs' expert (as it will), then plaintiffs' expert would have an opportunity to respond in his or her reply report. This is the standard procedure in class action practice. *See, e.g.*, *Rail Freight*, No. 1:2007-mc-00489, Docket # 296 (Friedman, J.) (scheduling order entered July 28, 2009) (copy attached as Exhibit B).

As to third party discovery, plaintiffs' view is that prompt commencement of such discovery—particularly with respect to trade associations and other trade meetings discussed in the complaint—is essential to (a) preserve important evidence and (b) develop an adequate class certification record on the nature and scope of industry production cuts and their impact on the market. *See, e.g.,* Compl. ¶¶ 125-26, 170. It makes little sense, moreover, to seek third party discovery twice—first on "class" requests and later on "conspiracy" requests. It is more efficient and less burdensome to non-parties simply to serve and obtain third party discovery once. In any event, it is for the third parties themselves, not defendants, to object to the scope of any non-party discovery.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs respectfully request that the Court adopt plaintiffs' discovery plan and enter plaintiffs' proposed case management order No. 2.


Dated:  July 30, 2009                    By:            /s/ *Matthew Duncan*



Michael K. Kellogg                              Allen D. Black
Mark C. Hansen                                  Roberta D. Liebenberg
Michael J. Guzman                               Donald L. Perelman
Steven F. Benz                                  Jeffrey S. Istvan
Aaron M. Panner                                 Matthew Duncan
**KELLOGG, HUBER, HANSEN,**                     Adam J. Pessin
**TODD, EVANS & FIGEL, P.L.L.C.**               **FINE, KAPLAN AND BLACK,**
Sumner Square                                   **R.P.C.**
1615 M Street, NW, Suite 400                    1835 Market Street, 28th Floor
Washington, DC 20036                            Philadelphia, PA 19103
Tel.:  (202) 326-7900                           Tel.:  (215) 567-6565
Fax:  (202) 326-7999                            Fax:   (215) 568-5872

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*



Michael J. Freed
Steven A. Kanner
William H. London
Douglas A. Millen
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.:   (224) 632-4500
Fax:   (224) 632-4521


*Liaison Counsel for Plaintiffs and the Proposed Class*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

MDL Docket No. 1869
Misc. No. 07-489 (PLF/AK/JMF)

This Document Relates To:

ALL DIRECT PURCHASER CASES

MEMORANDUM OPINION

Now pending before the Court is Defendants' Motion for Phased Discovery [#187]

("Motion").[1] Defendants propose a Case Management Order that provides for class discovery

before class certification and merits discovery. Plaintiffs propose an alternative order that

provides for class certification at the conclusion of all fact discovery.

The issue now before this Court is whether bifurcated discovery is appropriate.

**I.    Background.**

Defendants are the four largest Class I railroads based in the United States. Plaintiffs are

eighteen businesses from multiple districts that allege that defendants entered into a conspiracy in

---

[1]Also pending before the Court is defendants' Memorandum in Support of Motion for
Phased Discovery [#187] ("Supp. Memo."), Direct Purchaser Plaintiffs ("plaintiffs")'s
Opposition in Response to Defendants' Motion for Phased Discovery [#228] ("Opposition"),
BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), and Norfolk
Southern Railway Company ("NS")'s Reply Memorandum of Defendants in Support of
Defendants' Motion [#241] ("Reply"), CSX Transportation, Inc. ("CSXT")'s Amended Reply
Memorandum in Support of Defendants' Motion [#250] ("Amended Reply"), Plaintiffs'
Supplemental Memorandum in Response to New Arguments in Defendants' Reply and Amended
Reply [#280] ("Sur-Reply"), CSXT's Supplemental Memorandum in Further Support of
Defendants' Motion [#286], and BNSF, UP, and NS's Response Memorandum to Plaintiffs'
Supplemental Memorandum Regarding Defendants' Motion [#287].

2003 which they continued to enforce through 2007.[2]   The alleged conspiracy forms the basis of

the dispute in this case.

Plaintiffs allege that defendants violated federal antitrust laws by conspiring to fix and

maintain the prices of rail freight transportation services through the use of Rail Fuel Surcharges.

Rail Fuel Surcharges are separate fees added to customers' bills by defendants, purportedly to

compensate defendants for increased fuel costs.  Plaintiffs claim that defendants, in pursuit of

increased profits, devised a plan to impose inflated surcharges to as many customers as possible.

As part of their plan, defendants allegedly conspired to eliminate the surcharge being used

by the Association of American Railroads ("AAR") – a barrier that prevented defendants from

imposing new, inflated surcharges.  Plaintiffs claim that defendants conspired to cause the AAR

to remove fuel from the All-Inclusive Index ("AII"), a rate-escalation provision used in most rail

freight transportation agreements.  The AII and a related index, the Rail Cost Adjustment Factor

("RCAF"), provided for the full recovery of fuel cost increases by railroads.  Because no

provision was in place to compensate railroads for fuel cost increases after the AAR removed

fuel from the AII and RCAF, defendants were free to impose their own fuel surcharges.

Plaintiffs claim that defendants implemented a uniform Rail Fuel Surcharge program by

which they fixed and imposed artificially high surcharges that exceeded their increased fuel costs

and generated billions of dollars of profits.  Plaintiffs claim that defendants agreed to maintain

the established rates and took other collective actions to enforce their conspiracy.  Plaintiffs also

---

[2] Plaintiffs' individual actions (there originally were thirteen) were consolidated by the Judicial Panel on Multidistrict Litigation on November 6, 2007, and they were transferred to this Court pursuant to 28 U.S.C. § 1407.  Plaintiffs seek class certification pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

claim that defendants published the Rail Fuel Surcharges on their websites to ensure that each railroad adhered to the collusive pricing.

## II.    Summary of the Arguments.

### A.    Defendants' Arguments in Support of Their Motion.

District court judges are "accorded considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 324 (3d Cir. 2008). Bifurcated discovery is warranted if "the interests of economy and reduced costs outweigh any minimal prejudice which would befall plaintiffs from delaying discovery on the merits." Supp. Memo. at 2. The Federal Rules of Civil Procedure promote a "just, speedy and inexpensive determination of every action." Fed. R. Civ. P. 1. In addition, Rule 23 encourages the determination of class certification "at any early practicable time." Fed. R. Civ. P. 23. Discovery pertaining "only to the merits delays the certification decision and may ultimately be unnecessary." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.14 (2004). Defendants argue that phased discovery facilitates early resolution of the class certification issue and reduces the burden of the subsequent merits discovery.

First, defendants argue that the Court should decide whether to certify a class as soon as possible. Defendants contend that the sheer size of plaintiffs' proposed merits discovery, which includes requests for 100 depositions and 70 separate document requests, will substantially delay the potentially dispositve class certification decision. See Coopers & Lybrand v. Livesey, 437 U.S. 463, 476 (1978). Defendants call plaintiffs' request to proceed with merits discovery and Rule 23 briefs in the early summer of 2010 "unrealistic" given the volume of plaintiffs' requests.

Supp. Memo. at 4. Production of documents and answers would be more efficient if limited to class certification issues, thereby expediting the Court's consideration of class certification.

Defendants claim that plaintiffs, in opposing their Motion, intend to "begin class certification briefing more than 16 months later than they originally proposed in the Joint Rule 26(f) Report."[3] Based on plaintiffs' proposal that class briefing be completed in the end of 2010, the class certification issue may not be decided until the eve of trial in June 2011. Defendants argue that this approach creates an unworkable schedule if some of plaintiffs' proposed class is certified. It renders impossible interlocutory appeals of the class certification issue.[4] Also, it unfairly exposes putative class members to key rulings before requiring them to decide whether to opt out. See McCarthy v. Kleindienst, 741 F.2d 1406, 1412 (D.C.C. 1984) ("Fundamental fairness . . . requires that defendants haled into court not remain indefinitely uncertain as to the bedrock litigation fact of the number of individuals or parties to whom they may ultimately be held liable . . .").

---

[3] Local Rule 23.1(b) requires motions for class certification to be filed within 90 days unless the court offers an extension. "That rule and its predecessors 'have been strictly applied." Reply at 2 (citing Howard v. Gutierrez, 474 F. Supp. 2d 41, 53 (D.D.C. 2007), reconsideration denied, 503 F. Supp. 2d 392 (D.D.C. 2007)). Initially, plaintiffs submitted a proposed schedule which provided for "a class briefing in June 2009, approximately six months after the start of discovery and seven months before the close of discovery." Reply at 3.

[4] "The fact that, unlike other procedural rules, Rule 23 has a specific appeals provision confirms the importance of interlocutory appeals in this context." Reply at 4; see Fed. R. Civ. P. 23 advisory committee's note.

Second, bifurcated discovery, defendants argue, is logistically possible in this case.[5] Defendants acknowledge that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Reply at 6-7 (citing Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160 (1982)). Still, they argue, this concept does not translate into a requirement for a ruling on the merits of whether plaintiffs have established a factual conspiracy. At the class certification stage, plaintiffs need only "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class"; they need not prove the element of antitrust impact itself. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311. Proof that the challenged fuel surcharges were conspiratorial is unnecessary because, defendants argue, the alleged conspiracy is assumed at the certification stage to determine whether injury to all class members can be shown by common proof. Reply at 9. For example, defendants find evidence concerning their relationships with one another to be irrelevant at this stage and seek their exclusion from initial discovery.

Defendants argue that they can effectively isolate electronically stored information ("ESI") relevant to class certification from ESI relevant to the merits. Defendants would apply "search terms for class certification topics to materials related to an agreed-upon set of custodians, and would leave for future merits discovery (if any) the application of the remaining search terms." Reply at 11. Defendants would use platforms that would identify documents viewed in earlier phases of discovery to prevent the need to review these documents again during

---

[5] Defendants other than CSXT have agreed to produce "transactional data; freight transportation contracts and/or rate authorities; and selected shipper negotiation histories" in addition to other documents determined by the parties to be relevant to the class certification issue. Reply at 10-11.

merits discovery. Reply at 12. Manual review and classification of documents has been
outmoded, and the burden of conducting such electronic searches is one the defendants willfully
assume. Id.

Third, defendants argue that regardless of whether a class is certified, bifurcating
discovery will reduce the costs of merits discovery because, at the very least, the parties will know
the scope of the class. See Karan v. Nabisco, Inc., 78 F.R.D. 388, 396 (W.D. Pa. 1978).
Simultaneous class discovery and merits discovery may generate "extraordinary and unnecessary
expense and burden," in that the parties may waste resources on merits discovery that turns out to
be unnecessary either because the class is defined more narrowly than expected or the plaintiffs
decide to discontinue the case after a denial of certification. MANUAL FOR COMPLEX LITIGATION
(FOURTH) § 21.14. Defendants allege that phased discovery is particularly necessary in this case
because plaintiffs' proposed class faces serious certification challenges, primarily its ability to
satisfy Rule 23's "typicality" and "predominance" requirements. Fed. R. Civ. P. 23(a)(3) and
23(b)(3).

Defendants also argue that even if plaintiffs' proposed class is certified, it must be
narrowed to conform to plaintiffs' own theory of collusion in this case. CSXT alleges that
plaintiffs survived defendants' former motion to dismiss by defining the class as those upon
whom AIILF was imposed. Defendants claim that subsequently, plaintiffs have expanded their
legal theory, such that AIILF is only "one means for implementing the conspiracy to impose
stand-alone 'fuel surcharges.'" Opposition at 2 n.2. CSXT sought an Order striking plaintiffs'
"expanded" class definition as not supported by the allegations of their complaint. Motion for
Order Pursuant to Rule 23, or in the Alternative, for Clarification of the Court's Prior Opinion

6

[#239].  Accordingly, defendants argue that plaintiffs' proposed class must be narrowed to exclude the named class plaintiffs who "do not allege they had AIILF imposed on them."  Supp. Memo. at 6.

CSXT further asserts that even if plaintiff's proposed class is certified, phased discovery should still proceed only with respect to shippers who have been affected by AIILF because: "An AIILF class is ideally suited for phased discovery," "[d]iscovery of an AIILF class will have benefits even if the class theory is subsequently changed," and "[d]iscovery of narrowed class issues can proceed efficiently while any revised class definition proposed by plaintiffs is tested under the structures of both Rule 12 and Rule 23."  Amended Reply at 5-9.

Finally, defendants claim that even if their motion is denied, "the traditional approach of beginning the Rule 23 briefing well before the end of fact discovery should be followed."  Reply at 6.  The traditional approach resolves the class certification issue long before trial by mandating that the parties focus on class discovery issues during the initial stages of discovery.  Reply at 6.

### B.    Plaintiffs' Arguments in Opposition to Defendants' Motion.

Primarily, plaintiffs argue that class certification and merits evidence are indistinguishable. The "information about the nature of the claims on the merits and the proof that they require is important to deciding certification."  Hubbard v. Potter, No. 03-CV-1062, 2007 WL 604949, at *1 (D.D.C. Feb. 22, 2007).  Plaintiffs' presentation of their approach to proving a factual conspiracy and its impact at trial will "involve discovery into many 'merits' issues that defendants would apparently prefer to leave for the 'merits' phase."  Opposition at 7.  Plaintiffs claim that they need to discuss merit-based evidence at the class certification stage to explain how they intend to prove issues such as "Defendants' adoption of the fuel surcharge program, how it was imposed, and the

Defendants' purposes in doing so." Opposition at 7-8. Plaintiffs claim such evidence bears directly on the issue of common impact and goes to "the showing Plaintiffs will make in support of their class certification motion." Opposition at 8.

Moreover, plaintiffs claim that the scope of defendants' conspiracy, including the manner in which it was implemented and operated, "goes directly to the common application and thus common impact of the program – issues that defendants admittedly intend to dispute at the class certification stage." Opposition at 9. Because class and merits discovery overlap substantially, plaintiffs argue that full discovery on the merits is necessary to determine the class certification issue. See Bodner v. Banque Paribas, 202 F.R.D. 370, 373 (E.D.N.Y. 2000).

Second, plaintiffs assert that bifurcation is the exception rather than the norm with regards to discovery in the federal courts. Plaintiffs argue that bifurcation is inappropriate in this case because it would not promote "fairness and efficiency." In re Plastics Additives Antitrust Litig., No. 03-CV-2038, 2004 WL 2743591, at *2 (E.D. Pa. Nov. 29, 2004) (citing MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.213). Plaintiffs explain that other jurisdictions have adopted approaches in which the record is thoroughly developed before the class certification issue is decided. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 307. In this case, plaintiffs argue that "class certification should be addressed after merits discovery" to allow plaintiffs to present their "trial plan" to the Court. Opposition at 15.

Third, plaintiffs claim that simultaneous class and merits discovery would be more efficient than bifurcated discovery. Essentially, plaintiffs argue that it would be impossible for defendants to develop meaningful search terms that would distinguish between class and merits discovery in the production of ESI. Opposition at 17. Because of this deficiency, plaintiffs argue,

8

defendants would have to "perform the extra step of conducting a document-by-document review to separate 'class' and 'merits' documents, and finally create a log similar to a privilege log to allow plaintiffs to challenge any improper designations made." Opposition at 19. Such extra steps, plaintiffs argue, would cause great expense, further delays, and discovery disputes that would not otherwise exist. Opposition at 19-20. Similarly, plaintiffs argue that bifurcated discovery would result in more depositions because witnesses would have to be deposed twice. Opposition at 20-21.

Fourth, plaintiffs deny that their proposed class exceeds their theory of the case and explain that, although all putative class members may not have been subjected to AIILF, AIILF was only one step -- among many -- taken by defendants to impose a broad conspiracy.[6] Plaintiffs argue that even if the proposed class size were narrowed, the scope of merits discovery, which focuses on "Defendants' alleged agreement to fix prices through the use of fuel surcharges and the implementation of their conspiracy" would not be narrowed. Opposition at 22. "The alleged violations of a price fixing conspiracy . . . will focus on the actions of the defendants." In re Vitamins Antitrust Litig., 209 F.R.D. 251, 264 (D.D.C. 2002).

Fifth, plaintiffs argue that bifurcated discovery would cause additional disputes and delays. Because "the Court may be forced to spend time and resources resolving discovery disputes over what is 'merit' discovery as compared to 'class' discovery," bifurcated discovery "belies the principles of judicial economy." In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *3. Bifurcated discovery will enable the defendants to deny plaintiffs access to "damaging documents, including evidence bearing on class certification, by arguing that the information goes

---

[6] Judge Friedman has resolved this question in plaintiffs' favor.

9

to 'merits' as opposed to 'class' issues." Opposition at 23. Concerns over the costs and burdens

of discovery are "misplaced," because the plaintiffs "are entitled to discovery in order to

determine to what relief, if any, they are entitled" after they have asserted a plausible claim. In re

Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d 27, 32 (D.D.C. 2008).

Last, plaintiffs deny defendants' claim that this suit is inappropriate for certification as a

class-action lawsuit. They argue that defendants misstate the law and mischaracterize plaintiffs'

claims. Plaintiffs emphasize courts' tendencies to "repeatedly [find] antitrust claims to be

particularly well suited for class actions" and to "resolve doubts in favor of certifying the class"

due to the "important role for class actions in the private enforcement of antitrust claims." In re

Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 22 (D.D.C. 2001). Plaintiffs also assert

their ability to satisfy the "typicality," "adequacy," and "predominance" requirements of Rule 23.

See Fed. R. Civ. P. 23(a)(3), (a)(4), and (b)(3).

### III.    Analysis.

### A.    Standard of Review.

In resolving motions to bifurcate discovery at the pre-certification stage, district courts

must "balance the need to promote effective case management, the need to prevent potential

abuse, and the need to protect the rights of all parties." Hubbard v. Potter, 2007 WL 604949, at

*2 (citing Shushan v. Univ. of Colorado, 132 F.R.D. 263, 268 (D. Colo. 1990)). "Discovery is not

to be used as a weapon, nor must discovery on the merits be completed precedent to class

certification." Id. (citing Nat'l Org. for Women v. Sperry Rand Corp., 88 F.R.D. 272, 277 (D.

Conn. 1980)). The District of Columbia Circuit Court has not set a "bright line" test to determine

the circumstances under which discovery should be bifurcated. Id. Bifurcation, however, is

generally permitted in cases in which it promotes "fairness and efficiency." In re Plastics

Additives Antitrust Litig., 2004 WL 2743591, at *2 (citing MANUAL FOR COMPLEX LITIGATION

(FOURTH) § 11.213). Although some discovery is necessary to resolve certification issues, "pre-

certification discovery is subject to the limitations which may be imposed by the court, and any

such limitations are within the sound discretion of the court." Hubbard, 2007 WL 604949, at *2

(citing Nat'l Org. for Women, 88 F.R.D. at 277; Chateau de Ville Prod., Inc. v. Tams-Witmark

Music Library, Inc., 586 F.2d 962, 966 (2d Cir. 1978)).

### B. Defendants' Proposal to Provide Plaintiffs with Voluntary Disclosures and Thereby Eliminate the Need for a Search into Their Data.

Early certification of a class has significant advantages, so bifurcation of discovery into

merits and class certification to facilitate early resolution has initial appeal. But, that appeal may

prove superficial in any antitrust case, particularly one in which most of the discovery is going to

be of ESI.

Defendants argue that it would be simple, in practice, to isolate the items that are relevant

to class certification and the items that would be relevant to the merits of the case. Defendants

identify three types of documents that they consider to be relevant to the issue of class

certification, offer to produce those, and invite the plaintiffs to make good faith suggestions for

other types of documents that plaintiffs deem relevant to the class certification issue.

First of all, defendants have to concede that they are asking plaintiffs (and therefore the

Court) to accept their formulation of the certification question and their determination of what

pertains to it. But, the whole purpose of discovery is to find not only those documents that

defendants wish for plaintiffs to see but all documents that pertain to the certification issue that

plaintiffs believe will advance their position.  To limit plaintiffs to what defendants will give them

is to, in effect, begin and end discovery with defendants' voluntary disclosures.  But, unlike

continental systems where discovery consists of what the parties voluntarily exchange, the

American system expressly authorizes each party to independently demand relevant evidence

from its opponent.  While bifurcated discovery may have much to recommend it, defendants'

assertions about the ease with which they can find responsive documents only apply if I limit

plaintiffs to what defendants will give them.  That approach in effect amends the Federal Rules of

Civil Procedure to create a unique form of discovery for class actions.

   To the extent that all documents of a certain type are relevant to class certification, it is

relatively easy to see how the defendants could isolate all documents of that type and produce

them without having to go through an expensive and time consuming review process.  Things

become infinitely more complicated, however, when we are confronted with the possibility that

there will exist, within a given type of document – such as e-mails, memoranda, or meeting

minutes – items that are relevant to class certification, items that are relevant to the merits, and

items that aren't relevant to the case at all.

   The creators of the pertinent ESI could not possibly have foreseen that it would some day

prove important to discriminate and differentiate between information that pertained to a policy

and information that pertained to the impact of that policy upon a discrete group of consumers.

Moreover, the creation of means to search large databases is a work in progress and no one has

suggested how the search of defendants' data could be refined so that a search engine of some sort

could yield ESI that pertained to impact but not ESI pertaining to any thing else.  While

defendants blithely suggest that the lawyers in this case are skilled at searching and can therefore

find what they need, they do not propose exactly how the lawyers will use this claimed expertise

and create a search engine so refined and exquisite that it will yield information bearing on the

certification question but not the merits.

**C.    The Distinctiveness of "Merits-Based" and "Certification-Based" Evidence.**

Courts must consider the degree to which the certification evidence is "closely

intertwined" with, and indistinguishable from, the merits evidence in determining whether

bifurcation is appropriate. Cima v. WellPoint Health Networks, Inc., No. 05-CV-4127, 2008 WL

746916, at *4 (S.D. Ill. Mar. 18, 2008). Here, the evidence plaintiffs need for certification

purposes is closely intertwined with the merits evidence. See In re Plastics Additives Antitrust

Litig., 2004 WL 2743591, at *3-4 (finding certification and merits discovery to be "sufficiently

intermingled" when plastic companies entered into a national price-fixing conspiracy because the

discovery needed to prove the existence of the conspiracy (merits) and the consequential damages

to the class members (certification) overlapped).

To certify the class, plaintiffs must establish that "the questions of law or fact common to

class members predominate over any questions affecting only individual members and that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). To satisfy this "predominance" requirement, plaintiffs

must secure evidence concerning "Defendants' adoption of the fuel surcharge program, how it

was imposed, and the Defendants' purposes in doing so" which bears directly on the element of

common impact. Opposition at 8. In essence, the scope of defendants' alleged conspiracy is

indistinguishable from its operation. Plaintiffs need evidence concerning the operation of the

conspiracy – evidence defendants classify as "merits-based" -- to establish the scope of the

13

conspiracy. In turn, plaintiffs need evidence of the scope of the conspiracy to prove common

impact and thereby satisfy Rule 23's "predominance" requirement.

Here, the alleged conspiracy's operation and scope are so closely intertwined that it would

be an "arbitrary insistence . . . that thwarts the informed judicial assessment that the current class

certification practice emphasizes" to insist that one be classified as "certification evidence" and

the other as "merits evidence." Hubbard, 2007 WL 604949, at *1;  see Gray v. First Winthrop

Corp., 133 F.R.D. 39, 41 (N.D. Cal. 1990) (denying a stay of discovery to defendants who alleged

that class certification was unlikely because of the impracticalities of distinguishing "merits" and

"class" discovery, as they were "closely linked issues").

### D.    The Promotion of Judicial Economy and Efficiency.

Bifurcated discovery fails to promote judicial economy when it requires "ongoing

supervision of discovery." Id.  If bifurcated, this Court would likely have to resolve various

needless disputes that would arise concerning the classification of each document as "merits" or

"certification" discovery.  See In re Urethane Antitrust Litig., 237 F.R.D. 454, 459 (D. Kan. 2006)

(citing Fed. R. Civ. P. 26(b)(2)(iii) ("[T]he court must limit the frequency or extent of

discovery . . . if . . . the burden or expense of the proposed discovery outweighs its likely

benefit . . . ")).  Concurrent discovery is more efficient when bifurcation "would result in

significant duplication of effort and expense to the parties." MANUAL FOR COMPLEX LITIGATION

(FOURTH) § 11.213;  see In re Hamilton Bancorp, Inc. Sec. Litig., No. 01-CV-0156, 2002 WL

463314, at *1 (S.D. Fla. Jan. 14, 2002) (explaining that in certain cases, bifurcation may increase

the costs of litigation by "protracting the completion of discovery, coupled with endless disputes

over what is 'merit' versus 'class' discovery").

14

Furthermore, the continued need for supervision and the increased number of disputes would further delay the case proceedings. Such prevention of the "expeditious resolution of the lawsuit" would prejudice plaintiffs. In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *6; see Fed. R. Civ. P. 1 (The Federal Rules of Civil Procedure "should be construed and administered to secure the just, speedy, and inexpensive determination" of actions). A significant public interest exists in the "vigorous enforc[ement of] national anti-trust laws through the expeditious resolution of [] private antitrust litigation." In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *8 (citing Golden Quality Ice Cream, Co. v. Deerfield Specialty Papers, Inc., 87 F.R.D 53, 58 (E.D. Pa. 1980)). This public interest is even greater in class actions. Id.

In this case, the need for the Court to facilitate a resolution is especially strong.[7] Defendants' proposal would not increase the efficiency of case proceedings, but would delay the proceedings and ultimately, the resolution of the case. See In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *3 (denying a motion to bifurcate discovery due to the delays bifurcation would cause when the matter had already been on the docket for 18 months); 3 WILLIAM B. RUBENSTEIN, ALBA CONTE, & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 9.44 (4th ed. 2009) (explaining that bifurcated discovery which creates the need for the court to rule on whether the discovery pertains to the merits or class certification is therefore inefficient).

Even if plaintiffs' proposed class is not certified, discovery into merits-based evidence is not necessarily wasted; the information "may be valued circumstantial evidence" if litigation

---

[7] The first of the suits consolidated by the Judicial Panel on Multidistrict Litigation was filed over two years ago, in May 2007, and the cases were consolidated in November 2007. Opposition at 2. The limited amount of information produced thus far was done so only pursuant to Judge Friedman's Order on Motion for Protective Order [#114].

continues absent certification. MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.14. At this

stage, "there is no reason to believe that denial of class certification will terminate this litigation."

In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *4. Eighteen individual businesses

from multiple districts have alleged claims against defendants. Each business independently

sought judicial relief before four businesses moved to consolidate the cases. See id. (denying

motion to bifurcate discovery and finding that litigation was likely to continue absent class

certification when seven individual lawsuits were filed before the case was consolidated, and six

additional lawsuits were filed after consolidation was stayed pending class certification).

### E.    A Premature Evaluation of Plaintiffs' Ability to Satisfy Rule 23's Certification Requirements.

Defendants' attempt to pre-argue the class certification issue is unpersuasive. "Discovery

relating to class certification is closely enmeshed with merits discovery, and in fact cannot be

meaningfully developed without inquiry into the basic issues of the litigation." Gray, 133 F.R.D.

at 41 (citing MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.12 (1985)). Defendants'

argument that "discovery is premature, burdensome, and inefficient" at this stage is an attempt to

"litigate prematurely the sufficiency of the complaint and the appropriateness of class

certification." Gray, 133 F.R.D. at 41.

This Court has already established the sufficiency of the complaint. See In re Rail Freight

Fuel Surcharge Antitrust Litig., 593 F. Supp. 2d 29 (D.D.C. 2008) (denying defendants' motion to

dismiss plaintiffs' federal antitrust claim for injunctive relief and granting defendants' motion to

dismiss plaintiffs' state law claims for lack of subject matter jurisdiction); In re Rail Freight Fuel

Surcharge Antitrust Litig., 587 F. Supp. 2d 27 (D.D.C. 2008) (denying defendants' motion to

dismiss for failure to state a claim). The Court will not accept defendants' "glowing assessment"

of its own arguments – namely, that class certification will fail or be substantially narrowed–"as a

reason to bifurcate." See also Intervet, Inc. v. Merial Ltd., No. 06-CV-658, 2008 WL 2411276, at

*2 (D.D.C. June 11, 2008) (declining to bifurcate privilege issue from merits based on movant's

assessment of its own arguments).

Defendants' argument that class certification must be substantially narrowed such that

plaintiffs' proposed class conforms to their theory of collusion is without merit. Contrary to

defendants' assertions, Judge Friedman has already found, in his denial of CSXT's motion, that

plaintiffs' "complaint alleges a broader conspiracy by the defendants . . . Adoption of the AIILF

was one of the steps . . . but not the only step [] allegedly taken by the defendants to implement

this broader conspiracy." Memorandum Opinion and Order Denying Defendant's Motion for a

Hearing and Denying Defendant's Motion for Clarification [#281] at 1. Thus, I will not address

CSXT's arguments regarding the breadth of the class or CSXT's interpretation of the opinion

denying the motion to dismiss.

**F.    Defendants' Proposal to Begin Phased Discovery with a Limited Class Sample.**

As Judge Friedman has already found that CSXT's interpretation is incorrect, CSXT's

proposal to begin discovery only with respect to the shippers who have been affected by AIILF

takes on new implications. Where before CSXT was essentially saying it wanted to get started

with discovery on a smaller issue and fold in any additional issues as they arise, now, CSXT's

proposal would result in a test-certification process where the parties would conduct discovery on

class issues pertaining to AIILF shippers, go through the certification process, and then,

presumably, address the merits of the AIILF claims and begin discovery as to the other issues.

This could be a three or four stage process, and CSXT has not demonstrated why the results in an AIILF test case would accurately predict the results that would obtain if plaintiffs sought to certify the class as they believe it should be defined. Given that we already know that the scope of the putative class is larger than the AIILF claims alone, little will be saved in terms of time and resources by litigating class certification twice.

### G.    Plaintiffs' Proposal for Full and Complete Discovery Before Certification.

This discussion is not to say that untrammeled and unlimited discovery is appropriate before the issue of class certification is addressed. See Hubbard, 2007 WL 604949, at *2 (explaining that discovery on the merits need not be completed before class certification). Plaintiffs will have to concede that what may be a king's ransom will have been spent on discovery that may never be used if Judge Friedman denies class certification or narrows the nature of the class. Settlements based solely on avoiding discovery costs are not the hallmark of a judicial system that is working fairly. Thus, I am obliged to create a means by which the merits discovery that I will permit is no greater than it has to be. Working from the principle that nothing concentrates a lawyer's mind like a deadline, I have rejected plaintiffs' attempt to postpone briefing of the class certification until all discovery is finished, and a date for dispositive motions is set. See In re Graphics Processing Units, 253 F.R.D. 478, 482 (N.D. Cal. 2006) (demonstrating that district courts have the discretion to set the dates of Rule 23 briefings before the close of discovery).

Instead, I intend to allow an initial period of discovery, after which the parties will have to brief the certification issue. See Hubbard, 2007 WL 604949, at *1 (providing the parties in Scheduling Order [#66] with approximately 120 days before the Rule 23 briefing to conduct only

18

class-based discovery); In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *15
(explaining that decision not to bifurcate "may require the parties to spend substantial time in
responding simultaneously to merits-based discovery and class-based discovery" and therefore,
providing that parties with 120 days rather than originally proposed 60 to conduct discovery
before the Rule 23 briefings); In re Graphics Processing Units, 253 F.R.D. at 483 (determining
the class certification issue one month before the non-expert discovery cut-off date).

I appreciate that this is a compromise but I can only hope that like any compromise it will
displease both sides equally. It is my goal to avoid creating the new discovery disputes that would
arise by instituting a new criterion – relevance to certification – on top of the requirements for
discoverability outlined in the Federal Rules of Civil Procedure. I also would like to see the issue
of certification resolved as quickly as it can be to bring certainty to the litigation and avoid
wasting resources on discovery that turns out to be irrelevant. Also, as discussed herein, I want to
allow plaintiffs to make their case for certification using the evidence and arguments that they
consider to be the most appropriate and not to be limited to the information that defendants or the
Court might have chosen. I find this a preferable solution to attempting to define the ineffable by
attempting to identify in advance what ESI will bear on the certification issue and not the merits
and what I view as the unacceptable solution of limiting plaintiffs to the information defendants
deem relevant to the certification issue.

Accordingly and in light of this Opinion and the passage of time since the parties' first
proposed schedules, I will order counsel to meet and confer in the next ten days to ascertain
whether they can jointly agree to a schedule for all the remaining events to take place in the case,
with the understanding that I will insist that any such schedule allow for briefing of the

certification issue before the conclusion of discovery and to file a jointly proposed schedule if they can. If the parties cannot agree, each side will have to file proposed schedules fourteen days from the date of this Order.

### IV.    Conclusion.

For the reasons discussed herein, defendants' Motion [#187] will be denied. An Order accompanies this Memorandum Opinion.


Dated: July 2, 2009                                    _____/S/_____
                                                       JOHN M. FACCIOLA
                                                       U.S. MAGISTRATE JUDGE

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION

MDL Docket No. 1869
Misc. No. 07-489 (PLF/AK/JMF)

This Document Relates To:

ALL DIRECT PURCHASER CASES

## SCHEDULING ORDER

After hearing the parties' arguments and representations in support of their

proposed schedules in open court on July 27, 2009, and after conferring with Magistrate Judges

Facciola and Kay, it is hereby ordered that the following schedule shall govern further

proceedings in this case:

1.    The parties shall commence a rolling production of documents on August 1, 2009.

The parties have agreed to make their best efforts to front-load this production.

The production shall be completed by October 31, 2009.

2.    The parties are currently in the process of negotiating an agreement regarding the

production of certain transactional data.  The parties have expressed an interest in

resolving this issue promptly.  Accordingly, if the parties are unable to reach an

agreement within the next 10 business days, they are directed to seek relief from

Judge Facciola.

3.    Plaintiffs have asked that the defendants be required to certify, on October 31,

2009, that their production is substantially complete.  As Rule 26(g)(1)(A) of the

Federal Rules of Civil Procedure provides that a signature on a discovery response serves as a certification that the response is true and complete, the Court will not now require the defendants to provide any additional certification.

4.    After October 31, 2009, the parties will commence depositions.  Plaintiffs sought to take a total of 15 depositions per defendant, with five to be taken prior to class certification briefing and 10 additional depositions to be taken after briefing. Defendants argue that the number of depositions should be limited to 10 per party with the understanding that any party seeking to depose more people may petition Judge Facciola for permission upon a showing of good cause.  The Court agrees with the defendants' position, and will allow 10 depositions per party to be taken at any time.  Any deposition noticed pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure shall be counted as one deposition notwithstanding the number of witnesses that are presented.

5.    The deadline for adding parties will be December 31, 2009.

6.    Plaintiffs shall file their motion for class certification and any accompanying expert disclosures (only those relating to class certification issues) on or before March 18, 2010.  Plaintiffs must make those experts available for deposition as soon as possible thereafter.

7.    Defendants shall file their opposition to the plaintiffs' motion for class certification and any accompanying expert disclosures (only those relating to class certification issues) on or before June 7, 2010.  Defendants must make those experts available for deposition as soon as possible thereafter.

8.     Plaintiffs shall file their reply and any accompanying expert disclosures (only those relating to class certification issues) on or before July 19, 2010.  Plaintiffs must make those experts available for deposition as soon as possible thereafter.

9.     A hearing on class certification is scheduled before the undersigned for September 13 and 14, 2010.

10.    All fact discovery will conclude on November 19, 2010.

11.    Both parties initially proposed a period of expert discovery to begin a month after the close of fact discovery.  In light of the fact that the anticipated start of expert discovery is more than one year from today, rather than set a schedule for expert discovery at this point, the Court orders the parties to file a status report with Judge Facciola on or before July 26, 2010.  The status report shall contain a joint proposed schedule for expert discovery, or, in the event that the parties cannot agree, they shall file separate proposed schedules.

12.    The Court will reserve its ruling on further scheduling pending the final outcome of the class certification decision.

SO ORDERED.


                                        /s/
                                        PAUL L. FRIEDMAN
                                        United States District Judge

DATE: July 28, 2009



                                        3

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July, 2009, I caused a true and correct

copy of the foregoing **Plaintiffs' Memorandum in Support of Plaintiffs' Proposed**

**Case Management Order** to be filed and served electronically via the Court's CM/ECF

system upon all registered users. A true and correct copy is also being served via first-

class mail, postage prepaid, upon the following who are not registered ECF users:

David I. Gelfand, Esq.
Mark Leddy, Esq.
Cleary, Gottlieb, Steen & Hamilton
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006

Joseph A. Tate, Esq.
Stephen D. Brown, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Howard J. Sedran
Levin, Fishbein, Sedran & Berman
510 Walnut Street, 5th floor
Philadelphia PA 19106

Dianne M. Nast, Esq.
Roda & Nast, PC
801 Estelle Drive
Lancaster, PA 17601

Joseph R. Saveri, Esq.
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 30th Floor
Embarcedero Center West
San Francisco, CA 94111

Marc H. Edelson, Esq.
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

Anthony J. Bolognese
Joshua H. Grabar
Bolognese & Associates
One Penn Center
1617 JFK Boulevard #650
Philadelphia PA 19103


    /s/   Matthew Duncan       .
Matthew Duncan