**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STANDARD IRON WORKS, on behalf of itself and all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | Case No. 08-cv-5214 |
| v. ) ) | Hon. James B. Zagel |
| ARCELORMITTAL; ARCELORMITTAL USA, INC.; UNITED STATES STEEL CORPORATION; NUCOR CORPORATION; GERDAU AMERISTEEL CORPORATION; STEEL DYNAMICS, INC.; AK STEEL HOLDING CORPORATION; SSAB SWEDISH STEEL CORPORATION; COMMERCIAL METALS, INC., ) ) ) ) ) ) ) ) ) ) | Hon. Jeffrey Cole |
| Defendants. ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR PHASED DISCOVERY PROPOSAL**

Defendants jointly submit this proposal for phased discovery in response to the invitation in the Court's Memorandum Opinion and Order dated June 12, 2009 (dkt. 170) ("Mem. Op."). There, the Court stated that "the case should proceed to class issues and then to the merits of the claims, on neither of which matters I express any view." Id. at 43. The Court further stated:

> It is my intention to proceed with phases of discovery, and I am willing to entertain suggestions from all parties (preferably jointly) on how to achieve the goals of discovery in an economically feasible manner. I recognize the potential for staggering discovery costs in a case such as this. . . . [B]ecause – as far as I can tell and based upon the briefing up until this point – this will be a sizable, complex case, I am inclined to proceed with discovery in phases and, as is my custom in many other cases, invite the litigants to make a proposal (or two) in that regard.

Id. at 43-44.

With this guidance in mind, defendants identified the key factual issues that would be contested at the class certification stage and require discovery. Defendants concluded that class certification would turn on whether antitrust impact and amount of damages are susceptible to common proof such that common issues predominate, Fed. R. Civ. P. 23(b)(3); whether the claims of the named plaintiffs are typical of those of the class, Fed. R. Civ. P. 23(a)(3); and whether the named plaintiffs will fairly and adequately protect the interests of the class, Fed. R. Civ. P. 23(a)(4). Defendants then identified the topics of information that would be relevant to these contested Rule 23 issues.

In particular, any class certification in this antitrust case will hinge largely on the commonality of proof of the crucial element of antitrust impact; that is, whether plaintiffs can show, using evidence common to all members of the proposed class, that the alleged conspiracy increased the prices paid by thousands of purchasers for hundreds of different steel products -- from wire rod used to make coat hangers to coated flat steel for automobile fenders to structural steel used to build skyscrapers. The impact determination will necessarily require an extensive, data-driven focus on the characteristics of the steel products that putative class members bought from defendants and on how any cuts in production of "raw steel" purportedly affected the prices they paid.

Defendants propose that the parties in Phase I focus on developing the extensive information that will be relevant to determining whether impact can be shown using common evidence and the other key class certification issues. This is no small task; the quantity of data involved is enormous and presents numerous complexities inasmuch as it must be extracted and collated from various sources by defendants who have offices and store information at locations across the country, as well as from plaintiffs and putative class members. Focusing Phase I

discovery on the key class issues will enable a class certification motion to be brought, briefed, and adjudicated at an early practicable time while avoiding the even much greater costs, burdens, and complexities that would be associated with full merits discovery.

Plaintiffs' proposal pays lip service to the Court's guidance, but in substance seeks broad merits discovery having little, if anything, to do with the class determination. For example, plaintiffs seek many years of documents relating to communications among defendants, information about defendants' overall profitability, and "speeches, statements or presentations." Such discovery goes to the merits (and beyond) and is not relevant to antitrust impact, the typicality or adequacy of plaintiffs, or any other issue pertinent to class certification. Plaintiffs also propose to conduct 90 party depositions per side; in fact, plaintiffs advised defendants in meet-and-confer discussions that they envisioned Phase I to include searches of the email of the occupants of up to 20 senior positions per defendant -- potentially hundreds of employees over the relevant period -- although plaintiffs' proposal lacks even that limitation.

Plaintiffs thus fail to embrace the Court's direction to treat class as a threshold issue. Indeed, it is difficult to understand what merits issues are not encompassed in plaintiffs' proposed first phase of discovery; plaintiffs themselves cannot say what, if anything, would be left for the second phase. Plaintiffs' proposal also would greatly magnify the expense to the defendants, expense that may be unnecessary if class certification is denied or significantly narrowed, and that causes particular hardship in today's economic climate in which resources are severely constrained. Finally, plaintiffs' proposal is unrealistic about the time to complete their proposed discovery and to put the class issue before the Court. Discovery of the magnitude sought by plaintiffs could take as much as 18 months or longer to complete, which would

prevent class certification from being decided at the "early practicable time" mandated by the Federal Rules of Civil Procedure.

Apart from the overbroad scope of Phase I discovery, plaintiffs' proposal prejudices defendants in other respects. Most significantly, plaintiffs' schedule provides for expert reports to be disclosed simultaneously with, rather than in advance of, class certification briefing. Plaintiffs propose to file their rebuttal expert report with their reply class certification brief, after defendants have already deposed plaintiffs' expert and filed their class certification opposition brief. If, as is typical in complex antitrust cases, plaintiffs' rebuttal expert report significantly amplifies his or her opinion, this sequence prevents defendants from responding to the fully developed views of plaintiffs' expert. Instead, as defendants propose, expert discovery should occur as a separate phase prior to class certification briefing, which can be accomplished without significantly lengthening the overall schedule.

The Court should adopt defendants' proposal and reject plaintiffs'.

## RELEVANT BACKGROUND

Plaintiffs allege that defendants colluded to restrict their output of raw steel and thereby raise prices of steel products. Plaintiffs seek to represent a putative class of "all persons and entities who purchased steel products directly from Defendants between January 1, 2005 and the present . . . ." Compl. ¶ 1. This broad class includes purchasers of "all products derived from raw steel and sold by Defendants, including, but not limited to, steel sheet and coil products; galvanized sheet and other galvanized and/or coated steel products; tin mill products; steel slabs and plates; steel beams, blooms, rails, and other structural shapes; steel billets, bars, and rods; steel pipe and other tubular products; and all other products derived from raw steel and sold by Defendants." Compl. ¶ 21.

Following the Court's opinion on the motion to dismiss, the parties met and conferred and exchanged various written proposals for the scope of Phase I discovery and a briefing schedule for class certification. The parties negotiated but were unable to reach agreement on the scope of Phase I discovery and resolved to put their differences before the Court through simultaneous briefs. As part of these discussions, defendants advised plaintiffs that if discovery were limited as set forth in defendants' proposal, defendants would not oppose class certification on grounds that the existence of the conspiracy, as alleged in the Complaint, is not susceptible to common proof on a classwide basis.

## **ARGUMENT**

**A.  Defendants' Proposal Is Superior Because It Puts the Class Certification Issues First and Is Calculated to Achieve the Goals of Discovery Without Imposing Staggering Burdens on the Parties**

Class certification will be a key and possibly conclusive stage in this case. It will determine whether the named plaintiffs, regardless of the merits, can transform their individual monetary claims into a multi-billion dollar sword of Damocles hanging over defendants. See, e.g., Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 675 (7th Cir. 2001) (recognizing potential "bet-your-company" impact of class certification that can force settlement based on leverage, rather than merits); In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015-16 (7th Cir. 2002) (observing that "[a]ggregating millions of claims" can make "the stakes so large . . . that settlement becomes almost inevitable -- and at a price that reflects the risk of a catastrophic judgment as much as, if not more than, the actual merit of the claims"). This is particularly true in the instant case, brought on behalf of a vast class of purchasers of a wide variety of steel

products.  Accordingly, as the Court has already suggested, Mem. Op. at 43, the class

certification issue deserves the parties' and the Court's full attention at this stage of the case.[1]

Class certification is not expected to focus upon whether defendants made an

anticompetitive agreement -- an issue more susceptible to summary judgment or trial.  Rather, to

obtain certification of a Rule 23(b)(3) class, plaintiffs will have to establish, inter alia, that "the

claims or defenses of the representative parties are typical of the claims or defenses of the class";

that "the representative parties will fairly and adequately protect the interests of the class"; and,

most importantly for discovery, that "questions of law or fact common to class members

predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(a)(3),

(a)(4), (b)(3).[2]

---

[1]  Numerous courts hearing antitrust class actions have phased class and merits discovery based
on similar considerations.  See, e.g., In re Urethane Antitrust Litig., No. 04-md-1616-JWL-DJW,
2007 WL 140987, at *3 (D. Kan. Jan. 17, 2007); In re Pressure Sensitive Labelstock Antitrust
Litig., MDL No. 1356 (M.D. Pa. Apr. 15, 2004) (attached as Ex. B); Hampton Pugh Co. v.
Monsanto Co., CV-00-N-1307-W (N.D. Ala. Oct. 31, 2002) (attached as Ex. C); In re NASDAQ
Market-Makers Antitrust Litig., 169 F.R.D. 493, 500, 530 (S.D.N.Y. 1996).  Courts in this
District have routinely phased discovery even in non-antitrust cases that are neither as sizable nor
as complex as the case at hand.  See, e.g., Am. Nurses' Ass'n v. Illinois, No. 84 C 4451, 1986
WL 10382, at *2-3 (N.D. Ill. Sept. 12, 1986) (limiting initial discovery to class issues because
"[i]f class certification is denied, the scope of permissible discovery may be significantly
narrowed; if a class is certified, defining that class should help determine the limits of discovery
on the merits"); Plummer v. Chicago Journeyman Plumbers' Local Union No. 130, U.A., 77
F.R.D. 399, 402 (N.D. Ill. 1977) ("The bifurcated approach to discovery is the proper and most
efficient way to administer this [non-antitrust] class action.").  As one court remarked even
before electronic forms of communication made discovery much more complex and expensive,
"[w]here the plaintiffs seek to represent a large national class on a broad spectrum of [issues],
discovery can require intense commitments of time, money and resources and involve
innumerable documents and records.  Neither party would benefit from such extensive
expenditures when it could have been determined in the early stages that a class action was not
appropriate or that the class must be more limited in scope than originally alleged by the
plaintiffs."  Karan v. Nabisco, Inc., 78 F.R.D. 388, 396 (W.D. Pa. 1978).

[2]  Rule 23 contains other elements that plaintiffs are required to establish, but these other
elements are either not likely to be contested in this case, e.g., numerosity, Fed. R. Civ. P.

Footnote continued on next page

In antitrust class actions like this one, whether common questions predominate over individualized inquires is typically the dispositive issue and revolves around whether the crucial Clayton Act elements of impact and amount of damages -- i.e., whether and to what extent each class member was adversely affected by the alleged conspiracy -- can be proven by a common body of evidence. See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008) ("In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."); Blades v. Monsanto Co., 400 F.3d 562, 572 (8th Cir. 2005) (even if proof of entry into conspiracy may be common, certification denied because "proof of conspiracy is not proof of common injury"); Alabama v. Blue Bird Body Co., Inc., 573 F.2d 309, 320 (5th Cir. 1978) ("In making the determination as to predominance, of utmost importance is whether 'impact' should be considered an issue common to the class and subject to generalized proof, or whether it is instead an issue unique to each class member . . . ."); Hettinger v. Glass Specialty Co., Inc., 59 F.R.D. 286, 293-94 (N.D. Ill. 1973) (then-D.J. Bauer) ("In a treble damage action, the finding of an anti-trust violation does not result in liability. The statute creates a remedy only to the extent that each person has been 'injured in his business or property by reason of anything forbidden in the antitrust laws.' It is this injury which constitutes the crux of any plaintiff's cause of action." (citation omitted)).[3]

---

Footnote continued from previous page

23(a)(1), or are not fact-bound and can be adequately briefed without need for discovery, e.g., superiority over other methods for adjudicating the controversy, Fed. R. Civ. P. 23(b)(3).

[3] The elements for a private cause of action under the Clayton Act are (1) the existence of a conspiracy, (2) antitrust impact (sometimes called "fact of damage"), and (3) the amount of damages. See, e.g., In re Indus. Gas Antitrust Litig., 100 F.R.D. 280, 288 (N.D. Ill. 1983) (citing Windham v. American Brands, Inc., 565 F.2d 59, 65 (4th Cir. 1977) (en banc)); Hydrogen Peroxide, 552 F.3d at 311. Proof of the existence of a conspiracy is not typically considered by

Footnote continued on next page

Here, impact is susceptible to common proof only if plaintiffs can demonstrate that the same proof that shows that any particular class member paid higher prices due to allegedly coordinated production cuts will simultaneously be determinative of whether every other class member also paid artificially inflated prices. Similarly, amount of damages is susceptible to common proof only if the amount of each purchaser's alleged overcharge can be proven without highly individualized fact finding.

These questions must be applied to all purchasers of "steel sheet and coil products; galvanized sheet and other galvanized and/or coated steel products; tin mill products; steel slabs and plates; steel beams, blooms, rails, and other structural shapes; steel billets, bars, and rods; steel pipe and other tubular products; and all other products derived from raw steel" (Compl. ¶ 21) from defendants since 2005. This inquiry focuses on products, customers, and sales, and the answers lie largely in data: the products purchased, their characteristics, and the net prices paid, as well as the economic context in which such transactions occurred (e.g., state of demand, available supply of imports, and production levels).

For example, if output of some products behaves differently than other products, that would tend to undermine the notion that impact can be proven across a class of all steel purchasers by common evidence. Similarly, if some buyers experienced shortages, as alleged in the Complaint, see Compl. ¶¶ 94, 109-114, but others did not, that will be at odds with plaintiffs' ability to prove their case by common proof. Pricing to different customers may also be inconsistent with classwide proof of impact, as may be the existence of long-term contracts that

Footnote continued from previous page

courts at the class certification stage because this is generally viewed as an issue susceptible to common proof by all members of the proposed class. In that regard, defendants have confirmed to plaintiffs that, if discovery is limited as set forth in defendants' proposal, the existence of the conspiracy, as alleged in the Complaint, will not be a focus of defendants' opposition to class certification here.

allow some customers to lock in prices thereby insulating themselves against short-term swings. See, e.g., Hydrogen Peroxide, 552 F.3d at 326 (price disparities among similarly situated buyers militate against a finding that impact can be proved by common evidence); Blades, 400 F.3d at 572-74 ("wide variation" in pricing "would require the purchasers of some [products] to prove injury through evidence that would vary according to individualized market conditions and thus would not be shared in common with the rest of the proposed classes").

The theory of the Complaint is that impact on all steel buyers is linked because the input for all steel products is a commodity called "raw steel," the output of which drives the supply and price of all steel products in the United States. (Compl. ¶¶ 35, 37.) For purposes of the motion to dismiss, the Court was constrained to accept this allegation (Mem. Op. at 36). In the context of class certification, however, where plaintiffs cannot rest on their pleadings, see Szabo, 249 F.3d at 675 (rejecting "proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class") and Hydrogen Peroxide, 552 F.3d at 317-18 & n.18 (same), defendants will show that "raw steel" cannot properly serve as the lynchpin of common proof of impact on the wide variety of steel products sold to putative class members. "Raw steel" does not have a fixed definition. Steel in its molten state is not sold and has no price. Some (but not most) steel is sold in an intermediate semi-finished form such as billets[4] and is sometimes called "raw steel." It is used in varying quantities and with differing metallurgic qualities to make diverse steel products with different prices, end uses, and demand. The raw steel used to make rebar is different than that used to make auto body parts or to build ships and the raw steel used for rebar cannot be substituted for the raw steel used for auto body parts and so forth.

---

[4] A billet is an intermediate semi-finished form of steel that is usually two to seven inches square and rolled into "long" steel products such as bar, channels or rod.

Defendants designed their Phase I discovery topics to focus the inquiry into whether the impact of an alleged conspiracy to reduce the output of raw steel has a common effect on all buyers of steel products regardless of what steel product they purchased and when and how they purchased it. Specifically, defendants' proposal includes production of data showing their volume of production of steel products, their inventory levels, order entry, or backlog, and transactional data showing their sales of steel products. See Defs.' Proposed Order ¶ 2.a.i-iii (attached as Ex. A). Scores of antitrust class certification cases confirm that this type of data and the economic experts' analysis of it is central to the common impact analysis.[5] This is particularly so after Hydrogen Peroxide, which emphasized the crucial role of economic experts on impact. See 552 F.3d at 312-15. Defendants' proposed discovery would also cover the relevant production information and uses and markets for "raw steel," which Plaintiffs portray as the common link among all steel products. See Defs.' Proposed Order ¶ 2.a.vi. Additionally, defendants will produce business planning documents, market reports, analyses or presentations

---

[5] See, e.g., In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 491-97 (N.D. Cal. 2008) (observing that for common impact plaintiffs "primarily rely on the expert report of Dr. David Teece," who "performs a series of regression and correlation analyses"; scrutinizing plaintiffs' expert's analysis at length; and concluding that common impact element not met because "plaintiffs' proffered econometric models are grossly lacking"); In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 189-91 (D.N.J. 2003) (relying on analysis of plaintiffs' expert who reviewed over 1000 "deal jackets" for individual transactions as well as tracked prices and dealer gross profits); In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 383-84 & n.10 (S.D.N.Y. 1996) (to show common impact "Plaintiffs' expert examined transaction data provided by GE for purchases made between January 1989 and October 1993 of products that were affected by the 1992 list price increases" and concluded "the 1992 list prices increases had, in general, an upward effect on the transaction prices"); In re Agric. Chem. Antitrust Litig., No. 94-40216-MMP, 1995 WL 787538, at *3-11 (N.D. Fla. Oct. 23, 1995) (discussing experts' dueling testimony and noting that common impact depends on "empirical study" and a study of the industry); In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 689-93 (N.D. Ga. 1991) (discussing common impact entirely in context of plaintiffs' expert's "empirical analyses" and "statistical methodologies"). By citing the foregoing cases, defendants do not mean to imply agreement with their outcomes or with all aspects of their analysis, only to illustrate the type of information that is typically is at the heart of the common impact inquiry in a case like this.

created by or for senior executives relevant to whether the impact of the alleged conspiracy is susceptible to common proof.  See Defs.' Proposed Order ¶ 2.a.vii.

In addition to common impact, which  is likely to be the major focus of class certification briefing, Defendants' proposed Phase I discovery topics also include information necessary to determine whether the claims of the named plaintiffs are typical of those of the class and whether the named plaintiffs will fairly and adequately represent the interests of the class.  See, e.g., In re Graphics Processing Units Antitrust Litig., 253 F.R.D. at 489-90 (finding typicality lacking where class representatives purchased different products in different markets through different channels and arrangements than class they sought to represent); Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1195-96 (11th Cir. 2003) (finding adequacy potentially lacking and remanding for discovery on whether "some class members . . . have economic interests that are significantly different from -- and potentially antagonistic to -- the named representatives purporting to represent them").  These inquiries will require production of plaintiffs' and class members' data and information relating to their purchases and uses of steel products, types of steel products purchased, and their involvement in this litigation.  Also relevant may be documents showing the spectrum of arrangements, such as long-term contracts, through which plaintiffs and class members purchase steel products.  All of these matters are included in defendants' proposed Phase I topics.  See Defs.' Proposed Order ¶ 2.a.iv, v.

Even as limited to class issues, defendants' proposal involves extensive discovery that will require major expenditures and commitments of resources by defendants.  During the relevant period defendants sold hundreds of millions of tons of steel products to thousands of customers in millions of separate transactions.  The data recording these transactions are maintained in different ways by different defendants, and for a number of defendants will have to

11

be extracted and collated from numerous disparate sources.  The benefit of defendants' proposal
is that it would  make discovery manageable and focus the parties' resources on areas most likely
to yield information relevant to the crucial issue now before the Court, class certification.
Defendants' proposal would enable class certification to be ready for decision within 15 months -
- an aggressive schedule given the sheer volume of products, transactions, and customers
involved in this case, but one that is achievable if discovery is phased in the manner proposed by
defendants.  In this way, defendants' proposal not only helps to alleviate the staggering burdens
of discovery and avoid potential waste, but also serves Federal Rule of Civil Procedure
23(c)(1)'s imperative to determine class certification "[a]t an early practicable time."

**B.**      **Plaintiffs' Proposal Should Be Rejected Because It Frontloads Large Quantities
of Merits Discovery Under the Guise of Class Certification and Would Delay the
Certification Decision**

Plaintiffs' proposed order recites that "Phase I shall constitute discovery 'relevant to
making the certification decision on an informed basis' and include the 'information required to
identify the nature of the issues that will actually be presented at trial.'"  Pls.' Proposed Order
¶ 1.b (quoting Fed. R. Civ. P. 23(c)(1) Advisory Committee Notes).  In reality, plaintiffs'
proposed topics of discovery go far beyond what is relevant to the certification decision and
reasonably necessary to identify the issues to be tried.[6]  Plaintiffs' proffered format for Phase I
does not fulfill the Court's objective to "achieve the goals of discovery in an economically
feasible manner."  Mem. Op. at 43.

---

[6]  The Advisory Committee commentary on the scope of class discovery emphasizes that any
discovery "to identify the nature of the issues that actually will be presented at trial" should be
"controlled" and "limited to those aspects relevant to making the certification decision on an
informed basis."  Fed. R. Civ. P. 23, Advisory Committee Notes, 2003 Amendments.

In particular, plaintiffs envision a Phase I that would include mass searches of the email and other files of hundreds of defendants' employees that are unnecessary for a Rule 23 determination. Plaintiffs' first category of Phase I discovery encompasses six years worth of "[d]iscovery from the senior officers and senior managers of the parties." Pls.' Proposed Order ¶ 1.b.i. While plaintiffs' proposed order does not define "senior officers and senior managers," plaintiffs advised in meet-and-confer discussions that they meant "10-20 positions" per defendant -- i.e., potentially hundreds of employees overall since multiple employees could have occupied a given position since 2003 -- and insisted on general email searches of this population of individuals. Such mass email searches of large numbers of employees are enormously burdensome and costly.[7]

Moreover, the type of information that plaintiffs seek to uncover through these large-scale searches is geared toward merits issues, encompassing virtually any issue that could ever come up in the case at any stage: "market conditions, production levels, prices, customers, imports and exports, the market impact of production cuts, trade association meetings and other industry events, communications with competitors, and speeches, statements or presentations relating to the above topics." Pls.' Proposed Order ¶ 1.b.i. This is classic plaintiffs' merits discovery: it attempts to elicit evidence that defendants formed an agreement through "communications with competitors," or through trade associations and meetings and speeches, as

---

[7] See, e.g., Martin H. Redish, Electronic Discovery and the Litigation Matrix, 51 Duke L.J. 561, 592 (2001) ("[E]lectronic discovery can be predicted, as a general matter, to give rise to burdens and expense that are of a completely different magnitude from those encountered in traditional discovery."); Managing Discovery of Electronic Information: A Pocket Guide for Judges, Federal Judicial Center 2007, *available at* http://www.fjc.gov/public/pdf.nsf/lookup/eldscpkt.pdf/$file/eldscpkt.pdf ("Market research tells us that the average employee sends or receives about 50 messages per working day, which translates into more than 1,200,000 messages a year for an organization of 100 employees.").

alleged in the Complaint.[8]  However, "discovery on class certification is not a matter of ascertaining whether Plaintiffs will prevail on the merits, but whether the moving party can establish that the discovery is pertinent to the . . . Fed. R. Civ. P. 23 class certification requirements."  See Urethane, 2007 WL 140987, at *3.  As noted above, the existence of a conspiracy is generally viewed as a common issue, and if discovery is appropriately limited, defendants do not intend to argue that the existence of the alleged conspiracy to restrict raw steel output industry-wide is not susceptible to common proof.

Plaintiffs have asserted in discussions that broad merits discovery is relevant to common impact because communications of defendants could reflect "perceptions" that production cuts have a common impact on all purchasers of steel products.  This position has no limiting principle and runs counter to the objective of "achiev[ing] the goals of discovery in an economically feasible manner" with "phases of discovery."  Mem. Op. at 43.  Under plaintiffs' theory, phasing of discovery between class and merits would never be possible.  Moreover, plaintiffs ignore that any hypothetical narrative statements they might rely on cannot substitute for analysis of the actual data.

In this vein, defendants' proposal includes many gigabytes of production and transactional data that would serve as the best evidence for any analysis of common impact.  See Hydrogen Peroxide, 552 F.3d at 308 & n.3 (noting that "extensive discovery" occurred in that defendants "provided to plaintiffs all available sales transactions and market data relevant to how hydrogen peroxide and persalts were bought and sold during the class period"); supra note 5

---

[8]  With Phase I discovery of such breadth, it is unclear what would remain to be done during plaintiffs' proposed Phase II discovery.  Plaintiffs do not specify, other than to suggest possibly nothing.  See Pls.' Proposed Order ¶ 5 ("the parties shall meet and confer on the parameters of any remaining fact and expert discovery" (emphasis added)).

(collecting cases showing that common impact analysis turns on econometric analysis). Furthermore, defendants' proposal includes business planning documents, market reports, and analyses or presentations created by or for senior executives that shed light on whether the alleged production cuts had a common impact on all purchases of steel products. Compared to what defendants have proposed, plaintiffs' expansive Phase I discovery proposal delves into massive amounts of employee email and other documents in hopes of finding random narrative commentary on common impact and offers little to no marginal benefit while greatly escalating costs for defendants.

Plaintiffs also seek nine years of "high-level market reports, analyses and presentations" without any subject matter limitation. Pls.' Proposed Order ¶ 1.b.ii. By contrast, defendants' proposal includes discovery of "[b]usiness planning documents, market reports, analyses or presentations created by or for senior executives <u>relevant to whether the impact of the alleged conspiracy on class members, if any, is susceptible to common proof</u>." Defs.' Proposed Order ¶ 2.a.vii (emphasis added). The principal difference, again, is that defendants' proposal is anchored in relevance to disputed class certification issues, whereas plaintiffs' free-floating proposal includes financial plans, acquisition plans, plans relating to other businesses not engaged in the manufacture of steel products, and any number of other documents not material to production levels and prices of steel products.

Unsatisfied with the mountain of data and documents included in defendants' proposal, plaintiffs further seek nine years of sixteen separate categories of economic data. Pls.' Proposed Order ¶ 1.b.iii. While defendants agree that certain economic data will be important to answer the common impact question, <u>see</u> <u>supra</u> at pp. 7-10, both the time period and the myriad categories of data covered by plaintiffs' proposal are substantially overbroad. For instance,

plaintiffs cannot reasonably contend that data relating to defendants' "profits" is relevant to whether common evidence can show that every class member paid artificially inflated prices. Moreover, plaintiffs are hard-pressed to show why they need four years of data <u>before</u> the alleged conspiracy to demonstrate common impact <u>of</u> the alleged conspiracy.

Finally, plaintiffs request what they call "[c]ertain categories of easily produced and relevant discovery," namely "documents or statements submitted, received or prepared in connection with ITC, Department of Commerce, and government antitrust proceedings, including investigations, merger reviews or other proceedings involving the United States Department of Justice, the Federal Trade Commission, the Federal Bureau of Investigation, or other government authorities" from 2003 through 2008, inclusive. Pls.' Proposed Order ¶ 1.b.iv. In reality, such materials are neither "easily produced" nor, for the most part, "relevant."

With respect to ITC and Department of Commerce proceedings, plaintiffs themselves have alleged that during the relevant period, "there were over 100 trade-restricting measures on U.S. steel imports from approximately 30 countries . . . ." Pls.' Mem. Opp'n to Defs.' Mot. to Dismiss (dkt. 132) at 33. Defendants' collective files on ITC and Commerce matters would fill rooms, and much of the material is under protective order to protect confidential information of companies who are not parties here. To the extent not under protective order, the records of these cases are publicly available on the ITC's website or in Commerce's reading room, as plaintiffs' use of such materials in the Complaint demonstrates.

With respect to governmental merger reviews and antitrust investigations, there is no reason to believe that wholesale discovery of documents relating to those investigations will assist the Court with class issues. For example, government investigations of mergers can result in voluminous productions relating to the background of the merger, the cost savings that will

arise out of it, and the potential impact of the merger on competition in specific product and geographic markets, which do not bear on whether the impact from an alleged conspiracy can be proven with evidence that is common to a class of all purchasers of all steel products.

Defendants anticipate that plaintiffs will contend that expansive pre-certification discovery is warranted in light of recent case law holding that courts must resolve contested factual issues on class certification even if those issues overlap with the merits. See, e.g., Szabo, 249 F.3d at 676 ("a judge should make whatever factual and legal inquiries are necessary under Rule 23"; "if some of the considerations under Rule 23(b)(3) . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits"); Hydrogen Peroxide, 552 F.3d at 316 ("An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met."); id. at 326 (noting that analysis of common impact may be "informed, if necessary, by discovery").

Defendants agree that the disputed factual issues relevant to Rule 23 requirements -- such as common impact, typicality, and adequacy -- must be confronted and that rigorous discovery and proof on those issues is appropriate. Indeed, defendants' proposal provides for such rigorous discovery. However, it does not follow that the general merits-oriented discovery sought by plaintiffs is necessary where it does not relate to any "factual and legal inquiries [that] are necessary under Rule 23," Szabo, 249 F.3d at 676. The touchstone is whether the discovery is relevant to any disputed issue under Rule 23: here, predominance of common questions (in particular, whether impact and amount of damages are common), typicality, and adequacy of

representation.[9]  Simply put, defendants' proposed areas of discovery are tailored to those issues; plaintiffs' are not.

With plaintiffs' proposal it would be practically impossible to determine class certification within any reasonable period of time.  While plaintiffs' proposed schedule has class certification fully briefed as of October 2010, that expressly assumes Phase I document discovery being completed by December 15, 2009.  See Pls.' Proposed Order ¶ 4.a.  That assumption is completely unrealistic:  there is no way that document discovery of hundreds of custodians, let alone all of the other categories of Phase I discovery envisioned by plaintiffs, could be completed in just four months.  In defendants' counsel's experience, fact discovery of the magnitude envisioned in plaintiffs' Phase I typically takes at least 18 months.  Based on plaintiffs' tying the start of class certification briefing to six months after completion of Phase I document discovery, under plaintiffs' proposal a class determination would be at least two years away.  This is inconsistent with the direction in Rule 23(c)(1) to decide class certification "[a]t an early practicable time."  See Manual for Complex Litigation § 21.14 (4th ed. 2004) ("discovery relevant only to the merits delays the certification decision and may ultimately be unnecessary").

---

[9]  Szabo and Hydrogen Peroxide each support allowing discovery needed to resolve discrete Rule 23 elements at issue, not a wide-ranging foray into the general merits such as plaintiffs seek here. See Szabo, 249 F.3d at 676 (holding that it was necessary to determine choice-of-law and subsidiary fact issues that bore on the Rule 23(b)(3) consideration of "'the difficulties likely to be encountered in the management of a class action'"); Hydrogen Peroxide, 552 F.3d at 321-25 (holding that it was necessary to resolve conflicting expert testimony on common impact).  In this sense, Szabo and Hydrogen Peroxide simply exemplify the Federal Rules Advisory Committee's comment that some discovery "limited to those aspects relevant to making the certification decision on an informed basis" may be appropriate.  See Fed. R. Civ. P. 23, Advisory Committee Notes, 2003 Amendments (emphasis added).  As discussed above, the discovery that the Hydrogen Peroxide court mentioned had occurred consisted of sales transactions and other market data -- categories discoverable under defendants' own proposal. 552 F.3d at 308 n.3.

Finally, in determining appropriate phases for discovery to help mitigate staggering discovery costs in a case like this, the Court need not ignore the extraordinarily difficult circumstances that these companies are currently facing. It is common knowledge that demand for steel products, and the manufacturing sector in the United States generally, are at their most depressed state in generations. Amid the mass layoffs, large budget cuts, and effects on surrounding communities that the current economic downturn has brought about, these companies should not be forced to expend millions of scarce dollars on large-scale document discovery and up to 90 depositions that ultimately may serve no useful purpose other than generating <u>in terrorem</u> leverage for plaintiffs.

**C.   <u>Other Aspects of Plaintiffs' Proposal Also Are Objectionable</u>**

In addition to the overbroad scope of discovery, plaintiffs' proposal contains several other aspects that are objectionable, prejudicial to defendants, or unnecessary. Most notably, plaintiffs' briefing schedule (¶ 4) calls for expert reports to be served simultaneously with the parties' class certification briefs. This means defendants would see plaintiffs' rebuttal expert report for the first time as an attachment to plaintiffs' reply brief, at a time when defendants have already taken the deposition of plaintiffs' expert and filed their opposition to class certification. This is prejudicial to defendants because in these types of cases, plaintiffs' rebuttal expert report on class certification is often highly substantive and significantly refines opinions expressed in the initial expert report, and defendants need to be able to address it. As set forth in defendants' proposal, all expert reports on class certification should be exchanged and the experts' positions fixed before the parties file their briefs, and each side should have the opportunity to depose the other's expert <u>after</u> each report. Defs.' Proposed Order ¶ 3.

Similarly, plaintiffs' schedule (¶ 4.f) has Phase I fact depositions continue after defendants' brief has been submitted, depriving defendants of the opportunity to address all pertinent fact deposition testimony in their brief. Like expert discovery, Phase I fact depositions should instead close before briefing commences, as in defendants' proposal.

Plaintiffs' proposed order (¶¶ 2, 3) also calls for the parties to file automatic monthly progress reports with the Court and for a monthly status conference to be held with the Court. These provisions unnecessarily impose on the Court's calendar and escalate costs for clients who must pay for lawyer time to attend status conferences and draft reports. Defendants are confident that any issues that require attention from the Court or Magistrate Judge Cole can be efficiently dealt with as they arise.

In addition, plaintiffs' proposed order (¶ 1.c, d) establishes one-size-fits-all mandatory deadlines for production of documents and privilege logs that go beyond the Federal Rules of Civil Procedure. While defendants are committed to responding to plaintiffs' discovery requests in as timely a manner as practicable, the time needed for producing documents can vary significantly depending on the nature of the request and the form in which the information is maintained. Therefore, any timing issues are best addressed as they arise based on the particular circumstances.

Likewise, given the limitations of Phase I discovery, there is no reason now to give the parties advance permission to take 180 depositions (90 per side) as requested by plaintiffs (¶ 1.f). While defendants would not oppose a modest enlargement of the Federal Rules' default number of depositions upon a showing of specific need, 180 depositions far exceeds what is "required to identify the nature of the issues that actually will be presented at trial . . . limited to those aspects relevant to making the certification decision on an informed basis" and would send costs into the

stratosphere. Fed. R. Civ. P. 23, Advisory Committee Notes, 2003 Amendments. The number of depositions necessary for Phase II (merits) discovery can await another day.

Finally, defendants' proposal would have plaintiffs file a consolidated amended complaint before defendants are required to answer. Plaintiffs' proposal is silent on this issue. There are six substantially identical direct-purchaser cases pending in this Court that have been consolidated, <u>see</u> Mem. Op. at 1 n.1, yet each technically still has its own complaint. Moreover, in their brief opposing defendants' <u>Twombly</u> motion, plaintiffs added roughly 70 new allegations. In the interest of efficiency and clarity in pleading, and with no delaying impact on the rest of the schedule, plaintiffs should be required to file a consolidated amended complaint that incorporates the new allegations and will serve as the single operative complaint for all the direct-purchaser actions going forward.

## <u>CONCLUSION</u>

Defendants respectfully request that the Court adopt defendants' proposed Case Management Order No. 2.

Dated: July 30, 2009         By:     /s/ Todd J. Ehlman

                                     Counsel for Nucor Corporation and, for purposes of this memorandum only, on behalf of Defendants

Donna E. Patterson
David P. Gersch
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
202.942.5000 – Telephone
202.942.5999 – Facsimile
donna.patterson@aporter.com
david.gersch@aporter.com

John B. Wyss
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
202.719.7000 – Telephone
202.719.7049 – Facsimile
jwyss@wileyrein.com

Dan K. Webb
Thomas J. Frederick
Todd J. Ehlman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
312.558.5600 – Telephone
312.558.5700 – Facsimile
dwebb@winston.com
tfrederi@winston.com
tehlman@winston.com

Douglas R. Gunson
NUCOR CORPORATION
1915 Rexford Road
Charlotte, NC 28211
704.366.7000 – Telephone
704.972.1836 – Facsimile
doug.gunson@nucor.com

**Attorneys for Nucor Corporation**

Mark Leddy
David I. Gelfand
Patricia M. McDermott
Heather Johnson
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202.974.1500 – Telephone
202.974.1999 – Facsimile
mleddy@cgsh.com
dgelfand@cgsh.com

Andrew S. Marovitz
Jonathan L. Lewis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com
jlewis@mayerbrown.com

**Attorneys for ArcelorMittal S.A. and ArcelorMittal USA, Inc.**

Jonathan S. Quinn
REED SMITH LLP
10 S. Wacker Drive
Chicago, IL 60606
312.207.1000 – Telephone
312.207.6400 – Facsimile
jquinn@reedsmith.com


Alexander Y. Thomas
REED SMITH LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, DC 20005-3317
202.414.9200 – Telephone
202.414.9299 – Facsimile
athomas@reedsmith.com

Daniel I. Booker
Debra H. Dermody
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
412.288.3131 – Telephone
412.288.3063 – Facsimile
dbooker@reedsmith.com
ddermody@reedsmith.com


J. Michael Jarboe
THE LAW DEPARTMENT OF
UNITED STATES STEEL CORPORATION
600 Grant Street, Suite 1500
Pittsburgh, PA 15219-2880
412.433.2880 – Telephone
412.433.2811 – Facsimile
jmjarboe@uss.com

*Attorneys for United States Steel Corporation*

Nathan P. Eimer
Andrew G. Klevorn
EIMER STAHL KLEVORN & SOLBERG
224 S. Michigan Avenue, Suite 1100
Chicago, IL  60604
312.660.7600 – Telephone
312.692.1718 – Facsimile
neimer@eimerstahl.com
aklevorn@eimerstahl.com

*Attorneys for Gerdau Ameristeel Corporation*

Joel G. Chefitz
Amanda J. Metts
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606
312.372.2000 – Telephone
312.984.7700 – Facsimile
jchefitz@mwe.com
ametts@mwe.com

Robert S. Walters
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, IN 46802
260.423.8905 – Telephone
260.423.8900 – Facsimile
rsw@barrettlaw.com

*Attorneys for Steel Dynamics, Inc.*

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN P.C.
10 S. La Salle Street, Suite 3600
Chicago, IL 60603
312.251.4600 – Telephone
312.251.4610 – Facsimile
jfigliulo@fslegal.com
sjones@fslegal.com

Gregory A. Markel
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
212.504.6000 – Telephone
212.504.6666 – Facsimile
greg.markel@cwt.com

Charles F. Rule
Joseph J. Bial
CADWALADER, WICKERSHAM & TAFT LLP
1201 F Street, N.W.
Washington, DC 20004
202.862.2200 – Telephone
202.862.2400 – Facsimile
rick.rule@cwt.com
joseph.bial@cwt.com

*Attorneys for AK Steel Holding Corporation*

John W. Treece
Scott D. Stein
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
312.853.7000 – Telephone
312.853.7036 – Facsimile
jtreece@sidley.com
sstein@sidley.com

*Attorneys for SSAB Swedish Steel Corporation*

Joseph A. Tate
Stephen D. Brown
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
215.994.2350 – Telephone
215.655.2350 – Facsimile
joseph.tate@dechert.com
stephen.brown@dechert.com

***Attorneys for Commercial Metals Company***

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2009, I electronically filed the foregoing document **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR PHASED DISCOVERY PROPOSAL** and caused the same to be served electronically via the CM/ECF system upon all counsel of record.

/s/ Todd J. Ehlman
Todd J. Ehlman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601-9703
312.558.5600 – Telephone
312.558.5700 – Facsimile
tehlman@winston.com