## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **IN RE: STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| _____ | Honorable James B. Zagel |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** | |
| *Standard Iron Works v. ArcelorMittal, et al.,* **Case No. 08-cv-5214** | **REDACTED VERSION** |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-5371** | |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* **Case No. 08-cv-5633** | |
| *Alco Industries, Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-6197** | |
| *Gulf Stream Builders Supply, Inc. v. ArcelorMital, et al.,* **Case No. 10-cv-4236** | |

**MEMORANDUM OF LAW IN SUPPORT OF DIRECT PURCHASER
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 6

    I.     RAW STEEL PRODUCTION ............................................................. 6

    II.    STEEL PRODUCTS............................................................................ 6

    III.   THE ALLEGED CONSPIRACY ........................................................ 7

         A.    2005............................................................................... 8

         B.    2006............................................................................... 11

         C.    2007............................................................................... 14

    IV.   IMPACT OF PRODUCTION CUTS .................................................. 15

    V.    PLAINTIFFS' PROOF IS COMMON ............................................... 17

ARGUMENT .......................................................................................................... 18

    I.     HORIZONTAL ANTITRUST CONSPIRACY CLAIMS ARE
          PARTICULARLY APPROPRIATE FOR CLASS TREATMENT ................... 18

    II.    STANDARD OF REVIEW ................................................................ 20

    III.   THE CLASS IS ASCERTAINABLE AND RULE 23(a) IS SATISFIED .......... 21

         A.    The Class is ascertainable ................................................ 21

         B.    The proposed class satisfies Rule 23(a) ................................ 22

               1. Numerosity is satisfied ................................................ 23

               2. Commonality is satisfied .............................................. 23

               3. Typicality is satisfied................................................... 24

               4. Adequacy is satisfied ................................................... 25

    IV.   THIS ACTION MEETS RULE 23(b)(3)'s PREDOMINANCE
          REQUIREMENT ................................................................................ 27

         A.    Conspiracy is the central common issue ................................ 28

**TABLE OF CONTENTS**
(continued)

Page

B.    Plaintiffs will prove causation on a common basis ................................. 29

    1.  Defendants' statements can be used to establish causation............ 30

    2.  The market structure was ripe for a successful conspiracy causing class-wide antitrust injury ...................................................... 31

    3.  Evidence of similar pricing trends can be used to show widespread impact at trial.................................................................... 36

    4.  Econometric analysis shows that class members were injured ...... 37

C.    Plaintiffs will prove class-wide damages on a common basis ................ 38

V.    A CLASS ACTION IS THE SUPERIOR METHOD FOR ADJUDICATING THIS ACTION ..................................................................... 39

CONCLUSION.................................................................................................................. 41

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609 (D. Kan. 1995) ...............................30

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................1, 27

*In re Auction Houses Antitrust Litigation*, 193 F.R.D. 162 (S.D.N.Y. 2000)........................19, 30

*Behrend v. Comcast Corp*, 655 F.3d 182 (3d Cir. 2011) ........................................................4, 19

*In re Bromine Antitrust Litigation*, 203 F.R.D. 403 (S.D. Ind. 2001) ..............................19, 36, 40

*In re Bulk (Extruded) Graphite Products Antitrust Litigation*, No. Civ. 02-6030(WHW),
    2006 WL 891362 (D.N.J. Apr. 4, 2006) ........................................................19, 32, 33, 37, 39

*In re Brand Name Prescription Drugs Antitrust Litigation*, Nos. 94 C 897, MDL 997,
    1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ...............................................................................19

*In re Carbon Black Antitrust Litigation*, No. Civ. A. 03-10191-DPW, MDL No. 1543,
    2005 WL 102966 (D. Mass. Jan. 18, 2005) .................................................................... passim

*In re Carbon Dioxide Antitrust Litigation*, 149 F.R.D. 229 (M.D. Fla. 1993) .............................19

*In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich. 2001)................................19

*In re Catfish Antitrust Litigation*, 826 F. Supp. 1019 (N.D. Miss. 1993)....................19, 24, 28, 30

*In re Citric Acid Antitrust Litigation*, No. 95-1092, C-95-2963 FMS, 1996 WL 655791
    (N.D. Cal. Oct. 10, 1996)......................................................................................................19, 28

*In re Commercial Tissue Antitrust Litigation*, 183 F.R.D. 589 (N.D. Fla. 1998)........................19

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197 (D.
    Me. 2003).................................................................................................................................19

*In re Currency Conversion Fee Antitrust Litigation*, Nos. MDL 1409, M 21-95, 2004 WL
    2327938 (S.D.N.Y. Oct. 15, 2004) ...........................................................................................19

*DeLoach v. Philip Morris*, 206 F.R.D. 551 (M.D.N.C. 2002)................................................19, 34

*In re Disposable Contact Lens Antitrust Litigation*, 170 F.R.D. 524 (M.D. Fla. 1996)...............19

*In re Domestic Air Transportation Antitrust Litigation*, 137 F.R.D. 677 (N.D. Ga. 1991)...........19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, Case No. 02-1486,
    2006 WL 1530166 (N.D. Cal. June 5, 2006).........................................................19, 33, 36, 39

*In re EPDM Antitrust Litigation*, 256 F.R.D. 82 (D. Conn. 2009) .......................................... 19, 32

*In re Flat Glass Antitrust Litigation*, 191 F.R.D. 472 (W.D. Pa. 1999) ...................... 19, 28, 34, 39

*In re Foundry Resins Antitrust Litigation*, Case No. 2:04-md-1638, 2007 WL 1299211
    (S.D. Ohio May 2, 2007) ............................................................................................ 19, 30, 39

*General Leaseways, Inc. v. National Truck Leasing Association*,
    744 F.2d 588 (7th Cir. 1984) ....................................................................................... 3, 29

*General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ........................................................ 20

*In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302 (E.D. Pa. 1980) .............. 26

*Harman v. Lyphomed, Inc.*, 122 F.R.D. 522 (N.D. Ill. 1988) ................................................. 26

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) ................................................................ 18

*In re High Fructose Corn Syrup Antitrust Litigation*, 936 F. Supp. 530 (C.D. Ill. 1996) ..... passim

*In re Infant Formula Antitrust Litigation*, Dkt. No. 878, 1992 WL 503465
    (N.D. Fla. Jan 13, 1992) .................................................................................................. 19

*Kohen v. Pacific Investment Management Company LLC*,
    571 F.3d 672 (7th Cir. 2009) ..................................................................... 4, 25, 26, 37

*Kohen v. Pacific Investment Management Company LLC*, 244 F.R.D. 469 (N.D. Ill. 2007) ........ 23

*Law v. National Collegiate Athletic Association*, 167 F.R.D. 178 (D. Kan. 1996) ...................... 19

*In re Linerboard Antitrust Litigation*, 203 F.R.D. 197 (E.D. Pa. 2001), *aff'd*, 305 F.2d
    145 (3d Cir. 2002) .................................................................................................. 19, 24

*In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002) ..................................... passim

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ........................................ 4

*In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12 (D.D.C. 2001) .................. 19

*Lumco Industries, Inc. v. Jeld-Wen Inc.*, 171 F.R.D. 168 (E.D. Pa. 1997) .................................. 19

*In re Magnetic Audiotape Antitrust Litigation*, No. 99 CIV. 1580 (LMM), 2001 WL
    619305 (S.D.N.Y. June 6, 2001) ..................................................................................... 19

*In re Master Key Antitrust Litig.*, 528 F.2d 5 (2d Cir. 1975) ................................................. 30

*In re Medical X-Ray Film Antitrust Litigation*, No. CV-93-5904, 1997 WL 33320580
    (E.D.N.Y. Dec. 26, 1997) ............................................................................................... 19

*In re Mercedes-Benz Antitrust Litigation*, 213 F.R.D. 180 (D.N.J. 2003)......................................19

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 801 (7th Cir. 2012) .......................... passim

*In re Microcrystalline Cellulose Antitrust Litigation*, 218 F.R.D. 79 (E.D. Pa. 2003) ...............19

*In re Monosodium Glutamate Antitrust Litigation*, 205 F.R.D. 229 (D. Minn. 2001) ..................19

*In re NASDAQ Market-Makers Antitrust Litigation*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................19, 24, 27, 28, 35, 40

*In re OSB Antitrust Litigation*, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007)...........2, 19, 29, 34, 35

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
    231 F.R.D. 280 (N.D. Ill. 2005)..........................................................................................24

*Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wisc. 2000) ......................................19

*In re Plastic Cutlery Antitrust Litigation*, No. CIV. A. 96-CV-728, 1998 WL 135703
    (E.D. Pa. Mar. 20, 1998)..................................................................................................19

*In re Playmobil Antitrust Litigation*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998) .................................19

*In re Polyester Staple Antitrust Litigation*,
    2007 WL 2111380 (W.D.N.C. July 19, 2007).....................................19, 26, 33, 35-37

*In re Polypropylene Carpet Antitrust Litigation*, 996 F. Supp. 18 (N.D. Ga. 1997) ....................19

*In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D. Minn. 1995) ......................................19, 30

*In re Pressure Sensitive Labelstock Antitrust Litigation*, 2007 WL 4150666 (M.D. Pa.
    Nov. 19, 2007) ..........................................................................................................19, 33

*In re Rubber Chemicals Antitrust Litigation*, 232 F.R.D. 346 (N.D. Cal. 2005)...18, 24, 28, 33, 36

*Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009)................................4, 20, 22, 24, 25, 27

*Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323 (N.D. Ill. 2010) ..........................................23

*Schreiber v. National Collegiate Athletic Association*, 167 F.R.D. 169 (D. Kan. 1996) ............. 19

*In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2008) ......................2, 4, 19, 28, 38

*Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999) ...................................................................19

*In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D. Pa. 1976) ..................................34

*In re Sulfuric Acid Antitrust Litigation*, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) ..................19

*Sullivan v. DB Investments*, 667 F.3d 273 (3d Cir. 2011) (en banc) ...............................18, 20, 27

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) ...............................................20

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 291 (N.D. Cal. 2010)........19, 34, 37

*Thillens, Inc. v. Community Currency Exchange Association*, 97 F.R.D. 668 (N.D. Ill.
    1983) .................................................................................................................24

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209
    F.R.D. 159 (C.D. Cal. 2002) ...............................................................................19, 34

*In re Universal Service Fund Telephone Billing Practices Litigation*, 219 F.R.D. 661
    (D. Kan. 2004) ...................................................................................................19, 34

*In re Urethane [Polyester Polyols] Antitrust Litigation*,
    237 F.R.D. 440 (D. Kan. 2006)........................................................33, 37, 39, 40

*In re Urethane [Polyether Polyols] Antitrust Ligitation*, 251 F.R.D. 629 (D. Kan. 2008) .. passim

*In re Vitamins Antitrust Litigation*, 209 F.R.D. 251 (D.D.C. 2002) .....................19, 27, 28, 34, 36

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) .........................................................20, 23

**FEDERAL STATUTES AND RULES**

Fed. R. Civ. P. 23 .......................................................................................................................1, 30

Fed. R. Civ. P. 23(a) ...........................................................................1, 20, 22, 23, 24, 25

Fed. R. Civ. P. 23(a)(1) ..............................................................................................................23

Fed. R. Civ. P. 23(a)(2) ..............................................................................................................23

Fed. R. Civ. P. 23(a)(3) ..............................................................................................................24

Fed. R. Civ. P. 23(a)(4) ..............................................................................................................25

Fed. R. Civ. P. 23(b)(3)................................................................................1, 27, 28, 39

Fed. R. Civ. P. 23(c)(1)(B) ...................................................................................................21, 23

Section 1 of the Sherman Act, 15 U.S.C. § 1 .......................................................................1, 23

**MISCELLANEOUS**

6 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 18.28 (4th ed. 2002) ..............28

6 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 18:53 (4th ed. 2002) ..............39

7 Charles Alan Wright, Arthur R. Miller & Mary Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2005) ...............................................................................28

*Manual for Complex Litigation* § 21.222 (4th ed. 2005)...............................................................21

Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submit this memorandum in support of their motion for class certification.

## INTRODUCTION

Plaintiffs' Complaint alleges a conspiracy among Defendants to manipulate the supply and price of steel products sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* Docket # 1. Plaintiffs' central allegation is that between 2005 and 2007, Defendants conspired to restrict the production of raw steel, causing artificially higher prices for all steel products made from that primary input. *See* Docket # 170 (denying Defendants' motion to dismiss). Discovery corroborates these allegations. █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*See* pages 7-18, *infra*. This common evidence—on the central issues in the case—can be used by all direct purchasers in proving their claims at trial.

Plaintiffs' burden at class certification is to satisfy the threshold requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy) and Rule 23(b)(3)'s requirements of "predominance" and "superiority." *See* Fed. R. Civ. P. 23. Here, as in most antitrust cases, the parties' dispute centers on predominance, which requires a showing that the *prima facie* elements of Plaintiffs' case—antitrust conspiracy, causation (also known as "impact"), and damages—can be established using predominantly common proof at trial. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).

Most antitrust conspiracy claims meet this standard. *Id.* ("[I]n antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification.") (citation and internal quotation marks omitted); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997)

("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."); *see* page 19, *infra* (collecting cases). As the Seventh Circuit recently explained, most antitrust cases involve a "common nucleus of operative facts and issues"—the touchstone for predominance. *Messner*, 669 F.3d at 815. Class certification is particularly appropriate, moreover, in cases alleging collusive supply restriction. *See In re Linerboard Antitrust Litig*, 305 F.3d 145, 152-53 (3d Cir. 2002) (explaining economics of supply restriction and affirming class certification on similar facts); *In re OSB Antitrust Litig.*, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007). For the reasons that follow, class certification is warranted here.

First, the alleged conspiracy is a common and predominating issue. *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate") (citation omitted). Any trial in this matter will focus principally on common facts relating to whether Defendants conspired. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

████ *See* pages 7-15, *infra*. While Defendants dispute these allegations on the merits, they have conceded (for purposes of class certification) that conspiracy is a common question. *See* Docket # 269, at 11.

Second, Plaintiffs will establish antitrust impact using common proof at trial. Antitrust impact is a causation inquiry: Did the alleged conspiracy cause higher prices in the marketplace? *See, e.g., In re Urethane [Polyether Polyols] Antitrust Litig.*, 251 F.R.D. 629, 634-36 (D. Kan. 2008) (impact "can be likened to the causation element in a negligence cause of action" and the "legal inquiry is whether, as a result of defendants' alleged price-fixing conspiracy, the putative class plaintiffs paid a price that was artificially high"). In a case alleging a supply restriction

2

conspiracy, the basic law of supply and demand (itself common economic evidence) makes

causation a common issue. Cutting market supply necessarily causes prices to rise—a point the

Third Circuit emphasized in affirming class certification on strikingly similar facts. *Linerboard*,

305 F.3d at 152 ("A reduction in supply will cause prices to rise."); *see also Messner*, 669 F.3d

at 816 (establishing common impact is "relatively simple" in cases involving straightforward

theories of "supply and demand"); *General Leaseways, Inc. v. National Truck Leasing Assoc.*,

744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned

rise") (Posner, J.); Ex. 1, Expert Report of Dr. John L. Solow ("Solow Report").[1]

    Plaintiffs will establish causation at trial using several independent categories of common

evidence, all of which has class-wide application, including:

- ***Statements and Documents.*** ████████████████████████████

  *See* pages 15-16, *infra* (collecting examples). These statements and documents
  represent powerful common proof of causation. *See* pages 30-31, *infra*; *see also*
  Docket # 279 ("I agree with Plaintiffs that the high-level executive documents sought
  do not go solely to the issue of conspiracy but also shed light on impact.").

- ***Expert Testimony on Market Structure.*** ████████████████
  ████████████████████████████ *See* pages 31-36, *infra*.

- ***Pricing Data.*** ████████████████████████████████
  ████████████████████████ *See* pages 36-37, *infra*.

- ***Econometric Evidence.*** ████████████████████████████ This,
  too, serves as class-wide proof of impact. *See* pages 37-38, *infra*.

---

[1] Indeed, even Defendants concede this economic premise. *See* Ex. 2, 1/14/2011 Hearing
Transcript, at 18-19 ("there's not going to be a defense expert who is going to say that if you
hold all else constant and you cut production, that price won't go up. That's an economic tenet.
We're not going to fight that battle.").

Each of these categories represents common, probative and independently reliable proof of causation, which can be used by all class members at trial. Importantly, moreover, the issue at this stage is not whether Plaintiffs have established impact on the merits for every direct purchaser. *Messner*, 669 F.3d at 818-19; *Kohen v. Pacific Investment Management Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) (rejecting argument that class certification requires proof of injury for every class member and cautioning against "putting the cart before the horse" at this stage); *Behrend v. Comcast Corp.*, 655 F.3d 182, 197 (3d Cir. 2011) (same). Instead, "plaintiffs' burden at the class certification stage" is "only to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class." *Messner*, 669 F.3d at 818 (emphasis in original) (citations and internal quotation marks omitted).

To certify the class, in other words, the Court need not resolve Defendants' inevitable challenges to Plaintiffs' case on the merits; nor is it necessary for the Court to accept the opinion(s) of either side's expert(s) on the merits; instead, the Court must scrutinize the record rigorously, including the parties' expert reports, making any factual findings necessary to determine whether Plaintiffs' common proof is the type on which a reasonable jury could rely. *Id.*; *see also Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009); *Behrend*, 655 F.3d at 197; *Linerboard*, 305 F.3d at 152. Because the foregoing categories of evidence can be used to establish antitrust causation and injury on a class-wide basis at trial, that standard is met.

Third, Plaintiffs can establish the element of antitrust damages on a class-wide basis using econometric modeling. *See, e.g., Scrap Metal*, 527 F.3d at 532-34; *see generally Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 491-93 (7th Cir. 2002) (explaining standard for proving antitrust damages). To this end, Plaintiffs have retained Dr. James McClave, an experienced antitrust econometrician, to develop a rigorous empirical model of the steel industry.

*See* Ex. 3, Expert Report of James T. McClave, Ph.D., ("McClave Report"). 

*Id.* at

11-12.  Dr. McClave's preliminary multiple regression analysis provides common, empirical

proof of antitrust impact <u>and</u> damages, further supporting Plaintiffs' motion for class

certification.

For all of these reasons—the overwhelming predominance of the common conspiracy

issues and the common proof available to prove causation and damages—Plaintiffs respectfully

request that the Court certify the Class.

# FACTUAL BACKGROUND[2]

## I.     RAW STEEL PRODUCTION

Raw steel is the first stage of steel industry production, i.e., the initial solid form of steel

produced in Defendants' blast or minimill furnaces.  *See* Compl. ¶¶ 35-45; *see also* Ex. 4

(ArcelorMittal chart showing steelmaking process); ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████  Steel in this initial "semi finished"

state is an interchangeable commodity that serves as the primary input for all steel products

manufactured and sold by Defendants.  *Id.*; ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

## II.    STEEL PRODUCTS

████████████████████████████████████████████████████████████████████

████████████████████████  *See, e.g.,* Ex. 6; *see also* Docket # 170, at 5 (discussing flat and

long segments in the Court's motion to dismiss opinion). ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████  Most important for present

purposes, all steel products at issue were manufactured by Defendants from raw steel produced

in their blast and minimill furnaces.  Accordingly, the supply—and price—of all of these

products was impacted by Defendants' coordinated production cuts.

---

[2] The Court has surveyed previously the detailed allegations in the Complaint.  *See* Docket # 170.  This section provides a brief overview of the allegations relevant to class certification and the supporting evidence developed to date.

### III. THE ALLEGED CONSPIRACY

As alleged in the Complaint, Defendants' strategy was to raise prices for all finished steel products by cutting raw steel supply.  Compl. ¶¶ 53-54; ███████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

7

A.      **2005**

While class certification is not the time to litigate the merits of Plaintiffs' conspiracy claims, a brief sampling of the common evidence developed to date provides useful context for the Court's analysis. Every piece of evidence described below is common to all class members and will assist every class member in proving its case.



All direct purchasers will use this evidence to show that Defendants crossed the line from independent action to cooperation.





Complaint ¶¶ 62-88.[4]

---

[4] The industry gathered again the week after the AIST conference for meetings of the American Iron and Steel Institute ("AISI"), held May 16-17, 2005 in Washington, DC. *See* Complaint ¶ 61.

**B.**     <u>2006</u>

Supply restraints followed a similar pattern in late-2006. As Plaintiffs alleged, see

Docket # 170, at 20, █████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████

      ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████







*Cf. In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662-63 (7th Cir. 2002) (similar statements were "highly suggestive of the existence of an explicit though of course covert" industry conspiracy).

C.    <u>2007</u>

14



In sum, just as Plaintiffs alleged in their Complaint, [REDACTED]

[REDACTED] And, importantly for present purposes, all of the evidence of Defendants' conduct is common to the class.

## IV.    IMPACT OF PRODUCTION CUTS



*cf. Linerboard*, 305 F.3d at 153-54 (relying on similar pricing data in affirming class certification).

## V.    PLAINTIFFS' PROOF IS COMMON

Plaintiffs can use all of the foregoing evidence to establish their claims on a class-wide basis at trial, for example using demonstrative exhibits such as these:

Such exhibits, and all of the other evidence discussed above, is common to all class members.



## ARGUMENT

## I. HORIZONTAL ANTITRUST CONSPIRACY CLAIMS ARE PARTICULARLY APPROPRIATE FOR CLASS TREATMENT.

In *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972), the Supreme Court explained a key

rationale underpinning the role of private litigation and the law of antitrust class certification:

> Every violation of the antitrust laws is a blow to the free-enterprise
> system envisaged by Congress. This system depends on strong
> competition for its health and vigor, and strong competition
> depends, in turn, on compliance with antitrust legislation. . . .
> Congress chose to permit all persons to sue to recover three times
> their actual damages every time they were injured in their business
> or property by an antitrust violation. By offering potential litigants
> the prospect of recovery of three times the amount of their
> damages, Congress encouraged these persons to serve as "private
> attorneys general."

*Id.* at 262 (citation omitted).

In the decades since, federal courts have certified dozens of antitrust conspiracy cases

involving an array of products and industries—including many that were far more complicated

than the straightforward supply cartel alleged here. These decisions reflect the established view

that such cases are "particularly well suited" to class certification. *Urethane*, 251 F.R.D. at 635;

*see also Messner*, 669 F.3d at 815; *Sullivan v. DB Investments*, 667 F.3d 273, 298 (3d Cir. 2011)

(en banc); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)

("Courts have stressed that price-fixing cases are appropriate for class certification because a

class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust

violations have been continuous, widespread, and detrimental to as yet unidentified consumers.")

(quotations and citations omitted).[8]

---

[8] Other pertinent antitrust decisions granting or affirming class certification include: *Behrend*, 655 F.3d 182; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010); *In re EPDM Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009); *Scrap Metal*, 527 F.3d 517; *In re Pressure Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007); *In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380 (W.D.N.C. July 19, 2007); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007); *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007); *OSB*, 2007 WL 2253418; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166 (N.D. Cal. June 5, 2006); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, 2006 WL 891362 (D.N.J. Apr. 4, 2006); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966 (D. Mass. Jan. 18, 2005); *In re Currency Conversion Fee Antitrust Litig.*, 2004 WL 2327938 (S.D.N.Y. Oct. 15, 2004); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003); *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159 (C.D. Cal. 2002); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002); *DeLoach v. Philip Morris*, 206 F.R.D. 551 (M.D.N.C. 2002); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002); *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305 (S.D.N.Y. June 6, 2001); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001); *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000); *Paper Sys., Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wisc. 2000); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999); *Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998); *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703 (E.D. Pa. Mar. 20, 1998); *In re Commercial Tissue Antitrust Litig.*, 183 F.R.D. 589 (N.D. Fla. 1998); *In re Medical X-Ray Film Antitrust Litig.*, 1997 WL 33320580 (E.D.N.Y. Dec. 26, 1997); *Lumco Indus., Inc. v. Jeld-Wen Inc.*, 171 F.R.D. 168 (E.D. Pa. 1997); *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18 (N.D. Ga. 1997); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996); *In re Citric Acid Antitrust Litig.*, 1996 WL 655791 (N.D. Cal. Oct. 10, 1996); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996); *In re High Fructose Corn Syrup Antitrust Litig.*, 936 F. Supp. 530 (C.D. Ill. 1996); *Schreiber v. National Collegiate Athletic Ass'n*, 167 F.R.D. 169 (D. Kan. 1996); *Law v. National Collegiate Athletic Ass'n*, 167 F.R.D. 178 (D. Kan. 1996); *In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229 (M.D. Fla. 1993); *In re Infant Formula Antitrust Litig.*, 1992 WL 503465 (N.D. Fla. Jan. 13, 1992); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991).

The reason for this settled authority is that, in antitrust conspiracy matters, defendants' conduct is the central issue. *Urethane*, 251 F.R.D. at 635; *Sullivan*, 667 F.3d at 298. Any trial in cartel litigation necessarily focuses on a few core factual issues: Did defendants conspire? Did the alleged conspiracy impact the market? What is the economic measure of class-wide damages? Decades of authority holds that class certification is the appropriate means of resolving these questions.

This case is no different. The proposed class is sufficiently definite and reasonably ascertainable; Plaintiffs easily meet the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy); and the central issues in the case—the existence of the conspiracy, acts in furtherance thereof, its impact on direct purchasers, and the economic model used to show injury and class-wide damages—are issues whose proof will be common.

## II.    STANDARD OF REVIEW

The Supreme Court has emphasized that class certification demands a "rigorous analysis" under Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (quoting *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001).

In performing that inquiry, the Court must "probe beyond the pleadings," scrutinize the record (including the parties' expert reports), and make any factual findings necessary to resolve whether Plaintiffs' claims are amenable to common proof at trial. *Id.* at 677. The issue at this stage is not, however, whether Plaintiffs have proven the elements of their case on the merits. *Messner*, 669 F.3d at 818; *Saltzman*, 257 F.R.D. at 475. Instead, class certification focuses on the nature of the issues and whether predominantly common proof can resolve them. *Id.*

### III.  THE CLASS IS ASCERTAINABLE AND RULE 23(a) IS SATISFIED.

#### A.  The Class is ascertainable.

Plaintiffs' proposed class definition satisfies the threshold requirement that a class

definition be ascertainable.  *See* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class

action must define the class[.]"); *Manual for Complex Litigation* § 21.222, at 270 (4th ed. 2005)

("The definition must be precise, objective, and presently ascertainable.").  Here, the proposed

class is defined as:

> All persons (excluding Defendants, their present and former parents, subsidiaries,
> affiliates, joint ventures, co-conspirators and government entities) who Purchased
> Steel Products directly from any of the Defendants or their subsidiaries or
> controlled affiliates at any time between April 1, 2005 and December 31, 2007
> (the "class period") for delivery in the United States.

For purposes of the class definition, the terms "Steel Products" and "Purchased"

are more specifically defined as follows:

> "Steel Products" are defined as products derived from raw carbon steel and sold
> directly by any of the Defendants or their subsidiaries or controlled affiliates in
> the United States, including all carbon steel slabs, plates, sheet and coil products,
> galvanized and other coated sheet products; billets, blooms, rebar, merchant bar,
> beams and other structural shapes; and all other steel products derived from raw
> carbon steel and sold by Defendants except as specifically excluded below.

> "Steel Products" specifically <u>exclude</u> the following product categories:  stainless
> steel; grain-oriented electrical steel; tin mill products; clad plate (i.e., nickel,
> stainless or copper clad plate); steel pipe and other tubular products; "special bar
> quality" products; wire rod and other wire products; grinding balls; fabricated
> rebar products; fabricated steel joist, decking, fence posts and other fabricated
> building products; welded steel blanks; and steel products purchased under toll
> processing agreements.[9]

---

[9] Consistent with Plaintiffs' prior representations to the Court, see Ex. 2 (1/14/11 Hearing
Transcript, at 24), Plaintiffs have excluded from the class definition certain products not fairly
encompassed by Plaintiffs' theory of the case.  For example, certain specialty steels (e.g.,
stainless and grain oriented electrical steels) simply are not carbon steel products.  Other
excluded products involve extensive downstream fabrication or processing, or other unique
characteristics, such that raw carbon steel is a relatively less significant component of finished
product pricing (e.g., pipe, clad plate, fabricated steel building products, tin).  For other excluded

The term "Purchased" includes all transactions for which pricing was negotiated during the class period <u>and</u> delivery was received during the class period. The class definition also includes transactions for which a sales contract was negotiated before the class period but (i) delivery was received during the class period <u>and</u> (ii) the actual transaction price under the contract was adjusted (or indexed) based on market pricing that prevailed during the class period.

Plaintiffs have defined the class with ample precision. Each of the class products is defined with reference to product categories that are widely recognized within the industry. ██████

████████████████████████████████████████████████; Ex. 4 (Mittal

chart showing production process and basic steel product groups). The proposed class period has

clear beginning and ending dates, and the class is limited to persons who purchased the products

directly from Defendants for delivery in the United States. As such, class members are easily

identifiable (and notified) using sales records obtained in discovery. *See Saltzman*, 257 F.R.D. at

476. For all of these reasons, the class is properly defined. *See Urethane*, 251 F.R.D. at 632

(approving similar class definition).

**B.    The proposed class satisfies Rule 23(a).**

Rule 23(a) provides that "one or more members of a class may sue or be sued as

representative parties on behalf of all members only if (1) the class is so numerous that joinder of

all members is impracticable, (2) there are questions of law or fact common to the class, (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class,

and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a). As discussed below, each of these criteria is met.

---

product groups (e.g., wire rod and special bar), Defendants controlled a less dominant share of the domestic market during the relevant period. Plaintiffs, in short, have limited the class definition to the basic steel products derived directly from raw carbon steel for which Defendants dominate domestic production.

### 1.    Numerosity is satisfied.

The first requirement under Rule 23(a) is that the class must be so numerous that joinder is "impracticable." Fed. R. Civ. P. 23(a)(1).  Numerosity is satisfied here. ███████

████████████████████████████████████████████████████████

███████████████████████████████ *Kohen v. Management Co. LLC*, 244 F.R.D. 469, 476 (N.D. Ill. 2007); *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) ("a class of more than 40 members is generally believed to be sufficiently numerous") (citation omitted).

### 2.    Commonality is satisfied.

Rule 23(a)'s second requirement is the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To establish commonality, Plaintiffs must identify an issue of fact or law whose resolution "is central to the validity of each" class member's claim. *Wal-Mart*, 131 S.Ct. at 2551.  Commonality can be evaluated by considering the clear and complete summary of class-wide claims, issues and defenses Plaintiffs must identify under Rule 23(c)(1)(B).  Here, those common issues include:

- whether Defendants engaged in a conspiracy to manipulate the supply and/or price of Steel Products sold in the United States, including the identity of participants in the alleged conspiracy, its duration, and the acts carried out in furtherance thereof;

- whether the alleged conspiracy violated Section 1 of the Sherman Act;

- whether the conduct of Defendants impacted the supply and/or prices of Steel Products sold in the United States;

- whether the conduct of Defendants caused injury to Plaintiffs and other members of the Class;

- the appropriate measure of class-wide damages; and

- certain defenses to liability, including those raised in Defendants' pleadings, such as failure to allege conduct suggestive of conspiracy. *See, e.g.*, Docket # 111.

23

Plaintiffs' preliminary trial plan, attached as Exhibit 65, underscores the extent to which Defendants' conduct will be a key common issue for all parties at trial. Accordingly, Rule 23(a) commonality is readily met. *See, e.g.*, *Thillens, Inc. v. Cmty Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("the overriding common issue of law is to determine the existence of a conspiracy"); *NASDAQ*, 169 F.R.D. at 509 (same); *see also* Docket # 269, at 11 (Defendants concede for purposes of class certification that conspiracy is a common issue).

### 3. Typicality is satisfied.

The claims of the class representatives must be "typical" of the claims of the class. Fed. R. Civ. P. 23(a)(3). Typicality is "is closely related to commonality and should be liberally construed." *Saltzman*, 257 F.R.D. at 479. Factual differences among class members do not defeat typicality provided "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory." *Id.* (citation omitted). Typicality is a "low hurdle" requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005).

In the antitrust context, typicality is met where "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *Rubber Chemicals*, 232 F.R.D. at 351 (quotation omitted); *see also Urethane*, 251 F.R.D. at 640 ("[t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff") (citation omitted). Indeed, where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical[.]" *Linerboard*, 203 F.R.D. at 207 (quoting *Catfish*, 826 F. Supp. at 1035).

Here, the proposed class representatives are the named plaintiffs in the related direct purchaser actions: Standard Iron Works, a steel fabricator based in Scranton, Pennsylvania;

Wilmington Steel Processing Co., Inc., a steel fabricator based in Philadelphia, Pennsylvania;

Alco Industries Inc., a manufacturing firm based in Trooper, Pennsylvania; Capow, Inc. d/b/a

Eastern States Steel, a steel distributor based in Norristown, Pennsylvania; and Gulf Stream

Builders Supply, Inc., a construction industry supplier based in Riviera Beach, Florida.

The claims of the named plaintiffs are typical in that they, like all other members of the

proposed class, bought Steel Products directly from Defendants during the alleged conspiracy

period. McClave Report, Ex. 3, at 4. All named plaintiffs and proposed class members allege

that Defendants conspired to restrict raw steel production and raise the prices of Steel Products

during the relevant period. All bring the same claims under the antitrust laws, seeking the same

remedy. All direct purchaser claims arise from the same events or course of conduct, are based

on the same legal theory, and therefore satisfy typicality under Rule 23(a). *Saltzman*, 257 F.R.D.

at 479.

### 4. Adequacy is satisfied.

The final requirement of Rule 23(a) is that the representative parties must fairly and

adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). Adequacy is a two-

pronged inquiry: (i) the named plaintiff must not have claims in conflict with other class

members, and (ii) the named plaintiffs and proposed class counsel must demonstrate their ability

to litigate the case vigorously and competently on behalf of named and absent class members

alike. *See Kohen,* 571 F.3d at 679 (conflict analysis); *Urethane*, 251 F.R.D. at 644.

Here, the named Plaintiffs have no conflicts with other members of the putative class.

Rather, their interests are aligned because they, like all direct purchasers, have been injured by

the same alleged conduct—the industry conspiracy to restrict raw steel output—and they, like all

direct purchasers, share a strong interest in establishing Defendants' liability under the antitrust

laws and maximizing class-wide damages. In these circumstances, the first prong of the

"adequacy" requirement is satisfied. *See Harman v. Lyphomed, Inc.*, 122 F.R.D. 522, 528 (N.D. Ill. 1988).[10]

Second, Plaintiffs are represented by experienced and able counsel with ample resources at their disposal. *See* Docket # 33 (Plaintiffs' Interim Lead Counsel papers); Ex. 66 (statement of qualification). Since the outset of this litigation in 2008, the named Plaintiffs and proposed class counsel have pursued the matter vigorously and competently on behalf of both the named Plaintiffs and all other members of the putative class. Accordingly, "there is no ground for supposing that plaintiffs will not adequately represent the class" going forward. *In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 306 (E.D. Pa. 1980).

---

[10] The absence of any conflict means "flat product" and "long product" subclasses are unnecessary. *See Kohen*, 571 F.3d at 679 (subclasses are reserved for "real" conflicts of interest). Courts routinely grant class certification, without requiring formal subclasses, in circumstances like these. *See, e.g., Urethane*, 251 F.R.D. at 630-31 (certifying class in which single industry conspiracy allegedly fixed prices for multiple distinct product groups); *Polyester Staple*, 2007 WL 2111380, at *32 (rejecting need for subclasses owing to lack of "fundamental conflicts"). Here, far from being in conflict, the interests of flat and long purchasers are perfectly aligned. All have a strong and shared interest in (i) proving the industry conspiracy to limit raw steel production and (ii) maximizing the recovery of class-wide damages. No class member's best interest would be served by trying to prove pieces of the conspiracy; the whole story will be the best story for all direct purchasers.

## IV. THIS ACTION MEETS RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT.

Rule 23(b)(3) requires findings of "predominance" and "superiority," that is, findings that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As to predominance, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. Every issue in the case need not be common; the question, rather, is whether substantial common issues predominate. *See Messner*, 669 F.3d at 815; *NASDAQ*, 169 F.R.D. at 517 (predominance is satisfied unless "it is clear that individual issues will overwhelm the common questions"). Predominance typically is met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis[.]" *Vitamins*, 209 F.R.D. at 262. Predominance is a test "readily met" in many cases alleging violation of antitrust laws. *Amchem*, 521 U.S. at 625.

As discussed above, courts have granted class certification in the overwhelming majority of antitrust conspiracy cases because the core issue is defendants' conduct and the three elements of the claim—conspiracy (Did Defendants conspire?), causation (Did the conspiracy impact prices?), and aggregate damages (How much were prices inflated?)—usually can be established using common proof. *See, e.g., Messner*, 669 F.3d at 815; *Sullivan*, 667 F.3d at 298-301 (predominance is met because antitrust conspiracy claims necessarily turn on Defendants' common course of conduct and a common theory of market impact). This case is no exception.

## A.     Conspiracy is the central common issue.

While Defendants concede for class certification purposes that the alleged conspiracy is a common issue, that should not obscure the fact that any trial in this matter will focus overwhelmingly on common proof of conspiracy—witness testimony, documents, email and phone records, economic evidence, and other evidence relating to Defendants' conduct. At bottom, that is what this case is about, which is precisely why the issue of conspiracy "is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." 7 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1781 at 228 (3d ed. 2005).

The Court, then, should not accept the argument—which Defendants have made before and likely will repeat—that common proof of conspiracy has no bearing on the Court's predominance analysis. That is not the law. *Id.*; *see also* 6 Newberg on Class Actions § 18.28 at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions."); *Messner*, 669 F.3d at 815 ("common nucleus of operative facts" generally satisfies predominance); *Scrap Metal*, 527 F.3d at 535 ("proof of the conspiracy" is the central common issue "that is thought to predominate"); *Rubber Chemicals*, 232 F.R.D. at 352-53; *Carbon Black*, 2005 WL 102966, at *15; *NASDAQ*, 169 F.R.D. at 517; *Citric Acid*, 1996 WL 655791, at *6; *Catfish*, 826 F. Supp. at 1039 ("If proven, evidence of any meetings . . . telephone conversations, or other electronic communications in pursuit and furtherance of the alleged conspiracy would be the most relevant evidence that could be introduced"); *Vitamins*, 209 F.R.D. at 264-65 (rejecting defendants' argument that the complexity, fragmented nature, and diversity of the product markets negated predominance where the alleged industry-wide conspiracy was the overriding issue) (collecting cases); *Flat Glass*, 191 F.R.D. at 484 (same).

28

**B.**     **Plaintiffs will prove causation on a common basis.**

The second element of Plaintiffs' claim—causation, also known as antitrust "impact" or

"injury"—is likewise amenable to common proof.  In substance, the issue of impact turns on

whether the alleged production cuts caused higher prices in the marketplace.  In terms of

common proof, an appropriate starting point is the accepted economic theory that, in an industry

structurally prone to collusion (as this one is, see Exhibit 1), cartels typically cause higher prices.

*See Fructose*, 295 F.3d at 656 (explaining structural conditions under which collusion is likely to

"have an effect on price").  That rule holds especially true for a supply cartel, which, by its

nature, is likely to raise prices throughout the market under the basic law of supply and demand.

*See Linerboard*, 305 F.3d at 152.  As Judge Posner explained, restricting supply causes higher

prices:

> An agreement on output also equates to a price-fixing agreement. .
> . . [I]f firms restrict output directly, price will as mentioned rise in
> order to limit demand to the reduced supply.  Thus, with
> exceptions not relevant here, raising price, reducing output, and
> dividing markets have the same anticompetitive effect.

*Gen'l Leaseways*, 744 F.2d at 594-95 (emphasis added).

Indeed, Defendants themselves admit that "there's not going to be a businessman, there's

not going to be a defense expert who is going to say that if you hold all else constant and you cut

production, that price won't go up.  That's an economic tenet.  We're not going to fight that

battle."  Ex. 2, 1/14/2011 Hearing Transcript, at 18-19.

Based on this economic reality, courts have long held that antitrust conspiracy cases—

particularly supply restriction cases involving a basic commodity like raw steel—are classic

matters in which causation can be established on a class-wide basis at trial.  *See Linerboard*, 305

F.3d at 155 (supply restriction); *OSB*, 2007 WL 2253418, at *2 (same); *Messner*, 669 F.3d at 816

(establishing common impact is "relatively simple" in cases involving straightforward theories of

"supply and demand").[11]

Plaintiffs do not, however, rely on a mere presumption of impact. Instead, the record overwhelmingly supports the conclusion that causation can be established on a class-wide basis at trial. In particular, Plaintiffs will put forward several independently reliable categories of proof, including: (1) statements and documents from Defendants' top management; (2) expert testimony on market structure and common impact; (3) pricing data; and (4) econometric evidence showing that class members did, in fact, pay higher prices as a result of Defendants' supply restriction. This showing easily satisfies Rule 23. *See Linerboard*, 305 F.2d at 153 (characterizing a <u>lesser</u> showing as "belt and suspenders" proof under Rule 23).

### 1. Defendants' statements can be used to establish causation.

███████████████████████████████████████████████

███████████████████████████████████████████████

For example, the executive statements and documents summarized at pages 15-16, *supra*, reflect

---

[11] *See generally Urethane*, 251 F.R.D. at 636-37 ("there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market.") (citations and internal quotation marks omitted); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 614-15 (D. Kan. 1995) ("If successful on this [collusion] claim, it is likely that each plaintiff would have experienced the same impact of paying more for aluminum phosphide products than they would have paid in a truly competitive market.") (citation omitted); *Catfish*, 826 F. Supp. at 1040-41 ("In an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price."); *Foundry Resins*, 242 F.R.D. at 409 ("Where, as here, Plaintiffs have alleged a conspiracy to fix-prices and allocate markets, courts have presumed class-wide impact.") (citing *Carbon Black*, 2005 WL 102966, at *15); *Auction Houses*, 193 F.R.D. at 166 ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *Potash*, 159 F.R.D. at 695 ("[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market."); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975) ("[I]f the appellees establish . . . that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee.").

Defendants' view 

As the Court has recognized, statements such as these stand alone as probative class-wide proof of causation. *See* Docket # 279 ("I agree with Plaintiffs that the high-level executive documents sought do not go solely to the issue of conspiracy but also shed light on impact."); *see also Urethane*, 251 F.R.D. at 638-39 (crediting "documents from the defendants showing that the defendants viewed their allegedly collusive behavior as successful").

### 2. The market structure was ripe for a successful conspiracy causing class-wide antitrust injury.

The expert opinion of Dr. John Solow shows that common economic evidence can be used to establish impact on a class-wide basis at trial. Dr. Solow, a distinguished academic economist with extensive experience in antitrust analysis, has studied the economic structure of

the industry and explained how raw steel supply impacts pricing for Steel Products. Dr. Solow's

opinion is consistent not only with Defendants' contemporaneous documents but also with

textbook economics. Dr. Solow makes several key points in his report, each of which supports

the conclusion that causation is a common issue for trial:

**First**, █████████████████████████████████████████

████████████████████████████████████ *See generally*

*Fructose*, 295 F.3d at 656-57 (explaining structural conditions that facilitate successful

collusion). ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ It is widely

accepted that structural conditions such as these facilitate more effective collusion, rendering

common impact likely and class certification appropriate.[12]

**Second**, ████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[12] *See, e.g., EPDM*, 256 F.R.D. at 95 (impact a common issue where expert opined that market structure was ripe for effective collusion); *Urethane*, 251 F.R.D. at 637 (same); *Linerboard*, 305 F.3d at 153-55 (same); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *12-14 (same); *Carbon Black*, 2005 WL 102966, at *15-19 (same). *See generally Fructose*, 295 F.3d at 655 (surveying structural conditions of a collusion-prone market).



*see also Fructose*, 295 F.3d at 657 (product standardization facilitates a more "successful conspiracy"). In legal terms, it is well settled that antitrust impact is a common issue in cases involving fungible or commodity goods.[14]



[13]

[14] *See, e.g, Messner*, 669 F.3d at 816 (proof of common impact is "relatively simple" in cases involving "supply and demand" for a commodity); *Polyester Staple*, 2007 WL 2111380 , at *21 (emphasizing interchangeable nature of products); *Linerboard*, 305 F.3d at 153 (affirming certification where expert emphasized "fungible nature of the products"); *Pressure Sensitive Labelstock*, 2007 WL 4150666, at *12-13 (crediting expert opinion on commodity issue); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 450-51 (D. Kan. 2006) (certifying class where expert opined that "the products are fungible commodity products"); *DRAM*, 2006 WL 1530166, at *8 (common proof of impact is possible because "DRAM is a commodity"); *Graphite*, 2006 WL 891362, at *12 (certifying class where expert found "that extruded graphite products can be considered undifferentiated commodities"); *Rubber Chemicals*, 232 F.R.D. at 354 n.3 ("Rubber



Numerous cartels have operated in similar fashion, colluding at the building-block commodity level to raise prices for a variety of finished goods. *See, e.g. Linerboard*, 305 F.3d at 153 (certifying class where defendants restricted supply of primary input); *OSB*, 2007 WL 2253418 (same); *Flat Glass*, 191 F.R.D. 472 (certifying class where primary input cartel impacted various end products); *Urethane*, 251 F.R.D. at 630 (same); *TFT-LCD*, 267 F.R.D. 291 (same); *Vitamins*, 209 F.R.D. at 256 (same); *cf. In re Sugar Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) ("to deny recovery in this instance . . . would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product").

**Third**, ████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

Chemicals are highly fungible"; class certified); *Carbon Black*, 2005 WL 102966, at *19 (class certified where "carbon black is a commodity-like product"); *Universal Serv. Fund*, 219 F.R.D. at 678 (class certified where "product is a fungible, homogeneous product"); *Thomas & Thomas*, 209 F.R.D. at 166-67 (same); *DeLoach*, 206 F.R.D. at 562-63 (same); *Vitamins*, 209 F.R.D. at 267 (same).



**Fourth,**

In these circumstances—where the link between production cuts, spot and contract pricing is clear—negotiated contracts pose no difficulty for class treatment. *See, e.g., NASDAQ,* 169 F.R.D. at 523 ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally").[17]

---

[15] *See Linerboard* 305 F.3d at 153 (similar price trends show common impact)*; Polyester Staple,* 2007 WL 2111380, at *25-26 (same); *OSB,* 2007 WL 2253418, at *5-7 (same).



[17] *See also Urethane,* 251 F.R.D. at 638 ("individualized negotiations and a diversity of



\* \* \* \* \*

In sum, Dr. Solow's analysis shows that common economic proof can be used to establish causation at trial.

### 3. Evidence of similar pricing trends can be used to show widespread impact at trial.



---

prices paid do not" defeat class certification where "the alleged antitrust violation has caused widespread injury to the class as a whole"); *Polyester Staple*, 2007 WL 2111380, at *22-23 (rejecting argument that different transaction prices defeat common proof of impact); *DRAM*, 2006 WL 1530166, at *9 (certification appropriate "regardless whether some members of the class negotiated price individually"); *Carbon Black*, 2005 WL 102966, at *16-19 (same); *Rubber Chemicals*, 232 F.R.D. at 352-53 (same); *Vitamins*, 209 F.R.D. at 266 ("courts have found common impact in cases alleging price-fixing despite individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased"); *Bromine*, 203 F.R.D. at 415 (notwithstanding "individual price negotiations, plaintiffs may succeed in showing class wide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent)").

As many cases recognize, pricing evidence of this nature—showing similar trends across Defendants and product groups over time—can be used as common proof of impact. *See, e.g., Linerboard*, 305 F.3d at 153 (affirming class certification where pricing for class products "behaved similarly over time"); *Urethane*, 237 F.R.D. at 50-51 (crediting similar evidence); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *13 (same).

### 4. Econometric analysis shows that class members were injured.



While Plaintiffs are not required to present a formal econometric model at this stage of the case, see *Kohen*, 571 F.3d at 676, "courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis." *TFT-LCD*, 265 F.R.D. at 313; *see also Polyester Staple*, 2007 WL 2111380, at *26-27 (expert regression analysis accepted as common proof of impact).

The methodology employed by Dr. McClave is standard practice in his field and in cases like this one. *See Fructose*, 295 F.3d at 660-61.



A final version of Dr. McClave's analysis—incorporating additional analysis and information developed in the merits phase of discovery—will provide relevant, probative and common evidence on the elements of impact and damages. *See Fructose*, 295 F.3d at 660-61 (expert's multiple regression analysis held admissible to establish class wide impact at trial).

\* \* \* \* \*

In short, the element of causation (or antitrust "impact") can be established on a class-wide basis.

**C.**    **Plaintiffs will prove class-wide damages on a common basis.**

Multiple regression modeling, of precisely the sort performed by Dr. McClave, is well established as an appropriate tool for estimating antitrust damages on a class-wide basis. *See, e.g., Scrap Metal*, 527 F.3d at 532-34; *Fructose*, 295 F.3d at 660-61. That is why numerous courts have accepted proposed multiple

regression methodologies at the class certification stage as reliable and common proof for establishing the element of damages.[19]



Accordingly, Plaintiffs will introduce Dr. McClave's opinions and analysis to establish class-wide damages at trial.[20]

## V.  A CLASS ACTION IS THE SUPERIOR METHOD FOR ADJUDICATING THIS ACTION.

Rule 23(b)(3) provides that certification is warranted if a class-wide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, class certification is far more efficient than any other procedure available for

---

[19] *See Foundry Resins*, 242 F.R.D. at 411 (characterizing multiple regression models as "reasonable damage methodologies"); *DRAM*, 2006 WL 1530166, at *10 ("other courts have already upheld [multiple regression models] as valid means for proving damages on a class-wide basis, and this court has found no reason to reject them at this stage of the proceedings.") (collecting cases); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *15 (proposed regression "methods are widely accepted"); *Flat Glass*, 191 F.R.D. at 485-87 ("[t]here is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation"); *Urethane*, 237 F.R.D. at 452 ("damages are also likely susceptible to class-wide proof" using multiple regression analysis); *Linerboard*, 305 F.3d at 153-55 (same); 6 Alba Conte & Herbert Newberg, Newberg on Class Actions § 18:53 at 177 (4th ed. 2002).

[20] After aggregate class damages are established at trial, it is true of course that individual damage amounts will vary, depending on the volume of steel a given class member purchased. Such variation is no barrier to class certification. *Messner*, 669 F.3d at 815. Here, individual damages will be apportioned arithmetically after trial or settlement, using sales records and other available data to calculate each class member's appropriate share.

resolving the factual and legal issues raised by Plaintiffs' claims. *See Messner* 669 F.3d at 815

n.5 ("There are so many common issues of law and fact relating to the issue of [liability],

however, that the superiority requirement likely poses no serious obstacle to class certification

here."). The manageability of the case is underscored, moreover, by Plaintiffs' preliminary trial

plan, which, consistent with the foregoing, shows that Plaintiffs can establish their claims on a

class-wide basis using predominantly common proof at trial. *See* Ex. 65.

In addition, denying certification could lead to duplicative and wasteful litigation on the

part of some direct purchasers; while others would fail to pursue their claims based, not on a lack

of underlying merit, but rather on the relatively small size of their potential individual recovery

measured against the high cost of complex antitrust litigation. In finding superiority satisfied,

courts have explained that the alternative—litigating hundreds or thousands of lawsuits

individually—would be wasteful, inefficient and, for many plaintiffs, infeasible:

> Here, the obvious alternative to a class action would be for
> plaintiffs to bring individual suits against defendants. This would
> be grossly inefficient, costly, and time consuming because the
> parties, witnesses, and courts would be forced to endure
> unnecessarily duplicative litigation. The hundreds, and perhaps
> thousands, of class members are dispersed across the country, each
> with relatively similar claims. Certainly, the most feasible way for
> these plaintiffs to pursue their claims is by way of a class action.

*Urethane*, 237 F.R.D. at 453; *Carbon Black*, 2005 WL 102966, at *21; *Bromine*, 203 F.R.D. at

416; *NASDAQ*, 169 F.R.D. at 527 (echoing these concerns).

The same reasoning applies here. Class treatment is the superior way for this case to

proceed.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that their Motion for Class Certification be granted; that the named plaintiffs be appointed as Class Representatives; and that Fine Kaplan and Black R.P.C. and Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC be appointed as Co-Lead Class Counsel.


Dated:   May 24, 2012                         Respectfully submitted,


|  | /s/ Matthew Duncan |
|---|---|
| Michael K. Kellogg | Allen D. Black |
| Mark C. Hansen | Roberta D. Liebenberg |
| Michael J. Guzman | Donald L. Perelman |
| Steven F. Benz | Jeffrey S. Istvan |
| Christopher J. Walker | Matthew Duncan |
| **KELLOGG, HUBER, HANSEN,** | Adam J. Pessin |
| **TODD, EVANS & FIGEL, P.L.L.C.** | **FINE, KAPLAN AND BLACK, R.P.C.** |
| Sumner Square | 1835 Market Street, 28th Floor |
| 1615 M Street, NW, Suite 400 | Philadelphia, PA 19103 |
| Washington, DC 20036 | Tel.: (215) 567-6565 |
| Tel.: (202) 326-7900 | |

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Michael J. Freed
Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.:   (224) 632-4500

*Liaison Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May, 2012, I caused a true and correct copy of the foregoing **Direct Purchaser Plaintiffs' Motion for Class Certification and Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification** to be filed **UNDER SEAL** with the Court via the Court's ECF system, and served via e-mail to all counsel.

_/s/ Matthew Duncan_
Matthew Duncan

42