# EXHIBIT 2

1

1          THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   STANDARD IRON WORKS on behalf of )
    Itself and all others similarly  )
4   situated; WILMINGTON STEEL       )
    PROCESSING CO, INC., REM SYSTEMS )
5   INC., ALCO INDUSTRIES, INC.,     )
                                     ) No. 08 CV 05214
6                                    )
            PLAINTIFFS,              )
7                                    )
    vs.                              )Chicago, Illinois
8                                    )
    ARCELORMITTAL;ARCELORMITTAL USA, )
9   INC.;UNITED STATES STEEL         )January 14, 2011
    CORPORATION;; NUCOR CORPORATION; )
10  GERDAU AMERISTEEL CORPORATION;   )
    STEEL DYNAMICS,INC.; AK STEEL    )
11  HOLDING CORPORATION, SSAB SWEDISH)
    STEEL CORPORATION; COMMERCIAL    )
12  METALS, INC.; ArcelorMittal S.A. )
                                     )
13          DEFENDANTS.              )10:27 a.m.

14
                  TRANSCRIPT OF PROCEEDINGS
15        BEFORE THE HONORABLE JAMES B. ZAGEL

16
    For the Plaintiffs:
17          KELLOGG, HUBER, HANSEN, TODD, EVANS &
            FIGEL, PLLC
18          BY: Steven Benz
                Michael Guzman
19          1615 M Street, N.W.
            Suite 400
20          Washington, D.C. 20036
            (202) 326-7900
21
    Court reporter:
22
                   Blanca I. Lara, CSR, RPR
23              219 South Dearborn Street
                      Room 2504
24              Chicago, Illinois 60604
                    (312) 435-5895
25

2

1   APPEARANCES (continued:)

2

3   For plaintiffs:

4

5               FINE, KAPLAN & BLACK, RPC
            BY: Matthew Duncan
6                   Jeffrey Istvan
            1835 Market Street
7           28th Floor
            Philadelphia, Pennsylvania 19103
8           (215) 567-6565

9

10              MILLER LAW, LLC
            BY:  Marvin Alan Miller
11          115 South LaSalle Street
            Suite 2910
12          Chicago, Illinois 60603
            (312) 332-3400

13              FREED, KANNER, LONDON & MILLEN, LLC
            BY:  Michael Jerry Freed
14          2201 Waukegan Road
            Suite 130
15          Bannockburn, Illinois 60015
            (224) 632-4500

16

17  For defendant SSAB Swedish Steel Corporation:

18              SIDLEY, AUSTIN LLP
            BY:  John W. Treece
19                  Claire Marguerite Korenblit
            One South Dearborn Street
20          Chicago, Illinois 60603
            (312) 853-7000

21

22

23

24

25

1   APPEARANCES (continued:)

2

3

    For Defendant ArcelorMittal USA and SA:
4
                MAYER, BROWN LLP
5               BY:  Jonathan Lawrence Lewis
                     Andrew Stanley Marovitz
6               71 South Wacker Drive
                Chicago, Illinois 60606
7               (312) 782-0600

8
                CLEARY GOTTLIEB STEEN & HAMILTON LLP
9               BY:  Patricia Michelle McDermott
                     David I Gelfand
10              2000 Pennsylvania Avenue, NW
                Suite 9000
11              Washington, DC 20006
                (202) 974-1546
12

13  For Defendant Gerdau Ameristeel:

14              EIMER STAHL KLEVORN & SOLBERG
                BY:  John Kenneth Theis
15                   Nathan P. Eimer
                224 South Michigan Avenue
16              Suite 1100
                Chicago, Illinois 60604-2516
17              (312) 660-7600

18

19

20

21

22

23

24

25

4

1  APPEARANCES:   (Continued)

2

3  For Defendant Nucor Corporation:

4               WINSTON & STRAWN LLP
               By:  Todd Jay Ehlman
5               35 West Wacker Drive
               Chicago, Illinois 60601-9703
6               (312) 558-5600

7               ARNOLD & PORTER LLP
               BY: David Gersch
8                   Robert Katerberg
               555 12th Street NW
9               Washington, D.C. 20002
               (202) 942-5125

10

11 For Defendant  AK Steel Holding Corporation:

12               CADWALADER, WICKERSHAM & TAFT LLP
               BY:  Gregory A Markel
13               One World Financial Center
               New York, New York 10281
14               (212) 504-6000

15

16

17

18

19

20

21

22

23

24

25

1  Appearances (continued:)

2

   For defendant Commercial Metals, Inc.:

3

4              DECHERT, LLP
               BY:  Christine Levin
5              Cira Centre
               2929 Arch Street
6              Philadelphia, PA 19104
               (215) 994-4000
7

8  For defendant United States Steel Corporation:

9              REED, SMITH LLP
               BY:  Jonathan Stuart Quinn
10             10 South Wacker Drive
               40th Floor
11             Chicago, Illinois 60606
               (312) 207-1000
12

13             REED, SMITH, LLP
               BY: Daniel I. Booker
14             Reed Smith Centre
               225 Fifth Avenue
15             Pittsburgh, Pennsylvania 15222-2716
               (412) 288-3132
16

17

   For Defendant Steel Dynamics, Inc.:

18

19             MCDERMOTT, WILL & EMERY LLP (Chicago)
               By:  Amanda Jo Metts
20             227 West Monroe Street
               Suite 4400
21             Chicago, Illinois 60606-5096
               (312) 984-7748
22

23

24

25

1          THE CLERK:  2008 C 5214, Standard Iron versus
2   ArcelorMittal, et al.
3          MR. DUNCAN:  Good morning, Your Honor.
4          Matthew Duncan for the plaintiff.
5          THE COURT:  We'll start with this side,
6   plaintiffs.
7          MR. BENZ:  Your Honor, Steven Benz from
8   Kellogg, Huber out of Washington, D.C., for
9   plaintiffs.
10          MR. FREED:  Michael Freed direct purchaser
11   plaintiffs.
12          MR. GUZMAN:  Mike Guzman also for the
13   plaintiffs.
14          MR. ISTVAN:  Jeffrey Istvan for the
15   plaintiffs.
16          MR. DUNCAN:  I'll go again:  Matthew Duncan
17   for plaintiffs.
18          THE COURT:  Defendants.
19          MR. GERSCH:  David Gersch, Arnold & Porter,
20   for Nucor.
21          MR. BOOKER:  Dan Booker from Reed, Smith, for
22   United States Steel Corporation.
23          MR. QUINN:  Jonathan Quinn also for U.S.
24   steel.
25          MR. MAROVITZ:  Andy Marovitz for

1  ArcelorMittal.

2        MS. MCDERMOTT:  Patty McDermott for

3  ArcelorMittal.

4        MR. EIMER:  Nate Eimer for Gerdau Steel.

5        MR. GELFAND:  David Gelfand from Cleary,

6  Gottlieb for ArcelorMittal.

7        MR. KATERBERG:  Robert Katerberg for Nucor.

8        MR. LEWIS:  Jonathan Lewis for ArcelorMittal

9  defendants.

10        MR. THEIS:  Jack Theis for Gerdau Ameristeel.

11        MR. TREECE:  John Treece from Sidley & Austin

12  for SSAB.

13        MS. KORENBLIT:  Claire Korenblit from Sidley

14  for SSAB.

15        MS. METTS:  Amanda Metts for Steel Dynamics.

16        MS. LEVIN:  Christine Levin for Commercial

17  Metals.

18        MR. EHLMAN:  Todd Ehlman for Nucor.

19        MR. MARKEL:  Greg Markel from Cadwalader for

20  AK Steel.

21        THE COURT:  I have read the memorandums and

22  examined the 21 attachments, the cumulative total

23  that I have before me, so you can assume my

24  familiarity with the papers.

25        MR. DUNCAN:  Very good, Your Honor.

1    We have four basic points we want to make in
2  connection with this motion.  First I'll briefly
3  outline and then discuss in more detail in context
4  some of the documents that we put before the Court.

5    First, Your Honor, this discovery is relevant
6  to our affirmative showing of class certification.

7    Second, it's relevant to rebutting specific
8  arguments that the defendants are going to make at
9  class certification, arguments they've already made
10  in their discovery briefing and that we're likely to
11  hear again today.

12    Third, the discovery is necessary to inform
13  the work of our class certification experts.

14    Fourth, Your Honor, we've taken seriously the
15  Court's concerns about the scope of precertification
16  discovery.  So we've used the sampling process,
17  documents produced by U.S. Steel, documents produced
18  by Gerdau, to think hard about what we really need
19  for class certification and to tailor the requests
20  that are before the Court today.

21    So the discovery at issue is reasonable in
22  scope as a result of all that.  Indeed, we're
23  seeking far less precertification discovery than is
24  typical in cases like this one.

25    So for all these reasons, Your Honor, we

1  respectively submit that the time is ripe for the
2  other six defendants to do what U.S. Steel and
3  Gerdau have done and to produce key executive
4  documents that we intend to rely on to meet our
5  burden of class certification.
6        Now, turning to the substance, Your Honor,
7  and the relevance.  The discovery at issue is
8  relevant to the showing we intend to make for class
9  certification.  And it's important at the outset to
10 note that class certification is our motion, it's
11 our burden, we're going to put the case in the way
12 we want to put it in and defendants are attempting
13 to tell us how to do that.
14        The point is that these documents, the
15 discovery we're seeking, is relevant.  For example,
16 documents explicitly discussing production cuts,
17 production cuts at issue and their impact on the
18 market, that's what this case and this motion are
19 about.
20        So even putting aside the parties' dispute
21 about the relevance of conspiracy discovery at class
22 certification, the discovery at issue is relevant to
23 the contested question of causation, which is also
24 known as antitrust impact.
25        For example, documents produced from the

:09AM

:09AM

:09AM

:09AM

:10AM

10

1 executive files of U.S. Steel and Gerdau show that
2 the defendants' executives explicitly attributed
3 price and margin approvement to the production cuts
4 at issue.  Now, that's exactly the type of evidence
5 we would use in our affirmative presentation at
6 class assertion.
7          Now, let's consider some concrete examples,
8 Your Honor.  If you have the exhibits in front of
9 you, that's great, and if not, I can just talk about
10 them, but I'm looking now at Exhibit 4 from our
11 moving brief.
12          Exhibit 4, Your Honor, is a letter from
13 Mittal Steel, the CEO of Mittal Steel, and the date
14 of the letter is July 8, 2005.  what this letter is
15 is a letter from Mr. Mittal to the executive
16 director of a trade association, and what Mr. Mittal
17 says is, he's expressing his regrets to the trade
18 association for not being able to meet, make an
19 upcoming Executive Committee meeting.
20          Now, this Executive Committee is comprised of
21 CEO's of the largest steel companies in the world,
22 including, in this case, U.S. Steel, Nucor and
23 Gerdau.  So U.S. Steel, Nucor, Gerdau, Mittal, the
24 four largest producers in the United States, all
25 defendants here.

11

1        What Mr. Mittal said in his letter, July of
2   2005, right in the middle of the first round of
3   alleged production cuts in this case, right in the
4   middle of them, he says that:
5        "... the key message I would like you to
6           convey to the other members of the
7           Executive Committee is that the main
8           determinate of performance for the steel
9           industry will be production discipline
10          ..."
11             that's what he says.
12             So what does he mean by that?  Well, turning
13  to the next page of the document, Mr. Mittal
14  explains in detail that as long as producers, quote:
15       "... maintain the discipline of matching
16          supply to market requirements, prices will
17          be stable..." he says "... on the basis of
18          production discipline ..." which is
19          ongoing, which we've detailed in our
20          client "... market prices will be more
21          stable for the rest of the year ..."
22             that's what the document says.
23             Now, why is a document like that relevant?
24  Well, Mr. Mittal is the CEO of the largest steel
25  company in the world.  He's saying that production

1  discipline will lead to higher prices, he's saying

2  that's the most important issue for the industry, he

3  says it leads to price stability.  Now, this is from

4  a man who knows a little something about the steel

5  industry.  He's talking contemporaneously, he's

6  talking about the production discipline that's at

7  issue in our case --

8          THE COURT:  You can actually -- I've read all

9  this stuff.

10         MR. DUNCAN:  Understood, Your Honor.

11         THE COURT:  Everything you've said thus far

12  is something I expected you to say.

13         MR. DUNCAN:  Fair enough, Your Honor.

14         THE COURT:  You'd like to try to do stuff

15  that I probably don't expect.

16         MR. DUNCAN:  Understood.  We wanted to make

17  sure that we covered the record, which I think is

18  what Your Honor wanted this whole process to be

19  about, was looking at documents.  We're happy to

20  answer any questions.  I'm happy to go through lots

21  more of these.

22          I think the bottom line with this document,

23  with most of the documents that we put before the

24  Court, is that it's highly important that the

25  parties, that the Court, that the experts in this

:12AM
:12AM
:12AM
:12AM
:12AM

1 case understand what was happening in the market at

2 the time.  That discovery in a class case like this,

3 even certification discovery, is not about data,

4 it's about what really was happening in the market.

5 　　　　On the issue of conspiracy, we're putting

6 that to the side for today.

7 　　　　THE COURT:  Right.

8 　　　　MR. DUNCAN:  On the issue of impact, what did

9 people say at the time about the impact of

10 production cuts?  Did they talk broadly at a general

11 level?  It's an important issue for the industry.

12 Did production cuts impact the market?  That's what

13 these documents show.

14 　　　　These documents are equally relevant, Your

15 Honor, to the specific arguments that the defendants

16 are going to make.  Now, the defendants have made

17 some of those arguments in their papers, defendants

18 make them in lots of antitrust cases which Your

19 Honor undoubtedly has seen, things like this

20 particular product line, not impacted by a

21 conspiracy; these contract customers, not impacted

22 by the conspiracy; you can't use average price

23 charts to show trends in the industry.  All of these

24 things are arguments that have specifically been

25 made already that we're going to see again at class

1  certification and these documents bear on them.

2      If you have an executive document, and we've

3  collected some in our papers, where the executives

4  at issue say production cuts impacted this product

5  line, steel sheet prices went up, steel bar prices

6  went up, steel plate prices went up, if have

7  documents like that from the contemporaneous files

8  of the executives, that rebuts the argument they

9  want to make.  So we are not relying only on these

10  general statements like that.

11      THE COURT:  Stop for a second.

12      MR. DUNCAN:  Sure.

13      THE COURT:  Because this is a fairly

14  important point and I would like to hear from the

15  defense on this, which is the defense theory that

16  there's maybe enormously colorful statements made by

17  people who are in giant corporations but they're not

18  going to be proof, proof is going to come from some

19  other source which is a bunch of people who crunch

20  numbers and take a look at sales item by item,

21  correlate some things on daily price changes, do

22  massive statistical tables, apply regression

23  analysis.

24      I once heard a Daubert opinion, I can't

25  remember whether it was Mercado versus Ahmed or

15

1   Stanczyk versus Black & Decker in which they had a

2   footnote, an article I much admire about what you

3   would have to believe to believe in regression

4   analysis.  And I came out of the history and

5   philosophy with physical sciences, I never liked

6   regression analysis, but I've lost that battle.  I'm

7   stuck in a time warp and it's admissible.

8           At any rate, this basically is, as I

9   understand it, your position, but I want you to get

10  to the heart of this thing about why this stuff he

11  relies on doesn't count, because that is the heart

12  of your argument, at least the heart of one part of

13  your argument.

14          MR. GERSCH:  Certainly, Your Honor.

15          And I don't think we would say there's no

16  relevance to it, but we'd say they have a lot of

17  that stuff and it's not going to change.

18          The problem with those statements that they

19  want to rely on is, they're at a level of generality

20  that is not going to address the issue that the

21  Court is going to need to decide.

22          So the plaintiffs have chosen to sue buyers

23  of thousands of different kinds of steel products,

24  and I think we've cited the Judge Posner quote where

25  he says there's no such thing as steel, there's

:15AM

:16AM

:16AM

:16AM

:16AM

1  steel plate, there's, you know, sheet, there's beam,

2  there's bar, there's all these different products.

3  The plaintiffs have chosen to lump those together.

4  And when a CEO makes a general statement like

5  "we cut production," that -- and if you look at the

6  data, they don't cut production for some of the

7  products, the general statement is not going to

8  change.  It's as if I had a demographer come and

9  take the stand and he says the population of

10 Illinois is aging.  He might be right, but it

11 wouldn't mean there are no babies born in the State

12 of Illinois.

13 If we took one of the people they want to

14 represent, GM, and their engineer came in and said,

15 "we've got really green cars, they're tremendously

16 fuel efficient, they're more fuel efficient than

17 ever before," that might be true but it won't mean

18 that the Chevy Tahoe isn't a gas guzzler.

19 The problem with those general statements

20 that the plaintiffs want to rely on is that they are

21 too broad and too general to get at the issue that

22 Your Honor has to deal with, which is whether the

23 buyers of all these different kinds of products, and

24 they're very different, whether any trust impact can

25 be proved this to them from common evidence.

:16AM

:17AM

:17AM

:17AM

:17AM

1       And when it is the case that you look at the
2  data and the production doesn't get cut, that's
3  going to be a problem for them and no amount of
4  general statements by an executive saying "we cut
5  production" is going to mean that that product was
6  cut, and that's just one of the many problems.
7       So in their complaint, Your Honor might
8  remember they said the imports aren't enough of a
9  factor to absorb a production cut by the defendants.
10 We put in data in our paper that showed the imports
11 and how they differ by product.  So there were some
12 products where imports penetration is about 5
13 percent of the market share and I think probably
14 everyone would agree that nothing with 5 percent --
15 or the import is only 5 percent, they're not going
16 to increase production enough to make up for any
17 cuts in the defendants' production.
18      On the other hand, there were other sectors
19 in the pipe industry, in the pipe sectors, where
20 imports make up to 82 percent of the market share.
21 Very hard for the plaintiffs to say that domestic
22 producers only have 18 percent share that production
23 cut isn't going to get absorbed by imports.
24      So there are differences between each of the
25 products.  There are also differences in terms of

:18AM
:18AM
:18AM
:18AM
:19AM

the times that people purchase.  So the plaintiffs
are pointing you to three specific periods where
they say productions were cut, and let's start with
2005 and look at the summer, roughly May through
July or August, whatever, the dates aren't critical
to this.  But they're also including in their class
people who bought in the fall and winter of 2005.
Well, those people are buying when production is not
cut.  How are they going to prove by common evidence
that those buyers were impacted by the evidence that
they're going to use for the people as to whom they
say production was cut in 2005?

         Those are all data issues.  And there's not
one thing in any of the e-mails--and, by the way,
they cite very few e-mails--there's not one thing in
any of those documents that they got out of top
executive files that are going to help them deal
with those issues.

         The stuff they have, I think, largely is
either general or a red herring, and here's what I
mean by a red herring:  They spent a lot of time
saying, according to the defendants, "when they cut
production that either causes price to go up or it
stabilizes price," the defendants are not going to
argue, there's not going to be a businessman,

 1  there's not going to be a defense expert who is
 2  going to say that if you hold all else constant and
 3  you cut production, that price won't go up.  That's
 4  an economic tenet.  We're not going to fight that
 5  battle.
 6       So when they say, "oh, we found evidence of
 7  that," everyone will tell you that.  That's econ
 8  101.  So that's not going to be the battle, and
 9  that's not going to help them deal with these
10  thousands of different kind of products.
11       And this is their choosing.  They chose to
12  cover the waterfront.  They chose to allege this
13  very broad conspiracy.  This is not some technical
14  requirement that we're foisting on them, this goes
15  to the fundamental fairness of a class action.
16       If they have an individual plaintiff, an
17  individual plaintiff who bought some product,
18  special bar quality which is a kind of bar that's
19  used in moving equipment, it's produced at very
20  strict tolerances, it's used in things like axles
21  and the like and they said, "oh, you were hurt by a
22  antitrust conspiracy," we'd be entitled to defend by
23  saying "what do you mean?"  I don't know if this is
24  true, but if it were true we'd be able to say "the
25  production of that wasn't cut" or we'd be able to

:20AM

:20AM

:21AM

:21AM

:21AM

1  say "what do you mean?  The price that you're paying

2  now is lower than the price that held true before

3  the conspiracy" or we'd be able to say "but there

4  are lots of imports in that area," or anything like

5  that.  But when we get to the class situation, if we

6  can't make those arguments, if we can't make those

7  arguments, then it's not fair to try the case as a

8  class.

9       And the answer to those issues is in the

10  data, and there's not one thing in any of those

11  documents with the colorful statements which goes to

12  that question, Your Honor.  There's nothing in those

13  documents where, "oh, we'd never understand the data

14  but for those statements."

15       THE COURT:  Respond to that one.

16       MR. DUNCAN:  Your Honor, first in the general

17  statements:  The general statements help our case.

18  Our case is very simple, and Mr. Gersch just stated

19  it, it is that when you cut the supply of raw steel,

20  the price of all products made from that primary

21  input goes up.

22       Now, when Mr. Lakshmi Mittal is at this trade

23  association meeting and says "the most important

24  thing the industry can do is cut this control

25  production," he's not talking about separate product

1 lines, he's not saying we need to control product

2 production for this product or that product, he's

3 saying we need to control raw steel production.

4 Why?  Because it will inflate prices

5 across-the-board, it will help our industry.  So the

6 simplicity of these documents helps our case, that

7 is our case.

8          Now, even if defendants --

9          THE COURT:  Let me stop you for one second.

10          MR. DUNCAN:  Go ahead.

11          THE COURT:  One of the things that first

12 struck me about this case with the protest of the

13 defendants about these broad general statements and

14 the degree to which expert analysis was going to

15 determine this case is, it's the kind of thing where

16 if you're a defense lawyer and you have a very big

17 client, you would like to file these arguments under

18 seal and the seal would apply to your client looking

19 at them because there's a subtext that Lakshmi

20 Mittal really doesn't know what the possible

21 economic effect is of cutting production, but that's

22 not what their position is.

23          MR. DUNCAN:  Right.  Well, it certainly --

24          THE COURT:  When you read this, what is

25 beginning to reverberate in my mind is what seems to

:22AM

:23AM

:23AM

:23AM

:23AM

1 be happening with class actions, more commonly in
2 class actions of this type, which is you're not
3 going to wind up with a general class, you're going
4 to wind up with a series of subclasses, and then the
5 question that arises in my mind is, what kind of
6 subclasses would you envision.

7      And the reason I say this is, if you start
8 out with a general cut in steel, in making of steel,
9 maybe the guys who buy beams are getting killed and
10 maybe the guys who buy bars aren't getting killed,
11 and the question then arises, do you have a beam
12 class and a bar class, and then if you have a beam
13 class and a bar class, whatever its theoretical
14 value is, is it a practical and effective use of the
15 class action methodology.

16      There's lots of cases where you could have a
17 class action and it's refused not because it's
18 impossible and not because you can't do it, but
19 because it doesn't achieve the purpose of class
20 actions which is basically a kind of economy of
21 scale operation.

22      And that's the thrust of where they're going,
23 which is, yeah, we can see, you know, if there's
24 some conspiracy--which for purposes of this motion
25 they are not disputing, but only for purposes of

:24AM
:24AM
:25AM
:25AM
:25AM

23

this motion--if there's this massive conspiracy and
there's a lot less molten steel being poured out of
these kettles whatever they're ultimate destination
is, you're going to fall down on the damage element
and you're going to fall down on the idea of some
kind of general class remedy.  That's, I think, a
subtext of where they're going.

          MR. DUNCAN:  I think that's right, Your
Honor, and I think these are all important
questions, and I think the point for today is is
that the way to decide these issues is on a full
record.

          When we come before the Court on class
certification and Nucor says bar doesn't belong in
this case, beam doesn't belong in this case, we
don't have any documents, we don't have any e-mails
from Nucor's executives at the time discussing those
product groups, we don't know what the executives
said at the time --

          THE COURT:  Do you have any other reason
beyond that one?  Because I thought of that one
already.

          MR. DUNCAN:  No.  And we understand.

          And, Your Honor, the other point is informing
the work of the experts.  You know, defendants'

1 theory here is that we should take 40 million

2 transactions and lock our expert in a room with a

3 calculator, and their expert will come out with one

4 answer, ours will come out with another answer, and

5 Your Honor is going to have to decide which one is

6 right. Our point is is that the way expert work

7 should be done in this case is in the context of a

8 developed record.

9        And even the cases on which the defendants

10 relied, the Hydrogen Peroxides, the cases cited in

11 their brief on class certification, the upshot of

12 those decisions is that you need a more developed

13 record, not less, because the point of Hydrogen

14 Peroxide, a Third Circuit decision, is that the

15 district court didn't carefully scrutinize a full

16 record, they just rubber stamped an expert report,

17 and that's not what should happen here, Your Honor.

18 We should take full discovery, develop the record,

19 and decide all of these questions that Your Honor is

20 rasing at class certification, and if certain

21 products don't belong in the case, we don't want

22 them in the case.

23        THE COURT:  I got it.

24        Let me re-characterize what he said so you

25 understand how I'm receiving it.

25

1    MR. GERSCH:  Yes, Your Honor.

2    THE COURT:  And I don't blame people for
3 writing various sort of briefs saying this is the
4 case and that's the case.  I think what they are now
5 saying, which makes sense, is that, yeah, it might
6 turn out that you're right, maybe you're right,
7 maybe you're right about certain classes of steel,
8 and, you know, maybe we were wrong about it, but we
9 have all this stuff that says that maybe we're right
10 and the only way we're going to get a better handle
11 on it is if we have broader discovery and we look at
12 the other steel companies and we look at the people
13 who have not given such full discovery.  They're
14 argument is that they're entitled to do it, even if
15 we're talking about millions of dollars of cost.

16    And I accept that it's millions of dollars,
17 and part of it is is because I have a close family
18 member who tells me that spending a million dollars
19 on document discovery is an economical amount as
20 opposed to a large amount and practice has changed
21 over the years to that point.  But, basically, this
22 is their position that, under these circumstances,
23 it's reasonable to impose those costs.

24    And I think that their subtext is, if you
25 take a look at what these guys are saying about

1 cutting production, the very minimum that that
2 proves is that there's some reasonable basis for
3 letting them go further in discovery.  Maybe it
4 doesn't prove the case, but it proves that there
5 might be a case, a reasonable and plausible case to
6 be made, and therefore we ought to get this
7 discovery, and even though it's negative for you as
8 it turns out to be a zero, they've wasted a few
9 million dollars of your clients' money, excluding,
10 of course, the legal fees that are, by definition,
11 never wasted.
12         Go ahead.
13         MR. GERSCH:  Your Honor, if the sampling
14 process--and there's no reason to think they didn't
15 look hard at what they collected, I assume they
16 looked as hard as they could--if the sampling
17 process from two of the four biggest defendants
18 didn't produce information which helps answer the
19 questions that we're posing, which is how do you
20 deal with the fact that for some of the products
21 production isn't cut, how do you deal with these
22 questions about that there is different supply and
23 demand curbs for different products, there's
24 different import penetration for different products?
25 They didn't find any of that in their process.

:29AM

:30AM

:30AM

:30AM

:31AM

1        All they're coming back with is general

2   statements which are the same kind that were in the

3   motions to dismiss, now they have some statements

4   that are similar to the ones that they have in the

5   motion to dismiss which are private instead of

6   public, but they don't have statements which say:

7   Ah, this allows us to understand why it is that

8   there might be a conspiracy with respect to pipe

9   even though 82 percent of the market is made up of

10  imports.

11       They're not pointing to anything in the data

12  or the documents they've found and certainly not in

13  the e-mails from the top executives which helps

14  reconcile those questions or addresses the issue the

15  Court is going to have to deal with on class

16  certification, which is whether or not the buyers of

17  all these products are similarly situated.

18       And we could stipulate that if they have

19  found 50 documents in which an executive says "we

20  cut production and that was good for pricing" or "we

21  cut production that stabilized pricing" or words to

22  that effect, we could stipulate that they'll find

23  another whatever number you want to pick, 50 or 100,

24  it won't answer the questions the Court is going to

25  have to resolve to get on top of this class issue.

1   And when that issue comes before the Court, that is
2   going to be based on the economist, because only the
3   economist is going to be able to crunch the data to
4   look at all those products.

5          THE COURT:  Okay.  Which gets me actually to
6   my last question, you get the discovery you want and
7   I allow you to do that and you get a lot more of the
8   same kind of stuff you've gotten from the two big
9   ones, that's hypothetical number one.  Hypothetical
10  number two, which you are entitled to argue but I
11  don't want you to do it because we're not there yet,
12  the hypothetical is, it's more of the same,
13  essentially more of the same, what do you do then?

14         I'm not talking about motions you're making,
15  but what's the next thing you do to prepare for some
16  ongoing trial of this case?

17         MR. DUNCAN:  I think the first step, Your
18  Honor, is the class certification expert reports.
19  Our experts will look at the record, whatever the
20  record is that's developed through the course of
21  whatever discovery Your Honor allows, we will put
22  forward an expert report and a class certification
23  brief perhaps with adjustments to the class
24  definition.  If there's a product that doesn't
25  belong in this case, we're not going to try to get

that product certified.  We have to have a full
record to make that decision.

The defendants are going to do their own
expert work, their own class certification brief,
and Your Honor is going to decide what the class
definition should be, what products are in the case,
what aren't, how should the case move forward.  And
so certification, obviously, is the next step.

Our plan, the plan we put forward, defers a
fair amount of what I'll call classic conspiracy
discovery until later in the case, the phone
records, the travel logs, the expense reports, those
kinds of things, we've agreed to take those off the
table until after class certification.

So depositions and classic conspiracy
discovery will be the next phase after certification
getting ready for trial.  That's the roadmap we
foresee, in any event.

THE COURT:  But the data on which your expert
is going to rely consists of more data than what you
get from the defendants?

MR. DUNCAN:  I think two points, Your Honor.
Number one, even our data experts rely -- they start
their analysis with industry documents, the
structure of the industry, all that kind of stuff,

30

1  the discovery we're talking about, that's a big part

2  of their work.  The data crunching part of that

3  work, it takes time, and here's the status, and I'll

4  provide the Court with a quick status report on

:34AM  5  that:  All of the defendants have produced a lot of

6  transactional data, as they've said; 40 million

7  transactions, apparently.  Our experts are in the

8  process now of working through all of that and it's

9  a big job because there's always data that we don't

:35AM  10  understand or missing data fields.  And it's not to

11  cast aspersions, it's just the nature of a huge

12  database discovery.

13        Those issues are things that we're in the

14  process of resolving as many as we can.  Those that

:35AM  15  we can't resolve, we're going to ask questions of

16  the defendants, and there's always a round of

17  back-and-forth in these cases just to get the data

18  itself squared away, and that takes a little bit of

19  time.

:35AM  20        My plan, I'm doing it myself, is to get the

21  initial letter out to each defendant by the end of

22  this month raising any issues we have with the data.

23  It will then take a little while to get that

24  resolved.  We think that, by the spring, the data

:35AM  25  issue should be resolved.  And our discovery

31

1 schedule, the one we put in yesterday, would have

2 all that work getting done and our opening class

3 cert brief and opening expert report going in in

4 September of this year, with all class cert briefing

:36AM 5 finished one year from now in January of 2012.

6 That's the schedule we put forward.

7          THE COURT:  What data sets do they look at,

8 incidentally?

9          MR. DUNCAN:  Excuse me, Your Honor?

:36AM 10          THE COURT:  What data sets do they look at?

11 I ask the question because I have a pretty good idea

12 of what data sets people look at when they look at

13 automobiles because I had a case.

14          MR. DUNCAN:  It's a good question.  The

:36AM 15 starting point, Your Honor, is the financial

16 reports, each defendants' financial statements,

17 which include things like pricing by product line,

18 margins, costs, that sort of thing, so that's the

19 baseline.

:36AM 20          The individual level transactional data they

21 produced is another source of pricing data and our

22 experts have to aggregate all of that and figure out

23 how to make it usable, and that's a process that

24 takes a little bit of time.  But at the end of the

:36AM 25 day, the transactional data is largely price data.

32

1        Now, the defendants have always given us
2    their production data and so we'll incorporate that
3    into the analysis.  And ultimately --
4        THE COURT:  Incidentally, are there public
5    databases on this?
6        MR. DUNCAN:  Excuse me?
7        THE COURT:  Are there public databases on
8    this?
9        MR. DUNCAN:  There are certainly third-party
10   industry consultants, that type of thing, from whom
11   you can get a lot of information about the steel
12   industry; that's sort of empirical.
13       And at the end of the day, Your Honor, what
14   economists do is, they model the industry.  They
15   model supply conditions, demand conditions, and
16   they'll look at a whole array of sources to figure
17   out how to do that.  They'll look at the price data
18   that the defendants have given us, they'll look at
19   the financial reports that the defendants have given
20   us.
21       They will do what experts do and come up with
22   a reliable analysis, a reliable way to model this
23   market and submit a model that the Court has to
24   consider.  And the defendants, presumably, will do
25   all that work on their own and submit their own

:37AM
:37AM
:37AM
:37AM
:37AM

33

1 approach.

2      And so that's where the expert work is going,

3 broadly.

4      THE COURT:  You want to say anything about

5 that?

6      MR. GERSCH:  Just briefly, Your Honor.

7      I'd say what the plaintiffs are describing is

8 some of the work that they should have been doing at

9 this point in time and the exercise of sampling, it

10 seems to us, was to figure out whether they needed

11 additional information that they couldn't generate

12 out of the data.  And I think Your Honor put your

13 finger on it, which is, what the sampling shows is

14 they'll get general statements that is not going to

15 help explain the data in a useful way.  And while

16 whoever the Court's source is may be right, that

17 there were a lot of cases in which people spend a

18 millions, 2 millions, 3 million dollars in that

19 range, the fact of the matter is, we are spending a

20 lot of money already and the question is why does

21 the steel industry need these additional costs

22 imposed on it.

23      We've gone through the sampling procedure and

24 it doesn't seem to show that those documents that

25 they're pointing to are explaining the issues that

1  the court is going to have to rely on -- I'm sorry,

2  that the Court is going to have to decide at class

3  certification.

4        MR. DUNCAN:  Well, respectively, Your Honor,

5  we think that this whole process, the motion, the

6  argument today, shows otherwise, that the other

7  things we're asking for are important, not only just

8  to our affirmative showing as stand-alone documents,

9  but to our expert work.  Our expert work doesn't

10 really commence until the experts understand the

11 industry, and that's part of what the discovery work

12 we're asking for is about.

13       One last thing, Your Honor, and it's a point

14 worth making, and that is that we are aware of no

15 case, no case, in which the largest two defendants

16 in the market produce discovery before class

17 certification on a solely unilateral basis, and

18 that's the situation here.

19       And so it makes it easy for Nucor, for

20 example, in its brief to say, our products weren't

21 impacted.  They can say whatever they want on all of

22 these issues because they haven't produced any of

23 the documents we've asked for.  They've produced

24 what they wanted the Court to see and us to see.

25       And so all of that cuts in favor, I think, of

:39AM
:39AM
:39AM
:39AM
:39AM

35

1 the discovery we're asking for.  And we think, on
2 balance, for all of the reasons we've talked about,
3 that it should go forward.
4          THE COURT:  Okay, I've listened to you.  I'm
5 going to think about it some more.
6          The only conclusion that I have reached based
7 on what I've read thus far is that the most
8 practical thing I can do is what I generally don't
9 like to do, which is to say yes or to say no. I
10 don't think I can carve this up any more.  I think
11 we're past the sampling stage.
12          I don't really know enough about the industry
13 to say you can have this and you can't have that.
14 And based on my own experience with some industries
15 that I do know, we've reached the point where that's
16 really not a viable option.
17          So I'm going to go think about it, but the
18 one tip I'm giving you is going to be yes or no.  So
19 that's where we are.
20          I'll give you something in a couple of weeks.
21 The order won't actually just say yes or no, but the
22 order will probably be no longer than a few
23 sentences.
24          MR. DUNCAN:  Thank you, Your Honor.
25          MR. GERSCH:  Thank you, Your Honor.

1          MR. BOOKER:  Thank you, Your Honor.

2          MR. QUINN:  Thank you, Your Honor.

3          MR. MAROVITZ:  Thank you, Your Honor.

4          MR. EIMER:  Thank you, Your Honor.

:07AM    5          MR. GELFAND:  Thank you, Your Honor.

6          THE COURT:   Thanks, counsel.

7

8       (Which concluded the proceedings had on

9        this date in the above entitled cause.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

\*   \*   \*   \*   \*   \*   \*   \*

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER


/s/Blanca I. Lara                              date




_____        _____

        Blanca I. Lara                         Date