**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: STEEL ANTITRUST LITIGATION | Case No. 08-cv-5214 |
| | Hon. James B. Zagel |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** | |
| *Standard Iron Works v. ArcelorMittal et al.*, **Case No. 08-cv-5214** | |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.*, **Case No. 08-cv-5371** | |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.*, **Case No. 08-cv-5633** | |
| *Alco Industries, Inc. v. ArcelorMittal, et al.*, **Case No. 08-cv-6197** | |
| *Gulf Stream Builders Supply, Inc. v. ArcelorMittal, et al.*, **Case No. 10-cv-4236** | |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
EXCLUDE THE OPINIONS OF JAMES T. MCCLAVE**

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

**RESTRICTED DOCUMENT PURSUANT TO LOCAL RULE 26.2**

**CONTAINS HIGHLY CONFIDENTIAL MATERIAL**

**FILED UNDER SEAL IN ACCORDANCE WITH
THE PROTECTIVE ORDER ENTERED MAY 25, 2010**
******************************************************

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.    INTRODUCTION ................................................................................................... 1

II.   SUMMARY OF MCCLAVE'S METHODOLOGY AND OPINIONS ........................... 3

III.  ARGUMENT .......................................................................................................... 5

      A.   Unreliable Or Irrelevant Expert Opinion Is Inadmissible Under Rule 702 ........... 5

      B.   McClave's Use Of Averages Renders His Econometric Models Unreliable
           And Incapable Of Determining Whether Each Individual Class Member
           Has Been Impacted ........................................................................................... 7

           1.   McClave's Averaging Methodology Is Unreliable Because It
                Masks Substantial Differences in Price Between the Individual
                Steel Products ........................................................................................ 10

           2.   McClave's Averaging Methodology Is Unreliable Because It
                Ignores the Varying Degrees of Bargaining Power Among Class
                Members ................................................................................................. 16

      C.   McClave's Inference That "All Or Nearly All Customers" Were Impacted
           Is Pure Speculation Devoid Of Any Scientific Methodology ............................ 19

      D.   McClave's Estimated Average Classwide Overcharges Are Equally
           Unreliable For Calculating Any Individual Class Member's Damages ............. 23

      E.   McClave's Regression Model Suffers From Methodological Defects That
           Render It Unreliable For Estimating Impact And Damages Even At The
           Aggregate Level ................................................................................................ 24

           1.   McClave's Regression Model Fails Well-Recognized Econometric
                Specification Tests ................................................................................. 25

           2.   McClave's Reliance on "The Great Recession" as a Benchmark
                Period Biases His Regression Model and Fails the Chow Test ............. 26

           3.   McClave's Model Is Biased by the Omission of Key Explanatory
                Variables and Produces Unreliable Estimates of Impact ....................... 28

           4.   McClave's Model Is Unreliable Because He Failed to Test and
                Adjust for Serial Correlation .................................................................. 31

      F.   McClave's Model Contains Computational And Data Compilation Errors
           That Render His Analyses Unreliable ................................................................ 32

IV.   CONCLUSION .................................................................................................... 36

# TABLE OF AUTHORITIES

**Federal Cases**

*Ab v. Sekendur,*
　No. 03 C 4723, 2004 WL 2434220 (N.D. Ill. Oct. 28, 2004) .......................................... 24

*Abram v. United Parcel Service of America, Inc.,*
　200 F.R.D. 424 (E.D. Wis. 2001) ..................................................................................... 9

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,*
　247 F.R.D. 156 (C.D. Cal. 2007) ......................................................................... 9, 15, 23

*American Honda Motor Co. v. Allen,*
　600 F.3d 813 (7th Cir. 2010) ..................................................................................... 6, 32

*Barber v. United Airlines, Inc.,*
　17 F. App'x 433 (7th Cir. 2001) .................................................................................... 29

*Blades v. Monsanto Co.,*
　400 F.3d 562, 570 (8th Cir. 2005) ................................................................................... 9

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,*
　152 F.3d 588 (7th Cir. 1998) ........................................................................................ 29

*Dag Enterprises, Inc. v. Exxon Mobil Corp.,*
　226 F.R.D. 95 (D.D.C. 2005) ........................................................................................ 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
　509 U.S. 579 (1993) ................................................................................... 2, 6, 19, 22

*Dhillon v. Crown Controls Corp.,*
　No. 99 C 4428, 2000 WL 420747 (N.D. Ill. Mar. 14, 2000) .......................................... 23

*EEOC v. Ethan Allen, Inc.,*
　259 F. Supp. 2d 625 (N.D. Ohio 2003) .................................................................... 25, 32

*Freeland v. AT&T Corp.,*
　238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................ 9, 15, 30

*Fuesting v. Zimmer, Inc.,*
　421 F.3d 528 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936
　(7th Cir. 2006) ........................................................................................................ 28, 32

*General Electric Co. v. Joiner,*
　522 U.S. 136 (1997) ..................................................................................................... 20

*Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*,
No. 00 C 0191, 2003 WL 1797844 (N.D. Ill. Apr. 3, 2003)............................................ 29

*In re Graphics Processing Units Antitrust Litigation*,
253 F.R.D. 478 (N.D. Cal. 2008)................................................................................... 9-11

*In re Hydrogen Peroxide Antitrust Litigation*,
552 F.3d 305 (3d Cir. 2008)................................................................................................ 1

*In re Live Concert Antitrust Litigation*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ......................................................................... 9, 30

*In re Wholesale Grocery Products Antitrust Litigation*,
No. 09-MD-2090, 2012 WL 3031085 (D. Minn. July 25, 2012) ....................................... 9

*In re Wireless Telephone Services Antitrust Litigation*,
385 F. Supp. 2d 403 (S.D.N.Y. 2005)............................................................................... 18

*Jamie S. v. Milwaukee Public Schools*,
668 F.3d 481 (7th Cir. 2012) ............................................................................................... 5

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009) ............................................................................................... 7

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005)......................................................................... 20, 23

*Messner v. Northshore University Healthsystem*,
669 F.3d 802 (7th Cir. 2012) ..................................................................................... 5-6, 10

*Proctor v. General Conference of Seventh-Day Adventists*,
651 F. Supp. 1505 (N.D. Ill. 1986) .................................................................................... 28

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)................................................................................... *passim*

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ............................................................................................... 19

*Sheehan v. Daily Racing Form, Inc.*,
104 F.3d 940 (7th Cir. 1997) ............................................................................................. 32

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ............................................... 9

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011).......................................................................................................... 5

iii

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000) ........................................................................................................... 6

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,
  395 F.3d 416 (7th Cir. 2005) .................................................................................... 19, 23

**Rules**

Federal Rule of Evidence 702 .............................................................................................. 2-3, 6

**Other Authorities**

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*
  (2005) ........................................................................................................................... 8, 28

*Reference Manual on Scientific Evidence*, Federal Judicial Center (2d ed. 2000) ............... 22, 28

James T. McClave et al., *Statistics for Business & Economics* (11th ed. 2011) ..................... 31-32

## I.    INTRODUCTION

Defendants bring this *Daubert* motion to exclude the opinions of James T.

McClave, who has been offered as an expert by plaintiffs in support of their motion for class

certification. McClave created a rudimentary and fundamentally flawed regression model from

which he claims to be able to infer that "all or virtually all" class members paid higher prices for

steel products during the class period regardless of the particular products they bought, when in

the class period they bought them, or from whom they bought them. McClave is essential to

plaintiffs' class certification motion because "[i]n antitrust cases, impact often is critically

important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is

an element of the claim that may call for individual, as opposed to common, proof." *In re*

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

According to plaintiffs, defendant steel companies supposedly encouraged each

other—largely through public speeches—to exercise restraint in their output decisions and to

reduce what plaintiffs amorphously refer to as "raw steel" by amounts that would supposedly

bring "discipline" to the industry at large. Through this encouragement, so the theory goes,

defendants were able to reach an "agreement" to reduce their output of steel products in general

by some unspecified amount and in a manner that could affect some mills or products but not

others.

One would expect that with such a vague and unusual theory of agreement,

plaintiffs would present an expert who had carefully studied the industry, the nature of the

alleged violation, how it might have affected output levels at each steel mill, how those output

levels might have cascaded down to the hundreds of different products that thousands of class

members purchased, and how those output effects might have translated into price effects over

time. Not so here. McClave did not study the alleged violation nor did he study output levels of

1

particular products or even at particular mills. Instead, he asked plaintiffs' counsel to tell him when the purported violation occurred and what products were affected. He then ran a regression using highly aggregated pricing data with a small number of explanatory variables to produce output that supposedly shows a slight increase in average prices during the plaintiffs' alleged violation period. As McClave acknowledged at his deposition, he made no effort to study any individual customer or to design a model that is capable of analyzing individual impact.

McClave's regression model and the opinions he offers based on that model do not come close to satisfying the minimum standards for admissibility of expert testimony required under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). To begin with, his model is of no assistance to the Court in deciding class certification because it neither addresses customer-level impact nor is designed to do so. Moreover, the method that McClave used to generate data points for his regression—rolling up millions of individual transactions into a small number of high-level averages and then using those averages as input to his model—has been rejected by courts time and again as an invalid method of proving impact on individual purchasers. McClave recognizes this shortcoming and therefore declares that he can tell from his model that "all or virtually all" class members were impacted, but this leap of faith is not based on science or any recognized methodology. It is simply McClave telling us to trust him. Finally, defense expert Professor Jerry Hausman, a world-renowned econometrician and economist from MIT, has assessed McClave's regression model and identified numerous flaws that render it useless. The model does not even pass basic validity tests that college statistics students are taught to use.

2

In sum, McClave's regression analyses and opinions are not the product of reliable principles and methods reliably applied to the facts of the case and should be stricken. *See* Fed. R. Evid. 702.

## II.    SUMMARY OF MCCLAVE'S METHODOLOGY AND OPINIONS

McClave breaks his regression into two pieces: one for "flat" products and one for "long" products. (Expert Report of Dr. James T. McClave, May10, 2012, at 5, attached as Ex. 3 to Pls.' Mem. of Law in Support of Direct Purchaser Pls.' Mot. for Class Certification [hereinafter "McClave Report"].) Despite having data for approximately 30 million individual transactions provided by defendants in discovery, McClave combines the many hundreds of different products sold by defendants into just 18 flat categories and 7 long categories.[1] The groupings lump together numerous products that have no functional similarity to each other and often vary in price from one product to the next by 100% or more within the same category. Based on instructions from plaintiffs' counsel, McClave purports to exclude certain steel products from his analyses.[2] (*See* Ex. 1, McClave Dep. vol. I 223:11-19, Dec. 12, 2012; McClave Report at 3.) He then aggregates all purchases of the remaining products from each defendant within each category in a given month to get an average price across all transactions within the category, and this single data point is what he used as the price input for his model.

1 The composite flat product categories are: prime flat semi-finished slabs, unprime flat semi-finished slabs, prime flat semi-finished ingot, prime flat sheet hot rolled, unprime flat sheet hot rolled, prime flat sheet cold rolled, unprime flat sheet cold rolled, prime flat sheet galvanized, unprime flat sheet galvanized, prime flat sheet other coated, unprime flat sheet other coated, prime flat plate alloy, unprime flat plate alloy, prime flat plate special, unprime flat plate special, prime flat plate standard, unprime flat plate standard, and prime flat sheet. (McClave Report at 9 n.24 & App. A.) The composite long product categories are: merchant bar, rebar, semifinished billet, semifinished bloom, structural beam, structural other, and long other. (*Id.*)
2 The excluded product categories are: stainless steel, grain-oriented electrical steel, tin mill products, clad plate, steel pipe and other tubular products, "special bar quality" products, wire rod and other wire products, grinding balls, fabricated rebar products, fabricated steel joist, decking, fence posts and other fabricated building products, welded steel blanks, and steel products purchased under toll processing agreements. (McClave Report at 3.)

3

(McClave Report at 7, 9-10; *see also* Ex. 3, McClave Dep. Ex. 11.) For example, one input in McClave's flat model is the average price of ███ different ████████ transactions involving at least ██ different products sold to ██ different customers within the "Prime Flat Sheet Cold Rolled" category for the month of ████████, with individual product weighted average prices ranging from ████████ per ton. (Ex. 4, Expert Report of Jerry A. Hausman, Feb. 27, 2013, at 14, 20 [hereinafter "Hausman Report"].)

Despite the complexity of the numerous markets in which different steel products trade, McClave's regression uses a surprisingly small number of explanatory variables in an attempt to explain variation from month to month in the average prices used in his model. He uses a single cost variable consisting of an indexed price for steel scrap, and a single demand variable consisting of an index of automobile sales and non-residential construction activity.[3] (McClave Report at 7-8.) He also uses a dummy variable for the alleged violation period identified by plaintiffs' counsel, a set of product-manufacturer dummy variables (that allows the average price to vary by product-manufacturer), and interactions of those product-manufacturer dummy variables with the scrap price (that allow the effect of the price of scrap to vary by product-manufacturer). (*Id.* at 9-10.) No other explanatory factors are included in his model.

McClave's model uses a 62-month period, which includes an alleged pre-violation period of February 2002 through March 2005 and an alleged post-conspiracy period of January 2008 through December 2009, as a benchmark. (*Id.* at 5.) He compares the average monthly prices from the benchmark period against the average prices paid during the 33 months of the alleged violation period of April 2005 through December 2007 in an attempt to estimate the amount, if any, by which the average prices during the alleged violation period were

3 The specifications of the flat and long models differ only in how construction activity and automobile sales are weighted in the measure of demand and in the data used to calculate the respective scrap indices. (McClave Report at 5, 8-9.)

elevated. (*Id.* at 6.) For flat products as a whole, McClave gets an average overcharge of 5.6%, and for long products as a whole he gets an average overcharge of 7.0%. (*Id.* at 11-12.)

By McClave's own admission, the model is incapable of distinguishing between customers that allegedly paid a price elevated by the conspiracy and those that did not. (Ex. 1, McClave Dep. vol. I 90:18-22.) Nevertheless, he asserts without support that his model "can then be applied to each class member's purchases during the damages period to produce reliable estimates of its overcharges" and that "all or virtually all class members paid higher than competitive prices." (McClave Report at 11, 13.)

## III. ARGUMENT

### A. Unreliable Or Irrelevant Expert Opinion Is Inadmissible Under Rule 702

Prior to ruling on a motion for class certification, a district court must conduct a "rigorous analysis" of Rule 23's prerequisites for certifying a class. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 593 (N.D. Ill. 2009). When an expert's report or testimony is "critical to class certification," as it is here, this rigorous analysis must include an assessment of the expert opinions offered in support of class certification and a ruling on any challenge to the admissibility of the expert's submissions. *See Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 812 (7th Cir. 2012) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010)); *see also Reed*, 268 F.R.D. at 594 ("[W]e must act as a 'gatekeeper' to ensure that expert testimony satisfies the admissibility requirements of Federal Rule of Evidence 702."). That is, the district court must perform a full *Daubert* analysis before ruling on the class certification motion. *Messner*, 669 F.3d at 812.[4]

---

4 The Supreme Court recently granted *certiorari* in *Comcast Corp. v. Behrend*, 133 S. Ct. 24 (June 25, 2012) to address the related question of "[w]hether a district court may certify a class action without

Under Rule 702 and the *Daubert* standard, expert testimony is admissible only if (1) it represents scientific, technical, or specialized knowledge from a qualified expert that will help the trier of fact; (2) it rests upon sufficient facts or data; (3) it is the product of reliable principles and methods; and (4) the witness has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993); *Reed*, 268 F.R.D. at 594. Thus, the court must "ensure that any and all" expert material "is not only relevant, but reliable." *Daubert,* 509 U.S. at 589; *Am. Honda*, 600 F.3d at 817 ("[T]he most 'supremely qualified expert cannot . . . render opinions unless those opinions are . . . reliable and relevant under . . . *Daubert*.'") (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)).

The standard for reliability is an "exacting" one. *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000). In assessing the evidentiary reliability of an expert opinion, district courts are guided by four factors: (1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or method employed is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 592-94; *Am. Honda*, 600 F.3d at 817. Other benchmarks used by courts to gauge expert reliability include "[w]hether the expert has adequately accounted for obvious alternative explanations" and "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Am. Honda*, 600 F. 3d at 817 (quoting Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.)). The party offering expert testimony bears the burden of establishing, by a preponderance of the evidence, that the proffered testimony satisfies these requirements. *See Messner*, 669 F.3d at 811-12;

---

resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) ("The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard.").

**B.  McClave's Use Of Averages Renders His Econometric Models Unreliable And Incapable Of Determining Whether Each Individual Class Member Has Been Impacted**

As McClave acknowledges, in constructing his model, he averaged pricing data from nearly 30 million separate steel transactions into only 4,859 observations for flat steel and 1,883 observations for long steel (or less than 1% of the number of actual transactions).[5] (McClave Report App. A.)  In doing so, McClave aggregated data across hundreds of heterogeneous steel products with different metallurgical properties, dimensions, end uses, and distinct price points, grouping these products into 18 categories of flat products and 7 categories of long products.  (McClave Report at 9.)  His model also averaged prices across thousands of distinct purchasers with widely varying circumstances.

This methodology is fundamentally flawed because the use of average prices in a regression analysis does not, and cannot, indicate whether any specific putative class member suffered harm from the alleged conspiracy, particularly where, as here, the prices are so varied. McClave acknowledges that his model does not and cannot examine the prices of individual products purchased by individual customers.  (Ex. 5, July 18, 2012 Hrg. Tr. 47:20-22 ("This model, Your Honor, is not done at the customer level.  It is, it is a model that's done at a more aggregated level"); Ex. 1, McClave Dep. vol. I 156:2-8 ("[I]f you're going to run a separate model for that particular product, that's beyond what I did here, and I wouldn't necessarily

---

5 An "observation" is the average price for one defendant's sales in one product category during a specific month (*i.e.*, one defendant/product category/month grouping).  In other words, the average price of all ArcelorMittal transactions involving products within the "Prime Flat Sheet Cold Rolled" category for August 2006 represents one "observation" in McClave's model.

expect the same specification to produce the same results. You're now looking at a particular product as instead of a group of products.").) He readily concedes that his model is incapable of showing which customers were impacted and which were not. (Ex. 5, July 18, 2012 Hrg. Tr. 49:7-13 ("So trying to apply this model . . . at the customer level, I think is not a correct use of the model. . . . This model was not designed to do that."); Ex. 1, McClave Dep. vol. I 203:22-204:5 ("Q: We can't use your model to look at whether individual customers were overcharged by looking at your transaction data and your model's predictions of a but-for price? A: I don't believe those estimates would be meaningful and reliable. I think that's a different question answered by a different model.").)[6] The average results that he obtains, by definition, mask huge differences among class members.

      The American Bar Association has cautioned against the use of averages in these circumstances:

> Sometimes the prices used by economists are averages of a number of different prices charged to different customers or for somewhat different products. Using such averages can lead to serious analytical problems. For example, averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact. In addition, average prices may combine the prices of different package sizes of the same product or of somewhat different products. When this happens, the average price paid by a customer can change when the mix of products that the customer buys changes—even if the price of no single product changed.

Ex. 25, ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* 220 (2005). One court illustrated the perils of relying on this kind of aggregated data in statistical analysis as follows: "If Microsoft-founder Bill Gates and nine monks are together in a

---

6 *See also* Ex. 2, McClave Dep. vol. II 51:15-24 ("Q: . . . If there were a set of customers who demonstrably were not impacted, we could just show through outside evidence they clearly were not impacted, . . . your model as it's currently constructed is not able to drill down and determine that, right? A: That's correct."); Ex. 1, McClave Dep. vol. I 90:20-23 ("In my view, if you attempted to use my model to estimate a specific price for a specific customer, you would be going beyond what this model was specified to do."); Ex. 1, McClave Dep. vol. I 109:18-20 ("this does not answer a question about what customer X would have paid [but for the alleged conspiracy].").

room, it is accurate to say that on average the people in the room are *extremely* well-to-do, but this kind of aggregate analysis obscures the fact that 90% of the people in the room have taken a vow of poverty." *Abram v. United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424, 431 (E.D. Wis. 2001) (rejecting a regression methodology based on average salaries in a discrimination suit). For these very reasons, courts in this Circuit and elsewhere have rejected statistical analyses that use average prices of diverse products as unreliable and not relevant to the question of antitrust impact on individual class members. *See, e.g.*, *Reed*, 268 F.R.D. at 592-93; *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 496-97 (N.D. Cal. 2008) [hereinafter "*GPU*"].[7]

In *Reed*, plaintiff nurses filed a class action alleging that defendant hospitals conspired to suppress the wages of their nursing employees. This Court denied class certification where plaintiffs' expert relied on a regression model based on the average wage of nurses to calculate "a single estimated average percentage of suppression to be applied to all nurses in the class." *Reed*, 268 F.R.D. at 590-91. Judge Grady deemed this methodology inadmissible because "[m]easuring average base wage suppression does not indicate whether

---

7 *See also Blades v. Monsanto Co.*, 400 F.3d 562, 570, 573 (8th Cir. 2005) (holding that expert evidence "suggesting that [defendants] adhered to a price-fixing agreement that raised the average price of [genetically modified] seeds" was insufficient to show common impact where the seeds were not homogeneous and prices varied widely); *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090, 2012 WL 3031085, at *13 (D. Minn. July 25, 2012) (rejecting the expert's "benchmarking" analysis because the fact that "profits may have increased on *average*, does not mean that monopolist profits were extracted from each class member"); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974-75 (C.D. Cal. 2012) (rejecting the expert's methodology comparing average rock concert ticket prices sold by defendants to those of other promoters because the analysis failed to account for variation in artist quality/popularity); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at *30-31 (E.D. Pa. Sept. 30, 2010) (finding that "plaintiffs' methodology is insufficient because the calculations were made using *average* prices" where there were "substantial variations" in the prices paid, timing of purchases, and individual characteristics of the customers); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 169-70 (C.D. Cal. 2007) (rejecting methodology relying on averages because the products were heterogeneous with different features and prices varied substantially from $10 to $275); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 150-51 (S.D.N.Y. 2006) (rejecting a methodology based on the alleged average overcharge of the price of cellular phones which did not account for product variation such as cellular phone quality).

9

each putative class member suffered harm from the alleged conspiracy." *Id.* at 591, 594. The

Court found that the expert's use of averages "unacceptably masks the significant variation in

[nurse] base wages during the Class Period." *Id.* at 592. Because the expert's regression did not

control for "all of the wide variance in [nurse] base wages," this Court concluded that the expert

had failed to apply econometric principles and methods reliably to the facts of the case.[8] *Id.* at

591-92.

Likewise, the court in *GPU* found that by resorting to averaging in his analysis of

the prices of graphic cards, plaintiffs' expert:

> evaded the very burden that he was supposed to shoulder -- *i.e.*, that there is a
> common methodology to measure impact across individual products and specific
> direct purchasers. His report says little about how specific product pricing was
> correlated across buyers or whether prices paid for multiple products by particular
> direct purchasers were correlated. If data points are lumped together and
> averaged before the analysis, the averaging compromises the ability to tease
> meaningful relationships out of the data.

*GPU*, 253 F.R.D. at 493. In holding that plaintiffs' expert had failed to offer a viable

methodology for showing classwide impact, the court noted that the expert's analysis was "filled

with broad categories that each includes highly varying products and purchasers" and concluded

that "[i]t simply cannot be ignored that the products at issue are highly diverse and were sold to a

number of direct purchasers." *Id.* at 494, 497.

        1.     McClave's Averaging Methodology Is Unreliable Because It Masks
                Substantial Differences in Price Between the Individual Steel Products

Here, like in *Reed* and *GPU*, McClave's model uses averages that impermissibly

"glide over" the substantial variation in the steel products, pricing, and customers involved in the

---

8 Although the Court found that the expert's analysis failed to satisfy Rule 702, the Court ultimately
denied the motion for class certification based "on the substance of Dr. Rausser's analysis and not merely
on the question of whether it passes muster under *Daubert*" to avoid the necessity of a remand if the
Court of Appeals viewed the expert's analysis admissible. *Reed*, 268 F.R.D. at 594. The Seventh Circuit
has since held that a district court must rule on all challenges to experts whose opinions are "critical" to
class certification. *Messner*, 669 F.3d at 812 (quoting *Am. Honda*, 600 F.3d at 815-16).

millions of transactions that he aggregates together. *See id.* at 494. Each of the 25 broad

categories used in McClave's regressions includes numerous different steel products that have

distinct metallurgical properties, unrelated and non-interchangeable end uses, different demand

drivers, and widely-ranging price points. (Ex. 6, Expert Report of Kent D. Peaslee, P.E. Ph.D.,

Feb. 26, 2013, at 4 [hereinafter "Peaslee Report"]; Ex. 7, Nolan Aff. ¶¶ 27, 91-93, Feb. 26,

2013.) By way of illustration:

- The "Prime Flat Sheet Galvanized" category for defendant ███████ alone combines 50 disparate product names ranging from ██████████████a lower grade, lower value galvanized steel product used to make, among other things, studs for wall construction, to ███████████████ a painted sheet often used in appliances like dishwashers and refrigerators. An exemplar "observation" for this product category reveals that for ██████████ sales in ███████████ McClave averaged prices across ████ transactions, ████ individual customers, and at least ██ distinct products with weighted average monthly prices varying from ████████████████. (Ex. 4, Hausman Report at 14, 53.)

- The "Prime Flat Sheet Cold Rolled" category includes products ranging from "high strength continuous anneal baked hardenable coils" used in automobile applications, to enameling sheet products used to make scratch-, abrasion-, corrosion-, and heat-resistant stovetops, oven cavities, washing machine baskets, bathtubs and hot water heaters, to motor lamination sheet products used to make electrical motors that go into home heating furnaces and cooling fans. (███████ ████████ Aff. ¶ 4, Feb. 27, 2013.) An example of one "observation" for this product category reveals that for defendant ████████████ sales McClave averaged prices across █████ transactions, ████ customers, and at least ██ different cold rolled products with weighted average monthly prices ranging from ████████████. (Ex. 4, Hausman Report at 14, 20.) Over the entire time period analyzed by McClave, this particular product category encompassed over ██ different cold rolled product names (with ██████████ different variations in grades, sizes, and treatments).

- The "Long Structural Other" category—one of several of McClave's self-described "catchall" groups[9]—lumped together more than ████ distinct products sold by defendant ████████████ alone ranging from a ████████ channel product commonly used in a variety of construction applications to ████████████████ which is a special I-beam product produced for a single forklift manufacturer using the customer's proprietary chemistry. (*See* ████ ████████ Aff. ¶ 72.) One example "observation" for this product category reveals that for ████████ sales in ████████ McClave averaged prices across ████

---

9 Ex. 2, McClave Dep. vol. II 121:17-124:12.

transactions, ███ customers, and ███ different long products with weighted average monthly prices ranging from ███████████████████████. (Ex. 4, Hausman Report at 13, 53.) McClave acknowledged that there were no principles brought to bear in grouping the products in this category together "other than this was a catchall category." (Ex. 1, McClave Dep. vol. I 34:8-35:14.)

Tellingly, McClave could cite no academic authority or literature establishing that averaging across such diverse products is appropriate. (*See* Ex. 1, McClave Dep. vol. I 27:14-28:9, 181:6-182:21; Ex. 2, McClave Dep. vol. II 46:8-18.) Neither could he explain the methodology used to arrive at his 25 categories nor could he identify the specific information that supported those groupings. (Ex. 1, McClave Dep. vol. I 39:11-43:24.) In fact, McClave conceded during his deposition that he knows nothing about the individual steel products that he lumps together. (*See* Ex. 2, McClave Dep. vol. II 73:3-20 ("Q: Looking at this list -- there are about 85 products here -- are you familiar with any of these products? Can you tell us what any of these products are or what they're used for? A: No."); Ex. 1, McClave Dep. vol. I 47:21-48:5 ("Q: Do you know what these different products are that are listed in Exhibit 5? If I asked you what number 31 with a A572-50.06 max SI plate was, would you have any idea what those individual products are? A: I would not, other than it appears to be a plate from the name. Other than that, I don't know.").) He also has no understanding of the different demand drivers for these products. (*See* Ex. 1, McClave Dep. vol. I 50:6-17 ("Q: Do you think the steel product that's listed on line 32, which is a plate product called ████████████████ and had an average price over your study period of ██████, do you think that is trading in the same product market as the item on 106, which is plate ███████████████ with an average price of ██████? A: Without more, I don't know. Q: Do you know if these two products have similar demand features? A: I don't know.").)

12

For that matter, McClave did not even bother to speak with any steel producer, steel customer, steel service center or even the plaintiffs themselves about the steel products or customer markets at issue in this case. (Ex. 2, McClave Dep. vol. II 146:7-16 ("Q: Did you talk to any of the named Plaintiffs to learn about their business? A: I have not. Q: Have you talked to any steel customers? A: I have not. Q: Did you talk to any steel producers? A: No. Q: Any steel service center? A: No.").) Had he spoken to named plaintiffs, he would have learned that the products they purchase are not substitutable and trade in different markets. (*See, e.g.*, Ex. 9, Dennebaum Dep. [Standard Iron Works] 139:8-10, Oct. 16, 2012 ("You can't substitute A36 for grade 50 because it's not as strong."); *id.* at 141:13-17 (noting that grade 588 steel could not be substituted for other grades "[b]ecause it has a specific purpose"); Ex. 10, Neary Dep. [Wilmington Steel] 95:21-96:9, Nov. 6, 2012 (stating that the specification of the steel is important to the ultimate end use and that Max 33 carbon steel could not be substituted when structural grade material was required).)[10]

Without any understanding of the differences in the steel products that he purports to analyze, McClave has failed to apply his methodology reliably to the facts of this case. He simply chooses to ignore them. But by disregarding the divergent characteristics of the distinct steel products that he aggregates and using averages across broad product groupings, McClave "unacceptably masks" the very variations in price between individual products that he was supposed to be studying to determine whether there is a common methodology to measure impact across particular products and specific direct purchasers. *See Reed*, 268 F.R.D. at 592.

---

10 Even plaintiffs' other proffered expert, Professor John L. Solow, acknowledged in his deposition that there are metallurgical differences that are important to customers and that some steel products have different demand drivers and should be viewed as trading in different product markets. (Ex. 11, Solow Dep. 25:22-26:8,76:11-78:17, 83:10-19, 98:8-21, Nov. 16, 2012.)

One of the glaring problems created by McClave's averaging of prices across such disparate products is that it does not account for changes in product mix over time. (*See* Ex. 4, Hausman Report at 15.) For instance, where a product category contains a more expensive steel product and a less expensive one, the average price for that product category could increase simply because the mix of products purchased by customers shifted in favor of the expensive product over time—even if the prices for every one of the individual products stayed exactly the same. (*See id.* at 15-16.) As demonstrated by the examples above and in Professor Hausman's report, the prices of the individual products within McClave's broad categories vary substantially relative to each other. (*See id.* at 13-15.) In addition, the relative volume of sales of various products within McClave's product categories markedly fluctuated during the time period studied in the model, reflecting the fact that these diverse products were responding to very different demand and cost factors. (*Id.* at 16 (showing that █████ sales in McClave's "Prime Standard Plate" category included █████ different products during the pre-conspiracy period but the product mix shifted and its sales in that same category consisted of █████ of those products during the alleged conspiracy period).) McClave even testified at his deposition that he "would certainly . . . expect"—especially in his "catchall" categories—that there would be a change in product mix in at least some of his categorizations over the 2002-2009 time period. (Ex. 1, McClave Dep. vol. I 59:14-20 ("I don't recall any specifics, but I would be surprised if there *weren't* some changes in the mix") (emphasis added).)

Nonetheless, McClave proceeded to group the heterogeneous steel products into broad categories and failed to account for changes in product mix in any manner. His regression model is incapable of distinguishing mere shifts in the assortment of products purchased by customers from actual increases in prices and will incorrectly treat the increased average price as

14

an overcharge attributable to the alleged conspiracy instead of a legitimate increase in demand for the more expensive product. In the example cited in Professor Hausman's report, McClave compares ▇▇▇▇ sales of "Prime Standard Plate" in the alleged pre-conspiracy period, which consisted of ▇▇ products with a collective weighted average price of ▇▇, to ▇▇ ▇▇ sales in that same product category during the alleged conspiracy period, which consisted of ▇▇▇▇▇▇ products with a weighted average price of ▇▇. McClave's model erroneously treats this increase in the average price of the category between the two periods as an overcharge resulting from the alleged conspiracy when in reality the change in average price resulted from the simple shift in the mix of products purchased by customers within that category. In fact, the weighted average price for ▇▇▇▇▇ within the Prime Standard Plate category purchased from ▇▇▇ during both periods started at ▇▇ in the pre-conspiracy period and actually *decreased* by ▇▇▇ during the alleged class period, illustrating that McClave's use of averaging yields an incorrect and unreliable result. (Ex. 4, Hausman Report at 16.)

Under similar circumstances, courts have found models with these types of flaws to be inadmissible. *See, e.g., Allied Orthopedic Appliances*, 247 F.R.D. at 169-70, 176-77 (rejecting methodology relying on averages because the products were heterogeneous with different features, prices varied from $10 to $275, and expert failed to account for this variation and could not show that every purchaser was impacted); *Freeland*, 238 F.R.D. at 150-51 (holding that expert's regression model using an average price of all telephone handsets as the dependent variable was inappropriate as a classwide method for demonstrating injury because "the increase in average handset price might reflect the fact that more customers are freely

15

choosing to purchase more sophisticated (and therefore more expensive) types of phones rather than an across-the-board increase in prices.").

   2.    McClave's Averaging Methodology Is Unreliable Because It Ignores the Varying Degrees of Bargaining Power Among Class Members

Not only has McClave inappropriately averaged prices across disparate products, he also averages prices across different customers buying the same product and improperly ignores significant distinctions between these purchasers and the prices they pay. The transactional datasets produced by defendants contain approximately 30,000 different customer names. (Ex. 1, McClave Dep. vol. I 11:5-9.) Like the products they buy, these putative class members are incredibly diverse, ranging from massive Fortune 500 corporations, such as General Motors and Whirlpool, that purchase millions of dollars of different types of steel products annually from multiple defendants—to employee-owned companies like named plaintiff Alco Industries (parent of The John Wood Company) that purchases 20 tons of one or two types of steel a few times per year from only those suppliers located within a 200 mile radius of its business[11]—and everything in between.

Not surprisingly, differences in customer attributes such as size, location, and strategic importance affect the prices they pay for steel products. (*See* Ex. 4, Hausman Report at 18-20.) The bargaining power of these differently situated purchasers varies drastically. Customers with a more limited geographic supplier base area may have fewer options for playing alternative suppliers off each other and credibly threatening to take their business elsewhere. Volume discounts offered to a large customer with millions of dollars in steel product purchases may not be available to a small customer buying only 20 tons per year. (*See id.* at 18.) A producer of high quality exterior sheet for automobiles would find it difficult to replace General

---

11 Ex. 12, Fix Dep. [Alco Industries] 183:18-184:7, 189:4-21, 268:13-269:14, 278:2-4, Oct. 25, 2012.

Motors' substantial and consistent demand with another customer so that these large, regular customers have considerable leverage with which to negotiate lower prices compared to more sporadic customers. (*Id.* at 9, 18.) Both McClave and Solow confirm this reality and concede that large customers typically receive lower prices. (Ex. 1, McClave Dep. vol. I 318:15-20; Ex. 2, McClave Dep. vol. II 30:20-31:3 ("in my view, . . . the prices for those [large transaction] customers tend to be lower than for the small transaction customers"); Ex. 11, Solow Dep. 260:9-261:10 (although he has not studied the question in this case, "it would not surprise [him] to find" that large buyers receive favorable pricing).)

The underlying transactional data used by McClave demonstrates that class members in fact paid a wide range of prices even when purchasing the same specific product. (*See* Ex. 4, Hausman Report at 18-20.) For example, within McClave's "Long Structural Other" category discussed above, in ███████ putative class members ████████████████ paid ███████████ an average monthly price of ██████ per ton for ███████████████████ ████ while ████████████████ paid just ████ per ton for that same product. (*Id.* at 18-19.) Similarly, within the Prime Flat Sheet Galvanized category, in ███████████████████ ███████████ paid ████████████████ an average monthly price of ██████ per ton for ███████████████████ while ███████████ paid only ████ per ton for that product. (*Id.* at 19, 55.) Notably, McClave's model ascribes an average price of ██████ per ton to this category. Just like the example of Bill Gates in a room with 9 monks, it makes no sense to average these customers together.

Although McClave agrees that there might be some circumstances that are specific to a customer that may affect the price paid, his model does not take into account any customer-specific characteristics and he did not even bother to test for customer heterogeneity.

17

(*See* Ex. 1, McClave Dep. vol. I 316:3-317:8 (confirming that, beyond the size of the transaction, "there is nothing explicit in the model that would capture those [other characteristics]"); *id.* at 120:21-121:8 (confirming that he "[does not] recall any specific tests" conducted outside the model to test for customer heterogeneity).) Indeed, he admits that such heterogeneity might mean that some class members were not injured. (*Id.* at 125:2-11 ("Q: Do you think there might be some circumstances that are specific to a customer or to the products that the customer buys that causes the price to not be elevated not withstanding [sic] the findings of your model that all or nearly all customers are impacted? A: I wouldn't rule that out.").)

Professor Hausman conducted several straight-forward econometric exercises that examine McClave's regression model using the underlying customer level data. (Ex. 4, Hausman Report at 58-65.) These analyses confirm that there is "substantial heterogeneity across customers" that is completely obscured by the design of McClave's model. (*Id.* at 57.) For example, it is clear that "power-buyers" ████████████████ paid *below* what even McClave would consider the "but for price" with his flawed methodology. (*Id.* at 57, 59.)

Given the diversity of products and purchasers, McClave's averaging methodology presents an unreliable picture that masks the significant difference in prices actually paid by heterogeneous customers and cannot reliably determine impact with respect to each individual customer in the proposed class. Even as to standard econometric methodologies such as regression analyses, Rule 702 requires the exclusion of expert testimony where, as here, those methods have not been reliably applied to the specific facts at issue. *See, e.g.*, *In re Wireless Telephone Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427-29 (S.D.N.Y. 2005) (rejecting under *Daubert* a regression analysis directed at determining price inflation in the

18

market for portable telephone handsets where the expert relied on improper underlying data and "fail[ed] to consider 'the varying business practices, and business results' of each defendant").

### C.  McClave's Inference That "All Or Nearly All Customers" Were Impacted Is Pure Speculation Devoid Of Any Scientific Methodology

Relying on nothing more than his estimates of the aggregate average overcharge to the class *as a whole*, McClave next takes an enormous and unsubstantiated leap to the conclusion that "all or virtually all class members paid higher than competitive prices" as a result of the alleged conspiracy. (McClave Report at 13; *see also id.* at 3 (opining that "a common methodology exists that can show on a class-wide basis that all or nearly all class members were impacted").) Although he readily concedes that his model is not conducted at the individual customer level, McClave maintains that this is "a reasonable inference" based on the overall "robustness" of his aggregated regression analyses. (Ex. 1, McClave Dep. vol. I 90:1-23; Ex. 5, July 18 Hrg. Tr. 45:3-8; *see also* Ex. 2, McClave Dep. vol. II 18:9-36:20, 51:15-24; Ex. 1, McClave Dep. vol. I 167:23-168:15.) Instead of conducting any type of careful statistical analysis to test his inference, McClave simply opted to rely on his "expertise and experience" to assume that "all or nearly all" purchasers were impacted by the defendants' alleged supply cuts. (Ex. 2, McClave Dep. vol. II 36:4-12.)

To assist the court in evaluating the class certification issues in controversy, however, an expert must present more than mere conclusions and *ipse dixit*—he must provide reliable and reasoned methods for having arrived at those conclusions. *Daubert*, 509 U.S. at 589, 595. "An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("[E]xpressing what may be an insightful . . . hunch" is not sufficient if

it "lacks scientific rigor."). Without such proof, there is "simply too great an analytical gap between the data and the opinion proffered." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 818 (N.D. Ill. 2005) (Cole, M.J.) ("An expert's opinion full of assertion but empty of reasons has no value and is devoid of persuasiveness and legal significance.").

Here, McClave cannot point to any objective evidence or scientific methodology used to validate or buttress his "all or virtually all" inference. At his deposition, McClave admitted that he has made no effort to quantify the number of customers actually impacted or to test the validity of his inference. (Ex. 2, McClave Dep. vol. II 16:20-17:4 ("I don't have a quantification in mind at this point").) He could not even provide an approximate range for the percentage of class members or transactions supposedly impacted. (*Id.* at 35:17-19 ("I haven't made an estimate of what the percentage is at this point"); *id.* at 17:8-12 (Q: You can't say whether over 90 percent of the customers were impacted based on your modeling results? A: I wouldn't way [sic] to say that without going to the customer level, no."); *id.* at 17:13-19 ("Q: Can you say that over 80 percent of the customers were impacted? A: . . . I have not modeled at that level, so I don't know at this point."); *id.* at 59:3-11 (Q: So you can't say whether 60 percent of transactions were likely affected or 70 percent of transactions? . . . A: This model cannot answer that question.").) Neither has he attempted to estimate a confidence interval nor has he calculated a "p-value" (*i.e.*, the probability the inference is incorrect) to test the strength and validity of his inference. (Ex. 2, McClave Dep. vol. II 35:10-36:3.)[12]

---

[12] McClave explained that "[t]o become a statistical estimate, one would have to drill down to the customer level," which he repeatedly confirmed his models cannot do. (Ex. 2, McClave Dep. vol. II 36:1-3.) In fact, he cannot even rule out the possibility that some of the named plaintiffs may not have paid an overcharge on the steel products they purchased nor has he bothered to study this question. (Ex. 1, McClave Dep. vol. I 122:1-123:16.)

The only specific statistical measure identified by McClave during his deposition in support of his "all or virtually all" inference was the "r-squared" values of his model, which he claims "account for so much of the variability and [sic] price over time."[13] (Ex. 1, McClave Dep. vol. I 90:1-14, 104:15-119:18.) But he concedes that the r-squared values only address the variability of the monthly aggregate average prices for the broad product groupings used in his model, not the variability of the roughly 30 million individual transactions and thousands of different customers that roll up into those mean observations. (*Id.* at 25:6-26-12.) And contrary to his current position, in a different litigation in which he put forward a model based on specific transaction level data by individual customer, McClave previously testified:

> I think the fact that we looked at specific -- so many specific transactions by customers is -- would -- would probably -- if you're talking about predictive ability being reflected as R-square, which is only a partial – a partial measure, one measure, I would think that the fact that we use such a fine definition of a transaction is one of the reasons for a lower R score. Had we done more aggregation, it would -- that would likely increase the – the R-square, but not necessarily the reliability of the model. . . . R-square and reliability of the model for testing the hypothesis at issue is not necessarily a perfect fit.

Dep. of James T. McClave 557:11-24, December 15, 2005, *In re Sulfuric Acid Antitrust Litig.*, MDL-1536, No. 03 C 4576 (N.D. Ill. June 30, 2011), ECF No. 672-10, 2011 WL 8202150, at 157.

In addition, McClave's reliance on "the overall fit" and statistical properties of his model to support his "all or virtually all" inference is not based on accepted econometric principles. (*See* Ex. 4, Hausman Report at 66-68.) As explained by Professor Hausman, all of McClave's regression output, including the parameter estimates and r-squared values, are mathematical functions of his "weighted average" prices, not the underlying customer prices

---

13 McClave describes the r-squared value as the percentage of the variability in the dependent variable that is accounted for by the variables on the right hand side of the regression equation. (McClave Report at 10 n.27.)

they are based upon. Because these inputs into the model are uninformative about heterogeneity across customers, so too is McClave's regression output. (*Id.* at 67.) This is because a scenario in which all customers paid a uniform overcharge and a scenario in which half of the customers paid a more significant overcharge while the other customers were unaffected by the conspiracy can yield data sets of "weighted average" prices that are identical. Therefore, the regression estimates and r-squared values will also be identical. (*See id.* at 67-68.) Thus, McClave's reliance on the r-squared values or any other statistical properties of his aggregated regression analyses is misplaced.

During his deposition in this case, McClave also made vague references to "other robustness checks" that he conducted, which also give him confidence that "all or nearly all" customers were impacted. (Ex. 2, McClave Dep. vol. II 18:3-8.) He described these checks as "the iterative process leading up to the model that I ultimately relied on." (*Id.* at 18:9-19:1.) Notably, there is no description of this iterative process in his report. And when asked at deposition, McClave could not remember the specific analyses conducted or the exact results or coefficients generated. (*Id.* at 22:3-23:8.) He explained that he has no record of the steps taken or the output produced for these model runs because "[he] was just doing an interactive mode on the computer." (*Id.* at 18:9-23:8.) Analyses, such as these, that cannot be reproduced by others in order to validate their conclusions are neither reliable nor admissible. *See Daubert*, 509 U.S. at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."); Ex. 26, David H. Kaye & David A. Freeman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, Federal Judicial Center 102 (2d ed. 2000) ("In science, 'reliability' refers to reproducibility of results.").

Ultimately, McClave testified that he was simply relying on "the expertise and experience that [he'd] had to draw the kind of [inferences] that [he] did." (Ex. 2, McClave Dep. vol. II 36:4-12.) McClave's conclusion thus essentially rests on his assurances of "trust me, I'm an expert" instead of actual statistical analysis. It is well-established, however, that expert opinions grounded simply on the expert's say-so or unsupported, subjective belief are inadmissible. *See Zenith Elecs.*, 395 F.3d at 419-20 (excluding plaintiff's proffered expert testimony concerning lost profits as unreliable where expert invoked "my expertise" to support his conclusions because "[r]eliable inferences depend on more than say-so"); *Loeffel Steel*, 387 F. Supp. 2d at 814 ("It cannot be too often repeated or too strongly emphasized that 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" ); *Dhillon v. Crown Controls Corp.*, No. 99 C 4428, 2000 WL 420747, at *2 (N.D. Ill. Mar. 14, 2000) ("[T]he district court must exclude that testimony which amounts to merely 'subjective belief or unsupported speculation.'").

### D. McClave's Estimated Average Classwide Overcharges Are Equally Unreliable For Calculating Any Individual Class Member's Damages

McClave claims that the two estimated average classwide overcharge figures calculated by his regression model—*i.e.*, 5.6% for all flat products and 7.0% for all long products—"can then be applied to each class member's purchases during the damages period to produce reliable estimates of its overcharges." (McClave Report at 11.) But the very same problems with using McClave's aggregated regression model to show antitrust impact apply to its use for the calculation of any individual class member's damages. *See Reed*, 268 F.R.D. at 594-95; *Allied Orthopedic Appliances*, 247 F.R.D. at 176. Once again, McClave's reliance on averages renders his opinions unreliable.

23

As discussed above, differences in customer buying power give rise to significant variation in the prices paid by putative class members, even for the exact same products. The same highly individualized factors affecting the common impact analysis complicate the calculation of damages for individual class members.

McClave conceded this point when he informed the Court in July that "[o]bviously, or maybe it's not so obvious, I certainly wouldn't assert that every customer or every product, and so on, had exactly that number or that percentage overcharge." (Ex. 5, July 18, 2012 Hrg. Tr. 44:20-23.) He repeatedly confirmed during his deposition that just because his model estimates an overall classwide overcharge of 5.6% does not mean that every flat customer's prices were elevated by that exact amount. (*See, e.g.*, Ex. 1, McClave Dep. vol. I 169:17-19.) These statements belie the proposed mathematical computation described in McClave's report. Such inconsistencies between McClave's report and his testimony confirm that his methodology for calculating damages is patently unreliable. *Ab v. Sekendur*, No. 03 C 4723, 2004 WL 2434220, at *6 n.8 (N.D. Ill. Oct. 28, 2004) (finding expert testimony to be unreliable where, among other reasons, the conclusions in the expert's declaration and report contradicted the expert's prior testimony); *see also Dag Enterprises, Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 99-102, 112 (D.D.C. 2005) (criticizing McClave for repeatedly altering his position throughout the litigation). Accordingly, McClave's opinion on the existence of a common method to prove damages should be stricken as inadmissible.

E.    **McClave's Regression Model Suffers From Methodological Defects That Render It Unreliable For Estimating Impact And Damages Even At The Aggregate Level**

McClave's regression model suffers from several fundamental econometric defects that make it unreliable even for estimating the "average" effect of the alleged conspiracy. Specifically, McClave erroneously: (1) failed to apply well-recognized econometrics tests to

24

evaluate the robustness of his model; (2) relied on an improper benchmark period; (3) omitted

significant relevant explanatory variables; and (4) failed to adjust for serial correlation in the

model's error terms. Professor Hausman's report provides empirical evidence that these flaws

cause McClave's regression model to produce "biased and inconsistent estimates of the 'average'

conspiracy effect." (Ex. 4, Hausman Report at 50.) When Professor Hausman adjusts for these

basic econometric mistakes, he finds that McClave's model estimates average damages

approaching zero, evidencing the model's bias toward finding a positive average effect from the

alleged conspiracy even where none occurred. Each of these econometric errors independently

undermines the reliability of the model and serves as a distinct basis for the exclusion of

McClave's report and opinions. *See EEOC v. Ethan Allen, Inc.*, 259 F. Supp. 2d 625, 634 (N.D.

Ohio 2003) ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony

inadmissible. This is true whether the step completely changes a reliable methodology or merely

misapplies that methodology.") (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d

Cir. 1994)).

        1.     McClave's Regression Model Fails Well-Recognized Econometric
             Specification Tests

      McClave's regression model is incorrectly specified and yields biased and

inconsistent estimates. As Professor Hausman explains, for a model to be correctly specified, the

error term must be uncorrelated with the explanatory variables. (Ex. 4, Hausman Report at 69.)

Standard specification tests exist to evaluate whether a statistical model reliably corresponds to

the data, the most widely used of which is the Hausman Specification Test, developed by

Professor Hausman in 1978 and reported in most econometric textbooks. (*Id.*; Ex. 2, McClave

Dep. vol. II 96:3-17.)

McClave agrees that "[f]or unbiasedness, we need the error term to be uncorrelated with the explanatory variables" and that if a model fails the Hausman Specification Test, that model has "issues." (Ex. 1, McClave Dep. vol. I 248:20-22; Ex. 2, McClave Dep. vol. II 102:1-17.) But he did not bother to apply this or any other similar specification test to the regression model proffered in this case and merely relied on his unreported, iterative process of building the model. (Ex. 2, McClave Dep. vol. II 100:6-8, 103:2-104:6.)

When Professor Hausman applies his specification test to McClave's regression model, it fails. (Ex. 4, Hausman Report at 70-72.) As Professor Hausman details in his report, a correctly specified model should yield similar results whether analyzing price levels or changes in price (*i.e.*, "first differences"). Here, specifying McClave's model to explain changes in steel prices rather than the average price levels themselves results in the class coefficients decreasing drastically and becoming *negative* for both long and flat products. These substantial and highly statistically significant differences signify that McClave's model is incorrectly specified and its results unreliable. (*Id.*)

> 2. McClave's Reliance on "The Great Recession" as a Benchmark Period Biases His Regression Model and Fails the Chow Test

McClave's regression model is built on the faulty assumption that the relationships between the demand and cost variables and the price of steel remain constant throughout the entire 95-month period studied in his analyses (*i.e.*, February 2002 to December 2009). This assumption is particularly dubious given that the post-conspiracy benchmark period used by McClave includes data from the "Great Recession" period of 2008 and 2009, which represents the largest economic downturn to hit the U.S. economy since the 1930s. (Ex. 4, Hausman Report at 79.) Although McClave acknowledges that there can be macroeconomic factors that change the relationships between demand and price or between cost and price (Ex. 1,

26

McClave Dep. vol. I 216:22-217:1), he inexplicably has done nothing to test what impact reliance on the time period covering this historic economic collapse may have on the assumptions of his model and his analysis of steel pricing. (*See id.* at 217:2-8 ("Q: You don't think [the] great recession would may be[sic] a good candidate to test for that? A: Again, I haven't tested it, so, no I didn't. . . .").)[14]

It should surprise no one that starting in 2008, the "Great Recession" dramatically affected the steel industry. As Table 13 of Professor Hausman's report shows, average capacity utilization during the non-conspiracy Great Recession year of ███ was approximately ███ less than ███ levels for structural steel products, ███ less for sheet and bar, and ███ less for plate. (Ex. 4, Hausman Report at 79 & tbl.13; *see also* Ex. 7, Nolan Aff. ¶¶ 76, 86, Attach. 5.) The extensive negative impact on the steel industry and its downstream markets is further evidenced by the named plaintiffs' own experiences: Eastern States Steel, a steel service center, lost 50% of its business between 2008 and 2009 (*see* Ex. 13, Capinski Dep. [Eastern States Steel] 35:3-8, Nov. 8, 2012); Gulf Stream saw building permits decrease by 90% and its commercial construction business decrease by 80% causing this 50 year-old company to go out of business. (*See* Ex. 14, Vlassis Dep. [Gulf Stream] 31:5-36:23, Nov. 14, 2012.)

When presented with this type of macroeconomic backdrop, a standard and widely-adopted econometric test, known as the "Chow Test," can and should be applied to a regression to determine whether the model's coefficients remain constant over the entire study period or whether the effects of cost and demand variables are being "tainted" by

---

14 McClave's approach in the instant case stands in stark contrast to his May 15, 2012 expert testimony in another case in which he stressed the necessity for damages experts to consider macroeconomic conditions—specifically the "Great Recession"—when applying statistical methodologies, stating: "[w]e always take into account – I say 'we', damage experts, in my experience, including myself, take into account the macro-economic condition as well. And the country and Jacksonville were in pretty deep recession in the beginning of 2009." Ex. 15, Dep. of James T. McClave 36:24-37:5, May 15, 2012, *IMA Ponte Vedra. Ltd.* v. *Food Lion, Inc.*, No. CA09-2495 (Fla. 7th Cir. Ct. 2012) (emphasis added).

macroeconomic factors. (Ex. 4, Hausman Report at 80.) Once Professor Hausman applied the

Chow Test to McClave's regressions, the results "decisively reject" the assumption of

McClave's econometric model that the coefficients remain constant across the pre-conspiracy

and alleged post-conspiracy periods. (*Id.* at 80, 126 tbl.14.) In fact, the test shows substantial

decreases in the demand and scrap coefficients between the two periods. (*Id.* at 80.) These large

changes indicate that McClave's model "fails" the Chow Test and prove that his use of the Great

Recession period as a benchmark introduces bias in his statistical results. *See* Ex. 25, ABA

Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* 214 (2005)

("When there are substantial differences in the economic forces that determine the benchmark

product's price, the use of the benchmark may introduce biases that undermine the value of the

comparison."); *see also Proctor v. General Conference of Seventh-Day Adventists*, 651 F. Supp.

1505, 1522 (N.D. Ill. 1986) (rejecting expert economist's opinions on damages because, among

other things, he failed to account for the impact of the 1981 recession). As such, McClave has

failed to consider or account for this "obvious alternative explanation" for the pricing trends

observed in his model and his expert testimony should be excluded. *See Fuesting v. Zimmer,

Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th

Cir. 2006).

      3.    McClave's Model Is Biased by the Omission of Key Explanatory
              Variables and Produces Unreliable Estimates of Impact

      McClave also omits key explanatory variables from his regressions. As explained

in the Federal Judicial Center's Reference Manual on Scientific Evidence: "[f]ailure to include a

major explanatory variable that is correlated with the variable of interest in a regression model

may cause an included variable to be credited with an effect that actually is caused by the

excluded variable." *See* Ex. 26, Daniel L. Rubinfeld, "Reference Guide on Multiple

Regression," *Reference Manual on Scientific Evidence*, Federal Judicial Center 188 (2d ed. 2000); *see also* Ex. 4, Hausman Report at 74 (discussing omitted variables). Thus, "[s]tatistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998).

As discussed above, McClave uses a single cost variable in his model: scrap steel prices. (McClave Report at 7.) He chose scrap because "defendants themselves look to scrap costs to see where steel prices are going." (*Id.*) The steel making process, however, involves substantial amounts of natural gas, coking coal, iron ore, and other raw materials such as zinc and ferro-manganese as well. (*See* Ex. 4, Hausman Report at 75; Ex. 6, Peaslee Report at 8-13; Ex. 7, Nolan Aff. ¶¶ 87-89.)[15] In fact, some of the same company documents that McClave cites in support of his scrap variable describe these other inputs as major cost components as well.[16]



[15] Many of the documents produced by defendants in this litigation describe these inputs as significant cost components and show that the prices of these inputs increased during the alleged class period.

[16] An expert cannot simply ignore available information that might be inconvenient to his theories. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (finding district court correctly excluded expert testimony as unreliable where expert "cherry-picked the facts he considered" and ignored relevant data that did not suit his theory); *Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, No. 00 C 0191, 2003 WL 1797844, at *1-3 (N.D. Ill. Apr. 3, 2003) (excluding testimony of plaintiff's liability expert as unreliable where expert failed to familiarize himself with existing data and research).

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████ Similarly, McClave's econometric

model includes a single demand variable: an index constructed based on only automobile sales

and non-residential construction. (McClave Report at 8.) Although McClave and Solow both

acknowledge that there are many different end uses and applications for steel products, (Ex. 11,

Solow Dep. at 99:15-100:10; Ex. 1, McClave Dep. vol. I 23:20-25:6), McClave's model ignores

the significant demand for steel that arises from other industries like appliance production and oil

and gas drilling. (Ex. 2, McClave Dep. vol. II 308:8-309:11.)

When Professor Hausman adjusts McClave's model by adding explanatory

variables that capture other important steel making costs, such as iron ore, natural gas, electricity,

zinc and ferromanganese, and other demand drivers, such as appliance orders and oil-and-gas

activity, the estimated average overcharges vanish.[17] The regressions actually yield *negative*

aggregate overcharges at highly statistically significant levels. (Ex. 4, Hausman Report at 75-77,

123 tbl.10, 124 tbl.11.) In other words, the price movements that McClave's original model

attributed to the alleged conspiracy actually are related to changes in the underlying demand and

cost factors that McClave erroneously omitted from his regression analysis. By failing to take

these salient variables into account, the regressions performed by McClave are "so incomplete as

to be inadmissible as irrelevant." *Freeland*, 238 F.R.D. at 147 (excluding expert's benchmark

and regression analyses offered to prove common impact due to omission of explanatory

variables to account for the shift from analog to digital technology in the telephone industry and

advances in telephone handset quality); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at

---

17 During his deposition, McClave agreed that the approach to testing for possible omitted variable bias
used by Professor Hausman in these analyses is appropriate. (Ex. 1, McClave Dep. vol. I 231:4-232:7,
266:8-269:24; Ex. 2, McClave Dep. vol. II 103:2-18, 158:20-59:4.)

976 (excluding expert's regression analysis under Rule 702 where it failed to account for two

major variables, namely artist popularity and emergence of digital downloading, in estimating

damages caused by anticompetitive conduct in promotion of live rock concerts).

    4.  McClave's Model Is Unreliable Because He Failed to Test and Adjust for
        Serial Correlation

    Finally, McClave's regression model reflects high levels of serial correlation in its

error terms, an econometric problem that results when "error terms observed in different periods

of time are related." (Ex. 4, Hausman Report at 72.) When serial correlation (or

"autocorrelation") is present in a model, the results are potentially biased and inconsistent.[18]

Thus, it is a standard econometric practice to test and correct for serial correlation as part of

typical robustness checks. (*Id.* at 72-73.)

    Although he failed to test for this issue before serving his report in this case,

McClave acknowledged at his deposition that he has subsequently become aware that "there may

be some serial correlation in the . . . data." (Ex. 1, McClave Dep. vol. I 249:6-252:16, 279:5-

285:17.) McClave still has yet to test for it, let alone correct for it, because he does not consider

it a "priority issue." (*Id.*) Notably, the statistics textbook authored by McClave instructs:

"Rather than speculate about the presence of autocorrelation among time series residuals, we

prefer to test for it." Ex. 21, James T. McClave et al., *Statistics for Bus. & Econ.* §13.9, at 13-40

(11th ed. 2011). Thus, contrary to the tenets of Rule 702, McClave has failed to use the same

---

18 This statistical premise was confirmed by McClave:
   Q: What properties must your observable variables and error terms possess in order for
   weighted least squares to generate unbiased and consistent estimates?
   A: For unbiasedness, we need the error term to be uncorrelated with the explanatory
   variables. We need with large sample sizes, the normality assumption isn't necessary; it's
   often cited. And we need the error terms to be uncorrelated with -- with one another;
   they need to be independent. For consistency, we need to add that there are not time or
   auto correlations in the residuals as well.
(Ex. 1, McClave Dep. vol. I 248:16-249:5.)

level of professional care in conducting his statistical analyses in this litigation that he espouses to university-level economics students in his own textbook. *See Fuesting*, 421 F.3d at 534-35; *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (holding that expert testimony should be excluded if the expert is not "being as careful as he would be in his regular professional work outside his paid litigation consulting").

Professor Hausman, however, applied a standard econometric approach used to test for serial correlation to McClave's regression model and confirmed that it suffered from a large and statistically significant amount of serial correlation. (Ex. 4, Hausman Report at 73-74.) Professor Hausman found that, after correcting for the presence of serial correlation, the class coefficients for both the long and flat models are no longer statistically significant (*i.e.*, there is no effect from the alleged conspiracy on the average price of either flat or long steel products). (*Id.*) As McClave's own textbook explains: "Once strong evidence of autocorrelation has been established . . . doubt is cast on the least squares results and any inferences drawn from them." Ex. 21, McClave et al., *Statistics for Bus. & Econ.* §13.9, at 13-43 (11th ed. 2001).

## F. McClave's Model Contains Computational And Data Compilation Errors That Render His Analyses Unreliable

In addition to the conceptual flaws detailed above, McClave's model is fraught with computational and data compilation errors. Improperly executed models constructed without the same care that would be used outside of the litigation context are unreliable and should be stricken. *See Am. Honda*, 600 F.3d at 817; *see also EEOC*, 259 F. Supp. 2d at 634.

*First*, McClave failed to properly calculate the demand index used in his model and thus his model relies on incorrectly measured explanatory variables that produce nonsensical results when corrected. As explained above, McClave's model attempts to represent demand for each month in his study period using an index consisting of a weighted average of automobile

sales and non-residential construction activity values over the preceding twelve months.
(McClave Report at 8-9.) In calculating his index for 2002 (the first year of data in his sample),
however, McClave only used preceding months within 2002 rather than the requisite 2001 data.
(Ex. 4, Hausman Report at 80-81.) This data construction error generates indices with fewer
than twelve months of data through December 2002. (*Id.*) For example, for February 2002 (the
first month of data used in the model), McClave used an average of only January 2002 and
February 2002 rather than an average of February 2001 to January 2002. It is not until
December 2002 that McClave achieves an actual 12 month weighted average index. This
mistake has severe effects on the results of the flat model. When Professor Hausman reruns the
regression using a corrected 2002 index, the regressions produce a *negative* coefficient for
demand—which suggests that higher demand actually makes prices go *down*. (*Id.* at 81-82.)
These nonsensical results contradict basic economic principles and demonstrate that McClave's
methodologies and model are flawed and unreliable. Indeed, these results are inconsistent with
the "basic tenets" that McClave told the Court he used in building his model, namely "that the
variables in the model make economic sense." (Ex. 5, July 18, 2012 Hrg. Tr. 41:2-19; *see also*
McClave Report at 10 ("The demand estimate is likewise positive and statistically significant
(i.e., when demand rose, steel prices rose). Thus, the model accounts for a substantial percentage
of price variability and does so in a manner that makes both statistical and economic sense.").)

   *Second*, McClave makes a similar computational error when constructing the
three-month moving average price for his scrap index. For February 2002, he only uses January
prices for the supposed three-month average, and for March 2002, he uses only January and
February prices. Not until April 2002 does he achieve an actual three-month moving average.

33

(Ex. 4, Hausman Report at 82.) These errors are further evidence of the significant flaws in McClave's methodology that render his opinions unreliable.

*Third*, plaintiffs disclose for the first time in their motion seeking class certification that they have revised their class allegations and carved out certain categories of steel products from their original class definition, including stainless and grain oriented electrical steels, pipe, clad plate, tin, fabricated steel building products, wire rod, and special bar. Tucked into a footnote in their brief, plaintiffs state that these products are now being excluded from the class definition because they are "not fairly encompassed by Plaintiffs' theory of the case." (Mem. of Law in Support of Direct Purchaser Pls.' Mot. for Class Certification 21 n.9, ECF No. 307.)

As a threshold matter, McClave testified that he conducted no investigation or study to understand why these products were excluded while other similar products remained in the class. (Ex. 1, McClave Dep. vol. I 223:11-227:20.) He also did not attempt to conduct any type of study using the excluded products as a benchmark against which to compare the included factors or as a means to test the robustness of his model. (*Id.* at 227:21-228:7.) He failed to investigate how under plaintiffs' theory the alleged output reductions would raise the prices of all products except the now excluded products and he failed to study whether there were any other products similarly situated to the excluded products identified by plaintiffs' counsel. Given the nature of the "raw steel" conspiracy alleged, McClave's failure to test any of these products demonstrates his lack of rigor and undermines the credibility and reliability of his results.

But even having decided to exclude these products from the class definition, McClave failed to consistently and reliably remove these products and transactions from the dataset that fed into his regression model. For example, McClave purports to have excluded all

"special bar quality" ("SBQ") steel from his analysis, but the underlying dataset reveals that his model included defendant ▮▮▮▮▮▮▮, which during the class period produced SBQ almost exclusively. (Ex. 2, McClave Dep. vol. II 112:11-22; ▮▮▮▮▮ Aff. ¶ 51; *see also* Ex. 2, McClave Dep. vol. II 74:14-75:7 (admitting that he would not be surprised if tin plate products were included in his dataset for the "Flat Sheet Cold Rolled" category even though they are supposedly an excluded group).) Despite plaintiffs' recognition that these excluded products are not within the class claims (*i.e.*, were not impacted), McClave's model cannot distinguish between these "miscategorized" excluded products and the ones that were purportedly impacted by the conspiracy. These discrepancies, inconsistencies, and limitations in McClave's methodology for compiling the dataset used to create his "average" observations likewise render his models unreliable.

      *Fourth*, plaintiffs' class certification brief now also explicitly excludes from this litigation transactions which were negotiated prior to the class period at a fixed price but fulfilled during the class period. (Mem. of Law in Support of Direct Purchaser Pls.' Mot. for Class Certification 22, ECF No. 307.) McClave testified that he not only failed to exclude these transactions from his analysis but that he is not capable of identifying or removing them from the dataset. (Ex. 1, McClave Dep. vol. I 289:17-291:8.) This problem is significant due to the large amount of steel sold under fixed-price contracts. For example, documents produced during discovery demonstrate that in ▮▮▮▮▮▮ sold a substantial portion of its flat products under contracts with fixed prices and terms of ▮ months or more that had been negotiated in the latter part of ▮▮. (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████) This is true for a

number of the defendants. (██████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████) The fact that McClave's model

sweeps a large number of transactions that *could not* have been impacted by the alleged

conspiracy in with all other transactions and still finds and applies an overcharge to them

illustrates that McClave's model is completely unreliable.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion and issue an order excluding the proffered report and opinions of James T. McClave.

Dated: February 28, 2013          By:     /s/ Todd J. Ehlman
                                          Counsel for Nucor, and, for purposes of this
                                          memorandum only, on behalf of all
                                          opposing Defendants

Donna E. Patterson                        Dan K. Webb

36

David P. Gersch
Robert J. Katerberg
Ryan Z. Watts
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
202.942.5000 – Telephone
202.942.5999 – Facsimile
donna.patterson@aporter.com
david.gersch@aporter.com
ryan.watts@aporter.com
robert.katerberg@aporter.com

John B. Wyss
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
202.719.7000 – Telephone
202.719.7049 – Facsimile
jwyss@wileyrein.com

Thomas J. Frederick
Todd J. Ehlman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
312.558.5600 – Telephone
312.558.5700 – Facsimile
dwebb@winston.com
tfrederick@winston.com
tehlman@winston.com

Douglas R. Gunson
NUCOR CORPORATION
1915 Rexford Road
Charlotte, NC 28211
704.366.7000 – Telephone
704.972.1836 – Facsimile
doug.gunson@nucor.com

**_Attorneys for Nucor Corporation_**

Mark Leddy
David I. Gelfand
Patricia M. McDermott
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202.974.1500 – Telephone
202.974.1999 – Facsimile
mleddy@cgsh.com
dgelfand@cgsh.com
pmcdermott@cgsh.com

Andrew S. Marovitz
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com

**_Attorneys for ArcelorMittal S.A. and ArcelorMittal USA, LLC_**

Jonathan S. Quinn
NEAL, GERBERG & EISENBERG LLP
Two North La Salle Street, Suite 1700
Chicago, IL 60602
312.269.8000 – Telephone
312.429.3531 – Facsimile

Daniel I. Booker
Debra H. Dermody
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
412.288.3131 – Telephone

37

jquinn@ngelaw.com

412.288.3063 – Facsimile
dbooker@reedsmith.com
ddermody@reedsmith.com

Alexander Y. Thomas
REED SMITH LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, DC 20005-3317
202.414.9200 – Telephone
202.414.9299 – Facsimile
athomas@reedsmith.com

J. Michael Jarboe
THE LAW DEPARTMENT OF
UNITED STATES STEEL CORPORATION
600 Grant Street, Suite 1500
Pittsburgh, PA 15219-2880
412.433.2880 – Telephone
412.433.2811 – Facsimile
jmjarboe@uss.com

*Attorneys for United States Steel Corporation*

Nathan P. Eimer
Scott C. Solberg
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
312.660.7600 – Telephone
312.692.1718 – Facsimile
neimer@eimerstahl.com
ssolberg@eimerstahl.com
dbirk@eimerstahl.com

*Attorneys for Gerdau Ameristeel Corporation*

Joel G. Chefitz
Amanda J. Metts
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606
312.372.2000 – Telephone
312.984.7700 – Facsimile
jchefitz@mwe.com
ametts@mwe.com

Robert S. Walters
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, IN 46802
260.423.8905 – Telephone
260.423.8920 – Facsimile
rsw@barrettlaw.com

*Attorneys for Steel Dynamics, Inc.*

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603

Gregory A. Markel
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
212.504.6000 – Telephone

38

312.251.4600 – Telephone
312.251.4610 – Facsimile
jfigliulo@fslegal.com
sjones@fslegal.com

212.504.6666 – Facsimile
greg.markel@cwt.com

Charles F. Rule
Joseph J. Bial
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
202.862.2200 – Telephone
202.862.2400 – Facsimile
rick.rule@cwt.com
joseph.bial@cwt.com

*Attorneys for AK Steel Holding Corporation*

John W. Treece
Scott D. Stein
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
312.853.7000 – Telephone
312.853.7036 – Facsimile
jtreece@sidley.com
sstein@sidley.com

*Attorneys for SSAB Swedish Steel Corporation*

Joseph A. Tate
Christine C. Levin
David J. Stanoch
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215.994.2350 – Telephone
215.655.2350 – Facsimile
joseph.tate@dechert.com
christine.levin@dechert.com
david.stanoch@dechert.com

*Attorneys for Commercial Metals Company*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2013, I caused a true and correct copy of the foregoing **DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINIONS OF JAMES T. MCCLAVE** to be served via email on all counsel of record.

/s/  Todd J. Ehlman
Todd J. Ehlman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601-9703
312.558.5600 – Telephone
312.558.5700 – Facsimile
tehlman@winston.com