**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| **THIS DOCUMENT RELATES TO**<br>**ALL DIRECT PURCHASER ACTIONS:**<br><br>*Standard Iron Works v. ArcelorMittal et al.*,<br>**Case No. 08-cv-5214**<br><br>*Wilmington Steel Processing Co., Inc. v.*<br>*ArcelorMittal et al.*, **Case No. 08-cv-5371**<br><br>*Capow, Inc. d/b/a Eastern States Steel v.*<br>*ArcelorMittal et al.*, **Case No. 08-cv-5633**<br><br>*Alco Industries, Inc. v. ArcelorMittal et al.*,<br>**Case No. 08-cv-6197**<br><br>*Gulf Stream Builders Supply, Inc. v.*<br>*ArcelorMittal et al.*, **Case No. 10-cv-4236** | Hon. James B. Zagel |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**REDACTED VERSION FOR PUBLIC FILING**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................5

    A.    Steel Products ...........................................................................................5

    B.    How Steel Products Are Made ...................................................................7

    C.    Defendants ...............................................................................................10

    D.    Distinct Markets and Competition for the Sale of Steel Products .........11

        1.    Steel Products Trade in Different Markets .................................11

        2.    Competition From Non-Defendant Producers Varies by Product ............13

        3.    Purchasing Practices and Arrangements Vary Among Products and Customers ...........................................................................14

        4.    Steel Service Centers Play a Critical Role in Certain Product Markets ....................................................................................15

    E.    Alleged Production Cuts ..........................................................................15

    F.    Plaintiffs and Their Proposed Class .......................................................18

ARGUMENT .....................................................................................................................19

I.    PLAINTIFFS' BURDEN UNDER RULE 23 ........................................................19

II.    THE PROPOSED CLASS FAILS RULE 23'S PREDOMINANCE REQUIREMENT ..................................................................................................21

    A.    No Class Can Be Certified Without a Common Method of Proving Impact and Damages ..............................................................................21

    B.    Impact and Damages Are Not Common Issues in This Case ..................22

        1.    Steel Products Trade in Different Markets Requiring Different Proof .........................................................................................24

        2.    Plaintiffs' "Raw Steel" Theory is a Fallacy ..............................29

        3.    Different Purchasers of the Same Product Are Often Differently Situated ....................................................................................31

        4.    Purchasers Would Be Differently Affected by the Alleged Conspiracy Depending On When They Purchased ...................32

    C.    Plaintiffs Have Not Offered a Valid Common Method of Proving Impact or Damages ...............................................................................34

        1.    Dr. Solow's Opinions About Market Structure, Conduct, and Performance Do Not Constitute a Classwide Method for Proving Impact ...........................................................................35

2.     Dr. McClave's Econometric Model Is Incapable, By Design, of Determining Whether and The Extent to Which Any Class Member Was Impacted ..............................................................40

        a.     Dr. McClave's Model Cannot Show Whether Any Class Member Was Impacted by the Alleged Conspiracy ..................... 42

        b.     Dr. McClave's Model Is Inadequate for Calculating the Amount of Any Individual Class Member's Damages................. 45

        c.     Dr. McClave's Model Suffers From Methodological Defects That Make It Unreliable Even For Addressing Impact and Damages at the Aggregate Level ............................... 48

3.     Plaintiffs' Charts of Average Prices Do Not Show Impact On a Classwide Basis .......................................................................51

4.     Defendants' Statements Do Not Show Impact On a Classwide Basis.........................................................................................54

III.     THE NAMED PLAINTIFFS ARE NEITHER TYPICAL NOR ADEQUATE REPRESENTATIVES OF THE PROPOSED CLASS ...................................56

    A.     The Named Plaintiffs' Claims Are Not Typical of Those of Putative Class Members ...............................................................................56

    B.     Plaintiffs Are Particularly Inadequate Representatives of Steel Service Centers ...........................................................................................60

    C.     Plaintiff Wilmington Steel Is Not a Typical or Adequate Representative Because It No Longer Owns Any Claims ....................61

IV.     THE PROPOSED CLASS IS NOT ASCERTAINABLE ................................64

V.     CLASS LITIGATION IS NOT A SUPERIOR METHOD FOR ADJUDICATING THIS CONTROVERSY ........................................................................66

CONCLUSION...................................................................................................68

## TABLE OF AUTHORITIES

CASES                                                                              Page(s)

*Abrams v. Interco Inc.*,
    719 F.2d 23 (2d Cir. 1983)......................................................................................25

*Alabama v. Blue Bird Body Co.*,
    573 F.2d 309 (5th Cir. 1978)..................................................................................25

*Allen v. Dairy Farmers of Am., Inc.*,
    279 F.R.D. 257 (D. Vt. 2011).................................................................................54

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) .................................................................... passim

*Am. Honda Motor Co. v. Allen*,
    600 F.3d 813 (7th Cir. 2010) .................................................................................20

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ...........................................................................22, 46

*Bieneman v. City of Chicago*,
    864 F.2d 463 (7th Cir. 1988) .................................................................................60

*Bolden v. Walsh Constr. Co.*,
    688 F.3d 893 (7th Cir. 2012) .................................................................................21

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ...........................................................................22, 44

*Bramble Transp., Inc. v. Sam Senter Sales, Inc.*,
    294 A.2d 97 (Del. Super. Ct. 1971) .......................................................................63

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962).................................................................................................36

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
    141 F.R.D. 144 (N.D. Cal. 1991).............................................................................25

*CE Design Ltd. v. King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011) ...........................................................................56, 57

*County of Santa Clara v. Astra USA, Inc.*,
    257 F.R.D. 207 (N.D. Cal. 2009)............................................................................67

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).........................................................................................20, 35

- iii -

*Deiter v. Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) ...................................................................................57

*Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*,
    No. 91-CV-76072-DT, 1993 WL 527928 (E.D. Mich. Oct. 19, 1993) ...................................25

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
    431 U.S. 395 (1977)...................................................................................................23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)................................................................................................21

*Espenscheid v. DirectSat USA, LLC*,
    No. 12-1943, 2013 WL 407446 (7th Cir. Feb. 4, 2013) ................................4, 46, 47

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) ...........................................................2, 25, 28, 57

*FTC v. Occidental Petroleum Corp.*,
    Civ. A. No. 86-900, 1986 WL 952 (D.D.C. Apr. 29, 1986) ....................................39

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) ...............................................................2, 24, 25

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) .......................................................................26

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)...............................................................................20, 23, 56

*Hettinger v. Glass Specialty Co.*,
    59 F.R.D. 286 (N.D. Ill. 1973)................................................................22, 25, 66

*Hickey v. Great W. Mortg. Corp.*,
    No. 94 C 3638, 1995 WL 121534 (N.D. Ill. Mar. 17, 1995) ...........................57, 59

*In re Commercial Tissue Prods.*,
    183 F.R.D. 589 (N.D. Fla. 1998) ...................................................................60

*In re Copper Antitrust Litig.*,
    196 F.R.D. 348 (W.D. Wis. 2000),
    *aff'd sub nom. Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)......................64

*In re Elec. Weld Steel Tubing Antitrust Litig.*,
    No. 79-4628, 1980 WL 1992 (E.D. Pa. Nov. 7, 1980) .....................................25, 28

*In re Fla. Cement & Concrete Antitrust Litig.*,
    No. 09-23187-CIV, 2012 WL 27668 (S.D. Fla. Jan. 3, 2012)................................40

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ......................................................................44, 59

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ................................................................................ passim

*In re Indus. Gas Antitrust Litig.*,
   100 F.R.D. 280 (N.D. Ill. 1983) ...................................................................................57

*In re Linerboard Antitrust Litig.*,
   305 F.3d 145 (3d Cir. 2002) ......................................................................2, 23, 24

*In re Milk Prods. Antitrust Litig.*,
   195 F.3d 430 (8th Cir. 1999) ......................................................................................63

*In re New Motor Vehicles Can. Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .............................................................................................22

*In re OSB Antitrust Litig.*,
   No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ...................................2, 23

*In re Plastic Additives Antitrust Litig.*,
   No. 03-CV-2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) .................... passim

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) .......................................................................................64

*Mace v. Van Ru Credit Corp.*,
   109 F.3d 338 (7th Cir. 1997) .......................................................................................67

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) ........................................................................................65

*Martino v. McDonald's Sys., Inc.*,
   86 F.R.D. 145 (N.D. Ill. 1980) ....................................................................................66

*McCullough v. Ferruzzi Trading Int'l, S.A.*,
   No. 90 C 1138, 1993 WL 795256 (N.D. Ill. Jan. 8, 1993) ...................................34

*Mercado v. Ahmed*,
   756 F. Supp. 1097 (N.D. Ill. 1991) ...........................................................................48

*Messner v. Northshore Univ. Healthsystem*,
   669 F.3d 802 (7th Cir. 2012) .................................................................................22, 46

*Minasian v. Standard Chartered Bank, PLC*,
   109 F.3d 1212 (7th Cir. 1997) .....................................................................................45

*Murray v. GMAC Mortg. Corp.*,
    434 F.3d 948 (7th Cir. 2006) ............................................................................................66

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ............................................................................................57

*Premium Plus Partners, L.P. v. Davis*,
    No. 04 C 1851, 2008 WL 3978340 (N.D. Ill. Aug. 22, 2008),
    *aff'd*, 648 F.3d 533 (7th Cir. 2011) ...............................................................................66

*Randall v. Rolls-Royce Corp.*,
    637 F.3d 818 (7th Cir. 2011) ............................................................................................64

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) ............................................................................. passim

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ............................................................................................36

*Retired Chi. Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ..........................................................................................56, 60

*Robinson v. Tex. Auto. Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004) ............................................................................................23

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    Civ. A. No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ..........................44

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001) ......................................................................................20, 24

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..................................................................................60, 67

*Vasiliow Co. v. Anheuser-Busch, Inc.*,
    117 F.R.D. 345 (E.D.N.Y. 1987) .....................................................................................64

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................................................. passim

*West v. Prudential Sec., Inc.*,
    282 F.3d 935 (7th Cir. 2002) .............................................................................20, 24, 35

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ..............................................................................................67

*Wooley v. Jackson Hewitt Inc.*,
    No. 7 C 2201, 2011 WL 1559330 (N.D. Ill. Apr. 25, 2011) ...................................64, 65

STATUTES & RULES

15 U.S.C. § 15 .................................................................................................21, 42

Fed. R. Civ. P. 23 ................................................................................................. passim

Fed. R. Evid. 702 .........................................................................................................20

OTHER AUTHORITIES

Certain Carbon Steel Prods. From Austl., Belg., Braz., Can., Fin., Fr., Ger., Japan, Kor., Mex., Pol., Rom., Spain, Swed., Taiwan, and the U.K., Inv. Nos. AA1921-197; 701-TA-319, 320, 325-327, 348, 350; 731-TA-573, 574, 576, 578, 582-587, 612, 614-618, USITC Pub. 3899 vol. I (Jan. 2007) (Second Review)................................................... passim

Cut-to-Length Carbon-Quality Steel Plate from India, Indon., It., Japan, and Kor., Inv. Nos. 701-TA-388-391, 731-TA-817-82, USITC Pub. 4296 (Dec. 2011) (Second Review) .................................................................................................12, 15, 17

Frank M. Scherer & David Ross, *Industrial Market Structure and Economic Performance* (3d ed. 1990) ...................................................................................................36

Hot-Rolled Flat-Rolled Carbon-Quality Steel Prods. from Braz., Japan, and Russ., Inv. Nos. 701-TA-384, 731-TA-806-808, USITC Pub. 4237 (June 2011) ............................ passim

IIB Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law* (3d ed. 2007) ........36

Richard A. Posner, *Antitrust Law* (2d ed. 2001)...........................................................................5

Steel Concrete Reinforcing Bar from Turk., Inv. No. 731-TA-745, USITC Pub. 4052 (Dec. 2008) (Second Review)....................................................................6, 14, 17

Steel: Evaluation of the Effectiveness of Import Relief, Inv. No. TA-204-12, USITC Pub. 3797 (Sept. 2005)..................................................................................................15

Structural Steel Beams From Japan and Kor., Inv. Nos. 701-TA-401, 731-TA-853-854, USITC Pub. 3840 (Mar. 2006) (Review)................................................................6, 12, 15

U.S. Census Bureau Economic Statistics, *Manufacturers' Shipments, Inventories, and Orders Survey*, http://www.census.gov/manufacturing /m3/index.html ..........................16, 17

U.S. Census Bureau, http://www.census.gov/construction/c30/totpage.html ..............................17

U.S. Census Bureau News, *Full Report on Manufacturers' Shipments, Inventories and Orders*, July 2005, http://www.census.gov/manufacturing/m3/index.html..............................16

**INTRODUCTION**

To obtain class certification, plaintiffs have the burden of proving that the claims of all class members can be tried at once using common evidence. In an antitrust case, plaintiffs must demonstrate that the crucial element of impact -- that each individual purchaser paid supra-competitive prices -- does not require individualized inquiry. *See Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). Plaintiffs have not met that burden.

Plaintiffs seek to lump together purchasers of many hundreds of diverse steel products to litigate claims that they overpaid as a result of a conspiracy to reduce production. The "agreement" alleged in the Complaint is one of general discussion, in mostly public settings, about being "disciplined" in output decisions -- with no agreement about prices, no agreement about particular quantities to be reduced, no discussion of particular products, and no enforcement mechanism. The covered products, ranging from steel beams used to build skyscrapers to thin steel sheets used to make auto fenders, are made in different mills from different raw material combinations and sold into different markets with different purchasers, supply and demand conditions, and competition from foreign and domestic producers who are not defendants. No defendant makes all the products at issue and most make only a relatively small subset.

On its face, such a vague, indeterminate conspiracy -- to reduce production of a sprawling array of distinct steel products by unspecified amounts -- defies any notion that impact on each class member could be determined using the same evidence. In fact, the supply of different products moved in different directions and, for some products, *increased* during nearly the entire alleged class period. Moreover, because effects on prices depend on the interaction of supply and demand in a particular market, courts have often recognized that antitrust classes spanning

multiple markets are not amenable to common proof of impact. *See*, *e.g.*, *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir. 2012); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004).

Plaintiffs try to finesse these problems by asserting that defendants conspired to reduce the supply of what plaintiffs call a fungible commodity input for all the products: "raw steel." According to plaintiffs, by restricting the supply of this supposed common input, defendants could at once raise the prices of all the finished products.

That assertion is based on a fallacy. What plaintiffs call "raw steel" -- initial semi-finished forms such as slabs, billets, and blooms that emerge after molten steel solidifies -- are neither fungible commodities nor a common input. As defendants' steel manufacturing expert Dr. Kent Peaslee explains, semi-finished forms are intermediate production stages within a continuous process of transforming iron ore or scrap metal into finished steel products. Because different steel products have different metallurgical properties and those properties are baked in while the steel is still molten, a slab, billet, bloom, or other semi-finished form that emerges from a furnace is already customized to make a given finished product, and could not be diverted to make some other finished product. A reduction in the total number of semi-finished forms does not imply a reduction across the board in the supply of each of the many finished products.

This case therefore does not fit the model of *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002), or *In re OSB Antitrust Litigation*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007). In contrast to plaintiffs' characterization of those cases, this case involves hundreds of products that do not share any common fungible input that was the subject of an alleged agreement. Moreover, the decisions cited by plaintiffs rested on the flawed notion that a class can be certified by presuming impact and without resolving conflicts between experts,

which has never been the law in this Circuit and has now been rejected elsewhere.  Plaintiffs'

analogy to OPEC is similarly inapposite.  OPEC restricts the supply of crude oil, forcing

purchasers to pay higher prices for that commodity input and pass on those increased input costs

in the prices of downstream petroleum products they sell.  Because defendants by and large make

slabs, billets, and blooms internally rather than buying them for a price, the analogy does not

hold.

Even customers purchasing the same product have varying degrees of bargaining power

and vastly different purchasing arrangements.  The members of the putative class range from the

named plaintiffs, who made sporadic purchases in minute quantities to large manufacturing

concerns like automakers who purchase millions of tons annually, sometimes via long-term

contracts with special terms, and wield enormous bargaining power.  Moreover, plaintiffs allege

the production reductions were implemented only in two episodic windows of two months each,

covering less than one-eighth of a 33-month class period during which production was otherwise

mostly increasing.  These distinctions between purchasers and across time further preclude

common proof of the effects of temporary production decreases on the prices each customer

paid.

Plaintiffs rely heavily on the opinions of two putative experts.  As defendants' experts,

renowned economist and econometrician Dr. Jerry A. Hausman, steel manufacturing expert

Dr. Kent D. Peaslee, and former Commissioner of the International Trade Commission Jennifer

A. Hillman show in their reports, plaintiffs' first expert, Dr. John Solow, formed opinions based

on a series of critical misconceptions about the steel products at issue, how they are made, and

the markets involved.  If an expert's "description of the markets is inaccurate," plaintiffs "cannot

rely on that inaccurate description to demonstrate impact."  *In re Plastic Additives Litig.*, No. 03-

cv-2038, 2010 WL 3431837, at *7 (E.D. Pa. Aug. 31, 2010). Disregarding standards he

prescribes in his own academic work, Dr. Solow purports to do a "structure, conduct and

performance" analysis of the "market" without even identifying, let alone defining, actual

economic markets amenable to that analysis. Certification of a class of unprecedented breadth

demands much more rigorous analysis.

Plaintiffs' other expert, Dr. James McClave, purports to do an econometric analysis of

prices for steel products during the relevant period. As Dr. Hausman demonstrates,

Dr. McClave's analysis is unreliable for a host of reasons. The most significant flaw is one

Dr. McClave himself has freely admitted in open court and deposition: his model is incapable of

determining whether any particular purchaser suffered an impact by paying more than it would

have paid but for the conspiracy. The model is designed only to estimate the alleged *aggregate*

and *average* overcharge for the class as a whole. Dr. McClave admits that if any particular class

member was not impacted, the model would not, and could not, recognize that fact. Even aside

from its myriad other defects, this inadequacy alone renders Dr. McClave's model useless as a

common method of proving impact. *See Reed*, 268 F.R.D. at 590-91. Dr. McClave's model is

equally worthless for determining any class member's amount of damages. *See Espenscheid v.*

*DirectSat USA, LLC*, No. 12-1943, 2013 WL 407446, at *3 (7th Cir. Feb. 4, 2013).

Plaintiffs also fail other requirements for class certification. The named plaintiffs are

neither typical nor adequate class representatives because proof of any plaintiff's claim would

not prove the claims of even the other plaintiffs, let alone the many diverse class members. The

proposed class includes a complicated test relating to contract purchases that makes it impossible

to ascertain quickly and easily whether a given purchaser is in or out of the class. And class

litigation is neither a superior nor efficient method for resolving a controversy such as this,

- 4 -

where the magnitude of most class members' purchases of steel products, combined with the availability of treble damages and attorneys' fees, would be sufficient to make any valid claims worth pursuing on an individual basis.

Because plaintiffs have not met their burden under Rule 23, the Court should deny class certification. Defendants respectfully request a hearing to address key factual issues and expert evidence on which plaintiffs rely in seeking class certification.

## STATEMENT OF FACTS

### A.     Steel Products

"The steel industry does not sell 'steel'; it sells sheets, bars, and other shapes, of varying thickness, rigidity, heat resistance, strength, ductility, weight and so forth -- in short a large variety of product types."  Richard A. Posner, *Antitrust Law* 65 (2d ed. 2001).  As defendants' steel manufacturing expert Dr. Peaslee explains, not only do steel products have different shapes, sizes, and essential chemical and mechanical properties depending on their different applications and functions, they are sold to distinct customer segments in a wide range of industries for disparate end use applications.  *See* Ex. 2, Expert Report of Dr. Kent Peaslee at 7, 24-28.  The following are a few major product categories, each of which in turn includes numerous distinct and non-interchangeable products.

- *Sheet steel* products are thin sheets made in a vast number of chemistries and sizes.[1]
  Sheet products are customized to be used in particular applications by, among other customers, automobile manufacturers, the construction industry, appliance manufacturers, container manufacturers, and companies that weld sheet steel into pipes and tubes.  *See* ITC 2011 Hot-Rolled Sheet Review at I-25.  Within a particular application, sheet products are almost always made to the customer's precise size and chemical specifications and produced only after the steel mill receives a customer order.  *See id*. at

---

[1] *See* Hot-Rolled Flat-Rolled Carbon-Quality Steel Prods. from Braz., Japan, and Russ., Inv. Nos. 701-TA-384, 731-TA-806-808, USITC Pub. 4237, at 5-6, I-25-I-29 (June 2011) (Second Review) ("ITC 2011 Hot-Rolled Sheet Review"); Pls.' Ex. 6, at USS0259361-62.

29; Peaslee Report at 24-25. ████████████████████████████████████
████████████████████████[2]

- **Plate steel** products include a vast number of flat-rolled products thicker and often wider than sheet steel.[3] Plate products are principally made in different mills than sheet and are customized to be used in different applications, including without limitation the construction of buildings and bridges, the production of ships and barges, pipes, military armor, storage tanks, heavy machinery, railcars, machine parts, pressure vessels, and off-shore drilling platforms. *See* ITC 2007 CTL Plate/Corrosion-Resistant Sheet Review vol. I, at 63-64, CTL-I-19. Like sheet products, product quality is often the most important factor in plate customers' purchasing decisions, and plate products are generally produced only after the mill receives a customer order. *See id.* vol. I, at 63, 64 n.346; *id.* vol. II, at CTL-II-15.

- **Reinforcing bars** (or "rebar") are a variety of steel bars used in construction to reinforce concrete structures such as buildings and roads.[4] Rebar is made in several grades and sizes to be used in different construction applications. *See* ITC 2008 Rebar Review at I-25.

- **Structural steel products** consist of a wide range of beams, angles, and channels designed to bear loads and customized for different construction and manufacturing applications such as buildings, bridges, ships, and pre-manufactured homes.[5] Medium and large structural shapes are made in structural mills, while light structural shapes are made in bar mills and used for different construction applications. *See* ITC 2006 Structural Steel Review at I-15 n.42. Product quality is a very important factor for purchasers of structural products such as beams, and many beam products are not made until a customer submits an order. *See* Ex. 4, Affidavit of John Nolan ("Nolan Aff.") ¶¶ 69-70; ITC 2006 Structural Steel Review at II-16, II-12.

Defendants also make numerous other steel products. For example, certain defendants

make steel rails for railroads, which require ultra high carbon levels to withstand enormous

---

[2] ████████████████████████████████████████████████████████████████
████████████████

[3] *See* Certain Carbon Steel Products From Austl. et. al., Inv. Nos. AA1921-197; 701-TA-319, 320, 325-327, 348, 350; 731-TA-573, 574, 576, 578, 582-587, 612, 614-618, USITC Pub. 3899 vol. I, at 34, 36 (Jan. 2007) (Second Review) ("ITC 2007 CTL Plate/Corrosion-Resistant Sheet Review"); Pls.' Ex. 6, at USS0259361-62.

[4] *See* Steel Concrete Reinforcing Bar from Turk., Inv. No. 731-TA-745, USITC Pub. 4052, at I-25 (Dec. 2008) (Second Review) ("ITC 2008 Rebar Review"); Pls.' Ex. 6, at USS0259363.

[5] *See* Structural Steel Beams From Japan and Kor., Inv. Nos. 701-TA-401, 731-TA-853-854, USITC Pub. 3840, at 14, III-1 (Mar. 2006) (Review) ("ITC 2006 Structural Steel Review").

amounts of weight exerted over extended periods of time. *See* Nolan Aff. ¶¶ 4, 23, 27-28. A few defendants make sheet pilings, which are structural products that lock or are welded together to construct cofferdams, sea walls, excavations, and other retaining structures. *See* Ex. 15, at AM-000189345. Another group of defendants makes bar products known as merchant bar quality ("MBQ"), which are used for, among other things, industrial machines, trucks, and drill parts used in the agriculture, mining, and oil drilling industries. Nolan Aff. ¶ 64.

Industry participants and analysts sometimes group steel products generically into broad categories of "long," including bar, structural, and rail products, and "flat," including sheet and plate products. That categorization, however, does not begin to capture the diversity and breadth within the "long" and "flat" headings.[6]

## B. How Steel Products Are Made

Each steel product is a highly engineered combination of iron, carbon, and other elements added or subtracted during the production process. *See* Peaslee Report at 8-9, 24; Nolan Aff. ¶¶ 20-44, 67, 73. The customization of a steel product begins at the stage of melting raw materials to form liquid steel because the steel mill must select the appropriate recipe of raw materials for the intended final product. *See* Peaslee Report at 8-9, 24; Nolan Aff. ¶¶ 12, 21-23, 27-34, 43-44. In mills that utilize the basic oxygen furnace ("BOF") method, the primary raw materials melted in the furnace are iron ore, coke (a derivative of coal), and limestone, which are

---

[6] Plaintiffs do not dispute that each steel product is unique and not substitutable or interchangeable with other steel products. ██████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████

combined with smaller amounts of scrap steel. *See* Peaslee Report at 12; Pls.' Ex. 6, at USS0259367. In mills that utilize the electric arc furnace ("EAF") method, the primary raw materials are various grades of scrap steel and, depending on the product, smaller amounts of iron. *See* Peaslee Report at 13; Nolan Aff. ¶ 16; Pls.' Ex. 6, at USS0259367-68.

Further customization occurs in the next step, when the liquid steel is "tapped" from the furnace into a ladle. *See* Peaslee Report at 15-17; Nolan Aff. ¶ 16. In the ladle, the molten steel is further engineered into the specific chemistry required for the particular finished product and end use application. *See* Peaslee Report at 15-17. Alloying elements are added to alter certain mechanical properties as required by the customer (*e.g.*, hardness, wear resistance, elasticity, formability, machinability, weldability, corrosion resistance, and many other properties), carbon levels may be altered to customize the product's strength and ductility, and gases and particles may be removed resulting in steel products with higher toughness or enhanced surface quality. *See id.* at 9-10, 15-17; Nolan Aff. ¶¶ 13, 16, 21-23, 48, 67-74; Pls.' Ex. 6, at USS0259354. As one of plaintiffs' own exhibits explains, ███████████████████████

████████████████████████████████████████████████

The result is hundreds, if not thousands, of different chemical grades of molten steel, each suitable only for the end use application for which it was designed. *See* Peaslee Report at 10. As defendants' industry expert explains, steel products "are neither interchangeable nor substitutable and often must be custom manufactured for the customer." *Id.* at 25.

After the liquid steel has attained the required chemical properties for the intended finished product, the liquid steel is cast into an initial solid form depending on the type of mill it is made in. Bar mills make billets, heavy structural mills make blooms and beam blanks, and sheet and plate mills make slabs, thin slabs, or strip. *See* Peaslee Report at 18, 20-21; Pls.' Ex. 6,

at USS0259359.  These "semi-finished" forms have already been customized not only for a particular product (*e.g.*, rebar) and particular application (*e.g.*, weldable rebar), but also have been made into shapes and dimensions that will fit the rolling equipment in which the forms will be rolled into steel products.  *See* Peaslee Report at 17, 26-27.  They are not interchangeable with each other.  *See id*. at 26-28; Nolan Aff. ¶¶ 27-44.  They are often not interchangeable among different mills that make the same products.  *See* Peaslee Report at 5, 23; Nolan Aff. ¶¶ 53-56.  For example, nearly all sheet products manufactured by EAF sheet mills go from liquid steel to a finished product, known as a coil or hot band, in a continuous process that does not allow the mill to extract any semi-finished product or to use slabs made in other mills.  *See* Peaslee Report at 21-23; Nolan Aff. ¶¶ 12-19.[7]

The next stage in creating a finished steel product involves rolling the slab into a particular type of sheet or plate, rolling the billet into a particular bar product, or rolling the bloom or beam blank into a particular structural product.  *See* Peaslee Report at 18-24; Pls.' Ex. 6, at USS0259361, 63.  After this rolling process, many steel products undergo extensive further processing before being sold to customers.  For example, sheet can be sold in its initial hot-rolled form, cold-rolled to make it thinner and improve surface quality, or coated with zinc (galvanized) to protect against rust.  *See* Peaslee Report at 21; Pls.' Ex. 6, at USS0259361-62.  This additional processing further customizes the product for a particular end application; for example, automobile fenders that will be exposed to outside weather must be made with galvanized sheet.  ITC 2007 CTL Plate/Corrosion-Resistant Sheet Review vol. II, at CORE I-15.

---

[7] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

## C.    Defendants

Each defendant operates steel mills in the U.S.  Most defendants produce only a subset of steel products, and some defendants' product offerings do not overlap at all with certain other defendants.  Most importantly, each mill is configured and equipped with machinery to manufacture a particular, distinct grouping of steel products in certain grades and limited sizes, and could not be reconfigured to make another type of product without enormous expense.  *See* Peaslee Report at 17-24; Nolan Aff. ¶¶ 45-56.

- ***Nucor*** operated several EAF steel mills in the U.S. during the class period, including four mills that made sheet products of particular grades and sizes; two other mills that made plate products; two mills that made heavy structural products; and ten bar mills that made rebar, MBQ products, and light structural shapes.  *See* Peaslee Report at App.  Nucor's mills could not make all products made by other defendants.  ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████

- ***ArcelorMittal*** operated several BOF-based and EAF-based steel mills in the U.S. during the class period.  These steel mills included six BOF-based flat products mills, including one with a thin slab caster and one that also included two plate rolling mills.  There were five EAF-based mills, including one that produced plate products, one that produced rod and bar, one that primarily produced rail, one that produced wire rod, and an EAF mill in Texas that primarily produced bar and was acquired late in the class period in April 2007.  *See* Peaslee Report at App.  ██████████████████████████████ ███████████████████████████████

- ***U. S. Steel*** operated five BOF steel mills during the class period, which produced hot-rolled, cold-rolled, and corrosion-resistant sheet products.  *See id*.  ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

- ***Gerdau*** operated several EAF mills during the class period, including a number of bar mills that made rebar, MBQ, and light structural shapes.  *See id*.  Near the end of class period in September 2007, Gerdau acquired two large-capacity mills from non-defendant Chaparral that made heavy structural products.  *See* Ex. 19, at G00103243-44.  ███████ ████████████████████████████████████████████████ ███████████

- **AK Steel** operated two BOF and two EAF sheet mills during the class period that produced hot rolled sheet, cold rolled sheet, and corrosion-resistant sheet products as well as products outside the class such as electrical and stainless steel. *See id.* ████████ ██████████

- **Steel Dynamics Incorporated** (**SDI**) operated five EAF steel mills during the class period, including a sheet mill that specialized in thin-gauge, high strength alloy sheet steel products; a mill that produced heavy structural products; a bar mill that produced special bar quality ("SBQ") products and a small amount of MBQ; a bar mill producing angles, flat, channel, and round MBQ; and a mill producing primarily specialty shapes used in forklift and tractor-trailer manufacturing. *See id.*; Nolan Aff. ¶¶ 27, 40, 43, 55. ████████████████████████████████ ████████████████████████████████████ ██████████

- **SSAB** operated two EAF plate mills in the U.S. during the class period. *See* Peaslee Report at App. SSAB produced a variety of plate products, ████████████ ████████████████████████████

- **Commercial Metals Company** (**CMC**) operated three EAF bar mills in the Southern U.S. during the class period that produced rebar, MBQ, and light structural shapes. CMC also operated a mill without an EAF that rolled rebar and niche bar and light shapes products.[8] ████████████████████████████████ ██████████

## D. Distinct Markets and Competition for the Sale of Steel Products

### 1. Steel Products Trade in Different Markets

Defendants sell, and their customers buy, specific steel products engineered for specific uses and applications. Each steel product category is manufactured by a distinct set of defendants as well as non-defendant producers and is sold to a distinct set of customers in response to different downstream demands for the customers' products and services.

For example, during the alleged class period, galvanized sheet products used for exterior autobodies were made and sold by ArcelorMittal, U. S. Steel, and AK Steel to automobile manufacturers like Ford, General Motors, and Toyota. The manufacturers who use the EAF

---

[8] CMC, *About US*, http://www.cmc.com/en/americas/cmcsteelarkansas/pages/aboutus.aspx.

production process did not make galvanized sheet for exterior auto bodies because virgin iron ore (rather than recycled scrap steel) was needed for the exacting metallurgical specifications. *See* Peaslee Report at 12, 23; Nolan Aff. ¶ 49. Because the automobile manufacturers purchase huge quantities of steel products, they have significant bargaining power. *See* Ex. 1, Expert Report of Dr. Jerry A. Hausman at 9, 18, 55-57. Demand for exterior automotive sheet is closely linked to demand for automobiles; when the automakers make fewer automobiles, they buy less sheet.

In contrast to galvanized sheet for exposed automotive applications, plate products are made by Nucor, ArcelorMittal, and SSAB and are sold to a more diverse set of customers including the construction industry, shipmakers, military tank manufacturers, and makers of equipment and machinery for the oil and gas sector. *See supra* at 10-11. Unlike many sheet products, plate is not sold in significant quantities to automobile or appliance manufacturers.[9] Instead, other demand factors such as construction activity, ship building, and demand for energy are more relevant to plate product prices and production levels. For example, the ITC noted in 2007 that end user demand for plate "continues to be strong, especially from the oil and gas industry, even as sheet demand has weakened."[10]

Another product, structural beams, was made by defendants SDI, Nucor, and Gerdau. Demand for structural beams depends primarily on the level of non-residential construction activity. ITC 2006 Structural Steel Review at IV-16; Nolan Aff. ¶¶ 63, 82. In contrast, products such as steel rails made by SDI are not sold to the construction industry in any significant quantities, and demand for those products goes through different cycles. *See* Nolan Aff. ¶¶ 65,

---

[9] *See* Cut-to-Length Carbon-Quality Steel Plate from India, Indon., It., Japan, and Kor., Inv. Nos. 701-TA-388-391, 731-TA-817-821, USITC Pub. 4296, at II-9 (Dec. 2011) (Second Review) ("ITC 2011 CTL Plate Review") (showing 2.2% of plate shipments to the automotive industry); *see also* Ex. 18, at AM-000040003-05.

[10] *See* ITC 2007 CTL Plate/Corrosion-Resistant Sheet Review vol. I, at 56 n.285.

82. Other long products such as merchant quality bar are used extensively in non-construction applications such as industrial machinery and trucks used in the agriculture, mining, and oil and gas drilling industries. *See id.* ¶¶ 51, 64. Demand levels in these different industries fluctuate in different ways and at different times. *See id.* ¶¶ 61-66, 68, 84, 91-93.

        2.      Competition From Non-Defendant Producers Varies by Product

In many product categories, defendants face substantial competition both from non-defendant steel mills in the U.S. and from foreign producers. The number, identity, and competitive significance of these non-defendant producers varied greatly by product category, as well as over time.

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

Imported steel products were also a huge competitive factor in particular product markets. *See* Ex. 3, Expert Report of Jennifer A. Hillman ¶¶ 12, 14, 21; Pls.' Ex. 6, at

USS0259375. In the aggregate, approximately 21-27% of total U.S. demand for the steel

products encompassed by the class definition were supplied by foreign producers over the class

period. *See id*. ¶ 12. But, again, the extent of foreign import competition varied by product type.

*See id.* ¶¶ 12, 14, 21. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████. Even within product categories, the degree of competition from imports

varied by customer segment, geography, and product application. For example, rebar imports

were concentrated in sizes used primarily in light construction applications; as a result, rebar

purchasers who engaged in light construction activities (*e.g.*, constructing residences, swimming

pools, and patios) enjoyed much greater availability of foreign rebar than those who built high-

rise buildings, bridges, and roads. *See* ITC 2008 Rebar Review at I-25.

> 3. Purchasing Practices and Arrangements Vary Among Products and
> Customers

Buyers sometimes enter into long-term supply contracts with the steel mills.[11] These

contracts come in many variations and are more common in some product areas than in others.

*See, e.g.*, ITC 2007 CTL Plate/Corrosion-Resistant Sheet Review vol. I, at 125 (contrasting

prevalence of long-term contracts in automotive and appliance sectors with short-term

purchasing patterns in construction industry). A common feature of long-term contracts is to

lock in price for some period of time, such as three months or sometimes longer than one year.

*See, e.g.*, *id.* ████████████████████████████████████████

---

[11] *See, e.g.*, ████████████████████████████████████████████████ ███
█████████████████████████ One industry analyst observed that surveyed service centers
reported making, on average, 48% of their purchases of steel products through contracts ranging
from one month to a year in duration. *See* Ex. 31, at CMC00162958.

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

      4.      Steel Service Centers Play a Critical Role in Certain Product Markets

For certain products, independent distributors known as "service centers" serve as the steel industry's warehouses by buying and stocking vast inventories of products.  *See* Pls.' Ex. 6, at USS0259374.  Service center purchases accounted for more than half of U.S. commercial shipments of hot-rolled sheet and cut-to-length plate between 2005 and 2007.[12]  The ITC has observed that "since service centers buy large volumes of steel they can use their buying power to buy steel more cheaply than a small customer."[13]  Service centers also buy and resell substantial quantities of imported steel products.[14]  The collective inventory of domestic and foreign steel products maintained by U.S. steel service centers is typically several times U.S. mills' collective monthly production of steel products.  *See* Hausman Report at 34-38.

**E.    Alleged Production Cuts**

Although plaintiffs seek certification of a class running from April 1, 2005 through December 31, 2007, they allege that defendants reduced production in two short episodes, namely June/July of 2005 and October/November of 2006, during a 33-month class period when production of steel products generally was increasing.  *See* Pls.' Mem. at 7 (graph); Ex. 5, Solow Dep. at 121-28.  Any such reductions are consistent with longstanding patterns of cyclicality for steel products that derive from fluctuations in end user demand for steel products as well as

---

[12] *See* ITC 2011 Hot-Rolled Sheet Review at II-2; ITC 2011 CTL Plate Review at II-2.

[13] Steel: Evaluation of the Effectiveness of Import Relief, Inv. No. TA-204-12, USITC Pub. 3797, at OVERVIEW III-24 (Sept. 2005).

[14] *See* ████████████████████; ITC 2006 Structural Steel Review at II-4; *see also* ITC 2011 Hot-Rolled Sheet Review at 49, 51.

- 15 -

rising and falling service center inventory levels.  *See* Ex. 32 (showing cyclicality in steel production from 1980 through 2010).

For example, from May to July 2005, U.S. automobile manufacturers (the largest customers of certain sheet products) faced a 37% reduction in demand for new cars and domestic appliance manufacturers' new orders decreased by over 7%.[15]  Meanwhile, service centers also reduced their sheet purchases as they worked through a buildup of 6.8 million tons of inventory of sheet products (an inventory equal to six times the amount of sheet production cuts alleged by plaintiffs in this period).  *See* Hausman Report at 36; Ex. 34, at SSAB0035716; Ex. 35, at SSAB0034842.  With fewer orders for sheet products, naturally defendants' overall production of sheet products decreased.  Other industries that buy steel products also experienced downturns in demand, leading to fewer orders for many other types of steel products, albeit in varying degrees.[16]  Plaintiffs' own exhibits speak to these decreases in service center orders and end user demand.[17]

---

[15] Ex. 33, U.S. Census Bureau, *Manufacturers' Shipments, Inventories and Orders Survey*, http://www.census.gov/econ/currentdata.

[16] According to the U.S. Census Bureau, new orders for manufactured goods in July 2005 saw the "largest percent decrease in fifteen months."  *See* Ex. 36, U.S. Census Bureau, *Manufacturers' Shipments, Inventories and Orders*, http://www.census.gov/manufacturing/ m3/historical_data/ index.htm (July 2005 Press Release).  New orders of manufactured durable goods decreased by 25%, and customer sectors that normally use large quantities of different steel products saw fewer new orders during the May to July 2005 period, including shipbuilders who buy plate products (-24%), steel and metal fabricators who buy products such as rebar (-13%), and machinery manufacturers who buy plate and merchant-bar products (-8%).  *See* Ex. 33, U.S. Census Bureau, http://www.census.gov/econ/currentdata.

[17] ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

In the fourth quarter of 2006, the steel industry again faced a drop in orders for many products. Construction spending, automobile shipments, and demand for appliances all decreased significantly.[18] At the same time, service center inventories of sheet products climbed to record levels above eight million tons, over *three* times the volume of defendants' alleged sheet production cuts in fourth quarter 2006.[19] Again, documents cited by plaintiffs demonstrate this downturn in demand and inventory surplus.[20]

Notwithstanding these short-lived production fluctuations, supply of many steel products increased over the 2005-2007 class period as a whole. For example, domestic rebar production increased in every year starting in 2004 through the end of the class period in 2007. *See* ITC 2008 Rebar Review at 28, III-5 tbl. III-2. Cut-to-length plate production increased every year starting in 2001 through the end of the class period in 2007.[21] ███████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

---

[18] Ex. 37, U.S. Census Bureau, http://www.census.gov/construction/c30/totpage.html (non-seasonally-adjusted total construction spending); Ex. 33, U.S. Census Bureau Economic Statistics, *Manufacturers' Shipments, Inventories, and Orders Survey*, http://www.census.gov/econ/currentdata.

[19] *See* Hausman Report at 34-38; ITC 2011 Hot-Rolled Sheet Review at fig. III-12 (showing record service center sheet product inventory levels); Ex. 38, at AM-000107221.

[20] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████

[21] *See* ITC 2007 CTL Plate/Corrosion-Resistant Sheet Review vol. II, at CTL-III-4 tbl. CTL-III-II; *id*. at App. C-5 tbl. C-1a (covering 2001 through first half of 2006); ITC 2011 CTL Plate Review at III-4 tbl. III-6 (covering 2005 through 2007).

████████████████████████████████████████████████████████████████

████████████████████████████████

## F.    Plaintiffs and Their Proposed Class

There are five plaintiffs and proposed class representatives:

- *Standard Iron Works* ███████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

- *Wilmington Steel Processing* ███████████████████
████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████

- *Capow, Inc. (Eastern States Steel)* █████████████████
███████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████

- *Alco Industries, Inc.* ██████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████
████████████████

- *Gulf Stream Builders Supply* ████████████████████
███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████
███████████████████

These five plaintiffs now seek certification of a class consisting of "[a]ll persons
(excluding Defendants, their present and former parents, subsidiaries, affiliates, joint ventures,
co-conspirators and government entities) who Purchased Steel Products directly from any of the

Defendants or their subsidiaries or controlled affiliates at any time between April 1, 2005 and December 31, 2007 (the 'class period') for delivery in the United States." Pls.' Mem. at 21. Plaintiffs define "Steel Products" to include "products derived from raw carbon steel and sold directly by any of the Defendants or their subsidiaries or controlled affiliates in the United States, including all carbon steel slabs, plates, sheet and coil products, galvanized and other coated sheet products; billets, blooms, rebar, merchant bar, beams and other structural shapes; and all other steel products derived from raw carbon steel and sold by Defendants except as specifically excluded below." *Id.* Plaintiffs exclude many types of steel products from the class, however, without providing a detailed description of the basis for these exclusions.[22]

## ARGUMENT

## I.    PLAINTIFFS' BURDEN UNDER RULE 23

In order to justify departing from the "usual rule that litigation is conducted by and on behalf of the individual named parties only," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks omitted), plaintiffs must "affirmatively demonstrate" by a preponderance of the evidence that "in fact" all of the prerequisites of Federal Rule of Civil Procedure 23 are satisfied. *Id.* at 2551. "Rule 23 does not set forth a mere pleading standard." *Id.* Rather, "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).

---

[22] Plaintiffs purport to exclude "stainless steel; grain-oriented electrical steel; tin mill products; clad plate (*i.e.*, nickel, stainless or copper clad plate); steel pipe and other tubular products; 'special bar quality' products; wire rod and other wire products; grinding balls; fabricated rebar products; fabricated steel joist, decking, fence posts and other fabricated building products; welded steel blanks; and steel products purchased under toll processing agreements." Pls.' Mem. at 21.

In determining whether plaintiffs have satisfied these requirements, the Court is obliged to undertake a "rigorous analysis," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982), examining and resolving any and all factual disputes pertaining to the Rule 23 elements, even if those factual disputes also relate to the merits. *See Wal-Mart*, 131 S. Ct. at 2551 ("Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-77 (7th Cir. 2001); *Hydrogen Peroxide*, 552 F.3d at 307.

This obligation applies with full force to the consideration of expert testimony. Plaintiffs cannot "obtain class certification just by hiring a competent expert." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002). On the contrary, "[e]xpert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis" and "should not be uncritically accepted as establishing a Rule 23 requirement." *Hydrogen Peroxide*, 552 F.3d at 323; *accord, e.g.*, *West*, 282 F.3d at 938 ("Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives."). Concurrent with this opposition brief, defendants are filing motions to exclude the opinions of plaintiffs' two experts, Drs. Solow and McClave, pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (*Daubert* challenges to "critical" expert testimony must be resolved before ruling on class certification). But even if "the court holds the testimony should not be excluded, under *Daubert* or for any other reason," expert testimony should never be "uncritically accepted as establishing a Rule 23 requirement." *Hydrogen Peroxide*, 552 F.3d at 323.

## II.    THE PROPOSED CLASS FAILS RULE 23'S PREDOMINANCE REQUIREMENT

Plaintiffs must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Plaintiffs have not, and cannot, meet that requirement in this case.[23]

### A.    No Class Can Be Certified Without a Common Method of Proving Impact and Damages

The predominance inquiry "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) (quoting *Hydrogen Peroxide*, 552 F.3d at 311). Plaintiffs sue under Section 4 of the Clayton Act, 15 U.S.C. § 15, under which the essential elements of a cause of action are "(1) a violation of antitrust law . . . ; (2) individual injury, or impact, caused by that violation; and (3) measurable damages." *Reed*, 268 F.R.D. at 581 (citing *Hydrogen Peroxide*, 552 F.3d at 311).

Although plaintiffs try to lessen their burden by stressing the common nature of the first element (Pls.' Mem. at 28), the law is clear that "common issues do not predominate if the fact of antitrust violation *and* the fact of antitrust impact cannot be established through common

---

[23] It is also doubtful that plaintiffs can meet the threshold requirement of Rule 23(a)(2) that there be "questions of law or fact common to the class" under the rigorous standards recently enunciated by the Supreme Court. In *Wal-Mart*, the Supreme Court made clear that simply articulating common questions is not sufficient to meet the commonality requirement. "What matters to class certification is not the raising of common 'questions' -- even in droves -- but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation marks and alteration omitted); *see Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896-88 (7th Cir. 2012). For the same reasons set forth below that common questions do not predominate over individual questions, the questions that are common to class members will not drive the resolution of the litigation.

proof." *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008) (emphasis added); *accord Reed*, 268 F.R.D. at 581 ("To obtain class certification, plaintiffs must show that common proof will predominate with respect to *each of these elements of their claims*." (emphasis added)); *Hettinger v. Glass Specialty Co.*, 59 F.R.D. 286, 293 (N.D. Ill. 1973) (Bauer, then D.J.) (antitrust injury, not antitrust violation, "constitutes the crux of any plaintiff's cause of action"). Thus, "where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).[24] Simply put, "proof of conspiracy is not proof of common injury." *Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005); *see Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 816 (7th Cir. 2012) ("Under Rule 23(b)(3), plaintiffs ha[ve] to show that it [is] possible to use common evidence to prove that [the alleged conduct] injured the members of the proposed class.").[25]

### B.     Impact and Damages Are Not Common Issues in This Case

The impact and damages elements of plaintiffs' claims require proof by each class

---

[24] *Accord Hydrogen Peroxide*, 552 F.3d at 311 ("[I]mpact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007) ("[C]lass certification is precluded where plaintiffs have not shown that the fact of injury element can be proven for all class members with common evidence.").

[25] Although the Seventh Circuit vacated a district court's order denying certification in *Messner*, nothing in *Messner*'s reasoning suggests that certification is the appropriate outcome here. The Court of Appeals held that the district court erred by refusing to entertain a *Daubert* motion to exclude a defense expert, *Messner*, 669 F.3d at 811-14, and by rejecting plaintiffs' reliance on contracts "setting out the non-uniform price increases" and instead requiring a showing of "uniformity of price increases," *id.* at 818-19. In this case, there is nothing like the contracts listing price increases in *Messner*, and the problem is not that plaintiffs cannot prove uniformity of impact, but that they have offered no valid common methodology or evidence with which to analyze impact on particular class members at all.

member that it paid a higher price to one of the defendants for steel products than it would have

paid absent the alleged conspiracy to reduce production of "raw steel." Because the putative

class members purchased different steel products, trading in different markets, under different

supply and demand conditions, the impact and damages elements turn on distinct, not common,

questions. Unlike a typical price-fixing case, involving for example a quantitative agreement on

prices or a surcharge for a single product or relatively discrete group of products, this case would

require tracing how an alleged decrease in the output of raw steel translates into a decrease in the

production of each of hundreds of different final products that are sold in different markets, and

ultimately affects prices of each such product. The relevant evidence that would bear on the

links between raw steel and production of a particular finished steel product, and then between

the production of that particular finished steel product and sale prices, would be very different

from product to product, and from class member to class member.[26]

Plaintiffs' theory of impact relies heavily on two decisions from outside this Circuit

certifying classes alleging conspiracies to suppress output. *See In re Linerboard Antitrust Litig.*,

305 F.3d 145 (3d Cir. 2002); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa.

Aug. 3, 2007). Those decisions are factually distinguishable, and their precedential value even

---

[26] A recurrent theme in plaintiffs' brief is that antitrust cases should presumptively be certified. *See, e.g.*, Pls.' Mem. at 18-20, 27. Of course, the fact that a case is brought under the antitrust laws does not mean "a court should relax its certification analysis, or presume a requirement for certification is met." *Hydrogen Peroxide*, 552 F.3d at 322; *see Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 420-21 (5th Cir. 2004) ("There are no hard and fast rules . . . regarding the suitability of a particular type of antitrust case for class action treatment.") (internal citation and quotations omitted). The Supreme Court has directed a "rigorous analysis" of each case on its own facts, not a presumption for any particular categories of cases. *See Gen. Tel. Co.*, 457 U.S. at 162; *accord E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 405 (1977) (even for claims that "typically" involve common questions of law or fact, "careful attention to the requirements of [Rule 23] remains . . . indispensable"). As discussed below, this case is far different in many ways than typical price-fixing cases involving quantitative agreements relating to single commodity-type products.

within the Third Circuit is questionable in light of subsequent decisions. *Linerboard* involved classes of purchasers of corrugated containers and sheet made from linerboard; *OSB* involved structural panels made from oriented strand board. Plaintiffs characterize those cases as involving "fungible or commodity goods." Pls.' Mem. at 29, 33. This case does not: neither the semi-finished forms that plaintiffs call "raw steel," nor the finished products sold to members of the alleged class, are fungible commodities. This case involves a sprawling array of diverse products nothing like those at issue in *Linerboard* and *OSB*.

Moreover, the *Linerboard* panel endorsed a "presumption" of impact and adopted plaintiffs' experts' testimony without so much as mentioning contrary defense expert testimony. *See Linerboard*, 305 F.3d at 151-55. The Seventh Circuit has long disapproved such cursory treatment, *see, e.g., West*, 282 F.3d at 938; *Szabo*, 249 F.3d at 675-77, and the Third Circuit itself has retreated from this holding, finding in a subsequent case that "[e]xpert opinion with respect to class certification . . . calls for rigorous analysis" and that a presumption of impact is inconsistent with Rule 23. *Hydrogen Peroxide*, 552 F.3d at 323, 325-26; *see also Wal-Mart*, 131 S. Ct. at 2551. The *Hydrogen Peroxide* decision further observed that certain facts, such as increases in production during part of the class period and "substantial price disparities" between customers, distinguished that case from *Linerboard*. *See Hydrogen Peroxide*, 552 F.3d at 326. As described below, the facts in this case similarly defy comparison to *Linerboard*, and the opinions of plaintiffs' experts cannot withstand the rigorous analysis required in this Circuit.

1.     Steel Products Trade in Different Markets Requiring Different Proof

"Recovery under § 4 of the Clayton Act . . . requires proof of antitrust impact, which in turn requires proof of the relevant market." *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir. 2012). "Common proof of actual injury to each class member requires that all class members operate in the same relevant market, otherwise, they could not be

affected in a common manner by the challenged conduct." *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004); *see Funeral Consumers Alliance*, 695 F.3d at 348 (plaintiffs must show scope of class "corresponds with" a properly defined relevant market). Because classes lumping together distinct products trading in separate geographic or product markets are generally not amenable to common proof of impact, courts routinely decline to certify such classes.[27]

Here, the proposed class in no way corresponds with the scope of any market. Rather, plaintiffs are attempting to sweep into the class a vast number of products that plaintiffs appear to acknowledge are bought and sold in very different markets. It is not contested that, for example, rebar cannot be substituted for structural beam, hot-rolled sheet cannot be interchanged

---

[27] *See, e.g., Funeral Consumers Alliance*, 695 F.3d at 349-50 (rejecting nationwide class of casket buyers because caskets are bought in multiplicity of local geographic markets); *Abrams v. Interco Inc.*, 719 F.2d 23, 31 (2d Cir. 1983) (rejecting nationwide class of purchasers of scores of clothing product lines because determining impact "would be complicated by the scores of different products involved [and] varying local market conditions" and suggesting that to be manageable a class must be "limited to a single geographical area or product line"); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 328 (5th Cir. 1978) (reversing certification because "we do not understand how the plaintiffs can make this proof [of impact] without examining the relevant school bus market where each individual plaintiff is located"); *Exhaust Unlimited*, 223 F.R.D. at 513 (rejecting nationwide class of renters of worker uniforms because of multiple geographic markets); *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, No. 91-CV-76072-DT, 1993 WL 527928, at *3 (E.D. Mich. Oct. 19, 1993) (impact "not susceptible to any generalized class-wide method of proof" where laundry supplies involved in alleged conspiracy included "two different kinds of perc, 85 different types of poly, and 53 different types of hangers" sold in various geographic markets throughout Michigan); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (denying certification because "there are significant differences between the markets for macadamia nuts on Hawaii and on the mainland, between large and small purchasers, and between bulk and retail purchasers" and "[g]iven the diversity of markets, it can hardly be said that common issues predominate"); *In re Elec. Weld Steel Tubing Antitrust Litig.*, No. 79-4628, 1980 WL 1992, at *5 (E.D. Pa. Nov. 7, 1980) (no predominance where "the industry is extremely localized" and there were "myriad grades, shapes, finishes, and compositions of electric weld steel tubing"); *Hettinger*, 59 F.R.D. at 293 (denying certification where "conditions and effects of defendants' alleged activities are likely to vary greatly from geographic market to geographic market").

with cold-rolled sheet, tank armor plate cannot be substituted for plate used to make pipes, and galvanized sheet made for shipping containers cannot be swapped for galvanized sheet made for automobile fenders. *See* Pls.' Mem. at 34 (acknowledging "end-product differentiation"); *id.* at 21-22 n.9 ("the domestic market" varies product by product); █████████████████████ ████████████████████████████████████████████.

     Plaintiffs rely on the tenet that reduced supply leads to higher prices. Properly applied to the steel industry, that tenet would mean that, holding all other things equal, reduced supply of a certain grade of cold-rolled sheet would increase the price of only that type of cold-rolled sheet, reduced supply of Grade 60 rebar would increase the price of only Grade 60 rebar, and so forth. It does not mean that reducing the supply of any one of those products will increase the price of any of the others. After all, price is determined by the interaction of supply and demand within a given relevant market. ████████████████

_____

[28] ██████████████████████████████████████████████ ████████████████████████████████; *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984) (discussing effects of output reduction in terms of a "market" and a "product").

For instance, plaintiffs point to the shutdown of Gerdau's Beaumont mill in 2005 as Gerdau's alleged contribution to the plan to reduce output. Compl. ¶ 83. ████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

Production of different products sometimes moved in opposite directions during the class period, and some products' output generally *increased* during the class period. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ The claim of a purchaser of a product whose supply increased of course cannot be tried using common proof with that of someone who bought a product whose supply decreased.

Moreover, at trial the jury would have to examine each production reduction to determine whether it was driven by the alleged conspiracy as opposed to the legitimate business reasons that cause production to go up and down naturally. Even absent a conspiracy, steel mills like other businesses adjust production constantly in light of their order books, the cyclical demand for many steel products, and maintenance needs. The battle over whether any production reduction at a mill was the result of agreement, as opposed to legitimate business factors, would necessarily have to be waged at the mill level, and the answer as to one particular mill would not determine the answer as to any other mill, let alone mills that make a different product. Because

different mills make different products, evidence bearing on these issues will be mutually exclusive from one product to another. *See, e.g.*, Nolan Aff. ¶¶ 45-56.

Competitive conditions also vary widely between the markets for different products. ■

████████████████████████████████████████████████████████

███████████████████████████████████. High levels of construction activity might contribute to expanding demand for structural products at the same time flagging auto sales lead to a decline in orders for bar products used in automobile manufacturing. The competitive significance of competing, non-defendant suppliers such as imports varies widely from product to product. *See* Hausman Report at 13, 29-38. Such variances foreclose common proof of impact. *See Elec. Weld Steel Tubing*, 1980 WL 1992, at *5 (holding that impact could not be commonly proven where "each defendant was subject to different degrees of local pricing competition" in discrete relevant markets).

Different markets also foreclose common proof of impact and damages because they require separate analyses to determine the "but-for" prices that customers would have paid absent the conspiracy. The "but-for" price will depend on conditions in a particular market, and therefore "cannot be established without delineating the market in which [the transaction] occurs." *Exhaust Unlimited*, 223 F.R.D. at 513. That determination is at least a product-specific exercise, and, as further discussed below, often a customer-specific exercise. *See* Hausman Report at 65-66. The need to incorporate a "multitude of different variables" to determine customers' but-for prices "defeat[s] any reasonable notion of proof common to the class." *Hydrogen Peroxide*, 552 F.3d at 314 (internal quotation marks omitted).

Notably, plaintiffs' own proposed class definition reflects that whether purchasers could be impacted by the alleged conspiracy depends on product-specific factors. Plaintiffs

gerrymander out of the class many steel products that are made in the same mills, using the same production processes, as products that are in the class. *See* Pls.' Mem. at 21-22 n.9; *supra* note 22 (listing excluded products). Plaintiffs explain that products involving "extensive downstream fabrication or processing, or other unique characteristics" are "not fairly encompassed by [their] theory of the case." Pls.' Mem. at 21 n.9. But they apply that rationale haphazardly, leaving in the class many products that meet those criteria, *e.g.*, galvanized sheet products that undergo extensive downstream processing to confer rust-resistance. *See* Peaslee Report at 11-24 ("Steel products are highly engineered and manufactured to specific size, shape, mechanical properties, and final applications."). Plaintiffs' purported basis for excluding other products -- that "Defendants controlled a less dominant share of the domestic market during the relevant period" (Pls.' Mem. at 22 n.9) -- implicitly concedes that different products trade in different markets, market shares and concentration vary from one product to the next, and the alleged conspiracy would not have effects in markets where substantial non-defendant suppliers compete.

2.    Plaintiffs' "Raw Steel" Theory is a Fallacy

Rather than dispute the extensive diversity of the finished steel products in their proposed class, plaintiffs allege that defendants raised the prices of all steel products by reducing the supply of "raw steel." But plaintiffs' raw steel theory rests on a fiction.

Plaintiffs define "raw steel" as slabs, billets, blooms, or other forms of semi-finished steel in its first solid state. *See* Pls.' Mem. at 6. But slabs, billets, blooms, or other semi-finished forms are not "inputs" in any usual sense of the word, and are seldom bought or sold for a "price."[29] Far from being the interchangeable commodity input with a recognizable price that

---

[29] Plaintiffs and their experts cite a handful of documents, out of the millions of pages that were produced to them, that reflect purchases and sales of slabs and billets. For example, if a steel mill's rolling capacity exceeds its capacity to make slabs, it might bring in slabs produced

Footnote continued on next page

plaintiffs' impact theory surmises, raw steel is a transitory state within a production process dedicated to a specific product.

As discussed above, steel producers using the EAF production method use scrap steel as their primary input and transform it first into slabs, billets, or blooms and then into finished products in a single continuous process. *See* Peaslee Report at 17-24; *supra* at 7-9. Integrated manufacturers use iron ore, coke, and limestone as their inputs and transform those inputs into slabs and ultimately finished products. Each semi-finished shape has metallurgical characteristics that are specific to the finished steel product that the mill set out to make when it cast that semi-finished shape and specific to the rolling mill's configuration. Therefore, the semi-finished shapes could not be diverted to make some other product or often even the same product in another rolling mill. *See* Peaslee Report at 13-17, 28; Nolan Aff. ¶¶ 16, 20-23, 25, 27-32, 41, 43. And a significant portion of flat-rolled sheet produced by defendants is directly rolled and has no intermediate or semi-finished product that could be sold or transferred to another mill *See* Peaslee Report at 3-4, 17, 21-22; Nolan Aff. ¶¶ 14-19.

Because these customized, semi-finished shapes represent a transitory stage of production, to say that a mill reduced production of them is merely an alternate way of saying that the mill reduced production of whatever finished products it makes. As discussed above, an alleged conspiracy to reduce, by indeterminate amounts, production of a host of different

---

Footnote continued from previous page

elsewhere in order to achieve full utilization of its rolling capacity. But such transactions represent a tiny fraction of steel production in the U.S. ███████████████████████
███. Similarly, occasional use of the term "raw steel" within the industry and by analysts as a macroeconomic proxy for aggregate output of steel products does not suggest that raw steel itself is a product, much less a homogeneous commodity. *See* Nolan Aff. ¶ 14.

products trading in different markets defies any notion of common proof of impact. *See supra* Section II.B.1.

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ As already discussed, the alleged reductions in "raw steel" output could not have led to any increase in the price of raw steel because raw steel is merely an intermediate production stage, not (except in rare cases) an input that defendants purchase or sell for a price or treat as a cost. ████████████████

███████████████████████████████████████████████

███████████████████████████ Neither fictional constructs about raw steel nor specious analogies to other industries can rehabilitate plaintiffs' flawed theory of common impact.

       3.     Different Purchasers of the Same Product Are Often Differently Situated

Not only would purchasers of different products have to rely on different evidence to establish impact, but even within a given product, purchasers' circumstances vary dramatically. Purchasers of steel products range from small businesses that buy a few tons here and there to Fortune 500 manufacturing companies, such as automakers, that systematically purchase hundreds of millions of dollars worth of steel products every year. ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████

Naturally, the bargaining power of these buyers varies widely. A manufacturer who reduced production of a given product might well decide to keep selling the same quantity as before, at the same price, to its best customers, while limiting sales to new or more sporadic customers. ███████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████[30]

4.    Purchasers Would Be Differently Affected by the Alleged Conspiracy
      Depending On When They Purchased

For contract and spot market purchasers alike, the determination of impact and damages will vary significantly depending on when during the class period they made purchases of steel products. Plaintiffs' theory is that reductions in the production of "raw steel" caused prices for finished steel products to increase. █████████████████████████████████████████

---

[30] Plaintiffs have crafted their class definition to attempt to exclude purchasers with long-term contracts who locked in prices before the alleged conspiracy, but they offer no explanation of how those purchasers would be identified, creating a separate problem of ascertainability. *See infra* Section IV.

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████

Plaintiffs have not articulated how sporadic production reductions during specific windows of time could affect class members who purchased at other times during a lengthy class period. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████

A purchaser in December 2007 was separated from the last allegedly coordinated production reduction by a full year and bought at a time when aggregate production was near its highest point in three years. Plaintiffs' proposed class would nevertheless lump that purchaser together with someone who purchased in July 2005, when plaintiffs say "the industry cutbacks were in full effect" (Pls.' Mem. at 10), or in November 2006, the point of the largest overall

decrease during the period. There is no way plaintiffs could use common proof to show that purchasers with such dramatically different circumstances were impacted.

Courts have denied certification in other situations where customers alleged that a short-term supply squeeze affected transactions spread over a longer period of time. In *McCullough v. Ferruzzi Trading Int'l, S.A.*, No. 90 C 1138, 1993 WL 795256 (N.D. Ill. Jan. 8, 1993), buyers of soybean futures contracts alleged that Ferruzzi manipulated the August 1989 soybean contract to artificially high price levels, and sought certification of a class of purchasers of those contracts between April 1, 1989 and July 11, 1989. The court denied certification, concluding that because futures prices fluctuate daily based on multiple factors, "Plaintiff's attempts at proving an artificially high price for his purchase of six soybean futures on April 27, 1989 will not prove the claims of all other class members"; specifically, because "proof that the August contract was manipulated in April" would not "establish that the August contract was manipulated at other times, such as in June or July." *Id.* at *4.

Here, the temporal variations are even more striking than those in *Ferruzzi*. The proposed class period is nearly ten times the three-and-a-half months in *Ferruzzi*. The proposed class consists of purchasers not of a single futures contract, but hundreds of distinct steel products sold in different markets for different uses and subject to different supply and demand conditions. There is no plausible way plaintiffs could ever establish impact or damages on a common basis all at once for all class members.

**C.    Plaintiffs Have Not Offered a Valid Common Method of Proving Impact or Damages**

Despite these intractable barriers to class treatment, plaintiffs proffer four categories of evidence that they claim can be used to establish impact on a class-wide basis at trial:

(1) Dr. Solow's supposed analysis of the structure, conduct, and performance of the "market";

- 34 -

(2) Dr. McClave's econometric analysis; (3) pricing data; and (4) statements and documents from defendants' management. As shown below, none of these categories -- individually or cumulatively -- supports a finding that either the fact or extent of impact to each class member is provable using common evidence.[31]

      1.     Dr. Solow's Opinions About Market Structure, Conduct, and Performance Do Not Constitute a Classwide Method for Proving Impact

Plaintiffs rely on testimony of their economic expert, Dr. Solow, as supposed "common economic proof" that can be used to establish impact at trial. *See* Pls.' Mem. at 31-36. But Dr. Solow's opinions are not based on sound economic analysis and are predicated on profoundly mistaken factual assumptions about how steel is made and a failure to determine or describe the markets in which steel products are sold.

---

[31] As noted above, defendants have separately moved to exclude the opinions of Dr. Solow and Dr. McClave pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). If the Court nevertheless considers Dr. Solow's and Dr. McClave's opinions in deciding whether to certify a class, it must at least engage in a rigorous analysis of those opinions in light of the rebuttal offered by defendants' experts, Dr. Hausman, Dr. Peaslee, and Ms. Hillman. *See West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008). That rigorous analysis will reveal that Dr. Solow and Dr. McClave's opinions do not assist plaintiffs in carrying their burden of showing that impact and damages for each class member can be determined using common evidence.

████████████████████████████████████████████████████

████████████████ Dr. Solow emphasizes in his own antitrust treatise that one cannot

meaningfully determine market power without a "properly defined market." *See* Ex. 41, IIB

Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law* ¶ 404(d) (3d ed. 2007).

That proposition is reaffirmed in both the law of this Circuit and the economic literature

Dr. Solow relies upon in his report.[32]

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

    As Dr. Solow has made clear in his academic work, "[t]o define a market is to identify

those producers providing customers of a defendant firm (or firms) with alternative sources for

the defendant[s'] product or service." Ex. 41, IIB Areeda, Hovenkamp & Solow, *supra*, ¶ 530(a)

(footnote omitted); *see generally Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)

---

[32] *See Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("Economic analysis [in an antitrust case] is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market."); Ex. 42, Frank M. Scherer & David Ross, *Industrial Market Structure and Economic Performance* 4 (3d ed. 1990) ("performance" depends on "conduct," which in turn depends on the "structure of the relevant market"); *id.* at 74 ("even more important than choosing the proper index of concentration is ensuring that the market for which concentration is being measured is properly defined").

(market depends on "interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it").  As discussed above, the slabs, billets, and blooms that Dr. Solow labels "raw steel" are transitory forms that exist as an intermediate step along each company's internal production process.  *See* Peaslee Report at 11-24; Nolan Aff. ¶¶ 11, 19-21, 24, 26-30, 42. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

_____

[33] ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
███████

The confusion surrounding Dr. Solow's purported analysis of "concentration" is symptomatic of a more fundamental problem. A bona fide analysis of market structure would focus not on an internal stage of production, but on the products defendants actually sell to class members, *e.g.*, rebar, cold-rolled sheet, structural steel, or tank armor, to name a few. But if Dr. Solow took that approach, he would have to actually perform many different and separate market structure analyses for the sprawling variety of products that are in the class.

Such a product-by-product market analysis would have revealed not only that the demand for plate and rebar (and even the demand for plate and sheet) are different, but also that the defendants who produce rebar mostly do not overlap with those who produce plate. They sell to distinct sets of customers in varying industries, and they face differing levels of competition from very different sets of non-defendant producers both domestic and foreign. *See* Hausman Report at 10 ("Each steel product is heterogeneous, with different prices, demand conditions, cost conditions and competitive conditions."). Thus, the market structure analysis relevant to the claim of Wilmington Steel (which bought plate) would be very different from the market structure analysis relevant to the claim of Alco Industries (which bought pressure grade steel sheet). *See, e.g., id.* at 29 ("Customers of steel armor plate would not substitute to other types of steel in response to a small (or any) price change, and the same holds true for almost all customers of heterogeneous steel products. Economists have long recognized that concentration statistics cannot be used across different markets for heterogeneous products, or must be modified to take account of demand substitution effects."). The need to conduct such *seriatim* market analyses would be the antithesis of *classwide* proof. Dr. Solow cannot evade that problem by pretending to analyze a hypothetical "raw steel" market that does not exist in the real world.

Dr. Solow's SCP analysis also assumes away the pivotal role of imports in the various markets for steel products. For example, his supposed estimates of "concentration" (Solow Report ¶¶ 20-21) are arbitrarily limited to domestic producers even though imports represent an alternative source of supply. *See, e.g.*, *FTC v. Occidental Petroleum Corp.*, Civ. A. No. 86-900, 1986 WL 952, at *7 (D.D.C. Apr. 29, 1986) (rejecting market structure and concentration analysis that "fail[ed] to account for imports or the competitive pressure exerted" by foreign producers with 6-11% of U.S. sales, and thus "greatly overstate[d] the ability of firms in the market to exercise any degree of market power"). ███████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████

However, former Commissioner of the International Trade Commission Jennifer A. Hillman shows that Dr. Solow's opinions about barriers to imports of steel products are as fictional as his conclusions about "market" structure. Dr. Solow overlooks that two of the five supposed barriers that he relies upon -- tariffs and import quotas -- did not exist for any steel product at any time during the alleged class period. *See* Hillman Report ¶¶ 9-10. Antidumping and countervailing duty measures are designed to correct for specific, proven unfair trade practices by certain foreign producers, not to wall the U.S. off from imports generally. *See id.* ¶¶ 29-30. Such measures, when adopted, apply to particular steel products, cover only imports of such products from specified countries and producers, and have a limited duration. *See id.* ¶¶ 31-32. Only 9.6% of imports of products included in the alleged class were subject to

antidumping or countervailing duty orders in the 2005-2007 period.  *See id.* ¶ 31.  Any evaluation of the impact of such orders would be a product-specific or even more granular inquiry.  *See id.* ¶ 33-36.  Likewise, the market share of imports, and how that market share changed during the period at issue, varies widely from product to product.  *See id.* ¶ 14.  Overall, however, imports of the steel products in the alleged class surged into the U.S. during the period, increasing for example by 49.9% from 2005 to 2006, refuting any suggestion that the factors cited by Dr. Solow served to limit import competition across the board.  *See id.*

In sum, Dr. Solow's opinions about the structure, conduct, and performance of the "market" are riddled with flaws from beginning to end.  "While a market with the characteristics described by [plaintiff's expert] may in theory be vulnerable to a price-fixing conspiracy," that theoretical principle is useless where, as here, "the markets at issue in this case do not actually possess those characteristics."  *In re Plastic Additives Antitrust Litig.*, No. 03-CV-2038, 2010 WL 3431837, at *7 (E.D. Pa. Aug. 31, 2010); *see also In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2012 WL 27668, at *11 (S.D. Fla. Jan. 3, 2012).  Dr. Solow's ill-formed opinions do not help plaintiffs show impact on a common basis.

> 2.      Dr. McClave's Econometric Model Is Incapable, By Design, of Determining Whether and The Extent to Which Any Class Member Was Impacted

Plaintiffs also offer Dr. McClave's econometric analysis as evidence of impact that could be used in common by all class members to prove individual claims.  *See* Pls.' Mem. at 37-39.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████  ██  ███████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████

34
██████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████

As explained below, Dr. McClave's model, operating as it does at the aggregate level, cannot determine whether there has been impact at the individual level as required by Rule 23, and Dr. McClave's "all or virtually all" inference is a shot in the dark, not a scientific conclusion. Dr. McClave's model is equally worthless for calculating the amount of any purchaser's damages.

        a.      Dr. McClave's Model Cannot Show Whether Any Class Member Was Impacted by the Alleged Conspiracy

The Clayton Act requires each individual purchaser of each steel product to prove by a preponderance of the evidence that he individually was "injured in *his* business or property." 15 U.S.C. § 15 (emphasis added). To prove that the overall class *as a whole* or *on average* was injured would not entitle any plaintiff or class member to relief. Yet all that Dr. McClave even purports to do is to estimate a "class-wide overcharge," *i.e.*, the aggregate overcharge to the class as a whole. Pls.' Mem. at 36. That estimate, however accurate or inaccurate it may be, cannot tell the fact-finder whether Standard Iron Works, Eastern States Steel, Gulf Stream Supply, or any one of the tens of thousands of absent class members was overcharged.

Dr. McClave admits this deficiency. As he told the Court at the July 18 hearing, "[t]his model . . . is not done at the customer level. It is, it is a model that's done at a more aggregated level." Ex. 43, Hr'g Tr. 47, July 18, 2012. "So trying to apply this model . . . at the customer level, I think is not a correct use of the model. . . . This model was not designed to do that." *Id.* at 49.





It thus falls far short of satisfying plaintiffs' burden. *See, e.g.*, *Plastic Additives*, 2010 WL 3431837, at *19 (where plaintiff's expert "admits that his regressions are not necessarily representative of individual class member experience," court "find[s] that Plaintiffs cannot rely on [expert's] regressions to demonstrate impact on a basis common to the class").

Courts in this District and elsewhere have repeatedly rejected the use of averages as a common method of showing antitrust impact on individual class members. For example, in

*Reed*, as here, plaintiffs offered a model that "result[ed] in a single estimated average percentage of [impact] to be applied to all [members of] the class." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009). Judge Grady found this to be "a 'fundamental flaw' in [plaintiffs' expert's] approach." *Id.* Because "[m]easuring average [impact] does not indicate whether each putative class member suffered harm from the alleged conspiracy," it is "not a methodology common to the class that can determine impact with respect to each class member." *Id.*[36] Indeed, "[i]f data points are lumped together and averaged before the analysis," as was done by Dr. McClave here, "the averaging compromises the ability to tease meaningful relationships out of the data." *Graphics Processing Units*, 253 F.R.D. at 493. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[36] *Accord Blades v. Monsanto Co.*, 400 F.3d 562, 573-74 (8th Cir. 2005) (evidence that price-fixing agreement raised the *average* price of corn and soybean seeds was insufficient to show common impact when the actual prices of seeds varied widely); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493-94 (N.D. Cal. 2008) (plaintiffs' expert's use of averages "evaded the very burden that he was supposed to shoulder--*i.e.*, that there is a common methodology to measure impact across individual products and specific direct purchasers"); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, Civ. A. No. 04-5898, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010) ("[a]verage prices falter as a method for proving class-wide injury" because they "say[] nothing about the actual price paid by each purported class member"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 167 (C.D. Cal. 2007) (rejecting plaintiffs' reliance on averages because "the relevant question is what each purchaser paid in the actual world, relative to what that purchaser would have paid in the but-for world," not "relative to the *average price* of [the product] in the but-for world") (emphasis in original).



In short, Dr. McClave's makeweight, untested, untestable, and unquantifiable "all or virtually all" inference is a speculative afterthought, not a principled conclusion. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). Common proof of impact to justify certification of one of the largest and most disparate antitrust classes in history seeking billions of dollars in damages must consist of more than Dr. McClave's assurances that he knows it when he sees it.

                b.      Dr. McClave's Model Is Inadequate for Calculating the Amount of Any Individual Class Member's Damages

"[T]he very same flaws in the use of" Dr. McClave's analysis "to show class-wide impact apply to its use for calculation of damages on a class-wide basis." *Allied Orthopedic Appliances*, 247 F.R.D. at 176. In some antitrust cases a need for individualized proof of damages may not be "an obstacle to a showing of predominance" because apportioning damages involves simple

- 45 -

arithmetic (*e.g.*, multiplying quantity purchased by per-unit overcharge).  *See Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 815 (7th Cir. 2012).  But class treatment is inappropriate where "'the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate.'"  *Reed*, 268 F.R.D. at 595 (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003)); *see Espenscheid v. DirectSat USA, LLC*, No. 12-1943, 2013 WL 407446, at *2 (7th Cir. Feb. 4, 2013) (acknowledging that in some cases "the calculation of monetary relief will be mechanical, formulaic, a task . . . for a computer program," but holding that certification is improper where "[n]othing like that is possible") (internal quotation marks omitted).

Plaintiffs contend that Dr. McClave's model can be used to determine each class member's damages easily and mechanically.  *See* Pls.' Mem. at 38-39 & n.20 (while "damages amounts will vary, depending on the volume of steel a given class member purchased," damages for each individual class member could be "apportioned arithmetically").  ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████

But Dr. McClave's admissions in open court and deposition put the lie to those breezy assurances.  ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████[37]

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Yet plaintiffs

propose that the Court could determine damages using a model that is pre-programmed to ignore

such variances and to award damages to every class member in a fixed, identical percentage.

These admissions leave no doubt that Dr. McClave's model is incapable of calculating

and awarding damages to each individual class member. █████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ *See Espenscheid*, 2013 WL

407446, at *3 (rejecting use of averages to calculate damages of class members in wage-and-

hour case where "[n]o one thinks there was . . . uniformity" in the class members' circumstances,

because such extrapolation would "confer a windfall" on some class members while

"undercompensat[ing]" others).

---

[37] *See* Ex. 43, Tr. (7/18/12) at 44; ████████████████████████████████

████████████████████████████

c.      Dr. McClave's Model Suffers From Methodological Defects That Make It Unreliable Even For Addressing Impact and Damages at the Aggregate Level

Even taken as a methodology for measuring an aggregate "overcharge" level, Dr. McClave's model is "flawed by poor basic data, unstated assumptions and unskilled application." *Mercado v. Ahmed*, 756 F. Supp. 1097, 1102 n.13 (N.D. Ill. 1991).

First, the model is incorrectly specified and fails some of the most basic and fundamental specification tests utilized by econometricians. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Second, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████.

     Third, ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████

     These findings have two important implications.  The first is that Dr. McClave's regression analysis is deeply flawed and unreliable.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████.  ██████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

- 49 -

████████. This only underscores the futility of attempting to prove antitrust impact in this case using common evidence. As Dr. Hausman explains, █████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.

In addition, Dr. McClave's comparison of prices in the alleged conspiracy period with pre- and post-period price data ignores important differences among these time periods, ███████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████.

Intuitively, such an assumption makes little sense, ████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████. Dr. McClave's failure to account for this variance over time thus renders his model utterly unable to accurately predict price effects.

3. ██████████████████████████████████████████
██████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████[38]

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

---

38 ██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

Even if those flaws could be overlooked, actual examination of plaintiffs' price

comparison charts belies the conclusions plaintiffs would have the Court draw from them. ■

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████

---

39 █████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████
40 ████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
███

If "similar trend" has no objective meaning other than whatever Dr. Solow selectively chooses to see, it should not serve as the basis for certifying a class joining together hundreds of differently situated purchasers of disparate and independently priced steel products. *See In re Plastic Additives Antitrust Litig.*, No. 03-CV-2038, 2010 WL 3431837, at *13-14 (E.D. Pa. Aug. 31, 2010) (rejecting plaintiffs' experts' "visual observation" of price lines on graph because closer examination of graph showed "prices for some products remaining steady while the prices for others either fall or rise"); Hausman Report at 49 ("[R]eliable economic analysis must consider more than price movements, as changes in costs, demand, and competitive conditions also affect the extent to which there is any antitrust impact.").

████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████████████████████████████

██████████████████████████████████

█████████████████████████████████

██████████████████████████████████

████████████████████

"Generally, when the prices for some customers are going up while the prices of other customers are not, there is reason to doubt that different customers (class members) are experiencing a common impact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 314 n.12 (3d Cir. 2008) (internal quotation marks omitted). The above demonstrations confirm that plaintiffs' reliance on "similar trends" in average prices is entitled to no weight and that impact

cannot be adjudicated through common proof in this case. *See Plastic Additives*, 2010 WL 3431837, at *14 (crediting defense expert's finding that "prices paid by individual customers" moved "in opposite directions"); *Hydrogen Peroxide*, 552 F.3d at 326 (crediting defense expert's empirical analysis showing "substantial price disparities" among customers); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591-92 (N.D. Ill. 2009).

       4.      Defendants' Statements Do Not Show Impact On a Classwide Basis

      Finally, plaintiffs argue that documents produced in discovery contain statements by defendants' managers that plaintiffs say admit classwide impact. *See* Pls.' Mem. at 30-31. But the documents plaintiffs rely upon admit nothing of the sort. For example, plaintiffs make much of a document in which a representative of one of the defendants said ████████████

████████████████████████████████████████████████████████

█████. But the issue before the Court is whether plaintiffs could use common proof to show that the alleged conspiracy affected all or nearly all of the over 30,000 putative class members, not whether it affected all of the producers.

      In that regard, macro-level statements that ████████████████████████████

████████████████████████████████████████████████ say *nothing at all* about whether *any individual purchaser* paid a higher price, let alone *all of them*. Such "stray statements . . . are not an adequate substitute for a cogent theory of common adverse impact." *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 265 (D. Vt. 2011) (rejecting reliance on general statements about effect on the "entire market"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165-66, 172-73 (C.D. Cal. 2007) (finding no common proof of impact and denying certification where plaintiffs' expert "merely recites statements pulled from predictive internal [company] documents without meaningful further investigation"). ██████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████

Other statements plaintiffs rely on similarly speak to pricing for specific products in specific situations, not all steel products across the board. ████████████████

████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████

Plaintiffs do not, because they cannot, explain how any of these generalized statements about effects on pricing for particular products in particular markets would be useful to prove impact on a customer purchasing a different product -- for example, how the statements about impacts on sheet pricing would help named plaintiff Gulf Stream, which purchased only rebar, show that it was impacted.  To the contrary, plaintiffs' own examples vividly illustrate how the evidence is likely to vary from one customer to the next.  Plaintiffs of course cannot carry their

burden by "cherry-pick[ing] from among [defendants'] various forecasts the predictions and

conclusions most consistent with and helpful to [p]laintiffs' theory of the case" while "ignoring

equally reliable predictions and conclusions found in the very same internal documents." *Allied

Orthopedic Appliances*, 247 F.R.D. at 173.

## III.   THE NAMED PLAINTIFFS ARE NEITHER TYPICAL NOR ADEQUATE REPRESENTATIVES OF THE PROPOSED CLASS

The Court also should deny certification because plaintiffs fail to meet the typicality and

adequacy requirements of Rule 23(a)(3) and (a)(4).  The evidence at a trial of any of the named

plaintiffs' individual claims would not even prove the claims of the next named plaintiff, let

alone those of the 30,000 diverse class members.  Plaintiffs cannot adequately represent a

significant portion of the putative class -- steel service centers -- because they accuse the leading

service center trade association of facilitating the alleged conspiracy.  Moreover, one of the

named plaintiffs, Wilmington Steel Processing, is not a typical or adequate representative

because it has sold its business and thus no longer owns any claim.

### A.   The Named Plaintiffs' Claims Are Not Typical of Those of Putative Class Members

Typicality and adequacy "serve as guideposts for determining whether under the

particular circumstances maintenance of a class action is economical and whether the named

plaintiff's claim and the class claims are so interrelated that the interests of the class members

will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457

U.S. 147, 157 n.13 (1982); *accord CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d

721, 726 (7th Cir. 2011).  The typicality requirement "directs the district court to focus on

whether the named representatives' claims have the same essential characteristics as the claims

of the class at large." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir.

1993) (internal quotation marks omitted).  Typicality is not satisfied if class members were not

"treated identically" or their claims depend on individualized facts.  *Id.*; *see Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (no typicality where claim is "subject to certain specific factual defenses").  Courts ask whether "proof of [named plaintiffs'] claims will not necessarily prove all of the class members' claims."  *Hickey v. Great W. Mortg. Corp.*, No. 94 C 3638, 1995 WL 121534, at *9 (N.D. Ill. Mar. 17, 1995); *accord Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 511 (S.D. Ill. 2004) (using same test in an antitrust case); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) ("as goes the claim of the named plaintiff, so go the claims of the class").[41]

Here, the key evidence that would likely be presented at an individual trial of each of the five named plaintiffs' claims would not determine the validity of even the other named plaintiffs' claims, let alone the claims of some 30,000 absent class members.  Named plaintiff Wilmington Steel purchased plate, a product made by only three of the eight defendants (Nucor, ArcelorMittal, and SSAB) at eight U.S. mills.  Thus, to advance its claim Wilmington Steel would need to demonstrate that Nucor, ArcelorMittal, and SSAB materially reduced production at one or more of those eight mills, and that any reductions were conspiratorial rather than driven by legitimate business reasons such as fewer orders or maintenance needs.  *See, e.g.*, Ex. 47, at 5 (explaining that July 2005 outage at SSAB's Mobile, Alabama plate mill relied on by plaintiffs began as a result of hurricane evacuation and was briefly extended to accommodate maintenance that could not be done while mill was running).

---

[41] This inquiry encompasses likely defense arguments as well as the plaintiff's case in chief.  *See CE Design*, 637 F.3d at 726 ("[t]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation") (internal quotation marks omitted); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 293 (N.D. Ill. 1983) (court must ensure "the class format will similarly accommodate defendants' right to present their side of the story").

In such a trial, it would not help Wilmington Steel to show that U. S. Steel shut down a large blast furnace at a mill that made sheet, or that CMC reduced production of rebar. Nor would it help Nucor defend against Wilmington Steel's claim to explain why it legitimately reduced production at one of its mills making a product other than plate or that, as Dr. Hausman explains, production of structural beam generally increased during the alleged output restrictions. Hausman Report at 39-41.

The individual trial of the claims of Gulf Stream Builders Supply would look very different. Gulf Stream bought rebar, a product made by a different subset of the defendants (Nucor, Gerdau, and CMC). Gulf Stream would have no need to bring out any facts relating to reduced production at the plate mills of critical importance to Wilmington Steel's claim, or, for that matter, to the blast furnaces of ArcelorMittal and U. S. Steel that make sheet. A jury hearing Gulf Stream's claim would have no need to think about whether the 2005 outage at SSAB's plate mill in Mobile was explained by the hurricane evacuation. Instead, the parties would likely spar over issues such as plaintiffs' allegation that Nucor acted anticompetitively by taking a week of downtime late in 2005 at a Texas mill that makes rebar.[42] It would also be imperative for Gulf Stream, which is situated in a prime coastal market for imported rebar, to show that the widespread availability of imported rebar did not insulate it from the alleged domestic conspiracy.

The body of evidence at the trial of Standard Iron Works' claim, in turn, would be different from that of either Wilmington Steel or Gulf Stream. ███████████████

---

[42] *Compare* Compl. ¶ 79 (alleging Nucor "followed suit, announcing downtime on June 28, 2005"), *with* Ex. 48, *American Metal Market*, June 28, 2005 and June 29, 2005 correction (explaining that the announcement was about a standard one-week maintenance outage that would not occur until the following September, after the June/July 2005 production cuts alleged by plaintiffs).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ Standard Iron Works would have to

deal with a different issue that would not confront Gulf Stream:  the fact that production of

structural products generally remained steady or increased during the alleged production

cutbacks.  *See* Hausman Report at 39-41; Nolan Aff. ¶¶ 76-78.  In all of these examples, "proof

that one Plaintiff was overcharged is not probative of whether other class members were

overcharged," *Allied Orthopedic Appliances*, 247 F.R.D. at 178, and the body of evidence that

would be necessary to prove any plaintiff's individual claim "will not necessarily prove all of the

class members' claims," *Hickey*, 1995 WL 121534, at *9.

      The named plaintiffs are particularly atypical of the largest and most important

purchasers of steel products, such as automakers and steel service centers, who purchase billions

of dollars of steel products every year.  *See, e.g.*, Hausman Report 17 n.29.  These high-volume

purchasers have special relationships and arrangements with steel mills and use their substantial

leverage to individually negotiate the prices they pay.  The named plaintiffs, each of which

purchased just a few million dollars worth of various steel products over the alleged class period,

*see* Ex. 59, cannot serve as typical or adequate representatives of such differently situated

entities.  *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489-90 (N.D. Cal.

2008) (holding that individual consumers who made isolated purchases could not represent a

class of wholesale businesses that "purchased a vast array of products on individually negotiated

terms" and "therefore came to the negotiating table in a fundamentally different position").

- 59 -

B. **Plaintiffs Are Particularly Inadequate Representatives of Steel Service Centers**

Plaintiffs also undercut their own adequacy as representatives by accusing a significant component of the putative class -- steel service centers -- of facilitating the alleged conspiracy. *See In re Commercial Tissue Prods.*, 183 F.R.D. 589, 594-95 (N.D. Fla. 1998) (observing that there "would surely be a conflict of interest" if "the plaintiffs are going to try to prove that some distributors, who would otherwise be class members, were actually coconspirators with the manufacturers"). The principal trade association for steel service centers is an organization called the Metals Service Center Institute ("MSCI"), whose "members comprise *the largest single group of metals purchasers* in North America, totaling *more than 75 million tons* of steel, aluminum, and other metals each year."[43] Plaintiffs allege that MSCI -- and by necessary implication, the class members who control it -- "facilitated implementation and monitoring of the conspiracy" and sponsored numerous conspiratorial meetings. *See* Compl. ¶ 172; Pls.' Opp'n to Mot. to Dismiss at 8, 14 n.7, 17, 19, 19 n.11, 21, 22, 39 n.19, ECF No. 132. Plaintiffs clearly cannot represent the very class members they accuse of conspiring with the defendants.[44]

---

[43] Ex. 52, *About Us: History*, Metals Service Center Institute, http://www.msci.org/ABOUTUS/History.aspx (emphasis added).

[44] Plaintiffs' ability to represent service centers adequately is also questionable because many large service centers are on record as supporting production reductions at the same time periods over which plaintiffs are suing. *See, e.g.*, Ex. 49, Reliance Steel Quarterly Earnings Call, Oct. 19, 2006, at 4; Ex. 50, Olympic Steel Quarterly Earnings Call, Nov. 1, 2006, at 4; Ex. 51, Metals USA Quarterly Earnings Call, Feb. 26, 2007, at 2-5. These major purchasers of certain steel products considered reducing production at times of flagging demand to be rational independent conduct that benefited the entire industry."[A] class is not fairly and adequately represented if class members have antagonistic or conflicting claims" because, for example, some class members support or benefit from the challenged conduct. *Retired Chi. Police Ass'n*, 7 F.3d at 598; *see Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1196 (11th Cir. 2003).

**C.**   **Plaintiff Wilmington Steel Is Not a Typical or Adequate Representative Because It No Longer Owns Any Claims**

Wilmington Steel is not a proper plaintiff -- let alone a proper class representative -- because it sold, in two separate transactions, any legal claims it ever had relating to steel purchases. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████   Through the September 2006 transaction, Concord Steel -- not Wilmington Steel -- became the owner of any alleged antitrust claims arising out of Wilmington Steel's purchases of steel products from defendants through September 2006.

████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

█████████████████████; Ex. 56 ¶ 4 (motion filed by Wilmington Steel in unrelated litigation

stating "[o]n or about May 19, 2008, WSP sold all of its remaining assets and business to [VR Laser Services].").  █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████ ██ Thus, any claims relating to purchases of steel products that Wilmington Steel had not already sold to Concord Steel in September 2006, or that may have accrued after September 2006, were transferred to VR Laser Services in the May 2008 transaction.

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ Under Delaware law, ████████████████████████████████████

█████████████████ "accounts receivable" means a "right to payment for goods sold or leased

---
[45] █████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████

or for services rendered which is not evidenced by an instrument or chattel paper." *Bramble Transp., Inc. v. Sam Senter Sales, Inc.*, 294 A.2d 97, 100 (Del. Super. Ct. 1971). Wilmington Steel's own understanding of the phrase "accounts receivable," as admitted under oath, is consistent: "accounts receivable" is "money owed to us . . . *from the invoices that were not paid*." ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

 As a result of these transfers, Wilmington Steel no longer owns any antitrust claims it previously may have possessed relating to its purchases of steel products during the alleged class period. Indeed, in a November 2012 deposition taken in another case, Wilmington Steel's principal admitted that it does not own any assets at all.[46] Having transferred any such claims, Wilmington Steel lacks standing to assert them and cannot serve as a class representative.[47]

---

[46] ████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

[47] *See In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 435-36 (8th Cir. 1999) (affirming denial of certification in antitrust case where putative representative had sold "substantially all [its]

Footnote continued on next page

- 63 -

## IV.    THE PROPOSED CLASS IS NOT ASCERTAINABLE

In addition to the express requirements of Rule 23, certification requires that the composition of the class be "precise, objective, and presently ascertainable."  *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000) (internal quotation marks omitted), *aff'd sub nom. Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002).[48]  The class definition must effectively "communicat[e] to [potential class members] what they need to know to decide whether they are in or outside the proposed class."  *Id.* at 358.  For example, the court in *Copper Antitrust Litigation* found that a class definition excluding purchasers who paid a price "derived from the price that a prior purchaser had paid" because such purchasers would have been insulated from the anticompetitive conduct "postulat[ed] an incomprehensible test" and consequently denied certification.  *Id.* at 359-60.

Plaintiffs' class definition in this case also suffers from an "incomprehensible test." Plaintiffs seek certification of a class of "[a]ll persons . . . who Purchased Steel Products directly from any of the Defendants or their subsidiaries or controlled affiliates at any time between April 1, 2005 and December 31, 2007 . . . for delivery in the United States."  Pls.' Mem. at 21. But the definition limits the word "Purchased" to "transactions for which pricing was negotiated *and* delivery was received during the class period," thereby excluding purchases made after

---

Footnote continued from previous page

business assets to unrelated purchasers" prior to filing suit); *Vasiliow Co. v. Anheuser-Busch, Inc.*, 117 F.R.D. 345, 347 (E.D.N.Y. 1987) (holding that corporate plaintiff could not serve as class representative in antitrust case because it had "sold its claim for damages" by consummating a transaction "to sell all of its business assets" without "exempt[ing] from the sale of assets this or any other cause of action"); *see also Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) ("[N]amed plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives.").

[48] *Accord Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495-97 (7th Cir. 2012); *Wooley v. Jackson Hewitt Inc.*, No. 07 C 2201, 2011 WL 1559330, at *4 (N.D. Ill. Apr. 25, 2011).

April 1, 2005 but at prices determined prior to that date, for example under pre-existing long-term contracts.  Introducing yet another layer of complexity, the class definition then puts back into the class some sales under pre-existing contracts, specifically, "transactions for which a sales contract was negotiated before the class period but (i) delivery was received during the class period *and* (ii) the actual transaction price under the contract was adjusted (or indexed) based on market pricing that prevailed during the class period."  Pls.' Mem. at 21-22 (emphasis in original).

This convoluted sequence of tests fails to give potential class members the required bright line.  Steel purchasers would have to recall the precise timing and details of contracts and purchases from many years ago.  Even for steel purchasers who have kept archives of such documents, the project of pulling and analyzing those documents to determine one's class membership would constitute "arduous individual inquiry," not "ministerial review."  *Wooley*, 2011 WL 1559330, at *4 (internal quotation marks omitted).  ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  The ascertainability requirement is not met "where nothing in company databases shows or could show whether individuals should be included in the proposed class."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

Plaintiffs' attempt to exclude purchases under pre-existing, fixed-price contracts reflects an implicit concession that, without that exclusion, the class would include purchases that could

- 65 -

not have been impacted by the alleged conspiracy. There is no logical way, and not even plaintiffs' experts opine, that production reductions after April 1, 2005 could have affected purchases at prices determined prior to that date. But plaintiffs' proposed work-around -- stating that the transactions are carved out without explaining how -- merely swaps that problem for a different but equally formidable ascertainability issue. Whether viewed from the perspective of lack of impact on a substantial number of purchases, or lack of a method to readily ascertain the identities of those customers, the bottom line is that the proposed class cannot be certified.

## V. CLASS LITIGATION IS NOT A SUPERIOR METHOD FOR ADJUDICATING THIS CONTROVERSY

In addition to requiring predominance, Rule 23(b)(3) permits certification only if the Court finds "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Here, a class action is not a superior method. As "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (citation and internal quotation marks omitted), class actions are "designed for situations . . . in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate," *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006). Courts in this District and elsewhere have often found that class litigation is not a superior method for adjudicating business-against-business claims large enough to be litigated economically on an individual basis.[49]

---

[49]  *See, e.g.*, *Premium Plus Partners, L.P. v. Davis*, No. 04 C 1851, 2008 WL 3978340, at *6 (N.D. Ill. Aug. 22, 2008) (denying certification pursuant to *Murray* because plaintiff alleged "significant" losses), *aff'd*, 648 F.3d 533 (7th Cir. 2011); *Martino v. McDonald's Sys., Inc.*, 86 F.R.D. 145, 150 (N.D. Ill. 1980) ("[t]his is not a case where the individual franchisees are impecunious, or where [their] claims are small" and "[f]ailure to certify the class would not be the 'death knell' of any action by the individual franchisees"); *Hettinger v. Glass Specialty Co.*, 59 F.R.D. 286, 295 n.26 (N.D. Ill. 1973) (Bauer, then D.J.) ("since the anti-trust laws permit the recovery of treble damages and reasonable attorney's fees, a denial of a class action will not

Footnote continued on next page

The steel products sold by defendants are purchased not by individual consumers of modest means, but by some of the largest and most powerful corporations in the country. These corporations, including such businesses as service centers, automobile manufacturers, appliance manufacturers, and energy companies, purchase millions and in some cases billions of dollars of steel products every year. These buyers have both the wherewithal and the incentive to bring a claim if they believe they have been overcharged. Even the named plaintiffs, whose purchases are dwarfed by those of many of the class members they seek to represent, collectively bought $▓ million in steel products from defendants over the alleged class period, and in a successful action they would recover treble damages and attorneys' fees. *See* Ex. 59.

"The policy at the very core of the class action mechanism . . . that small recoveries do not provide the incentive for any individual to bring a solo action," *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997), collapses when individual claims are of this size. If purchasers of steel products -- as opposed to lawyers who wish to represent a large class -- are interested in pursuing claims, such claims could be handled efficiently on an individual basis where they would not be burdened with prolonged classwide discovery and complex certification proceedings. The lack of superiority of class adjudication is yet another reason to deny certification in this case.

---

Footnote continued from previous page

prevent the litigation of a violation by individual members of the proposed class who may be as yet unnamed"); *accord, e.g., Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1194 n.20 (11th Cir. 2003); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 69 (4th Cir. 1977); *County of Santa Clara v. Astra USA, Inc.*, 257 F.R.D. 207, 213 (N.D. Cal. 2009).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs'

motion for class certification.


Dated:  February 28, 2013          By:      /s/ Todd J. Ehlman
                                                        Counsel for Nucor Corporation and, for
                                                         purposes of this memorandum only, on
                                                         behalf of all opposing defendants

| | |
|---|---|
| Donna E. Patterson | Dan K. Webb |
| David P. Gersch | Thomas J. Frederick |
| Robert J. Katerberg | Todd J. Ehlman |
| Ryan Z. Watts | WINSTON & STRAWN LLP |
| ARNOLD & PORTER LLP | 35 West Wacker Drive |
| 555 Twelfth Street, N.W. | Chicago, IL  60601-9703 |
| Washington, DC  20004 | 312.558.5600 – Telephone |
| 202.942.5000 – Telephone | 312.558.5700 – Facsimile |
| 202.942.5999 – Facsimile | dwebb@winston.com |
| donna.patterson@aporter.com | tfrederick@winston.com |
| david.gersch@aporter.com | tehlman@winston.com |
| ryan.watts@aporter.com | |
| robert.katerberg@aporter.com | |
| | |
| John B. Wyss | Douglas R. Gunson |
| WILEY REIN LLP | NUCOR CORPORATION |
| 1776 K Street, N.W. | 1915 Rexford Road |
| Washington, DC  20006 | Charlotte, NC  28211 |
| 202.719.7000 – Telephone | 704.366.7000 – Telephone |
| 202.719.7049 – Facsimile | 704.972.1836 – Facsimile |
| jwyss@wileyrein.com | doug.gunson@nucor.com |

*Attorneys for Nucor Corporation*

Mark Leddy
David I. Gelfand
Patricia M. McDermott
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202.974.1500 – Telephone
202.974.1999 – Facsimile
mleddy@cgsh.com
dgelfand@cgsh.com
pmcdermott@cgsh.com

Andrew S. Marovitz
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com

**Attorneys for ArcelorMittal S.A. and ArcelorMittal USA LLC**

Jonathan S. Quinn
NEAL, GERBER & EISENBERG LLP
Two North La Salle Street, Suite 1700
Chicago, IL 60602
312.269.8000 – Telephone
312.429.3531 – Facsimile
jquinn@ngelaw.com

Daniel I. Booker
Debra H. Dermody
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
412.288.3131 – Telephone
412.288.3063 – Facsimile
dbooker@reedsmith.com
ddermody@reedsmith.com

Alexander Y. Thomas
REED SMITH LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, DC 20005-3317
202.414.9200 – Telephone
202.414.9299 – Facsimile
athomas@reedsmith.com

J. Michael Jarboe
THE LAW DEPARTMENT OF
UNITED STATES STEEL CORPORATION
600 Grant Street, Suite 1500
Pittsburgh, PA 15219-2880
412.433.2880 – Telephone
412.433.2811 – Facsimile
jmjarboe@uss.com

**Attorneys for United States Steel Corporation**

Nathan P. Eimer
Scott C. Solberg
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
312.660.7600 – Telephone
312.692.1718 – Facsimile
neimer@eimerstahl.com
ssolberg@eimerstahl.com
dbirk@eimerstahl.com

### *Attorneys for Gerdau Ameristeel Corporation*

Joel G. Chefitz
Amanda J. Metts
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606
312.372.2000 – Telephone
312.984.7700 – Facsimile
jchefitz@mwe.com
ametts@mwe.com

Robert S. Walters
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, IN 46802
260.423.8905 – Telephone
260.423.8920 – Facsimile
rsw@barrettlaw.com

### *Attorneys for Steel Dynamics, Inc.*

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603
312.251.4600 – Telephone
312.251.4610 – Facsimile
jfigliulo@fslegal.com
sjones@fslegal.com

Gregory A. Markel
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
212.504.6000 – Telephone
212.504.6666 – Facsimile
greg.markel@cwt.com

Charles F. Rule
Joseph J. Bial
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
202.862.2200 – Telephone
202.862.2400 – Facsimile
rick.rule@cwt.com
joseph.bial@cwt.com

### *Attorneys for AK Steel Holding Corporation*

- 70 -

John W. Treece
Scott D. Stein
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
312.853.7000 – Telephone
312.853.7036 – Facsimile
jtreece@sidley.com
sstein@sidley.com

*Attorneys for SSAB Swedish Steel Corporation*

Joseph A. Tate
Christine C. Levin
David J. Stanoch
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215.994.2350 – Telephone
215.655.2350 – Facsimile
joseph.tate@dechert.com
christine.levin@dechert.com
david.stanoch@dechert.com

*Attorneys for Commercial Metals Company*

## CERTIFICATE OF SERVICE

I, Todd J. Ehlman, an attorney, hereby certify that on February 28, 2013, I caused a true and accurate copy of the foregoing **DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** to be filed via the Court's CM/ECF system, and served via e-mail to all counsel of record.

<u>/s/ Todd J. Ehlman</u>
Todd J. Ehlman
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
312.558.5600 – Telephone
312.558.5700 – Facsimile
tehlman@winston.com