# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| **IN RE:  STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| ——————————————— | Honorable James B. Zagel |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** |  |
| *Standard Iron Works v. ArcelorMittal, et al.,* **Case No. 08-cv-5214** | **REDACTED VERSION** |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-5371** |  |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* **Case No. 08-cv-5633** |  |
| *Alco Industries, Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-6197** |  |
| *Gulf Stream Builders Supply, Inc. v. ArcelorMital, et al.,* **Case No. 10-cv-4236** |  |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 5

I.      PLAINTIFFS HAVE SATISFIED THE PREDOMINANCE REQUIREMENT ............ 5

     A.     Conspiracy Is a Common and Central Issue ................................................ 5

     B.     Impact and Damages Are Capable of Common Proof at Trial ............................ 6

             1. Defendants' Statements and Documents ................................................ 10

             2. Industry Economics ................................................................................. 13

                  a.     The Steel Industry Is an Oligopoly ............................................. 13
                  b.     Supply-Side Price Linkage ......................................................... 15
                  c.     Relevant Market Definition ......................................................... 23
                  d.     Raw Steel ..................................................................................... 27
                  e.     OPEC and *Linerboard* ............................................................... 29
                  f.      Contract and Spot Market Customers .......................................... 30
                  g.     Impact Over Time ....................................................................... 32
                  h.     Imports ......................................................................................... 34
                  i.      Production Data ........................................................................... 38

             3. Econometric Analysis Supports Class Certification ................................ 42

                  a.     Dr. McClave's Methodology Is Reliable, Common, and Relevant
                          as to the fact of class-wide overcharges....................................... 43
                  b.     Dr. McClave's Analysis Reliably Estimates Damages................ 49
                  c.     *Comcast*..................................................................................... 51

             4. Industry Price Data ................................................................................. 54

             5. Expert Opinions of Dr. Jeryl Wright......................................................... 57

II.     DEFENDANTS' ARGUMENTS REGARDING OTHER RULE 23
      REQUIREMENTS ARE MERITLESS............................................................... 57

     A.     Typicality Is Satisfied ................................................................................. 57

             1.  The Named Plaintiffs' Claims Are Typical................................................ 58

             2.  Service Centers Do Not Defeat Typicality ............................................... 59

     B.     Wilmington Steel Is an Adequate Class Representative...................................... 60

     C.     The Class Is Ascertainable.......................................................................... 61

## TABLE OF CONTENTS

**Page**

D. A Class Action Is the Superior Means of Resolving the Claims ......................... 63

CONCLUSION ................................................................................................................. 65

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Adams v. Ameritech Servs., Inc.*,
   231 F.3d 414 (7th Cir. 2000) ........................................................................ 9, 46, 47

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
   683 F.3d 328 (7th Cir. 2012) ............................................................................... 26

*Allen v. Dairy Farmers of Am., Inc.*,
   279 F.R.D. 257 (D. Vt. 2011) .............................................................................. 12

*Allen v. Dairy Farmers of Am., Inc.*,
   No. 5:09-CV-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012) ........................... 9, 12

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................. 7

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013) ......................................................................................... 5

*Bazemore v. Friday*,
   478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (U.S.N.C. 1986) ........ 46, 47, 48, 50

*BCS Services, Inc. v. Heartwood 88, LLC*,
   637 F.3d 750 (7th Cir. 2011) ..................................................................... passim

*Behrend v. Comcast Corp.*,
   264 F.R.D. 150 (E.D. Pa. 2010) ......................................................................... 53

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946) ........................................................................................... 44

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) .............................................................................. 24

*Butler v. Sears, Roebuck & Co.*,
   702 F.3d 359 (7th Cir. 2012) ............................................................................... 6

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ..................................................................... passim

*Cohen v. Formula Plus, Inc.*,
   750 F. Supp. 2d 495 (D. Del. 2010) ................................................................... 61

## TABLE OF AUTHORITIES

**Pages**

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ...................................................................................... 51-54

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ................................................................................................ 15

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
223 F.R.D. 506 (S.D. Ill. 2004) ............................................................................. 26

*Fishman v. Wirtz*,
No. 74-C-2814, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981) ...................................... 26

*Franco v. Connecticut Gen. Life Ins. Co.*,
818 F. Supp. 2d 792 (D.N.J. 2011) ........................................................................ 60

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
744 F.2d 588 (7th Cir. 1984) ...................................................................... 1, 9, 15

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*,
995 F.2d 425 (3d Cir. 1993) .............................................................................. 60, 61

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ................................................................................................ 60

*Hawaii v. Standard Oil Co. of Cal.*,
405 U.S. 251 (1972) .................................................................................................. 7

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .......................................................................................... 59, 63

*In re Aluminum Phosphide Antitrust Litig.*,
160 F.R.D. 609 (D. Kan. 1995) ............................................................................... 8

*In re Bromine Antitrust Litig.*,
203 F.R.D. 403 (S.D. Ind. 2001)..................................................................8, 32, 58

*In re Bulk (Extruded) Graphite Products Antitrust Litig.*,
CIV. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006)........................ 8, 58

*In re Carbon Black Antitrust Litig.*,
CIV.A.03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005)....................... 58

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)......................54

## TABLE OF AUTHORITIES

**Pages**

*In re Chocolate Antitrust Litig.,*
289 F.R.D. 200 (M.D. Pa. 2012) …………………………………………………………8, 45

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006) ……..………………32, 58

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
256 F.R.D. 82 (D. Conn. 2009).........................................................................................passim

*In re Flat Glass Antitrust Litig.,*
191 F.R.D. 472 (W.D. Pa. 1999) ................................................................................... 8, 30

*In re Folding Carton Antitrust Litig.,*
75 F.R.D. 727 (N.D. Ill. 1977)............................................................................................ 8

*In re Foundry Resins Antitrust Litig.,*
242 F.R.D. 393 (S.D. Ohio 2007)..................................................................................... 58

*In re High Fructose Corn Syrup Antitrust Litig.,*
156 F. Supp. 2d 1017 (C.D. Ill. 2001) ............................................................................ 45

*In re High Fructose Corn Syrup Antitrust Litig.,*
295 F.3d 651 (7th Cir. 2002) ....................................................................................passim

*In re Ins. Brokerage Antitrust Litig.,*
618 F.3d 300 (3d Cir. 2010).............................................................................................. 26

*In re Linerboard Antitrust Litig.,*
305 F.3d 145 (3d Cir. 2002)......................................................................................passim

*In re Linerboard Antitrust Litig.,*
504 F. Supp. 2d 38 (E.D. Pa. 2007) ................................................................................ 41

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................. 31, 49

*In re OSB Antitrust Litig.,*
No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ........................................ 9, 30, 57, 62

*In re Pharm. Indus. Average Wholesale Price Litig.,*
582 F.3d 156 (1st Cir. 2009)............................................................................................. 50

*In re Polyester Staple Antitrust Litig.,*
MDL No. 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007)……………….8, 32, 56

## TABLE OF AUTHORITIES

**Pages**

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995)........................................................................ 58

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007)................................. 8, 57

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012)........................................................................... 11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013)………………………………………………………...…54

*In re Ready-Mixed Concrete Antitrust Litig.*,
   261 F.R.D. 154 (S.D. Ind. 2009)………………………………………………......8, 46

*In re Rubber Chemicals Antitrust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005)................................................................... 7, 32

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ................................................................. passim

*In re Sugar Indus. Antitrust Litig.*,
   579 F.2d 13 (3d Cir. 1978)........................................................................ 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 291 (N.D. Cal. 2010)………………………………………………...…8, 51

*In re U.S. Foodservice Inc. Pricing Litig.*,
   No. 12-1311-CV, 2013 WL 4609219 (2d Cir. Aug. 30, 2013)............................................... 53

*In re Urethane Antitrust Litig.*,
   251 F.R.D. 629 (D. Kan. 2008).......................................................... 8, 30, 32, 58

*In re Urethane Antitrust Litig.*,
   No. 04-MD-1616-JWL, 2013 WL 2097346 (D. Kan. May 15, 2013)............................. passim

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002)........................................................... 8, 30, 32, 58

*In re Vitamins Antitrust Litig.*,
   MISC 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000) ........................................... 26

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*,
   722 F.3d 838 (6th Cir. 2013) ...................................................................... 53

## TABLE OF AUTHORITIES

**Pages**

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981)..................................................................................... 11, 44

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ..................................................................... 46, 59

*Leyva v. Medline Industries Inc.*,
  716 F.3d 510 (9th Cir. 2013)……………….…...............................................54

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ........................................................................ 44

*Manno v. Healthcare Revenue Recovery Group, LLC*,
  289 F.R.D. 674 (S.D. Fla. 2013)………………………………………………...54

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ................................................................. passim

*Murray v. GMAC Mortgage Corp.*,
  434 F.3d 948 (7th Cir. 2006) ........................................................................ 63

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*,
  231 F.R.D. 280 (N.D. Ill. 2005)..................................................................... 58

*Paper Sys. Inc. v. Mitsubishi Corp.*,
  193 F.R.D. 601 (E.D. Wis. 2000) .................................................................. 45

*Perkins v. Standard Oil Co. of Cal.*,
  395 U.S. 642 (1969)...................................................................................... 11

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009)............................................................... 47, 48

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471(N.D. Ill. 2009)........................................................... 6, 58, 62

*Standard Iron Works v. ArcelorMittal*,
  639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................................ 4, 10, 35, 42

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011)............................................................................ 9

*Sullivan v. Nat'l Football League*,
  34 F.3d 1091 (1st Cir. 1994)......................................................................... 60

## TABLE OF AUTHORITIES

**Pages**

*Szabo v. Bridgeport Machines, Inc.*,
  249 F.3d 672 (7th Cir. 2001) ................................................... 51


**Rules**

Fed. R. Civ. P. 23 ........................................................... 53, 57, 61, 63

Fed. R. Civ. P. 23(a)........................................................................1

Fed. R. Civ. P. 23(b)(3).................................................... 1, 5, 51, 63

Fed. R. Civ. P. 23(c)(1)(C) ................................................... 63

**Other Authorities**

3 Newberg on Class Actions § 10:2 (4th ed. 2002) .................................... 50

5 James W. Moore, *Moore's Federal Practice*, § 23.21[1] (3d ed.)..........................61

7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2005)............ 6

Areeda, Hovenkamp & Solow, *Antitrust Law,* ¶¶ 560-61.....................................24

Areeda, Hovenkamp & Solow, *Antitrust Law,* ¶¶ 552...................................37

Baker & Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique,"
  *American Law and Economics Review* (1999) .................................................45

Carlton & Perloff, *Modern Industrial Organization* (4th ed. 2005) .................................14

Federal Judicial Center, *Reference Guide on Multiple Regression* (3rd ed. 2012)..........45, 46

## INTRODUCTION

In their opening brief, Plaintiffs showed that this case, like the vast majority of price-fixing cases—and especially supply restriction conspiracy cases—is appropriate for class treatment.  Plaintiffs have met Rule 23(a)'s requirements for class certification, and the Rule 23(b)(3) requirements of predominance and superiority.  The central focus at trial will be on the common factual and legal questions of conspiracy:  what Defendants said and did, and whether they conspired.  *See Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (predominance generally met where "central" issue is common).  In addition, Plaintiffs will show the impact of the conspiracy with common proof, *i.e.*, evidence showing that Defendants' coordinated furnace curtailments were intended to, and did, inflate the price of steel products. *See Gen'l Leaseways, Inc. v. Nat'l Truck Leasing Assoc.*, 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned rise").

Defendants' opposition to certification focuses primarily on the element of impact. Defendants argue that because the steel industry is so complex and steel products are so diverse, Plaintiffs will not be able to show that the coordinated furnace outages had a widespread impact on the price of finished steel.

But Defendants' arguments cannot be squared with the record.  Defendants argue, for example, that "raw steel" is a "fiction."  But during the class period—and even today—"raw steel" is a term and a concept that Defendants use in the ordinary course of business to measure industry output.  Defendants argue that virtually every size, shape and grade of steel is unique, but their own documents and expert have emphasized that most finished steel products are standardized.  Defendants argue that their products trade in different "markets," but in proceedings before the International Trade Commission ("ITC"), they argued that all "flat" products and all "long" products comprise single economic markets.  Defendants' expert

economist, Dr. Hausman, testifies that the supply and prices of the various class products are unrelated, but Dr. Hausman told the ITC precisely the opposite. Defendants even say they did not really cut production and that steel prices were not impacted, but during the class period, they told anyone who would listen—industry analysts, investors, and each other—that the "industry's" production cuts and "discipline" raised prices successfully.

Defendants were right then and are wrong now. A brief overview of the "impact" evidence shows why Plaintiffs will be able to prove impact on a common basis. *First*, Plaintiffs will show that Defendants intended for their production cuts to have a broad impact on finished steel prices. Indeed, that was the very reason for the cuts. For example, Plaintiffs will show that around that time of the first production cuts, a ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

*Second*, Plaintiffs will show that, based on the economic structure of the steel industry, Defendants' production cuts were destined to and did have class-wide effects. Plaintiffs' economist, Dr. Solow, will testify that because Defendants can shift their furnace output among an array of finished goods (known as "supply side substitution" in economics), the supply, and therefore prices, of the various products are linked. For this reason, coordinated furnace outages *necessarily* would impact all steel products and therefore all customers—and they did.

Plaintiffs will show that Defendants' own economist, Dr. Hausman, has offered the same assessment to the ITC, testifying that "*the prices of all carbon and alloy flat steel products are*

*linked* by substitution in supply," that "from an economic point of view" the prices of steel products are "interrelated" and "economically linked," and that all major flat products (which represent 75% of total class sales here) are cast in common industry furnaces, the output of which can be diverted easily among the entire range of products. *See* pages 21-23, *infra*. According to Dr. Hausman's ITC testimony, supply-side substitution is "what makes this a flat-rolled sector single industry." *Id.* Similarly, "[w]hen Professor Hausman approached the long products, he felt that there was a linkage among the—among the long products." *Id.*

In the same proceeding, Defendants' executives testified that "*we view all flat products as being market related*," and that as a matter of business reality and industry economics, flat steelmakers operate a "single business, the flat-rolled business," consisting of products that "cannot be separated from one another." *Id.* They made the same argument about long products: "Likewise *in the bar products area . . . They're all tied together* from the producer's standpoint," and "it makes sense to consider billets, rebar, hotrolled bar, structural, and rail as essentially one product." *Id.*

*Third*, Plaintiffs will show that the broad price effects came to pass. For example,



As this Court has found, such "high-level executive documents [] do *not* go solely to the issue of conspiracy, but also shed light on impact." Dkt. No. 279 (emphasis in original).

3



Taken together, this evidence—what Defendants did and said in 2005-2007, how they and their expert describe and analyze the industry outside this Court, straightforward economic theory, the reality of industry structure, industry price and production data, and robust statistical analysis—shows that when Defendants restricted furnace output in coordinated fashion, their action impacted the price of substantially all steel products sold to substantially all class members. In other words, as this Court has noted, Defendants' plan made sense. *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 887 (N.D. Ill. 2009) ("It is difficult to see how [Defendants] could plausibly deny" that "the reason for their production cuts was to decrease supply and keep prices high").

Defendants' arguments cannot change history or facts. Because all steel starts in a furnace, a raw steel supply cartel was a straightforward way for Defendants to make more money. Defendants knew this, they did it, and it worked. That, in a nutshell, is why Plaintiffs can present their case using predominantly common proof at trial. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012) (Plaintiffs need only demonstrate at this stage that their claims are "*capable of proof at trial* through evidence that is common to the class") (citations omitted, emphasis in original).

## ARGUMENT

## I.    PLAINTIFFS HAVE SATISFIED THE PREDOMINANCE REQUIREMENT

Plaintiffs' motion for class certification should be granted because—notwithstanding Defendants' emphasis on the complexity of the industry—predominantly common evidence will establish that Defendants conspired and that their coordinated production cuts caused class-wide impact and damages.  *See, e.g., Messner*, 669 F.3d at 811-19; *Butler*, 727 F.3d 796.  As the Seventh Circuit noted in a similar case, "the complexity of the case is largely illusory and a streamlined trial strikes us as eminently feasible."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 665 (7th Cir. 2002).

### A.    Conspiracy Is a Common and Central Issue

The element of antitrust conspiracy is a common issue, a point Defendants conceded in order to limit class certification discovery.  *See* Dkt. No. 269, at 11 ("it is taken for granted that the existence of a conspiracy would be subject to common proof").[1]

Furthermore, contrary to Defendants' suggestion (at 21-22), common conspiracy issues carry much of Plaintiffs' burden in the Court's predominance inquiry.  As controlling authority makes clear, Rule 23(b)(3) requires the Court to balance all common versus individual issues, with "central" common issues entitled to great weight in the analysis.[2]

---

[1]Defendants ignore this prior stipulation and suggest that conspiracy issues may not be common.  Def. Br. at 21 n.23.  Defendants should not be permitted to concede an issue and reap the procedural benefits (*i.e.*, the limitation on discovery), only to reverse course when it suits their tactical interests.  In any event, conspiracy is unquestionably a common and central issue. *See* Dkt. No. 307, at 28 (collecting authority).

[2]*See Amgen Inc. v. Connecticut Ret. Plans & Trust* Funds, 133 S.Ct. 1184, 1196 (2013) ("Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof.  What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members.") (alterations and emphasis in original; internal citations and quotation marks

In cartel cases, Defendants' conduct—what they said and did, and whether they conspired—is *the* central common issue on which every class member's claim will turn. Any trial will focus on these common operative facts. Accordingly, conspiracy issues require due weight in the Court's certification analysis. *See* Dkt. No. 307, at 28 (collecting authority); 7 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1781 at 228 (3d ed. 2005) (conspiracy "is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)"); *see generally Saltzman v. Pella Corp.*, 257 F.R.D. 471, 484 (N.D. Ill. 2009) ("A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts.").

### B.      Impact and Damages Are Capable of Common Proof at Trial

Once the conspiracy is proven, Plaintiffs must establish the elements of causation (also known as "impact") and damages. That is, did Defendants' coordinated production cuts cause steel prices to rise, and by how much?

Common evidence will predominate in answering these questions. Plaintiffs will present several distinct but mutually reinforcing kinds of proof: ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

omitted); *Butler v. Sears, Roebuck and Co.*, 702 F.3d 359, 361 (7th Cir. 2012) (predominance entails "weighing" of common issues "that usually—including the determination whether to certify a class—is left to the district court, subject to light appellate review"), *reaffirmed by Butler*, 727 F.3d at 800-02 (same).

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ [3]

Plaintiffs in cartel cases are entitled to rely on evidence of this nature to establish class-wide individual injury and support a finding of predominance—as courts have held for decades. *See* Dkt. No. 307, at 18-19 and 31-39 (collecting cases). Defendants have not addressed this settled authority, which holds that price-fixing and supply restriction cases are almost always suitable for class certification because conspiracy is a common and central issue and because the effects of such conspiracies are usually amenable to common proof at trial. *Messner*, 669 F.3d at 811-18; *see also Amchem Products Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972) ("class actions . . . are definitely preferable in the antitrust area"). The Court must, of course, review the record rigorously to make sure the requirements for certification are met, but "Rule 23, when applied rigorously, will frequently lead to certification" in cases such as this. *Messner*, 669 F.3d at 815.

Contrary to Defendants' argument (at 2), there is no exception to this rule for cases involving multiple finished goods. "Contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." *In re Rubber Chemicals*

---

[3] The first four categories were discussed at length in Plaintiffs' moving brief. The fifth refers to ITC evidence identified in researching Dr. Hausman. The sixth refers to a rebuttal report from Dr. Jeryl Wright, an industry expert offered to rebut the opinions of Defendants' experts and industry witnesses. For ease of reference, Plaintiffs' expert reports are cited as follows throughout this brief: (1) "Solow Rep." (attached as Ex. 1 to Plaintiffs' moving brief); (2) "Solow Rebuttal" (attached as Ex. 1 to this brief); (3) "McClave Rep." (attached as Ex. 3 to Plaintiffs' moving brief); (4) "McClave Rebuttal" (attached as Ex. 2 to this brief) and (5) "Wright Rebuttal" (attached as Ex. 3 to this brief). Otherwise, exhibits to Plaintiffs' opening brief are cited as "Pl. Ex. ─" while exhibits to this brief are cited as "Pl. Reply Ex. ─"

*Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) (citations omitted) (certifying claims for

multiple product categories). "Antitrust defendants resisting class certification routinely argue

that the complexity of their particular industry makes it impossible for common proofs to

predominate on the issue of antitrust impact . . . but the argument is usually rejected[.]" *In re*

*Bulk (Extruded) Graphite Products Antitrust Litig.*, No. Civ. 02-6030 (WHW), 2006 WL

891362, at *11 (D.N.J. Apr. 4, 2006) (citations omitted). Many other class certification

decisions are in accord, including a seminal case from this district. *See In re Folding Carton*

*Antitrust Litig.*, 75 F.R.D. 727, 734 (N.D. Ill. 1977) (Robson, J. and Will, J.) (rejecting "infinite

diversity of product, marketing practices, and pricing" arguments).[4]

Defendants' arguments are particularly unavailing in a case involving collusive supply

restriction. Plaintiffs do not allege a conspiracy to fix specific prices for each individual steel

product. Rather, Plaintiffs allege that Defendants conspired to restrict supply at a common stage

---

[4] *See also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012)
(certifying class and rejecting product differentiation arguments); *In re TFT-LCD (Flat Panel)*
*Antitrust Litig.*, 267 F.R.D. 291, 312-13 (N.D. Cal. 2010) (certifying class and rejecting
defendants' "distinct markets" arguments); *In re Ready-Mixed Concrete Antitrust Litig.*, 261
F.R.D. 154, 170-73 (S.D. Ind. 2009) (same); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 635
(D. Kan. 2008) (certifying class covering variety of finished goods and rejecting product
variation arguments); *In re Polyester Staple Antitrust Litig.*, MDL 3:03 CV 1516, 2007 WL
2111380, at *22 (W.D.N.C. July 19, 2007) (rejecting defendants' argument that "there is no
single product market" and certifying class encompassing goods with "different physical
properties and characteristics" and end-uses); *In re Pressure Sensitive Labelstock Antitrust Litig.*,
No. 3:03-MDL-1556, 2007 WL 4150666, at *2 (M.D. Pa. Nov. 19, 2007) (certifying claims
covering "fifteen product categories"); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 414 (S.D.
Ind. 2001) ("A wide range of products and prices does not make it impossible to use common
proof to demonstrate impact."); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265-68 (D.D.C.
2002) (accepting common proof of impact involving a host of vitamins notwithstanding
argument that products were "so diverse as to comprise many relevant antitrust markets"); *In re*
*Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 485-87 (W.D. Pa. 1999) (rejecting argument that
varied products, markets, and demand considerations defeat certification); *In re Aluminum*
*Phosphide Antitrust Litig.*, 160 F.R.D. 609, 614-15 (D. Kan. 1995) (same).

of production for *all* products, a theory readily amenable to common economic proof at trial.
*See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) (explaining
economics of supply restriction and certifying class for various end products); *Gen. Leaseways,*
744 F.2d at 594 (when "firms restrict output directly, price will as mentioned rise"); *In re OSB
Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) (certifying class where
supply cartel impacted a variety of finished goods made in the same curtailed facilities).[5]

Many of Defendants' class certification arguments also ignore the fundamental rule that
Plaintiffs are entitled to consideration of their proof *as a whole*. *See Fructose*, 295 F.3d at 655-
56; *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000). Much of Defendants'
brief is devoted to focusing on each piece of evidence in isolation and asserting that it does not,
by itself, establish class-wide injury on the merits. But that is not Plaintiffs' burden at any stage
of the case. *Id.* Plaintiffs' case for certification does not rise and fall with any one piece or any
one category of proof, including the testimony of any one expert. Taken together, Plaintiffs'
evidence is more than enough to show that Plaintiffs are capable of presenting their claims using
predominantly common proof at trial, which is the only question at this stage. *See Messner*, 669
F.3d at 818; *Allen v. Dairy Farmers of Am., Inc.,* No. 5:09-cv-230, 2012 WL 5844871, at *16 (D.
Vt. Nov. 19, 2012) ("Examining the totality of Plaintiffs evidence presented regarding antitrust
impact, the court concludes that Plaintiffs have established by a preponderance of the evidence a

---

[5] Defendants suggest the *Linerboard* decision is inapposite because, according to
Defendants, the court applied a "presumption" of antitrust impact. Def. Br. at 23-24. In fact,
*Linerboard* expressly disavowed exclusive reliance on such a presumption. 305 F.3d at 153,
155. The court went on to analyze and credit plaintiffs' experts and market structure evidence in
a case involving strikingly similar facts, explaining the economics of supply restriction. *Id.* at
153-55. As the Third Circuit has made clear, *Linerboard* remains good law. *See, e.g., Sullivan
v. DB Investments, Inc.*, 667 F.3d 273, 299 (3d Cir. 2011) (*en banc*) (citing *Linerboard* with
approval for proposition that antitrust conspiracy cases usually satisfy predominance).

means of establishing antitrust impact through a common body of admissible proof and through common questions of law and fact which clearly predominate over individualized questions."); *see generally In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2013 WL 2097346, at *7 (D. Kan. May 15, 2013) (class jury verdict supported by several mutually consistent categories of proof showing class-wide injury).

### 1. Defendants' Statements and Documents

Plaintiffs' moving brief and expert reports ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ *see also Standard Iron Works*, 639 F. Supp. 2d at 884-93; pages 32-34, *infra*. Such documents represent classic common proof used in class action trials to support a reasonable inference of conspiracy having a causal effect on price, and can be used here—in conjunction with Plaintiffs' other proof—to assist all class members in proving their claims. *See, e.g.,* Dkt. No. 307, at 17 (sample demonstrative); Dkt. No. 279 ("I agree with Plaintiffs that the high-level executive documents . . . shed light on impact.").

Defendants' assertion (at 54-55) that "generalized statements" are irrelevant as class-wide proof mischaracterizes the evidence and is wrong as a legal matter. ████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ Such evidence undoubtedly will feature prominently in Plaintiffs' case-in-chief at trial. *See, e.g., Urethane*, 2013 WL 2097346, at *6 (jury finding of conspiracy and class-wide impact was supported by evidence including documents indicating cartel was "effective" in the marketplace).

In antitrust cases, plaintiffs are entitled to introduce evidence that would allow the jury to "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business" that the alleged violation "caused damage to the plaintiffs." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) (citations and internal quotation marks omitted); *see also Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648 (1969) ("If there is sufficient evidence in the record to support *an inference of causation*, the ultimate conclusion as to what that evidence proves is for the jury.") (emphasis added).

As the Second Circuit explained in a recent cartel class action, class-wide impact can be established through proof tending to show the consequences of the conspiracy. *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 66-69 (2d Cir. 2012) (analogizing to general tort principles of causation and citing *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758-59 (7th Cir. 2011) with approval). Significantly, the court in *Publication Paper* did not rely on expert analysis at all in discussing this element of the claim. Instead, the court surveyed the central facts of the case and accepted that any evidence *tending to show* that a cartel was implemented successfully can be used to establish causation at trial. *Id.*

Here, the documents provide proof of impact. ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ These statements can be used at trial to show that furnace outages caused higher prices for finished steel, that the effects were widespread, and, accordingly, that individual class members were impacted. *See, e.g., Urethane*, 2013 WL 2097346, at *5 ("in a class action context, proof of an

effective conspiracy to fix prices will include facts which tend to establish—perhaps circumstantially—that each class member was injured") (citation omitted); *see generally BCS Services*, 637 F.3d at 758-59 ("probabilistic" proof is sufficient to establish causation).

Defendants cite no authority for the suggestion that antitrust plaintiffs are somehow foreclosed from using such documentary evidence to establish causation. Indeed, the only remotely germane case Defendants have cited in support of their argument, *Allen v. Dairy Farmers of Am. Inc.*, 279 F.R.D. 257, 265 (D. Vt. 2011), was superseded by a subsequent order *granting* class certification in the same litigation, relying, in part, on statements from the defendants' executives relating to impact. *See Allen*, 2012 WL 5844871, at *12 ("To demonstrate that their theory of antitrust impact is consistent with other evidence in the case, Plaintiffs point to various statements made by representatives of the alleged co-conspirators, including statements attributed to [the defendant's] CEO[.]"). In short, there is no authority supporting Defendants' novel theory that their own statements are irrelevant to causation.



In sum, documents and statements showing that industry production cuts or "discipline" impacted Defendants' finished steel prices and profits—whether the documents refer to the industry as a whole or a major product group—are probative of Plaintiffs' basic theory of causation, which is that by curtailing their furnaces, Defendants inflated the price of finished steel goods purchased by the class. These documents and statements will assist *all* class members in proving their claims at trial.

### 2. Industry Economics

Defendants argue at length that industry economics are inconsistent with class-wide harm. These arguments are factually and legally incorrect, as explained below. Plaintiffs' economic proof is both common and reliable, which are the only questions at this stage.

### a. The Steel Industry Is an Oligopoly



Nor have Defendants attempted to address or distinguish the many class certification decisions holding that impact is a common issue in oligopolistic markets. Dkt. No.

307, at 32 (collecting cases).



Dr. Solow's testimony to that effect, and the

reasons for it, can be used as common proof supporting a finding of class-wide impact. *See, e.g.,*

*Linerboard*, 305 F.3d at 152 (accepting such proof at class certification); *In re Ethylene*

*Propylene Diense Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 95 (D. Conn. 2009) (same);

*Urethane*, 2013 WL 2097346, at *7 (accepting such proof on the merits as relevant to class-wide

impact).

14

**b.**  **Supply-Side Price Linkage**

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

████████  The very nature of the case lends itself to common economic analysis.  As detailed

below, Dr. Solow's opinions on these issues are supported by textbook economic theory,

contemporaneous documents, and testimony from Defendants and Dr. Hausman.  *See, e.g.,*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993) (expert testimony is

acceptable if supported by "reliable foundation"); *In re Scrap Metal Antitrust Litig.*, 527 F.3d

517, 529-30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

The starting point for analysis is the undisputed fact that all the steel products in the class start in a steelmaking furnace operated by Defendants in which raw steel is melted and cast for a variety of finished goods. ███████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ This common production process is depicted in the ArcelorMittal graphic below:



The Chicago-area mills of ArcelorMittal are typical examples. These "Indiana Harbor" and "Burns Harbor" facilities, like many others, focus their production on the industry's core flat-rolled products shown in the chart, known as hot rolled sheet (or "coil"), plate, cold rolled sheet, and galvanized/coated sheet. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████



Together, the supply of raw steel used for making *all* flat steel products covered by the class definition was impacted, causing higher prices across the board, just as Defendants planned.

The same is true for long products. As depicted on the ArcelorMittal graphic, all major product categories such as bars, rebars, and structural shapes can be and often are cast in the same furnaces. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████

Contrary to Defendants' arguments, the steelmaking process described above lends itself to straightforward (and common) economic analysis. ████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

Pl. Reply Ex. 6, Solow Dep. at 29. *See also Linerboard*, 305 F.3d at 152 ("The economic laws of supply and demand run in tandem with the tenets of logic. A reduction in supply will cause prices to rise. A deliberate cut in supply, as alleged here, is a deliberate interference with market forces.").



████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

Second, Dr. Solow's testimony corresponds with what Dr. Hausman and Defendants told the ITC in 2001. *See generally* USITC Investigation No. TA-201-73, *Steel*, Publication 3479 (December 2001). The case involved efforts by the domestic steel industry (including most Defendants) to impose broad-based tariffs applicable to all "flat" and "long" steel products. The domestic steelmakers' central argument was that industry-wide import relief was necessary because all "flat" and "long" steel products, respectively, comprise single, inter-related economic markets, owing to the industry's common furnace stage of production. That is, Defendants sought relief on *all* imported steel products because *any* change in import supply would impact the domestic market for *all* steel products. Dr. Hausman was their expert on these issues, offering common analysis for an array of "flat" and "long" steel products very similar to those at issue here. In the ITC case, Dr. Hausman's opinion was that all "flat" and "long" steel prices, respectively, are linked on the supply side, which is just what Dr. Solow has explained.[7]

Contrary to his opinions here, Dr. Hausman testified before the ITC that the "production and pricing of the various flat steel products is interrelated due to supply-side substitution possibilities." Pl. Reply Ex. 15 at ¶ 9. He made the same point repeatedly in support of the

---

[7] *See, e.g.,* Pl. Reply Ex. 15 (Hausman Dep. Ex. 4, Dr. Hausman's flat product expert report); Pl. Reply Ex. 16, (Hausman Dep. Ex. 5, Dr. Hausman's ITC comments and responses); Pl. Reply Ex. 17 (Hausman Dep. Ex. 6, Dr. Hausman's testimony on flat products); Pl. Reply Ex. 18 (Defendants' testimony on flat products); Pl. Reply Ex. 19 (Hausman Dep. Ex. 7, Dr. Hausman's long product expert report); Pl. Reply Ex. 20 (Hausman Dep. Ex. 8, testimony of Dr. Hausman's colleague, Dr. Ray Hartman, appearing on Dr. Hausman's behalf at long product hearing); Pl. Reply Ex. 21 (Hausman Dep. Ex. 9, Defendants' long product testimony).

argument that the major flat steel products comprise a single economic market or industry. *Id.* at

Technical Report ¶ 14 ("the prices of all carbon and alloy flat steel products are linked by

substitution in supply""); *id.* at Statement ¶ 9 ("all five [major flat] products are economically

linked"); *id.* at ¶ 16 ("the production of the various products is linked"); Pl. Reply Ex. 17 at 415

(industry-wide supply effects are "what makes this a flat-rolled sector single industry, at least

from an economic point of view").

Defendants told the ITC the same thing. Steel Dynamics CEO Keith Busse testified that

"we view all flat products as being market related" because of supply substitution. Pl. Reply Ex.

18, at 679. With respect to long products, Nucor CEO Dan DiMicco emphasized that "it is

important that you understand that from a producer's viewpoint it makes sense to consider

billets, rebar, hot-rolled bar, structurals, and rail *as essentially one product*." Pl. Reply Ex. 21, at

1296 (emphasis added). Like Dr. Hausman, Defendants made these points repeatedly:

- "Businessmen in this industry know that various flat-rolled products, slabs, hot rolled, cold-rolled, plate, corrosion resistant products and so on cannot be separated from one another. I run a single business, the flat-rolled business." Pl. Reply Ex18, at 403-04 (ITC testimony of Mr. Usher, U.S. Steel's then-CEO).

- "Any steel that is going into slabs, plates, hot rolled, cold-rolled, galvanized, tin, all goes through basically the same production process. It starts with a slab caster." *Id.* at 436 (testimony of Mr. Usher).

- "Likewise in the bar products area where we focus it all in one group. In the same mill you can make reinforcing bar, angles, channels, beams and so on. They're all tied together from the producer's standpoint[.]" *Id.* at 438 (testimony of Nucor CEO Dan DiMicco).[8]

---

[8] *See also* Pl. Reply Ex. 21 at 1403-04 (Hausman Dep. Ex. 9, Testimony of Clyde Selig of Commercial Metals Company); Pl. Reply Ex. 22 at 187-88 (Sept. 17, 2001 ITC Testimony of Charles Verrill, attorney for Nucor).

- "I think it's clear to me that if you think about slabs, and there's been a lot of dialogue about slabs today, if the front ends [i.e., domestic furnaces] go away, guess what we're going to be left with? . . . [T]here's going to be less supply. And when the other guy is in the driver's seat and ***there's less supply, guess what's going to happen to the price? It's going to go up, and the price is going to go up substantially. And guess what that's going to do? It's going to injure the consumer.***" *Id.* at 734-35 (testimony of Steel Dynamics CEO Keith Busse) (emphasis added).[9]

Against this backdrop, Defendants and Dr. Hausman cannot credibly criticize Dr. Solow for offering the same opinions here. To the contrary, the record validates Dr. Solow's analysis of how steel is made, supply-side substitution, and the economic consequences flowing from that production process. Dr. Solow's testimony is reliable and represents common economic proof that can be used to prove the claims of class members at trial.

c. **Relevant Market Definition**

---

23

The lynchpin of Defendants' argument to the contrary is language in a treatise co-authored by Dr. Solow to the effect that antitrust analysis typically involves definition of a "market"—which Defendants then mischaracterize as always requiring a formal demand-side "relevant market" analysis as would be done in the monopolization or merger context. *See* Def. Br. at 36-38. But that is not what the treatise says. The pertinent discussion appears in the very beginning of the *Antitrust Law* section on "Product Markets":

> A product grouping constitutes a market if a hypothetical defendant [or cartel] controlling its output could maximize profits by charging significantly more than the competitive price for a significant period.
>
> . . . . Two products, A and B, are in the same relevant market if substitutability at the competitive price is very high as measured from either the demand side *or the supply side*. To have separate markets, one must find that a significant price increase beyond the competitive level in the A price would neither induce customers of A to buy B instead, nor induce B producers to make A. ***Thus, although not close substitutes for each other on the demand side, two products produced interchangeably from the same production facilities are presumptively in the same market.***

Areeda, Hovenkamp & Solow, *Antitrust Law* ¶¶ 560-61 (emphasis added).

The treatise goes on to describe the steel industry as an example of this supply-side substitution, which Defendants also ignored. *Id.* Defendants likewise ignored the Seventh Circuit case cited in the same section of the treatise, which held that "the definition of a market depends on substitutability on the supply side as well as on the demand side. Even if two products are completely different from the consumer's standpoint, if they are made by the same producers, an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supra competitive price." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995) (citations omitted).

24

For all of these reasons, Dr. Solow properly focused his economic "market" analysis on the supply-side of the steel industry, which is where this alleged cartel operated. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

Dr. Solow's economic methodology is consistent, moreover, with Dr. Hausman's testimony before the ITC, where he emphasized *supply-side* production and price linkage in the steel industry. Pl. Reply Ex. 17, at 414 ("I emphasize supply side substitution, not demand side substitution"); *id.* at 487 ("[t]he linkages among supply side effects in terms of the own and cross price are much, much stronger than the own and cross price demand effects."). Dr. Solow's methodology also mirrors Dr. Hausman's approach in other cartel litigation, where Dr. Hausman has offered opinions and analysis without performing the formal demand-side relevant market definition he now says is required.[11]

---

████████████████████████████████████████████████████████████████████████████

████████████████ *See, e.g., Fructose*, 295 F.3d at 657 (similar analysis of demand); *Linerboard*, 305 F.3d at 153-55 (approving similar analysis at class certification stage); *EPDM*, 256 F.R.D. at 92-95 (same). ████████████████████████████████████████

[11] In the *DRAM* price-fixing matter, Dr. Hausman submitted an economic report that closely tracked the methodology applied by Dr. Solow here. *See* Pl. Reply Ex. 23. Dr. Hausman surveyed the structure and performance of the DRAM industry, focusing on many of the same structural characteristics addressed by Dr. Solow here, including market concentration and barriers to entry. *Id.* at 2-6. He then offered the opinion that had DRAM supply been reduced (in that case by eliminating one of the producers from the market), market prices would have increased substantially. *Id.* In offering these opinions about DRAM industry structure and pricing, Dr. Hausman did not find it necessary to perform a formal demand-side "relevant market" definition, despite the fact that DRAM was produced to a variety of different specifications and sold to different end-use market segments. *See id.*, Hausman DRAM Report

Dr. Solow's supply-side analysis is equally consistent with the operative legal standard in cartel cases, under which Plaintiffs are *not* required to introduce a formal demand-side "relevant market" analysis. *See, e.g., Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 345 (7th Cir. 2012) ("naked price and output controls can obviate the need for a detailed market analysis in a Sherman Act case"). At most, Plaintiffs' burden in a case alleging a *per se* unlawful conspiracy to restrict supply is simply "to describe the rough contours of the relevant commercial market in which anticompetitive effects may be felt." *Id.*; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010) ("Under the *per se* standard, plaintiffs are relieved of the obligation to define a market and prove market power."); *In re Vitamins Antitrust Litig.*, No. MISC 99-197 (TFH), 2000 WL 1475705, at *9 (D.D.C. May 9, 2000) ("Alleging a *per se* violation of Section 1 of the Sherman Act obviates the need to define a relevant market."); *Fishman v. Wirtz*, No. 74-C-2814, 1981 WL 2153, at *32 (N.D. Ill. Oct. 28, 1981) ("no market definition is needed to prove *per se* violations").[12]

Consistent with this authority, numerous class certification decisions have rejected defendants' "product diversity" arguments and held that finished product differentiation is no barrier to class certification in a *per se* conspiracy case. *See* pages 7-9, *supra*. Indeed, many of these cases rejected squarely the argument that certification is disfavored for products sold in different end-use "markets." The Seventh Circuit's decision in *High Fructose* is likewise

---

at 4, Hausman DRAM Appendix, and Hausman DRAM ITC Testimony at 52 (all recognizing that DRAM was sold to different end markets in different densities, line widths and wafer sizes).

[12] Many of the cases cited by Defendants on this question are inapposite monopolization, merger or "rule of reason" cases. *See* Def. Br. at 24-25. As noted, the legal standard and economic inquiry is very different in that context. In the small number of cartel cases cited by Defendants, *see, e.g., Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004), the denial of certification turned not on whether the plaintiffs introduced a demand-side "relevant market" analysis, but on whether they met their overall burden as to Rule 23.

instructive.  In a leading summary judgment opinion applying law and economics to analyze whether an alleged cartel was likely to impact customers (*i.e.*, "might actually have an effect on price"), the court engaged in a market structure analysis that mirrored Dr. Solow's methodology here.  295 F.3d at 656-58.  That is, the court engaged in qualitative analysis of industry conditions, applying economic theory to the facts without mentioning a word about formal demand-side market definition.  *Id.*

In short, Defendants are wrong that antitrust class certification requires a demand-side market definition analysis and equally wrong that class certification is somehow disfavored for conspiracy claims involving multiple finished goods.  The very nature of the case—a supply cartel expressly intended to raise prices for multiple finished goods—underscores the wisdom of the rule that cartel plaintiffs are entitled to focus their market definition analysis on the common supply-side features of the industry.

### d.      Raw Steel

Defendants also argue that Dr. Solow's "raw steel theory rests on a fiction."  Def. Br. at 29.  It is Defendants, however, that have distorted basic market facts.

Defendants suggest on several occasions that "raw steel" is a concept invented by Plaintiffs for this litigation.  But the reality is that both the term "raw steel" and, more importantly, the furnace output to which the term refers, are emphasized routinely by Defendants and others in the industry.  Furnace output of raw steel was the key measure of industry supply watched closely by Defendants during the relevant period, and, moreover, was the focus of the alleged conspiracy, which is why it is the proper focus of Dr. Solow's analysis.[13]

---

████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

Defendants also challenge Dr. Solow's opinion that raw steel is a "commodity," arguing that steel is made in different chemistries, grades, and shapes. ████████████████ ████████████████████████████ ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ .

As is clear from the discussion above, steel is substitutable on the supply side, making it a commodity in the relevant sense. ████████████████████████████ ████████████████████████████ and Defendants themselves told the ITC that steel supply is fungible. *See* pages 21-23, *supra*. In short, Dr. Solow's opinion finds extensive support in the record. ████████████████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████ .

Defendants also overstate the extent of end-product differentiation. ████████████ ████████████████████████████ ████████████████████████████

████████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████ █████ .

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Once again, Dr. Hausman has made the same point in a different case.  In his 2002 deposition in *Worldwide Basketball and Sport Tours v. NCAA*, Dr. Hausman cited steel as an example of a standardized commodity, explaining that:  "differentiated products mean that products compete with each other but they are not identical.  Perhaps the easiest way to think about this is a certain grade of steel has to meet ASTM standards, *and it is all going to be the same, and that is a perfect substitute.  It is nondifferentiated*.  Products like that compete only on price.  If I am going to buy steel, as long as I am going to get it delivered, I will buy the cheapest steel that meets the standards."  Pl. Reply Ex. 26, at 16 (emphasis added).

### e.    OPEC and *Linerboard*

Another prong of Defendants' "raw steel" argument is that some Defendants melt and cast raw steel shapes in a furnace and then send them directly through the production line for immediate rolling and finishing, such that the semi-finished shapes are not always physical, stand-alone products.  According to Defendants, this undercuts Dr. Solow's analysis and, moreover, distinguishes the steel industry from other supply cartels like *Linerboard* and OPEC in which the primary input (linerboard and crude oil, respectively) was sold frequently as a stand-alone product.  *See* Def. Br. at 3, 30-31, 37.

Defendants are wrong on both points.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Either way, the economic bottom line is that furnaces represent a common and essential stage of production for all finished steel products, with furnace output controlling supply (and hence price) for all product groups.

For much the same reason, Defendants fail to distinguish OPEC and *Linerboard*. *See* Def. Br. at 2-3. It is economically immaterial whether furnace output is sold directly to customers or allocated internally by the Defendants among their own finished product groups. Either way, the cartelized product ultimately is sold to customers by the Defendants. That is why numerous cases have recognized that impact is a common question where cartels manipulate supply or price at an industry's intermediate stage of production. *See Linerboard*, 305 F.3d at 159 (certifying class involving supply restriction for primary input, including claims for finished products that "incorporate[d] the price-fixed product as one of its ingredients"); *OSB*, 2007 WL 2253418 (same); *Flat Glass*, 191 F.R.D. 472 (certifying class where primary input cartel impacted various end products); *Urethane*, 251 F.R.D. at 630 (same); *Vitamins*, 209 F.R.D. at 256 (same); *cf. In re Sugar Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) ("to deny recovery in this instance . . . would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product").

### f.    Contract and Spot Market Customers

Defendants contend that Plaintiffs failed to account for the existence of large and small customers whose "bargaining power" may differ. *See* Def. Br. at 3. ███████████████████

████████████████████████████████████████████



493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally").[15]

### g. Impact Over Time

Defendants also challenge the extent of class-wide impact over time, an argument that rests 

In fact, the record is consistent with the Defendants' production manipulation being

---

[15] *See also Urethane*, 251 F.R.D. at 638 ("individualized negotiations and a diversity of prices paid do not" defeat class certification where "the alleged antitrust violation has caused widespread injury to the class as a whole"); *Polyester Staple*, 2007 WL 2111380, at *22-23 (same); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *9 (D.N.J. Apr. 4, 2006) (same); *Rubber Chemicals*, 232 F.R.D. at 352-53 (same); *Vitamins*, 209 F.R.D. at 266 ("courts have found common impact . . . despite individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased"); *Bromine*, 203 F.R.D. at 415 (notwithstanding "individual price negotiations, plaintiffs may succeed in showing class wide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent)").







Br. at 13, and that because import levels varied by product and over time they must be examined on a piecemeal basis. *Id.* at 39. Again, Defendants' arguments obscure the relevant inquiry at class certification: whether, if imports need to be addressed, they can be

addressed on a class-wide basis. They can, and indeed they have been, not only by Dr. Solow here, but by Defendants' own experts, Dr. Hausman and Ms. Hillman in the ITC proceeding.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████); *see generally Standard Iron Works*,

639 F. Supp. 2d at 882-83 (discussing imports and crediting Plaintiffs' allegations as plausible).

████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████



Defendants' arguments on these points are wrong for at least three reasons.

*First*, the relevant question is not whether trade barriers varied (they did), but whether Plaintiffs have introduced sufficient common evidence to show that imports in the aggregate did not constrain Defendants' ability to raise prices by cutting production. ███████████████ ███████████████████████████████████████████████████████ ██████████████ It is economically irrelevant, for example, whether Korean steel producers faced different tariffs than Turkish steel producers, or whether shipping rates from China were different than those from Brazil. All imported steel is merely another (high cost) source of supply to the domestic marketplace, the effects of which can be analyzed (if necessary) on an industry-wide basis, just as Dr. Hausman did in his testimony before Ms. Hillman and the ITC.[18]

*Second*, there are sound economic reasons for focusing on domestic supply. Where, as here, a cartel elevates prices above a competitive level, the natural level of imports will be distorted (*i.e.,* high prices will attract more imports than otherwise would enter the market). It is hornbook economic theory that domestic production is the proper focus of analysis in this situation. *See* Areeda, Hovenkamp & Solow, *Antitrust Law* ¶ 552 ("When export sales are attributable to noncompetitive pricing in the importing region, the relevant market should generally include the sales of local producers only."). Indeed, to the extent imports are attracted by the conspiracy itself, it underscores that the domestic cartel had significant impact in the



marketplace. Otherwise, domestic demand for imports would remain unchanged.[19]

Third, although domestic producers clearly are the proper focus of analysis for the

reasons stated above ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

The bottom line is that Defendants' import arguments are another failed attempt to make

the industry—and this case—seem more complicated than they really are.

### i. Production Data

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

As an initial matter, these arguments merely underscore the extent to which common

issues predominate, because, at all events, Defendants' production data (and whether industry

production was curtailed) can be presented and resolved on a class-wide basis. Defendants'

conduct—including the fact and scope of production cuts—is a common issue.

In any event, Defendants cannot refute the evidence of coordinated curtailments. ███

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████ ██████████████████████████████████████████████

██████ To the extent imports were attracted by the industry's production cuts and inflated

prices, that would be yet another indication of the conspiracy's success.





*See* Pl. Reply Ex. 14 (backup data).



241:8-246:8.



Accordingly, as described above, the pertinent inquiry focuses not on mill-by-mill or product-specific production data, but on identifying the products made in Defendants' curtailed furnaces and their supply-side substitutes. That is the group of industry products covered by the class definition. *See* pages 15-23, *supra*.

*See In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 62 (E.D. Pa. 2007) (rejecting similar argument because "The fact that [the defendant's] overall productivity was increasing at this time does not bear on whether or not the company conspired to take downtime. Taking downtime on the

Number Six machine would have nevertheless contributed to a reduction in industry-wide inventory overhang.")[20]



Most significantly for class certification purposes, the parties' factual disputes about production are readily susceptible to class-wide resolution on the merits at the appropriate time.

### 3. Econometric Analysis Supports Class Certification.

Plaintiffs have introduced the multiple regression analysis of Dr. McClave, whose opinions show that common methodology can be used to estimate class-wide overcharges. The issue at this stage is not whether Dr. McClave's opinions prove Plaintiffs' case on the merits, but whether his opinions are sufficiently reliable and relevant, in conjunction with other proof, to assist all class members at trial.[21]

---

[20] If anything, the fact that demand was increasing in the class period (as Defendants'

█████████████████████████████████

In this respect, Defendants' yearly demand data serves as additional common proof of a plausible conspiracy. *See, e.g., Standard Iron Works*, 639 F. Supp. 2d at 882 (discussing evidence of end-user demand).

[21] Contemporaneously, Plaintiffs have filed briefs and supporting exhibits in opposition to Defendants' *Daubert* motions directed at Dr. McClave and Dr. Solow. Plaintiffs' *Daubert* filings are hereby incorporated by reference as to all class certification issues.

As detailed in Plaintiffs' *Daubert* response, 

As summarized below and discussed at length in Plaintiffs' *Daubert* opposition, Dr. McClave's methodology has been accepted many times in similar cases, is reliable as applied, and will assist all class members in proving the impact and damages elements of their claims at trial. *See, e.g., Fructose*, 295 F.3d at 660-61 (accepting similar methodology at merits stage); *see generally EPDM*, 256 F.R.D. at 88 (explaining difference between impact and damages and noting that regression analysis can be used to show both).



####    a.    Dr. McClave's Methodology Is Reliable, Common, and Relevant as to the Fact of Class-Wide Overcharges.

Defendants' principal criticism is Dr. McClave's estimation of an "average" class-wide overcharge. According to Defendants, such analysis is irrelevant to individual class member injury and damages, does not support Dr. McClave's opinion that all or nearly all class members were injured, and therefore cannot be used as common proof at trial. Def. Br. at 40-50.

To the contrary, the use of average class-wide multiple regression models is standard practice in cartel cases, and is well-accepted as relevant and reliable proof that can be used (i) *in conjunction with other evidence* to establish individual class member injury and (ii) as a reasonable estimate of class-wide damages. Accordingly, Dr. McClave's "common methodology" will assist the proposed class at trial, which is the only question at this stage. *Messner*, 669 F.3d at 819.

Plaintiffs are *not* required to introduce inherently individualized regression results to prove their claims. Instead, because antitrust violations distort the market and make the "but for" world difficult to reconstruct with certainty, the rule is well-established that Defendants' liability can be established using probabilistic proof of injury and reasonable estimates of aggregate class-wide harm. *See, e.g., J. Truett Payne*, 451 U.S. at 565-66; *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (injury can be shown with proof of price change not attributable to competitive forces); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002) (settled law "that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of damages"); *Scrap Metal,* 527 F.3d at 532-34 (approving aggregate proof of class overcharge); *see generally BCS Servs. Inc.*, 637 F.3d at 760 (crediting statistical evidence and explaining similar standard for proving causation and damages in RICO context).

44

Dr. McClave's regression methodology represents the textbook approach for proving class-wide overcharge in cartel cases under these standards, and is accepted by courts and commentators alike. *See, e.g.*, *Fructose*, 295 F.3d at 660-61 (approving similar methodology at merits stage to show that "prices were higher during the period of the alleged conspiracy than they were before or after"); *In re High Fructose Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017, 1052 (C.D. Ill. 2001) (underlying model accepted by Seventh Circuit estimated "an average overcharge of 15.7% during the conspiracy period after controlling for other non-collusion variables"); *Scrap Metal,* 527 F.3d at 532-34 (affirming jury verdict where single average overcharge methodology supported inference of class-wide injury); *EPDM*, 256 F.R.D. at 89 (approving similar expert analysis and average overcharge methodology).[23]

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[23] *See also Chocolate*, 289 F.R.D. at 211-213 (certifying class, rejecting "average overcharge" criticism, and collecting cases and authority approving similar methodology as supporting reasonable inference of class-wide injury and damages); *Paper Systems Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 615-16 (E.D. Wisc. 2000) (certifying class, accepting average overcharge regression model, and collecting cases and authority for the proposition that such a model represents "a commonly accepted tool to make such assessments and to evaluate whether there is common impact from an alleged price-fixing conspiracy"); Baker & Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique," *American Law and Economics Review* (1999), at 392 (explaining that Dr. McClave's methodology is "perhaps the most commonly employed in price-fixing cases") (copy attached as Pl. Reply Ex. 41; *see generally* Federal Judicial Center, Reference Guide on Multiple Regression (3d ed. 2011) ("Reference Guide"), at 348 n.90 ("in a price-fixing antitrust case, the expert can ask what the price of a product would have been had a certain event associated with the price-fixing agreement not occurred. If prices would have been lower, the evidence suggests impact. If the expert can predict how much lower they would have been, the data can help the expert develop a numerical estimate of the amount of damages.").

and producers).  Accordingly, Dr. McClave's opinions on the fact and extent of overcharge will assist all class members, and are particularly relevant and reliable considering the extensive independent evidence described above, all of which is consistent with his empirical results.  *See Bazemore v. Friday*, 478 U.S. 385, 401(1986) (court must "examine the regression analyses in light of all the evidence in the record"); *Adams*, 231 F.3d at 425 (statistical evidence need not prove injury standing alone); *Scrap Metal,* 527 F.3d at 532-34; *Urethane*, 2013 WL 2097346, at *7 (regression only one of several categories of proof supporting finding of class-wide injury).

Such proof supports class certification.  As the Seventh Circuit has emphasized, Rule 23 does not require individualized proof of injury.  *See Kohen v. Pacific Investment Management, Co., LLC*, 571 F.3d 672, 676 (7th Cir. 2009) (any such requirement "would vitiate the economies of class action procedure"); *Messner*, 669 F.3d at 823-26; *Butler*, 727 F.3d at 799-802.  Instead, Rule 23(b)(3) predominance is satisfied where, as here, Plaintiffs' common proof as a whole (regression methodology and otherwise) can be used to establish Defendants' liability and establish individual class member injury at the merits phase of the case.  *Messner*, 669 F.3d at 819; *see also EPDM*, 256 F.R.D. at 89; *Ready-Mixed Concrete*, 261 F.R.D. at 170-71 (rejecting similar arguments from defendants and accepting proposed regression methodology).

These standards also comport with the fundamentals of statistics.  Defendants suggest that any type of "average" statistical analysis is somehow unreliable, but multiple regression analysis *by definition* makes use of averages, and courts do not reject regression evidence on that basis alone.  *See Reference Guide,* at 334 ("Multiple regression . . . is a method in which a regression line is used to relate the average of one variable—the dependent variable—to the values of other explanatory variables.").  The point of regression analysis is to use average data modeling to shed statistical light on the question at issue.  As Dr. McClave has further explained:



For the same reasons, "average" statistical analyses are accepted routinely not just in antitrust but in many other civil cases to support a reasonable inference of causation and harm. *See* pages 45-46, *supra* (antitrust class action context); *BCS Services*, 637 F.3d at 758-59 (accepting "statistical, probabilistic" proof of causation and injury); *see also Bazemore*, 478 U.S. at 398-401 (regression analysis of "average" data supports inference of individual harm); *Adams*, 231 F.3d at 422-28 (discussing use of statistical evidence generally).[24]

*Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009), emphasized heavily by Defendants, is not to the contrary. *Reed* involved an alleged conspiracy among Chicago area



hospitals to depress wages paid to nurses. It was not a cartel case involving a straightforward theory of supply restriction, but rather an antitrust claim implicating a number of individualized employment issues. The court refused to certify the class because of numerous fundamental flaws in the expert's "vague and inscrutable" average wage analysis. *Id.* at 589.

The facts here are the opposite. First, *Reed* lacked what Plaintiffs have emphasized: corroborating direct evidence ███████████████████████████████████████████████ ███████████████████████████████████████████████████. *See Bazemore*, 478 U.S. at 401.

Second, unlike the "vague and inscrutable" expert analysis in *Reed*, Dr. McClave's analysis is transparent, and supported by the record. ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████ *Compare Reed*, 268 F.R.D. at 592 (demonstrably inferior statistical fit). Both the facts of this case and the details of the models are far removed from *Reed*.[25]

Finally, even if individualized overcharge estimates were required on the merits—and they are not—████████████████████████████████████████████████

---

[25] Nor does *Reed* stand for the proposition that *any* use of averaging is *per se* unreliable, as Defendants suggest. Any such reading of *Reed* cannot be squared with the extensive authority described above. *See, e.g., Fructose*, 295 F.3d at 660-61 (approving average overcharge model); *Scrap Metal*, 527 F.3d at 529 (accepting average price data and average overcharge model); pages 44-46, *supra* (collecting many cases).



Dr. McClave provides a relevant, reliable, and common multiple regression methodology for estimating class-wide overcharges.[26]

### b. Dr. McClave's Analysis Reliably Estimates Damages

Defendants assert that class certification should be denied because Plaintiffs cannot establish damages (as distinct from impact) on a customer-by-customer basis, but Plaintiffs have no such obligation. "[A]ggregate judgments have been widely used in antitrust, securities and other class actions." *NASDAQ*, 169 F.R.D. at 525-26. "In many cases, the class representative in an antitrust suit may prove the amount of damages for the entire class . . . thus eliminating the need for individual damage proofs during trial. This approach allows the named plaintiff to show the total class damages caused by the defendant's unlawful conduct. The aggregate class damage approach has obvious case management advantages. By eliminating individual damage proofs at trial, the length, complexity and attendant costs of litigation are greatly reduced." *Id.* (internal citations and quotation marks omitted); *see also Scrap Metal,* 527 F.3d at 532-34 (approving aggregate class damage judgment).



███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████     In actuality, of course, it will not be the lawyers who decide how to distribute

damages.  The Court will be asked to approve a plan of allocation, with class members having an

opportunity to comment and object.

This approach to resolving the element of damages is well-supported in the class action

context.  *See, e.g., In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 582 F.3d 156, 197

(1st Cir. 2009) ("The use of aggregate damages calculations is well established in federal court

and implied by the very existence of the class action mechanism itself[.]"); 3 Newberg on Class

Actions § 10:2 (4th ed. 2002) ("Proof of aggregate monetary relief for the class is feasible and

reasonable under various circumstances. In fact, the ultimate goal in class actions is to determine

the aggregate sum, which fairly represents the collective value of claims of individual class

members.  The evidentiary standard for proof of monetary relief on a classwide basis is simple—

the proof submitted must be sufficiently reliable to permit a just determination of the defendant's

liability within recognized standards of admissible and probative evidence.") (footnote omitted).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████     Accordingly, common proof is feasible on damages, even though such proof

is not required to satisfy predominance.  *See Butler*, 727 F.3d at 799-801.[27]

---

[27] Defendants also raise a number of more technical modeling issues relating to Dr.
McClave's damage estimate, including criticism of the way in which Dr. McClave "aggregated"

c.    *Comcast*

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), a case in which the Supreme Court reversed class certification because the plaintiffs' original damage model (developed by Dr. McClave) no longer fit the plaintiffs' liability case after its scope was narrowed by the district court, does not alter the legal principles that apply here.

As the Seventh Circuit recently explained, *Comcast* breaks no new ground. *Butler*, 727 F.3d at 799-802. The Supreme Court itself emphasized that *Comcast* turned on "straightforward application" of class certification principles. 133 S.Ct. at 1433. The Court did not re-write the established rule law of antitrust class certification, but instead reaffirmed the rule (which has long been the law in the Seventh Circuit) that courts must review the record rigorously before certifying a class. *Id.*; *see Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001). The Supreme Court also emphasized that *Comcast* "provide[d] no occasion" for discussion or analysis of "substantive antitrust law." 133 S.Ct. at 1433. Instead, the Court reaffirmed the standard in place for decades with respect to antitrust damages: that the plaintiffs' evidence must simply allow for a "just and reasonable" approximation of damages under a flexible burden of proof. *Id.* at 1432-33; *see* pages 44-46, *supra* (collecting cases). In other words, damage estimates need not be perfect, only reasonable.

The factors that led the Supreme Court to reverse in *Comcast* are not present here. *First*, as the Seventh Circuit recently explained, *Comcast* was unique because the parties had

███████████████ hese arguments are meritless for reasons described in Plaintiffs' *Daubert* opposition, and they afford no basis for denying class certification. *See, e.g., Fructose*, 295 F.3d at 660 (such disputes generally go to probative value, not admissibility); *Bazemore*, 478 U.S. at 400 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *TFT-LCD*, 267 F.R.D. at 313 ("To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology.") (citation omitted); *EPDM*, 256 F.R.D. at 102 (same).

agreed in that case that Rule 23(b)(3) predominance required common proof of damages. 133 S.Ct. at 1430; *Butler*, 727 F.3d at 799-801 (explaining *Comcast*). That is not the usual rule and is not true here. To the contrary, it remains "fundamental[]" that, absent such an agreement among the parties, common proof of damages generally is not required to support class certification. *Butler*, 727 F.3d at 800 ("common proof of damages . . . is not required") (citation omitted); *Messner*, 669 F.3d at 815 (collecting cases).[28]

*Second*, the model in *Comcast* was developed to estimate damages attributable to four different theories of monopolization liability alleged by the plaintiffs. The trial court accepted Dr. McClave's damage analysis and certified the class but determined that only one of the plaintiffs' liability theories was susceptible to common proof, and accordingly excluded the other three theories in its class certification order. The Third Circuit affirmed the order granting class certification, finding it "unnecessary" at the certification stage to determine whether the original damage model remained viable given the narrowed scope of the liability case.

The Supreme Court reversed, holding that a court evaluating common proof of damages (in a case in which the parties agreed common proof of damages was required) must resolve whether the plaintiffs' methodology allows a "just and reasonable" estimate of the overcharges caused by the conduct at issue, even if such inquiry overlaps with the merits. *Id*. at 1432-33. Because the court of appeals did not believe such a determination was necessary at the class certification stage, and because the model on its face appeared to estimate damages attributable

---

[28] Plaintiffs here do not concede that common proof of damages is required to satisfy predominance. Indeed, Plaintiffs' case for class certification does not rise and fall with the regression model. While Dr. McClave's analysis is exceptionally strong for all the reasons stated, it does not stand alone. Instead, the central issue of conspiracy is plainly common to all class members, and Plaintiffs have introduced extensive non-econometric proof on the element of impact, as detailed above. This common proof would satisfy predominance as to Defendants' liability even if certain individual damage issues remained. *See Butler*, 727 F.3d at 800-02.

to conduct no longer at issue, the Court reversed the order affirming certification.  *Id.*[29]

The apparent liability/damages disconnect in *Comcast* has no application here, where Dr. McClave's analysis is fully consistent with Plaintiffs' liability theory.  This is not a multi-theory monopolization case.  Plaintiffs allege that Defendants engaged in a *per se* unlawful conspiracy to restrict output, a context in which Dr. McClave's methodology has been—and remains—the standard approach for supporting a "just and reasonable" estimate of class-wide overcharge.  *See* pages 44-46, *supra*.  Similar methodology has been accepted many times at class certification (and on the merits) in similar matters.  *Id.*  Furthermore, all of Plaintiffs' proof—the conspiracy evidence, impact documents, industry economics, price and production data, and Dr. McClave's modeling—is consistent and mutually reinforcing.  The liability and damage cases are consistent.  Accordingly, Dr. McClave's methodology supports a "just and reasonable" inference of class-wide overcharge at trial, thus supporting a finding of predominance.

Because *Comcast* simply applied settled law to unusual procedural and substantive facts, numerous courts, including the Seventh Circuit, have cautioned against over-reading the Supreme Court's decision.  As *Butler* makes clear, district courts should continue to evaluate Rule 23 predominance in the usual way, consistent with established circuit and Supreme Court authority.  *Butler*, 727 F.3d at 799-802; *see also In re Whirlpool Corp. Front-Loading Washer Products Liability Litig.*, 722 F.3d 838, 858-61 (6th Cir. 2013) (explaining *Comcast*); *In re U.S. Foodservice Inc. Pricing Litig.*, No. 12-1311-cv, 2013 WL 4609219 (2d Cir. Aug. 30, 2013)

---

[29] The Supreme Court did not cast any doubt on the quality of Dr. McClave's work.  The Supreme Court took issue with the Third Circuit's holding that class certification was not the time to resolve whether the original damage estimate remained sufficiently connected to the remaining theory of liability after the district court rejected the other three original theories on which certification was sought.  None of this had anything to do with the quality of Dr. McClave's analysis in the first instance (which in fact the district court credited and no court questioned).  *See Behrend v. Comcast Corp.*, 264 F.R.D. 150, 181-91 (E.D. Pa. 2010).

(affirming class certification under *Comcast*).[30]

### 4. Industry Price Data

Defendants argue that Plaintiffs' price data exhibits— ██████████████

████████████████████████████████████████████

████ "do not show impact on a class-wide basis." Def. Br. at 51.[31]

The price charts are relevant. They are consistent with and thus support Plaintiffs' theory

of liability. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

---

[30] *See also Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (certification appropriate under *Comcast* because plaintiffs' damages model was directly linked with underlying theory of liability); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159, at *7 (N.D. Cal. Sept. 24, 2013) ("Defendants' arguments misread *Comcast* and relevant precedent to require proof of the merits of their damages claim—as opposed its methodology—at the class certification stage"); *Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 694 (S.D. Fla. 2013) ("The Court … does not agree that the Supreme Court's decision in *Comcast Corp. v. Behrend* treads any new ground in class action law."); *but cf. In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) (reversing and remanding for consideration of damages model under *Comcast*, in case in which trial court certified the class prior to *Comcast*).



████████████████████████████████ These data not only support the analyses of Plaintiffs' experts, but can be used in conjunction with Plaintiffs' other common proof to establish class-wide price impact caused by production cuts.

For example, Defendants contend, among other things, that Plaintiffs cannot establish causation in a class-wide trial because steel products are different, Defendants are different, and, according to Defendants, these differences preclude common impact. To rebut this argument and show that furnace curtailments led to price inflation throughout the marketplace, Plaintiffs may introduce demonstratives based on charts such as the following, overlaying evidence of production cuts, documents discussing price effects, and price data itself. The same proof could be used to address Defendants' arguments regarding causation for particular Defendants or products.





While Defendants are entitled to contest the value of such proof on the merits—for example pressing their arguments about whether "average" prices are probative or whether the trends are really the same across product categories—that is different from attempting to foreclose plaintiffs from using such data at all. The charts are probative, and more importantly for present purposes, they are common evidence.

For all of these reasons, courts routinely accept such common proof for purposes of class certification. *See, e.g., Linerboard*, 305 F.3d at 153 (crediting "qualitative" analysis showing

that prices "behaved similarly over time" across product categories); *Polyester Staple*, 2007 WL 2111380, at *25-26 (same); *OSB*, 2007 WL 2253418, at *5-7 (same); *Labelstock*, 2007 WL 4150666, at *19 (same).

### 5. Expert Opinions of Dr. Jeryl Wright

In response to Defendants' arguments and expert reports concerning the complexity of steel production and the diversity of finished steel products, Plaintiffs have submitted the report of Dr. Jeryl Wright. Dr. Wright holds a doctorate in metallurgical engineering from MIT and has spent his career working for steel companies. █████████████████████████

████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████

## II. DEFENDANTS' ARGUMENTS REGARDING OTHER RULE 23 REQUIREMENTS ARE MERITLESS

### A. <u>Typicality Is Satisfied</u>

As explained in Plaintiffs' moving brief (at 24), typicality focuses on the nature of the claim, not the characteristics of the named plaintiff. Nevertheless, Defendants raise the argument that the five named Plaintiffs in the case—which bought a representative array of steel products—essentially are too small relative to the largest class members to serve as representatives. Courts have rejected this argument time and again.

### 1. The Named Plaintiffs' Claims Are Typical

Where, as here, "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," typicality is met. *Saltzman*, 257 F.R.D. at 479 (citation omitted); *see also Urethane*, 251 F.R.D. at 640 ("Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff.") (citation omitted). Typicality is a "low hurdle" requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005); *see also Saltzman*, 257 F.R.D. at 479 (typicality "is closely related to commonality and should be liberally construed").

Courts applying these standards reject the argument advanced by Defendants that smaller purchasers are atypical where, as here, all class members including the named class representatives have the same interest in proving the elements of Defendants' antitrust violation using the same common proof. *See, e.g., Bromine*, 203 F.R.D. at 409-10 (discussing Seventh Circuit authority).[32]

---

[32] *See also In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 405-06 (S.D. Ohio 2007); *In re Carbon Black Antitrust Litig.*, CIV.A.03-10191-DPW, MDL No. 1543, 2005 WL 102966, at *12 (D. Mass. Jan. 18, 2005) (typicality met notwithstanding different purchase terms and purchase volumes); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 690-91 (D. Minn. 1995) ("Although the Plaintiffs admittedly purchased potash in smaller quantities and were not privy to special high-volume benefits available to their larger counterparts, Rule 23(a)(3) does not require that all members of a proposed class pay the same amount or use similar purchase methods in order to pursue an antitrust price-fixing claim.") (collecting cases). *See generally Bulk Graphite,* 2006 WL 891362, at *6 ("That the proposed class representatives had different purchasing positions from [other] class members does not mean that the class representatives' claims are atypical[.]"); *DRAM*, 2006 WL 1530166, at *5 ("[I]n conspiracy cases, plaintiffs' claims are typical of the class because proof of their section 1 claim will depend on proof of violation *by defendants*, and not on the individual positioning of the plaintiff") (emphasis in original); *Vitamins,* 209 F.R.D. at 261("[t]he typicality requirement does not mandate that products

The balance of Defendants' typicality argument is simply a rehash of arguments to the effect that the common proof on which Plaintiffs intend to rely is irrelevant to the claims of individual class members. This argument is erroneous for all the reasons described above.

### 2. Service Centers Do Not Defeat Typicality

Defendants argue that the named class representatives are atypical of service center (*i.e.*, distributor) class members because certain conspiracy allegations *involving Defendants* relate to a service center trade association known as the "MSCI," and also because certain service centers may have been able to pass through overcharges and were thus supposedly indifferent to the alleged production cuts. Def. Br. at 60.

Neither argument has merit. The MSCI trade association raises no typicality issue. No class member is an alleged co-conspirator in this case, and indeed the trade association itself is not an alleged co-conspirator. *See* Compl. ¶¶ 18-19. Plaintiffs have simply alleged that MSCI events were among the many forums in which *Defendants* made relevant statements. *See* Def. Br. at 60 (citing examples of *Defendants'* conduct at these events). Defendants cite no authority for the proposition that this fact pattern creates a conflict or defeats typicality. To the contrary, it is the type of fanciful hypothetical conflict rejected by the Seventh Circuit in a similar case. *Kohen*, 571 F.3d at 680 ("hypothetical" conflicts do not defeat class certification).

Defendants' argument that certain class members may have benefitted from the conspiracy is equally unavailing. Since at least *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), which afforded direct purchaser plaintiffs the right to collect 100% of the overcharge imposed by a cartel, antitrust class actions almost always have included certain class members who were

purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members").

capable of "passing on" the overcharge or otherwise arguably benefitting from the alleged conspiracy. But this hardly creates divergent class interests, let alone disabling conflicts, given that any such pass-on or benefit is categorically irrelevant under the *Illinois Brick* doctrine. *See also Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968); *BCS Servs.*, 637 F.3d at 756 (explaining doctrine). Under this rule, whether certain service centers may have benefitted from production cuts is immaterial, because they are nevertheless entitled to recover 100% of the overcharge imposed by the conspiracy, just like all other direct purchasers in the proposed class. Accordingly, the interests of the class are squarely aligned.

### B. <u>Wilmington Steel Is an Adequate Class Representative</u>

Wilmington Steel is a proper plaintiff and class representative. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

The transfer of an antitrust claim requires an express contractual provision. *See Franco v. Conn. Gen. Life Ins. Co.,* 818 F. Supp. 2d 792, 812 (D.N.J. 2011); *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993) ("any assignment of antitrust claims, as a matter of federal common law, must be an express assignment"); *Sullivan v. Nat'l Football League,* 34 F.3d 1091, 1106 (1st Cir. 1994) (same).

In *Gulfstream III Associates,* for example, the defendant argued that the plaintiff was not proper because its antitrust claim was transferred in a transaction assigning "all of [Gulfstream III Associates'] rights, title and interest" in a certain aircraft. 995 F.2d at 437. The court disagreed, holding that "only an express assignment of antitrust claim can be valid." *Id.* at 438-

39.  In other words, "general assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims."  *Id.* at 440.



For all of these reasons, Wilmington Steel has standing to assert its antitrust claims and is a typical and adequate class representative.

### C.    The Class Is Ascertainable

Rule 23 requires that the class be ascertainable by "objective criteria."  5 James W. Moore, Moore's Federal Practice, § 23.21[1] (3d ed.).  Plaintiffs' proposed class satisfies this



requirement.  The class definition includes all persons who purchased steel products during the class period, where "purchased" is defined as transactions for which pricing was negotiated and delivery was taken during the class period.  These are objective criteria, relying upon transaction records held by Plaintiffs or Defendants.  The small subset of class period transactions excluded because the price was set before the Class Period can be identified in merits discovery by reviewing fixed price contracts, or in the notice and claims administration phase of the case  by asking class members to provide information regarding contract purchases.  *See Saltzman*, 257 F.R.D. at 476; *OSB*, 2007 WL 2253418, at *9 ("Because the proposed class need only be ascertainable by some objective criteria, not actually ascertained, challenges to individual claims based on class membership may be resolved at the claims phase of the litigation.").

Defendants suggest that Plaintiffs' class definition relies upon an "incomprehensible test" that "fails to give potential class members the required bright line."  Def. Brief at 64-65.  This criticism is without merit.  To be included in the class, a purchaser must have taken delivery of steel during the Class Period for a price that was determined during the Class Period—a clear and simple test that, contrary to Defendants' suggestion, requires no "individualized" inquiry beyond determining whether the putative class member actually purchased a class product during the class period.  This could require, at most, a records search for basic information regarding steel purchases.  Courts have certified countless cases in which the class was comparably ascertainable.  *See, e.g.*, *Saltzman*, 257 F.R.D. at 476.

Furthermore, Defendants' suggestion that class certification should be denied in its entirety based on arguments concerning minor issues with the class definition is contrary to well-established authority, under which class definitions are tailored as the litigation proceeds through merits discovery and trial.  *See, e.g, Messner*, 669 F.3d at 825 (class definition issues "can and

often should be solved by refining the class definition rather than by flatly denying class certification on that basis"); Fed. R. Civ. P. 23(c)(1)(C) (permitting alteration of class certification order at any time prior to final judgment).

### D.    A Class Action Is the Superior Means of Resolving the Claims

Finally, there can be no serious dispute that a class action is the superior method for adjudicating this controversy. Defendants first claim that class actions are not proper for resolving disputes between businesses. Def. Br. at 66-67. This claim lacks merit. Courts have certified classes consisting of businesses in literally hundreds of cases. *See, e.g.,* Dkt. No. 307, at 19. Indeed, under *Illinois Brick*, businesses usually are the only group of purchasers with standing to bring federal antitrust claims. Moreover, there is no basis for Defendants' speculation that individual class members could or would bring their own claims, especially in light of the astronomical cost and complexity of an antitrust claim that relies upon substantial economic evidence available only through expensive experts. And while some class members are large entities, most are not. ███████████████████████████████████

███████████████████████████

The cases cited by Defendants provide no support for their novel position. Indeed, in *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), a case cited by Defendants, the court explained that "Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in aggregate." *Id.* at 953. That is the situation here. While Defendants speculate (without any evidence) that certain large class members might be capable of bringing their own suits, the vast majority of class members would not.

Regardless, Defendants have ignored the basic rationale underpinning Rule 23, which is that class litigation is superior and more efficient when a central question of liability can be

resolved in a manageable class-wide trial, thus avoiding the need for duplicative individual suits by thousands of plaintiffs, most of whom would lack the wherewithal to pursue their claims at all. *See Butler*, 727 F.3d at 799-800; *Messner*, 669 F.3d at 815 n.5 ("There are so many common issues of law and fact relating to the issue of [defendant's] liability . . . that the superiority requirement likely poses no serious obstacle to class certification here.").

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that their Motion for Class Certification be granted; that the named plaintiffs be appointed as Class Representatives; and that Fine, Kaplan and Black, R.P.C. and Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC be appointed as Co-Lead Class Counsel.

Dated:   October 15, 2013                             Respectfully submitted,

|  |  |
|---|---|
|  | /s/ Matthew Duncan |
| Michael K. Kellogg | Allen D. Black |
| Mark C. Hansen | Roberta D. Liebenberg |
| Michael J. Guzman | Donald L. Perelman |
| Steven F. Benz | Jeffrey S. Istvan |
| **KELLOGG, HUBER, HANSEN,** | Matthew Duncan |
| **TODD, EVANS & FIGEL, P.L.L.C.** | Adam J. Pessin |
| Sumner Square | **FINE, KAPLAN AND BLACK, R.P.C.** |
| 1615 M Street, NW, Suite 400 | One South Broad Street, 23rd Floor |
| Washington, DC 20036 | Philadelphia, PA 19107 |
| Tel.: (202) 326-7900 | Tel.: (215) 567-6565 |

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Michael J. Freed
Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.:   (224) 632-4500

*Liaison Counsel for Plaintiffs and the Proposed Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 15th day of October, 2013, I caused a true and correct copy of the foregoing **Reply Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification** to be filed **UNDER SEAL** with the Court via the Court's ECF system, and served via e-mail to all counsel.


                    _/s/  *Matthew Duncan*_
                        Matthew Duncan