# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **IN RE:  STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| | Honorable James B. Zagel |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** | |
| *Standard Iron Works v. ArcelorMittal, et al.,* **Case No. 08-cv-5214** | **REDACTED VERSION** |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-5371** | |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* **Case No. 08-cv-5633** | |
| *Alco Industries, Inc. v. ArcelorMittal, et al.,* **Case No. 08-cv-6197** | |
| *Gulf Stream Builders Supply, Inc. v. ArcelorMital, et al.,* **Case No. 10-cv-4236** | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## JOINT MOTION TO EXCLUDE THE OPINIONS OF
## DR. JOHN L. SOLOW

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.     Dr. Solow's Qualifications ......................................................................................... 2

II.    Dr. Solow's Assignment .......................................................................................... 3

III.   Dr. Solow's Opinions .............................................................................................. 4

      A.    Industry Structure ......................................................................................... 4

      B.    Defendants' Conduct .................................................................................... 7

      C.    Industry Performance .................................................................................. 8

LEGAL STANDARDS .................................................................................................... 9

ARGUMENT ................................................................................................................ 11

I.     Dr. Solow's Structure Analysis Is Reliable ............................................................ 12

      A.    Formal Demand-Side Market Definition Is Not Required ................................... 12

      B.    Criticisms of Dr. Solow's Analysis of Raw Steel Ignore the Myriad Evidence of Supply Substitution ................................................................... 20

II.    Dr. Solow's Conduct and Performance Analysis Is Reliable ......................................... 27

      A.    Dr. Solow's Review of Defendants' Documents Is Appropriate and Reliable .................................................................................................. 28

      B.    Dr. Solow's Analysis of Production and Pricing Data Is Appropriate and Reliable .................................................................................................. 31

            1.    Production Data ............................................................................. 31

            2.    Pricing Data ................................................................................ 33

CONCLUSION .............................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012)................................14, 15

*Allapattah Services Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335 (S.D. Fla. 1999)....................10, 33

*Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) ............................................9, 10, 11

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) .........................19

*Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002)............................30

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406
    (7th Cir. 1995)............................................................................................................................14

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) ...........................15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...............................*Passim*

*Fishman v. Wirtz*, No. 74 C 2814, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981) ...............................15

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assn.,* 744 F.2d 588 (7th Cir. 1984) .......................17

*Guarantee Trust Life Ins. Co. v. Am. Med. & Life Ins. Co.*, No. 10 C 2125,
    2013 WL 4714146 (N.D. Ill. July 26, 2013)...........................................................................21

*In re Aftermarket Auto. Lighting Products Antitrust Litig.*, 276 F.R.D. 364
    (C.D. Cal. 2011).........................................................................................................................11

*In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609 (D. Kan. 1995)...............................16

*In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012) ......................................................11

*In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001)..................................................16

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, CIV. 02-6030 (WHW), 2006 WL
    891362 (D.N.J. Apr. 4, 2006) .............................................................................................11, 15

*In re Carbon Black Antitrust Litig.,* CIV.A.03-10191-DPW, 2005 WL 102966 (D. Mass.
    Jan. 18, 2005).............................................................................................................................11

*In re Chocolate Confectionary Antitrust Litig.,* 289 F.R.D. 200 (M.D. Pa. 2012) ............12, 16, 30

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82
    (D. Conn. 2009) ....................................................................................................................11, 18

ii

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ...............................................16

*In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2012 WL 27668
 (S.D. Fla. Jan. 3, 2012) ...........................................................................................................33

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) .............16, 33

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ..................*Passim*

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ...............................................14

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ....................................11, 17, 18, 34

*In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................16

*In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001) ...................................15

*In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001)..........................11

*In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007)..............17, 34

*In re Polyester Staple Antitrust Litig.*, MDL 3:03CV1516, 2007 WL 2111380
 (W.D.N.C. July 19, 2007) ..................................................................................................16, 34

*In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) ..............12, 30

*In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL
 4150666 (M.D. Pa. Nov. 19, 2007)...................................................................................16, 34

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005)..................................15

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)...........................................10, 11

*In re Scrap Metal Antitrust Litig.*, No. 02-cv-844, 2006 WL 2850453 (N.D. Ohio
 Sept. 30, 2006) .......................................................................................................................10

*In re Southeastern Milk Antitrust Litig.*, No. 08-MD-1000, 2012 WL 947106
 (E.D. Tenn. Mar. 20, 2012).....................................................................................................16

*In re Southeastern Milk Antitrust Litig.*, No. 08-MD-1000, 2010 WL 5102974
 (E.D. Tenn. Dec. 8, 2010), *report and recommendation adopted*, 2011 WL 2693541
 (E.D. Tenn. July 11, 2011)................................................................................................10, 29

*In re Southeastern Milk Antitrust Litig.*, 801 F. Supp. 2d 705 (E.D. Tenn. 2011) ......................16

*In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646 (N.D. Ill. 2006)............................................21

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) ..............................................6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010),
    *abrogated on other grounds by In re ATM Fee Antitrust Litig.*, 686 F.3d 741
    (9th Cir. 2012)............................................................................................................11, 16

*In re Titanium Dioxide Antitrust Litig.*, Civ. A. No. RDB-10-0318,
    2013 WL 1855980 (D. Md. May 1, 2013).............................................................................30

*In re Urethane Antitrust Litig.*, MDL 1616, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) .....12, 30

*In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008) ............................................11, 16

*In re Vitamins Antitrust Litig.*, MISC 99-197 (TFH), 2000 WL 1475705
    (D.D.C. May 9, 2000) ........................................................................................................14

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ..............................................11, 16

*Jamsport Entm't, LLC v. Paradama Prods., Inc.*, 02 C 2298, 2005 WL 14917
    (N.D. Ill. Jan. 3, 2005) .......................................................................................................30

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................9, 10

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908
    (6th Cir. 2009)....................................................................................................................16

*Lapsley v. Xtek, Inc.,* 689 F.3d 802 (7th Cir. 2012) ...................................................................9

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ..............................1, 11

*McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603
    (S.D. Ind. Feb. 18, 2004) ...................................................................................................16

*MDG Int'l, Inc. v. Australian Gold, Inc.*, 1:07-CV-1096-SEB-TAB, 2009 WL 1916728
    (S.D. Ind. June 29, 2009) ...................................................................................................32

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989)............29

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253 (D. Mass. 2008) ........16

*Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013 (N.D. Ill. 2011) ...........................................32

*Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877 (N.D. Ill. 2009)............................5, 8

*Sommerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. 2008) ..............................................32

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ...........................................................19

*U.S. Horticultural Supply, Inc. v. Scotts Co.*, No. 04-5182, 2009 WL 89692
    (E.D. Pa. Jan. 13, 2009) .................................................................................................16, 17

## OTHER AUTHORITIES

Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.) ..........................................10, 29

F. R. Civ. P. 23........................................................................................................................19

F. R. Civ. P. 26(a)(2)(B) Advisory Committee's Notes (1993 Amends.) ....................................32

Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, IV and IVA (1998 ed.) and IIB (1994 ed.)..................................................................................1, 3, 13, 14

Carlton & Perloff, *Modern Industrial Organization* 122 (4th ed. 2005) ............................4, 6, 14

Case, Karl E., Fair, Ray C. and Oster, Sharon C., *Principles of Microeconomics* 9th ed. (2009 Prentice Hall) ...........................................................................................................21

George A. Hay & Daniel Kelley, *An Empirical Survey of Price Fixing Conspiracies*, 17 J. L. & ECON. 13 (1974) .....................................................................................................29

Louis Kaplow, *Why (Ever) Define Markets?,* 124 HARV. L. REV. 437 (2010) ...........................19

Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. ECON. LITERATURE 43 (2006).........................................................................................29

Richard A. Posner, *Antitrust Law* (2d ed. 2001)...............................................................4, 5, 6, 29

Waldman & Jensen, *Industrial Organization*, *Theory and Practice* 2d ed. (2001, Addison Wesley Longman) ..............................................................................................................6

## <u>INTRODUCTION</u>

Recognizing the importance of soundly analyzing and addressing the economic issues presented in this case, Plaintiffs have retained Dr. John L. Solow, an experienced and respected economist and co-author of what is widely considered the leading antitrust law treatise (Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law*).

Dr. Solow's report and testimony are offered in support of class certification. The most pertinent inquiry at this stage of the case is whether common evidence will predominate at trial over any issues affecting only individual class members. The question is *not* whether the common evidence <u>proves</u> Plaintiffs' case. *See, e.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("[T]he court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."). The Plaintiffs' expert's job at the class certification stage is to show that common economic methodology can be used to support the class-wide claims. *Id.* at 819. Courts have routinely recognized that the types of analyses and opinions offered by Dr. Solow here meet that standard, and will assist all class members in proving the elements of conspiracy and antitrust injury at trial.



As described below, these opinions are supported in all respects by accepted economic theory, Defendants' contemporaneous business documents, and sworn submissions from the

same Defendants and the very same expert on whom they rely here (Dr. Jerry A. Hausman) in cases before the International Trade Commission ("ITC"). There, Defendants and Dr. Hausman took positions concerning the economics of steel supply and price that support Dr. Solow's opinions and directly contradict the positions Defendants have taken in this litigation.

Yet notwithstanding that Dr. Solow used standard economic methodology that courts have accepted time and again in the class certification context, Defendants move to exclude his opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). As discussed in more detail below, none of Defendants' criticisms warrants exclusion:

- Contrary to Defendants' arguments, a formal demand-side "relevant antitrust market" analysis, such as those applied in merger and monopolization cases, is not a "necessary precursor" to an expert economist's structure, conduct and performance analysis in support of class certification in a case involving a *per se* horizontal conspiracy in violation of Section 1 of the Sherman Act;

- Defendants' arguments concerning the economics of steel production are contradicted by Defendants' contemporaneous business documents, their prior statements to the ITC, and the fundamental tenets of supply and demand; and

- Defendants' criticisms of Dr. Solow's review of Defendants' documents and his analysis of the pricing data are unfounded. Dr. Solow's reliance on the record to confirm and support his conclusions is exactly what a responsible expert is supposed to do.

Defendants would have the Court exclude Dr. Solow for doing what expert economists routinely do in antitrust cases, and for offering opinions about the steel industry that Defendants themselves have offered in the past. Their arguments fail. This is not a close call under *Daubert*.

## BACKGROUND

## I.    DR. SOLOW'S QUALIFICATIONS

Dr. Solow has credentials as an economist that are beyond question, and which Defendants do not contest. He is an accomplished academic economist specializing "in

2

industrial organization, microeconomics, and antitrust economics." Ex. 1, Expert Report of John

Solow, May 22, 2012 ("Solow Report") ¶ 1. He received his undergraduate degree in economics

from Yale and his Master's degree and Ph.D. in economics from Stanford. *See id.* at Attach. A.

Dr. Solow chairs the economics department at the University of Iowa, where he has taught for

more than 20 years. Dr. Solow has published widely and co-authored several volumes in the

leading *Antitrust Law* treatise with the late Professor Phillip Areeda and Professor Herbert

Hovenkamp. *See id.* ¶ 2; *see also id.* at Attach. A; *see generally* Phillip E. Areeda, Herbert

Hovenkamp & John L. Solow, *Antitrust Law: An Analysis of Antitrust Principles and Their*

*Application*, IV and IVA (1998 ed.) and IIB (1994 ed.). Dr. Solow is qualified by both education

and experience to perform the analysis that he performed.

## II.    DR. SOLOW'S ASSIGNMENT



████████████████████████████████████████████████████

██████████████████████████████

### III. DR. SOLOW'S OPINIONS

#### A. Industry Structure

████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ in the leading *Fructose* case, an influential antitrust decision in which the Seventh Circuit applied economic theory to determine whether a cartel was plausible and "might actually have an effect on price." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656-58 (7th Cir. 2002) (surveying industry structure, performance, and defendant conduct); *see also* Richard A. Posner, *Antitrust Law* at 69-79 (2d ed.

2001) (similar economic framework for analysis, emphasizing many of the characteristics studied by Dr. Solow).

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████. *See also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 880-83 and 898-99 (N.D. Ill. 2009) (crediting Plaintiffs' market structure allegations and underlying documents as plausible).

███████████

█  █████████████████████████████████████████████████████

   ██████████████████████████████████████████████████████████

   ██████████████████████████████████████████████████████████████

   █████████████████████████████████████████████████████████████

   █████████████████████████████████████████████████████████████

   █████████████████████████████████████████

█  █████████████████████████████████████████████████████████████

   █████████████████████████████████████████████████████████████

   ████████████████████████████████████████████████████████████

5



█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ In other words, Dr.

Solow's structural analysis serves as common economic proof relevant to the question of

conspiracy and the likely class-wide scope of its impact.

    **B.**    **Defendants' Conduct**

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

**C.**     **Industry Performance**

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

## LEGAL STANDARDS

District courts must perform a gatekeeping role concerning the admission of expert testimony. *See Daubert*, 509 U.S. at 589-93; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999). The *Daubert* standard for admissibility is flexible and permissive, consistent with the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 588 (internal quotation marks and citation omitted). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).

"*Daubert* sets forth a non-exhaustive list of guideposts to consult in assessing the reliability of expert testimony: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (quoting *Daubert*, 509 U.S. at 593-94). Additionally, "other benchmarks for gauging expert reliability" include "whether the testimony relates to 'matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying'; '[w]hether the expert has adequately accounted for obvious alternative explanations'; and '[w]hether the expert is being as careful as he would be in his regular

9

professional work outside his paid litigation consulting.'" *Id.* (quoting Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.)).

The inquiry under *Daubert* is not whether the expert's analysis is perfect, or even correct, but whether it is reasonable. *Kumho Tire*, 526 U.S. at 153 (Rule 702 is concerned with "junk science" falling outside "the range where experts might reasonably differ"); *Fructose*, 295 F.3d at 660-61 (rejecting exclusion of the "responsible though of course not necessarily correct work of a qualified professional"); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon reliable foundation, as opposed to, say, unsupported speculation."). This flexible understanding is particularly important in antitrust cases, where "'causes and effects' in the realm of economics are not nearly as clear-cut as they are in other disciplines, such as chemistry or engineering; there is room for disagreement among the experts." *In re Southeastern Milk Antitrust Litig.*, No. 08-md-1000, 2010 WL 5102974, at *2 (E.D. Tenn. Dec. 8, 2010), *report and recommendation adopted*, 2011 WL 2693541 (E.D. Tenn. July 11, 2011); *see also In re Scrap Metal Antitrust Litig.*, No. 02-cv-844, 2006 WL 2850453, at *12-13 (N.D. Ohio Sept. 30, 2006) ("even in the most complicated cases . . . [competing expert opinions] should be tested by the adversary process . . . rather than excluded"); *Allapattah Services Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1340-41 (S.D. Fla. 1999) (*Daubert* is broad enough to allow competing testimony from competing experts in complex cases).

In applying *Daubert* at the class certification phase, the Court's inquiry focuses on the basic relevance and reliability of the expert's methodology, not whether the expert proves Plaintiffs' case on the merits standing alone. Thus, through its *Daubert* analysis at class

10

certification, the Court determines whether it may rely on the methodology used by Plaintiffs' expert to help it decide whether the claims are amenable to common proof. *See Am. Honda Motor*, 600 F.3d at 817-19; *In re Aftermarket Auto. Lighting Products Antitrust Litig.*, 276 F.R.D. 364, 370 (C.D. Cal. 2011).[1]

## ARGUMENT

Dr. Solow's report is consistent with economic reports accepted routinely by courts in support of class certification in similar matters.[2] Such opinions are scientifically reliable because they are reasonable analyses routinely undertaken by economists on issues relevant to cartel behavior. *See, e.g.*, *Fructose*, 295 F.3d at 660-61; *Scrap Metal*, 527 F.3d at 529-30. For example, the law is well-settled that opinions concerning industry structure are squarely relevant to the disputed class certification question of common impact. *See, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 91 (D. Conn. 2009) (class

---

[1] *American Honda* explained that the Court should resolve any *Daubert* challenge that is "critical" or otherwise "relevant" to class certification. 600 F.3d at 815-16; *see also Messner,* 669 F.3d at 812 (explaining that district court with "doubts" concerning whether the *American Honda* standard is satisfied should err on the side of making an explicit *Daubert* ruling). Because Dr. Solow's analysis is "relevant," Plaintiffs respond here to the substance of Defendants' *Daubert* motion, though Plaintiffs do not concede that any one piece of evidence (expert or otherwise) is "critical" to class certification. To the contrary, extensive non-expert evidence is sufficient to establish predominance. *See* Plaintiffs' Class Certification Reply Brief (Dkt. No. 389). Plaintiffs hereby incorporate by reference all class certification arguments and evidence with respect to the instant *Daubert* motion.

[2] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 311-12 (N.D. Cal. 2010) (crediting Plaintiffs' expert's economic analysis and granting class certification), *abrogated on other grounds by In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 755 n.7 (9th Cir. 2012); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634-35 (D. Kan. 2008) (same); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154-55 (3d Cir. 2002) (same); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, CIV. 02-6030 (WHW), 2006 WL 891362, at *12-13 (D.N.J. Apr. 4, 2006); *In re Carbon Black Antitrust Litig.,* CIV.A.03-10191-DPW, 2005 WL 102966, at *15 n.18 (D. Mass. Jan. 18, 2005); *In re Vitamins Antitrust Litig*., 209 F.R.D. 251, 266-67 (D.D.C. 2002) (same); *In re Monosodium Glutamate Antitrust Litig*., 205 F.R.D. 229, 234 (D. Minn. 2001) (same).

certification supported by common economic proof showing that the market was "conducive to creation and implementation of an antitrust conspiracy" and "if the alleged collusion actually did occur," the "structural characteristics made it more likely that the impact of those price increases would be felt class wide").

In re Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200 (M.D. Pa. 2012), is just one of many representative cases accepting similar economic proof. As Dr. Solow did here, the expert in Chocolate "researched the structural characteristics" of the industry and "examined manufacturer conduct" and "the economic performance of the industry to determine the impact of collusive price-fixing." Id. at 209-10. The Court held that "there is nothing particularly controversial or unique in the conceptual or foundational aspects" of the expert's opinion and accordingly denied the defendants' Daubert motion. Id. at 210 (emphasis in original). The Court emphasized that while "Defendants vigorously disput[ed]" the expert's conclusions, "these disputes go to the weight, and not the admissibility of [Plaintiffs' expert's] testimony." Id.

So too here. There is nothing "controversial or unique" about Dr. Solow's opinions and, as will be described below, Defendants' unfounded criticisms go to the weight and not the admissibility of his testimony.

## I.      DR. SOLOW'S STRUCTURE ANALYSIS IS RELIABLE

### A.      Formal Demand-Side Market Definition Is Not Required

As noted above, Dr. Solow's method of analysis is well-accepted and his opinion is appropriate to the case at hand. See, e.g., In re Urethane Antitrust Litig., MDL 1616, 2012 WL 6681783, at *2 (D. Kan. Dec. 21, 2012) ("Dr. Solow undertook a 'structure-conduct-performance' analysis of the alleged conspiracy. Dow concedes that such a method of analysis is well accepted in this field . . . ."); In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1353-54 (N.D. Ga. 2000) ("Dr. Kamerschen purports to have conducted a straight-forward

and orthodox analysis of the market for polypropylene carpet products. Under this approach, an economist examines market structure, the conduct or behavior of sellers in the market, and the performance of the market to evaluate whether the characteristics of that market are consistent with competitive or collusive behavior. Defendants do not challenge the reliability of this approach in general.") (citation to record omitted).[3]

The premise of Defendants' argument is that, rather than undertaking the standard structure-conduct-performance analysis described above, Dr. Solow should have engaged in a formal "relevant market" investigation as is typically done in an antitrust merger or monopolization case. According to Defendants, Dr. Solow should have focused his attention on defining specific steel product "markets" from the end-user perspective. But that is not and never has been the relevant (let alone required) analysis in a cartel case like this one.

Defendants' argument is wrong as a matter of both economics and law. The foundation of Defendants' argument is their assertion that the *Antitrust Law* treatise co-authored by Dr. Solow calls for the formal demand-side definition that Defendants say is required. But the treatise says no such thing. The pertinent discussion appears in the very beginning of the *Antitrust Law* section on "Product Markets," and it supports Dr. Solow's methodology here:

> A product grouping constitutes a market if a hypothetical defendant [or cartel] controlling its output could maximize profits by charging significantly more than the competitive price for a significant period.
>
> . . . . Two products, A and B, are in the same relevant market if substitutability at the competitive price is very high as measured

████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████

> from either the demand side or the supply side.  To have separate markets, one must find that a significant price increase beyond the competitive level in the A price would neither induce customers of A to buy B instead, nor induce B producers to make A.  ***Thus, although not close substitutes for each other on the demand side, two products produced interchangeably from the same production facilities are presumptively in the same market.***

Areeda, Hovenkamp & Solow, *Antitrust Law* ¶¶ 560-61 (emphasis added).  The treatise goes on

to specifically identify the steel industry as an example of an industry characterized by supply-

side substitution.  *Id.*

Defendants do not address the Seventh Circuit case cited in the same section of the

treatise, which held that "the definition of a market depends on substitutability on the supply side

as well as on the demand side.  Even if two products are completely different from the

consumer's standpoint, if they are made by the same producers, an increase in the price of one

that is not cost-justified will induce producers to shift production from the other product to this

one in order to increase their profits by selling at a supra-competitive price."  *Blue Cross & Blue*

*Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995) (citations

omitted); *see also* Carlton & Perloff, Modern Industrial Organization, 4th ed. (2005) p. 646.

Defendants also ignore other overwhelming antitrust authority rejecting their argument.

First, substantive antitrust law is well-established that demand-side market definition is *not*

required in a *per se* collusion case.  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 345

(7th Cir. 2012) ("naked price and output controls can obviate the need for a detailed market

analysis in a Sherman Act case"); *see also In re Vitamins Antitrust Litig.*, MISC 99-197 (TFH),

2000 WL 1475705, at \*9 (D.D.C. May 9, 2000) ("Alleging a *per se* violation of Section 1 of the

Sherman Act obviates the need to define a relevant market.").[4]

---

[4] *See also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010) ("Under the *per se* standard, plaintiffs are relieved of the obligation to define a market and prove market

14

At most, Plaintiffs in a horizontal cartel case are required to describe the "rough contours" of the market at issue. *Agnew*, 683 F.3d at 345. Plaintiffs and Dr. Solow have readily satisfied this requirement. ████████████████████

████████████████████████████████████████████

████████████████████

Second, in evaluating industry economics for purposes of class certification, courts have emphasized repeatedly that finished product diversity is not the relevant issue where, as here, plaintiffs' cartel allegations involve multiple finished goods. "Contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) (citations omitted) (certifying claims for multiple product categories). "Antitrust defendants resisting class certification routinely argue that the complexity of their particular industry makes it impossible for common proofs to predominate on the issue of antitrust impact . . . but the argument is usually rejected[.]" *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, No. Civ. 02-6030 (WHW), 2006 WL 891362, at *11 (D.N.J. Apr. 4, 2006) (citations omitted). This rule applies

---

power."); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999) ("*Except when alleging a* per se *antitrust violation*, Plaintiffs must identify the relevant geographic and product markets . . . .") (emphasis added); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 359 (D.N.J. 2001) ("The Court begins with black-letter law . . . . Some types of concerted activity, however, because of their pernicious effect on competition and lack of any redeeming virtue, are treated as per se violations of section 1, without any inquiry into the harm such activity may have caused *in the relevant market*.") (internal quotations and citations omitted, emphasis added); *Fishman v. Wirtz*, No. 74 C 2814, 1981 WL 2153, at *32 (N.D. Ill. Oct. 28, 1981) ("Section 1 cases decided under the rule of reason require a showing of unreasonable restraint of trade within a relevant market. On the other hand, no market definition is needed to prove *per se* violations.") (internal citation omitted).

with equal force in cases in which defendants argue the finished products are differentiated or comprise multiple "relevant" markets from the end-user perspective.[5]

Defendants fail to confront this authority. Instead, they argue that "[a]n expert proffered to support a motion for class certification may not rest on a 'cursory' market definition analysis," Def. Br. at 11-12 & n.35, but the cases they cite are not on point.[6] In fact, as demonstrated

---

[5] *See also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012) (certifying class and rejecting product differentiation arguments); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 312-13 (N.D. Cal. 2010) (certifying class and rejecting defendants' "distinct markets" arguments); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 635 (D. Kan. 2008) (certifying class covering variety of finished goods and rejecting product variation arguments); *In re Polyester Staple Antitrust Litig.*, MDL 3:03 CV 1516, 2007 WL 2111380, at *22 (W.D.N.C. July 19, 2007) (rejecting defendants' argument that "there is no single product market" and certifying class encompassing goods with "different physical properties and characteristics" and end-uses); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *2 (M.D. Pa. Nov. 19, 2007) (certifying claims covering "fifteen product categories"); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 414 (S.D. Ind. 2001) ("A wide range of products and prices does not make it impossible to use common proof to demonstrate impact."); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265-68 (D.D.C. 2002) (accepting common proof of impact involving a host of vitamins notwithstanding argument that products were "so diverse as to comprise many relevant antitrust markets"); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 485-87 (W.D. Pa. 1999) (rejecting argument that varied products, markets, and demand considerations defeat certification); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 614-15 (D. Kan. 1995) (same).

[6] *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253 (D. Mass. 2008), involved a Section 2 monopolization claim and Section 1 rule of reason claim. *See id.* at 262. Although Defendants cite *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 492 (N.D. Cal. 2008), for the proposition that courts are "increasingly skeptical of plaintiffs' experts who offer only generalized and theoretical opinions," nothing in that opinion implicates an expert's failure to define a relevant market. Other cases Defendants cite involve claims for which plaintiffs had the burden of proving the relevant market. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908 (6th Cir. 2009) (rule of reason case where plaintiff had the burden of defining the relevant market); *In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2012 WL 947106 (E.D. Tenn. Mar. 20, 2012) (in an earlier decision, *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 716-21 (E.D. Tenn. 2011), the court ruled that Plaintiffs' claims involving a vertical conspiracy were subject to the rule of reason); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012) (Section 2 monopolization claims); *McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603, at *14-32 (S.D. Ind. Feb. 18, 2004) (claims not subject to *per se* treatment). Defendants' citation to *U.S. Horticultural Supply, Inc. v. Scotts Co.*, C. A. No. 04-5182, 2009 WL 89692 (E.D. Pa. Jan. 13,

above, Dr. Solow has done precisely what economists do—and always have done—in cartel cases. His methodology is particularly appropriate in a supply restriction case like this one, in which the entire point of the alleged conspiracy was to restrict supply in order to inflate prices for multiple finished goods. The very nature of the case underscores the wisdom of the rule that economic analysis of cartel effects is *not* constrained by finished product market definition. *See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) (explaining economics of supply restriction and certifying class for various end products and grades); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assn.,* 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned rise"); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) (certifying class where supply cartel impacted a variety of finished goods made in the same curtailed facilities).

Basic principles of economics are consistent with this authority. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████  ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

2009), Def. Br. at 12, fares no better. *Horticultural Supply* was a vertical case involving an alleged vertical price-fixing conspiracy proceeding under the rule of reason. *Id*. at *20 ("A properly defined market is the foundation of a rule of reason antitrust case."). Any intimation that Dr. Solow's opinions were excluded in that case are incorrect. *Horticultural Supply* is a summary judgment opinion. 2009 WL 89692, at *9 & n.4.

████████████████████████████████████████████████████████

████████████████████████████████████

The soundness of Dr. Solow's methodology and opinions (as well as the flaws in Defendants' argument) is further demonstrated by a close review of Defendants' expert's work. First, as to the importance of the supply side of the industry, Dr. Solow's methodology here is consistent with Dr. Hausman's testimony before the ITC, where he emphasized the supply-side production and price linkage in the steel industry. Ex. 6 (Hausman Dep. Ex. 6) at 414 (Dr. Hausman's ITC testimony relating to all major flat products: "I emphasize supply side substitution, not demand side substitution"); *id.* at 487 ("[t]he linkages among supply side effects in terms of the own and cross price are much, much stronger than the own and cross price demand effects.").

Second, in the *DRAM* price-fixing matter, Dr. Hausman submitted an economic report on behalf of one of the criminal defendants, which closely tracked Dr. Solow's analysis here. *See* Ex. 7 (Hausman Dep. Ex. 3). Dr. Hausman surveyed the structure (and performance) of the DRAM industry, focusing on many of the same structural characteristics addressed by Dr. Solow. *Id*. at 2-6. He then offered the opinion that had DRAM supply been reduced (in that case by eliminating one of the producers from the market), market prices would have increased substantially. *Id.* In offering these opinions, Dr. Hausman did not find it necessary to perform a formal demand-side "relevant market" analysis, despite the fact that DRAM was produced to a variety of different specifications and sold to different end-use market segments. *See id*., Ex. 7

---

█ ████████████████████████████████████████████████████

██████████████          *See, e.g., Fructose*, 295 F.3d at 657 (similar analysis of demand); *Linerboard*, 305 F.3d at 153-55 (approving similar analysis at class certification stage); *EPDM*, 256 F.R.D. at 92-95 (same). ████████████████████████████████

████████████████████████████████████████████████

(Hausman Dep. Ex. 3), Hausman DRAM Report at 4, Hausman DRAM Appendix, and

Hausman DRAM ITC Testimony at 52 (all recognizing that DRAM was sold to different end

markets in different densities, line widths and wafer sizes).



As detailed above, Dr. Solow's opinions are consistent with his own academic work, the

economic literature, Seventh Circuit authority, and dozens of antitrust class certification

decisions accepting similar economic opinions without requiring the demand-side market

definition Defendants request. Dr. Solow properly focused his analysis on the supply side of the

steel industry, which is where the cartel at issue operated.[8]

---

[8] ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████ *accord* Solow
Rebuttal ¶ 10. *See also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) ("[T]he
share a firm has in a properly defined relevant market is only a way of estimating market power,
which is the ultimate consideration."); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d
1325, 1336 (7th Cir. 1986) ("Market share is just a way of estimating market power, which is the
ultimate consideration."); Louis Kaplow, *Why (Ever) Define Markets?,* 124 HARV. L. REV. 437,
467 (2010) ("the raison d'être for the market definition enterprise is to provide a basis for

**B.**     **Criticisms of Dr. Solow's Analysis of Raw Steel Ignore the Myriad Evidence of Supply Substitution**

Defendants also argue that Dr. Solow has oversimplified the steel industry by focusing on

"raw steel." Def. Br. at 14-22. But again Dr. Solow's focus is appropriate for this case where

Plaintiffs allege an output restriction conspiracy. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

inferring market power"). ████████████████████████████████████

███████████████████████████████████████████████

████████         ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████



*See, e.g.*, *Guarantee Trust Life Ins. Co. v. Am. Med. & Life Ins. Co.*, No. 10 C 2125, 2013 WL 4714146, at *3 (N.D. Ill. July 26, 2013) ("questions asked at depositions may expand the scope of the expert's testimony"); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 659-61 (N.D. Ill. 2006) (same).

(1) Dr. Hausman's own ITC testimony (*e.g.*, "**the prices of all carbon and alloy flat steel products are linked by substitution in supply**") (emphasis added), *see infra*, at 23-24 & Plaintiffs' Class Certification Reply Brief (Dkt. No. 389), at 21-22;

(2) Defendants' ITC testimony (*e.g.,* "**It is important that you understand that from a producer's viewpoint it makes sense to consider billets, rebar, hot-rolled bar, structurals, and rail as essentially one product**.") (emphasis added), *see infra*, at 25-26 & Plaintiffs' Class Certification Reply Brief (Dkt. No. 389), at 22-23;





Looking at just one of these categories of evidence – the ITC testimony -- is particularly revealing, if not dispositive.  Dr. Hausman's position in this case, echoed by Defendants in their briefing, is that economic analysis of the steel industry must focus on end-product specifications and product-specific demand.  Dr. Hausman virtually ignores the supply side in this case, and does not recognize any supply-side price linkage at the furnace level of production.  Dr. Hausman's ITC testimony stands in stark contrast to his current report.  That prior testimony, given well before the onset of this litigation, underscores that supply substitution exists within the steel industry, exactly as Dr. Solow has explained.

For example, in a major 2001 trade case involving all domestic flat rolled products (including hot rolled sheet, cold rolled sheet, galvanized and other coated sheet, and plate, which collectively represent approximately 75% of total class sales at issue here), Dr. Hausman offered the opinion with respect to *all* of these flat steel products that:  "The production and pricing of the various flat steel products is interrelated due to supply-side substitution possibilities."  Ex. 8 (Hausman Dep. Ex. 4), Statement of Jerry A. Hausman before the U.S. ITC in the Matter of Steel, Inv. No. TA-201-73 (Sept. 10, 2001), at 5; *id.*, Hausman and Lexecon Technical Report (Sept. 10, 2001), at 15 ("the prices of all carbon and alloy flat steel products are linked by substitution in supply"); *see also* Ex. 4, Hausman Dep. at 342:7-15; 346:5-10; 346:19-23; 390:3-8.

These were by no means isolated statements, as Dr. Hausman made the same point repeatedly – about both flat and long products -- to the trade authorities. *See* Ex. 6 (Hausman Dep. Ex. 6), Hausman ITC Testimony in the Matter of Steel, Inv. No. TA-201-73 (Sept. 19, 2001) at 416 ("all five [major flat] products are economically linked"); *id.* at *id. at* 486-87 ("When you think about Nucor, they're vertically integrated. When you talk about vertically integrated, it's that they can shift production amongst different outputs -- hot-rolled, cold-rolled, galvanized, tin -- and they're going to make that based on a profit….The linkages among supply side effects in terms of the own and cross price are much, much stronger than the own and cross price demand effects."). According to Dr. Hausman at the time, the common supply side effects are "what makes this a flat-rolled sector single industry, at least from an economic point of view." *Id. at 391.* And while Dr. Hausman was unavailable to testify before the ITC in a similar investigation covering all or nearly all long products at issue here, the econometrician with whom Dr. Hausman worked on that matter testified as follows on Dr. Hausman's behalf: "When Professor Hausman approached the long products, he felt that there was linkage among the – among the long products." Ex. 4, Hausman Dep. at 435 (quoting Dep. Ex. 8).

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

Likewise, Defendants themselves testified about supply-side substitutability at the furnace level of industry production during the same ITC proceedings. As with Dr. Hausman,

Defendants' position before the ITC was that *all* major flat products represent a single market as a matter of economics and business reality, and that the same is true for long products, which of course validates Dr. Solow's opinion here. For example, Dan DiMicco, CEO of Nucor, testified as follows regarding flat and long products, respectively:

> If we have a flat-rolled mill that has a capacity of say 2,000,000 tons, that capacity is usually discussed in terms of melting, casting and the hot-rolling capability. Further downstream there could and usually are cold-rolled and a galvanizing operation. ***All of those three product lines are tied to one another in the operations and in the profitability and the marketing of that particular business unit.*** We may, depending on market conditions, produce more hot-rolled, or move more into cold-rolled or move more into galvanized, depending on what's going on there.
>
>      \*   \*   \*
>
> For the record, I am Dan DiMicco, President and CEO of Nucor. We manufacture long products at mills in Arkansas, South Carolina, New York, Nebraska, Utah and Texas. Each mill has a hot end, an electric furnace where raw material, usually scrap, is melted into liquid steel and then cast into billets. We tailor the metallurgy of each sheet to the finished steel we need to roll for our customers. ***Please note that the same furnace and caster could be used and many times is to make billets for rebar, hot-rolled bar shapes, structurals, and rail.*** About 70 percent of the finished steel cost is realized by the time the billets leave the caster as a semi-finished product. Billets are converted into rebar, hot-rolled bar, rail, or structurals in a rolling mill. Many of our modern rolling mills can theoretically be used to make all or most of these long products by simply changing the rolls, which takes about a half an hour. In practice, though, most rolling mills are dedicated to two or three of the long products. ***It is important that you understand that from a producer's viewpoint it makes sense to consider billets, rebar, hot-rolled bar, structurals, and rail as essentially one product***.

Ex. 9, Dan DiMicco (Nucor) at 437, ITC Testimony (Sept. 19, 2001) ITC TA-201-073 and Ex. 10 (Hausman Dep. Ex. 9), DiMicco Testimony at 1295-96, ITC Testimony (Sept. 24, 2001) ITC TA-201-073 (emphasis added); *see also* Ex. 9, DiMicco Testimony at 407-08, ITC Testimony (Sept. 19, 2001) ITC TA-201-073; *id.*, Tom Usher (US Steel) at 403-04, ITC Testimony (Sept.

19, 2001) ITC TA-201-073 ("Businessmen in this industry know that various flat-rolled products, slabs, hot-rolled, cold-rolled, plate, corrosion resistant products and so on cannot be separated from one another.  I run a single business, the flat-rolled business.  Our production, sales and pricing decisions are made by considering these flat-rolled products in their entirety.  Once we melt a ton of steel, we must roll it to sell it."); *id.*, Dave Beinner (Bethlehem Steel, acquired by ISG/Arcelor Mittal) at 696, ITC Testimony (Sept. 19, 2001) ITC TA-201-073 ("From a business perspective, there is no question that all these flat-rolled products should be seen as part of a single industry."); Ex. 10, Charles Verrill (counsel for Long Producers) at 1354, ITC Testimony (Sept. 24, 2001) ITC TA-201-073 ("linkage on the production level" for long products is "what justifies, in our view, that they be considered a single article and a single industry").

The record thus demonstrates that Dr. Solow's focus on furnace output for raw steel and supply substitution rests on responsible economics and a proper foundation.

Rather than addressing directly the economics of supply substitution, Defendants and Dr. Hausman first mischaracterize Dr. Solow's opinions, then knock down a series of straw men. For example, Defendants characterize the notion that all raw steel is exactly the same as the "linchpin" of Plaintiffs' theory and Dr. Solow's analysis.  *See* Def. Br. at 16.  But that is not Dr. Solow's (or Plaintiffs') theory.  Plaintiffs do not dispute that steel is made in many shapes and grades (*see* Def. Br. at 15-19); that steel products may have different metallurgical properties (*see id.* at 16, 18-19); that flat mills generally do not produce long products and vice versa (which is why both Dr. Solow and Dr. McClave analyzed flat and long products separately) (*see id.* at 17-18, 20); that certain mills tend to focus on certain basic product groups (*see id.* at 17-

19); that all raw steel is not sold as a stand-alone product (*see id.* at 22-23)[10] and that production trends varied somewhat by mill and defendant over time (*see id.* at 25).

But these facts do not alter the economics of supply substitution at all. Defendants have not and cannot rebut the basic economic reality of the steel industry, which is that a conspiracy to curtail raw steel supply makes perfect sense and would necessarily impact the price of all steel products made in those furnaces.[11] ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

## II.    DR. SOLOW'S CONDUCT AND PERFORMANCE ANALYSIS IS RELIABLE

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[10] Defendants fail in their attempt to distinguish OPEC. *See* Plaintiffs' Class Certification Reply Brief (Dkt. No. 389), at 29-30.

[11] Moreover, most of Defendants' flat mills make most flat products, including the key high-volume commodity flat products representing the vast majority of steel bought by the class. *See* Ex. 9, Tom Usher (US Steel) ITC Testimony (Sept. 19, 2001) ITC TA-201-07 at 436 ("Any steel that is going into slabs, plates, hot rolled, cold-rolled, galvanized, tin, all goes through basically the same production process."); ████████████████████████████████████████ Ex. 9, Dan DiMicco (Nucor) ITC Testimony (Sept. 19, 2001) ITC TA-201-073 at 437-38. As such, when all major flat producers cut their furnace output simultaneously, the price of all flat products was impacted—both in theory and in fact. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████ .

## A.    Dr. Solow's Review of Defendants' Documents Is Appropriate and Reliable

The conduct prong of the structure-conduct-performance inquiry necessarily focuses on what industry participants said and did at the time, including indications found in Defendants' contemporaneous records.  Yet Defendants criticize Dr. Solow's review of their documents because he did not "conduct any meaningful scientific analysis" of them.  Def. Br. at 27.  ███████

███████████████████████████████████████████████████████████

████████████████████████ Surely Defendants are not suggesting that Dr. Solow's economic analysis should be undertaken without considering contemporaneous statements from Defendants' executives and other industry participants that bear on economic conditions in the steel industry.  An antitrust economist should investigate and, when warranted, rely on contemporaneous business documents describing relevant industry conditions.  As Defendants' own expert Dr. Hausman has explained in another case,

> [F]or years I have told my students that when you get econometric results you should do the smell test.  In other words, does that accord with business reality? . . . When I say that the steel mills are taking into account their profit margins and will decide which one to produce, I didn't invent that.  I mean, economic theory says that should happen.  I talked to people at Nucor.  I talked to people at USX.  I said am I just a crazy economist or do you people act this way?  They told me we make business decisions every day on the way you've told us because we're out here to make profits for our stockholders.

Ex. 6, Jerry Hausman (expert for Flat & Long Producers) ITC Testimony (Sept. 19, 2001) ITC TA-201-073 at 478-79.

Had Dr. Solow *not* verified his opinions by reviewing and citing contemporaneous business documents, Defendants doubtless would have criticized him for failing to do so.  Dr. Solow did what a responsible economist is supposed to do:  he studied the record evidence to inform his conclusions.  Dr. Solow's review of the record evidence is consistent with *Daubert*,

which imposes on experts the burden of supporting their opinions with "reliable foundation." *Daubert*, 509 U.S. at 597.

Defendants do not dispute the substance of the documents or even Dr. Solow's interpretation of them, nor do they articulate what "scientific analysis" he should have performed on them. The most Defendants can say is that experts are not necessary to interpret documents. But that is not what Dr. Solow is doing. He is playing the fundamental role of an expert in putting information into proper economic context and offering specialized opinions based on that information. Antitrust "deals with what at root are economic phenomena." Posner, *Antitrust Law*, at 1. And a case like this one – involving economic theories such as market power and supply substitution, all of which are disputed in theory and fact by Defendants and their own economist – "would be completely beyond the understanding of the ordinary lay person without the assistance of economists to explain the economic causes and effects of particular actions." *Southeastern Milk,* 2010 WL 5102974, at *2. Dr. Solow's role is to explain his economic conclusions and the record support on which they are based, including but not limited to Defendants' documents, in order to assist the jury with his specialized knowledge at trial. Fed. R. Evid. 702.

The economics literature is rich with similar investigations and analyses of cartel behavior – economic inquiries that necessarily rest on documents and other indications of what the cartel participants said and did at the time. That is what antitrust economists do. They study cartels, including how they actually work in practice and how to reconstruct and interpret their conduct after the fact.[12]

---

[12] *See generally* Posner, *Antitrust Law* at 69-93; Margaret C. Levenstein & Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. Econ. Literature 43 (2006); George A. Hay & Daniel Kelley, *An Empirical Survey of Price Fixing Conspiracies*, 17 J. L. & Econ. 13 (1974).

Nor is Dr. Solow advancing "legal opinion masquerading as expert testimony". Def. Br. at 27. While it is true that experts cannot cross the line and offer legal opinions at trial, *see id.*, Dr. Solow has done nothing of the sort. In fact, he has scrupulously avoided opining on legal issues, as explained in his deposition testimony. Ex. 3, Solow Dep. at 65.

The goal of a structure-conduct-performance analysis is to evaluate industry conduct in a broader economic context. Dr. Solow studied Defendants' <u>conduct</u> against the backdrop of his extensive industry <u>structure</u> analysis—explaining how Defendants' conduct fit the overall economic theory of the case. Defendants might prefer to have Dr. Solow begin and end his investigation with industry structure. But that is not what antitrust economists do, or what structure-conduct-performance analysis is about. Because economists add specialized knowledge and expertise in terms of placing allegedly collusive conduct into a broader economic framework from which reliable conclusions can be drawn, courts have long accepted analyses such as Dr. Solow's in similar matters. *See, e.g.*, *Fructose*, 295 F.3d at 656-61; *In re Titanium Dioxide Antitrust Litig.*, Civ. A. No. RDB-10-0318, 2013 WL 1855980, at *4, *11-12 (D. Md. May 1, 2013); *Urethane*, 2012 WL 6681783, at *2-4; *Chocolate*, 289 F.R.D. at 209-10; *Polypropylene Carpet*, 93 F. Supp. 2d at 1353-55.

---

Defendants' suggestion that Dr. Solow's opinions do not reflect his expertise and experience as an economist are therefore without merit, and Defendants' cases on this point are distinguishable. *See, e.g.*, *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) ("*nothing* in the [expert's] affidavit draws on the skills of an economist") (emphasis added); *Jamsport Entm't, LLC v. Paradama Prods., Inc.*, 02 C 2298, 2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005) (expert opinions that merely interpret "correspondence and other evidence" *without* applying "expertise in a manner helpful to the finder of fact" may be excluded); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 539 (D. Md. 2002) (expert was not qualified to offer an opinion on market definition where his "background is completely devoid of specific education, training, or experience in economics or antitrust analysis").

**B.     Dr. Solow's Analysis of Production and Pricing Data Is Appropriate and Reliable**

**1.     Production Data**

Defendants are wrong to criticize Dr. Solow's analysis of production and prices as "unscientific".  Economists frequently employ a visual review of production and pricing trends and data. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████": ███

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

31

██████████████████████████████████████████████████

██████████████████████████████████████████████ Rather,

they say, in essence, that Dr. Solow should not have looked at the chart and concluded – in a

production restriction case – that production was restricted. ███████████████████████

████████████████████████████████████████████████

██████████████████████

     The argument is meritless.  First, there is no basis for the assertion that experts are

categorically precluded from relying on voluminous production data compiled and summarized

by counsel, particularly where, as here, there is no suggestion that the data or the compilation is

unreliable.  *See* Fed.R.Civ.P. 26(a)(2)(B) Advisory Committee's Notes (1993 Amends.) (counsel

may provide "assistance to experts in preparing [expert] reports, and indeed ... this assistance

may be needed"). [13]   Second, this is especially true in a situation such as that presented here, in

which ████████████████████████████████████████████

---

[13]  In a footnote, Defendants cite to several cases that they contend support their argument that
expert testimony that relies on factual information generated by attorneys should be
excluded.  Def. Br. at 29, n.91.  The cases cited by Defendants are distinguishable because they
involve situations where the expert relied solely on counsel's characterization of the facts
without reviewing or even having access to the underlying data to formulate his own,
independent opinions.  *See Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1026 (N.D. Ill.
2011) (excluding expert opinion where expert "seems to have ***uncritically relied solely*** on
Plaintiff's counsel's" outlines of record evidence) (emphasis added); *Sommerfield v. City of
Chicago*, 254 F.R.D. 317, 320-27 (N.D. Ill. 2008) (rejecting expert opinion where the "***only
documents*** that [the expert] reviewed in order to prepare his report were the plaintiff's Second
Amended Complaint and the summary of depositions by the plaintiff's lawyer") (emphasis
added); *MDG Int'l, Inc. v. Australian Gold, Inc.*, 1:07-CV-1096-SEB-TAB, 2009 WL 1916728,
at *4 (S.D. Ind. June 29, 2009) (excluding testimony where expert relied "***solely*** on the
information provided to him by counsel" and "did not review the record in preparing his report")
(emphasis added). ████████████████████████████████████████████
██████████████████████████ ████████████████████████
████████████████████████████  █████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

Finally, the production data itself plainly are common to all class members. Defendants complain about the aggregation of data in the chart. But for the reasons discussed above (*e.g.*, in Dr. Hausman's words, "supply substitution possibilities") economically and factually the relevant data is indeed aggregate production.

### 2. Pricing Data

Lastly, Defendants contend that Dr. Solow's inclusion of average price charts (Exhibit 3) lacks "empirical" support, and merely reflects Dr. Solow's "visual check".

The ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

---

[14] Defendants cite two cases (*In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2012 WL 27668 (S.D. Fla. Jan. 3, 2012) and *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008)), Def. Br. at 35 & n. 108, that have no bearing on the reliability of Dr. Solow's analysis, as they concern specific applications of a different form of analysis, known as "correlation analysis." *See Fla. Cement*, 2012 WL 27668, at *10; *Graphics Processing Units*, 253 F.R.D. at 493. Furthermore, the correlation analyses performed in those two cases were central to plaintiffs' proof of impact, whereas here, Dr. Solow's examination of price trends is only one of the many types of evidence and data that he considered, which,

███████████████████████████████

███████████████████████████████

█████████████████████████████  Similarly, in his submissions to the ITC, Professor Hausman justified grouping all flat steel products together because "prices for similar [flat steel] products move broadly together over time since they compete in the same product markets. Ex. 8 (Hausman Dep. Ex. 4), Statement of Jerry A. Hausman (Sept. 10, 2001) (Flat Products), ITC TA-201-073 at 12; *see also* Hausman Dep. at 498-99 (Dr. Hausman's testimony concerning his use of representative flat and long products and weighted averages in econometric models presented to ITC).

Defendants have not explained why such analysis is methodologically permissible for Dr. Hausman but not Dr. Solow.

Average price data and the trends they show for products representing the vast majority of product groups at issue are relevant to both class certification and the merits. *See, e.g., Linerboard,* 305 F.3d at 153 (crediting economist's "qualitative" analysis showing that prices "behaved similarly over time" across product categories); *In re Polyester Staple Antitrust Litig.*, MDL 3:03CV1516, 2007 WL 2111380, at *25-26 (W.D.N.C. July 19, 2007) (same); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418, at *5-7 (E.D. Pa. Aug. 3, 2007) (same); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *19 (M.D. Pa. Nov. 19, 2007) (same).

---

includes, *inter alia*, Dr. McClave's econometric analysis. *Cf. Allapattah*, 61 F. Supp. 2d at 1340 ("[A]s circumstantial evidence, the [expert's] data and testimony need not prove the plaintiff's case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.") (citation omitted).

And as with the documents and production data, the jury will need the assistance of an expert to understand the price data and what it shows.  Defendants, of course, will be permitted to respond to Dr. Solow's analysis, but the fact that they disagree with it is no basis to exclude it.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude the opinions of Dr. Solow and consider Dr. Solow's opinion in ruling on class certification.

Dated:   October 15, 2013                        Respectfully submitted,


                                                 /s/ Matthew Duncan
Michael K. Kellogg                               Allen D. Black
Mark C. Hansen                                   Roberta D. Liebenberg
Michael J. Guzman                                Donald L. Perelman
Steven F. Benz                                   Jeffrey S. Istvan
**KELLOGG, HUBER, HANSEN,**                      Matthew Duncan
**TODD, EVANS & FIGEL, P.L.L.C.**                Adam J. Pessin
Sumner Square                                    **FINE, KAPLAN AND BLACK, R.P.C.**
1615 M Street, NW, Suite 400                     One South Broad Street, 23rd Floor
Washington, DC 20036                             Philadelphia, PA 19107
Tel.:  (202) 326-7900                            Tel.:  (215) 567-6565

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Michael J. Freed
Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.:    (224) 632-4500

*Liaison Counsel for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of October, 2013, I caused a true and correct copy of the foregoing **Plaintiffs' Opposition to Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow** to be filed **UNDER SEAL** with the Court via the Court's ECF system, and served via e-mail to all counsel.

_/s/  Matthew Duncan_
Matthew Duncan
