# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: STEEL ANTITRUST LITIGATION | Case No. 08-cv-5214 |
| | Honorable James B. Zagel |
| THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS: | |
| *Standard Iron Works v. ArcelorMittal, et al.,* Case No. 08-cv-5214 | **REDACTED VERSION** |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* Case No. 08-cv-5371 | |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* Case No. 08-cv-5633 | |
| *Alco Industries, Inc. v. ArcelorMittal, et al.,* Case No. 08-cv-6197 | |
| *Gulf Stream Builders Supply, Inc. v. ArcelorMital, et al.,* Case No. 10-cv-4236 | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINIONS OF DR. JAMES T. MCCLAVE

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................. 1

STANDARD OF REVIEW ................................................................................................. 5

DR. MCCLAVE'S QUALIFICATIONS .......................................................................... 7

DR. MCCLAVE'S MULTIPLE REGRESSION METHODOLODY ........................... 9

    I.       BACKGROUND ............................................................................. 9

    II.      DR. MCCLAVE'S PROCESS............................................................ 11

    III.    DR. MCCLAVE'S MODELS ......................................................... 14

DEFENDANTS' ARGUMENTS ...................................................................................... 18

    I.       AVERAGE PRICES AND OVERCHARGE ................................... 18

          A.     Dr. McClave Controlled for Price Variation Throughout the Industry ............................................................................................ 18

          B.     Dr. McClave's Testimony Is Relevant to Whether All or Nearly All Class Members Were Injured ........................................... 23

          C.     Aggregate Damages ..................................................................... 31

    II.      TECHNICAL MODELING ISSUES ............................................... 32

          A.  The Hausman Test .................................................................... 32

          B.  Benchmark Period/Chow Test ................................................. 33

          C.  Other Variables ........................................................................ 35

          D.  Serial Correlation .................................................................... 38

          E.  Supposed Data "Error" ........................................................... 40

          F.  Other Data Issues.................................................................... 41

i

CONCLUSION..........................................................................................................................43

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) ....................................................24

*Allapattah Services Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335 (S.D. Fla. 1999) .................6, 35, 36

*Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) ........................................................7

*Bazemore v. Friday*, 478 U.S. 385 (1986) .............................................................1, 24, 26, 32, 35

*BCS Services, Inc. v. Heartwood 88 LLC*, 637 F.3d 750 (7th Cir. 2011). .....................................24

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) ...........................................................10

*Butler v. Sears, Roebuck and Co.*, 727 F.3d 796 (7th Cir. 2013) ............................................25, 31

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) ......................................................................31

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) .................................................35

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993) .........................................*Passim*

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) ..................................6

*Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281 (7th Cir. 1986) ............................15

*Heller v. Shaw Industries*, Inc, 167 F.3d 146 (3d Cir. 1999) ......................................................40

*In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012) ...............*Passim*

*In re EPDM Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009) ......................................9, 10, 22, 32

*In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012).....................................................28

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ............. 26-28

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) .................. *passim*

*In re High Fructose Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017 (C.D. Ill. 2001) ............10

*In re Industrial Silicon Antirust Litig.*, No. 95-2104, 1998 WL 1031507
    (W.D. Pa. Oct. 13, 1998) ...........................................................................................................38

*In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666 (E.D. Pa. 2007)........................................35

*In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154 (3d Cir. 2002) ..............................................9

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996)......................31

*In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 582 F.3d 156
    31(1st Cir. 2009) ...........................................................................................................................31

*In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348
    (N.D. Ga. 2000) ..............................................................................7, 8, 14, 35, 36

*In re Publication Paper Antitrust Litig.*, 690 F.3d 351 (2d Cir. 2012)........................................23

*In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154 (S.D. Ind. 2009) ...............9, 22, 23

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008).............................2, 9, 10, 24, 31

*In re Scrap Metal Antitrust Litig.*, No. 02-cv-844, 2006 WL 2850453
    (N.D. Ohio Sept. 30, 2006) ...........................................................................................................6

*In re Southeastern Milk Antitrust Litig.*, No. 08-md-1000, 2010 WL 5102974
    (E.D. Tenn. Dec. 8, 2010) .............................................................................................................6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010).....................9, 32

*In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346
    (D. Kan. May 15, 2013)................................................................................................................24

*In re Urethane Antitrust Litig.*, No. 04-1616, 2012 WL 6681783 (D. Kan. 2012).........................8

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ...........................................23

*Kohen v. Pacific Investment Management, Co., LLC*, 571 F.3d 672 (7th Cir. 2009)...................25

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)...........................................2, 5, 7, 14, 16

*Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) .........................................6, 10

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ...................6, 7, 25, 42

*Paper Systems Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wisc. 2001) .....................9, 10, 12

*Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642 (1969) ...........................................................23

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) ........................................... 26-28

*Southwire Company v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908
    (W.D. Wisc. 2007) .............................................................................................................32, 40

*State of Ohio ex. rel Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247
    (S.D. Ohio 1996)............................................................................................................................8

*Ty, Inc. v. Publications Int'l, Ltd.*, No. 99-5565, 2004 WL 2359250
(N.D. Ill. Oct. 19, 2004)...........................................................................................7

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005)..............28

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ...................................................................................................25

Fed. R. Evid. 702 ...................................................................................4, 5, 22, 36, 39

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*
(2005)....................................................................................................................28

Baker & Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique,"
*American Law and Economics Review* (1999) .........................................................9

Federal Judicial Center, *Reference Guide on Multiple Regression* (3rd ed. 2012)
("*Reference Guide*").........................................................................10, 14, 15, 22

Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach* (5th ed. 2013) ..........33

## **INTRODUCTION**

Plaintiffs have retained a qualified econometrician, Dr. James T. McClave, to offer expert testimony about the commonality of impact and damages. Applying decades of experience to the facts, Dr. McClave has shown that a standard multiple regression analysis can be used to establish that steel prices were inflated on a class-wide basis by the alleged conspiracy. *See* Ex. 1 ("McClave Report"); Ex. 2 ("McClave Rebuttal"). ████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

It is important to consider Dr. McClave's analysis in the context of the record as a whole. *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 401 (1986) (court must "examine the regression analyses in light of all the evidence in the record"); *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993) (relevant expert testimony is admissible if supported by "reliable foundation"). Viewed in this light, Dr. McClave's models are even more powerful, as they are consistent not only with the extensive foundation identified in his reports, but with Plaintiffs' overall case. For example, there is little serious dispute that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

McClave's analysis is supported not only by the rigor of his work and the statistical strength of his models, but also by its consistency with the facts of the case.

The methodology applied here is known as "dummy variable" multiple regression modeling, a standard approach used to estimate the aggregate class-wide overcharge attributable to collusion. *See* pages 9-10, *infra* (collecting authority); ███████████████████████ ███████████████████████████████████████████ *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 211-12 (M.D. Pa. 2012) (certifying class, accepting Dr. McClave's analysis, and collecting cases and authority approving methodology).

In brief, dummy variable modeling is used to control for independent price drivers in the industry—factors such as cost, demand, product, and producer—and use those variables to estimate what competitive prices would have been absent collusion. ██████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

███ ██████████████████████████████████████████████

███████████████████████████████████

- **The models make statistical sense.** Econometricians use a series of standard statistical tests to evaluate the reliability of multiple regression models. ████ ██████████████████████████████ *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (testing and error rates a factor).

- **The models fit the facts of the case**. ████████████████████████████ ████████████████████████████████ Moreover, Dr. McClave's estimates are consistent with extensive independent proof of conspiracy and class-wide impact. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to

determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Defendants nevertheless move to exclude Dr. McClave's testimony under *Daubert*. Dkt. No. 375 (hereinafter "Def. Br."). Defendants make two basic arguments: (i) the structure of Dr. McClave's models incorporates "average" price data and estimates an "average" class overcharge, which Defendants say is unreliable for showing individual class member injury; and (ii) based on a ████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████ such that common econometric methodology can be used to assist all class members in proving their claims at trial. *See* pages 9-11, *infra* (collecting cases accepting similar analyses and class-wide estimates).

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████

██████████████████████████████████ It is a fact
of life in complex antitrust litigation that opposing econometricians rarely if ever agree on the
specification of a model.  If the plaintiff's expert introduces a damage model estimating
significant overcharges, it is standard practice for the opposing expert to change the structure of
the model, apply alternative techniques, introduce a few new variables, and "presto," make the
damages disappear.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61
(7th Cir. 2002).  ██████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████████ *See* Fed. R.
Evid. 702, advisory committee note (rule "is broad enough to permit testimony that is the
product of competing principles or methods in the same field of expertise.").

In sum, Plaintiffs have introduced a rigorous multiple regression analysis from a highly
qualified expert with an impeccable academic and professional reputation.  Dr. McClave used

standard methodologies that are well accepted within the discipline and by the courts, and his results are highly reliable according to standard tests. Defendants and their expert would do things differently in order to reach different conclusions. But that does not warrant exclusion under *Daubert*. The role of *Daubert* is to screen junk science from the courtroom—to exclude evidence falling outside the "range where experts might reasonably differ." *Kumho Tire,* 526 U.S. at 153. That is not the case here. Because Dr. McClave's methodology easily meets the standards of responsible expert analysis, Defendants' motion should be denied. *See Fructose*, 295 F.3d at 660-61 (rejecting similar *Daubert* challenge).

## STANDARD OF REVIEW

To be admissible under Rule 702, a qualified expert must offer relevant and reliable opinions. *See Kumho Tire*, 526 U.S. at 141. Depending on the facts of the case, several non-exclusive and discretionary factors may bear on this inquiry, including testability, peer review, error rates, and acceptance within the scientific community. *Daubert*, 509 U.S. at 592-94; *Kumho Tire*, 526 U.S. at 141 ("a trial court *may* consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability" but "the test of reliability is 'flexible' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts in every case.") (emphasis in original).

The Court's *Daubert* inquiry is flexible and permissive, consistent with the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." (citation and internal quotation marks omitted). *Daubert*, 509 U.S. at 588. "[R]ejection of expert testimony is the exception rather than the rule," and is not warranted simply because an opposing expert or party relies on different contested facts, or employs different methodology, or reaches different conclusions. Fed. R. Evid. 702, advisory committee note. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . . . These conventional devices, rather than wholesale exclusion . . . are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert*, 509 U.S. at 596.

Applying this framework, courts have long recognized that the range of permissible expert disagreements is particularly broad in complex antitrust litigation, where "causes and effects in the realm of economics are not nearly as clear-cut as they are in other disciplines, such as chemistry or engineering; there is room for disagreement among the experts." *In re Southeastern Milk Antitrust Litig.*, No. 08-md-1000, 2010 WL 5102974, at *2 (E.D. Tenn. Dec. 8, 2010); *see also Fructose*, 295 F.3d at 660-61; *In re Scrap Metal Antitrust Litig.*, No. 02-cv-844, 2006 WL 2850453, *12-13 (N.D. Ohio Sept. 30, 2006) ("even in the most complicated cases . . . [competing expert opinions] should be tested by the adversary process . . . rather than excluded"); *Allapattah Services Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1340-41 (S.D. Fla. 1999) (*Daubert* is broad enough to allow competing expert testimony in complex cases).[1]

At class certification, the issue is not whether Plaintiffs' proposed evidence (expert or otherwise) proves Plaintiffs' case on the merits, but whether the expert's basic methodology is sufficiently relevant and reliable to assist class members in proving their claims at trial. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811, 814-15, 819 (7th Cir. 2012) ("[T]he court should not turn the class certification proceedings into a dress rehearsal for the trial

---

[1] In this respect, *Daubert*'s liberal admissibility standard comports with Plaintiffs' flexible burden for proving antitrust damages, under which the "responsible though of course not necessarily correct work of a qualified professional" is admissible. *Fructose*, 295 F.3d at 660-61; *see also Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002) ("Since the days of *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927), it has been established that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.").

on the merits."); *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010).[2]

Thus, the Court's inquiry here is not whether Dr. McClave's common methodology is perfect, or even correct, but whether it is reasonable. *Fructose*, 295 F.3d 660-61; *see also Kumho Tire*, 526 U.S. at 153 (Rule 702 is concerned with junk science falling outside "the range where experts might reasonably differ"); *Ty, Inc. v. Publications Int'l, Ltd.*, No. 99-5565, 2004 WL 2359250, at *6 (N.D. Ill. Oct. 19, 2004) (expert's "methodology must not yield mathematical exactness, but it must provide a rational basis upon which to make a reasonable approximation.").

Defendants largely ignore these established standards and instead suggest that the Court must determine that Dr. McClave's models are correct to serve as a common methodology that will assist all class members at trial. As noted above, that is not the law. *See Messner*, 669 F.3d at 808 ("it is important not to let a quest for perfect evidence become the enemy of good evidence").

### DR. MCCLAVE'S QUALIFICATIONS

Dr. McClave is fully qualified to perform the standard econometric analysis presented in his reports. *See* McClave Report, at 1-2 and Appendix C; *see also Chocolate*, 289 F.R.D. at 211; *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1359 (N.D. Ga. 2000).

---

[2] *American Honda* explained that the Court should resolve any *Daubert* challenge that is "critical" or otherwise "relevant" to class certification. 600 F.3d at 815-16; *see also Messner*, 669 F.3d at 812 (explaining that district court with "doubts" concerning whether the American Honda standard is satisfied should err on the side of making an explicit *Daubert* ruling). Because Dr. McClave's analysis is "relevant," Plaintiffs respond here to the substance of Defendants' *Daubert* motion, though Plaintiffs do not concede that any one piece of evidence (expert or otherwise) is "critical" to class certification. To the contrary, extensive non-expert evidence is sufficient to establish predominance. *See* Dkt. No. 389. (Plaintiffs' class certification reply brief). Plaintiffs hereby incorporate by reference all class certification arguments and evidence with respect to the instant *Daubert* motion.

After earning a Ph.D. in statistics from the University of Florida in 1971, Dr. McClave taught statistics and econometrics at the university level for approximately twenty years, including undergraduate and graduate courses such as "Statistics and Econometric Modeling"; "Statistics and Econometrics for MBAs"; "Applied Time Series Modeling and Forecasting"; and "Advanced Time Series Analysis". McClave Report, Appendix C. Dr. McClave has written and co-written a number of respected books and articles in his field, including six textbooks used in hundreds of colleges and universities, one of which, *Statistics for Business and Economics*, is in its eleventh edition. *Id*. When it comes to applied econometrics, Dr. McClave literally wrote the book. *See Chocolate*, 289 F.R.D. at 211 ("Remarkably, approximately 480 colleges and universities have had occasion to use one or more of his textbooks.").

Dr. McClave's practical experience is equally impressive. In 1977, Dr. McClave co-founded Info Tech, Inc., now a 240-employee consulting and software firm based in Gainesville, Florida, whose "business, in short, is the empirical analysis of industries and markets." McClave Report, at 2 and Appendix C. As President of Info Tech, Dr. McClave has provided expert testimony and econometric analysis on behalf of plaintiffs, defendants and government entities for more than 30 years in more than 100 industries. *Id*. With decades of litigation and non-litigation experience, Dr. McClave and Info Tech have developed particular expertise in modeling the effects of horizontal collusion. Courts have approved Dr. McClave's econometric testimony many times in similar cases.[3]

_____

[3] *See, e.g., Chocolate*, 289 F.R.D. 200; *In re Urethane Antitrust Litig.*, MDL No. 1616, 2012 WL 6681783 (D. Kan. 2012); *Polypropylene Carpet*, 93 F. Supp. 2d at 1351; *State of Ohio ex. rel Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1249 (S.D. Ohio 1996) (Dr. McClave "has offered testimony or provided consultation in over fifty antitrust cases.").

## DR. MCCLAVE'S MULTIPLE REGRESSION METHODOLOGY

Because Defendants have mischaracterized the nature of Dr. McClave's analysis in their submissions, it is appropriate to start with a brief overview of what he actually did.

## I.    BACKGROUND

Multiple regression modeling is the standard methodology used to estimate class-wide overcharges in cartel cases. *See, e.g.*, *Fructose*, 295 F.3d at 660-61; *Scrap Metal*, 527 F.3d at 529; *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154 (3d Cir. 2002); *Chocolate*, 289 F.R.D. at 212; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313-14 (N.D. Cal. 2010); *In re EPDM Antitrust Litig.*, 256 F.R.D. 82, 95-96 (D. Conn. 2009); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009); *Paper Systems Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 615-16 (E.D. Wisc. 2000).

The type of regression analysis used by Dr. McClave is known as a "reduced form dummy variable" model, which is equally well-accepted. *See, e.g., Chocolate*, 289 F.R.D. at 212 (collecting authority); *EPDM*, 256 F.R.D. at 95-98; Ex. 3, Hausman Dep. at 454:8-457:22 and 463:19-21 (agreement from Defendants' expert that methodology is accepted); [4] Baker & Rubinfeld, "Empirical Methods in Antitrust Litigation:  Review and Critique," *American Law and Economics Review 1* (1999), at 392 (explaining that such models "are perhaps the most commonly employed in price-fixing cases.") (copy attached as Ex. 5).

The theory behind this type of regression analysis is to use extensive industry data from both a conspiracy and non-conspiracy period to estimate the statistical relationships between price and the factors that influence price, such as cost, demand, producer, and product type. *Id.*

---

[4] The full transcript of the depositions of Dr. Hausman and Dr. McClave are attached as Pl. Reply Exs. 4 and 5, respectively, to Plaintiffs' Class Certification Reply Brief.  For the Court's convenience, the Hausman and McClave deposition excerpts cited in this brief are collected at Exs. 3 and 4 hereto.

By estimating these relationships over time, and controlling for them during the alleged conspiracy period, the model estimates what "competitive" prices should have been. These "but for" prices are then compared to actual prices to estimate the collusive overcharge, if any. McClave Report, at 4-6. *See generally Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (injury can be established with evidence of price changes not attributable to competitive forces); *Loeb,* 306 F.3d at 490 ("It is certainly acceptable through expert economic testimony to make a reasonable estimation of actual damages through probability and inferences.").

In the class action antitrust context, the dummy variable methodology often is used to model an industry as a whole and estimate an "average" class-wide overcharge, which in conjunction with other (non-econometric) proof can be used to assist class plaintiffs in proving the injury and damage elements of their claims at trial. *See, e.g., Fructose*, 295 F.3d at 660-61 (accepting dummy variable regression methodology to show that "prices were higher during the period of the alleged conspiracy than they were before or after"); *In re High Fructose Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017, 1052 (C.D. Ill. 2001) (model accepted by Seventh Circuit estimated "an average overcharge of 15.7% during the conspiracy period after controlling for other non-collusion variables"); *Scrap Metal,* 527 F.3d at 532-34 (affirming jury verdict where average overcharge methodology supported inference of class-wide harm); *EPDM*, 256 F.R.D. at 89 (approving same methodology at class certification stage).[5]

_____

[5] *See also Chocolate*, 289 F.R.D. at 211-213 (certifying class, rejecting Defendants' "average overcharge" criticism, and collecting authority approving similar methodology as supporting reasonable inference of class-wide injury and damages); *Paper Systems*, 193 F.R.D. 601, 615-16 (certifying class, accepting average overcharge regression model, and collecting authority for the proposition that such a model represents "a commonly accepted tool to make such assessments and to evaluate whether there is common impact from an alleged price-fixing conspiracy"); *see generally* Federal Judicial Center, *Reference Guide on Multiple Regression* (3rd ed. 2012) ("FJC *Reference Guide*"), at 348 n.90 ("in a price-fixing antitrust case, the expert can

## II.    DR. MCCLAVE'S PROCESS

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

---

ask what the price of a product would have been had a certain event associated with the price-
fixing agreement not occurred.  If prices would have been lower, the evidence suggests impact.
If the expert can predict how much lower they would have been, the data can help the expert
develop a numerical estimate of the amount of damages.").

## III. DR. MCCLAVE'S MODELS

*Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1292 n.23 (7th Cir. 1986) (R-squared "is clearly relevant to the validity of the model").

Statistical significance is another test of model reliability, which is typically measured using the "p-value." *See* FJC *Reference Guide*, at 320. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

A third objective test is whether the estimated numerical "coefficients" for the independent variables in a model make basic economic sense. Ex. 9, 7/18/12 Hearing Tr. at 41.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

To summarize, a regression model that explains a large percentage of industry price variation (as measured by the R-squared), with a high degree of statistical confidence (as measured by the "p-values"), and with variables displaying economically sensible relationships with price (as measured by the sign and magnitude of the variable coefficients), is a reliable

model according to accepted econometric standards. ████████████████████████

██████████████████ *Cf. Kumho Tire*, 526 U.S. at 149.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████





## DEFENDANTS' ARGUMENTS

### I. AVERAGE PRICES AND OVERCHARGE

Defendants focus great attention on the fact that Dr. McClave incorporated "average" prices into his analysis and estimated an "average" class-wide overcharge, as if any use of averages is *per se* unreliable. But for reasons summarized above and described in more detail below, Dr. McClave's use of weighted average prices was both textbook and reliable, and in fact Dr. McClave controlled for the variation Defendants contend he "masked." Defendants are simply wrong on this issue.

#### A. Dr. McClave Controlled for Price Variation Throughout the Industry

18







*Cf. In re Ready-Mixed Concrete*, 261 F.R.D. at 170-73 (accepting proposed regression methodology at class certification stage and rejecting Defendants' "product diversity" arguments, even though actual model was not developed yet).

Accordingly, even if Defendants and their expert would model the industry in a different or more granular way using different product categories or a different number of observations, that does not mean Dr. McClave's approach was unsound. There is room for disagreement among experts where, as here, Dr. McClave's methodology was responsible, reliable, and supported by foundation. *Fructose*, 295 F.3 at 660-61; *EPDM*, 256 F.R.D. at 102; Fed. R. Evid. 702, advisory committee note (Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise").

---

[12] Defendants' "averaging" arguments are wrong for the additional reason that multiple regression analysis *by definition* relies on averaging of industry data, and there can be no suggestion that it is unreliable on that basis alone. *See Reference Guide*, at 334 ("Multiple regression . . . is a method in which a regression line is used to relate the average of one variable—the dependent variable—to the values of other explanatory variables."). The question is whether the data is aggregated and analyzed in a reasonable way based on proper foundation, which, as explained above, it was.

**B.**     **Dr. McClave's Testimony Is Relevant to Whether All or Nearly All Class Members Were Injured**

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████  Again, the question at this stage is not whether Dr.

McClave's opinions are correct on the merits, but whether they are sufficiently relevant and

reliable to allow Plaintiffs to introduce his testimony in a class-wide trial.  *See, e.g., In re Ready-*

*Mixed Concrete*, 261 F.R.D. at 170-71 (review of expert methodology at class certification stage

does not "necessitate a determination of which expert is more credible").

Because antitrust violations distort the market and make the "but for" world difficult to

reconstruct with certainty, antitrust causation (also known as "impact") can be established at trial

using probabilistic proof supporting a *reasonable inference* of injury.  *See, e.g., J. Truett Payne*

*Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) (explaining the "traditional rule"

under which "the factfinder may conclude as a matter of just and reasonable inference from the

proof of defendants' wrongful acts and their tendency to injure plaintiffs' business . . . [that

they] had caused damage to the plaintiffs") (citations and internal quotation marks omitted);

*Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648 (1969) ("If there is sufficient evidence in

the record to support an inference of causation, the ultimate conclusion as to what the evidence

proves is for the jury."); *In re Publication Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012)

(explaining causation in class action cartel case).  Indeed, the same standard applies in tort cases

generally, under which plaintiffs are entitled to rely on "statistical, probabilistic" proof to support

a reasonable inference of causation and harm. *See BCS Services, Inc. v. Heartwood 88 LLC*, 637 F.3d 750, 758-59 (7th Cir. 2011).

Consistent with these standards, courts have long accepted that well-specified "average" overcharge estimates—that is, regression analyses that control for relevant industry variables and explain prices with statistical confidence—can be used along with other proof to establish that individual class members were overcharged. *See, e.g., Fructose*, 295 F.3d at 660-61 (approving average overcharge model); *Scrap Metal*, 527 F.3d at 529 (accepting average price data and average overcharge model); pages 9-11, *supra* (collecting many cases).

Regression analysis need not prove the element of injury by itself. Instead, the statistical evidence should be considered in light of the record as a whole to determine its relevance and reliability. *See, e.g., Bazemore*, 478 U.S. at 401 (1986) (court must "examine the regression analysis in light of all the evidence in the record"); *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000). Here, ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████. This independent proof demonstrates that Dr. McClave's analysis is far from "junk science." It not only fits the data well, but also fits the facts. Therefore it is relevant and probative as to whether individual class members were harmed, and the jury should be permitted to consider it, along with other evidence of injury, at the merits phase of the case. *See, e.g., In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346, at *7 (D. Kan. May 15, 2013) (regression analysis only one of several categories of proof showing class-wide injury).

████████████████████████████████████████████ also supports class certification. The Seventh Circuit has emphasized that Rule 23 does *not* require individualized proof of injury to satisfy the predominance requirement. *See Kohen v. Pacific Investment Management, Co., LLC*, 571 F.3d 672, 676 (7th Cir. 2009) (requiring customer-specific proof of injury at the class certification stage "would vitiate the economies of class action procedure"); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823-26 (7th Cir. 2012) (same); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799-802 (7th Cir. 2013). ████████████████████████████ ████████████████████████████████████████████ thus support a finding of predominance.[13]

These legal standards comport with the fundamentals of statistics. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████
███████████████████████████████
██████████████████████████████
████████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
████████████████████████████
████████████████████████████
██████████████████████████
████████████████████████████
█████████████

---

[13] By relying on class-wide regression analysis, Plaintiffs are not suggesting that there is no evidence of individual class member injury. ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████

McClave Rebuttal at 5.[14]



That is why models of this type are the standard methodology accepted as relevant proof in antitrust and other cases, which the jury should be permitted to consider at the merits phase of the case. *See* pages 9-11*, supra*; *cf. Bazemore*, 478 U.S. at 398-401 (regression analysis of "average" data supports inference of individual harm in discrimination context).

The authority cited by Defendants is inapposite. For example, in the two cases on which Defendants rely most heavily, *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) and *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("GPU"),

the purported expert analyses bear no resemblance to what Dr. McClave has done.

In both *Reed* and *GPU*, the courts were concerned with fundamentally flawed expert analyses that used average prices to distort underlying market reality. The problems were case-specific. *Reed* involved an alleged conspiracy to suppress nurse wages at Chicago area hospitals, in which the plaintiffs' expert used average wage data and a "vague and inscrutable" methodology that failed to account for the myriad individual factors influencing a particular nurse's wages, yielding models with demonstrably weak statistical properties. *Reed*, 268 F.R.D. at 592 (regression results far inferior to Dr. McClave's results here). For these and many other reasons, the court rejected the analysis. *Id.*

The court in *GPU* began its analysis by recognizing that multiple regression methods, "where plausibly reliable, should be allowed as a means of common proof. To rule otherwise would allow antitrust violators a free pass in many industries." *GPU*, 253 F.R.D. at 491. The first problem identified by the court in *GPU* was the plaintiffs' reliance on a simplified "correlation" analysis (as distinct from more sophisticated multiple regression analysis), about which the court was plainly skeptical. *Id.* Because both the "correlation" analysis and a backup proposed regression analysis ignored a litany of pertinent industry factors, the court rejected the expert's opinion, expressing particular dismay that the expert would put forward an admittedly preliminary and incomplete regression methodology—that failed even to account for supply and demand variables—at a late stage in the case. The court was not impressed with the expert's promise, offered near the close of discovery, to do more and better work at some future date. *Id.* at 496-97 (emphasizing that plaintiffs' expert conceded defects in the proposed regression and criticizing expert for suggesting that "a more acceptable model will be developed as this case further progresses," given that merits discovery "will close in a little over a month").

27

Here, Dr. McClave has done just the opposite.  Far from providing a "vague and inscrutable" analysis as in *Reed*, or a mere "proposed" or incomplete analysis as in *GPU*, Dr. McClave went to extraordinary lengths to specify formal (and readily understandable) multiple regression models ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

The Seventh Circuit case cited by Defendants, *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005), is equally unavailing.  The issue in *Zenith* was that the expert *failed to perform any regression analysis at all* in support of his opinions.  Had the expert done what Dr. McClave has done here—rely on rigorous modeling as foundation for his opinions—that would have been a far more reliable and acceptable course, as the court of appeals explained.  *Id.* at 419.[16]

---

[15] *Reed* and *GPU* do not stand for the proposition that any use of "average" price data or "average" overcharge estimates in any type of analysis is *per se* unreliable, as Defendants suggest.  Any such reading would be contrary to the overwhelming authority summarized above under which class-wide overcharge models reasonably relying on averages are accepted as relevant and reliable.  *See* pages 9-11, *supra*.  *See also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 228 n.25 (E.D. Pa. 2012) (distinguishing *Reed*).

[16] Defendants also cite an ABA publication on econometrics for the proposition that "sometimes" average prices can be problematic.  Def. Br. at 8 (citing ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* 220-24 (2005)).  It bears mention that the portion of the ABA treatise on which Defendants rely starts by *approving* Dr. McClave's basic methodology in this case (reduced form dummy variable models) as an accepted approach. *Id.*  The treatise goes on to discuss the purported pros and cons of using average prices and "average" overcharge models depending on the facts of a particular case, a discussion



unaccompanied by any citation to statistical, econometric, or legal authority. *Id.* These passages should be taken with a grain of salt. The author of the ABA's discussion is unknown, but the primary editor was an antitrust defense lawyer, not an econometrician. Which is not to cast aspersions on the ABA or the editor; everyone brings his or her own perspective. It is just to say the treatise is not necessarily an authoritative or unbiased source on econometric theory and practice, or the law of class certification.



Defendants, of course, are entitled to make their arguments to the contrary on the merits. They will be free to cross-examine Dr. McClave about the extent of individual injury and to introduce contrary evidence and expert testimony of their own. What Defendants cannot show, however, is that Dr. McClave's opinions are so flawed, or lacking in foundation, or irrelevant that they should not be considered by the Court at class certification.

## C. <u>Aggregate Damages</u>

As detailed in Plaintiffs' class certification reply memorandum, Defendants are wrong to suggest that Dr. McClave is not permitted to offer opinions estimating aggregate class damages (as opposed to customer-by-customer damages). *See* Dkt. No. 389, at 49-50. The law is to the contrary, ████████████████████ *See, e.g, Scrap Metal,* 527 F.3d at 534 (approving aggregate class damage estimate); *In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525-26 (S.D.N.Y. 1996) ("In fact, aggregate judgments have been widely used in antitrust, securities and other class actions."); ████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████.

███████████████████████████████

████████████████████████████████████████

██████████████████████████ *Cf. Butler,* 727 F.3d at 799-802 (individual damage issues are no barrier to certification).[17]

## II. TECHNICAL MODELING ISSUES

████████████████████████████████████████

████████████████████████████████████████

---

[17] Plaintiffs have addressed the relevance of the Supreme Court's recent decision in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) at length in their class certification reply memorandum and need not repeat that discussion here. Dkt. No. 389, at 51-54. In short, *Comcast* casts no doubt on Dr. McClave's analysis. *See also Butler*, 727 F.3d at 799-802 (recent Seventh Circuit decision explaining *Comcast*).

███████████████████████████████████████

███████████████████████████████████████

████████████████ Technical modeling issues of this nature generally, and here, go to the probative value of the models on the merits, not the fundamental reliability of the proposed methodology. *See, e.g. Fructose*, 295 F.3d at 660 (technical econometric disputes generally go to probative value, not admissibility); *Bazemore*, 478 U.S. at 400 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *TFT-LCD,* 267 F.R.D. at 313 ("To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology.") (citation omitted); *EPDM*, 256 F.R.D. at 102 (same); *Southwire Company v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 926-30 (W.D. Wisc. 2007) (rejecting serial correlation and other technical challenges to antitrust regression analysis). Nevertheless, as described below, none of these arguments has merit.

### A.   The Hausman Test



---

[18] The Hausman test is sometimes used by econometricians to investigate whether a given model is sensitive to alternative specifications.

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

        ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ ████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

**B.**     <u>**Benchmark Period/Chow Test**</u>

     Defendants next challenge Dr. McClave's specification of a benchmark period that

includs the "Great Recession." This argument is wrong.

     The whole point of regression analysis is to study and measure price and the factors that

affect price over a reasonably large set of data. In this respect, changes in price and other

33

variables over time—whether for business cycle reasons or otherwise—are precisely what allow multiple regression to do its job in evaluating the relevant relationships. Change over time is how the regression works, such that market volatility is generally a good thing for the reliability of a model. ██████████████████

████████████████████

████████████████████

████████████████████

█████████████████████

████████████████████

█████████████████████

██████████████

     Defendants further contend that a so-called "Chow test" casts doubt on whether the Great Recession period belongs in the benchmark. A "Chow test" is a tool that can be used to measure whether price/variable relationships were different during the alleged conspiracy period as compared to the benchmark period. When the Chow test indicates different relationships, that can mean one of two things in the context of a dummy variable regression model such as Dr. McClave's. ██████████████

█████████████████████

███████████████████

█████████████████████

██████████████████

█████████████████████

█████████████████



## C.   Other Variables

Quibbling over regression variables is standard fare in antitrust litigation but rarely a basis for exclusion.  *See, e.g. Fructose*, 295 F.3d at 660; *Conwood Co. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666,  678-79 (E.D. Pa. 2007) ("quibbling with the variables" is no basis for exclusion); *Polypropylene Carpet*, 93 F. Supp. 2d at 1364-70 (same); *Allapattah*, 61 F. Supp. 2d at 1341 (disagreements "over which data to use" are for the jury); *see generally Bazemore*, 478 U.S. at 400 ("Normally,

failure to include variables will affect the analysis' probativeness, not its admissibility.").[19]



The variables also make statistical sense.

*Daubert* requires no more than this. *See Polypropylene Carpet*, 93 F. Supp. 2d at 1364-70 (rejecting series of variable challenges where Dr. McClave's opinions were reasonable and supported by the record); *Allapattah*, 61 F. Supp. 2d at 1341 (expert disagreements "over which data to use or the manner in which the data should be evaluated" are for the jury); *see generally Chocolate*, 289 F.R.D. at 212-13 and 220-25 (rejecting *Daubert* challenge and crediting Dr. McClave's analysis on numerous disputed issues).

---

[19] The universe of potential modeling variables is large; it is not surprising that different experts would identify different but equally reasonable data series. *Cf.* Fed. R. Evid. 702, advisory committee notes (Rule 702 "is broad enough to permit testimony" that relies on different facts, principles or methods accepted within a given field of expertise).



████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

The more fundamental point is that experts are entitled to disagree on variables and other technical modeling issues without one or the other requiring exclusion. It is relatively simple for opposing experts to insert new variables into a model and assert that the model must be unreliable because things change. But the Seventh Circuit has said this is not a ground for exclusion. *See Fructose*, 295 F.3d at 660 (denying *Daubert* challenge where opposing expert "added a couple of variables to the analysis" and the model changed); *see also In re Industrial Silicon Antirust Litig.*, No. 95-2104, 1998 WL 1031507, *3 (W.D. Pa. Oct. 13, 1998) ("a party cannot successfully challenge the admissibility of a regression analysis by simply pointing to a laundry list of possible independent variables that were not included in the study.").

**D.**    <u>**Serial Correlation**</u>

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████



Accordingly, as the Advisory Committee has explained, "expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the field and both reach reliable results." Fed. R. Evid 702, Advisory Committee

Note (citing *Heller v. Shaw Industries,* Inc, 167 F.3d 146, 160 (3d Cir. 1999)); *see also*

*Southwire*, 528 F. Supp. 2d at 928-29 (rejecting *Daubert* challenge where experts disagreed

about how to account for serial correlation).

### E. **Supposed Data "Error"**

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████

          ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

**F.**     <u>**Other Data Issues**</u>

The remaining issues raised by Defendants—concerning scrap data, the class definition, and pre-class contract customers—are trivial. None relates remotely to the fundamental reliability of Dr. McClave's methodology.

          ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████



. *See generally Messner*, 669 F.3d at 822-26.[21]  In any event, this is not Dr. McClave's issue.  Dr. McClave focused his analysis on the products identified by counsel as relevant, and properly so.  It is not the expert's job to investigate products not at issue in the case.[22]

*Third*, as explained in Plaintiffs' class certification briefing, the presence in the modeling database of contract transactions in which the prices were agreed upon prior to the class period is an issue for the merits and/or claims handling phase of the case.  *See* Dkt. No. 389, at 60.  With respect to Dr. McClave, including such transactions in the models actually makes the analysis *more conservative* because the potential presence of unimpacted contract transactions in the database would have the effect of depressing the estimated average class overcharge.[23]  It is

---

[21] Contrary to Defendants' assertion, there is no concession that excluded products were unimpacted.  They may well have been impacted.

[22] To the extent Defendants complain about the presence of a few stray excluded product transactions within the database, such minor data issues are readily addressed in the merits phase of the case.  Dr. McClave will remove the trivial number of transactions identified by Defendants and any others that should be removed.

[23] These transactions are excluded from the class definition and therefore have no bearing on the Court's decision on class certification.

therefore quite possible—indeed likely—that if such contract transactions are identified in merits discovery and/or claims handling and removed from the dataset, Dr. McClave's percentage overcharge estimates will increase. Plaintiffs are happy to take discovery on contracts and address this issue accordingly. In any event, this issue has no bearing on the basic reliability and commonality of Dr. McClave's methodology and is properly addressed as the case proceeds.

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude the testimony of Dr. McClave.

Dated:   October 15, 2013                                     Respectfully submitted,


                                                             /s/ Matthew Duncan
Michael K. Kellogg                         Allen D. Black
Mark C. Hansen                             Roberta D. Liebenberg
Michael J. Guzman                          Donald L. Perelman
Steven F. Benz                             Jeffrey S. Istvan
**KELLOGG, HUBER, HANSEN,**                Matthew Duncan
**TODD, EVANS & FIGEL, P.L.L.C.**          Adam J. Pessin
Sumner Square                              **FINE, KAPLAN AND BLACK, R.P.C.**
1615 M Street, NW, Suite 400               One South Broad Street, 23rd Floor
Washington, DC 20036                       Philadelphia, PA 19107
Tel.:  (202) 326-7900                      Tel.:  (215) 567-6565

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*


Michael J. Freed
Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.:    (224) 632-4500

*Liaison Counsel for Plaintiffs and the Proposed Class*

43

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October, 2013, I caused a true and correct copy of the foregoing **Plaintiffs' Opposition to Defendants' Joint Motion to Exclude the Opinions of Dr. James T. McClave** to be filed **UNDER SEAL** with the Court via the Court's ECF system, and served via e-mail to all counsel.


_____/s/ _Matthew Duncan_____
Matthew Duncan