# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| | |
| | Hon. James B. Zagel |
| **THIS DOCUMENT RELATES TO** **ALL DIRECT PURCHASER ACTIONS:** | |
| ***Standard Iron Works v. ArcelorMittal et al.*, Case No. 08-cv-5214** | |
| ***Wilmington Steel Processing Co., Inc. v. ArcelorMittal et al.*, Case No. 08-cv-5371** | |
| ***Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal et al.*, Case No. 08-cv-5633** | |
| ***Alco Industries, Inc. v. ArcelorMittal et al.*, Case No. 08-cv-6197** | |
| ***Gulf Stream Builders Supply, Inc. v. ArcelorMittal et al.*, Case No. 10-cv-4236** | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINIONS OF DR. JOHN L. SOLOW

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
### REDACTED VERSION FOR PUBLIC FILING
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENTS IN REPLY ............................................................................1

ARGUMENT .....................................................................................................................2

I.  DR. SOLOW DID NO RELIABLE SCIENTIFIC ANALYSIS TO SUPPORT HIS
    OPINION THAT ALL CLASS PRODUCTS ARE SUPPLY-SIDE SUBSTITUTES. .......2

    A.  The Alleged Conspiracy Would Not Have Caused the Prices of All Class
        Products to Rise Above a Competitive Level. ..........................................................3

    B.  Dr. Solow Did None of the Analyses Prescribed by His Treatise to Test for
        Supply-Side Substitution. ........................................................................................5

        1.  Dr. Solow Did Not Perform Any Empirical Tests to Confirm His
            Hypothesis That the Class Products Are Supply-Side Substitutes. .............5

        2.  Dr. Solow Did Not Conduct Any Analyses to Determine if Steel
            Producers Can Shift Among the Various Class Products. ...........................7

    C.  Instead of Performing the Tests Prescribed by His Treatise, Dr. Solow Relied
        on Types of Statements that His Treatise Calls "Speculative" and
        "Unpersuasive." ....................................................................................................11

    D.  Dr. Solow Ignored ITC Findings and Dr. Hausman's ITC Testimony that Do
        Not Support His Supply-Side Substitutes Theory. ..................................................14

    E.  The Court Should Exclude Dr. Solow's New Supply-Side Opinions Because
        They Were Not Timely Disclosed. .........................................................................15

II. DR. SOLOW'S STRUCTURE, CONDUCT, AND PERFORMANCE ANALYSIS IS
    UNRELIABLE. ......................................................................................................17

    A.  Despite Positing that It Is Necessary to Define the Market Before Conducting
        a Structure, Conduct, and Performance Analysis, Dr. Solow Failed to Define
        the Relevant Market. ..............................................................................................17

    B.  Dr. Solow's Dismissal of Customer-Specific, "Demand Substitution" Factors
        Further Renders His Structure, Conduct, and Performance Opinion Unreliable...19

    C.  Dr. Solow's Visual Inspection of Aggregated Data Is an Unreliable
        Methodology and Is Disconnected from Plaintiffs' Liability Theory. ..................21

CONCLUSION...................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
 No. 03-C-7713, 2005 WL 1300763 (N.D. Ill. Feb. 22, 2005) .................................16

*Bielskis v. Louisville Ladder, Inc.*,
 663 F.3d 887 (7th Cir. 2011) .......................................................................2, 5

*Bowman v. Int'l Bus. Mach. Corp.*,
 No. 1:11-cv-0593, 2013 WL 1857192 (S.D. Ind. May 2, 2013) ...........................16

*Clark v. Takata Corp.*,
 192 F.3d 750 (7th Cir. 1999) .......................................................................2, 5

*Comcast Corp. v. Behrend*,
 133 S. Ct. 1426 (2013).........................................................................3, 22, 23

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993)................................................................................ passim

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
 744 F. Supp. 2d 870 (E.D. Wisc. 2010)........................................................14

*Finley v. Marathon Oil Co.*,
 75 F.3d 1225 (7th Cir.1996) ........................................................................16

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997).......................................................................................2

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n.*,
 744 F.2d 588 (7th Cir. 1984) ......................................................................20

*Guarantee Trust Life Ins. Co. v. Am. Med. and Life Ins. Co.*,
 291 F.R.D. 234 (N.D. Ill. 2013)...................................................................16

*Holden Metal & Aluminum Works v. Wismarq Corp.*,
 No. 00-C-0191, 2003 WL 1797844 (N.D. Ill. Apr. 2, 2003)..........................14

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*,
 No. 02-6030, 2006 WL 891362 (D.N.J. Apr. 4, 2006).........................20

*In re Chocolate Confectionary Antitrust Litig.*,
 289 F.R.D. 200 (M.D. Pa. 2012)................................................................18

*In re Fla. Cement & Concrete Antitrust Litig.*,
No. 09-23187-CIV, 2012 WL 27668 (S.D. Fla. Jan. 3, 2012)................................................22

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008)........................................................................................22

*In re High-Tech Employee Antitrust Litig.*,
No. 11-cv-02509, 2013 WL 5770992 (N.D. Cal. Oct. 24, 2013) ....................................13, 14

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002)..........................................................................................20, 22

*In re OSB Antitrust Litig.*,
No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ................................................20, 22

*In re Plastics Additives Antitrust Litig.*,
No. 03-CV-2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) .........................................3, 22

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
MDL No. 1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007)..............................................20

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005)........................................................................................20

*In re Sulfuric Acid Antitrust Litig.*,
235 F.R.D. 646 (N.D. Ill. 2006)..........................................................................................16

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999).........................................................................................................5

*McLaughlin Equip. Co., Inc. v. Servaas*,
No. IP98-0127, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ..................................................5

*Messner v. Northshore Univ. Healthsystem*,
669 F.3d 802 (7th Cir. 2010) ..............................................................................................2

*Salgado v. GMC*,
150 F.3d 735 (7th Cir. 1998) ............................................................................................16

*SEC v. Lipson*,
46 F. Supp. 2d 758 (N.D. Ill. 1998) ...................................................................................13

*Standard Iron Works v. ArcelorMittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) ..................................................................................17

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
7 F.3d 986 (11th Cir. 1993) ................................................................................................4

*Wal-Mart Stores v. Dukes*,
   131 S. Ct. 2541 (2011) ...................................................................................................22

*West v. Prudential Sec., Inc.*,
   282 F.3d 935 (7th Cir. 2002) .........................................................................................22

**STATUTES & RULES**

Fed. R. Evid. 702 ................................................................................................ passim

Fed. R. Civ. P. 23 ............................................................................................... passim

**OTHER AUTHORITIES**

Certain Steel Prods., Inv. No. TA-201-073, USITC Pub. 3479, Vol. I (Dec. 2001)
   (Determination and Views of Commissioner) ...............................................................14

Certain Carbon Steel Products From Australia et al., Inv. Nos. 701-TA-319, 320, 325-
   327, 348, 350; 731-TA-573, 574, 576; 578, 582-587, 612, 614-618; AA1921-197
   USITC Pub. 3899, Vol. I (Jan. 2007) (Second Review) ...............................................19

Hot-Rolled Flat-Rolled Carbon-Quality Steel Prods. from Brazil, Japan, and Russia, Inv.
   Nos. 701-TA-384, 731-TA-806-808, USITC Pub. 4237
   (June 2011) (Second Review) ........................................................................................19

Structural Steel Beams from Japan and Korea, Inv. Nos. 701-TA-401, 731-TA-853-854,
   USITC Pub. 3840 (Mar. 2006) (Review) ................................................................8, 19

Steel Concrete Reinforcing Bar From Belarus, China, Indonesia, Korea, Latvia, Moldova,
   Poland, and Ukraine, Inv. Nos. 731-TA-873-875, 877-880, and 882, USITC Pub.
   3933 (Jul. 2007) (Review) ...............................................................................................8

## CITATION CONVENTIONS

The following citation conventions will be used throughout this Reply Memorandum. Documents attached as exhibits to this Reply Memorandum are identified in bold below.

| Citation in Reply Memorandum | Full Citation | Location of Document in the Record |
|---|---|---|
| **Areeda, Hovenkamp, & Solow IIA** | **IIA Phillip E. Areeda, Herbert Hovenkamp & John L. Solow,** *Antitrust Law* **(1995)** | **Exhibit No. 1 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| **Areeda, Hovenkamp, & Solow IIB** | **IIB Phillip E. Areeda, Herbert Hovenkamp & John L. Solow,** *Antitrust Law* **(3d ed. 2007)** | **Exhibit No. 2 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| **CMC Steel Arkansas - About Us** | **CMC Steel Arkansas - About Us,** *available at* **https://www.cmc.com/en/ americas/cmcsteelarkansas/Pages/ aboutus.aspx** | **Exhibit No. 3 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| Defs.' Solow *Daubert* Mem. | Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (February 28, 2013) | ECF No. 361 |
| Defs.' Class Opp'n | Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (February 28, 2013) | ECF No. 358 |
| ███████████ | ██████████████████ | Exhibit No. 23 to Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (February 28, 2013), ECF No. 358-26 |
| Hausman Report | Revised Expert Report of Jerry A. Hausman (March 26, 2013) | Exhibit to Defendants' Revised Joint Memorandum of Law in Support of Motion to Exclude the Opinions of James T. McClave (March 26, 2013), ECF No. 374 |

| Citation in Reply Memorandum | Full Citation | Location of Document in the Record |
|---|---|---|
| Hillman Report | Expert Report of Jennifer A. Hillman (February 28, 2013) | Exhibit No. 3 to Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (February 28, 2013), ECF No. 358-4 through ECF No. 358-7 |
| Nolan Aff. | Affidavit of John Nolan (February 26, 2013) | Exhibit No. 4 to Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (February 28, 2013), ECF No. 358-8 |
| Peaslee Report | Expert Report of Kent D. Peaslee (February 26, 2013) | Exhibit No. 2 to Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (February 28, 2013), ECF No. 358-3 |
| Pls.' Opp'n | Plaintiffs' Opposition to Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (October 15, 2013) | ECF No. 404 |
| **Pushis Aff.** | **Affidavit of Glenn A. Pushis (September 18, 2013)** | **Exhibit No. 4 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| **Pushis Dep.** | **Deposition of Glenn A. Pushis (October 8, 2013)** | **Exhibit No. 5 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| Sept. 19, 2001 USITC Hearing (Pls.'Reply Ex. 17) | Hearing before the USITC, In the Matter of Steel, Inv. No. TA-201-73 (September 19, 2001) (Excerpted) | Exhibit No. 17 to Reply Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification (October 15, 2013), ECF No. 392-4 |

| Citation in Reply Memorandum | Full Citation | Location of Document in the Record |
|---|---|---|
| Sept. 24, 2001 USITC Hearing (Pls.' Reply Ex. 21) | Hearing Before the USITC, In the Matter of Steel, Inv. No. TA-201-73 (September 24, 2001) (Excerpted) | Exhibit No. 21 to Reply Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification (October 15, 2013), ECF No. 393-3 |
| Solow Dep. | Deposition of Dr. John L. Solow (November 16, 2012) | Exhibit No. 1 to Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (February 28, 2013), ECF No. 361-2 |
| Solow Rebuttal | Rebuttal Expert Report of Dr. John L. Solow (October 15, 2013) | Exhibit No. 2 to Plaintiffs' Opposition to Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (October 15, 2013), ECF No. 404-3 |
| Solow Report | Expert Report of Dr. John L. Solow (May 22, 2012) | Exhibit No. 1 to Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification (May 24, 2012), ECF No. 308-1 |
| **Thomas Report** | **Expert Report of Brian G. Thomas (August 29, 2013)** | **Exhibit No. 6 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| Trachtenberg Declaration | Declaration of David L. Trachtenberg (February 27, 2013) | Exhibit No. 8 to Defendants' Joint Memorandum of Law in Support of Motion to Exclude the Opinions of James T. McClave (February 28, 2013), ECF No. 364-3 |
| ████████ | ███████████████ | **Exhibit No. 7 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |

| Citation in Reply Memorandum | Full Citation | Location of Document in the Record |
|---|---|---|
| **Wright Dep.** | **Deposition of Jeryl K. Wright (December 4, 2013)** | **Exhibit No. 8 to Reply Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Opinions of Dr. John L. Solow (January 5, 2014)** |
| Wright Report | Expert Report of Jeryl K. Wright (October 11, 2013) | Exhibit No. 3 to Reply Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification (October 15, 2013), ECF No. 390-3 |

## SUMMARY OF ARGUMENTS IN REPLY

Dr. John Solow's opinions are unreliable and should be excluded under

*Daubert v. Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579 (1993), and its progeny because he failed to

conduct any of the required economic analyses to support his opinion that the alleged conspiracy

would have impacted all class members.

Dr. Solow's opinion that the alleged conspiracy to restrict production of "raw steel"

would have "widespread impact" is premised on the basic concept that, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Solow Rebuttal

¶¶ 2(a)-(b).  Dr. Solow's opinions do not assist all class members in proving the antitrust impact

requirement because, as Dr. Solow conceded, the agreement to curtail "raw steel" production

*would not result in reduced supply of all class products*.  *See* Solow Dep. at 23-27.  Indeed, the

supplies of various class products *increased* over the class period.  Thus, Dr. Solow's original

opinions cannot support classwide impact and, for the reasons set forth in defendants' initial

brief, the Court should exclude the opinions in Dr. Solow's original report under *Daubert*.

Dr. Solow's so-called "rebuttal" report surfaces an entirely new opinion that the prices of

all class products are "linked" by supply-side substitution.  This theory holds that "two products

produced interchangeably from the same production facilities" are supply-side substitutes and

the prices of the two products will "generally be related."  Areeda, Hovenkamp, & Solow IIB

¶ 561, at 360; Solow Rebuttal ¶ 24.  Dr. Solow, however, failed to do any analysis to determine

whether, and if so to what extent, defendants can produce different class products

interchangeably.  He never performed any of the analyses that his own treatise prescribes to test

his opinion that the class products are supply-side substitutes.  Instead, Dr. Solow rests his new

opinion on types of evidence that his treatise calls unreliable for determining whether supply-

side substitution exists, and he misleadingly characterizes Dr. Jerry Hausman's testimony before the International Trade Commission ("ITC") as supporting his sweeping supply-side substitution opinion when it demonstrably does not.

The Court need not engage in a consideration of competing expert views to conclude that Dr. Solow failed to do any reliable, scientific analysis to support his opinions because his opinions fail on their own merits.[1]  The Court should exclude Dr. Solow's testimony from its consideration of whether plaintiffs have met their burden under Rule 23.  Fed. R. Civ. P. 23.

### ARGUMENT

## I.   DR. SOLOW DID NO RELIABLE SCIENTIFIC ANALYSIS TO SUPPORT HIS OPINION THAT ALL CLASS PRODUCTS ARE SUPPLY-SIDE SUBSTITUTES.

Plaintiffs bear the burden to demonstrate that Dr. Solow's opinions constitute more than hypothesis.  Fed. R. Evid. 702.  As the Seventh Circuit explains, Rule 702 requires that an expert witness must do sufficient, reliable, scientific work to support his or her opinion.  *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (an expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Clark v. Takata Corp.*, 192 F.3d 750, 758-59 (7th Cir. 1999) (affirming exclusion of expert where the witness "conducted absolutely no scientific tests to determine" if his theory was correct).  Opinions based on an expert's *ipse dixit* are not admissible.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  These principles apply to expert testimony in support of class certification.  *See Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 812 (7th Cir. 2010).

By claiming repeatedly that the alleged agreement would result in "widespread" price increases, plaintiffs and Dr. Solow attempt to lower their burden to meet the predominance requirement of Rule 23(b).  *See, e.g.*, Pls.' Opp'n at 7, 8, 22, 33; Solow Rebuttal ¶¶ 2(b), 6-7.

---

[1]     Defendants' expert, Dr. Jerry Hausman, will respond to the opinions in Dr. Solow's rebuttal report at the class certification hearing or as otherwise permitted by the Court.

It is *not* sufficient for plaintiffs to establish that price increases were "widespread." Plaintiffs acknowledge that they must "show that common economic methodology can . . . assist *all class members* in proving the elements of conspiracy *and antitrust injury*." Pls.' Opp'n at 1 (emphasis added). An expert's testimony proffered to meet Rule 23(b)'s predominance requirement must "'translat[e] . . . the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) (citation omitted). As defendants demonstrated in their initial brief, Dr. Solow's opinion that reduced "raw steel" production would impact all class members fails to translate plaintiffs' conspiracy theory into an impact to each member of the proposed class. Defs.' Solow *Daubert* Mem. at 22-26. Dr. Solow's belated attempt to cure this flaw with his new supply-side substitution theory is scientifically unreliable and fails to meet the requirements of Rule 702.

**A.    The Alleged Conspiracy Would Not Have Caused the Prices of All Class Products to Rise Above a Competitive Level.**

Dr. Solow opined in his initial report that "raw steel" is the ███████████████



███████████████ Solow Report ¶¶ 9, 27; *see also* Solow Dep. at 90-91. Dr. Solow further opined that, ███████████████

███████████████

███████████████

███████████████ Solow Report ¶¶ 45, 47.[2]

---

[2]    Defendants showed in their initial brief that Dr. Solow's foundational opinions concerning "raw steel" and the steelmaking process do not reflect reality, compelling exclusion of his testimony under Rule 702 for this reason as well. Defs.' Solow *Daubert* Mem. at 14-22; *cf. In re Plastics Additives Antitrust Litig.*, No. 03-CV-2038, 2010 WL 3431837, at *7-12 (E.D. Pa. Aug. 31, 2010) (denying class certification and criticizing economist's inaccurate characterizations of the industry based on misleading uses of documents and testimony).

Dr. Solow's theory suffers from a critical flaw: a reduction in defendants' total output does not compel the conclusion that defendants reduced the production of all class products. Defendants are profit-maximizing businesses. If required to reduce overall production, standard economics tells us that rational producers would reduce their production of low-margin products, not high-margin products. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 997 (11th Cir. 1993) (rejecting a market definition based on supply-side substitution because it "defies logic to suggest that a rational supplier would switch from selling [more profitable products] to selling [lower margin products], even assuming that the lower[-margin products] would yield significant supranormal profits").

Dr. Solow's own treatise recognizes that when a manufacturer chooses among products to make within a given facility, it will choose to produce the product that generates the greatest "net incremental profit." Areeda, Hovenkamp, & Solow IIB ¶ 561b. Plaintiffs' industry witness, Dr. Jeryl Wright, ████████████████████████████



Wright Dep. at 188:19-24 (emphasis added). ████████████████████████
███████████████████████████████████████████████████████

*See* Solow Dep. at 23-27. Under Dr. Solow's theory, a conspiracy to constrain the output of raw steel would reduce the defendants' output of only what ██████████████████████
███████ requiring individual inquiries into class members and their class product purchases to ascertain whether they were impacted by the alleged conspiracy.

In a belated attempt to address this critical flaw in his impact theory, ██████████
███████████████████████████████████████████████████████

███████████████████████████████

██████████████ *See* Solow Rebuttal ¶¶ 24-25.  However, in reaching this opinion, Dr. Solow did ***no economic analysis*** to determine whether any steel product was a supply-side substitute for any other product.

      **B.**     **Dr. Solow Did None of the Analyses Prescribed by His Treatise to Test for Supply-Side Substitution.**

The object of *Daubert* is to make certain that an expert employs "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Bielskis*, 663 F.3d at 894; *Clark*, 192 F.3d at 758-59; *McLaughlin Equip. Co., Inc. v. Servaas*, No. IP98-0127, 2004 WL 1629603, at *6 (S.D. Ind. Feb. 18, 2004) (excluding expert testimony because it "is insufficient for an expert to merely mention cross-elasticity of demand or supply; an analysis is required").  The Court should exclude Dr. Solow's supply-side substitution opinions for their lack of analytical support.

      **1.**     **Dr. Solow Did Not Perform Any Empirical Tests to Confirm His Hypothesis That the Class Products Are Supply-Side Substitutes.**

Dr. Solow's own treatise recognizes that there are ways to test for the presence of supply-side substitution.  Dr. Solow never conducted any of those tests before reaching his opinions in this case.

***First***, Dr. Solow's treatise acknowledges that one can calculate the cross-price elasticity of supply, which measures the responsiveness of producers in switching to particular products as a result of a price increase.  Areeda, Hovenkamp, & Solow IIB ¶ 530c; Areeda, Hovenkamp, & Solow IIA  ¶¶ 507.  Dr. Solow undertook no such study.

***Second***, Dr. Solow's treatise states that one must look at the "objective data" to determine whether "actual shifts" occur among the products in question.  Areeda, Hovenkamp, &

██████

Solow IIB ¶¶ 538, 561b.  Only "actual shifts" in production show that both production and non-production barriers can be overcome.  *Id.*  Without a record evidencing actual production shifts, supply-side substitution is merely "speculative."  *Id.* ¶ 561b.  Dr. Solow did no such analysis here.

**Third**, production costs may indicate whether a producer would shift production to another product in the event of a price increase.  *Id.* ¶ 538.  If producers have the capability to switch to make a certain product, but they face higher costs than incumbent producers of that product, a production shift is unlikely.  *Id.*  Dr. Solow did no analysis of the relative production costs across mills that specialize in different types of class products.

**Finally**, Dr. Solow's supply-side substitution opinion assumes that defendants earn similar margins per ton for each class product.  *See* Solow Dep. at 245-46 

*id.* at 247 (

*See* Hausman Report 43-44

*see also, e.g.,* Trachtenberg Declaration ¶ 3

Dr. Solow admitted that

*See* Solow Dep. at 26-27, 100-109,

220-24.  The wholesale lack of scientific rigor associated with Dr. Solow's belatedly-advanced supply-side substitution theory compels its exclusion.

### 2.    Dr. Solow Did Not Conduct Any Analyses to Determine if Steel Producers Can Shift Among the Various Class Products.

Dr. Solow's treatise explains that the theory of supply-side substitution holds that "if B producers can *costlessly* switch production to product A *in a short time* and can readily distribute the resulting output, they will constrain the prices of A firms in virtually the same way as another A firm."  Areeda, Hovenkamp, & Solow IIB ¶ 561, at 360 (emphasis added).  Dr. Solow failed to do any analysis to determine whether these requirements are met in this case.

***The ability to switch production from one product to another:***  Dr. Solow ignored the physical barriers that limit defendants' abilities to shift production among different class products.  ████████████████████████████████████████████████████
████████████████████████████████████████ Thomas Report 10; *see also* Wright Dep. at 191-92 ████████████████████████████████████████
████ *id.* at 165 ████████████████████████████████████████
████████████████████████████████████████████████ Wright Report 14. ████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████ *See* Nolan Aff. ¶¶ 45-48; *see also* Wright Dep. at 226; Peaslee Report 18-30, App'x. ████████████████████████████████████████████████████
████████████████████████████████ *See* Nolan Aff. ¶¶ 45-48; *see also* Wright Dep. at 226; Peaslee Report 18-30, App'x.  As a result of these production limitations, and contrary to Dr. Solow's assumption, long product mills cannot "switch production" among various long products.

Even within the mills that make long products there is little supply-side substitution. Had Dr. Solow done any of the analyses that his own treatise requires, he would have found, for example, that switching production from structural beams to other structural products within the same mill was "both time-consuming and costly." *See* Structural Steel Beams from Japan and Korea, Inv. Nos. 701-TA-401, 731-TA-853-854, USITC Pub. 3840, II-6, III-1 (Mar. 2006) (Review). Switching from producing rebar to other bar products in a bar mill is, where possible, "not always desirable." *See* Steel Concrete Reinforcing Bar From Belarus, China, Indonesia, Korea, Latvia, Moldova, Poland, and Ukraine*, Inv. Nos. 731-TA-873-875, 877-880, and 882, USITC Pub. 3933, III-6 (Jul. 2007) (Review).

The same is true of many significant flat products. ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *See* Thomas Report 5, 8-9; Wright Dep. at 172-73; *see also* Peaslee Report 21-24, App'x. ████████████████████████████████ ███████████████████████████████ Wright Dep. at 165-66. ████████ ██████████████████████████████████████. *See* Wright Report 16; Peaslee Report App'x. Sheet mills cannot switch production from sheet to make most plate products. *See* Peaslee Report App'x (████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████ And plate mills cannot switch production to make most sheet products. *See, e.g.*, Peaslee Report 21-24 (showing most plate mills lack finishing capabilities to make thin-gauge sheet, cold

rolled, or galvanized sheet products); Nolan Aff. ¶¶ 49-50; Pushis Aff. ¶ 15; Wright Report

16-17 (███████████████████████████████ Sheet mills cannot readily

and costlessly switch from producing hot rolled sheet to making cold rolled sheet and galvanized

sheet because of bottlenecks in the finishing equipment used to cold roll and galvanize the latter

products. *See* Pushis Dep. at 199, 203, 207-10, 232-34 ████████████████████

████████████████████████. Dr. Solow did no analysis to examine

these issues and his opinions are therefore unreliable.

> ***The presence of nonproduction barriers that impact price effects:*** Dr. Solow's treatise

also explains that "nonproduction barriers" can preclude price effects from supply-side

substitution. Areeda, Hovenkamp, & Solow IIB ¶ 561b. His treatise offers several examples of

such "nonproduction barriers":

- Firms would have to add "supplementary facilities to produce the other product." *Id.*

- Firms lack "distinctive technologies" needed to meet certain customer requirements. *Id.*

- Firms will not switch because they make a more profitable product on the same equipment. *Id.*

- Firms may not perceive a shift to a new product as profitable if they believe prices of the new product will "fall back to former levels." *Id.*

- Firms may not switch if a new product requires "specialized distribution." *Id.*

> Dr. Solow did not examine whether any of these "non-production barriers" are present in

the steel industry. If he had undertaken such an analysis, he would have learned that *all* of these

posited non-production barriers exist.

- ██████████████████████████████████ *See* Peaslee Report App'x; Wright Report 16-17.

- ██████████████████████████████████ *See* Thomas Report 8-9; Peaslee Report 23; Nolan Aff. ¶ 49; Pushis Aff. ¶ 15.

- No steelmaker would switch from producing more profitable products to producing lower-margin products, even if those products could be made in the same mills. *See* Hausman Report 42-44; *see also* Wright Dep. at 188 (███████████████████ ███████████).

- Defendants would not likely switch to making a product such as rebar or beams that "will fall back to former [pricing] levels" as the result of a supply response from imports (e.g., rebar) or significant non-defendant mills (e.g., beam). Areeda, Hovenkamp, & Solow IIB ¶ 561b.

- Similarly, the "specialized distribution" channels and methods that are required to sell products like military-grade armor through government contracts also "impede" supply shifts. Areeda, Hovenkamp, & Solow IIB ¶ 561b.

Dr. Solow's failure to conduct any inquiry into these non-production barriers renders his analysis unreliable.

**The presence of long-term supply contracts:** As Dr. Solow's treatise explains, "long term 'relationships between buyers and sellers'" and customers "committed under long term contracts" may "impede" a producer's ability to shift production. Areeda, Hovenkamp, & Solow IIB ¶ 561b (quoting *United States v. Bethlehem Steel Corp.*, 168 F. Supp. 576 (S.D.N.Y. 1958)); *see also id.* ¶ 538. Dr. Solow admitted in his initial report that ███████████████ ███████████████████████████████████ ███████████ Solow Report ¶ 58. ████████████████████████ ████████████████████████ *See* Wright Dep. at 106-107. Long-term contracts and their hindrance on producers' abilities to switch production among class products was also confirmed in the ITC hearing upon which Dr. Solow relies. *See* Sept. 19, 2001 USITC Hearing (Pls.' Reply Ex. 17) at 490-91 (ITC Commissioner Jennifer Hillman observing that, because a large portion of sheet products are sold on a long-term contract basis, the mills "obviously are not going to be able to shift that demand immediately from one product category to another whenever the profit margin changes."); *id.* (Dr. Hausman similarly testifying that "because of contractual restrictions,

it take[s] some time to [switch production]").[3]  Long-term contracts prevalent within the steel industry preclude immediate and widespread supply-side substitution.  Dr. Solow's failure to consider these effects renders his opinions unreliable.

      **C.**    **Instead of Performing the Tests Prescribed by His Treatise, Dr. Solow Relied on Types of Statements that His Treatise Calls "Speculative" and "Unpersuasive."**

Rather than conducting the type of empirical analysis an objective economist would perform to determine whether supply-side substitution affects prices of the disparate class products at issue in this litigation, Dr. Solow relied on the very types of statements that his treatise refers to as "speculative" and "unpersuasive."  Dr. Solow wrote in his treatise that "'subjective' testimony" by "company officials" about their possible supply responses to changing industry conditions is "often unreliable."  Areeda, Hovenkamp, & Solow IIB ¶ 538b.  Dr. Solow's treatise concludes that reliable indicators are "objective data" showing "past shifts by [] producers" or production cost data that can "indicate whether [] suppliers will shift."  *Id.* ¶ 538a; *see also* ¶ 561b ("Actual shifts show that no nonproduction barriers prevent [] firms from selling the other product.").  As Dr. Solow explained in his treatise, testimony from company officials is "less reliable" than objective data because such testimony often comes in response to questions that are incomplete or "oversimplified."  *See id.* ¶ 538b.

      Nevertheless, 

*See, e.g.*, Solow Rebuttal ¶ 15

---

[3]    Plaintiffs' exclusion from their class definition of all sales pursuant to certain long-term contracts with fixed-price terms entered into before the class period does nothing to absolve Dr. Solow of his failure to take those long-term contracts into account when rendering his opinion of classwide impact.  Regardless of the timing or price terms, long-term contractual commitments to produce specific products for specific customers within a specific period of time impede the unfettered switching Dr. Solow assumes.

*id.* ¶¶ 27-28 (same).  Acknowledging the unreliability of these statements as substitutes for economic analysis, plaintiffs argue that Dr. Solow merely uses statements to "verif[y] his opinions."  Pls.' Opp'n at 28-29.  Critically, Dr. Solow did no empirical work whatsoever to be "verified."  Rather, the "subjective testimony" is the foundation of Dr. Solow's supply-side theory.  Dr. Solow's reliance on statements by industry executives falls far short of the rigor Dr. Solow sets forth in his own treatise and is thus unreliable under Rule 702.[4]

Furthermore, the statements on which Dr. Solow relies do not support his sweeping supply-side substitution opinion.  The cited statements say nothing about whether medium and heavy structural steel products such as beams -- ████████████████████████ ████████████████████ (Wright Report ¶ 36) -- ████████████████████ ████" (Solow Rebuttal ¶ 28) to bar mill products, as Dr. Solow assumes.  Nor do those statements say anything about whether products made in sheet mills and products made in plate mills are so linked.  Thus, Dr. Solow not only relies on testimonial evidence that his own treatise describes as unreliable, but he also uses that testimony to extrapolate to products that are not even the subject of such testimony.

The testimony upon which Dr. Solow relies is also little more than conditional statements concerning what sheet and bar mills "could do," or "may do," what is "theoretically" possible, and what firms "are capable of producing."[5]  For example, ████████████████████ ████████████████████████████████ ████████████████ Solow Rebuttal ¶ 28; Pls.' Opp'n at 25.  The quoted statements do not say

---

[4] Dr. Solow also offers his opinions on the "████████████████████ (Solow Rebuttal ¶ 42), which improperly invades upon the finder of fact's role and does not call on the expertise of an economist, providing still further grounds for excluding his testimony under *Daubert* and Rule 702.  *See* Defs.' Solow *Daubert* Mem. at 13 & n.39 (citing authority).

[5] *See, e.g.*, Pls.' Opp'n at 25 (quoting Nucor CEO Dan DiMicco); Solow Rebuttal ¶ 27 ████████████████.

whether such "theoretical" shifts actually take place or are likely to be economically viable.[6]

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████[7]

Nowhere do the steel executives testify with the type of precision Dr. Solow's treatise demands before an economist could reasonably rely on their statements to support the sweeping conclusion Dr. Solow makes here: that all of the all class products are supply-side substitutes. Thus, rather than examine what in fact happened to production of various steel products during the class period, Dr. Solow eschews the empirical analysis his treatise requires in favor of subjective testimony that he deems (in his academic work) "less reliable" than objective data.

Courts consistently exclude expert testimony attempting to reach economic conclusions based on the kinds of statements Dr. Solow relies on here. *See* Defs.' Solow *Daubert* Mem. at 12-14 (citing authority); *see also SEC v. Lipson*, 46 F. Supp. 2d 758, 764 (N.D. Ill. 1998) (rejecting expert testimony where the expert did no reliable analysis and would merely reiterate testimony "with the gloss of an expert's opinion").[8] Dr. Solow's use of industry statements is an unreliable methodology, requiring exclusion of his opinions under Rule 702.

---

[6] The only example of an actual shift in production that appears in the 2001 ITC testimony is a shift that occurred in 2000 between two specific bar products at a single bar mill. Sept. 24, 2001 USITC Hearing (Pls' Reply Ex. 21) at 1365. That bar mill produced no raw steel. *See* CMC Arkansas - About Us, *available at* https://www.cmc.com/en/americas/cmcsteelarkansas/Pages/aboutus.aspx.

[7] *See* Pushis Dep. at 203, 207-10 ████████████████████████████████████████
█████████████████████████████████████████████████████); *id.* at 324 (explaining that SDI's cold rolled facility acts as a "bottleneck," so SDI cannot simply shift all ████████████████████████████████████ *id.* at 197-99 (█████████
████████████████████████████████████████████████████████████

[8] The scant relevance of the documents and testimony cited by Dr. Solow (and plaintiffs) stand in stark contrast to the documents and testimony in *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509, 2013 WL 5770992 (N.D. Cal. Oct. 24, 2013), which plaintiffs claim in a supplemental filing (ECF No. 421) supports their opposition to defendants' *Daubert* motions and their motion for class certification. Unlike the unprecedented breadth of the class definition in this case, the *High-Tech Employee* court granted certification only after plaintiffs addressed the Court's common impact concerns under Rule 23(b)(3) and significantly reduced the number of

### D. Dr. Solow Ignored ITC Findings and Dr. Hausman's ITC Testimony that Do Not Support His Supply-Side Substitutes Theory.

Dr. Solow also ignores evidence inconsistent with his untested supply-side substitution theory, further underscoring the unreliability of his approach. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████ Solow Rebuttal ¶¶ 24-28.  Far from making any such finding about long steel products, the ITC and Dr. Hausman found no "cross price effect," i.e., *no price linkage*, among different long products.  Certain Steel Prods., Inv. No. TA-201-073, USITC Pub. 3479, Vol. I, 81-82 & n.456 (Dec. 2001) (Determinations and Views of Commissioner). Dr. Solow ignores this finding by the ITC because it is unhelpful to plaintiffs, which is another basis for excluding his opinions.[9]

Dr. Solow also ignores Dr. Hausman's econometric analysis in the ITC proceeding demonstrating that imports of both flat and long products were "the most important factor" in determining the prices of domestically produced steel products.  Sept. 19, 2001 USITC Hearing

---

class members.  *Id.* at *5, 7.  Also unlike this case -- where statements plaintiffs rely upon are general and vague with respect to impact for every class member -- the plaintiffs in *High-Tech Employee* submitted copious documents directly establishing that the agreement among defendants to cease cold calling rivals' employees impacted all members of the narrowed class. *See, e.g.*, *id.* at *20-32.  The agreements in *High-Tech Employee* were designed to prevent wage competition among defendants, and there was overwhelming evidence, unlike the merely theoretical and untested evidence Dr. Solow and plaintiffs offer, that the suppression of wage competition impacted all class members due to the defendants' stated desire to compensate like employees comparably.  *See id.* at *23-27.  There is no comparable evidence regarding the prices charged to class members in this case.  Moreover, unlike Dr. Solow's analysis here, the plaintiffs' expert in *High-Tech Employee* used statistical models to support his conclusion that wage suppression would have effects across job categories because the court required such analysis when it initially rejected plaintiffs' motion.  *See, e.g.*, *id.* at *34.

[9]  *See, e.g.*, *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wisc. 2010) (excluding economist expert testimony as "unreliable" because of the expert's "unwarranted dismissal of the evidence or outright blindness to contrary evidence"); *Holden Metal & Aluminum Works v. Wismarq Corp.*, No. 00-C-0191, 2003 WL 1797844, at *2 (N.D. Ill. Apr. 2, 2003) (granting motion to exclude where the expert '"cherry-picked' the facts he considered to render his opinion and such selective use of facts fail[s] to satisfy the scientific method and *Daubert*'").

(Pls.' Reply Ex. 17) at 412-13, 421. Dr. Hausman empirically measured whether demand, scrap

cost, or *domestic steel mill capacity utilization* (i.e., what plaintiffs would call "raw steel" output)

had a larger effect on steel product prices than imports for any steel product. *Id*. at 412-13, 418-

20. Dr. Hausman found that the supply of foreign steel is so vast that domestic changes in output

had varying, but "statistically insignificant," effects on the prices of most steel products. *Id*. at

412-13, 421-23.

Dr. Hausman's ITC study also used empirical analysis to show that the effect of imports

*varied greatly* among several product categories. *Id*. at 420-22. This is consistent with the

record on imports during the class period. Hillman Report ¶¶ 8-12.

Solow Rebuttal ¶ 33. But Ms. Hillman is an expert in trade regulations and

their effect on the steel industry, independent of the fact that she is also an attorney. Dr. Solow's

selective analysis and failure to even acknowledge the existence of facts unhelpful to his

opinions renders his testimony unreliable and inadmissible under Rule 702.

### E. The Court Should Exclude Dr. Solow's New Supply-Side Opinions Because They Were Not Timely Disclosed.

Dr. Solow's new supply-side substitution opinions should be excluded for the

independent reason that they were not properly disclosed in his initial report. Plaintiffs try to

make it appear that supply-side substitution was included in Dr. Solow's initial report. It was

not.

████████████████████ (*see* Pls.' Opp'n at 17-18), ████████████████████ (*see* Solow Rebuttal ¶ 9).

A party cannot use a rebuttal expert report to offer new opinions. *See, e.g.*, *Bowman v. Int'l Bus. Mach. Corp.*, No. 1:11-cv-0593, 2013 WL 1857192, at *7 (S.D. Ind. May 2, 2013) ("Plaintiffs do not have free reign to produce a rebuttal report containing additional analyses . . . ."); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03-C-7713, 2005 WL 1300763, at *2 (N.D. Ill. Feb. 22, 2005) ("The rebuttal expert report is no place for presenting new arguments. . . ."). Likewise, a party cannot cure a deficient expert report by disclosing new opinions during deposition testimony. *See* Defs.' Solow *Daubert* Mem. at 26 (citing authority). Plaintiffs rely on two cases that provide them no excuse for Dr. Solow's attempt to sandbag defendants in his deposition and in his rebuttal report. *See* Pls.' Opp'n at 21 n.9. In both cases the district court held that deposition questions may open the door for an expert to offer additional opinions on other subjects that were previously undisclosed. *See In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 659-60 (N.D. Ill. 2006); *Guarantee Trust Life Ins. Co. v. Am. Med. and Life Ins. Co.*, 291 F.R.D. 234, 237 (N.D. Ill. 2013). Here, Dr. Solow's testimony regarding his new impact theory, however, was not in response to an open-ended request for additional opinions, as in the cases plaintiffs cite. ████████████████████ ██████████████████████████████████████ ████████████████████ *See, e.g.*, Solow Dep. at 27-34.

Exclusion for non-disclosure is "automatic and mandatory" unless the party can show that its failure to properly disclose was either justified or harmless. *Salgado v. GMC*, 150 F.3d 735, 741 (7th Cir. 1998); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir.1996).

Plaintiffs have established neither of these mitigating circumstances, and Dr. Solow's dilatory report and testimony about supply-side substitution should be excluded.

## II.    DR. SOLOW'S STRUCTURE, CONDUCT, AND PERFORMANCE ANALYSIS IS UNRELIABLE.

Dr. Solow's only theory properly before this Court is his "structure, conduct, and performance analysis" that appeared in his original report. As explained in defendants' initial brief and as further set forth below, Dr. Solow's testimony fails to satisfy the requirements of *Daubert* or Rule 702, and the Court should exclude it.[10]

### A.    Despite Positing that It Is Necessary to Define the Market Before Conducting a Structure, Conduct, and Performance Analysis, Dr. Solow Failed to Define the Relevant Market.

Dr. Solow failed to conduct a sound market definition analysis, which is necessary for a proper analysis of market structure, conduct, and performance. Defs.' Solow *Daubert* Mem. at 7-14. Plaintiffs assert that no market definition analysis is necessary because proving a relevant antitrust market is not an element of their claim. Pls.' Opp'n at 14-15. This argument is a straw man that altogether misses the point. Dr. Solow put market definition at issue. ███████████

███████████████████████████████████████████████████████████

███████████████  Solow Rebuttal ¶¶ 6-7 (emphasis added); *see also id.* ¶ 2(b) ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

_____

[10]    Plaintiffs' attempt to support Dr. Solow's structure, conduct, and performance analysis by citing the Court's ruling on defendants' motion to dismiss misunderstands the purpose and effect of that decision. The question of whether a pleading is sufficiently plausible to survive a Rule 12 motion entails an entirely different analysis than the analysis required under Rule 23, Rule 702, and *Daubert*. *See* Pls.' Opp'n at 5; *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 880, 894, 902 (N.D. Ill. 2009) (plaintiffs must demonstrate "plausible" grounds to infer an agreement). Indeed, the Court made it abundantly clear in its decision on the motion to dismiss that it was not "express[ing] any view" on either class issues or on the merits of plaintiffs' claims. *ArcelorMittal*, 639 F. Supp. 2d at 902.

███████████████████ (emphasis added).[11]  Having made the structure of the market the foundation of their theory of common impact, plaintiffs should not now be heard to argue that the definition of the market (or lack thereof) should be exempt from the rigorous scrutiny *Daubert* demands.

Plaintiffs primarily rely on *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012), in support of their argument that Dr. Solow's structure, conduct, and performance analysis meets the requirements of Rule 702.  That decision does not aid plaintiffs' arguments because, unlike in this case, the "*conceptual* or *foundational* aspects" of the expert's opinions were not at issue.  *Id.* at 210.  Furthermore, unlike Dr. Solow who largely ignores substitutability at the customer level, the expert in *Chocolate Confectionary* opined that *customers* could and would substitute the various chocolate bars included within the class definition on the basis of price.  *Id.* at 210 & n.12, 220.  Plaintiffs also claim that Dr. Solow defined a market through his new supply-side substitution theory.  Pls.' Opp'n at 17, 19; *see also* Solow Rebuttal ¶ 16.  However, that theory was not disclosed in his initial report, *supra* Section I.E, nor is it supported by any statistical, empirical, or otherwise reliable analysis.  *See supra* Section I.A-D.  Accordingly, Dr. Solow's structure, conduct, and performance analysis is unreliable and should be excluded under Rule 702.

---

[11]    Defendants demonstrated in their initial brief that Dr. Solow intends to offer opinions that are legal conclusions.  Defs.' Solow *Daubert* Mem. at 27-28 (citing authority supporting exclusion of such testimony); *see also* Solow Report ¶ 54 (█████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████; *id.* ¶¶ 8(b), 65 ████████████████████████; Solow Rebuttal ¶¶ 2, 4(b), 42, 45 ████████████████).  Plaintiffs agree that experts may not offer legal opinions.  Pls.' Opp'n at 29-30.  Plaintiffs do not do not even attempt to show that Dr. Solow's statements about meeting the requirements of Rule 23 are anything but legal opinions. *Id.*  The Court should not permit Dr. Solow to testify about the requirements of Rule 23, or about whether his flawed market structure, conduct, and performance analysis satisfies the requirements of Rule 23.

**B. Dr. Solow's Dismissal of Customer-Specific, "Demand Substitution" Factors Further Renders His Structure, Conduct, and Performance Opinion Unreliable.**

Plaintiffs and Dr. Solow concede that the class definition encompasses hundreds of different steel products sold to customers operating in diverse and differentiated marketplaces. *See, e.g.*, Pls.' Opp'n at 26-27 ("Plaintiffs do not dispute that steel is made in many shapes and grades;" "steel products may have different metallurgical properties;" "all raw steel is not sold as a stand-alone product"). There is no dispute that many class members wielded enormous bargaining power over defendants to extract lower prices. *See, e.g.*, Solow Dep. at 260-61 ██████████████████████████████████████ Nor do plaintiffs dispute that many class products are made only when the mill has a customer order in hand.[12] As plaintiffs' own industry expert admitted in his deposition:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

Wright Dep. at 47; *id.* at 206-07 ████████████████████████████████████
██████████████████████████; *see also* Pushis Dep. at 90 ████████████████
████████████████████████████████████████████████████
████████████████████. Plaintiffs also make no attempt to refute defendants' contentions that

---

[12] *See* Hot-Rolled Flat-Rolled Carbon-Quality Steel Prods. from Brazil, Japan, and Russia, Inv. Nos. 701-TA-384, 731-TA-806-808, USITC Pub. 4237, 29, II-22 (June 2011) (Second Review) ("Domestic [hot rolled coil] producers make an overwhelming percentage of their sales on a made-to-order basis.); Certain Carbon Steel Products From Australia et al., Inv. Nos. 701-TA-319, 320, 325-327, 348, 350; 731-TA-573, 574, 576, 578, 582-587, 612, 614-618, AA1921-197 USITC Pub. 3899, Vol. 1, 122 (Jan. 2007) (Second Review) ("The vast majority of corrosion-resistant steel sold by both domestic producers and importers is made to order."); Structural Steel Beams From Japan and Korea, Inv. Nos. 701-TA-401, 731-TA-853-854, USITC Pub. 3840, II-16 (Mar. 2006) (Review) (at least half of U.S. producers sold most structural beams made to order).

the number of different suppliers -- foreign or domestic, defendant or non-defendant -- varied by product.

For all of these reasons, the impact of the alleged decline in "raw steel" production must be studied on a customer-by-customer basis. Defs.' Solow *Daubert* Mem. at 24-25; Defs.' Class Opp'n at 11-13, 23, 28-29. The vastly different economic realities of each steel product -- different products with different uses bought by different customers facing different demand conditions who had varying levels of bargaining power and different supply alternatives -- no doubt affected the prices individual customers paid. Dismissing all of these market factors renders Dr. Solow's structure, conduct, and performance analysis unreliable.

Plaintiffs claim that "finished product diversity is not the relevant issue" and rely on decisions granting class certification where different grades of a particular commodity are sold to customers that use the commodity to make different products. Pls.' Opp'n at 15-17 & n.5. Unlike the cases plaintiffs cite, however, the class definition here encompasses not merely different grades of a single product, but an extraordinary breadth of different steel products made by different subsets of producers that include producers that are not alleged co-conspirators, and that are consumed by buyers operating in many distinct industries and in response to different demand conditions.[13] Individual issues predominate when the class definition encompasses a

---

[13] *See, e.g.*, *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, No. 02-6030, 2006 WL 891362, at \*12 (D.N.J. Apr. 4, 2006) (class members purchased a single type of graphite where -- unlike all of the class products at issue here -- various grades are substitutable across the industry); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 349 (N.D. Cal. 2005) (certifying class for group of chemicals used in single process -- to facilitate conversion of raw rubber into finished rubber); *In re Pressure Sensitive Labelstock Antitrust Litig.*, MDL No. 1556, 2007 WL 4150666, at \*9 (M.D. Pa. Nov. 19, 2007) (limiting the class to two types of self-adhesive labelstock); *see also* Defs.' Class Opp'n, at 23-24 (distinguishing *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) and *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) on these grounds). The decision in *General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n.*, 744 F.2d 588 (7th Cir. 1984) cited by plaintiffs addressed only whether a preliminary injunction was properly issued and had no occasion to address whether

---

diversity of product types and customers competing in various product markets. *See* Defs.' Class

Opp'n at 25 & n.27 (citing cases). Dr. Solow's decision to ignore these "demand-side" factors

renders his methodology unreliable under Rule 702.

### C. Dr. Solow's Visual Inspection of Aggregated Data Is an Unreliable Methodology and Is Disconnected from Plaintiffs' Liability Theory.

Dr. Solow uses graphs of aggregate steel production and average prices to support his

opinions. Solow Report ¶¶ 49, 57. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ Solow Report ¶ 57.[14] Defendants demonstrated in their initial brief that

Dr. Solow's visual inspections are an unreliable basis for admissible expert opinion because they

are not reproducible or testable. Defs.' Solow *Daubert* Mem. at 30, 32-35. Plaintiffs do not

respond to Defendants' criticisms. Instead, they say that defendants and Dr. Hausman also used

charts, so Dr. Solow should be able to do so too. Pls.' Opp'n at 31.[15] Defendants do not quarrel

with the use of charts to demonstrate an observable point (e.g., production levels during a period)

---

common proof was available to show a supply restriction impacted buyers of numerous and diverse products.

[14] *See also* Solow Rebuttal ¶ 44; Solow Dep. at 188-91 (████████████████████████ *id.* at 193 ██████████████████████████████████████ *see also* Pls.' Opp'n at 22

[15] Plaintiffs wrongly assert that "Defendants do not contest the fact that major industry production cuts took place at the times shown in the chart; nor do they contend that there are errors in the production data." (Pls.' Opp'n at 32). Overall production declined during very brief time periods within the class period due to decreased demand. ████████████████ Solow Dep. at 171. ██████████████████████████████ ████████ *See, e.g.*, Defs.' Class Opp'n at 17-18. ████████ ██████████████████████████ Solow Dep. at 113-14.

or to illustrate underlying empirical analysis, which is how Dr. Hausman uses such charts.  What defendants dispute is the irreproducible, unscientific "visual inspection" method Dr. Solow uses to perceive a hidden relationship between production trends and pricing across all products.

Plaintiffs claim that similar visual inspections have been used before to support class certification, but the decisions plaintiffs cite employed a more deferential standard for plaintiffs' experts on class certification than what the Seventh Circuit and recent Supreme Court decisions require.[16]  More recently, courts have *rejected* analyses of prices following "similar trends" as support for class certification.  *See In re Plastics Additives Antitrust Litig.*, No. 03-CV-2038, 2010 WL 3431837, at *13-14 (E.D. Pa. Aug. 31, 2010) (rejecting plaintiffs' experts "visual observation" of price graphs under *Daubert.*); *see also In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2012 WL 27668, at *10 (S.D. Fla. Jan. 3, 2012) (rejecting comparable "similar trend" analysis); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493 (N.D. Cal. 2008) (same).  Dr. Solow's leaping to conclusions about causation based solely on visual inspection of price data, without considering any underlying factors or potential alternative explanations, is the epitome of the type of "junk science" *Daubert* rejects.  His opinions should be excluded under Rule 702.

---

[16]    *Compare, e.g.*, *Linerboard*, 305 F.3d at 152 ("Plaintiffs need only make a threshold showing") (citation omitted); *OSB Antitrust Litig.*, 2007 WL 2253418, at *6 (stating that defendants do not challenge plaintiffs' expert's methodology, only his conclusions and holding that "to resolve the [expert] dispute now would require me to determine which expert is correct -- something I may not do at the class certification stage" and citing *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 171 (E.D. Pa. 2007), *rev'd,* 552 F.3d 305 (3d Cir. 2008)), *with Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard. . . .  [S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.") (citations and quotation omitted); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 1432-33 (2013); *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) ("Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives," including opposing perspectives offered by expert witnesses.).

More fundamentally, *Comcast* requires that an expert's testimony in support of class certification must "'translat[e] . . . *the legal theory of the harmful event* into an analysis of the economic impact *of that event*.'"  133 S. Ct. at 1435.  Dr. Solow visually observes peaks and valleys in a graph created by plaintiffs' lawyers of aggregate steel production during the class period.  But Plaintiffs do not allege that every dip in steel production is unlawful; ███████████

████████████████████████████████████████████████████

███████████████████████████████████  Wright Dep. at 47, 178-79.

Dr. Solow did no analysis whether or to what extent the fluctuations he saw on the graph resulted from lawful independent behavior.  He did no statistical analysis comparing prior years, which demonstrate similar fluctuations in production.  He also made no attempt to examine production trends of the specific class products.  *See* Defs.' Solow *Daubert* Mem. at 30-32.  In short, Dr. Solow's opinions fail to assist plaintiffs' attempt to meet their burden to prove that common evidence can establish the impact of unlawful conduct on each class member.

## CONCLUSION

For the foregoing reasons and those set forth in defendants' initial brief, the Court should exclude the opinions of Dr. Solow under Rule 702.

Respectfully submitted,

Dated: January 5, 2014      By:    /s/ Todd J. Ehlman_____
Counsel for Nucor Corporation and, for purposes of this motion only, on behalf of all defendants

| | |
|---|---|
| Donna E. Patterson | Dan K. Webb |
| David P. Gersch | Thomas J. Frederick |
| Robert J. Katerberg | Todd J. Ehlman |
| Ryan Z. Watts | WINSTON & STRAWN LLP |
| ARNOLD & PORTER LLP | 35 West Wacker Drive |
| 555 Twelfth Street, N.W. | Chicago, IL 60601-9703 |
| Washington, DC 20004 | 312.558.5600 – Telephone |
| 202.942.5000 – Telephone | 312.558.5700 – Facsimile |
| 202.942.5999 – Facsimile | dwebb@winston.com |
| donna.patterson@aporter.com | tfrederick@winston.com |
| david.gersch@aporter.com | tehlman@winston.com |
| ryan.watts@aporter.com | |
| robert.katerberg@aporter.com | |
| | |
| John B. Wyss | Douglas R. Gunson |
| WILEY REIN LLP | NUCOR CORPORATION |
| 1776 K Street, N.W. | 1915 Rexford Road |
| Washington, DC 20006 | Charlotte, NC 28211 |
| 202.719.7000 – Telephone | 704.366.7000 – Telephone |
| 202.719.7049 – Facsimile | 704.972.1836 – Facsimile |
| jwyss@wileyrein.com | doug.gunson@nucor.com |

**Attorneys for Nucor Corporation**

Mark Leddy
Patricia M. McDermott
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC  20006
202.974.1500 – Telephone
202.974.1999 – Facsimile
mleddy@cgsh.com
pmcdermott@cgsh.com

Andrew S. Marovitz
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com

**Attorneys for ArcelorMittal S.A. and ArcelorMittal USA LLC**

Jonathan S. Quinn
NEAL, GERBERG & EISENBERG LLP
Two North La Salle Street, Suite 1700
Chicago, IL  60602
312.269.8000 – Telephone
312.429.3531 – Facsimile
jquinn@ngelaw.com

Daniel I. Booker
Debra H. Dermody
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA  15222
412.288.3131 – Telephone
412.288.3063 – Facsimile
dbooker@reedsmith.com
ddermody@reedsmith.com

Alexander Y. Thomas
REED SMITH LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, DC  20005-3317
202.414.9200 – Telephone
202.414.9299 – Facsimile
athomas@reedsmith.com

**Attorneys for United States Steel Corporation**

Nathan P. Eimer
Scott C. Solberg
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
312.660.7600 – Telephone
312.692.1718 – Facsimile
neimer@eimerstahl.com
ssolberg@eimerstahl.com
dbirk@eimerstahl.com

**Attorneys for Gerdau Ameristeel Corporation**

Joel G. Chefitz
Amanda J. Metts
McDermott Will & Emery LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606
312.372.2000 – Telephone
312.984.7700 – Facsimile
jchefitz@mwe.com
ametts@mwe.com

Robert S. Walters
Barrett & McNagny LLP
215 East Berry Street
Fort Wayne, IN 46802
260.423.8905 – Telephone
260.423.8920 – Facsimile
rsw@barrettlaw.com

**Attorneys for Steel Dynamics, Inc.**

James R. Figliulo
Stephanie D. Jones
Figliulo & Silverman P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603
312.251.4600 – Telephone
312.251.4610 – Facsimile
jfigliulo@fslegal.com
sjones@fslegal.com

Gregory A. Markel
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
212.504.6000 – Telephone
212.504.6666 – Facsimile
greg.markel@cwt.com

Charles F. Rule
Joseph J. Bial
Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington, DC 20001
202.862.2200 – Telephone
202.862.2400 – Facsimile
rick.rule@cwt.com
joseph.bial@cwt.com

**Attorneys for AK Steel Holding Corporation**

John W. Treece
Scott D. Stein
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
312.853.7000 – Telephone
312.853.7036 – Facsimile
jtreece@sidley.com
sstein@sidley.com

**Attorneys for SSAB Swedish Steel Corporation**

Joseph A. Tate
Christine C. Levin
David J. Stanoch
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215.994.2350 – Telephone
215.655.2350 – Facsimile
joseph.tate@dechert.com
christine.levin@dechert.com
david.stanoch@dechert.com

**Attorneys for Commercial Metals Company**

## CERTIFICATE OF SERVICE

I, Andrew S. Marovitz, an attorney, hereby certify that on January 6, 2014, I caused a true and accurate copy of the foregoing **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINIONS OF DR. JOHN L. SOLOW** to be served via the Court's CM/EMF system, and served via e-mail to all counsel of record on January 5, 2014.

/s/ Andrew S. Marovitz
Andrew S. Marovitz
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com