**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: STEEL ANTITRUST LITIGATION** | Case No. 08-cv-5214 |
| | Hon. James B. Zagel |
| **THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS:** | |
| ***Standard Iron Works v. ArcelorMittal et al.,* Case No. 08-cv-5214** | |
| ***Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* Case No. 08-cv-5371** | |
| ***Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* Case No. 08-cv-5633** | |
| ***Alco Industries, Inc. v. ArcelorMittal, et al.,* Case No. 08-cv-6197** | |
| ***Gulf Stream Builders Supply, Inc. v. ArcelorMittal, et al.,* Case No. 10-cv-4236** | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT
MOTION TO EXCLUDE THE OPINIONS OF JAMES T. MCCLAVE**

---

**REDACTED VERSION FOR PUBLIC FILING**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.      INTRODUCTION ............................................................................................... 1

II.      ARGUMENT ...................................................................................................... 3

     A.      Statistical Models Must Comply With Rule 702's Reliability Standard To Be Admissible ................................................................................... 3

     B.      Significant False Positive Overcharges Prove McClave's Models Are Entirely Unreliable .................................................................................... 6

         1.      McClave's Models Erroneously Detect Overcharges for Legacy Contract Sales That Plaintiffs Concede Could Not Have Been Impacted ......................................................................................... 7

         2.      McClave's Models Also Calculate Over a Billion Dollars in Overcharges During the "Competitive" Benchmark Period Where Indisputably None Should Be Found .................................................... 10

     C.      McClave's Reliance On The Great Recession As A Competitive Benchmark Period Renders His Models Unsound .............................................. 15

     D.      McClave's Averaging Methodology Is Unreliable ............................................. 21

         1.      Substantial Authority Exists for the Exclusion of Regression Models That Average Prices Across Disparate Products and Customers ...................................................................................... 21

         2.      Plaintiffs Have Failed to Justify McClave's Inference of Class-wide Impact Based on His Averaged Overcharge Methodology ............ 25

         3.      McClave's New Customer Level Model Is Similarly Flawed and Fails to Validate McClave's Initial Models ............................................. 27

     E.      McClave Fails To Tie His Regression Models To The Alleged "Raw Steel" Conspiracy As *Comcast* Requires ........................................................... 28

III.      CONCLUSION ................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*American Honda Motor Co. v. Allen*,
    600 F.3d 813 (7th Cir. 2010) ..................................................................3, 15

*Barber v. United Airlines, Inc.*,
    17 F. App'x 433 (7th Cir. 2001) ..................................................................19

*Bazemore v. Friday*,
    478 U.S. 385 (1986)..................................................................................4

*BCS Services, Inc. v. Heartwood 88 LLC*,
    637 F.3d 750 (7th Cir. 2011) ........................................................................26

*Bennett v. Roberts*,
    295 F.3d 687 (7th Cir. 2002) ........................................................................4

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ........................................................................29

*Cannon v. BP Prods. N. Am., Inc.*,
    No. 3:10-CV-00622, 2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) ............................4, 20

*Coates v. Johnson & Johnson*,
    756 F.2d 524 (7th Cir. 1985) ........................................................................17

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013).................................................................. passim

*Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)......................................................................20

*Dag Enterprises, Inc. v. Exxon Mobil Corp.*,
    226 F.R.D. 95 (D.D.C. 2005)........................................................................1

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).................................................................................1, 3

*Gutierrez v. Johnson & Johnson*,
    No. 01-5302, 2006 WL 3246605 (D.N.J. Nov. 6, 2006) ..................................................17

*In re BP P.L.C. Securities Litigation*,
    No. 10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) .......................................29

*In re Chocolate Confectionary Antitrust Litigation*,
    289 F.R.D. 200 (M.D. Pa. 2012).................................................................20, 22

*In re Graphics Processing Units Antitrust Litigation*,
253 F.R.D. 478 (N.D. Cal. 2008) ............................................................24

*In re High Fructose Corn Syrup Antitrust Litigation*,
295 F.3d 651 (7th Cir. 2002) .................................................... 4, 21-22

*In re High-Tech Employee Antitrust Litigation*,
No. 11-cv-02509 (LHK), 2013 WL 5770992 (N.D. Cal. Oct. 24, 2013) .........................25

*In re Plastics Additives Antitrust Litigation*,
No. 03-cv-2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ....................................6, 10

*In re Polypropylene Carpet Antitrust Litigation*,
93 F. Supp. 2d 1348 (N.D. Ga. 2000) ............................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
725 F.3d 244 (D.C. Cir. 2013) ............................................................ passim

*In re Rhone-Poulenc Rorer, Inc.*,
51 F.3d 1293 (7th Cir. 1995) ............................................................5

*In re Scrap Metal Antitrust Litigation*,
527 F.3d 517 (6th Cir. 2008) ............................................................21

*In re Scrap Metal Antitrust Litigation*,
No. 02-cv-844, 2006 WL 2850453 (N.D. Ohio Sept. 30, 2006) .........................................4

*In re Southeastern Milk Antitrust Litigation*,
No. 08-md-1000, 2010 WL 5102974 (E.D. Tenn. Dec. 8, 2010) .......................................4

*Indiana Democratic Party v. Rokita*,
458 F. Supp. 2d 775 (S.D. Ind. 2006), *aff'd*, 472 F.3d 949 (7th Cir. 2007),
*aff'd*, 128 S. Ct. 1610 (2008) ............................................................4, 15

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ............................................................26

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005) ............................................................20

*Manpower, Inc. v. Insurance Co. of Pennsylvania*,
732 F.3d 796 (7th Cir. 2013) ............................................................5-6

*MCI Communications Corp. v. AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) ............................................................10, 15

*Messner v. Northshore University Healthsystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................6, 8, 10, 29

*Paper Systems Inc. v. Mitsubishi Corp.*,
 193 F.R.D. 601 (E.D. Wisc. 2000)..................................................................22

*People Who Care v. Rockford Board of Education*,
 111 F.3d 528 (7th Cir. 1997) .......................................................................15

*Perkins v. Standard Oil Co. of California*,
 395 U.S. 642 (1969)......................................................................................26

*Pierson v. Orlando Health*,
 No. 6:08-cv-466, 2010 WL 3447496 (M.D. Fla. Aug. 30, 2010)....................20

*Proctor v. General Conference of Seventh-Day Adventists*,
 651 F. Supp. 1505 (N.D. Ill. 1986) ................................................................18

*Reed v. Advocate Health Care*,
 268 F.R.D. 573 (N.D. Ill. 2009)....................................................................24

*Rodriguez v. National City Bank*,
 726 F.3d 372 (3d Cir. 2013)..........................................................................23

*Sheehan v. Daily Racing Form, Inc.*,
 104 F.3d 940 (7th Cir. 1997) .....................................................................4, 19

*Southern Pacific Communications Co. v. AT&T Co.*,
 556 F. Supp. 825 (D.D.C. 1983), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984)...........14

*Turnbow v. Life Partners, Inc.*,
 No. 3:11-cv-1030-M, 2013 WL 3479884 (N.D. Tex. July 9, 2013)................23

*Wal-Mart Stores Inc. v. Dukes*,
 131 S. Ct. 2541 (2011)..................................................................................25

*West v. Prudential Securities Inc.*,
 282 F.3d 935 (7th Cir. 2002) ...........................................................................5

**Rules**

Federal Rule of Civil Procedure 23 ....................................................... passim

Federal Rule of Evidence 702................................................................ passim

**Other Authorities**

Damodar N. Gujarati, *Basic Econometrics* (4th ed. 2004) ...........................16

James T. McClave et al., *Statistics for Business & Economics* (11th ed. 2011)....................17, 21

William H. Greene, *Econometric Analysis* (7th ed. 2012) ...........................16

## I.  INTRODUCTION

In support of their motion for class certification, plaintiffs rely on statistical regression models devised by Dr. James McClave—the same statistician whose models the Supreme Court recently rejected in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)—to attempt to show that they can establish impact and the amount of damages as to each individual purchaser using evidence common to the class.  As defendants demonstrate, the regression models and concomitant opinions offered here by McClave fail to satisfy the minimum standards of reliability for expert testimony mandated by Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Perhaps recognizing the serious errors in his original regressions, McClave submitted a second report in conjunction with plaintiffs' opposition to the instant *Daubert* motion that is more than four times the length of his first report and contains at least two entirely new models and dozens of new regressions in an attempt to salvage his initial inadmissible opinions.[1]  (Rebuttal Expert Report of Dr. James T. McClave, October 15, 2013, attached as Ex. 2 to Pls.' Opp'n to Defs.' Joint Mot. to Exclude the Opinions of Dr. James T. McClave [hereinafter "Second McClave Report"].)  But because these new econometric analyses—including an "alternative 'forecasting' methodology" and a purported individual customer-level model—rely on many of

---

[1] Although not the primary focus of this motion, it is worth noting that plaintiffs improperly elected to save McClave's new forecasting model and individual customer-level regressions for a second report even though the dataset to run them has been available since December 2010.  *See Dag Enters., Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 99-102, 112 (D.D.C. 2005) (criticizing McClave for repeatedly altering his opinion throughout the litigation and for seeking to submit a new expert report relying on new information under the guise of a "supplement" to his opening report). ████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

the same unsound methodologies as McClave's original models, they do not pass muster under Rule 702 either.[2]

Plaintiffs attempt to pass off the serious methodological errors in McClave's models as nothing more than a typical "battle of the experts" that goes to the weight, not the admissibility, of McClave's opinions. This it is not. The fatal flaws in McClave's methodologies are demonstrated by the fact that his models incorrectly purport to find over ███████ dollars in overcharges for transactions that plaintiffs concede could not have been affected by the alleged conspiracy. These "false positive" results pervade McClave's models and are exactly the same type of methodological flaws that the D.C. Circuit recently found "shred the plaintiffs' case for certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013).

As shown in defendants' opening brief, McClave was able to generate the regression results contained in his initial report only by: (1) including the most severe economic collapse since the Great Depression in his benchmark period as an example of how the steel industry would operate and what prices would be under "normal" conditions, (2) improperly averaging nearly 30 million separate purchases of hundreds of distinct finished steel products by thousands of diverse customers, and (3) attempting to distill the myriad factors that impact the price of steel into a

---

[2] In response to certain new opinions contained in McClave's Second Report, defendants submit a rebuttal report from their expert, MIT professor, Jerry Hausman. (Ex. 1, Rebuttal Expert Report of Jerry A. Hausman, Jan. 5, 2014 [hereinafter "Hausman Rebuttal Report"].) ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

single demand and single cost variable. Plaintiffs' opposition fails to refute these fundamental shortcomings of McClave's models.

Finally, McClave makes the same fatal error here as he did in *Comcast*: he fails to tie his models to plaintiffs' theory of liability—*i.e.*, the supposed periodic coordinated cuts in the production of "raw steel." As such, McClave provides no reliable means of measuring impact or damages resulting from the alleged conspiracy and the Court should exclude his opinions for this additional reason under Rule 702.

## II.  ARGUMENT

### A.  Statistical Models Must Comply With Rule 702's Reliability Standard To Be Admissible

The dictates of Federal Rule of Evidence 702 and *Daubert* are clear. To be admissible, an expert's opinions must be the product of reliable principles and methods. *See Daubert*, 509 U.S. at 589-92; *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010). In an effort to salvage their expert, plaintiffs portray the serious defects in McClave's regression analyses as mere differences of opinion among experts that should be addressed through cross-examination rather than a *Daubert* challenge. (Pls.' Opp'n at 5-6, 38.) The issues raised in defendants' opening brief and in this reply, however, represent fundamental flaws in the construction of McClave's proffered models that render his opinions unreliable, unscientific, and inadmissible. These flaws are laid bare by the existence of over ███████ dollars in false positive overcharges that negate the ability of his methodologies either to detect antitrust impact or to calculate damages reliably. (*See infra* Section B.) Unlike the cases plaintiffs cite (*see* Pls.' Opp'n at 35,

38), the defects at issue here go well beyond minor "technical modeling issues" or "quibbling over regression variables" between experts.[3]

Similarly, plaintiffs try to side-step their burden under *Daubert* by arguing that dummy variable multiple regression modeling is the standard methodology used in antitrust class actions, thereby making McClave's models *ipso facto* admissible. (Pls.' Opp'n at 2, 9.) This argument misconstrues the law. Although the use of a generally accepted methodology—like a regression model—may be a starting point for the analysis under Rule 702 and *Daubert*, it by no means guarantees admissibility. (*See* Defs.' Br. at 9 & n.7 (collecting cases in which misapplication of otherwise acceptable methodologies led to exclusion).) Where, as here, the proffered regression analysis is fundamentally flawed and "improperly constructed," courts routinely reject the model as unreliable and deem it inadmissible. *See, e.g., Cannon v. BP Prods. N. Am., Inc.*, No. 3:10-CV-00622, 2013 WL 5514284, at *9-10 (S.D. Tex. Sept. 30, 2013) (excluding damages expert's regression model as unreliable because it was "improperly constructed" and failed to account for major explanatory variables).[4] To hold otherwise would reduce the court's important gatekeeping function under *Daubert* to a nullity and would give plaintiffs a free pass at the class certification

---

[3] *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002) (discussing multi-expert battle where the sole issue was the inclusion of variables); *In re Scrap Metal Antitrust Litig.*, No. 02-cv-844, 2006 WL 2850453, *12-13 (N.D. Ohio Sept. 30, 2006) (challenge to expert's selection of and reliance on an industry magazine's price index that contained inaccurate data for which the magazine later published a correction); *see also In re Se. Milk Antitrust Litig.*, No. 08-md-1000, 2010 WL 5102974, at *1 (E.D. Tenn. Dec. 8, 2010) (discussing the general *Daubert* standard "as a preamble to the individual orders that are filed with respect to each *Daubert* motion" and not considering or deciding any motion).

[4] *See also Bazemore v. Friday*, 478 U.S. 385, 400 & n.10 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part) ("There may, of course, be some regressions so incomplete as to be inadmissible as irrelevant."); *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) (rejecting expert statistical analysis that based its conclusions on improper benchmark assumptions); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (finding expert's statistical analysis inadmissible where expert arbitrarily omitted individuals from analysis, failed to correct for potential explanatory variables, and ignored key differences among employees); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 804-05 (S.D. Ind. 2006), *aff'd*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1610 (2008) (finding expert report unreliable where statistician failed to use degree of care that he would use in his scientific work, outside of the context of litigation).

stage to put forward *any* statistical model "so long as it can be applied classwide, no matter how arbitrary the measurements may be."[5]  *Comcast*, 133 S. Ct. at 1433; *see also West v. Prudential Sec. Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (warning that plaintiffs should not obtain a free pass on class certification "just by hiring a competent expert").

Plaintiffs' attempt to lighten their burden of proof by invoking *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796 (7th Cir. 2013), is similarly misplaced.  (*See* Dkt. No. 421 (submitting *Manpower* as supplemental authority).)  In *Manpower*, the Seventh Circuit reversed the district court's decision to exclude an accountant's damages calculations in an insurance coverage case that was not a class action.  *Manpower*, 732 F.3d at 802.  The district court had found the expert's methodology to be sound (and in fact the very same methodology mandated by the terms of the insurance policy in question) but had taken issue with the expert's selection of the projected growth rate used as an input in his damages model.  *Id.* at 801-02, 807. The Seventh Circuit held that scrutinizing the quality of the expert's data and conclusions rather than the reliability of the expert's methodology was an abuse of discretion.  *Id.* at 806-07.  The court cautioned, however, that "[t]his is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed."  *Id.* at 808.  Thus, only after an extensive analysis confirming that the accountant had "considered sufficient data to employ the methodology" and had relied on "'those kinds of facts or data' on which experts in the field would reasonably rely" in selecting the data input, did the Seventh Circuit conclude that the opinions

---

[5] It is imperative to weed out unreliable expert testimony under *Daubert* at the class certification stage given the enormous leverage plaintiffs gain to extract substantial settlements even for meritless claims once a class is certified.  *See Rail Freight*, 725 F.3d at 252 ("[C]ertification 'generates unwarranted pressure to settle nonmeritorious or marginal claims.'"); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298-1300 (7th Cir. 1995) (noting that defendants facing billions of dollars in potential liability if class certification is granted "may not wish to roll these dice" and "will be under intense pressure to settle," even if claims lack merit).

were admissible. *Id.* at 808-09. As demonstrated in defendants' opening brief and in further detail below, McClave has failed to satisfy these basic prerequisites.

### B. Significant False Positive Overcharges Prove McClave's Models Are Entirely Unreliable

A model that "detects injury where none could exist" is not a reliable means of proving class-wide injury or impact. *Rail Freight*, 725 F.3d at 252-53 (reversing class certification order where expert's models "detect[ed] injury where none could exist" and district court failed to consider this flaw in the methodology); *see also Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 823-24 (7th Cir. 2012) (stating that evidence of inclusion of some putative class members that were not injured "could [be] used . . . to argue that [the expert's] methodologies were flawed"); *In re Plastics Additives Antitrust Litig.*, No. 03-cv-2038, 2010 WL 3431837, at *17 (E.D. Pa. Aug. 31, 2010) (denying class certification because "[p]laintiffs' proposed method of proof demonstrates impact where there in fact was none"). Indeed, recent decisions issued by the Supreme Court and the D.C. Circuit since the filing of defendants' opening brief "sharpen[] the defendants' critique of the damages model as prone to false positives" and make clear that plaintiffs have the burden of offering a methodology free of such statistical incongruities. *Rail Freight*, 725 F.3d at 253-54; *see Comcast*, 133 S. Ct. at 1434 (reversing judgment affirming class certification and rejecting McClave's "methodology that identifies damages that are not the result of the wrong").

Here, *all* of McClave's models have a demonstrated propensity to generate significant false positive overcharges for steel purchases both during and outside of the class period. Although plaintiffs try to portray these problems as "trivial" and mere "data issues" (Pls.' Opp'n at 41), McClave incorrectly finds ███████ of dollars in class period damages just from the examples identified so far of customer purchases made pursuant to legacy contracts negotiated before the conspiracy allegedly began, and the false positives in ██████████████—a

6

time outside the conspiracy period—yield over a ███ dollars in erroneously predicted overcharges. These glaring and substantial discrepancies belie the validity of McClave's methodologies and render the opinions contained in both of his reports inadmissible.

1.  **McClave's Models Erroneously Detect Overcharges for Legacy Contract Sales That Plaintiffs Concede Could Not Have Been Impacted**

That McClave's methodologies are unreliable is evidenced by the fact that they purport to find substantial overcharges for steel product purchases made during the class period at contract prices negotiated well before any conspiratorial behavior is alleged to have occurred.[6] This defect alone necessitates the exclusion of McClave's models under *Daubert*.

Plaintiffs do not dispute that sales made during the class period pursuant to fixed-price contracts negotiated before April 2005 (*i.e.*, before the alleged conspiracy began) could not have been affected by the supposed agreements to curtail production. (Pls.' Opp'n at 42-43.) Instead, plaintiffs simply dismiss these legacy contract sales as irrelevant because they already are excluded from the class definition and therefore such sales "have no bearing on the Court's decision on class certification." (*Id.* at 42 n.23.) Plaintiffs speculate that, if anything, the unintended inclusion of such transactions in McClave's models makes his estimated average overcharges "*more conservative*" and, in any event, these transactions can be removed from the datasets during "the merits and/or claims handling phase" once McClave obtains the information needed to identify them. (*Id.* at 42-43.)

But plaintiffs miss the point—the issue is not merely that these customers were not injured by the supposed anticompetitive conduct. The problem is that McClave's models incorrectly detect antitrust impact where plaintiffs concede none possibly could exist. *See, e.g.*, *Rail Freight*,

---

[6] ████████████████████████████████████████████████████████████████ (Defs.' Br. at 35.) McClave testified that he was unable to identify or remove these legacy contract transactions from the class period dataset and they are therefore included in his damages analyses. (*Id.*)

725 F.3d at 254; *Messner*, 669 F.3d at 823. Indeed, plaintiffs specifically removed these legacy contract shipments from the class definition because there is no plausible way that a conspiracy could have distorted the pricing in contracts signed before the alleged illegal conduct began.

McClave's methodologies nonetheless generate very substantial overcharges for these indisputably unaffected legacy contract transactions. (Ex. 1, Hausman Rebuttal Report at 14-30). Thus, plaintiffs effectively concede that McClave's models get the impact analysis wrong for a significant proportion of customers' transactions, but ask the Court to take it on faith that the models get the analysis right for all other customers in the class.

For purposes of illustration, Professor Hausman identified a number of these false positives by comparing the "but for" price predicted in McClave's individual customer-level model to the prices specified in a sampling of customer contracts negotiated before 2005 that ran through at least part of the damages period.[7] (*Id.*) The results are clear. For example, according to McClave's individual customer-level analysis, ████████████████████ paid an average overcharge of ███ on purchases of ███████████████████████████ ████████████████████████████████████████████████████ ███████████████████████. (*Id.* at 19-20, 26-27 Table 11.) Across all of the products listed in ████████████, Professor Hausman found more than ████████ in damages erroneously calculated by McClave's model based on the false positive overcharge applied to these legacy contract purchases.[8] (*Id.*)

---

[7] These same competitively priced transactions are included in McClave's original highly aggregated product models and nonetheless are assigned the same average overcharges of ███████████ for all flat and long product purchases, respectively. Notably, as plaintiffs seem to admit, McClave does not know how many improperly included transactions there are, nor which products or which customers are affected, or in what manner. (*See* Pls.' Opp'n at 42-43.)

[8] To demonstrate, McClave's model assigns a "but for" price of ██████ to the ██████████ of a particular grade ████████████████████████████████████████. (Ex 1, Hausman Rebuttal Report at 19, 26-27 Tables 10 & 11.)

Similarly, McClave's models predict minimum overcharges between ████████ and false positive damages of more than █████████ for ████████ purchases of ██████████████████████████████████████████████████████████████████████████████████████. (*Id.* at 17, 24 Table 7.) ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (*Id.* at 14, 16 nn.22-23.) Nevertheless, McClave's model generates monthly false positive overcharges as high as nearly ████████████. (*Id.* at 22-23 Tables 4 & 5.) Instances of additional legacy contract customers Professor Hausman identified for which McClave's regression models predict false positive overcharges (*i.e.*, where the actual minimum prices specified in contracts negotiated in the "pre-conspiracy period" are higher than McClave's "but for" competitive prices) are set forth in the table below.



| ArcelorMittal Customer | Date contract executed | Contract Effective Dates | Identified False Positive % Overcharges Estimated by McClave |
|---|---|---|---|
| ████████ | ██ | ████ | ████ |
| ██████████ | | | |
| ████████ | ██ | ████ | ████ |

(*Id.* at 24-30 Tables 8-9 & 12-14.)  These exemplar "false positives" show that McClave's proffered regression models yield unreliable results concerning the supposed effect of the alleged conspiracy and thus are not scientifically valid methods for measuring antitrust injury.

As the D.C. Circuit recently explained in the factually similar *Rail Freight* case, this type of flawed model is not a "reliable means of proving classwide injury in fact" and "shred[s] the plaintiffs' case for certification." *Rail Freight*, 725 F.3d at 252-53.  There, plaintiffs' expert

---

Thus, McClave's model wrongly concludes that these contract purchases were subject to ████████████ ████████ suffered damages in the amount of over ████████ in that month alone.  (*Id.*)

proffered two regression models that purported to establish class-wide impact and quantify overcharges but identified damages for customers that, during the class period, were bound by shipping rates negotiated before any conspiratorial behavior was alleged to have occurred. The court reasoned that "[a]s things stand, we have no way of knowing the overcharges the damages model calculates for class members is any more accurate than the obviously false estimates it produces for legacy shippers." *Id.* at 254. The D.C. Circuit held that no weight can be given to a "methodology [that] detects injury where none could exist" and vacated the lower court's order certifying the class. *Id.* at 252.

Here, as in *Rail Freight*, there is no basis to expect that the overcharges McClave's models generate for class members are more accurate than the clearly erroneous damages the models produce for indisputably unaffected pre-2005 legacy contract sales. *See id.* at 254-55. These "false positives" prove that McClave's models are fundamentally unreliable and incapable of distinguishing between price effects from lawful causes and price effects from allegedly unlawful causes, as any valid impact or damages model must do. *See MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is essential . . . that damages reflect only the losses directly attributable to *unlawful* competition."); *see also Comcast*, 133 S. Ct. at 1434 (assurance that a plaintiff can prove antitrust impact "is not provided by a methodology that identifies damages that are not the result of the wrong" in rejecting a damages model formulated by McClave); *Messner*, 669 F.3d at 823; *Plastics Additives*, 2010 WL 3431837, at *17. Plaintiffs thus cannot meet their burden of proof under *Daubert*.

> ### 2. McClave's Models Also Calculate Over a Billion Dollars in Overcharges During the "Competitive" Benchmark Period Where Indisputably None Should Be Found

In addition to predicting injury where none could exist during the class period, McClave's models yield significant false positives on data observations *outside* the purported class period. A

properly specified model should find overcharges only on purchases during the alleged conspiracy period. A model that detects substantial injury outside that framework is failing to account for some major factor that affects prices.

As McClave's own graphs illustrate, his original flat products model generates substantial apparent overcharges (*i.e.*, actual steel prices exceeding what his models predict the competitive prices should have been) from ████████ through ████████ and ████████, despite there being no allegations of any conspiratorial behavior during those times. (Second McClave Report at 20 Figure 4a.) Similarly, McClave's original aggregated long products model finds that actual prices were drastically inflated above competitive levels in the ████████. (*Id.* at 21 Figure 4b.) McClave's Figures 4a and 4b from his rebuttal report purport to show (i) actual steel prices in red; (ii) the "competitive" industry prices as predicted by McClave's models in blue; and (iii) McClave's estimated overcharges during the alleged conspiracy period in yellow. However, McClave fails to note, as the below reproduction of Figures 4a and 4b reflect in the green shading, that his models also predict clearly erroneous overcharges during the competitive benchmark periods.

McClave's Figure 4a (green shading added)



McClave's Figure 4b (green shading added)



McClave's "forecasting models" produce almost identical false positive overcharges for the pre-conspiracy periods as those generated by the respective flat and long dummy variable models. (*See* Second McClave Report at 47-48 Figures 6a & 6b.)

Contrary to plaintiffs' claim, these charts reveal that McClave's predicted competitive prices (in blue) *do not* closely track actual market prices (in red) during significant portions of the benchmark period. (*Compare* Pls.' Opp'n at 17.) As shown by Professor Hausman, both McClave's original flat and long product models actually generate *higher* overcharges during the ███████████████████—a portion of McClave's benchmark *competitive* period—than the estimated damages during the alleged conspiracy period. (Ex. 1, Hausman Rebuttal Report at 10-13; Rev. Hausman Report at 79-80.) Similarly, when Professor Hausman ran McClave's new individual customer-level analysis and allowed for damages in the second half of 2004, he found that ████ of all flat product customers and ████ of all long product customers experienced "false positive" overcharges during this pre-conspiracy period even though none can actually exist. In fact, the customer-level models further reflect that ████ of flat customers and ████ of long customers experienced "false positive" overcharges in ████████████ that *exceed* the supposed

damages they experienced during the alleged conspiracy period. (Ex. 1, Hausman Rebuttal Report at 12, 13 Table 3.) In total, McClave's models find a ███ average overcharge for flat products and a 12% average overcharge for long products representing over ███████ during these pre-conspiracy benchmark periods. (*Id.* at 10, 13 Table 3.) Such nonsensical results reveal that McClave's models do not reliably predict actual prices in years that plaintiffs agree were "competitive."[9] In short, his methodologies are demonstrably *unsuccessful* at predicting the very prices his models are designed to estimate.

The pre-conspiracy overcharges generated by McClave's regressions indicate that the models fail to account for economic factors that caused steel prices to be higher than McClave's proffered "competitive" price in March 2002 through February 2003 and the second half of 2004. (*Id.* at 9-12.) The Court is left with no way of knowing whether these other determinants of steel prices that produced the considerable variances from McClave's predicted "but-for" prices during the "competitive" benchmark period persisted beyond 2004 and are likewise responsible for the supposedly elevated steel prices observed during the alleged conspiracy period. Put simply, the same models that fail to reliably predict "competitive" prices before 2005 cannot reasonably be presumed to do so after that date.

McClave never attempts to identify, much less explain, what produced the anomalous purported pre-conspiracy overcharges estimated by his models. He both fails to study whether the causes of these supposedly elevated prices persisted into the conspiracy period and fails to test whether his predicted damages are robust to this possibility. (*Compare* Ex. 1, Hausman Rebuttal

---

[9] As alleged by plaintiffs, the conspiracy began in April 2005 following a "dramatic period of restructuring in the domestic steel industry" that arose from a series of bankruptcies, mergers and acquisitions between 2000 and 2004 and "consolidated what previously had been a fragmented market." (Compl. ¶ 51; *see also* Class Cert. Br. at 1.) The existence of elevated prices in the pre-conspiracy period particularly undermines the validity of McClave's models given that plaintiffs' theory of collusion rests on this type of clear "structural break" at the start of the class period. Much like in *Rail Freight*, this structural break prevents any argument that defendants' collusive behavior may have started earlier than plaintiffs originally alleged. *Rail Freight*, 725 F.3d at 254-55.

Report at 9-12, 13 Table 2.)  He simply chooses to ignore these significant red flags.  Thus, without any type of actual statistical analysis to test his inference, McClave asks the Court to assume, based on his say-so, that the class period damages his models yield are attributable to the alleged conspiracy and not to whatever produced the false positives in the period just three months before the alleged conspiracy began.  *See Comcast*, 133 S. Ct. at 1435 ("Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here.").  This is not a reliable methodology; it is rank speculation.

McClave's only response is that "*Dr. Hausman* fails to show that something other than the alleged conspiratorial reduction in production (reflected in the class variable) might have caused the increase in prices during the class period."  (Second McClave Report at 44 (emphasis added).)  But McClave misapprehends his and plaintiffs' burden.  "It is not enough to submit a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis."  *Rail Freight*, 725 F.3d at 254; *see also Comcast*, 133 S. Ct. at 1433.  Moreover, the supposed benchmark prices posited by McClave are of his own creation.  Given that actual pre-conspiracy prices often exceeded McClave's benchmark prices as well, the most likely explanation for the price "increase" during the class period is that the models' attempts to identify a correct benchmark simply do not work in the first place.[10]

Failure to consider and correct for these observed false positives is a fatal flaw.  *See S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F. Supp. 825, 1090 (D.D.C. 1983) (damages model was "fatally deficient" where it "gave the Court no means of assuring itself that injuries attributable to other

---

[10] Despite the fact that it is *plaintiffs'* burden to provide a connection between supposed supracompetitive prices and the alleged conspiracy, Dr. Hausman did in fact offer possible explanations for price increases during the class period.  (*See* Ex. 2, Rev. Hausman Report at 77 (discussing rapid growth in Chinese demand for steel from 2004 to 2008).)

causes . . . have been excluded from the damage claim"), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984). By not identifying, testing for, and excluding other sources of price movement in the face of such significant false positives, McClave's methodologies fail to meet the standards that professionals would adhere to in conducting this type of modeling. *Am. Honda*, 600 F. 3d at 817-18 (quoting Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.) and holding that "methodological omissions" rendered the expert's opinions "somewhat speculative" and unreliable); *see also Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 804-05 (S.D. Ind. 2006), *aff'd*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1610 (2008) (finding expert report unreliable where expert ignored other obvious causes of apparent statistical results). As one court summed up the rule:

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of 'speculation or guesswork' not permitted for antitrust jury verdicts.

*MCI Commc'ns*, 708 F.2d at 1162-63; *see also Comcast*, 133 S. Ct. at 1435 (condemning McClave's model for not excluding damages caused by factors unrelated to plaintiffs' liability theory); *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) (analysis "that fails to correct for salient explanatory variables . . . has no value" and is "inadmissible in a federal court").

### C. McClave's Reliance On The Great Recession As A Competitive Benchmark Period Renders His Models Unsound

All of McClave's models in this case share another common methodological flaw: each depends on a competitive benchmark period that includes the Great Recession. As defendants previously explained, reliance on the period covering the largest economic downturn to hit the U.S. economy since the 1930s as a benchmark for "normal" economic conditions introduces bias in McClave's models and renders them unreliable. (Defs.' Br. at 26-28.) This is because each of

his models incorrectly assumes that the relationship between the demand and cost variables and the price of steel remained constant throughout the time period he analyzed. However, when a significant macroeconomic event like a recession occurs—as it did beginning in 2008[11]—it can cause an unexpected shift in the relationships between these variables from one time period to another (*i.e.*, a "structural break") and can result in major forecasting errors, including a tendency to detect antitrust impact where there actually is none. *See* Ex. 4, Damodar N. Gujarati, *Basic Econometrics* § 8.8, at 274 (4th ed. 2004) ("[I]t is well known that in 1982 the United States suffered its [then] worst peacetime recession. The civilian unemployment rate that year reached 9.7 percent, the highest since 1948. An event such as this might disturb the relationship between [the economic factors being modeled].").

Where, as here, a large scale macroeconomic event such as the Great Recession occurs during a benchmark period, it is particularly important in econometric modeling to conduct a Chow test, a standard and widely-adopted statistical technique used to determine whether two or more sets of data may be reliably grouped as a single sample in a regression model. *See id.* § 8.8, at 273-76 (advocating the use of the Chow test where two sub-periods have been inappropriately grouped because a recession or changed economic policies caused a structural break); Ex. 5, William H. Greene, *Econometric Analysis* § 6.4, at 168-69 & n.10 (7th ed. 2012) ("One of the more common applications of the [Chow test] is in tests of structural change."); Ex. 2, Rev. Hausman Report at 80. As Professor Hausman has demonstrated, and as plaintiffs have failed to rebut, McClave's original dummy variable models fail the Chow test. (Ex. 2, Rev. Hausman

---

[11] Plaintiffs' own proffered industry expert, Jeryl Wright, has confirmed the devastating impact the Great Recession had on the steel industry. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This adds to the testimony of plaintiffs themselves that the steel industry was significantly impacted by the Great Recession. (Defs.' Br. at 26-27.)

Report at 80.)  In other words, the models' coefficients do not remain constant throughout the entire measurement period as McClave assumed, rendering the models unreliable for showing impact or calculating damages.

Plaintiffs do not dispute the appropriateness of performing a Chow test to detect the presence of these types of structural breaks in the data and to determine whether a model's results are being tainted by such macroeconomic factors.  Nor could they.  Chow tests have been accepted by courts, including the Seventh Circuit, as valid and reliable statistical methods for more than a quarter of a century. *See, e.g., Coates v. Johnson & Johnson*, 756 F.2d 524, 541-42 (7th Cir. 1985) (affirming district court's rejection of plaintiffs' statistical model because a Chow test showed that pooling the data was improper); *Gutierrez v. Johnson & Johnson*, No. 01-5302, 2006 WL 3246605, at *8 (D.N.J. Nov. 6, 2006) (explaining plaintiffs could not dispute the validity of the statistical tests defendant's expert performed, including a Chow test, because the tests "are all standard, peer-reviewed tests with acknowledged reliability").

Moreover, McClave himself has confirmed the wide-spread acceptance of the Chow test (McClave Dep. vol. I 206:8-10), and acknowledged using this test in other work.  (*Id.* at 205:11-206:10; *see also* Ex. 6, James T. McClave et al., *Statistics for Business & Economics* § 11.9, at 681-83 (11th ed. 2011) (describing the F-test process—of which the Chow test is a specific application—of comparing complete and reduced models to determine structural differences).)  Indeed, in creating models to determine antitrust impact in other cases, McClave himself has used a Chow test to determine whether the value of a coefficient in the model remained constant between the benchmark period and the class period.  *See In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1361 (N.D. Ga. 2000).  Plaintiffs offer no reason for McClave's failure to perform a Chow test on his models in this case, nor do they dispute that McClave's original models fail the Chow test when applied.  (Pls.' Opp'n at 33-35.)  Incredibly, rather than

17

attempt to correct for this fundamental flaw in the original models, McClave offers new models that also fail the Chow test.  (Ex. 1, Hausman Rebuttal Report at 2 & n.2 (demonstrating that McClave's new forecasting models and McClave's new individual customer-level models all fail the Chow test).)

Notwithstanding the strong quantitative and qualitative evidence of a structural break that impugns the reliability of McClave's models, plaintiffs' opposition provides no legitimate explanation for McClave's decision to continue using the Great Recession as a benchmark period in his original analyses beyond the bare assertion that "the model fits the data exceptionally well for the entire period, *including 2008-2009*."  (Pls.' Opp'n at 34.)  McClave claims that his models would at least partially account for the Great Recession through his demand variable, noting that "if the Great Recession caused a drop in construction and auto demand, and therefore demand for steel, my demand variable would have picked that up."  (Second McClave Report at 44-45.) Although it is true that his variable may account for changes in demand in the non-residential construction and auto industries, McClave's models fail to account for any of the many other channels through which the Great Recession may have affected steel prices.  (Ex. 1, Hausman Rebuttal Report at 2 n.1.)  For example, McClave's models would completely ignore the effect of the Great Recession on consumer demand for appliances and the impact this shift would have had on the price of steel.  There can be no reasonable doubt that many other steel-consuming downstream markets experienced dramatic downturns in demand as a result of this historic economic crisis.

The Chow test results confirm that the Great Recession had a severe impact on demand for both long and flat steel products and caused a structural change in the coefficients across the time periods in McClave's models.  This unrebutted evidence demonstrates that McClave's reliance on the Great Recession as a benchmark period makes his models unreliable.  *See Proctor v. Gen.*

*Conference of Seventh-Day Adventists*, 651 F. Supp. 1505, 1522 (N.D. Ill. 1986) (rejecting expert economist's opinions on damages because, among other things, they failed to account for recession in benchmark period). By continuing to use the Great Recession period as a benchmark, McClave has "fail[ed] to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); *see also Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (upholding exclusion of expert testimony as unreliable where expert ignored relevant but unfavorable facts and data).

In an effort to distract from the fact that the results of this standard and widely-adopted econometric test unambiguously signify that his initial models are unreliable, McClave claims that the new forecasting models contained in his second report "deliver[] results consistent with his original dummy variable model[s]" and therefore validate the specification of those models as reliable.[12] (Pls.' Opp'n at 35; Second McClave Report at 46.) This result is not unexpected because McClave's forecasting models suffer from the same infirmity as the models they seek to reinforce: they too use the Great Recession as part of the competitive benchmark period and rely on the faulty assumption that economic behavior in the pre-class period is the same as in the post-class period. (Second McClave Report at 46.) Not surprisingly, these models also resoundingly flunk the Chow test. (Ex. 1, Hausman Rebuttal Report at 2.) Thus, the consistency of results touted by plaintiffs shows nothing more than the fact that the new models are as flawed as the original ones.

---

[12] McClave constructs his new "forecasting" models separately for flat and long products and uses the exact same specifications from his original dummy variable models, including the highly aggregated steel product groupings, the averaging of extremely disparate price observations, and the remarkably small number of explanatory variables, to develop the equations. (Second McClave Report at 46.) The major difference is that he removes all real-world data for the class period (April 2005 to December 2007) and derives estimates of impact using only pre-class and post-class period data. (*Id.*)

To demonstrate the structural shortcomings of McClave's forecasting methodology, Professor Hausman tested these models using only the January 2002 – March 2005 pre-conspiracy period for the competitive benchmark without making any other changes. (*Id.* at 3-4.) He found that, in contrast to McClave's estimated ███████ overcharges, the models produce *negative damages* in both long and flat products at highly statistically significant levels when the Great Recession period was excluded. (*Id.* at 4 n.5.) Thus, without including the Great Recession in his benchmark period, McClave's models are unable to demonstrate class-wide impact or to find plausible damages. (*Id.* at 3-4.) In other words, McClave's models must include prices charged during the Great Recession in the benchmark period to generate supra-competitive prices for all products encompassed by the class definition.[13]

These results confirm that McClave's forecasting models are improperly biased by their use of the Great Recession period and that his proffered methodologies for predicting impact and damages are unreliable. *Cannon*, 2013 WL 5514284, at *9 (excluding expert's regression analysis under *Daubert* because it used improper benchmark periods and areas to estimate diminution in property value attributable to chemical emissions from defendant's nearby refinery); *see also Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357-59 (Fed. Cir. 2001) (affirming district court's exclusion of expert testimony as unreliable where the expert used an inappropriate benchmark that greatly differed from the market at issue); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 810-17 (N.D. Ill. 2005) (excluding expert

---

[13] Given that McClave has run models using a single pre-conspiracy benchmark in other cases (some as recently as 2012), his decision to not do so here despite the evidence of a structural change in the post-class period data is all the more suspect. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 223 (M.D. Pa. 2012) (McClave applying a pre-conspiracy benchmark period in his model proffered to show antitrust impact); *Pierson v. Orlando Health*, No. 6:08-cv-466, 2010 WL 3447496, at *1-2 (M.D. Fla. Aug. 30, 2010) (McClave presenting a model utilizing a pre-damage period benchmark).

testimony on lost profits as unreliable where the expert used dissimilar companies as a yardstick).[14]

### D. McClave's Averaging Methodology Is Unreliable

Defendants demonstrated in their opening brief that McClave's methodology of averaging the price data across hundreds of heterogeneous steel products and thousands of disparate customers in constructing his original econometric models unacceptably masks the significant variation in prices paid by customers and cannot reliably measure—or even demonstrate—impact on any particular customer. This is an independent ground for exclusion. Plaintiffs' opposition fails to rebut defendants' arguments.

#### 1. Substantial Authority Exists for the Exclusion of Regression Models That Average Prices Across Disparate Products and Customers

Plaintiffs claim that courts have "long accepted" regression models that use averaged price data and estimate "average" overcharges. (Pls.' Opp'n at 24.) However, plaintiffs' authorities either are not on point or are distinguished easily. For example, *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2008), addresses an expert's reliance on a particular trade magazine's price index that was subject to a later published correction due to errors in the pricing information. The court's opinion contains no discussion of the propriety of using averaged prices of dissimilar products to prove class-wide impact. Similarly, *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002), discusses neither the predominance standard under Rule 23 nor the reliability standard under *Daubert. Fructose* also precedes by nearly a decade the Supreme Court's recent *Comcast* decision, which reinforces the need for a rigorous analysis of an expert's methodology at the class certification stage.

---

[14] Indeed, McClave explains in his textbook that "[i]ntentionally selecting a biased sample in order to produce misleading statistics is considered *unethical statistical practice*." Ex. 6, McClave, et al., *Statistics for Bus. & Econ.* § 1.7, at 18.

Moreover, the few cases cited by plaintiffs as permitting the use of averaging involved econometric analyses of a smaller number of homogeneous products with little price variability.[15] In stark contrast, McClave's models lump together hundreds of varied finished steel products with different metallurgical properties and dimensions, unrelated and non-interchangeable end uses, and extremely wide-ranging prices paid by over 5,500 distinct purchasers.  (Defs.' Br. at 11-13.) By way of illustration, the chart below shows the tremendous variability in the daily transaction prices paid by the top 35 customers purchasing the different products grouped in McClave's "Prime Galvanized Sheet" category from ████████ in ████████, which McClave simply averages together to get one "observation" used in his dummy variable model for flat products.[16] These prices range from a low of about ████ per ton to a high of more than ████ per ton during a single month in McClave's largest product category (by revenue) during the class period.  This spread of over ████ per ton between customer transaction prices demonstrates that McClave's averaging methodology impermissibly masks the substantial differences in the many products and customers that he aggregates to generate his average overcharges.

---

[15] *See Fructose*, 295 F.3d at 654 (involving just two grades of commodity sweetener product made from corn that differed only in their percentage of fructose); *Chocolate*, 289 F.R.D. at 205-13 (involving "commodity-like" candy products that were "reasonably interchangeable," sold using common "list prices," and subject to three lock-step price increases during the alleged class period); *Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 612-13 (E.D. Wisc. 2000) (involving three grades of thermal facsimile paper sold in bulk rolls to converters based on negotiations off of list prices).

[16] These 35 customers make up ████ of defendants' "Prime Galvanized Sheet" revenue for ████████.



(*See also* Ex. 7, Galvanized Sheet Prices from October 2006 (showing extreme variability in daily transaction prices for ███████████████ sales of products in McClave's "Prime Galvanized Sheet" category to the top 35 customers in October 2006).)

Courts faced with this type of substantial variation across products, prices, and customers routinely reject statistical analyses that use average prices as unreliable and not relevant to the question of antitrust impact on individual class members. Defendants' opening brief cites a long string of authorities that have deemed averaging methodologies such as McClave's inadmissible. (*See Defs' Br.* at 8-10, n.7 (citing *Reed*, *GPU*, *Blades*, *In re Wholesale Grocery Prods.*, *In re Live Concert Antitrust Litig.*, *Sheet Metal Workers Local 441*, *Allied Orthopedic*, and *Freeland*).) Since that filing, two new opinions have issued rejecting regression models that employ averaging to prove impact. *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 385-86 (3d Cir. 2013) (affirming denial of final certification of a settlement class where regression model was based on average national data not necessarily representative of regional or store disparities); *Turnbow v. Life Partners, Inc.*, No. 3:11-cv-1030-M, 2013 WL 3479884, at *6 (N.D. Tex. July 9, 2013) (denying

class certification where expert's methodology yielded only average variation because "such a uniform application . . . inevitably would lead to both over- and under-compensation").

Plaintiffs' efforts to distinguish *Reed* and *GPU,* the two main cases discussed in defendants' initial brief, are ineffective. Contrary to plaintiffs' assertion that the expert analyses in these two cases "bear no resemblance" to McClave's (Pls.' Opp'n at 27), the plaintiffs in *Reed* and *GPU* also tried to prove class-wide impact using a regression model. *Reed v. Advocate Health Care*, 268 F.R.D. 573, 590-91 (N.D. Ill. 2009); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493-94, 497 (N.D. Cal. 2008) [hereinafter "*GPU*"]. As shown in defendants' opening brief, here, just like in *Reed* and *GPU*, McClave uses average input data in his regression that fail to account for the "myriad of individual factors influencing" prices, including differences in chemistry, sizes, characteristics, applications, demand drivers, price points, buyer power, and product mixes, as illustrated by several exemplar product category "observations" taken directly from McClave's model. (*See* Defs.' Br. at 11-12 █████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

Further, the fact that the expert's work was ongoing in *GPU* neither distinguishes it (indeed, McClave just submitted a second report with multiple new econometric models in an effort to bolster his original opinions) nor renders it inapposite. (*See* Pls.' Opp'n at 27-28.) In its extensive analysis of the challenged models, the *GPU* court found that, much like McClave's 25 steel product categories, the expert's analysis was "filled with broad categories that each includes highly varying products and purchasers" and stated that "[i]f data points are lumped together and averaged before the analysis, the averaging compromises the ability to tease meaningful relationships out of the data." *GPU*, 253 F.R.D. at 493-94 (cited in Defs.' Br. at 10-11).

24

Nor does the recent decision in *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-02509 (LHK), 2013 WL 5770992 (N.D. Cal. Oct. 24, 2013), submitted by plaintiffs as supplemental authority, save McClave's improper reliance on averaging in this case. (*See* Dkt. No. 421.) Plaintiffs' expert in *High-Tech*, a class-action wage suppression case, presented a model based on averaged data for employee salaries by job title. 2013 WL 5770992, at *41. In that case, however, there was (1) a demonstrated ripple effect of compensation changes across job categories; (2) no statistical analysis backing defendants' critique of the model based on (unnamed) omitted variables; and (3) a concession by defendants' expert that averaging was an appropriate methodology in that situation. *Id.* at *41-42. None of these factors applies here.

2. **Plaintiffs Have Failed to Justify McClave's Inference of Class-wide Impact Based on His Averaged Overcharge Methodology**

*Comcast* requires that any statistical model of injury must demonstrate with "evidentiary proof" that all or substantially all members of the class were injured. *Comcast*, 133 S. Ct. at 1432. To satisfy Rule 23's requirements, any statistical model used to establish the elements of an antitrust claim on a class-wide basis must account for potentially relevant differences among class members as to the fact and mechanism of injury. *See Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2552-56 (2011). One of the principle shortcomings of models like McClave's that employ averaging across a wide range of disparate products, customers, and prices, is that they *assume* the same or similar impact across the class, which in turn subverts the required evidentiary proof that class members in fact suffered an injury. A model that assumes what it must demonstrate—*i.e.*, that all plaintiffs were injured by the defendants' conduct—is neither reliable nor relevant for purposes of the class certification analysis.

In an attempt to gloss over McClave's improper "statistical inference" of individual class member impact from his average overcharge analyses, plaintiffs contend that antitrust impact can

be established "using probabilistic proof supporting a reasonable inference of injury." (Pls.'
Opp'n at 23, 25 (emphasis omitted).) The cases cited by plaintiffs, however, are inapposite and
all, in any event, pre-date *Comcast*.[17] None of the cases concerns a *Daubert* challenge to the
reliability of an expert's opinion. None addresses Rule 23's requirement to demonstrate that class-
wide injury-in-fact can be proven by common evidence, much less stands for the proposition that
even with demonstrated variability, it is sufficient for an expert simply to assume that what is true
on average is necessarily true for each class member.

　　Plaintiffs further seek to downplay their reliance on McClave's analysis by urging the
Court to consider its reliability in light of other non-econometric evidence. (Pls.' Opp'n at 1, 24.)
However, the non-econometric evidence plaintiffs point to—namely, statements made by
defendant executives regarding market discipline and the analysis of plaintiffs' other proffered
expert, John L. Solow—also fails to demonstrate that a common methodology can be used to
establish injury and damages on a class-wide basis. (Reply in Support of Defs.' Joint Mot. to
Exclude Dr. John L. Solow at 11-13.)[18] For example, statements by defendant executives that
market discipline may have avoided plunging prices say nothing about whether particular steel
products, let alone individual class members, were impacted by the alleged reduction in the output
of "raw steel." Indeed, Professor Hausman demonstrates in his report that output of structural
steel, which represented 44.1% of all long steel products at the time, increased, rather than

---

[17] For example, *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981), and *Perkins v. Standard Oil Co. of California*, 395 U.S. 642 (1969), are not Sherman Act cases and their discussion of causation and damages is specific to the Robinson-Patman Act claims there at issue. Likewise, plaintiffs' reliance on *BCS Services, Inc. v. Heartwood 88 LLC*, 637 F.3d 750 (7th Cir. 2011), for the standard of proof in general tort cases is wholly irrelevant to the Sherman Act antitrust claims asserted here and is particularly misplaced.

[18] In dismissing the need to conduct individual econometric testing of the numerous and varied steel products in the proposed class, McClave relies on Solow's flawed opinions that all steel product prices are economically linked on the supply side. (Second McClave Report at 26-27.) As demonstrated in defendants' reply brief in support of their motion to exclude Solow's opinions, Solow has done no scientific testing of his belated supply-side substitution theory. Thus, where Solow's opinions fail *Daubert*, so do McClave's opinions.

decreased during the alleged conspiracy period. (Ex. 2, Rev. Hausman Report at 42.) Plaintiffs do not contest this evidence of an output increase in a major category of steel products.

### 3. McClave's New Customer Level Model Is Similarly Flawed and Fails to Validate McClave's Initial Models

In his second report, McClave offers a new "individual customer analysis" that he claims "find[s] consistent results and widespread injury for all or nearly all class members" and "demonstrates the robustness of the results of his original model[s]." (Pls.' Opp'n at 29.) By "testing his models at the individual transaction and customer level," McClave claims to find that 91% of customers were impacted by the alleged conspiracy. (*Id.*; Second McClave Report 6-9.) Not surprisingly, McClave's new models are biased in many of the same ways as his original regression methods because they are constructed using many of the same faulty methodologies and specifications.[19]

These new models are incorrectly specified in one additional respect. To adapt his models to the customer level, McClave adds a series of indicator variables that identify each of the 5,585 distinct customer names he was able to detect in the transaction data. (Second McClave Report at 6-7.) Despite the millions of transaction prices and thousands of customers in the data, however, McClave still measures antitrust impact using only a single class variable that indicates when the alleged conspiracy was in effect. (*Id.*) By relying on but one class variable, McClave yet again is able to estimate only one measure of antitrust impact with these models, *i.e.*, the *average* impact experienced by all customers, for all products, from all manufacturers. (Ex. 1, Hausman Rebuttal

---

[19] McClave constructs his new "individual customer" models using the actual 30 million-steel transactions that underlie the average prices used in both his forecasting models and the original regressions from his first report. (Second McClave Report at 6-7.) Like his original dummy variable models, he breaks his customer-level analyses into separate regressions for flat products and long products, uses the same 62 months of transaction data, once more relies on the same pre-class and post-class periods as his competitive benchmarks, and uses the same single cost variable (an indexed price for steel scrap), the same single demand variable (an index of automobile sales and non-residential construction activity), and the same set of product-manufacturer dummy variables. (*Id.*)

Report at 5-6.)  This fails to allow for the possibility that the alleged antitrust conspiracy impacted customers differently, or indeed, that a significant proportion of customers were not impacted at all.  In other words, McClave attempts to measure variation in antitrust impact across customers using a regression model that by design assumes all customers are impacted in exactly the same way.  (*Id.* at 5)

When combined with the numerous other errors, anomalies, and instabilities inherent in his models, it becomes apparent that McClave's regression analyses and opinions are not the "product of reliable principles and methods . . . reliably applied . . . to the facts of the case" and should be stricken.  Fed. R. Evid. 702.

### E. McClave Fails To Tie His Regression Models To The Alleged "Raw Steel" Conspiracy As Comcast Requires

As the Supreme Court's recent *Comcast* decision makes clear, to be relevant and reliable for purposes of Rule 23's class certification analysis, a model must "translat[e] . . . the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."  *Comcast*, 133 S. Ct. at 1435.  McClave's models in this case suffer from flaws of the same nature that led the Supreme Court to reject his damages model in *Comcast*.  Just like in *Comcast*, there is a critical disconnect between plaintiffs' theory of liability in this case and McClave's proposed methodology for proving class-wide impact and damages.

Here, plaintiffs' theory of harm is that alleged coordinated reductions in the aggregate supply of "raw steel" by unspecified amounts ultimately impacted all or virtually all purchasers of hundreds of different types of steel products by artificially inflating the prices of all finished products.  (Class Cert. Br. at 1.)  Despite the submission of multiple new regression analyses in his rebuttal report, McClave still has not come forward with a model that attempts to translate the alleged periodic raw steel production cuts into an impact on the price of all products purchased by

28

the thousands of diverse class members. None of McClave's models includes a variable for output levels for "raw steel" or any finished product. He failed to study or incorporate in his analysis the production levels or capacity utilization rates of any mill and made no attempt to understand whether the output of particular finished steel products decreased, increased, or remained constant during the class period.[20] (McClave Dep. vol. I 130:3-9, vol. II 55:7-58:6.) Neither did he compare normal production fluctuations outside the class period to the variations observed during the class period.

Instead, McClave's various regressions simply compare prices over time and find that prices during the class period were affected by some unknown condition, which McClave *assumes* is the alleged production cuts he never studied. By their design, McClave's models are set up to yield the same percentage overcharge whether output of the particular finished steel product increased, decreased, or remained constant during the class period.[21] His models thus lack the necessary connection to plaintiffs' theory of the case and provide no reliable means of measuring impact or damages resulting from the alleged conspiracy to reduce output of "raw steel."[22] *See, e.g.*, *In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2013 WL 6388408, at *15-17 (S.D. Tex. Dec. 6, 2013) (noting *Comcast* "signals a significant shift in the scrutiny required for class certification"

---

[20] ███████████████████████████████████████. (*See* ███████████████████████████; Defs.' Class Opp'n Br. at 17-18.)

[21] Plaintiffs mischaracterize *Messner v. Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012), and *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), in asserting that "individualized proof of injury" is not required under Rule 23. (Pls.' Opp'n at 25.) In those cases, the Seventh Circuit rejected a requirement to demonstrate *identical* damages for each class member, a proposition that defendants do not dispute. *See Messner*, 669 F.3d at 819; *Butler*, 727 F.3d at 801.

[22] McClave's reliance on Solow's new supply-side substitution theory exposes another flaw in his models. (Second McClave Report at 26-27.) Although plaintiffs' latest theory is that the prices of all steel products are economically linked due to supply-side substitutability, McClave offers no explanation as to why certain carbon-based steel products are excluded from the class and his regression models. The only rationale under such an economic theory is that plaintiffs cherry-picked the products to be included in the class in order to manipulate the regression models initially proffered by McClave.

and denying class certification where the plaintiffs' theory of damages did not track their theory of liability as *Comcast* requires).

In sum, the teachings of both *Daubert* and *Comcast* require that any statistical model supporting plaintiffs' claim of class-wide impact and damages must match plaintiffs' ultimate theory of liability. Here, they clearly do not match.

## III. CONCLUSION

For the foregoing reasons, as well as those advanced in defendants' initial brief, defendants respectfully request that the Court grant their motion and issue an order excluding the proffered reports, models, and opinions of James McClave.

Respectfully submitted,

Dated: January 5, 2014      By:    /s/ Andrew S. Marovitz

Counsel for ArcelorMittal S.A. and ArcelorMittal USA, Inc. and, for purposes of this motion only, on behalf of all defendants

Mark Leddy
Mark W. Nelson
Patricia M. McDermott
CLEARY GOTTLIEB STEEN
   & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202.974.1500 – Telephone
202.974.1999 – Facsimile
mleddy@cgsh.com
pmcdermott@cgsh.com

Andrew S. Marovitz
Kristin W. Silverman
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com
ksilverman@mayerbrown.com

*Attorneys for ArcelorMittal S.A. and ArcelorMittal USA LLC*

Donna E. Patterson
David P. Gersch
Robert J. Katerberg
Ryan Z. Watts
ARNOLD & PORTER LLP

Dan K. Webb
Thomas J. Frederick
Todd J. Ehlman
WINSTON & STRAWN LLP
35 West Wacker Drive

30

555 Twelfth Street, N.W.
Washington, DC 20004
202.942.5000 – Telephone
202.942.5999 – Facsimile
donna.patterson@aporter.com
david.gersch@aporter.com
ryan.watts@aporter.com
robert.katerberg@aporter.com

John B. Wyss
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
202.719.7000 – Telephone
202.719.7049 – Facsimile
jwyss@wileyrein.com

Chicago, IL 60601-9703
312.558.5600 – Telephone
312.558.5700 – Facsimile
dwebb@winston.com
tfrederick@winston.com
tehlman@winston.com

Douglas R. Gunson
NUCOR CORPORATION
1915 Rexford Road
Charlotte, NC 28211
704.366.7000 – Telephone
704.972.1836 – Facsimile
doug.gunson@nucor.com

**Attorneys for Nucor Corporation**

Jonathan S. Quinn
NEAL, GERBER & EISENBERG LLP
Two North La Salle Street, Suite 1700
Chicago, IL 60602
312.269.8000 – Telephone
312.429.3531 – Facsimile
jquinn@ngelaw.com

Daniel I. Booker
Debra H. Dermody
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
412.288.3131 – Telephone
412.288.3063 – Facsimile
dbooker@reedsmith.com
ddermody@reedsmith.com

Alexander Y. Thomas
REED SMITH LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, DC 20005-3317
202.414.9200 – Telephone
202.414.9299 – Facsimile
athomas@reedsmith.com

**Attorneys for United States Steel Corporation**

31

Nathan P. Eimer
Scott C. Solberg
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
312.660.7600 – Telephone
312.692.1718 – Facsimile
neimer@eimerstahl.com
ssolberg@eimerstahl.com
dbirk@eimerstahl.com

*Attorneys for Gerdau Ameristeel Corporation*

Joel G. Chefitz
Amanda J. Metts
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606
312.372.2000 – Telephone
312.984.7700 – Facsimile
jchefitz@mwe.com
ametts@mwe.com

Robert S. Walters
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, IN 46802
260.423.8905 – Telephone
260.423.8920 – Facsimile
rsw@barrettlaw.com

*Attorneys for Steel Dynamics, Inc.*

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603
312.251.4600 – Telephone
312.251.4610 – Facsimile
jfigliulo@fslegal.com
sjones@fslegal.com

Gregory A. Markel
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
212.504.6000 – Telephone
212.504.6666 – Facsimile
greg.markel@cwt.com

Charles F. Rule
Joseph J. Bial
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
202.862.2200 – Telephone
202.862.2400 – Facsimile
rick.rule@cwt.com
joseph.bial@cwt.com

*Attorneys for AK Steel Holding Corporation*

John W. Treece
Scott D. Stein

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
312.853.7000 – Telephone
312.853.7036 – Facsimile
jtreece@sidley.com
sstein@sidley.com

*Attorneys for SSAB Swedish Steel Corporation*

Joseph A. Tate
Christine C. Levin
David J. Stanoch
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215.994.2350 – Telephone
215.655.2350 – Facsimile
joseph.tate@dechert.com
christine.levin@dechert.com
david.stanoch@dechert.com

*Attorneys for Commercial Metals Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew S. Marovitz, an attorney, hereby certify that on January 6, 2014, I caused a true and accurate copy of the foregoing **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINIONS OF JAMES T. MCCLAVE** to be served via the Court's CM/EMF system, and served via e-mail to all counsel of record on January 5, 2014.

/s/ Andrew S. Marovitz
Andrew S. Marovitz
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
312.782.0600 – Telephone
312.701.7711 – Facsimile
amarovitz@mayerbrown.com
