# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE:  STEEL ANTITRUST LITIGATION | Case No. 08-cv-5214 |
| THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS: | Honorable James B. Zagel |
| *Standard Iron Works v. ArcelorMittal, et al.,* Case No. 08-cv-5214 | |
| *Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al.,* Case No. 08-cv-5371 | |
| *Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al.,* Case No. 08-cv-5633 | |
| *Alco Industries, Inc. v. ArcelorMittal, et al.,* Case No. 08-cv-6197 | |
| *Gulf Stream Builders Supply, Inc. v. ArcelorMittal, et al.,* Case No. 10-cv-4236 | |

**JOINT DECLARATION OF JEFFREY S. ISTVAN AND MICHAEL J. GUZMAN
IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENTS WITH ARCELORMITTAL S.A., ARCELORMITTAL USA
LLC, AND UNITED STATES STEEL CORPORATION, AND CLASS
COUNSEL'S MOTION FOR ATTORNEYS' FEES
AND REIMBURSEMENT OF EXPENSES**

Jeffrey S. Istvan and Michael J. Guzman declare and state as follows:

1.      Jeffrey S. Istvan states that he is a member of the law firm of Fine Kaplan

and Black, R.P.C. ("Fine Kaplan") and is one of the Court-appointed Interim Co-Lead

Counsel for the Plaintiff Class in this litigation.

2.      Michael J. Guzman states that he is a partner in the law firm of Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC ("Kellogg Huber") and is one of the Court-appointed Interim Co-Lead Counsel for the Plaintiff Class in this litigation.

3.      Jeffrey S. Istvan and Michael J. Guzman (collectively, "Co-Lead Counsel") submit this Declaration in support of (i) Plaintiffs' Motion for Final Approval of Settlements with ArcelorMittal S.A., ArcelorMittal USA LLC, and United States Steel Corporation; and (ii) Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses.  We have personal knowledge of the matters set forth herein and, if called as witnesses, we could and would testify competently as follows:

**THE SETTLEMENTS ARE FAIR AND REASONABLE**

4.      The settlements with ArcelorMittal ($90 million) and U.S. Steel ($58 million) (collectively, "the Settlements") were the product of extensive good faith, arm's length negotiations conducted over a period of months between Co-Lead Counsel and counsel for the settling Defendants.

5.      There was no collusion in connection with the Settlements, nor have the settling Defendants provided for any payment of attorneys' fees.  Instead, the Settlement negotiations were protracted, adversarial and hard-fought, with any and all fees to be awarded by the Court pursuant to the common fund doctrine.

6.      In the experienced good faith judgment of Co-Lead Counsel, the Settlements deliver an excellent result for the Class given the nature of the case and the risks of continued litigation.

7.      The Settlements with ArcelorMittal and U.S. Steel provide for a guaranteed cash benefit of $148 million—payable promptly to class members without the

need for an onerous claims process—while the litigation continues against three remaining Defendants (Nucor, Steel Dynamics, and SSAB) under principles of joint and several liability.

8.      The Settlements bring the total common fund recovery to $163.9 million (*i.e.*, a total of $15.9 million from CMC, Gerdau and AK Steel, plus $148 million from ArcelorMittal and U.S. Steel), which is a substantial and meaningful recovery for the approximately 5,300 class members.

9.      The Settlements are fair and reasonable given the risks of continued litigation, which include, *inter alia*, Plaintiffs' pending motion for class certification; the possibility of appeal of the class certification decision under Rule 23(f); and, assuming the Class is certified, all the risks of continued litigation on the merits (*e.g.*, summary judgment, *Daubert*, evidentiary challenges, trial risk on liability and damages, post-trial motions, and the possibility of several stages of appeal up to and including the Supreme Court).

10.     In addition to the nine-figure monetary benefit to the Class, the Settlements deliver substantial non-monetary benefits in the form of cooperation from ArcelorMittal and U.S. Steel, including production of previously unproduced documents and phone records, interviews and depositions from certain key executives, assistance in locating former employees, and authentication of business records for purposes of admissibility at trial.

11.     Significantly, moreover, as of the date of this filing, <u>no class member</u> has objected to <u>any</u> aspect of <u>any</u> of the Settlements reached in this case.

12.     For all of these reasons, Co-Lead Counsel strongly endorse the Settlements as fair, reasonable, adequate, and in the best interests of the Class.

**SETTLEMENT NOTICE AND ADMINISTRATION COSTS**

13.     Class Counsel have moved for an order authorizing the payment of settlement notice and administration costs from the Settlement Funds.  The costs incurred to date are as follows:[1]

- The Garden City Group, Inc., $109,242.95

- Info Tech, Inc., $1,200.00

14.     Based on Class Counsel's experience and supervision of all work relating to Settlement notice and administration, the costs reported in paragraph 13 above were reasonable and necessary.

**HISTORY OF LITIGATION AND SUMMARY OF WORK**

15.     Class Counsel have moved for an award of attorneys' fees and reimbursement of litigation expenses from the $163.9 million common settlement fund. As described in more detail below, the history of the case supports Class Counsel's one-third (33.33%) fee request, given that Class Counsel built the claims from the ground up and bore significant risk and costs to pursue the litigation on behalf of the Class.

16.     Class Counsel began investigating potential collusion in the steel industry in early 2008.  From that time through the filing of the initial complaint in September 2008, our firms devoted substantial resources to the case including, *inter alia*, interviews

---

[1] These figures include only the costs of the ArcelorMittal and U.S. Steel notice and administration.  Class Counsel requested the Court's authorization to pay the costs incurred in connection with CMC, Gerdau and AK Steel settlements during the final approval proceedings for those settlements in July 2014.

with industry professionals, review of industry documents, engaging experts to evaluate the issues, and performing legal research. In total, we devoted 1434.90 hours to the matter prior to September 12, 2008, equating to approximately $902,222.25 of Class Counsel's time ("lodestar") at current billing rates.

17.    Based on our investigation, we identified strong foundation for alleging that Defendants, the nation's largest steelmakers, had engaged in collusive behavior in the production and sale of steel products. At the same time, we recognized that any litigation of this type would involve significant risk.

18.    Accepting these risks, we agreed to handle the case on an entirely contingent basis (*i.e.*, to advance all time and litigation costs to prosecute the claims), and we filed the initial complaint on behalf of Standard Iron Works on September 12, 2008. *See Standard Iron Works v. ArcelorMittal, et al.,* No. 08-cv-5214. A series of related cases were later filed in this district. *See Wilmington Steel Processing Co., Inc. v. ArcelorMittal et al.*, No. 08-cv-5371; *Capow, Inc. v. ArcelorMittal et al.*, No. 08-cv-5633; *MPM Display, Inc. v. ArcelorMittal et al.*, No. 08 C 5700; *REM Sys., Inc. v. ArcelorMittal et al.*, No. 08-cv-5942;[2] *Alco Indus. Inc. v. ArcelorMittal, et al.*, No. 08-cv-06197; *Gulf Stream Builders Supply, Inc. v. ArcelorMittal, et al*, No. 10-cv-4236.

19.    Co-Lead Class Counsel then took the lead in (i) organizing the parties and counsel in the related actions; (ii) consolidating all direct purchaser cases before this Court; and (iii) negotiating various case management orders with Defendants. *See, e.g.,* Dkt. Nos. 28, 48 (initial case management orders), Dkt. Nos. 228, 235 (protective orders), Dkt. No. 258 (expert discovery order).

---

[2] The *MPM Display* and *REM Systems* cases were later voluntarily dismissed.

20.     On January 2, 2009, Defendants moved to dismiss for failure to state a claim. Dkt. No. 110.  Because Plaintiffs' complaint included detailed factual allegations, Defendants introduced a large number of exhibits (beyond the four corners of the complaint) in support of their motion to dismiss, which the Court agreed to consider under Rule 12.  *See* Dkt. Nos. 111-119.

21.     Class Counsel devoted substantial resources to opposing Defendants' motion with an equally fact-intensive opposition brief, *see* Dkt. No. 132, and to preparing for oral argument.

22.     The Court heard argument on February 26, 2009, with Plaintiffs' presentation handled by Michael Kellogg, a founding partner of Kellogg Huber and respected Supreme Court and antitrust specialist.

23.     On June 12, 2009, the Court denied Defendants' motion to dismiss, relying largely on the extensive factual record developed and introduced by Class Counsel.  Dkt. No. 170.

24.     After prevailing on the motion to dismiss, Class Counsel drafted and served discovery on all eight Defendants, which triggered a series of case management disputes about how class certification discovery should proceed.  *See, e.g.,* Dkt. Nos. 181, 211, 221, 233.

25.     On January 28, 2010, the Court ordered a phased discovery schedule under which Plaintiffs received limited executive-level discovery relevant to class certification issues from two of the eight Defendants, which Plaintiffs were then permitted to use to demonstrate the relevance of executive-level discovery from all Defendants with respect to class certification issues.  *See* 1/28/2010 Status Hearing Tr.

26.     By random draw, this first phase of discovery proceeded with Defendants U.S. Steel and Gerdau.  Between February and October 2010, Class Counsel engaged in exhaustive meet and confers with these two Defendants over issues including (i) the identity of relevant custodians, (ii) the substantive scope of discovery, (iii) on-site search and document collection protocols, (iv) electronic keyword searches and protocols, (v) production of paper and handwritten records, (vi) document preservation issues, (vii) an array of data discovery issues, and much more.

27.     In parallel, Class Counsel devoted substantial time and effort to obtaining transaction, financial, and operational data from all eight Defendants.  This process was challenging and involved, first, obtaining transaction-specific sales data on nearly 30 million steel transactions.  Because Defendants used different software and formats for their various sales databases, Class Counsel engaged in protracted back and forth to obtain, process, and understand the relevant information.  Working closely with Plaintiffs' experts, Class Counsel managed this process.

28.     Similar work was necessary to obtain Defendants' financial and operational data for the relevant period, including monthly price, cost, steel production and capacity data.  Class Counsel was required to (i) identify the relevant financial/cost/production reports for each of the eight Defendants; (ii) search Defendants' respective document productions to collect all relevant reports; (iii) follow up with certain Defendants to fill identified gaps in the production; and ultimately (iv) input the relevant data into usable electronic format.  Working closely with Plaintiffs' experts, Class Counsel completed this process as well.

29.     Class Counsel finished the initial phase of U.S. Steel and Gerdau executive-level discovery in late 2010, after which Plaintiffs moved to compel similar executive-level class certification discovery from the other six Defendants.  *See* Dkt. No. 261 (Plaintiffs' motion to compel filed November 19, 2010).

30.     On February 3, 2011, after briefing and argument, including a hearing at which Class Counsel presented some of the fruits of the Gerdau and U.S. Steel discovery, the Court overruled Defendants' objections and allowed executive-level class certification discovery to proceed against the other six Defendants.  Dkt. No. 279.

31.     Class Counsel devoted the next 16 months to obtaining and reviewing the same type of discovery previously obtained from U.S. Steel and Gerdau, including dozens of meet and confers with the "other six" Defendants on essentially the same issues:  custodians, substantive scope, search and collection protocols, electronic keywords, paper and handwritten documents, preservation, data discovery, etc.  During this time period, Class Counsel's work with respect to the transaction, financial, and operational data, described in paragraphs 27-28 above, continued.

32.     While all of the above discovery was proceeding, Class Counsel also spent significant time handling discovery of the class representatives.  Defendants served all-encompassing discovery requests on the class representatives.  Responding entailed a number of steps and a number of lawyers.  First, there were site visits to each of the class representatives' facilities to assess the nature and volume of documents (paper and electronic) and custodians.  Second, Class Counsel retained an e-discovery vendor and accompanied that vendor on site visits to collect and preserve electronic documents, as well as to collect and process paper documents.  Third, Class Counsel negotiated the

8

scope of discovery with various defense lawyers and oversaw the production of documents in conformance with the agreements reached. Fourth, Class Counsel reviewed all the documents collected from the class representatives.

33.     Throughout class certification discovery, Class Counsel made every effort to meet and confer productively to resolve as many disputes as possible without the need for Court involvement. Nonetheless, many disputes arose, requiring Class Counsel to research the issues and prepare for and conduct negotiations.

34.     Both sides completed their production of class certification documents and data in early 2012. In total, over 3.5 million pages of discovery were reviewed by Class Counsel.

35.     On May 24, 2012, Plaintiffs moved for class certification. *See* Dkt. No. 305. Plaintiffs' opening class certification filings were substantial, *see* Dkt. Nos. 307-313, reflecting the volume of work involved in obtaining discovery, reviewing millions of pages of documents, retaining and supervising experts, drafting the briefs, and organizing thousands of pages of exhibits.

36.     Defendants requested and received more than nine months to file their opposition. Most of Class Counsel's work during this period focused on (i) preparing for and defending expert and class representative depositions; and (ii) continuing Class Counsel's review of Defendants' documents in anticipation of particular class certification and *Daubert* arguments. In addition, Class Counsel continued to work with Plaintiffs' econometric expert, Dr. McClave, including preparing for a hearing in July 2012 during which Dr. McClave explained his model to the Court.

37. On February 28, 2013, Defendants opposed class certification and filed *Daubert* motions directed at two of Plaintiffs' experts, Dr. McClave and Dr. Solow. As expected, Defendants' submissions were voluminous, including hundreds of pages of briefing, thousands of pages of exhibits, and reports or declarations from four different experts and industry witnesses.

38. Class Counsel performed additional document review and analysis in response to Defendants' arguments; vetted Defendants' experts and their prior opinions, including intensive study of their testimony before the United States International Trade Commission; deposed Defendants' experts and industry witnesses; supervised rebuttal work from Plaintiffs' experts; and prepared Plaintiffs' reply and opposition briefs on class certification and *Daubert* issues, respectively.

39. On October 15, 2013, Plaintiffs submitted their class certification reply and oppositions to Defendants' two *Daubert* motions, including three expert rebuttal reports and thousands of pages of exhibits. *See* Dkt. Nos. 389-416.

40. Defendants filed their *Daubert* replies (and a new expert report) on January 6, 2014, after which the Court scheduled a three-day class certification and *Daubert* hearing for March 5-6 and April 11, 2014.

41. Class Counsel devoted considerable resources to preparing witnesses, demonstratives, and attorney presentations for the hearing, as well as drafting Plaintiffs' proposed post-hearing findings of fact and conclusions of law.

42. During the run-up to the class certification hearing, Class Counsel negotiated "icebreaker" settlements with Defendants Commercial Metals ($3.99 million), Gerdau ($6.1 million) and AK Steel ($5.8 million). After the class certification hearing,

Class Counsel negotiated significantly larger settlements with Defendants ArcelorMittal ($90 million) and U.S. Steel ($58 million).

43.     Each of these settlement agreements required exhaustive negotiation and drafting of monetary and other terms.  Other settlement-related work included managing all issues relating to class notice and administration, including retention of vendors (*e.g.*, claims administrators and escrow agents), drafting of notices, launching and updating the settlement website, negotiating escrow agreements, researching class member contact information, and handling communications with class members to answer questions about the case.

44.     From the beginning of the case through July 31, 2014, Class Counsel devoted a total of 53,343.95 hours, accounting for $27,690,030.10 in time at current hourly rates ("lodestar") to prosecuting the claims on behalf of the Class.  Using historical hourly rates, this translates to $23,629,295.95 in lodestar.[3]

45.     The breakdown of Class Counsel's time by date and stage of the proceeding is as follows:

- ***2008 through June 2009***.  Class Counsel devoted 9,488.48 hours and $5,360,699.00 in time (at current hourly rates) from the beginning of their investigation of the case through June 2009, when the Court denied the motions to dismiss.  Critical tasks in this phase included, *inter alia*, pre-complaint investigation, preparing the complaint, coordinating related cases, litigating initial case management issues, and opposing the motions to dismiss.

---

[3] These totals exclude time spent on the instant fee petition and supporting papers.

[4] *See, e.g., In re Plasma Derivative Protein Therapies Antitrust Litig.*, MDL No. 2109, Dkt. No. 697-1, at 9 (N.D. Ill. 2014) (lodestar of $39 million at class certification stage); *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5, 7 (E.D. Tenn. May 17, 2013) (lodestar over $53 million after five years of litigation); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000) (lodestar of $84 million after approximately six years of litigation).

- ***July 2009 through May 2012.*** Class Counsel devoted 28,750.97 hours and $14,682,611.35 in time during this phase of the case, which commences after the Court denied the motions to dismiss and ends when Plaintiffs filed their Motion for Class Certification. The vast bulk of the work during this period involved reviewing and synthesizing millions of pages of documents and data, coordinating expert work, drafting, serving and responding to discovery, litigating case management and discovery disputes, continuing to conduct independent research into the facts, and preparing Plaintiffs' opening class certification submissions.

- ***June 2012 through October 2013.*** Class Counsel devoted 9,633.35 hours and $4,948,872.75 in time during this phase of the case, which commences after filing of the Motion for Class Certification and ends after the close of briefing on that motion. Most of the time during this period was devoted to preparing the experts and class representatives for depositions, defending those depositions, document analysis and expert work on class certification and *Daubert* issues, preparing for and taking the depositions of Defendants' experts, and drafting the class certification reply and oppositions to the *Daubert* motions.

- ***November 2013 through July 2014.*** Class Counsel devoted 5,471.15 hours and $2,697,847.00 in time during this phase of the case, which work included preparing for and conducting the class certification hearing and drafting Plaintiffs' post-hearing submissions, and settlement-related work, including negotiation, drafting, approval briefing, class notice and administration, and court hearings.

46. Another way of looking at Class Counsel's time is by substantive category of work. Each month, all firms in the case are required to submit detailed time and expense reports, and they are required to place each expenditure of time into one of ten substantive categories of work. From 2008 through July 2014, the breakdown of time by category of work was as follows:

| Category | No. of Hours | Lodestar |
|---|---|---|
| Factual Research and Investigation | 4,372.65 | $2,223,533.75 |
| Document Review | 15,234.80 | $7,339,819.10 |
| Depositions (including preparation) | 2,673.85 | $1,321,097.75 |

| | | |
|---|---|---|
| Other Discovery | 8,427.10 | $4,250,258.75 |
| Meetings/Negotiations with Defense Counsel (including preparation) | 777.65 | $486,992.00 |
| Pleadings, Briefs and Legal Research | 9,276.78 | 5,063,099.00 |
| Litigation Strategy and Case Management | 5,418.50 | $3,157,311.00 |
| Court Appearances and Preparation | 2,561.50 | $1,401,122.25 |
| Experts | 3,398.32 | $1,722,921.00 |
| Settlement | 1,202.80 | $723,875.50 |
| **Total** | **53,343.95** | **$27,690,030.01** |

47.     At all times throughout the case, Class Counsel have worked efficiently and made every effort to avoid wasting time or duplicating effort.  In Co-Lead Counsel's experience, the total lodestar reported above is reasonable for a case of this nature (involving large claims against eight sophisticated Defendants and years of discovery), and indeed is lower than in many comparable cases.[4]

48.     To validate the total lodestar and expenses submitted herein, Co-Lead Counsel and each co-counsel law firm representing Plaintiffs has prepared a signed declaration summarizing that firm's time, costs and expenses, and attesting that all hourly rates used in this matter are the same as those billed to paying clients in non-contingent

_____

[4] *See, e.g., In re Plasma Derivative Protein Therapies Antitrust Litig.*, MDL No. 2109, Dkt. No. 697-1, at 9 (N.D. Ill. 2014) (lodestar of $39 million at class certification stage); *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5, 7 (E.D. Tenn. May 17, 2013) (lodestar over $53 million after five years of litigation); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000) (lodestar of $84 million after approximately six years of litigation).

matters. With the Court's permission, these declarations will be submitted to the Court for *in camera* review. *See* Plaintiffs' Motion for *in camera* review, filed contemporaneously.[5]

49. Class Counsel also request reimbursement for the costs that they have advanced in litigating this case on behalf of the class.

50. Class Counsel previously moved for reimbursement of the vast majority of their costs and expenses in connection with final approval of the CMC, Gerdau, and AK Steel settlements in July 2014. *See* Dkt. No. 494-1 at 15 (requesting reimbursement of $5,064,908.97). At the July final approval hearing, the Court indicated its intention to approve the CMC, Gerdau and AK Steel settlements and to review the expenses prior to final approval. *See* 7/10/14 Hearing Tr. at 13-14 (Class Counsel submitting requested backup for all costs and expenses).[6]

51. Class Counsel now seek reimbursement for the remaining $406,850.08 in "out of pocket" costs incurred through July 31, 2014. For the most part, these are costs that were advanced by individual firms for travel, computerized legal research, copying and the like, backup for which can be found in the individual Class Counsel declarations being submitted to the Court for *in camera* review, filed contemporaneously. These costs

_____

[5] Class Counsel have not submitted this information publicly because it would reveal sensitive information on staffing, case strategy and litigation tactics to the Defendants were it disclosed. If the Court wishes to review even more granular backup (*e.g.*, daily time entries for all Class Counsel), Plaintiffs are prepared to submit this information for *in camera* review at or after the October 17, 2014, final approval hearing.

[6] After the final approval hearing, CMC, Gerdau and AK Steel advised Plaintiffs of an issue relating to CAFA notice requirements, and obtained Plaintiffs' consent to delay entry of the Court's final approval order (and any order awarding reimbursement of litigation expenses) until October 17, 2014. *See* 7/16/2014 Letter to Court from Defendants CMC, Gerdau and AK Steel.

were not submitted for reimbursement in connection with the CMC, Gerdau and AK

Steel settlements.

52.     Summing all of the Class Counsel declarations, the breakdown of the total

costs, by category, is as follows:

| **CO-COUNSEL OUT OF POCKET EXPENSES** | |
|---|---:|
| Commercial Copies | $33,785.82 |
| Internal Reproduction/ Copies | $77,874.79 |
| Court Fees (Filing, etc.) | $6,180.05 |
| Court Reporters/Transcripts | $992.50 |
| Computer Research | $71,746.82 |
| Telephone/Fax/E-mail | $4,760.53 |
| Postage/Express/Delivery/Messenger | $20,623.04 |
| Professional Fees (expert, investigator, accountant, etc.) | $2,562.21 |
| Witness/Service Fees | $1,965.00 |
| Travel:  Air Transportation, Ground Travel, Meals, Lodging, etc. | $183,476.12 |
| Miscellaneous | $2,883.20 |
| **TOTAL** | **$406,850.08** |

53.     Class Counsel thus seek a total of $406,850.08 in cost reimbursement in

this petition.  Together with Class Counsel's prior request for expense reimbursement in

connection with the earlier settlements, Class Counsel seek total reimbursement of

$5,471,759.05 from the $163.9 million common settlement fund.

## MARKET RATE FOR CLASS COUNSEL'S SERVICES

54.     Co-Lead Counsel are experienced high-stakes litigators and often represent sophisticated individual clients and class action plaintiffs in antitrust and other complex litigation in exchange for a one-third contingent fee from any recovery.

55.     In a case like this one—involving large antitrust claims against sophisticated defendants with vast resources and capable counsel—a one-third contingent fee is consistent with Class Counsel's standard market rate.

56.     For example, Michael Guzman states that Kellogg Huber has been retained by many private and governmental clients to prosecute antitrust and other complex contingent claims on a non-class basis, and the firm's typical market rate ranges from 25-50% of any recovery.  Examples include the following:

- *Confidential antitrust matter involving e-book price fixin*g (S.D.N.Y., 2014) (contingent fee of 33% in a non-class case; matter is ongoing);

- *Confidential accounting fraud matter* (arbitration, 2010) (contingent fee of 33.33% with client also paying expenses);

- *Columbia Hospital for Women Medical Center, Inc. v. NCRIC, Inc.,* Adv. Pro. No. 09-10010 (Bankr. D.D.C. 2009) (contingent fee of 50% with client also paying expenses);

- *In re Copper Antitrust Litigation*, M.D.L. Docket No. 1303 (W.D. Wis. 2007) (contingent fee of 33.33% with client also paying expenses);

- *Volumetrics Medical Imaging, LLC v. General Electric Healthcare Ltd., et. al.*, No. 1:05-cv-00955-NCT-RAE (M.D. N.C. 2005) (contingent fee of 50% with client also paying expenses)

- *HCP Life Science Assets TRS, LLC, et. al.* v. *Camanne Management, Inc. , et al.,* 2008 CA 004024B (D.C. Super. Ct.) & Nos. 1O-CV-674, 10-CV-770 & 10-CV- 821 (D.C.C.A.) (contingent fee of 33.33% with client paying expenses).

57.     Michael Guzman further states that Kellogg Huber's standard market rate

is similar in contingent class action litigation.  Examples include:

- *In re Urethanes Antitrust Litig.*, MDL No. 1616, Dkt. No. 2210 (D. Kan. Dec. 13, 2011) (one-third fee from initial settlements with litigation continuing) (Kellogg Huber co-lead trial counsel in non-settling portion of case)

- *Massachusetts Smokeless Tobacco Litigation*, Civil Case No. 03-5038 (Mass. 2010) (one-third fee awarded from common fund settlement) (Kellogg Huber co-lead counsel for class)

- *Smokeless Tobacco Cases I-IV*, J.C.C.P. Nos. 4250, 4258, 4259 & 4262 (Cal. Sup. Ct, 2009) (one-third fee awarded from common fund settlement) (Kellogg Huber member of Plaintiffs' Executive Committee)

- *Feuerabend, et al. v. UST Inc., et al.*, Case No. 02-CV-7124 (Wis. 2007) (one-third fee awarded from common fund settlement) (Kellogg Huber co-lead counsel for class)

- *Chance v. United States Tobacco Co.*, No. No. 05-cv-112 (Kan. 2007) (one-third fee awarded from common fund settlement) (Kellogg, Huber, Hansen co-lead counsel for class)

- *Microsoft Antitrust Litigation*  (Cal. 2006) (one-third fee awarded from common fund settlement) (Kellogg Huber member of Plaintiffs' Executive Committee)

58.     Jeffrey Istvan states that Fine Kaplan's primary practice is representing

class action plaintiffs, and the firm is commonly awarded one-third of any common fund

recovery for its work.  Recent examples of awarded fees include:

- *In re Urethanes Antitrust Litig.*, MDL No. 1616, Dkt. No. 2210 (D. Kan. Dec. 13, 2011) (one-third fee from initial settlements with litigation continuing) (Fine Kaplan serves as co-lead counsel for the class)

- *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 09-cv-7666, Dkt. Nos. 693 and 701 (N.D. Ill. 2014) (class counsel including Fine Kaplan awarded one-third fee)

- *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) (class counsel including Fine Kaplan awarded one-third fee)

- *In re Metoprolol Succinate End-Payor Antitrust Litig.*, No. 06-cv-71, Dkt. No. 342 (D. Del. March 7, 2013) (class counsel awarded 32% fee) (Fine Kaplan served as co-lead counsel)

- *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, Dkt. No. 1063 (N.D. Ill. Feb. 22, 2013) (class counsel awarded 30% fee) (Fine Kaplan served as co-lead counsel)

- *In re Terrapin Express, Inc. v. Airborne Express, Inc.,* No. 11–199–01536–05 (AAA 2007) (class counsel awarded 30% fee) (Fine Kaplan served as co-lead counsel)

- *In re OSB Antitrust Litig.*, No. 06-cv-826, Dkt. No. 987 (E.D. Pa. Feb. 9, 2009) (class counsel awarded one-third fee) (Fine Kaplan served on plaintiffs' Executive Committee)

- *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) (class counsel awarded approximately one-third fee) (Fine Kaplan on plaintiffs' Executive Committee)

- *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. June 2, 2004) (class counsel awarded 30% fee) (Fine Kaplan on plaintiffs' Executive Committee)

59.     Jeffrey Istvan further states that Fine Kaplan is compensated at similar market rates when representing individual clients.  For example, the most recent antitrust case in which Fine Kaplan represented individual plaintiffs against large, sophisticated defendants involved conspiracy allegations and hundreds of millions of dollars in estimated damages.  Fine Kaplan represented the clients on a fully contingent basis for a 30% fee ,plus payment of all litigation expenses.[7]

---

[7] Fine Kaplan's slight downward departure from a standard one-third fee in that case was justified by somewhat lower *ex ante* risks, given that (i) certain conspiracy facts had been established in a prior government investigation, and (ii) disputed and time-consuming class certification issues were not in play because it was not a class case.

60.    Here, where the claims involve a complex antitrust class action with no parallel government investigation or proceeding, Fine Kaplan's typical *ex ante* market rate is one-third of any class recovery.

61.    Co-Lead Counsel also expect clients to reimburse them for litigation costs as part of their standard terms and conditions with both individual and class action clients.  All categories of costs and expenses requested here—expert and e-discovery costs, courtroom technology, inside and outside copying costs, depositions and transcripts, legal research costs, other vendor and consulting services, travel, etc.—are billed to and reimbursed directly by individual clients in nearly every case, and are thus well-accepted by the marketplace.  Furthermore, in Class Counsel's experience, these costs are nearly always reimbursed in full by the Court in the context of common settlement funds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this ___1st___ day of ___October, 2014___ at ___Philadelphia, PA___

_____
Jeffrey S. Istvan

Executed on this ___30th___ day of ___September___ at ___Washington DC___.

_____
Michael J. Guzman