## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In Re: Steel Antitrust Litigation, | |
| THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS: | |
| Standard Iron Works v. ArcelorMittal et al., Case No. 08-cv-5214 | |
| Wilmington Steel Processing Co., Inc. v. ArcelorMittal, et al., Case No. 08-cv-5371 | No. 08 C 5214 Judge James B. Zagel |
| Capow, Inc. d/b/a Eastern States Steel v. ArcelorMittal, et al., Case No. 08-cv-5633 | |
| Alco Industries, Inc. v. ArcelorMittal, et al., Case No. 08-cv-6197 | |
| Gulf Stream Builders Supply, Inc. v. ArcelorMittal, et al., Case No. 10-cv-4236 | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Standard Iron Works, Alco Industries, Inc., Gulf Stream Builders Supply, Inc.,

Wilmington Steel Processing Co., and Capow, Inc. d/b/a Eastern States Steel (collectively

"Plaintiffs"), on behalf of itself and all others who purchased steel products directly from

domestic steel producers, Defendants ArcelorMittal S.A. and ArcelorMittal USA LLC, United

States Steel Corporation, Nucor Corporation, Steel Dynamics, Inc., and SSAB Swedish Steel

Corporation (collectively "Defendants"), from April 2005 through December 2007, moves to

certify a class action against Defendants for an alleged multi-year antitrust conspiracy to reduce

the production of steel products in the United States in violation of Section 1 of the Sherman Act,

15 U.S.C. § 1.[1] In particular, Plaintiffs allege that Defendants' top executives, which collectively

---

[1] This action is instituted under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 to recover treble damages, amongst other fees and costs, for injuries sustained by Plaintiffs and members of the putative class for Defendants'

operated 14 steel mills and received sales of $100 billion during the relevant period, conspired to restrict the output of their steelmaking furnaces (i.e., "raw steel" production, according to Plaintiffs) to raise the price of finished steel goods purchased by the class.

For the following reasons, I grant, in part, and deny, in part, Plaintiffs' motion for class certification.[2]

## I.      Motion for Class Certification

Direct Purchaser Plaintiffs moved for class certification on May 24, 2012. Defendants filed an Opposition to Plaintiffs' Motion for Class Certification on February 28, 2013, which Plaintiffs replied to on October 15, 2013. An evidentiary hearing then took place on March 5, March 6, and April 11, 2014, at which the parties presented evidence and argument relating to both class certification and Defendants' *Daubert* motions to exclude Plaintiffs' experts.

Plaintiffs offered the testimony of Dr. John L. Solow, Professor of Economics at the University of Iowa, an expert on "economics, industrial organization and econometrics," Dr. Jeryl K. Wright, an expert in "steel making, steel processing, steel plant processed layouts, steel customer service and quality system management," and Dr. James T. McClave, an expert in "statistics and econometrics."

Defendants offered the testimony of their experts, Dr. Jerry A. Hausman, the MacDonald Professor of Economics at the Massachusetts Institute of Technology, as an expert in "economics and econometrics," and two steel industry executives, Mr. Glenn A. Pushis, Vice President and General Manager of SDI's Flat Roll Division, and Ms. Lisa Roundabush, U.S. Steel's Managing Director, Product Quality North American Flat Rolled Operations.

alleged violations of § 1 of the Sherman Act, 15 U.S.C. § 1.
[2] As in all cases, as this case proceeds, further information may come to light or a change in circumstances may occur which requires modification of the methodology employed to effectively and efficiently resolve the pending issues related to this matter.

By agreement of the parties, Defendants offered the testimony of Dr. Brian G. Thomas, C.J. Gauthier Professor of Mechanical Engineering and Director of the Continuous Casting Consortium at the University of Illinois at Urbana-Champaign, which was submitted through an affidavit and a Revised Appendix to his report, as an expert in metallurgy, steel processing, and steel manufacturing. Defendants also submitted the expert report of Ms. Jennifer A. Hillman, a former Commissioner at the United States International Trade Commission, on international trade law and international trade remedies.

Based on a rigorous review of the complete record, the Court denied Defendants' motion to exclude the testimony of Plaintiffs' experts after finding that the expert opinions of Drs. Solow, Wright, and McClave were based on reliable methodology generally accepted in the relevant scientific community and were relevant to the task at hand for the purposes of *Daubert*. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580, 113 S. Ct. 2786, 2790, 125 L. Ed. 2d 469 (1993). That the opinions of the experts in this case are, in part or whole, valid as well as reliable is yet to be decided.

## II.     Legal Standard

A.     Class Certification Requirements

I have broad discretion in determining whether to certify a class, *see Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 306 (7th Cir.1985), but I may not reach the merits of the case when considering certification. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–178, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). I am to interpret Rule 23 liberally to permit class actions. *See In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 731 (N.D.Ill.1977). *Calkins v. Fid. Bond & Mortgage Co.*, No. 94C5971, 1998 WL 719569, at *1 (N.D. Ill. Oct. 8, 1998). In moving for class certification, Plaintiffs bear the burden of establishing that all the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and, additionally,

3

one of the requirements of Rule 23(b) are met. *General Telephone of the Southwest Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982); *Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126, at *1 (N.D. Ill. Apr. 3, 2002). Under Rule 23(b)(3), a class should be certified where (1) common questions predominate over individual questions, and (2) a class action is superior to other adjudicative methods. *Miller v. Gen. Motors Corp.*, No. 98 C 2851, 2003 WL 168626, at *1 (N.D. Ill. Jan. 26, 2003).

It "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-161 (1982).

### III.    Discussion

A.    Rule 23(a) Requirements

    1.    Numerosity

To satisfy the numerosity requirement, "the class must be so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs' class is comprised of thousands of class members. Plaintiffs allege that there are 5,585 direct purchasers, with more than half of the class having fewer than 50 transactions during the relevant class period. *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D.Ill. 2010) ("a class of more than 40 members is generally believed to be sufficiently numerous"); *Riordan v. Smith Barney*, 124 F.R.D. 60, 62 (N.D.Ill. 1989) (citing cases certifying classes with 10-23 members); *Swanson v. American Consumer Industries*, 415 F.2d 1326, 1333 (7th Cir. 1969) (finding forty class members sufficient

to certify a class). The Court is satisfied that numerosity, which is uncontested, is satisfied and joinder is impracticable.

    2.      Commonality

Commonality is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common nucleus of operative facts exists between the named plaintiffs and the class, such that commonality is met, when a defendant has "engaged in standardized conduct toward members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D.Ill. 2009) *aff'd* 606 F.3d 391 (7th Cir. 2010). While factual variations among the class grievances do not defeat a class action, *Patterson v. General Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980), Plaintiffs must identify an issue of fact or law whose resolution "is central to the validity of each" class member's claim. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). The common issue or fact "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011).

Plaintiffs' theory is that Defendants, steel producers, engaged in a conspiracy to manipulate the supply and/or price of steel products sold in the United States. Plaintiffs will offer evidence common to the class to establish the identity of the participants, the duration of the conspiracy, and the acts carried out in furtherance of the conspiracy. The central issues before the court will be whether the alleged conspiracy violated Section 1 of the Sherman Act; whether the conduct of Defendants impacted the supply and/or prices of steel products sold in the United States, and whether any related price changes caused injury to Plaintiffs and other class

members. The Court will also be required to measure the extent of class-wide damages, if any, and assess whether Defendants have any defenses to potential liability. Resolution of these issues is essential to every class members' claims. Commonality is satisfied.

Defendants' argument that the putative class is comprised of thousands of steel purchasers, varying in size and product type purchased, and that impact and damages are not common questions to the entire class, but require individualized proof by each class member, are issues for a predominance inquiry. Commonality is satisfied.

3.     Typicality

Under Rule 23(a), typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a). The typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n City of Chicago*, 7F.3d 584, 597 (7th Cir. 1993). In the antitrust context, a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members," *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983), and "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) ; *see also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 640 (D. Kan. 2008) aff'd, 768 F.3d 1245 (10th Cir. 2014)("[t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff"). While class claims must be "fairly encompassed" by the claims of the named plaintiffs, the typicality requirement does not require that all class members suffer the same injury as the named representative.  *General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission,* 446 U.S. 318, 330 (1980); *Id* (at Fuente).

6

"The issue of typicality is closely related to commonality and should be liberally construed."
*Saltzman*, 257 F.R.D. at 480 (citing Keele, 149 F.3d at 595).

Here, the named plaintiffs, Standard Iron Works, Wilmington Steel Processing, Co.[3]

Alco Industries, Inc., Capow, Inc. d/b/a Eastern States Steel, and Gulf Stream Builders Supply,

Inc., like all other members of the proposed class, bought steel products directly from

Defendants during the alleged conspiracy period and subsequently brought claims under the

Sherman Act alleging that Defendants conspired to restrict steel production and raise the price of

those steel products during the relevant period. While Defendants contend that the named

representatives' claims depend on individualized facts and distinct evidence that would be

properly presented at individual trials, the claims of each named representative and class

members are based on the same legal theory and arise from the same course of conduct (i.e.

conspiring to restrict steel supply); therefore, typicality is satisfied under Rule 23(a).

4.      Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement is satisfied where

the named representative (1) has retained competent counsel, (2) has a sufficient interest in the

outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to

those of the class. *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009) *aff'd,* 606 F.3d

391 (7th Cir. 2010). The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of

interest between named parties and the class they seek to represent. *Id.* (citing *Amchem Products,*

---

[3] Parties dispute whether Wilmington Steel Processing, Co. retained possession of its antitrust claims after it sold
"substantially all of its assets" to first, Concord Steel in September 2006 and then, new business assets to VR Laser
Services USA, Inc. in May 2008. Because Wilmington Steel did not expressly transfer its antitrust claims, it retains
its antitrust claims. *See Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 812 (D.N.J. 2011); *Gulfstream III
Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993) ("any assignment of antitrust
claims, as a matter of federal common law, must be an express assignment").

*Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (U.S.1997)). The burden is

on the party opposing class certification to demonstrate that representation will be inadequate.

*Robin v. Doctors Officecenters Corp.*, 686 F.Supp. 199, 203 (N.D.Ill. 1988)(citing *Lewis v.*

*Curtis*, 671 F.2d 779, 788 (3d. Cir.), cert denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144

(1982).

      Defendants argue that Plaintiffs' allegations that steel service centers, such as "Metals

Service Center Institute," were among the forums in which Defendants made relevant

conspiratorial statements representing a conflict with a significant component of the putative

class. Defendants contend that Plaintiffs cannot represent the class members that they accused of

conspiring with Defendants. Plaintiffs do not, however, allege that either the MSCI trade

association or any class member that controls a steel service center is an alleged co-conspirator

in this case. To the extent Defendants argue that certain service centers may have benefitted from

production cuts, they are nevertheless entitled to recover 100% of the overcharge imposed by the

conspiracy, just as all other direct purchasers in the proposed class. *Illinois Brick Co. v. Illinois*,

431 U.S. 720, 746, 97 S. Ct. 2061, 2075, 52 L. Ed. 2d 707 (1977).

      There is no conflict between the named Plaintiffs' and class members' interests; rather,

they are aligned in establishing Defendants' liability under the antitrust laws and maximizing

class-wide damages. Additionally, the named Plaintiffs and putative class are represented by

experienced counsel who have litigated this matter vigorously and competently. Thus adequacy

is satisfied under Rule 23(a)(4).

B.      Rule 23(b) Requirements

      To satisfy Rule 23(b) and obtain class certification on grounds that "questions of law or

fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy," Plaintiffs must show that common proof will predominate with respect to each of the elements of their claims. Fed. R. Civ. P. 23(b)(3). The following four factors that are pertinent to finding predominance and superiority: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3); *Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126, at *1 (N.D. Ill. Apr. 3, 2002).

      1.    Predominance

      The predominance criterion, requiring that common questions of law in this case predominate over any question affecting only individual members, is similar to Rule 23(a)'s commonality requirements, but even more demanding. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013) . When "common questions represent a significant aspect of [a] case and…[they] can be resolved for all members of [a] class in a single adjudication," there is clear justification for handling the dispute on a representative rather than on an individual basis. *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 815 (7th Cir.2012)(quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed.2011)); *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 641 (D. Colo. 1986). Determining what issues predominate requires a qualitative assessment, rather than a simply quantitative determination made "by counting noses," that is to say, identifying whether there are more common issues or more individual issues, regardless of relative importance. *Parko*, 1086. So, every issue in the

case need not be common; the question, rather, is whether substantial common issues predominate. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996) (predominance is satisfied unless "it is clear that individual issues will overwhelm the common questions").

Analysis of predominance under Rule 23(b) "begins, of course, with the elements of the underlying cause of action." *Messner*, 669 F.3d at 815 (citing *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S.804, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011)). The essential elements of Plaintiffs' cause of action arising under § 1 of the Sherman Act, 15 U.S.C. § 1 are "(1) a violation of antitrust law…; (2) individual injury, or impact, caused by that violation; and (3) measurable damages." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D.Ill. 2009) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d. Cir. 2008)).

Plaintiffs must affirmatively show how common evidence and a single, reliable methodology will prove an element on a simultaneous, class-wide basis. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085-86 (7th Cir. 2014); *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013). It is now indisputably the role of the district court to scrutinize the evidence before granting certification, even when doing so "requires inquiry into the merits of the claim." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013) 133 S.Ct. at 1433. After the Court examines "the substantive elements of plaintiffs' cause of action and inquire[s] into the proof necessary for the various elements," it "inquire[s] into the form that trial on these issues would take." *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981). In many cases alleging a violation of antitrust laws, predominance is a test "readily met." *Amchem*, 521 U.S. at 625.

### (a)  15 U.S.C. § 1: a violation of antitrust law

Here, it is undisputed that whether Defendants engaged in conspiracy in violation of antitrust law is a question common and central to the entire class's claims. Any trial in this matter will focus overwhelmingly on common proof of conspiracy—witness testimony, documents, email and phone records, economic evidence, and other evidence relating to Defendants' conduct. In particular, Plaintiffs plan to prove causation by introducing the statements of Defendants' senior executives regarding its plan to "exercise discipline" and cut supply over the relevant period, which, as Defendants' executives subsequently stated at private trade association meetings, caused higher prices and profits for the industry as a whole.

Plaintiffs also intend to offer the expert testimony of economist Dr. John Solow as common proof of conspiracy. Dr. Solow, using structure-conduct-performance ("SCP") analysis, identified a number of structural features that are recognized as facilitating effective collusion, including industry concentration, barriers to entry, lack of close substitutes, product standardization, and trade associations. These factors suggest, in Dr. Solow's opinion, that even though not all finished steel is the same, Defendants compete principally on the basis of price in the sale of the various finished steel goods which is an economic factor that motivates and facilitates collusion. Defendants argue that Dr. Solow's SCP analysis and opinions on the structure of the steel industry merely shows that the market is not inconsistent with coordination amongst firms. This objection goes to the weight that should be accorded to Dr. Solow's opinion and is not a basis for striking his opinion as unreliable. Dr. Solow's testimony is admissible and is common evidence that is relevant to establishing the element of conspiracy.

Plaintiffs offer evidence that is common to all class members and would prove or disprove a violation of the antitrust law on a class-wide basis. The question of whether

Defendants engaged in a conspiracy is an issue that is central to this case and has the effect of satisfying the prerequisite of predominance in Rule 23(b)(3). Whether Defendants' conduct constitutes conspiracy in violation of antitrust law is a question appropriate for resolution on a class-wide basis.

### (b)     15 U.S.C. §1: impact of the violation of antitrust law

Still, other issues in antitrust actions besides conspiracy have also been found to predominate. The core of this dispute—as in many antitrust disputes—is the second element, the antitrust impact, of the alleged conspiracy; in other words, did the alleged conspiracy *cause* higher prices in the marketplace? The antitrust injury requirement allows a plaintiff to recover only if the plaintiff has suffered a loss that stems from a competition-reducing aspect of the defendant's behavior. *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634 (D. Kan. 2008) *aff'd*, 768 F.3d 1245 (10th Cir. 2014).

At the class certification stage, Plaintiffs' burden is not to prove the element of antitrust impact itself, but only to "demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1430 (2013) (emphasis added). While impact or damages must be determined by a common methodology or evidence for all members of the class, Rule 23(b)(2) does not require uniformity in impact or identical damages. *Messner*, 669 F.3d at 815 (finding that "common proof of damages for class members…is not required."); *Butler*, 727 F.3d at 819 (stating that "requir[ing] that every member of the class have identical damages" would "drive a stake through the heart of the class action device.").

To prove antitrust impact and the accompanying damages, Plaintiffs intend to offer the expert testimony of Drs. Solow, Jeryl Wright, and James McClave to show that the structure of

the steel industry was ripe for a successful supply cartel and that raw steel production cuts caused class-wide impact in the form of increased prices. To further demonstrate class-wide impact, Plaintiffs intend to offer pricing data that shows that prices of all major categories of steel products followed similar trends during the relevant period and resulted in widespread impact, as well as econometric analysis that serves as proof that class members paid higher prices for steel products than they would have paid in a competitive market. This evidence, Plaintiffs contend, will prove that its class members suffered damages on a common basis as a result of Defendants' conduct.

Defendants oppose class certification based on its position that Plaintiffs cannot prove antitrust impact (i.e. whether the conspiracy caused an increase in prices) and damages using common proof at trial. Specifically, Defendants argue that both Dr. Solow's and Dr. McClave's methodologies have significant flaws that render them incapable of determining the impact of the conspiracy on a class-wide basis and damages. Defendants further argue that, in any case, these questions, which are critical to this case, require individual proof by each class member. This Court has previously considered the expert testimonies of Drs. Solow, Wright, and McClave and determined that they are all admissible as reliable and relevant under *Daubert.* Nonetheless, expert testimony should never be "uncritically accepted as establishing a Rule 23 requirement," *Messner*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d. Cir. 2008), and the Court considers each of Defendants' objections to Plaintiffs' experts in turn.

  *(i) Common evidence of impact*

    *(a) Supply-side Substitutability*

Parties differ in even their basic understanding of how the steel industry operates. First, Dr. Solow defined the relevant antitrust market from the supply side and explained that a

coordinated restriction in the supply of raw steel products would cause class-wide price effects "under the basic laws of supply and demand." Based on supply-side economic theory, Dr. McClave and Dr. Solow opined that "even if two products are completely different from the consumer's standpoint, if they are made by the same producers an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supracompetitive price." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995).

It is well-established that the steel industry does not sell a single commodity substance called "raw steel." Rather, it sells "a large variety of product types" with different chemical properties, including "sheets, bars, and other shapes, of varying thickness, rigidity, heat resistance, strength, ductility, weight and so forth." Richard A. Posner, *Antitrust Law* 65 (2d ed. 2001). Still, Plaintiffs argue that the steel for virtually all of the finished products in the proposed class, which includes a variety of different steel products, comes from common furnaces and can be made by multiple, overlapping producers.

Dr. Solow explained in his reports and testimony the rule that, when the price of steel products made in common or substitutable furnace facilities are connected, a cartel reducing raw steel production would impact the price of all products made in curtailed furnaces *and* the price of their supply-side substitutes. For example, Dr. Solow explained: "if B producers can costlessly switch production to product A in a short time and can readily distribute the resulting output, they will constrain the prices of A firms in virtually the same way as another A firm."

This holds true even when steel products are "not close substitutes for each other on the demand side[;] two products produced interchangeably from the same production facilities are

14

presumptively in the same market." *See generally* Areeda, Hovenkamp, & Solow, Antitrust Law, ¶¶ 560-61 (3rd ed. 2007). As further evidence that there is at least some substitutability between steel products, Plaintiffs point to the explanation of Dr. Hausman, Defendants' rebuttal expert: "[A] certain grade of steel has to meet ASTM standards, and it is all going to be the same, and that is a perfect substitute. It is nondifferentiated. Products like that compete only on price." Dr. Solow concludes that because the prices of all steel products within the class definition are linked in the same economic market on the supply side, common economic proof can be used to show that prices for finished steel rose significantly and across the board after the production cuts—across all major products and Defendants.

Defendants, however, dispute the very premise that supply-side substitutability can be applied to steel products based on the realities of the steel industry and argue that Dr. Solow should have defined the market for the steel industry from the demand side. First, Defendants contend that steel prices vary widely because finished steel is largely custom made, with differences in steel chemistry, product specifications, and end-uses. No defendant or mill makes all products, and most mills focus on a relatively small number of products; moreover, preparing a steel mill's furnace to switch production of products is time-consuming and expensive. Defendants contend that this demonstrates that, even if there had been a capacity constraint, furnaces and steel mills would not have been able to switch production to high profit margin steel products, even if it was profitable.

Markets may be appropriately defined from either the supply side (Plaintiffs' and Dr. Solow's approach) or the demand side (Defendants' and Professor Hausman's approach), as long as it can be used to determine the power of the relevant market. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Dr. Solow testified that there is direct, undisputed

evidence that at least some substitution is possible and occurred. Dr. Jeryl Wright also opined that industry furnace production is flexible and substitutable. He testified that "reducing primary production capability" (i.e. cutting furnace production) "impacts every product that comes through that mill." While there are undoubtedly barriers to switching production, for our current purposes, I find that there are also a wide range of products that may have been produced from common furnaces that make supply substitutability an appropriate way to define the antitrust market and measure impact.

### (b) "But for" Production Levels

Plaintiffs' theory is that Defendants' executives conspired to cut overall steel production in the United States twice within a 33-month period, which caused an increase in the price of steel products. Even if some steel products are substitutable, Defendants argue that Plaintiffs have failed to measure "but for" production levels, i.e. what production levels would have been "but for" the alleged cartel to restrict supply. While Dr. Solow did not conduct statistical analysis on production levels, he reviewed industry production data and direct evidence that production was curtailed, interpreted a "Production Cut" chart created by Plaintiffs' attorneys, testified about what actual production levels were, and opined on the "but for" production levels.

Defendants argue that the "Production Cut" chart referenced by Dr. Solow had major flaws, such as omitting major product categories, like structural beam and failing to account for whole sections of the products encompassed by the proposed class and members. Defendants also argue that any alleged production cuts would not have equally applied to all products within Plaintiffs' proposed definition and, consequently, would not have impacted the price of all products equally. In response, Dr. Solow opined that the proper comparison is not whether the sale of each and every steel product decreased over time during the cartel period, but whether

overall steel production was lower than it otherwise would have been had the coordinated reductions in furnace output not taken place. Unconvinced, Defendants concluded that Plaintiffs had not offered a class-wide method of proving at trial that the production of each proposed class product decreased below competitive levels during the class period and failed to identify "but for" production levels to link their liability theory to their damage estimate.

In *Comcast*, the Court declined to reject the Third Circuit majority's conclusion that "[a]t the class certification stage we do not require that [p]laintiffs tie each theory of antitrust impact to an exact calculation of damages, but instead that they assure us that if they can prove antitrust impact, the resulting damages are capable of measurement and will not require labyrinthine individual calculations," *Behrend v. Comcast Corp.*, 655 F.3d 182, 203-04 (3d Cir. 2011) *rev'd,* 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013). Rather, the Court held that the plaintiffs, who had failed to establish a method for proving common impact, could not rest on such assurances. The Court further recognized the "inherent difficulty of identifying a 'but-for world,'" and stated that it did "not require that damages be measured with certainty, but rather that they be demonstrated as "a matter of just and reasonable inference." *Behrend,* 655 F.3d at 203 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

Though Plaintiffs' "but for" production data cannot be considered precise, I find it reasonable that, if Plaintiffs are able to show antitrust impact (an increase in prices) on a class basis, the resulting damages—which requires production data—are capable of measurement on a class basis.

### (c) Dr. McClave's Model to Prove Common Impact

If allowed to proceed to trial, Plaintiffs must establish that the injury it suffered (in the form of increased prices) from the violation of the antitrust laws is measurable. *See Hydrogen*

*Peroxide,* 552 F.3d at 311; *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001) ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury).") To proceed as a class, Plaintiffs must offer a common methodology for proving that prices increased on a class-wide, rather than individual, basis.

Plaintiffs offer Dr. McClave's model to measure the impact of the alleged conspiracy on the price of steel products (the dependent variable) by controlling for relevant demand and cost factors (the explanatory variables). Dr. McClave included in his model one explanatory demand variable, a weighted average index of demand for construction and automobile manufacturing, and one explanatory cost variable, the cost of scrap—which he determined to be the single most important price driver in the industry. McClave's model used a pre-conspiracy benchmark period (February 2002 to March 2005), the proposed class period, during which the conspiracy occurred, (April 2005 to December 2007), and a post-conspiracy benchmark period (January 2008 to December 2009).

Dr. McClave divided steel products into 25 product categories to reduce transaction data from 30 million to approximately 6,700 transactions and then ran separate regression tests for two broad categories of steel products, flat products and long products. Using multiple regression analysis, Dr. McClave calculated a single, average estimated overcharge (i.e. estimated antitrust impact) that is aggregated across all class members within each of the flat (5.6%) and long (7%) categories and does not calculate individual damages (i.e. overcharges for any particular customer). To verify its data in response to Dr. Hausman's critique, Dr. McClave used a customer-specific model which added customer identifiers and assessed impact on an individual basis.

18

Rule 23 requires the court to take a hard look at the soundness of statistical models that purport to show predominance. *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013). Defendants believe the Dr. McClave's model suffers from fatal flaws that render his results unreliable and unable to prove impact. For instance, Defendants explain, the true bottleneck for many producers of steel was not the furnace but the mills, so even a restriction on the supply at the furnace would not have impacted the production of steel at many existing mills, or the price. Rather, Defendants argue that the dummy variable in Dr. McClave's model picked up factors that affect production and price and improperly attributed the impact of those factors to the alleged conspiracy. Defendants point to an increased demand on steel from China as a cause of increased prices, as well as an increase in the cost of zinc.

Additionally, Defendants claim that, as in *Rail Freight*, Plaintiffs included fixed-price long term contracts which were negotiated at prices higher than Dr. McClave's estimated competitive price. 725 F.3d at 253. Dr. Hausman argued that, "[t]he core thing that's wrong with the model is, he doesn't take into account that this very high proportion of steel is sold by contract…and you need to take that into account in your model." Defendants, relying on *Comcast Corp. v. Behrend*, argue that because Plaintiffs' model cannot calculate the impact of solely the alleged conspiracy without these external factors, it cannot be used to prove common impact. 133 S.Ct. 1426, 1430 (2013).

A model that "identifies damages that are not the result of the wrong" is an impermissible basis for calculating class-wide damages. *Comcast*, 133 S.Ct. at 1434; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013). In *Comcast*, Dr. McClave designed a regression model comparing actual prices with hypothetical prices that would have prevailed but for the

petitioner's allegedly anticompetitive conduct. Petitioners offered four theories of antitrust impact, three of which were ultimately rejected by the district court. Dr. McClave's regression model was designed to calculate impact and damages resulting from "the alleged anticompetitive conduct as a whole," not just the theory of liability accepted by the court. The Court determined—even without objection by Comcast to Dr. Clave's model, testimony, or expert report—that Dr. McClave's model failed to attribute damages to any one particular theory of anticompetitive impact. This, the Court concluded, resulted in a model that would identify damages that were not the result of the wrong. With no common methodology for evaluating class-wide impact, the Court found that questions of individual damage calculations would inevitably overwhelm questions common to the class and rejected class certification.

Here, unlike *Comcast*, Dr. McClave's model is offered to measure the impact of the conspiracy. Plaintiffs do not have multiple theories of liability, but one distinct theory that the price of steel products increased directly as a result of Defendants' conspiracy to restrict supply. While calculations need not be exact, *Story Parchment Co.*, 282 U.S. 555, 563 (1931), a model that does not even attempt to identify and isolate "damages" that are not the certain result of the wrong cannot be used to establish that damages are susceptible of measurement across an entire class for purposes of Rule 23(b)(3). *Comcast*, 133 S. Ct. at 1433; *Butler*, 727 F.3d at 799. Dr. McClave's model has narrowly identified the wrong (i.e. the conspiracy to restrict production) and "translat[ed] [] the legal theory of the harmful event into an analysis of the economic impact *of that event*." Federal Judicial Center, Reference Manual of Scientific Evidence, 432 (3d ed. 2011) (emphasis added).

While it is likely true that some of the external factors raised by Defendants also had an impact on the cost and price of steel, "the Supreme Court and this Circuit have confirmed on a

number of occasions that the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility. *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) (citing *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (reversing lower court's exclusion of regression analysis based on its view that the analysis did not include proper selection of variables)).

In any case, the model itself, Dr. McClave contends, has considered these factors and is statistically sound with R-squared values, the most common measure of a model's ability to explain industry data, of 92-95%. This, he contends, indicates that his model is able to accurately explain the impact of the conspiracy on steel production and price. FJC Reference Guide, at 355.

Dr. Hausman disputes that McClave's model is reliable and properly used here because it failed three tests that assess statistical reliability: the Chow test, the F-test, and the Hausman test. First, Dr. Hausman contends that McClave's model failing the Chow test indicates that there were "structural changes" between periods. A structural change occurs when an increase in cost leads to an increase in price, but the relationship doesn't remain consistent over that period of time; rather than accurately assessing the relationship between cost and price, Dr. McClave's model averages and estimates the relationship. Defendants explain that the structural break was likely caused by Dr. McClave's improper inclusion of the Great Recession in the post-conspiracy benchmark. Defendants argue that the structural break showed false positives, which they claim is proof that Dr. McClave's results aren't reliable.

There are different accepted methods to account for the reliability of serial correlations and models, Fed. R. Evid. 702, Advisory Committee Note ("expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the

field and both reach reliable results"), and this Court is satisfied that Dr. McClave's multiple regression methodology is reliable and admissible.

While multiple regression analysis, by definition, makes use of averages to identify the underlying trends in a particular industry or data series, Federal Judicial Center, Reference Guide on Multiple Regression (3d ed. 2012) at 334 ("Multiple regression…is a method in which a regression line is used to relate the average of one variable—the dependent variable—to the values of other explanatory variables.") and is generally considered an appropriate tool for estimating antitrust damages on a class-wide basis, *see, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532-34 (6th Cir. 2008); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002) . *See In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 411 (S.D. Ohio 2007) (characterizing multiple regression models as "reasonable damage methodologies"), this Court must consider whether multiple regression is properly used here to prove impact of the conspiracy across the broad range of products and producers represented in the class. *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 485-87 (W.D. Pa. 1999) ("[t]here is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation"); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 452 (D. Kan. 2006) ("damages are also likely susceptible to class-wide proof" using multiple regression analysis); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d Cir. 2002) (same).

The realities of the steel industry reveal that it is unlikely that class members were either impacted at the same levels or suffered the same damages. Still, class certification will not be precluded simply because a class includes persons who have not been injured by the defendant's conduct. *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *Messner*, 669

F.3d at 823 (quoting *Schleicher v. Wendt*, 618 F.3d 679, 687 (7th Cir. 2010). This is because

such an issue goes to the likelihood a class member will win on the merits; "[t]he chance, even

the certainty, that a class will lose on the merits does not prevent its certification." *Id*. Even if I

can determine that there was some impact, the inevitable conclusion remains: Dr. Solow's and

Dr. McClave's methodology cannot be used, on a common basis, to measure accurately what

impact, if any, each member of the class experienced as a result of the alleged conspiracy. Even

if Plaintiffs determined that the overall price of steel increased, individual inquiries into the

damages each class member incurred would be required and predominate over issues common to

the class.

> ### (d)    *Efficiency of a class action*

In determining whether predominance is satisfied, courts also consider the efficiency of a

class action as an alternative to individual suits. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796,

800 (7th Cir. 2013) (finding that because the basic claim hinged on a question common to the

entire class, and the only individual issues concerned the amount of harm to particular class

members, it was more efficient for the principal issue to be resolved in a single proceeding than

for it to be litigated separately in hundreds of different trials). In particular, when adjudication of

questions of liability common to the class will achieve economies of time and expense, the

predominance standard is generally satisfied even if damages are not provable in the aggregate.

See Advisory Committee's 1966 Notes on Fed. R. Civ. Proc. 23, 28 U.S.C.App., p. 141 ("[A]

fraud perpetrated on numerous persons by the use of similar misrepresentations may be an

appealing situation for a class action, and it may remain so despite the need, if liability is found,

for separate determination of the damages suffered by individuals within the class."); 7AA

Wright, Miller, & Kane, § 1781, at 235-237.

Should the Court certify a class, the core issues for the Court to resolve would be Defendants' conduct and three elements of the claim (conspiracy, causation, and aggregate damages). This Court has already determined that conspiracy may be proven by common evidence. Whereas in the instance case, there may be differences among the members as to the amount of damages incurred, it does not mean that a class action would be inappropriate. Rather, the question of damages can be severed from that of liability and tried on an individual basis. *In re Allstate Ins. *665 Co.,* 400 F.3d 505, 508 (7th Cir.2005); *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004)) ("[I]f common questions do not predominate over the individual questions so that class certification of the entire action is warranted," a court may use Rule 23(c)(4) to "isolate the common issues ... and proceed with class treatment of these particular issues.").

Allowing split proceedings furthers the Rule 23 purpose of promoting judicial economy since the main issue will be tried only once, rather than for each class member, and damage claims only need be determined in the event liability is found. § 1781 Class Actions in Which Common Questions Predominate Over Individual Questions—Antitrust Actions, 7AA Fed. Prac. & Proc. Civ. § 1781 (3d ed.).

2. Superiority

The last prerequisite for class certification is that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 642 (D. Colo. 1986). Manageability is one of the key factors courts consider when determining superiority of a proposed class action. *Windham v. Am. Brands, Inc.*, 565 F.2d 29, 65 (4th CIr. 1977), *cert. denied*, 435 U.S. 968 (1978) (it is a "firmly established principle that the issue of manageability of a proposed class action is

24

always a matter of 'justifiable and serious' concern for the trial court")(citation omitted). Courts should take a "practical, on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies expected to ensure." *Hamilton v. O'Connor Chevrolet, Inc.*, No. 02 C 1897, 2006 WL 1697171, at *13 (N.D.Ill. June 12, 2006). The more claimants there are, the more likely a class action is to yield substantial economies in litigation, for purposes of determining whether a class action was superior to other methods for fairly and efficiently adjudicating a controversy. Fed. Rules Civ. P. 23(b)(3); *Butler*.

I find that certifying the class on the issue of conspiracy and leaving resolution on the question of impact and damages on an individual basis to be the most efficient and appropriate course of action in this matter.

## IV.    Conclusion

For the following reasons, I grant, in part, and deny, in part, Plaintiffs' Motion for Class Certification. Plaintiffs are certified as a class for the purpose of determining whether Defendants engaged in a conspiracy in violation of 15 U.S.C. § 1. I decline to certify a class on the issues of impact and damages.

ENTER:

James B. Zagel
United States District Judge

DATE: September 9, 2015

25